UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------X
BARBARA E. MURPHY,  :   3:03 CV 00519 (MRK)
    Plaintiff, :
     :
    v. :
     :
THE CITY OF STAMFORD and :
DAVID VECCHIA, :
    Defendants. :   April 6, 2004
------------------------------------------------X

## LOCAL RULE 56(a)1 STATEMENT

Pursuant to Local Rule 56(a)1, plaintiff Barbara Murphy (hereinafter, "Murphy") submits the following statement setting forth material facts as to which there is no genuine issue to be tried:

1. In 1993, Vecchia was hired as the Purchasing Agent for the City of Stamford. (Admission 1)

2. Vecchia's position as Purchasing Agent for the City of Stamford was a supervisory position. (Admission 2)

3. In 1996, Murphy was transferred to administrative assistant/data systems for the City of Stamford Fire Department. (Admission 3)

4. In or around 1997, Murphy began working with Vecchia on several City of Stamford committees. (Admission 4)

5. In 1997, Vecchia and Murphy worked for the City of Stamford in different buildings. (Admission 5)

6. At the end of 1997 and beginning of 1998, Vecchia began making unwanted sexual advances to Murphy. (Admission 6)

7.    a. Vecchia asked Murphy to lunch. (Admission 7a)

      b. Vecchia sent candy to Murphy's office. (Admission 7b)

      c. Vecchia sent cards to Murphy through interoffice mail. (Admission 7c)

      d. Vecchia went to Murphy's office uninvited. (Admission 7d)

8. In late 1997 and 1998, Murphy repeatedly told Vecchia to stop making "advances" toward her as she was not interested. (Admission 8)

9. After Murphy told Vecchia to stop making "advances" toward her, he began to "stalk" her. (Admission 9)

10.    a. In 1997 and 1998 Vecchia appeared at bars and restaurants that Murphy frequented. (Admission 10a)

      b. Vecchia was generally alone when he was seen at bars and restaurants that Murphy frequented. (Admission 10b)

      c. Vecchia would stare at Murphy while standing near by. (Admission 10c)

11. One time, Vecchia repeatedly shouted Murphy's name in a crowded club. (Admission 11)

12. In 1997 and 1998 Vecchia attempted to pay for Murphy's drinks and meals. (Admission 12)

13. Murphy repeatedly declined Vecchia's gifts, even telling the bartender to refuse on her behalf any drinks from Vecchia. (Admission 13)

14. Murphy repeatedly declined Vecchia's gifts because she was not interested. (Admission 14)

15. Murphy repeatedly declined Vecchia's gifts because Vecchia was annoying Murphy. (Admission 15)

16. After seeing Murphy at a nightclub or restaurant, Vecchia would make phone calls to Murphy's home. (Admission 16)

17. After seeing Murphy at a nightclub or restaurant, Vecchia would make repeated phone calls to Murphy's home. (Admission 17)

18. The phone calls consisted of someone breathing heavily, silence or music in the background. (Admission 18)

19. Vecchia began to eavesdrop on conversations that Murphy would have with co-workers while at the Government Center. (Admission 19)

20. Vecchia would send Murphy articles and other materials through interoffice mail related to topics that he had overheard her discussing. (Admission 20)

21. Vecchia located a copy of Murphy's high school yearbook picture. (Admission 21)

22. Vecchia carried the high school photo of Murphy in his briefcase. (Admission 22)

23.  The document attached hereto as <u>Exhibit 1</u> is a copy of the yearbook page discovered by Vecchia's ex-wife. (Admission 23)

24.  <u>Exhibit 1</u> is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence. (Admission 24)

25.  The information contained <u>in Exhibit 1</u> is true. (Admission 25)

26.  The document attached hereto as <u>Exhibit 1</u> is authentic. (Admission 26)

27.  In 1997 and 1998 Vecchia began following Murphy from establishments she frequented to her vehicle when she left. (Admission 27)

28.  In 1997 and 1998 Vecchia began appearing on Murphy's running path at the same time that she regularly ran. (Admission 28)

29.  This running path was over fifteen miles from Vecchia's home. (Admission 29)

30.  This running path was several miles from Vecchia's place of employment. (Admission 30)

31.  At a United Way sponsored race, Vecchia attempted to run the entire race directly in front of Murphy. (Admission 31)

32.  On Valentine's Day, Vecchia tied balloons to Murphy's vehicle which was parked outside of her home. (Admission 32)

33.  On Murphy's birthday, Vecchia tied balloons to Murphy's vehicle as it was parked outside of her home. (Admission 33)

34.  Vecchia obtained a copy of an internet article titled "Stopping the Stalker" during this time frame. (Admission 34)

35. a. Throughout 1998, Vecchia stared at Murphy. (Admission 35a)

b. Throughout 1998, Vecchia followed Murphy to various locations. (Admission 35b)

c. Throughout 1998, Vecchia appeared at Murphy's running path. (Admission 35c)

d. Throughout 1998, Vecchia sent Murphy gifts through interoffice mail. (Admission 35d)

e. Throughout 1998, sent Murphy drinks and food which she had repeatedly rejected. (Admission 35e)

36. a. One evening as Murphy left a restaurant, Vecchia followed her to her car. (Admission 36a)

b. As Murphy started the car, Vecchia stood in front of her car, blocking her from leaving. (Admission 36b)

c. As Murphy drove forward, Vecchia stayed in the way and Murphy was unable to leave. (Admission 36c)

d. As a result of Vecchia's actions, Murphy had to put her car in reverse and drive the wrong way on a one-way street to get away. (Admission 36d)

37. a. On another occasion, Murphy left the same restaurant with a friend. Vecchia followed Murphy and a friend out to their car and watched them drive off. (Admission 37a)

    b.    Later that evening Murphy had her side-view mirror of her car smashed while the car sat in her driveway. (Admission 37b)

38.    a.    On March 20, 1998, Murphy was at Brennan's restaurant in Stamford, Connecticut. (Admission 38a)

    b.    Vecchia arrived at Brennan's and began staring at Murphy. (Admission 38b)

    c.    Murphy left with someone walking her to her car for fear of her safety. (Admission 38c)

    d.    Vecchia entered Murphy's car. (Admission 38d)

    e.    Vecchia broke into Murphy's car. (Admission 38e)

    f    Vecchia took things from Murphy's car. (Admission 38f)

    g.    Vecchia took things from the trunk of Murphy's car. (Admission 38g)

    h.    Vecchia took things from the glove compartment of Murphy's car. (Admission 38h)

39.    On March 21, 1998, Murphy called Vecchia's home and left a message on his answering machine requesting the return of her things to the Fire Station by 4:00 p.m. (Admission 39)

40.    a.    Later that night, at approximately 10:30 p.m., Murphy received a telephone call from Vecchia. (Admission 40a)

    b.    Vecchia told Murphy that he had done what she asked and brought her briefcase to the Fire Station. (Admission 40b)

  c. Vecchia stated that he was sorry. (Admission 40c)

  d. Vecchia stated that he did not know why he had broken into Murphy's car and that he was sorry for causing so much trouble in her life. (Admission 40d)

  e. Murphy shouted in response; "just leave me alone" and hung up the phone. (Admission 40e)

41. a. When Murphy went to retrieve her things at the Fire Station, she found that most of the contents of her briefcase, including her appointment book, an extensive database she was creating for a local attorney and her cell phone charger were missing. (Admission 41a)

  b. Items that had been in the trunk of her car were now in her briefcase. (Admission 41b)

42. Vecchia received a call from Attorney Fraser who demanded that Vecchia return the remainder of Murphy's belongings. (Admission 42)

43. Vecchia agreed to meet Attorney Fraser at Attorney Fraser's office and return some items. (Admission 43)

44. a. Vecchia arrived at Attorney Fraser's office and returned some broken computer discs that had contained the above-referenced "data base", and gave Attorney Fraser one hundred dollars. (Admission 44a)

  b. Vecchia said that the items he had were all that he could find. (Admission 44b)

  c. Vecchia stated that he had thrown most of Murphy's things away. (Admission 44c)

  d. Vecchia produced a letter he had written apologizing for his conduct. (Admission 44d)

  e. The document attached hereto as <u>Exhibit 2</u> is a copy of the letter Vecchia wrote, apologizing for his conduct. (Admission 44e)

  f. The information contained <u>in Exhibit 2</u> is true. (Admission 44f)

  g. The document attached hereto as <u>Exhibit 2</u> is authentic. (Admission 44g)

  h. Vecchia's sister, an attorney located in Washington, DC, participated in the meeting between Vecchia and Attorney Fraser via telephone. (Admission 44h)

  i. Vecchia and his sister, in a conference with Attorney Fraser, begged Murphy not to report him to the City of Stamford. (Admission 44i)

  j. Vecchia promised to stop stalking and harassing Murphy. (Admission 44j)

  k. Vecchia promised to seek psychological treatment. (Admission 44k)

45. Vecchia did not stop stalking Murphy. (Admission 45)

46. Vecchia did not stop harassing Murphy. (Admission 46)

47. Vecchia continued to follow Murphy to bars and restaurants. (Admission 47)

48. Vecchia continued to make numerous hang-up phone calls. (Admission 48)

49. On September 25, 1998, Vecchia met with Fred Manfredonia and William Stover from the Human Resources Department of the City of Stamford. (Admission 49)

50. At that meeting, Vecchia admitted the following: (Admission 50)

    a. His prior conduct toward Murphy both at work and outside of work. (Admission 50a)

    b. His prior agreement to get psychological help. (Admission 50b)

    c. His prior agreement to cease and desist his unwanted behavior towards Murphy. (Admission 50c)

51. Vecchia agreed to cease contact with Murphy during work and on City of Stamford premises. (Admission 51)

52. Vecchia agreed to get counseling. (Admission 52)

53. The City of Stamford never drafted an agreement for Vecchia to sign. (Admission 53)

54. The City of Stamford never confirmed Vecchia was receiving counseling. (Admission 54)

55. The City of Stamford never followed up with Vecchia regarding Vecchia's progress in therapy. (Admission 55)

56. The City of Stamford never saw to it that Vecchia attended therapy sessions. (Admission 56)

57.   The City of Stamford never received any progress reports from Vecchia. (Admission 57)

58.   The City of Stamford never monitored Vecchia's conduct regarding Murphy in any manner. (Admission 58)

59.   Vecchia never obtained psychological treatment for his behavior. (Admission 59)

60.   Throughout the year of 1999, Vecchia continued to harass his ex-wife. (Admission 60)

61.   Vecchia's ex-wife filed a complaint alleging Vecchia's unacceptable and distorted behavior with the State of Connecticut Public Safety, Division of State Police. (Admission 61)

62.   The document attached hereto as <u>Exhibit 3</u> is a copy of the complaint filed by Vecchia's ex-wife with the State of Connecticut Public Safety, Division of State Police, alleging Vecchia's unacceptable and distorted behavior. (Admission 62)

    a.   <u>Exhibit 3</u> is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence. (Admission 62a)

    b.   The information contained <u>in Exhibit 3</u> is true. (Admission 62b)

    c.   The document attached hereto as <u>Exhibit 3</u> is authentic. (Admission 62c)

63.   In September 2000, Vecchia's harassment of Murphy resumed. (Admission 63)

64. a.    In the last week of September of 2000, Murphy was in the Finance area of Stamford Government Center where she saw Vecchia. (Admission 64a)

   b.    As soon as Vecchia noticed Murphy, he began staring at her. (Admission 64b)

   c.    Murphy walked away from Vecchia, but he continued to stare at her. (Admission 64c)

65.    Vecchia placed numerous hang-up telephone calls to Murphy at work in September 2000. (Admission 65)

66. a.    On October 5, 2000, Vecchia showed up at a bar where Murphy was with a friend. (Admission 66a)

   b.    Vecchia entered the establishment, sat near Murphy and stared at her. (Admission 66b)

   c.    Murphy was so disturbed by Vecchia that she and her friend were forced to leave. (Admission 66c)

67. a.    That same night, Murphy's caller ID indicated she had received a phone call from a pay phone located on Route 7 in Wilton. (Admission 67a)

   b.    The pay phone is on Vecchia's way home from work in Stamford. (Admission 67b)

   c.    Vecchia called Murphy from pay phones. (Admission 67c)

68.    Vecchia placed a "frog" ornament in the front lawn of Murphy's home. (Admission 68)

69. In October 2000, Murphy reported Vecchia's harassment of her to the Stamford Police Department (hereinafter, the "Police"). (Admission 69)

70. In late October or early November of 2000, the Police met with Vecchia. (Admission 70)

71. Vecchia was arrested and charged with stalking. (Admission 71)

72. The document attached hereto as Exhibit 4 is a complete copy of the Arrest Warrant Application. (Admission 72)

    a. The information contained in Exhibit 4 is true. (Admission 72a)

    b. The document attached hereto as Exhibit 4 is authentic. (Admission 72b)

    c. Exhibit 4 is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence. (Admission 72c)

73. The arrest warrant was issued upon the following information:

    a. Murphy worked for the City of Stamford and through work became acquainted with Vecchia. (Admission 73a)

    b. Vecchia began harassing, following, and stalking her both at work and after work hours. (Admission 73b)

    c. Murphy reported Vecchia's harassing behavior to City of Stamford officials. (Admission 73c)

    d. The City of Stamford interviewed Vecchia, he admitted stalking Murphy and he agreed to stop harassing her and seek counseling. (Admission 73d)

e. Despite Vecchia's agreement, he continued to harass Murphy. (Admission 73e)

f. Murphy claimed that Vecchia was involved in criminal mischief, harassing telephone calls, hang-up telephone calls, along with other harassing conduct. (Admission 73f)

g. An officer of the Redding Police Department verified that Vecchia had several complaints filed against him by his ex-wife. The complaints consisted of criminal mischief, harassing telephone calls, unusual behavior, and stalking. (Admission 73g)

h. It was determined that the harassing telephone calls to Vecchia's ex-wife came from a phone located at Vecchia's mother's home, Vecchia's place of work, and areas around Vecchia's residence. (Admission 73h)

i. Vecchia's ex-wife had received approximately 75 letters from Vecchia. (Admission 73i)

74. After Vecchia's arrest, the City of Stamford placed him on paid administrative leave from work. (Admission 74)

75. The City of Stamford in 1998 had a "zero tolerance" policy regarding sexual harassment. (Admission 75)

76. The City of Stamford in 1999 had a "zero tolerance" policy regarding sexual harassment. (Admission 76)

77. The City of Stamford in 2000 had a "zero tolerance" policy regarding sexual harassment. (Admission 77)

78. Vecchia admitted calling Murphy to the City of Stamford. (Admission 78)

79. Vecchia admitted following Murphy to the City of Stamford. (Admission 79)

80. Vecchia admitted giving gifts to Murphy to the City of Stamford. (Admission 80)

81. Vecchia admitted staring at Murphy to the City of Stamford. (Admission 81)

82. Vecchia admitted calling Murphy to the City of Stamford. (Admission 82)

83. Vecchia admitted following Murphy to the City of Stamford's Human Resources Department. (Admission 83)

84. Vecchia admitted giving gifts to Murphy to the City of Stamford's Human Resources Department. (Admission 84)

85. Vecchia admitted staring at Murphy to the City of Stamford's Human Resources Department. (Admission 85)

86. Vecchia failed to comply with his agreement with Murphy. (Admission 86)

87. Vecchia failed to comply with his agreement with the City of Stamford. (Admission 87)

88. The City of Stamford did not to terminate Vecchia's employment until 2002. (Admission 88)

89. On January 23, 2002, Vecchia entered into an agreement to plead guilty to criminal trespass and disorderly conduct. (Admission 89)

90. The document attached as <u>Exhibit 5</u> hereto is an excerpt of the court transcript. (Admission 90)

        a.      Exhibit 5 is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence. (Admission 90a)

        b.      The information contained in Exhibit 5 is true. (Admission 90b)

        c.      The document attached hereto as Exhibit 5 is authentic. (Admission 90c)

91.    Vecchia was terminated by the City of Stamford over a year after he was arrested for stalking. (Admission 91)

92.    Vecchia spent a year on paid leave. (Admission 92)

93.    The City of Stamford failed to obtain a written agreement from Vecchia that he would cease harassing Murphy. (Admission 93)

94.    The City of Stamford failed to monitor Vecchia's behavior. (Admission 94)

95.    The City of Stamford failed to investigate Vecchia's conduct in November 2000. (Admission 95)

96.    The City of Stamford waited for the police to arrest Vecchia before taking any action. (Admission 96)

97.    The City of Stamford failed to complete its investigation of Vecchia's harassment of Murphy in a timely manner. (Admission 97)

98.    The City of Stamford neglected their responsibility and "deferred" their investigation until there was an outcome in Vecchia's criminal case. (Admission 98)

99.    Vecchia permitted a pattern, practice, and course of conduct that violated the City of Stamford's Sexual Harassment Polices and Procedures.

(Admission 99)

100.  Vecchia tolerated a pattern, practice, and course of conduct that violated the City of Stamford's Sexual Harassment Policies and Procedures. (Admission 100)

101.  Vecchia engaged in a pattern, practice, and course of conduct that violated the City of Stamford's Sexual Harassment Policies and Procedures. (Admission 101)

102.  Vecchia failed to refrain from violating the City of Stamford's Sexual Harassment Policies and Procedures. (Admission 102.)

103.  Vecchia failed to enforce the City of Stamford's Sexual Harassment Polices and Procedures. (Admission 103)

104.  The City of Stamford has a "Zero Tolerance" policy. (Admission 104)

105.  Vecchia was aware his conduct violated the Policy and Procedure of the City of Stamford. (Admission 105)

106.  The City of Stamford and Vecchia entered into an agreement that stated: (Admission 106)

    a.  Vecchia would be able to remain at work only if he discontinued the harassment of Murphy. (Admission 106a)

    b.  Sought psychological treatment. (Admission 106b)

    c.  Reported on the progess of his psychological treatment. (Admission 106c)

16

107. Vecchia made unwelcomed advances at Murphy while working for the City of Stamford. (Admission 107)

108. Vecchia made unwelcomed advances at Murphy after work hours. (Admission 108)

109. Vecchia left a bullet on Murphy's deck at home. (Admission 109)

110. Vecchia left balloons on Murphy's car while it was parked at her home. (Admission 110)

111. Vecchia sent Murphy numerous articles and packages through interoffice mail. (Admission 111)

Dated:     Ridgefield, Connecticut
           April 6, 2004

                              PLAINTIFF,
                              BARBARA E. MURPHY

                              BY: _____
                              Elisabeth Seieroe Maurer (ct11445)
                              Law Offices of Elisabeth Seieroe Maurer, PC
                              871 Ethan Allen Hwy., Suite 202
                              Ridgefield, CT 06877
                              Phone (203) 438-1388
                              Fax (203) 431-0357
                              E-mail esmaurer@esmlaw.net

17