**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-------------------------------------------------X
BARBARA E. MURPHY,   :  DN 3:03 CV 00519 (MRK)
  Plaintiff,      :
           :
    v.       :
THE CITY OF STAMFORD and :
DAVID VECCHIA,    :  March 30, 2005
  Defendants.    :
-------------------------------------------------X

<u>**AFFIDAVIT OF  FRED MANFREDONIA**</u>

Fred Manfredonia, being duly sworn deposes and says that:

1. I have been employed by the department of Human Resources of the City of Stamford since 1997 as a Human Resources Specialist; I have a Bachelors in Business (1984, Pace) and an MBA (1999,Univ.of New Haven); prior to working for the City of Stamford I was Director of Human Resources of various law firms in New York City.

2. I make this affidavit based upon personal knowledge and I am over the age of 18 and understand the nature of an oath

3. My duties from 1998 to the present include conducting sexual harassment investigations and training; I have taken approximately 20 seminars from First Management Systems, Wiggin & Dana, Fred Pryor Seminars, Gray Wolf Consulting, and Univ. of New Haven; I drafted the expanded City policy on sexual harassment, which after review by my superiors and the law department, was adopted in June, 1998.

4. After the expanded policy was adopted, all managers were required to attend a training session on sexual harassment, which started in the summer of 1998 (and continues today), and both Mr. Vecchia and Ms. Murphy attended this training.

5. In September 1998, I was notified that plaintiff had a problem with a co-employee, Mr. Vecchia, the City purchasing agent, whom she claimed had been stalking her.

6. On September 21, 1998, I met with Bill Stover, the Assistant Director of Human Resources, Barbara Murphy and her personal attorney, Ben Fraser, and heard her complaints about Mr. Vecchia, to include an incident in March, 1998 when he broke into her car which was parked at her home, sometime after midnight.

7. Bill Stover and I met with David Vecchia on September 25, 1998, who admitted that he broke into her car, wrote a note of apology, and paid Ms. Murphy $100.00 for

damage he did to her personal property he took from her car. He also admitted most of

the claims that she made- that he went lunch with her, saw her numerous times at a

local bar, sent her candy at work.

8.  He admitted that he told Ms. Murphy at meetings in March 1998, with her attorney

Ben Fraser, that he would leave her alone and get help.

9.  On September 30, 1998 Bill Stover and I met with Barbara Murphy and her attorney,

Ben Fraser, who were satisfied with an agreement with David Vecchia that he would

leave Barbara Murphy alone at work and outside of work; that if he saw her, he would

turn around and go the other way; he would get counseling, and provide evidence that

he was getting help through counseling.

10. Barbara Murphy was adamant that she did not want to "hurt" David Vecchia, such

as having him fired or arrested, but that she just wanted to be left alone.

11. On October 15, 1998, Bill Stover and I met with Mr. Vecchia, who was given a

clear directive to leave Ms. Murphy alone, get counseling, and if he repeated any

harassment or stalking he would be disciplined or fired. He agreed to this, and that

he would let me know about the counseling. He was also told that his file would be

left "open", that we would inform his superior (Mr. Thomas Hamilton) of this

agreement, and that his conduct would be monitored.

12. I spoke to Mr. Vecchia's sister, an attorney in Washington, DC, who said she would take responsibility to make sure her brother would honor this agreement.

13. I had no doubt that Mr. Vecchia realized the seriousness of the charges made by Barbara Murphy, and if he did not agree to leave Barbara alone, that he was in danger of not only losing his job but of possibly being arrested.

14. From September 1998 to November 2000, I never heard from either Barbara Murphy or her attorney that Mr. Vecchia resumed his harassment or that her had any contact with Ms. Murphy. During this time period, I asked Barbara periodically if everything was all right and Ms. Murphy told me that it was.

15. Barbara Murphy told me in 1998 that she was very concerned with confidentiality and that she did not want hurt Mr. Vecchia, so I didn't pursue getting a written agreement with Mr. Vecchia, since such a written agreement would be put in Mr. Vecchia's personnel file and would be a permanent record of his actions. This could potentially hurt him. It would also reduce the ability to maintain a level of confidentiality since it would be a public record.

16. In October 2000, Detective Carl Strate of the Stamford police department told me that he was investigating Mr. Vecchia for stalking Ms. Murphy. After I was told that it was all right to do so, I gave Detective Strate the notes and my recollection

of the meetings with the parties in 1998, and I advised him of the agreement that Mr. Vecchia made to leave Ms. Murphy alone.

17. Mr. Vecchia was arrested in late November 2000 for stalking Ms. Murphy.

18. On December 18, 2000, Bill Stover and I met with Barbara Murphy and she told us about four incidents that she felt were a resumption of Mr. Vecchia's previous conduct- two times in October, 2000 when Mr. Vecchia stared at her on the fourth floor and the tenth floor of Government center; one time when he stared at her at a local restaurant, Tarantos; and another time when she found a plastic frog left on her lawn at her house in Norwalk, CT.

19. After his arrest, Mr. Vecchia was suspended with pay, pending the disposition of the criminal charges.

20. In January 2001, Mr. Vecchia's criminal attorney, Mr. Katz, wrote that I should not contact Mr. Vecchia except through him and that Mr. Vecchia denied doing anything wrong and only had "chance meetings" with plaintiff in 2000.

21. Bill Stover and I met with Mr. Vecchia and his criminal attorney, Mr. Katz, on February 7, 2001, and Mr. Katz, on behalf of Mr. Vecchia, again denied all charges that Mr. Vecchia did anything wrong in 2000.

22. In March 2001, I was asked by Director of Legal Affairs Andrew MacDonald to see if there was some agreement that I could reach with Barbara Murphy to allow

Mr. Vecchia to return to work, since he was getting paid and he was home, not performing his duties as the Purchasing Agent. I was unable to get plaintiff to agree to such an arrangement.

23. After Mr. Vecchia pled guilty to a misdemeanor from the March 1998 car break-in, and the Octdober 2000 Tarantos incident, he was fired for a breach of the agreement we made in October 1998.

24. The Plaintiff's complaint was taken seriously in September, 1998; there was a clear directive to Mr. Vecchia to leave her alone, which he did for over two years; after he resumed his conduct, he was arrested, suspended from his duties and fired after he pled guilty to disorderly conduct for his conduct at Tarantos restaurant in October, 2000.

25. I feel that Ms. Murphy's complaint in September 1998 was promptly addressed by an immediate investigation, resulting in a clear directive to Mr. Vecchia to leave Ms. Murphy alone, which he did for two years.

26. The Stamford police department promptly and effectively addressed Ms. Murphy's complaint in October 2000 because Mr. Vecchia was arrested, and by Human Resources, since Mr. Vecchia was suspended from work and ultimately fired.

27. I prepared a list of sexual harassment complaints made and investigated by the City of Stamford Human Resources from January 1, 1998 to the date of compliance

(May, 2004); the complaints were promptly addressed and, if founded, disposed of

with appropriate discipline; the dates of disposition indicate that they were all

investigated after the Barbara Murphy complaint, and none of them involved

stalking and an arrest with a protestation of innocence similar to Mr. Vecchia's

situation. These eight sexual harassment investigations are (with names deleted):

a)     Mary S (Complainant) against Mr. H  - date of Disposition September 17, 1999- Investigated by William C. Stover- Finding - the complaint had merit, although not necessarily of a sexual nature (rage and anger). H was disciplined and the Complainant was satisfied with the resolution of the matter.

b)     Michelle H (Complainant) against Mr. A (school custodian)- date of Disposition January 24, 2001- Investigated by William C. Stover and Peter Dibble, Personnel Administrator, Board of Education- Finding - the complaint was unfounded.  No evidence. Mr. A was transferred to another school, sent to sexual harassment training and counseled.

c)     Angela M (Complainant) against Mr. C - date of Disposition November 2000 Investigated by Fred Manfredonia- No evidence to support allegation. Resolved by separating parties.

d)     Erica B (Complainant)  against Sgt W - date of Disposition July 24, 2003- Investigated by William C. Stover -Finding - complaint made by non-employee who works on a grant funded program (truancy prevention) that interacts with the Police Department.  The complaint was unfounded.  During course of investigation, Complaint was moot since complainant's job ended as grant was over. Complainant contacted after investigation and was satisfied with outcome of the process.

e)     Jane F/Margaret C (Complainants) against Mr. H - date of Disposition 2003- Investigated by Fred Manfredonia- Finding - closed after discussion.  Mr. H left employment.

f)     V (Complainant) against Mr. DeJ- Investigated by Fred Manfredonia and Tania Collazo- Finding – Mr. DeJ terminated November 15, 2002, after he was arrested for sexual assault of complainant

g)  Michele McE (Complainant) against Mr. F, volunteer fire chief, Springdale FD - <u>September 2003</u> - Investigated by Felicia Wirzbicki- Finding - situation did not constitute sexual harassment (volunteer chief complained that professional firefighter wasn't answering phones during blackout).

h)  Bonneita L (Complainant) against Mr. V - date of Disposition <u>October 2001</u>- Investigated by Felicia Wirzbicki- Finding - cause, 1 day suspension.

28.  In addition, there were eight (8) other non-sexual harassment complaints investigated, and again, all were investigated after the Barbara Murphy investigation in September, 1998; they were all promptly addressed, and if the complaint was found to have merit, resulted in prompt and appropriate discipline.

29.  During the time period of September 1998 to the present, Barbara Murphy was a union employee, with a collective bargaining agreement (CBA) dated July 19, 1998, through June 2001. This CBA required that if she had a complaint over "working conditions" that her union is the "exclusive bargaining agent" (par. A, pg. 1) and that she or her union could file a grievance (pgs.25-26). The next collective bargaining agreement was essentially the same as to those provisions. A true and accurate copy of the relevant CBA is attached hereto as Ex.  .

30.  Barbara Murphy never filed a union grievance concerning the City's actions concerning Mr. Vecchia, such as the City's investigation of her complaints in September 1998, the follow-up in 1998-2000, the decision to suspend Mr. Vecchia

with pay until his criminal arrest resulted in a guilty plea, or any of the other claims

in her complaint to the Commission on Human Rights and Opportunities (CHRO).

31. The above is true to the best of my knowledge and belief.

**Dated at the City of Stamford, Connecticut this 30th day of March 2005.**

_____
Fred Manfredonia
Human Resources Specialist
City of Stamford, Connecticut

Sworn and subscribed to me this 30th day of March 2005.

_____
James V. Minor
Commissioner of the Superior Court