## UNITED STATES DISTRICT COURT
## DISTRICT OF CONECTICUT

```
---------------------------------------------------------------X
BARBARA E. MURPHY,                      :        No. 3:03 CV 00519 (MRK)
        Plaintiff,                      :
v.                                      :
                                        :
THE CITY OF STAMFORD and                :
DAVID VECCHIA,                          :
        Defendants.                     :        APRIL 1, 2005
---------------------------------------------------------------X
```

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DAVID VECCHIA

Barbara Murphy (hereinafter at times, "Murphy") submits this

memorandum of law in support of her motion for partial summary judgment

against Defendant David Vecchia ("Vecchia") pursuant to Rule 56 of the Federal

Rules of Civil Procedure (hereinafter, "FRCP ____").  Partial summary judgment

is appropriate because as discussed below and in the attached Affirmation of

Eva M. Puorro sworn on April 1, 2005 and the exhibits annexed thereto

(hereinafter "Puorro Aff."), there is no genuine issue of material fact to be tried

and Murphy is entitled to judgment as a matter of law against Vecchia on the

following claims:  (i) Cause of Action Nine – civil assault by David Vecchia;  (ii)

Cause of Action Ten – invasion of privacy by David Vecchia; and (iii) Cause of

Action Eleven – intentional infliction of emotional distress by David Vecchia.

### I.    PRELIMINARY STATEMENT

This action was commenced by Murphy on or about March 20, 2003,

alleging various claims against Vecchia and the City of Stamford (the "City")

including violation of 42 U.S.C. §1983, breach of contract, civil assault, invasion

of privacy by intrusion, intentional infliction of emotional distress, and negligent infliction of emotional distress.

On or about February 27, 2004, Vecchia filed his Answer ("Answer") to Murphy's Complaint herein. Puorro Aff., ¶3. In that Answer, Vecchia admitted certain material facts alleged in Murphy's Complaint. Id. (A copy of Murphy's Complaint is attached as Exhibit "A" to the Puorro Aff. and is referred to herein as the "Complaint. A copy of Vecchia's Answer is attached as Exhibit "B" to the Puorro Aff. and is referred to herein as "Vecchia Answer").

On August 15, 2003, Vecchia's deposition in this case was held at the office of Plaintiff's counsel. Id. at ¶4. (A true and correct copy of the transcript of Vecchia's deposition, referenced herein as "Vecchia Deposition", is attached as Exhibit "C" to the Puorro Aff).

On October 29, 2003, Murphy served Request for Admissions (hereinafter "Request for Admissions") upon Vecchia, a copy of which is attached as Exhibit "D" to the Puorro Aff. Id. at ¶5. On or about May 12, 2004, Vecchia provided a response to Murphy's Request for Admissions ("Vecchia Response to Request for Admissions", a copy of which is attached as Exhibit "E" to the Puorro Aff.) by which Vecchia admitted certain material facts alleged in Murphy's Complaint. Id.

On October 21, 2002, Vecchia provided testimony before the Connecticut Board of Mediation and Arbitration in an action titled In the Matter of City of Stamford and AFSCME Co. 4, Local 2657 (No. 2002-A-

2

0842) (Dee, Arb.) (referred to herein as the "Vecchia Termination Proceeding"). Id. at ¶6. That proceeding generally related to whether the City of Stamford had just cause to terminate David Vecchia's employment with the City. Id. As indicated below, during the Vecchia Termination Proceeding, Vecchia admitted certain material facts alleged in Murphy's Complaint. Id. (A copy of transcript of testimony that Vecchia provided under oath during the Vecchia Termination Proceeding held on October 21, 2002, is attached as Exhibit "F" to the Puorro Aff.).

On April 21, 2004, Plaintiff produced to all parties a redacted copy of her psychiatrist's treatment notes, pursuant to the protective order granted by Judge Mark Kravitz on April 16, 2004. Id. at ¶7. (A copy of those redacted therapist's notes, preceded by a summary of certain relevant portions thereof, are attached as Exhibit "G" to the Puorro Aff., and are included to the extent that they illustrate certain aspects of Plaintiff's claims against David Vecchia for intentional infliction of emotional distress and civil assault.).

Because the admissions, documents and proceedings referenced and specified in further detail herein, as well as the pre-trial deposition testimony of Vecchia and the testimony of Vecchia under oath during the Vecchia Termination Proceeding, and the above redacted psychiatrist notes produced during discovery, cover all material facts pertinent to Plaintiff's claims against Vecchia of civil assault (Cause of Action Nine), invasion of privacy by intrusion (Cause of Action Ten) and intentional infliction of emotional distress (Cause of

Action Eleven), there is no genuine issue of material fact to be tried by the jury on

those claims. Accordingly, Plaintiff's claims against Vecchia of civil assault,

invasion of privacy and intentional infliction of emotional distress are ripe for

summary judgment.

## II.    FACTS

The undisputed material facts and supporting documents are fully set forth

in, or annexed to the Puorro Aff.

In summary, Vecchia has admitted:

1.    In 1993, Vecchia was hired as the purchasing agent for the City of Stamford. [Admission 1].[1]

2.    Vecchia's position as Purchasing Agent for the City was a supervisory position. [Admission 2].

3.    In 1995, Murphy was transferred to administrative assistant/data systems for the City of Stamford Fire Department. [Admission 3].

4.    In or around 1997, Murphy began working with Vecchia on several City of Stamford committees. [Admission 4].

5.    Vecchia has been to Brennan's, a neighborhood bar located in the Shippan section of Stamford, during the period of 1997 to 2000, probably around 300 times. [Admission 5].

6.    On one occasion in 1998, Vecchia attempted to pay for Murphy's drinks and meals at a pub. [Admission 6].

7.    In January of 1998, Vecchia had lunch with Murphy. [Admission 7].

8.    Vecchia called out Barbara Murphy's name while at Brennan's one night. [Admission 8].

9.    Vecchia sent candy one time to Barbara Murphy's office. [Admission 9].

10.   Vecchia sent M&Ms one time through the interoffice mail to Barbara Murphy. [Admission 10].

11.   Vecchia located a copy of Murphy's high school yearbook picture. [Admission 11].

12.   Vecchia saw Barbara Murphy at Brennan's on March 20, 1998. [Admission 16].

13.   Vecchia broke into Barbara Murphy's car in March of 1998. [Admission 13].

---

[1] The "Admission" designations noted in this document are included for the reader's convenience, and refer to the entire paragraph in which they appear.

14.    In March of 1998, Vecchia went to Barbara Murphy's car, which at the time was parked about two car lengths from her home, broke into her car, and took from her car a briefcase and other items. Just as he was committing these acts, he realized immediately he made a bad decision. [Admission 14].

15.    Immediately after breaking and entering into Barbara Murphy's car, and stealing items from her car, David Vecchia drove away and stopped at a Dunkin Donuts parking lot. At that time he began to look through the briefcase and other items he had stolen from her car. He tore up some of the items he had taken and threw them away. He stepped on and smashed some computer disks he had taken from her car. [Admission 15].

16.    Vecchia "admits to criminal trespass in entering car at Murphy's home" and "admits to taking things from Murphy's car". [Admission 16].

17.    On March 20, 1998, Barbara Murphy left Brennan's without Vecchia. [Admission 17].

18.    On the morning of next day, March 21, 1998, Vecchia returned home from work at 2:30pm. Upon returning home, Vecchia's wife told him she found a message on the answering machine that a woman named Barbara Murphy had called and wanted to know if Vecchia had her briefcase. [Admission 18].

19.    Later that night, at about 10:30 pm, Vecchia called Murphy. [Admission 19].

20.    During that telephone call, Vecchia told Barbara Murphy that he had taken her briefcase, that he was sorry and that he didn't know why he had done it. [Admission 20].

21.    He also told her that he had done what she asked and brought her briefcase, as Murphy requested in her telephone message, to the Fire Station, told her that he was sorry, stated that he did not know why he had broken into Murphy's car and that he was sorry for causing so much trouble in her life. [Admission 21].

22.    Subsequent to Vecchia's break in to Murphy's car, he received a call from Ben Frasier, Esq., Barbara Murphy's attorney, in which Attorney Frasier demanded that Vecchia return the remainder of Murphy's belongings he had taken during his break-in of Murphy's car. [Admission 22].

23.    Subsequent to Vecchia's break in to Murphy's car, Vecchia spoke with and agreed to meet Ben Frasier, Esq., Barbara Murphy's attorney, and return the items he had taken. [Admission 23].

24.    During Vecchia's meeting with Attorney Frasier, Vecchia's sister, an attorney, participated via telephone. [Admission 24].

25.    Vecchia arrived at Attorney Frasier's office and returned some broken computer disks that had contained an extensive database that she was creating for a local attorney, and gave Attorney Frasier one hundred dollars. [Admission 25].

26.    During that meeting, Vecchia said that the items he had brought with him and returned during that meeting were all that he could find, and that he had thrown out most of the things he had taken from her car. [Admission 26].

27.    During that meeting, Vecchia produced to Attorney Frasier a letter he wrote to Murphy apologizing for his conduct (with respect to the break-in of her car). [Admission 27].

28.    In that letter Vecchia states as follows: "Barbara, this is all I have, it was thrown in the trash at my house and in my panic I forgot it. Anything else missing was thrown out elsewhere and I cannot recover. Please use enclosed money to purchase any items you are missing. If more is needed, I will reimburse you. I do not know why I did this, and regret the pain that is has brought your family. My life is in your hands. Please give me time, a chance to solve my problems and redeem my life. David". [Admission 28].

29.    The document attached as Exhibit 2 to Plaintiff's Request for Admissions is a copy of that letter that Vecchia wrote, apologizing for his conduct. The information contained in that Exhibit 2 is true and authentic. [Admission 29].

30.    Vecchia understood that during his meeting with Attorney Frasier that Attorney Frasier was requesting that Vecchia have no contact whatsoever with Barbara Murphy. [Admission 30].

31.    Vecchia understood that during his meeting with Attorney Frasier, he "was told by Attorney Frasier that I shouldn't have any contact with her [Barbara Murphy]". [Admission 31].

32.    Vecchia agreed, as requested by Attorney Frasier, that he would not have any contact whatsoever with Barbara Murphy and that he would not speak to her. [Admission 32].

33.    During the meeting in Attorney Frasier's office, Vecchia also agreed that he would seek immediate counseling. [Admission 33].

34.    Vecchia was concerned he was going to be reported to the City or the police, because on Saturday he had left at the fire department the items he had taken from Barbara Murphy's car with letter he wrote stating he was sorry for what he had done. [Admission 34].

35.    After Vecchia's meeting with Attorney Frasier, Vecchia saw Barbara Murphy. [Admission 35].

36.    In April of 1998, Vecchia obtained a copy of an internet article titled "Stopping the Stalker". [Admission 36].

37.    In July of 1998, Vecchia saw Murphy again at Brennan's. Vecchia approached Murphy and tried to talk to her. Murphy "waved him off", not wanting to talk to him. [Admission 37].

38.    In the summer of 1998, Vecchia ran in the High Ridge Road race sponsored by the City. [Admission 38].

39.    Vecchia attended a meeting in September of 1998 with William Stover ("Stover") and Fred Manfredonia ("Manfredonia") of the City's Human Resources department. During that meeting, Stover and

Manfredonia told Vecchia that Barbara Murphy complained about Vecchia and told them that he was bothering her. [Admission 39].

  40. It was Vecchia's understanding that Barbara Murphy, through the complaint she made with the personnel department in 1998 that Barbara Murphy had asked through the personnel department that Vecchia have <u>no</u> further contact with her. [Admission 40].

  41. After 1998, Barbara Murphy continued to ask that Vecchia have no further contact with her, for example, by filing the criminal complaint against Vecchia. [Admission 41].

  42. During his meeting with Stover and Manfredonia in September 1998, Vecchia admitted that he had broken into Barbara Murphy's car, and stolen her briefcase from that car, in March of 1998. [Admission 42].

  43. During that meeting, Vecchia admitted that he had committed "prior unwanted behavior towards Barbara Murphy". [Admission 43].

  44. During that meeting, Stover and Manfredonia also told Vecchia that they were investigating the complaint Barbara Murphy made against Vecchia, that they had not made any decision on that complaint, and that they would get back to Vecchia. [Admission 44].

  45. Manfredonia and Stover contacted Vecchia in September of 1998 after their meeting with him. During this contact, they asked Vecchia more questions and instructed Vecchia not to have any contact with Barbara Murphy in the workplace. [Admission 45].

  46. Vecchia agreed at this time to cease contact with Murphy at work. [Admission 46].

  47. During that follow up contact with Vecchia in September of 1998, Vecchia told them he was a Vietnam war veteran and they had some nerve telling him what to do outside of the workplace. [Admission 47].

  48. Stover and Manfredonia did not instruct Vecchia to have no further contact with Barbara Murphy outside of the workplace. [Admission 48].

  49. Stover and Manfredonia did not tell Vecchia that Barbara Murphy had requested the right to ensure that Vecchia was receiving counseling and that Vecchia be required to provide to them reports as necessary regarding such counseling. [Admission 49].

  50. Stover and Manfredonia suggested to Vecchia that he use a program sponsored by the City that provides its employees with funds for services such as counseling. [Admission 50].

  51. Vecchia told Manfredonia and Stover during that meeting that he would use that program to obtain counseling. [Admission 51].

  52. During that meeting, Vecchia agreed to go to counseling because he wanted his job. [Admission 52].

  53. The City never followed up with Vecchia regarding Vecchia's progress in therapy. [Admission 53].

54.    The City never received any progress reports from Vecchia. [Admission 54].

55.    Manfredonia and Stover did not ever tell Vecchia that he must go to counseling in order to keep his job with the City. [Admission 55].

56.    Manfredonia and Stover told Vecchia that they would get back to Vecchia with a written agreement for him. [Admission 56].

57.    The City never drafted a written agreement for Vecchia to sign. [Admission 57].

58.    It was Vecchia's understanding that the "written agreement" that Manfredonia and Stover referred to would require that Vecchia have no contact with Barbara Murphy in the workplace. [Admission 58].

59.    Manfredonia and Stover told Vecchia if circumstances at work require that he interact with Barbara Murphy at work, that he deal with Barbara Murphy in a businesslike manner. [Admission 59].

60.    In September of 1998, Barbara Murphy and Vecchia occasionally needed to deal with each other in performing their jobs. [Admission 60].

61.    The City placed no restrictions on Vecchia's dealings with Barbara Murphy outside of work. The City only told Vecchia that he should limit his dealings with Barbara Murphy in the workplace. [Admission 61].

62.    Vecchia went back to meet with Stover in the end of October 1998. Vecchia asked Stover about the written agreement Stover and Manfredonia had mentioned to Vecchia during their September 1998 meeting. Stover told Vecchia that as far as he was concerned, the City was not involved in Barbara Murphy's complaint and that her complaint ended in March of 1998. [Admission 62].

63.    After September of 1998, Vecchia continued to go to Brennan's. During that period, he saw Barbara Murphy there "plenty of times". He did not cease his pattern of continuing to go to Brennan's regularly. [Admission 63].

64.    The City did not tell Vecchia that any future inappropriate interactions or contact with Barbara Murphy would result in Vecchia's dismissal. [Admission 64].

65.    In October of 2000, Vecchia went to a restaurant called Toronto's. He saw Barbara Murphy there. He saw her, and sat at the opposite end of the bar from her. [Admission 65].

66.    Looking back now, Vecchia realizes that upon seeing Murphy at Toronto's in October of 2000, he should have turned around and left. [Admission 66].

67.    On November 29, 2000, Judge Richard Tobin signed an arrest warrant for Vecchia. Vecchia was arrested and charged with stalking. [Admission 67].

68.    After Vecchia's arrest, the City placed him on paid administrative leave from work. [Admission 68].

69.    The City terminated Vecchia in 2002, over a year after he was arrested for stalking.  [Admission 69].

70.    In January of 2002, Vecchia pled guilty to the March 1998 theft of Barbara Murphy's briefcase.  [Admission 70].

71.    Specifically, on January 23, 2002, Vecchia entered into an agreement to plead guilty to criminal trespass and disorderly conduct.  [Admission 71].

72.    The document attached as Exhibit 5 to Plaintiff's Request for Admissions is an excerpt of the court transcript from the proceedings during which Vecchia entered the above pleas of guilty.  That document is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence.  The information contained in that document is true and authentic.  [Admission 72].

## III.    ARGUMENT

### A)    Because There is No Genuine Issue of Material Fact as to Plaintiff's Claims of Civil Assault, Invasion of Privacy and Intentional Infliction of Emotional Distress, Summary Judgment Against Vecchia On Those Claims is Appropriate

Summary judgment shall be rendered if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FRCP 56(c).  Thus, if this Court determines there are no issues of material fact to be tried, summary judgment finding liability against Vecchia should be granted. Southern New England Telephone Co. v. U.S., 886 F. Supp. 211 (D. Conn. 1995); see Hionis Intern. Enterprises, Inc. v. Funding Corp., 867 F. Supp. 268 (D. Del. 1994), aff'd, 61 F.3d 895 (3d Cir. 1995).

FRCP 8(d) provides that "Averments in a pleading to which a responsive pleading is required, other than those as to amount of damage, are admitted when not denied in the responsive pleading".  FRCP 12(a)  requires that a party file his Answer to a Complaint "within 20 days after being served with the summons and complaint".  On or about February 27, 2004, Vecchia filed his

Answer to Murphy's Complaint. That Answer contained admissions of certain material facts alleged in the Complaint. Accordingly such matters, specified in further detail in the Puorro Aff., are deemed admitted.

FRCP 36(a) provides that as to each matter as to which an admission is requested, such "matter is admitted unless, within 30 days after service of the request, ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter..." Murphy's Requests for Admissions were served on October 29, 2003, (see Puorro Aff., Exhibit "D"). On or about May 12, 2004, Vecchia provided his Response to Request for Admissions, by which Vecchia admitted certain material facts alleged in Murphy's Complaint. Accordingly, the matters contained in Murphy's Requests for Admissions are "admitted"; and FRCP 36(b) provides that "any matter admitted under this rule is conclusively established..." Moosman v. Joseph P. Blitz, Inc., 358 F.2d 686 (2d Cir. 1966); Mangan v. Broderick & Bascom Rope Co., 351 F.2d 24 (7th Cir. 1965), cert denied, 383 U.S. 926, 86 Ct. 930 (1966).

Rule 801(d) ("Statements Which Are Not Hearsay") of the Federal Rules of Evidence ("FRE ____") provides that a statement is not hearsay and constitutes an "Admission by a Party-Opponent"

> if...[t]he statement is offered against a party and is (A) the party's own statement...(B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency...made during the existence of the relationship.

FRE 801(d)(2)(A), (B) and (C).

On August 15, Vecchia's deposition was held in this case at the office of Plaintiff's counsel. Puorro Aff., ¶4. During that deposition, Vecchia made admissions of certain material facts alleged in Plaintiff's complaint. (A copy of the transcript of Vecchia's Deposition herein is attached as Exhibit "C" to the Puorro Aff.).

Moreover, on October 21, 2002, Vecchia provided testimony before the Connecticut Board of Mediation and Arbitration in an action titled In the Matter of City of Stamford and AFSCME Co. 4, Local 2657 (No. 2002-A-0842) (Dee, Arb.) (referred to herein as the "Vecchia Termination Proceeding"). Puorro Aff., ¶6. That proceeding generally related to whether the City of Stamford had just cause to terminate David Vecchia's employment with the City. Id. During Vecchia's sworn testimony in that proceeding, Vecchia admitted certain material facts alleged in Murphy's Complaint. Id. (A copy of transcript of Vecchia's testimony during the Vecchia Termination Proceeding held on October 21, 2002, is attached to the Puorro Aff. as Exhibit "F"). The arbitrator for that proceeding determined that there was just cause to terminate Vecchia's employment with the City.

Admissions may be used in support of summary judgment. Donovan v. Carls Drug Co., Inc., 703 F.2d 650 (2d Cir. 1983); Nic-O-Val Music Co., v. P.O.S. Radio, Inc., 656 F. Supp. 826 (M.D. Fla. 1987); An-Port, Inc. V. MBR Industries, Inc., 772 F. Supp. 1301 (d. Puerto Rico 1991), motion to amend denied, 142 F.R.D. 47 (1992); Weva Oil Corp v. Belco Petroleum Corp., 68 F.R.D. 663 (N.D.

W. Va. 1975); In re Mack, 330 F. Supp. 737 (S.D. Tex. 1970); Mountcastle v.

U.S., 226 F. Supp. 706 (M.D. Tenn. 1963).

FRE 803(8) provides that "records reports, statements or data

compilations in any form, of public offices or agencies, setting forth…the activities

of the office or agency…unless the sources of information or other circumstances

indicate lack of trustworthiness" are "not excluded by the hearsay rule".   In

Vecchia's Response to Request for Admissions, Vecchia admitted that the

transcript attached as Exhibit 5 to Plaintiff's Request for Admissions, setting forth

the proceedings during which Vecchia pled guilty to trespass and disorderly

conduct in connection with his actions against Barbara Murphy (see Admissions

71 and 72 supra), is a public record and meets the requirements of FRE 803(8),

and that the information contained in that document is true and authentic.  (See

Puorro Aff., Exhibit "E" thereto, which contains a copy of Plaintiff's Request for

Admissions and its accompanying Exhibit 5, which is the transcript of Vecchia's

guilty pleas addressed herein).

**B.   Vecchia Should be Found Liable Because He Invaded Murphy's Privacy**

Connecticut courts have found that a person can be found liable for

invasion of privacy as follows:

> In Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 126-
> 28, 448 A.2d 1317 (1982), the Supreme Court established a cause of
> action for invasion of privacy and adopted the four categories as defined in
> § 652A of the Restatement (Second) of Torts.  The four categories are:
> "(a) unreasonable intrusion upon the seclusion of another; (b)
> appropriation of the other's name or likeness; (c) unreasonable publicity
> given to the other's private life; or (d) publicity that unreasonably places
> the other in a false light before the public." Id., 128. The court explained
> these four categories to have "not developed as a single tort, but as a

complex of four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each **represents an interference with the right of the plaintiff [\*11] to be let alone**." (Internal quotation marks omitted.) Id., 127-28.

Silva v. Warecke, 2004 Conn. Super. LEXIS 2066, 10-11 (Conn. Super. Ct., 2004) (emphasis added), citing Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 126-28, 448 A.2d 1317 (1982).

> To be liable for intrusion upon seclusion under Connecticut law, a defendant must invade the privacy of the plaintiff in such a way that the "**intrusion would be highly offensive to a reasonable person**." Bonanno v. Dan Perkins Chevrolet, 2000 Conn. Super. LEXIS 287, No. CV99-066602, 2000 WL 192182, at \*1 (Conn. Super. Ct. Feb. 4, 2000).

Miller v. Edward Jones & Co, 2005 U.S. Dist. LEXIS 1705 (D. Conn., 2005) (Kravitz, J.) (emphasis added).  Moreover,

> Courts faced with "determining the existence of 'offensiveness' would consider **the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives**, the setting into which he intrudes and the expectations of those whose privacy is invaded." Miller v. National Broadcasting Co., 187 Cal. App. 3d 1463, 1483-4, 232 Cal. Rptr. 668 (1986).

Sorrentino v. Textron Lycoming, 1995 U.S. Dist. LEXIS 21754 (D. Conn., 1995) (emphasis added).

An allegation of physical contact is not necessary to successfully state a claim for invasion of privacy via an unreasonable intrusion upon the seclusion of another.  Even acts such as "highly personal questions or demands" by a person without physical contact may be held to be an "intrusion on psychological solitude or integrity and hence an invasion of privacy".  See Miller, supra, 2005 U.S. Dist. LEXIS at \*36 (Kravitz, J.), citing Bonanno v. Dan Perkins Chevrolet, 2000 Conn.

Super. LEXIS 287, No. CV99-066602, 2000 WL 192182, at *2 (Conn. Super. Ct. Feb. 4, 2000).

Vecchia has admitted, through certain pleadings herein, through his testimony under oath and his guilty plea to trespass and disorderly conduct in relation to his conduct toward Murphy. Further details of those admissions are contained above and in the Puorro Aff., and are summarized in part below.

Specifically, on January 23, 2002, Vecchia plead guilty to "criminal trespass" and disorderly conduct, in connection with (i) In March of 1998 breaking and entering in to Barbara Murphy's car (while it was parked right in front of Murphy's home), taking items from that car, destroying certain items he took from her car and (ii) upon seeing Barbara Murphy at a restaurant called Toronto's in October 2000, sat near her and remained there (after agreeing that he would have no further contact with her). Admissions 65, 66, 71. See also Puorro Aff., Exhibit "E" thereto, which contains a copy of Plaintiff's Request for Admissions. Attached as Exhibit 5 to that Request for Admissions is a copy of the transcript of Vecchia's guilty pleas.

Vecchia also admitted to the acts relating to the break in of Murphy's car in a phone call he made to her [Admissions 20 and 21], in a letter he wrote and gave to Murphy [Admissions 27, 28, 29], and during a meeting with Murphy's attorney Ben Frasier. Admissions 25, 26).

Vecchia has also admitted in testimony he provided under oath at his deposition that after he agreed to leave Murphy alone, he saw Murphy in October of 2000 at a restaurant called Toronto's and upon seeing her, remained there

and sat across from her. See Admission 65. He has also admitted in testimony under oath in his Termination Proceeding that he realizes that upon seeing Murphy at Toronto's in October of 2000, he should have, but failed, to immediately turn around and leave. See Admission 66.

Furthermore, Vecchia has admitted he had not only improper but criminal motives while committing these criminal acts. The transcript of his guilty plea leaves no question that he intended to commit a breaking and entry into Barbara Murphy's car, steal her belongings from that car, and destroy items he stole, while knowing that such acts were wrongful. (See Puorro Aff., Exhibit "D" thereto, Plaintiff's Request for Admissions (Exhibit 5 thereto). The transcript of Vecchia's guilty pleas reveals that during that proceeding, Vecchia "admit[ed] that he knew he had actual knowledge when he entered the motor vehicle that he had no right to do so. And that his conduct in that regard was proscribed by law".

Criminal trespass and disorderly conduct against another person, breaking and entering into a car and stealing the owner's personal belongings, needless to say, are actions that are offensive to reasonable persons, and constitute an invasion of one's personal private affairs.[2] The very fact that such acts constitute crimes, to which David Vecchia has plead guilty, confirms their wrongful, invasive nature. Any reasonable person would find such conduct to be offensive.

---

[2] It is well accepted that a person has protected privacy interest in his automobile, and any items that are stored within it, and that any illegal or unlawful invasion and/or search of one's automobile and the items stored within it will be held an improper and illegal invasion of the owner's rights to privacy. As the US Supreme Court has acknowledged, "A search, even of an automobile, is a substantial invasion of privacy". United States v. Ortiz, 422 U.S. 891, 896 (U.S., 1975). Thus, "[t]o protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search". Id.

There is no issue of material fact with respect to each and every aspect of

Murphy's claim for invasion of privacy.  Accordingly, summary judgment on

Murphy's invasion of privacy claim (Cause of Action Ten) against Vecchia is

warranted.


### C.    Vecchia Should Be Found Liable Because He Committed Intentional Infliction of Emotional Distress

Under Connecticut law, a plaintiff making a claim from intentional infliction of emotional distress must show that: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the [*40] conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

Miller v. Edward Jones & Co, 2005 U.S. Dist. LEXIS 1705, 39-40 (D. Conn.,

2005), citing Berube v. Nagle, 81 Conn. App. 681, 698, 841 A.2d 724 (2004).

A person's intent can be inferred from his conduct. Anderson v. Drapp, 2003

Conn. Super. LEXIS 2516 (Conn. Super. Ct., 2003).

Moreover,

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse resentment against the actor, and lead him to exclaim, Outrageous!" (Internal quotation marks omitted.) Appleton v. Board of Education, 254 Conn. 205, 210, 757 A.2d 1059 (2000).

Liability clearly does not extend to mere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities.  Hiers v. Cohen, 21

conn. Supp. 305, 308-9, 329 A.2d 609 (1973). <u>Boanno v. Papcin</u>, 2001
Conn. Super. LEXIS 233 (JD Ansonia 2001).

Vecchia clearly committed acts and crimes against Murphy that were
"extreme and outrageous". By way of example, Vecchia has admitted, through
certain pleadings herein, through his testimony under oath and his guilty plea to
trespass and disorderly conduct, to breaking and entering Murphy's car, stealing
her belongings from her car and destroying and disposing of certain of those
items, and to committing disorderly conduct when, after promising to have no
further contact with Murphy, he saw Murphy at a restaurant in October of 2000,
and upon seeing her sat near her rather than leaving immediately.

Specifically, on January 23, 2002, Vecchia plead guilty to "criminal
trespass" and disorderly conduct, in connection with (i) In March of 1998
breaking and entering in to Barbara Murphy's car (while it was parked right in
front of Murphy's home), taking items from that car, destroying certain items he
took from her car and (ii) upon seeing Barbara Murphy at a restaurant called
Toronto's in October 2000, sat near her and remained there (after agreeing that
he would have no further contact with her). Admissions 65, 66, 71. <u>See also</u>
Puorro Aff., Exhibit "E" thereto, which contains a copy of Plaintiff's Request for
Admissions. Attached as Exhibit 5 to that Request for Admissions is a copy of
the transcript of Vecchia's guilty pleas.

Vecchia also admitted to the acts relating to the break in of Murphy's car
in a phone call he made to her [Admissions 20 and 21], in a letter he wrote and

gave to Murphy [Admissions 27, 28, 29], and during a meeting with Murphy's attorney Ben Frasier.  Admissions 25, 26).

Vecchia has also admitted in testimony he provided under oath at his deposition that after he agreed to leave Murphy alone, he saw Murphy in October of 2000 at a restaurant called Toronto's and upon seeing her, remained there and sat across from her.  See Admission 65.  He has also admitted in testimony under oath in his Termination Proceeding that he realizes that upon seeing Murphy at Toronto's in October of 2000, he should have, but failed, to immediately turn around and leave.  See Admission 66.

Furthermore, Vecchia has admitted he had not only improper but criminal motives while committing these criminal acts.  The transcript of his guilty plea leaves no question that he intended to commit a breaking and entry into Barbara Murphy's car, steal her belongings from that car, and destroy items he stole, while knowing that such acts were wrongful. (See Puorro Aff., Exhibit "D" thereto, Plaintiff's Request for Admissions (Exhibit 5 thereto).  The transcript of Vecchia's guilty pleas reveals that during that proceeding, Vecchia "admit[ed] that he knew he had actual knowledge when he entered the motor vehicle that he had no right to do so.  And that his conduct in that regard was proscribed by law".

Just after Vecchia's break into Murphy's car, he repeatedly promised he would leave Murphy alone, and acknowledged that he knew contact with her by him was not only unwanted but caused extreme harm and distress to her.  For example, during his meeting with Murphy's' attorney Ben Frasier after Vecchia broke into Murphy's car, Vecchia was informed, and understood he was being

asked not to have any contact with Murphy because of the traumatic impact such contact had upon her. Admission 29. He agreed during that meeting that he would have no further contact with Murphy. Admission 31. Yet, he continued to go frequently and regularly to the places he knew Murphy would go to, and continued to make contact with her. Admission 5 (acknowledges that during the entire period 1997 through 2000, he went to Brennan's --- a bar frequented by Murphy--- over 300 times); Admission 37 (admits he saw Murphy at Brennan's in July 1998, approached her and tried to talk to her); Admission 63 (admits that after September of 1998, when he was again told by City officials about the harmful effect his contacts and acts toward Murphy were having, he went to Brennan's and saw Murphy there "plenty of times" ).

As the above illustrates, Vecchia's conduct was extreme and outrageous, and while committing such conduct, Vecchia knew and should have known the effect his conduct was having upon Murphy.

The notes compiled by Murphy's psychiatrist (attached as Exhibit "G" to the Puorro Aff.) during his treatment of Murphy from 1998 through 2002 illustrate the significant distress Vecchia's contact had upon Murphy and that Murphy continues to experience that distress years after those incidents. A summary of some pertinent portions of those notes (emphasis has been added) follows and is also contained in the Puorro Aff, Exhibit "G":

> 10/9/98 – Barbara Murphy is **"not sleeping, wakes up 2-3 in the morning, has difficulty concentrating, has difficulty having fun, is agitated, irritable, tired, hopeless about things getting better and has had futile thoughts with suicidal ideas** that she rejects because of...[her]...mother and son"....

**Psychiatrist notes that "she clearly has significant depression from unresolved grief and losses...".[3]**

10/19/98 – her psychiatrist notes that **Plaintiff spoke with him about her troubles with David Vecchia stalking her**, that "they've made an agreement to back off but this has recurred in the last few months". He also notes that Barbara Murphy "talks about **mood swings, irritability, hyperness, racing thoughts**...".

11/19/98 – her psychiatrist notes that Murphy is **"feeling very stressed, tearful and reactive...[and] had the panicky thought that treatment wasn't going to work and that she was destined to be depressed and in a miserable state forever"**.

11/24/98 – psychiatrist notes "[s]he is **having massive trouble sleeping...There's a tremendous neediness on her part**...[and s]he doesn't want another medicine to help her sleep".

12/2/98 – "She **continues to be sad, tearful and somewhat volatile....obviously continues to be sad, depressed and angry [and has] agitation, sleeplessness, pressure and racing thoughts"**.

12/29/98 – Murphy reports that she "is **much more sad than she was...".**

1/21/99 – She comes in and **continues to be somewhat irritable and sad".**

2/3/99 – Barbara Murphy has **"difficulty sleeping, staying awake much of the night...has night sweats...".**

4/26/99 – **"There is a subtle, sarcastic, angry tone underneath a lot of what she talks about. She says this has been occurring at work as well as in her personal life**. People say her edge is back. She is **not sleeping much** and is energetic and active around the house". Also notes..."**At this point I certainly think she is a Bipolar II".**

6/17/99 – **Murphy reports that she** "still has periods when she is depressed, has trouble when she gets home finding the energy to do much of anything**...".**

---

[3] Emphasis had been added in this summary document.

8/12/99 – since running out of the medicine [he prescribed for her]...she says she has **gotten much more irritable, frustrated, hyper and unhappy"**.

3/21/01 – **"She comes at this time because the stalking has become a major problem.  The issue is intensified and progressed over these last two years with a continuation of more events.** This put her **more and more on edge and made her hyper-vigilant and she would react quite intensely to anything that seem related.  There was an incident where her car was broken into in her driveway and materials were taken from her car....[T]he fact that it's been so persistent and continues despite initial warnings and protest on the part of the man that it would stop, she is increasingly agitated and angry about the intrusiveness into her space...[S]he's been informed recently that he might be welcomed back to work...but even just the notion that he's going to be around at the work place is overwhelming** to her.  During the last few weeks, **she's been having dreams about the situation, having difficulty concentrating, with intrusive thoughts about the person, worrying about what he's going to be doing and what's going to happen next. She becomes angry when people dismiss it as a minor thing, and quite frustrated feeling that from what she's been able to see on the Website and the sense she gets from her attorneys and the police, there isn't much that can be done about it....**She felt **increasingly isolated, frightened...Barbara is quite anxious, tearful, angry and feels totally stressed and trapped by this whole situation...She has a situation where she feels like her privacy's invaded, where she's threatened, where she's been intruded upon, and yet may not have any recourse of relief from the situation.** The fact that the city is thinking of bringing him back to work only minimizes her pain and suffering....**I think she has Post Traumatic Stress Disorder** at this time. **She is highly reactive to all aspects of the situation and with the kind of life experience and reactivity she had before I think that only adds to the intensity of her reaction.  It doesn't cause the reaction but it certainly adds to the intensity and pain of it"**.

3/20/01 – **With respect to Plaintiff's not discussing the stalking situation for quite some time with him:  "She says she really didn't want to address it as a reality and shut it out of her mind then until she just couldn't shut it out any**

further…She is terrified and frustrated that it wont go away. She does not see an end in sight".

4/9/01 – Murphy **"continues to be quite anxious, mildly agitated and very overloaded…She continues to be very anxious, very fearful" with respect to her problems with David Vecchia.**

4/19/01 – "She is **quite anxious and reactive**…She is having **a lot of impulses, moods, angry, sad, scared and trying to calm down with trouble doing that.…I think Barbara has PTSD [post-traumatic stress disorder] at this time relative to the whole incident of being stalked.** I think prior to this she had a bipolar II Disorder with mood swings, depression and irritability".

5/10/01 – Murphy "is a little less agitated, fearful, panicky. **She is still angry, scared and upset about the stalking, but is no longer overwhelmed by it like she was".**

11/29/01 –Murphy **"comes back [for treatment] now because of the issues around the man at work who was stalking her over a several year [sic] time have come to a head in that his criminal trial will begin next week. She is very anxious about the whole prospect and what will happen and what will be expected from her…She is actually reliving a lot of the trauma and ongoing fear of the whole stalking experience…Clearly this whole experience has been unsettling for her and she has withdrawn from a lot of the activities that were a part of her, recreation, activities and friendships…**For Barbara with the stalking, people who haven't been stalked have no reaction to the ongoing terror and uncertainty that being stalked entails. **They dismiss it and say that physically she is OK what is the big deal. Needless to say this attitude is traumatic and takes a toll on her as we've seen.** Going to a court she will re-experience a lot of what she went though…**She casually mentions that he may well come back to kill her. One can dismiss this as fearfulness but on the other hand is [sic] one being stalked one doesn't really know what could happen".**

12/13/01 –**Murphy had an "anger outburst", and that "[a]fter some discussion it just would seem the stress was pretty intense and that was more responsible** than the Neurontrin".

1/14/02 – **Murphy reports there was a criminal court hearing regarding Vecchia that she had to attend.** That "[d]uring the proceeding she was discomforted by his staring at her the

whole time in court...**This frightened her because clearly he hasn't changed any. From her perspective he continues to pose a threat** as a stalker to her. There is the sense that even if she wins she realizes that he is probably not going to stop and she may have to move...**I tried to suggest [to Barbara Murphy] that I though[t] that the stressors she'd been under with her mother's illness put her in a state where she was more vulnerable to something like this. This does not negate the impact of what happened to her**".

1/25/02 –**Murphy "comes in quite distraught, sad, anxious, flooded and kind of overwhelmed in terms of her emotional response.** It turns out that **the stalker pleaded guilty to less than the stalking charges, namely, breaking into her car and trespassing....She was unable to go to work yesterday and is struggling with whether to go today...She is anxious and overwhelmed** at the prospect that he might actually be there and not be fired by the city".

2/4/02 – Barbara Murphy "has returned to work and things at work continue to be stressful although she seems to be managing...She **acknowledges that she continues to be fearful and continues to have difficulty joining in activities that had once been part of her routine in the past. Going out at night is hard for her and she prefers to stay home. All of this is fearfulness and anxiety related to the stalking and anticipation and fear of the whole process**".

2/25/02 –Murphy's **"stress continues in terms of the stalking and trial".**

3/27/02 – Reports that Barbara Murphy "says **over the last few weeks she has been tearful and crying. She is sad** but punctuates that with jokes, humor and levity but **underneath she is quite sad. All of this follows the court proceedings involving her stalking...Recently the stalker has returned, is present around the city and there is some question if he is trying to get his job reinstated. The effect of this is that she has gotten much more depressed and tearful. She wants to withdraw from the situations and is feeling quite sad and overwhelmed".**

9/3/02 – Reports that Barbara Murphy comes to him now "because Human Resources [of **the City of Stamford] had called because...[David Vecchia]...was applying to get his job back saying he's been unfairly separated from the city. She**

**was being asked to testify** before a labor relations board about what had transpired.  She was going to have to confront him at the hearing.  **She became increasingly anxious, panicky, fearful, unable to focus, unable to sleep and basically re-experienced all of the terror filled feelings she had during the stalking over the last few years.  Part of the helplessness and hopelessness were even thoughts of suicide or life not being worth continuing**....I feel that she is too fragile to appear at any hearing --- certainly tomorrow and certainly she would be unlikely to appear where she would be confronted by the stalker".

9/6/02 – He reports that **Murphy testified at Vecchia's hearing before the labor relations board:**  "I was supposed to see her afterwards and she said that she was just too exhausted from the hearing to come so she comes today instead.  **The hearing was very intense and she was shaking and trembling.  She was very agitated and ultimately became annoyed and expressed that to the attorney she was speaking to.  Apparently the city has lost the file of the incident and they needed to talk to her** because there was no other information available...**Going through the interview and the discussions brought back all the memories of what has been going on.  She felt acutely the re-experience of the traumatic event...She feels somewhat overwhelmed.**  She says **the worry about the stalking has always bee[n] on her mind – though at a distance.  Once this all started up again it has come back into the forefront and is very intense.**  She has **found herself trimming back all the vegetation around her house and she has added more lights to feel safe**".

9/16/02 –Murphy "...**continues to be stressed with intrusive thoughts and feelings from her stalking experience.  Being asked to testify at a grievance hearing for the city against him** just was **all she needed to get stirred up.  She's not sleeping, she's fearful, she's agitated, she's not able to concentrate, and she has mood swings**".

11/22/02 –Murphy "...**comes in and is somewhat emotional and reactive and becomes more so as she relates that in fact she was called to appear at the grievance [hearing] of her stalker.**  It was a call on a Friday saying that she needed to be there on a Monday...She **ended up going and describes having a surge of reactivity and adrenalin at the hearing...She recalls her rage and anger when she saw his face grinning at her as she entered the room**...She was **very**

> **anxious, angry inside and felt like she was falling apart.
> She trembled; she quaked and really was upset.  This
> lasted on the way home and for a day or two afterwards.
> This meeting precipitated again the hypersensitivity, the
> fearfulness about him coming to get her, to bomb her
> house, to burn her house.  She finds herself very anxious
> when she enters the house, having to check everything to
> see if it's been moved or put out of position...She's very
> tearful and sad having this whole thing triggered again.
> Clearly this is post-traumatic reaction to the stalking**".

As the above excerpts from Murphy's psychiatrist's notes illustrate, Vecchia has

caused emotional distress to Murphy that is so extreme and severe, Murphy

continues to experience and re-experience it for years afterward.

There is no issue of material fact as to Murphy's claim of intentional

infliction of emotional distress against Vecchia.  Accordingly, summary judgment

on Murphy's intentional infliction of emotional distress (Cause of Action Eleven)

against Vecchia is warranted.


### D.    Vecchia Should Be Found Liable Because He Committed Assault

The Connecticut Appellate Court, using guidance from the Restatement of Torts
and other well-known treatises, has

> defined a "civil assault" as "the intentional causing of imminent
> apprehension of harmful or offensive contact in another." Dewitt v. John
> Hancock Mutual Life Ins. Co., 5 Conn. App. 590, 594, 501 A.2d 768
> (1985). 1 Restatement (Second) Torts, § 21 (1965).  In order to be held
> liable under § 21, "it is necessary that the actor intend to inflict [*12]  a
> harmful or offensive bodily contact upon the other or a third person or put
> him in apprehension of such contact. Unless he acts with such intent, the
> actor is not liable for an assault . . ." (Emphasis supplied.) Id., comment f
> to § 21. Although no actual contact is required, the action must be of "such
> a nature as to excite an apprehension of a battery . . ." and that
> apprehension "must be one which would be normally aroused in the mind
> of a reasonable person." W. Prosser & W. Keeton, Torts, § 10, pp. 43-44

(5th ed. 1984). An assault "cannot be accomplished by words alone. There must be an overt act evidencing some corporeal threat." D. Wright, J. FitzGerald & W. Ankerman, Connecticut Law of Torts, § 6, p. 8 (3d ed. 1991).

Norman v. Distasio, 2001 Conn. Super. LEXIS 1644, 11-12 (Conn. Super. Ct., 2001).

As also indicated above, there is no question that in this case Plaintiff, due to Vecchia's repeated, deliberate overt acts, was placed in extreme fear of imminent harm. Vecchia's ongoing acts against her caused Barbara Murphy extreme terror and to fear for her life. See Puorro Aff., Exhibit "G". This fear increased substantially when Vecchia broke into Barbara Murphy's car [Admission , and destroyed the personal belongings that he took from her car, see Admissions 20, 21, 25, 26, 27, 28, 29 and 71, and after committing those crimes continued his relentless campaign of pursuit and intimidation of Murphy, while knowing throughout the time the harmful effect his contact had on Murphy and knowing that he was breaching his repeated agreements to have no further contact with her Admissions 30 - 32 [During meetings with Murphy's attorney, Vecchia was informed about effect his contact had on Murphy and agreed to have no further contact with her], Admission 41, 43.

By way of example, after Vecchia broke into Murphy's car and stole her belongings, he deliberately continued to go to the places that he knew Barbara Murphy would be, and at times even attempted to approach her. See Admission 5, in which Vecchia admits he went to Brennan's, a bar that Murphy frequented, about 300 times for the entire period from 1997 through 2000. See also, e.g.,

Admissions 37, 63, 65. He did so despite repeated agreements that he would have no further contact with her.

By way of further example, Vecchia has also admitted in testimony he provided under oath at his deposition that after he agreed to leave Murphy alone, he saw Murphy in October of 2000 at a restaurant called Toronto's and upon seeing her, remained there and sat across from her. See Admission 65. He has also admitted in testimony under oath in his Termination Proceeding that he realizes that upon seeing Murphy at Toronto's in October of 2000, he should have, but failed, to immediately turn around and leave. See Admission 66.

Vecchia's actions caused Murphy extreme fear and apprehension that her life was in danger. The treatment notes of Murphy's psychiatrist describe effects that Vecchia's conduct against Murphy caused. These excerpts illustrate that she has for years, and continues to, experience imminent fear of bodily harm or death from Vecchia's repeated acts toward her. See Puorro Aff., Exhibit "G", and summary thereof also contained in that exhibit. By way of example, Murphy's psychiatrist observed the following during his treatment of Barbara Murphy during 1998 through 2002 (emphasis had been added):

> [T]he fact that it's [David Vecchia's wrongful behavior] been so persistent and continues despite initial warnings and protest on the part of the man that it would stop, she is **increasingly agitated and angry**. (See Puorro Aff., Exhibit "G", notes dated March 21, 2001);
>
> **She casually mentions that he may well come back to kill her.** (See id., notes dated 11/29/01).
>
> She feels somewhat overwhelmed. She says the **worry about the stalking has always bee[n] on her mind** – though at a distance. Once this all started up again it has come back into the forefront and is very intense. **She has found herself trimming back all the**

27

**vegetation around her house and she has added more lights to feel safe**. (See id., notes dated 9/6/02).

This meeting [where she testified against Vecchia before the labor relations board] **precipitated again the hypersensitivity, the fearfulness about him coming to get her, to bomb her house, to burn her house**. She finds herself **very anxious when she enters the house**, having to check everything to see if it's been moved or put out of position...She's very tearful and sat having this whole thing triggered again. **Clearly this is a post-traumatic reaction to the stalking**. See id., notes dated 11/22/02.

Clearly, Vecchia's actions toward Murphy placed her repeatedly in apprehension of imminent bodily harm. The psychological effect that Vecchia's treatment of her was so extreme, Murphy continues to re-experience those same feelings of terror and danger, again, years after the incidents occurred.

There is no issue of material fact as to Murphy's claim of civil assault against Vecchia. Accordingly, summary judgment on Murphy's invasion of privacy claim (Cause of Action Ten) against Vecchia is warranted.

## IV.    **CONCLUSION**

For all of the reasons stated above, in the accompanying Affirmation and its exhibits, and during any hearing on this motion, Murphy respectfully requests that the Court grant summary judgment against David Vecchia on the following causes of action in her Complaint:  (i) Cause of Action Nine – civil assault;  (ii) Cause of Action Ten – invasion of privacy; and (iii) Cause of Action Eleven – intentional infliction of emotional distress.

PLAINTIFF,
BARBARA E. MURPHY

BY:

Elisabeth Seieroe Maurer (ct11445)
Eva M. Puorro (ct25772)
Maurer & Associates, PC
871 Ethan Allen, Hwy., Suite 202
Ridgefield, CT 06877
Phone (203) 438-1388
Fax (203) 431-0357