UNITED STATES DISTRICT COURT
DISTRICT OF CONECTICUT

---------------------------------------------------------------X
BARBARA E. MURPHY,                           :        03-CV-519 (DJS)
    Plaintiff,                                    :
v.                                                           :
                                                         :
THE CITY OF STAMFORD and                  :
DAVID VECCHIA,                                  :
    Defendants.                                :        APRIL 1, 2005
---------------------------------------------------------------X

## LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Local Rule 56(a)(1), Plaintiff Barbara Murphy (hereinafter, "Murphy") submits the following statement setting forth material facts as to which there is no genuine issue to be tried:

    1.    In 1993, Vecchia was hired as the purchasing agent for the City of Stamford. [Admission 1].[1]

    2.    Vecchia's position as Purchasing Agent for the City was a supervisory position. [Admission 2].

    3.    In 1995, Murphy was transferred to administrative assistant/data systems for the City of Stamford Fire Department. [Admission 3].

    4.    In or around 1997, Murphy began working with Vecchia on several City of Stamford committees. [Admission 4].

---

[1] The "Admission" designations noted in this document are included for the reader's convenience, and refer to the entire paragraph in which they appear.

5. Vecchia has been to Brennan's, a neighborhood bar located in the Shippan section of Stamford, during the period of 1997 to 2000, probably around 300 times. [Admission 5].

6. On one occasion in 1998, Vecchia attempted to pay for Murphy's drinks and meals at a pub. [Admission 6].

7. In January of 1998, Vecchia had lunch with Murphy. [Admission 7].

8. Vecchia called out Barbara Murphy's name while at Brennan's one night. [Admission 8].

9. Vecchia sent candy one time to Barbara Murphy's office. [Admission 9].

10. Vecchia sent M&Ms one time through the interoffice mail to Barbara Murphy. [Admission 10].

11. Vecchia located a copy of Murphy's high school yearbook picture. [Admission 11].

12. Vecchia saw Barbara Murphy at Brennan's on March 20, 1998. [Admission 16].

13. Vecchia broke into Barbara Murphy's car in March of 1998. [Admission 13].

14. In March of 1998, Vecchia went to Barbara Murphy's car, which at the time was parked about two car lengths from her home, broke into her car, and took from her car a briefcase and other items. Just as he

2

was committing these acts, he realized immediately he made a bad decision. [Admission 14].

15. Immediately after breaking and entering into Barbara Murphy's car, and stealing items from her car, David Vecchia drove away and stopped at a Dunkin Donuts parking lot. At that time he began to look through the briefcase and other items he had stolen from her car. He tore up some of the items he had taken and threw them away. He stepped on and smashed some computer disks he had taken from her car. [Admission 15].

16. Vecchia "admits to criminal trespass in entering car at Murphy's home" and "admits to taking things from Murphy's car". [Admission 16].

17. On March 20, 1998, Barbara Murphy left Brennan's without Vecchia. [Admission 17].

18. On the morning of next day, March 21, 1998, Vecchia returned home from work at 2:30pm. Upon returning home, Vecchia's wife told him she found a message on the answering machine that a woman named Barbara Murphy had called and wanted to know if Vecchia had her briefcase. [Admission 18].

19. Later that night, at about 10:30 pm, Vecchia called Murphy. [Admission 19].

20. During that telephone call, Vecchia told Barbara Murphy that he had taken her briefcase, that he was sorry and that he didn't know why he had done it. [Admission 20].

21. He also told her that he had done what she asked and brought her briefcase, as Murphy requested in her telephone message, to the Fire Station, told her that he was sorry, stated that he did not know why he had broken into Murphy's car and that he was sorry for causing so much trouble in her life. [Admission 21].

22. Subsequent to Vecchia's break in to Murphy's car, he received a call from Ben Frasier, Esq., Barbara Murphy's attorney, in which Attorney Frasier demanded that Vecchia return the remainder of Murphy's belongings he had taken during his break-in of Murphy's car. [Admission 22].

23. Subsequent to Vecchia's break in to Murphy's car, Vecchia spoke with and agreed to meet Ben Frasier, Esq., Barbara Murphy's attorney, and return the items he had taken. [Admission 23].

24. During Vecchia's meeting with Attorney Frasier, Vecchia's sister, an attorney, participated via telephone. [Admission 24].

25. Vecchia arrived at Attorney Frasier's office and returned some broken computer disks that had contained an extensive database that she was creating for a local attorney, and gave Attorney Frasier one hundred dollars. [Admission 25].

26. During that meeting, Vecchia said that the items he had brought with him and returned during that meeting were all that he could find, and that he had thrown out most of the things he had taken from her car. [Admission 26].

27. During that meeting, Vecchia produced to Attorney Frasier a letter he wrote to Murphy apologizing for his conduct (with respect to the break-in of her car). [Admission 27].

28. In that letter Vecchia states as follows: "Barbara, this is all I have, it was thrown in the trash at my house and in my panic I forgot it. Anything else missing was thrown out elsewhere and I cannot recover. Please use enclosed money to purchase any items you are missing. If more is needed, I will reimburse you. I do not know why I did this, and regret the pain that is has brought your family. My life is in your hands. Please give me time, a chance to solve my problems and redeem my life. David". [Admission 28].

29. The document attached as Exhibit 2 to Plaintiff's Request for Admissions is a copy of that letter that Vecchia wrote, apologizing for his conduct. The information contained in that Exhibit 2 is true and authentic. [Admission 29].

30. Vecchia understood that during his meeting with Attorney Frasier that Attorney Frasier was requesting that Vecchia have no contact whatsoever with Barbara Murphy. [Admission 30].

31. Vecchia understood that during his meeting with Attorney Frasier, he "was told by Attorney Frasier that I shouldn't have any contact with her [Barbara Murphy]". [Admission 31].

32. Vecchia agreed, as requested by Attorney Frasier, that he would not have any contact whatsoever with Barbara Murphy and that he would not speak to her. [Admission 32].

33. During the meeting in Attorney Frasier's office, Vecchia also agreed that he would seek immediate counseling. [Admission 33].

34. Vecchia was concerned he was going to be reported to the City or the police, because on Saturday he had left at the fire department the items he had taken from Barbara Murphy's car with letter he wrote stating he was sorry for what he had done. [Admission 34].

35. After Vecchia's meeting with Attorney Frasier, Vecchia saw Barbara Murphy. [Admission 35].

36. In April of 1998, Vecchia obtained a copy of an internet article titled "Stopping the Stalker". [Admission 36].

37. In July of 1998, Vecchia saw Murphy again at Brennan's. Vecchia approached Murphy and tried to talk to her. Murphy "waved him off", not wanting to talk to him. [Admission 37].

38. In the summer of 1998, Vecchia ran in the High Ridge Road race sponsored by the City. [Admission 38].

39. Vecchia attended a meeting in September of 1998 with William Stover ("Stover") and Fred Manfredonia ("Manfredonia") of the

6

City's Human Resources department. During that meeting, Stover and Manfredonia told Vecchia that Barbara Murphy complained about Vecchia and told them that he was bothering her. [Admission 39].

40. It was Vecchia's understanding that Barbara Murphy, through the complaint she made with the personnel department in 1998 that Barbara Murphy had asked through the personnel department that Vecchia have <u>no</u> further contact with her. [Admission 40].

41. After 1998, Barbara Murphy continued to ask that Vecchia have no further contact with her, for example, by filing the criminal complaint against Vecchia. [Admission 41].

42. During his meeting with Stover and Manfredonia in September 1998, Vecchia admitted that he had broken into Barbara Murphy's car, and stolen her briefcase from that car, in March of 1998. [Admission 42].

43. During that meeting, Vecchia admitted that he had committed "prior unwanted behavior towards Barbara Murphy". [Admission 43].

44. During that meeting, Stover and Manfredonia also told Vecchia that they were investigating the complaint Barbara Murphy made against Vecchia, that they had not made any decision on that complaint, and that they would get back to Vecchia. [Admission 44].

45. Manfredonia and Stover contacted Vecchia in September of 1998 after their meeting with him. During this contact, they asked Vecchia

more questions and instructed Vecchia not to have any contact with Barbara Murphy in the workplace. [Admission 45].

46. Vecchia agreed at this time to cease contact with Murphy at work. [Admission 46].

47. During that follow up contact with Vecchia in September of 1998, Vecchia told them he was a Vietnam war veteran and they had some nerve telling him what to do outside of the workplace. [Admission 47].

48. Stover and Manfredonia did not instruct Vecchia to have no further contact with Barbara Murphy outside of the workplace. [Admission 48].

49. Stover and Manfredonia did not tell Vecchia that Barbara Murphy had requested the right to ensure that Vecchia was receiving counseling and that Vecchia be required to provide to them reports as necessary regarding such counseling. [Admission 49].

50. Stover and Manfredonia suggested to Vecchia that he use a program sponsored by the City that provides its employees with funds for services such as counseling. [Admission 50].

51. Vecchia told Manfredonia and Stover during that meeting that he would use that program to obtain counseling. [Admission 51].

52. During that meeting, Vecchia agreed to go to counseling because he wanted his job. [Admission 52].

53.  The City never followed up with Vecchia regarding Vecchia's progress in therapy. [Admission 53].

54.  The City never received any progress reports from Vecchia. [Admission 54].

55.  Manfredonia and Stover did not ever tell Vecchia that he must go to counseling in order to keep his job with the City. [Admission 55].

56.  Manfredonia and Stover told Vecchia that they would get back to Vecchia with a written agreement for him. [Admission 56].

57.  The City never drafted a written agreement for Vecchia to sign. [Admission 57].

58.  It was Vecchia's understanding that the "written agreement" that Manfredonia and Stover referred to would require that Vecchia have no contact with Barbara Murphy in the workplace. [Admission 58].

59.  Manfredonia and Stover told Vecchia if circumstances at work require that he interact with Barbara Murphy at work, that he deal with Barbara Murphy in a businesslike manner. [Admission 59].

60.  In September of 1998, Barbara Murphy and Vecchia occasionally needed to deal with each other in performing their jobs. [Admission 60].

61.  The City placed no restrictions on Vecchia's dealings with Barbara Murphy outside of work. The City only told Vecchia that he

should limit his dealings with Barbara Murphy in the workplace. [Admission 61].

62. Vecchia went back to meet with Stover in the end of October 1998. Vecchia asked Stover about the written agreement Stover and Manfredonia had mentioned to Vecchia during their September 1998 meeting. Stover told Vecchia that as far as he was concerned, the City was not involved in Barbara Murphy's complaint and that her complaint ended in March of 1998. [Admission 62].

63. After September of 1998, Vecchia continued to go to Brennan's. During that period, he saw Barbara Murphy there "plenty of times". He did not cease his pattern of continuing to go to Brennan's regularly. [Admission 63].

64. The City did not tell Vecchia that any future inappropriate interactions or contact with Barbara Murphy would result in Vecchia's dismissal. [Admission 64].

65. In October of 2000, Vecchia went to a restaurant called Toronto's. He saw Barbara Murphy there. He saw her, and sat at the opposite end of the bar from her. [Admission 65].

66. Looking back now, Vecchia realizes that upon seeing Murphy at Toronto's in October of 2000, he should have turned around and left. [Admission 66].

67. On November 29, 2000, Judge Richard Tobin signed an arrest warrant for Vecchia. Vecchia was arrested and charged with stalking. [Admission 67].

68. After Vecchia's arrest, the City placed him on paid administrative leave from work. [Admission 68].

69. The City terminated Vecchia in 2002, over a year after he was arrested for stalking. [Admission 69].

70. In January of 2002, Vecchia pled guilty to the March 1998 theft of Barbara Murphy's briefcase. [Admission 70].

71. Specifically, on January 23, 2002, Vecchia entered into an agreement to plead guilty to criminal trespass and disorderly conduct. [Admission 71].

72. The document attached as Exhibit 5 to Plaintiff's Request for Admissions is an excerpt of the court transcript from the proceedings during which Vecchia entered the above pleas of guilty. That document is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence. The information contained in that document is true and authentic. [Admission 72].

PLAINTIFF, BARBARA E. MURPHY

BY: _____
Elisabeth Seieroe Maurer (ct11445)
Eva M. Puorro (ct25772)
Maurer & Associates, PC
871 Ethan Allen, Hwy., Suite 202
Ridgefield, CT 06877
Phone (203) 438-1388
Fax (203) 431-0357