UNITED STATES DISTRICT COURT
DISTRICT OF CONECTICUT

---

BARBARA E. MURPHY, : 3:03 CV 00519 (MRK)
    Plaintiff, :
v. :
     :
THE CITY OF STAMFORD and :
DAVID VECCHIA, :
    Defendants. : APRIL 1, 2005

---

### AFFIRMATION OF EVA M. PUORRO IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Eva M. Puorro hereby affirms under the penalties of perjury that:

1) I am an attorney licensed to practice law in the State of Connecticut and the United States District Court of the District of Connecticut. I am one of the attorneys representing the Plaintiff Barbara E. Murphy ("Murphy") in this action. I submit this affirmation in support of Plaintiff's motion for partial summary judgment on the following claims against Defendant David Vecchia: (i) Cause of Action Nine – Civil Assault; (ii) Cause of Action Ten – invasion of privacy by intrusion; and (iii) Cause of Action Eleven -- intentional infliction of emotional distress.

2) This affirmation sets forth facts admitted by Defendant David Vecchia (hereinafter "Vecchia") under Rules 8(d), 12 and 36 of the Federal Rules of Civil Procedure, refers to certain documents admitted by Vecchia to be true, authentic and correct, refers to a document that Vecchia admits is a public record that meets the requirements of Rule 803(8) of the Federal

Rules of Evidence and refers to sworn deposition testimony and sworn testimony that Vecchia provided before the Connecticut Board of Mediation and Arbitration, which testimony is admissible pursuant to Rule 801(d) of the Federal Rules of Evidence. This affirmation also refers to redacted notes made by Barbara Murphy's psychiatrist that were produced to all parties during discovery pursuant to the protective order issued by this Court.

3) On or about February 27, 2004, Vecchia filed his Answer ("Answer") to Murphy's Complaint herein. In that Answer, Vecchia admitted certain material facts alleged in Murphy's Complaint herein. (A copy of Murphy's Complaint is attached hereto as **Exhibit "A"** and is referred to herein as the "Complaint. A copy of Vecchia's Answer is attached hereto as **Exhibit "B"** and is referred to herein as "Vecchia Answer").

4) On August 15, 2003, Vecchia's deposition in this case was held at my office. A true and correct copy of the transcript of Vecchia's sworn deposition herein (referenced herein as "Vecchia Deposition") is attached hereto as **Exhibit "C"**. During that sworn deposition testimony, Vecchia made admissions of certain material facts alleged in Murphy's Complaint.

5) On October 29, 2003, Murphy served Request for Admissions (hereinafter "Request for Admissions") upon Vecchia, a copy of which is attached hereto as **Exhibit "D"**. On or about May 12, 2004, Vecchia provided a response to Murphy's Request for Admissions ("Vecchia Response to Request for Admissions", a copy of which is attached hereto as

**Exhibit "E"**) by which Vecchia admitted certain material facts alleged in Murphy's Complaint.

6) On October 21, 2002, Vecchia provided sworn testimony before the Connecticut Board of Mediation and Arbitration in an action titled <u>In the Matter of City of Stamford and AFSCME Co. 4, Local 2657</u> (No. 2002-A-0842) (Dee, Arb.) (referred to herein as the "Vecchia Termination Proceeding"). That proceeding generally related to whether the City of Stamford had just cause to terminate David Vecchia's employment with the City. As indicated below, during the Vecchia Termination Proceeding, Vecchia admitted certain material facts alleged in Murphy's Complaint. A copy of transcript of testimony that Vecchia provided under oath during the Vecchia Termination Proceeding held on October 21, 2002, is attached hereto as **Exhibit "F"**.

7) On April 21, 2004, Plaintiff produced to all parties a redacted copy of her psychiatrist's treatment notes, pursuant to the protective order granted by Judge Mark Kravitz on April 16, 2004. A copy of those redacted therapist's notes, preceded by a summary of certain relevant portions thereof, are attached hereto as **Exhibit "G"**, and are included to the extent that they illustrate certain aspects of Plaintiff's claims against David Vecchia for intentional infliction of emotional distress and civil assault.

8) In light of the admissions of certain material facts specified in further detail below, and other undisputed facts, partial summary judgment should be granted against Vecchia.

9) The undisputed material facts are as follows:

1. In 1993, Vecchia was hired as the purchasing agent for the City of Stamford. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶ 1.[1] [Admission 1].[2]

2. Vecchia's position as Purchasing Agent for the City was a supervisory position. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶2. [Admission 2].

3. In 1995, Murphy was transferred to administrative assistant/data systems for the City of Stamford Fire Department. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶3. [Admission 3].

4. In or around 1997, Murphy began working with Vecchia on several City of Stamford committees. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶4. [Admission 4].

5. Vecchia has been to Brennan's, a neighborhood bar located in the Shippan section of Stamford, during the period of 1997 to 2000, probably around 300 times. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 62 (Testimony of David Vecchia), lines 6-8. [Admission 5].

---

[1] Unless otherwise indicated, citations apply to the entire paragraph in which they appear.

[2] The "Admission" designations noted in this document are included for the reader's convenience, and refer to the entire paragraph in which they appear.

4

6. On one occasion in 1998, Vecchia attempted to pay for Murphy's drinks and meals at a pub. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶12. [Admission 6].

7. In January of 1998, Vecchia had lunch with Murphy. See Exhibit "C" hereto, Vecchia Deposition, p. 53, lines 5-8. [Admission 7].

8. Vecchia called out Barbara Murphy's name while at Brennan's one night. See Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding (Testimony of David Vecchia) at 62, lines 18-21. [Admission 8].

9. Vecchia sent candy one time to Barbara Murphy's office. See Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 59 (Testimony of David Vecchia), lines 8-11. See also, Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶7b and ¶80. [Admission 9].

10. Vecchia sent M&Ms one time through the interoffice mail to Barbara Murphy. See Exhibit "C" hereto, Vecchia Deposition, p. 9, lines 14-20. [Admission 10].

11. Vecchia located a copy of Murphy's high school yearbook picture. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶21. [Admission 11].

12. Vecchia saw Barbara Murphy at Brennan's on March 20, 1998. See Exhibit "F" hereto, Transcript of David Vecchia Termination

Proceeding at 67 (Testimony of David Vecchia), lines 18-21. [Admission 12].

13. Vecchia broke into Barbara Murphy's car in March of 1998. See Exhibit "F" hereto, Transcript of David Vecchia Termination Proceeding at 65 (Testimony of David Vecchia), lines 19-21. [Admission 13].

14. In March of 1998, Vecchia went to Barbara Murphy's car, which at the time was parked about two car lengths from her home, broke into her car, and took from her car a briefcase and other items. See Exhibit "F" hereto, Transcript of David Vecchia Termination Proceeding at 66 (Testimony of David Vecchia), lines 14-16, and at 69 (Testimony of David Vecchia), lines 16-25. Just as he was committing these acts, he realized immediately he made a bad decision. Id. at 70, lines 18-19. [Admission 14].

15. Immediately after breaking and entering into Barbara Murphy's car, and stealing items from her car, David Vecchia drove away and stopped at a Dunkin Donuts parking lot. At that time he began to look through the briefcase and other items he had stolen from her car. He tore up some of the items he had taken and threw them away. He stepped on and smashed some computer disks he had taken from her car. See Exhibit "F" hereto, Transcript of David Vecchia Termination Proceeding at 71 (Testimony of David Vecchia), lines 11-25, and at 72 (Testimony of David Vecchia), lines 6-22. [Admission 15].

16. Vecchia "admits to criminal trespass in entering car at Murphy's home" and "admits to taking things from Murphy's car". See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶38d and f, respectively. [Admission 16].

17. On March 20, 1998, Barbara Murphy left Brennan's without Vecchia. See Exhibit "F" hereto, Transcript of David Vecchia Termination Proceeding at 67 (Testimony of David Vecchia), lines 23-24. [Admission 17].

18. On the morning of next day, March 21, 1998, Vecchia returned home from work at 2:30pm. Upon returning home, Vecchia's wife told him she found a message on the answering machine that a woman named Barbara Murphy had called and wanted to know if Vecchia had her briefcase. See Exhibit "F" hereto, Transcript of David Vecchia Termination Proceeding at 73 (Testimony of David Vecchia), lines 18-23. See also Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶39. [Admission 18].

19. Later that night, at about 10:30 pm, Vecchia called Murphy. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶40a. [Admission 19].

20. During that telephone call, Vecchia told Barbara Murphy that he had taken her briefcase, that he was sorry and that he didn't know why he had done it. See Exhibit "E" hereto, Transcript of David Vecchia

7

Termination Proceeding at 75 (Testimony of David Vecchia), lines 17-19. [Admission 20].

21. He also told her that he had done what she asked and brought her briefcase, as Murphy requested in her telephone message, to the Fire Station, told her that he was sorry, stated that he did not know why he had broken into Murphy's car and that he was sorry for causing so much trouble in her life. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶40b, c and d. [Admission 21].

22. Subsequent to Vecchia's break in to Murphy's car, he received a call from Ben Frasier, Esq., Barbara Murphy's attorney, in which Attorney Frasier demanded that Vecchia return the remainder of Murphy's belongings he had taken during his break-in of Murphy's car. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶42. [Admission 22].

23. Subsequent to Vecchia's break in to Murphy's car, Vecchia spoke with and agreed to meet Ben Frasier, Esq., Barbara Murphy's attorney, and return the items he had taken. See Exhibit "B" hereto, Vecchia Answer, ¶35. See also Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶43. [Admission 23].

24. During Vecchia's meeting with Attorney Frasier, Vecchia's sister, an attorney, participated via telephone. See Exhibit "B" hereto, Vecchia Answer, ¶36. [Admission 24].

25. Vecchia arrived at Attorney Frasier's office and returned some broken computer disks that had contained an extensive database that she was creating for a local attorney, and gave Attorney Frasier one hundred dollars. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶44a. [Admission 25].

26. During that meeting, Vecchia said that the items he had brought with him and returned during that meeting were all that he could find, and that he had thrown out most of the things he had taken from her car. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶44b and c. [Admission 26].

27. During that meeting, Vecchia produced to Attorney Frasier a letter he wrote to Murphy apologizing for his conduct (with respect to the break-in of her car). See Exhibit "B" hereto, Vecchia Answer, ¶36. See also Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶44d. [Admission 27].

28. In that letter Vecchia states as follows: "Barbara, this is all I have, it was thrown in the trash at my house and in my panic I forgot it. Anything else missing was thrown out elsewhere and I cannot recover. Please use enclosed money to purchase any items you are missing. If more is needed, I will reimburse you. I do not know why I did this, and regret the pain that is has brought your family. My life is in your hands. Please give me time, a chance to solve my problems and redeem my life. David". See Exhibit "F" hereto, Transcript of Vecchia Termination

Proceeding at 85 (Testimony of David Vecchia), lines 17-25, and at 86, lines 1-3.   [Admission 28].

29.    The document attached as Exhibit 2 to Plaintiff's Request for Admissions is a copy of that letter that Vecchia wrote, apologizing for his conduct.  The information contained in that Exhibit 2 is true and authentic. See, Exhibit "D" hereto, Request for Admissions, Exhibit 2 thereto, and Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶44e, f and g.  [Admission 29].

30.    Vecchia understood that during his meeting with Attorney Frasier that Attorney Frasier was requesting that Vecchia have no contact whatsoever with Barbara Murphy.  See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 82 (Testimony of David Vecchia), lines 3, 21-25.  [Admission 30].

31.    Vecchia understood that during his meeting with Attorney Frasier, he "was told by Attorney Frasier that I shouldn't have any contact with her [Barbara Murphy]".  See Exhibit "C" hereto, Vecchia Deposition, p. 13, lines 8-10.  [Admission 31].

32.    Vecchia agreed, as requested by Attorney Frasier, that he would not have any contact whatsoever with Barbara Murphy and that he would not speak to her.  See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 83 (Testimony of David Vecchia), lines 1-2, and at 87, lines 14-17.  See also Exhibit "C" hereto, Vecchia Deposition, p. 74, lines 11-15.  [Admission 32].

33. During the meeting in Attorney Frasier's office, Vecchia also agreed that he would seek immediate counseling. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 87 (Testimony of David Vecchia), lines 4-6. See also, Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶44k. [Admission 33].

34. Vecchia was concerned he was going to be reported to the City or the police, because on Saturday he had left at the fire department the items he had taken from Barbara Murphy's car with letter he wrote stating he was sorry for what he had done. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 83 (Testimony of David Vecchia), lines 17-20. [Admission 34].

35. After Vecchia's meeting with Attorney Frasier, Vecchia saw Barbara Murphy. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 89 (Testimony of David Vecchia), lines 19-24. [Admission 35].

36. In April of 1998, Vecchia obtained a copy of an internet article titled "Stopping the Stalker". See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶34. [Admission 36].

37. In July of 1998, Vecchia saw Murphy again at Brennan's. Vecchia approached Murphy and tried to talk to her. Murphy "waved him off", not wanting to talk to him. See Exhibit "C" hereto, Vecchia Deposition, p. 58, lines 15-25. [Admission 37].

38. In the summer of 1998, Vecchia ran in the High Ridge Road race sponsored by the City. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 92 (Testimony of David Vecchia), lines 17-25. [Admission 38].

39. Vecchia attended a meeting in September of 1998 with William Stover ("Stover") and Fred Manfredonia ("Manfredonia") of the City's Human Resources department. During that meeting, Stover and Manfredonia told Vecchia that Barbara Murphy complained about Vecchia and told them that he was bothering her. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 95 (Testimony of David Vecchia), lines 4-20. See also, Exhibit "B" hereto, Vecchia Answer, ¶41, and Exhibit "C" hereto, Vecchia Deposition, p. 59, lines 14-15. [Admission 39].

40. It was Vecchia's understanding that Barbara Murphy, through the complaint she made with the personnel department in 1998 that Barbara Murphy had asked through the personnel department that Vecchia have no further contact with her. See Exhibit "C" hereto, Vecchia Deposition, p. 10, lines 12-16, 25 and p. 11, lines 1, 5-11. [Admission 40].

41. After 1998, Barbara Murphy continued to ask that Vecchia have no further contact with her, for example, by filing the criminal complaint against Vecchia. See Exhibit "C" hereto, Vecchia Deposition, p. 11, lines 7-11. [Admission 41].

42.  During his meeting with Stover and Manfredonia in September 1998, Vecchia admitted that he had broken into Barbara Murphy's car, and stolen her briefcase from that car, in March of 1998. See Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 96 (Testimony of David Vecchia), lines 1-5, and Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶50. [Admission 42].

43.  During that meeting, Vecchia admitted that he had committed "prior unwanted behavior towards Barbara Murphy". See Exhibit "C" hereto, Vecchia Deposition, pp. 15, lines 23-25, and p. 16, line 1. [Admission 43].

44.  During that meeting, Stover and Manfredonia also told Vecchia that they were investigating the complaint Barbara Murphy made against Vecchia, that they had not made any decision on that complaint, and that they would get back to Vecchia. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 96 (Testimony of David Vecchia), lines 18-22. [Admission 44].

45.  Manfredonia and Stover contacted Vecchia in September of 1998 after their meeting with him. During this contact, they asked Vecchia more questions and instructed Vecchia not to have any contact with Barbara Murphy in the workplace. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 96 (Testimony of David Vecchia), lines 4-7. [Admission 45].

46. Vecchia agreed at this time to cease contact with Murphy at work. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶51. [Admission 46].

47. During that follow up contact with Vecchia in September of 1998, Vecchia told them he was a Vietnam war veteran and they had some nerve telling him what to do outside of the workplace. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 98 (Testimony of David Vecchia), lines 8-10. [Admission 47].

48. Stover and Manfredonia did not instruct Vecchia to have no further contact with Barbara Murphy outside of the workplace. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 99 (Testimony of David Vecchia), lines 22-25. [Admission 48].

49. Stover and Manfredonia did not tell Vecchia that Barbara Murphy had requested the right to ensure that Vecchia was receiving counseling and that Vecchia be required to provide to them reports as necessary regarding such counseling. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 12-16. [Admission 49].

50. Stover and Manfredonia suggested to Vecchia that he use a program sponsored by the City that provides its employees with funds for services such as counseling. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 17-20. [Admission 50].

51. Vecchia told Manfredonia and Stover during that meeting that he would use that program to obtain counseling. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 21-23. [Admission 51].

52. During that meeting, Vecchia agreed to go to counseling because he wanted his job. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 23-25. [Admission 52].

53. The City never followed up with Vecchia regarding Vecchia's progress in therapy. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶55. [Admission 53].

54. The City never received any progress reports from Vecchia. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶57. [Admission 54].

55. Manfredonia and Stover did not ever tell Vecchia that he must go to counseling in order to keep his job with the City. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding (Testimony of David Vecchia) at 101, lines 1-2. [Admission 55].

56. Manfredonia and Stover told Vecchia that they would get back to Vecchia with a written agreement for him. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 7-8. [Admission 56].

57. The City never drafted a written agreement for Vecchia to sign. See Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶53. [Admission 57].

58. It was Vecchia's understanding that the "written agreement" that Manfredonia and Stover referred to would require that Vecchia have no contact with Barbara Murphy in the workplace. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 11-14. [Admission 58].

59. Manfredonia and Stover told Vecchia if circumstances at work require that he interact with Barbara Murphy at work, that he deal with Barbara Murphy in a businesslike manner. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 23-25. [Admission 59.

60. In September of 1998, Barbara Murphy and Vecchia occasionally needed to deal with each other in performing their jobs. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 102 (Testimony of David Vecchia), lines 6-9. [Admission 60].

61. The City placed no restrictions on Vecchia's dealings with Barbara Murphy outside of work. The City only told Vecchia that he should limit his dealings with Barbara Murphy in the workplace. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 102 (Testimony of David Vecchia), lines 3-9. [Admission 61].

62.  Vecchia went back to meet with Stover in the end of October 1998. Vecchia asked Stover about the written agreement Stover and Manfredonia had mentioned to Vecchia during their September 1998 meeting. Stover told Vecchia that as far as he was concerned, the City was not involved in Barbara Murphy's complaint and that her complaint ended in March of 1998. See, Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 105 (Testimony of David Vecchia), lines 2-8. [Admission 62].

63.  After September of 1998, Vecchia continued to go to Brennan's. During that period, he saw Barbara Murphy there "plenty of times". He did not cease his pattern of continuing to go to Brennan's regularly. See Exhibit "C" hereto, Vecchia Deposition, p. 83, lines 1-15, and p. 96, lines 14-17. [Admission 63].

64.  The City did not tell Vecchia that any future inappropriate interactions or contact with Barbara Murphy would result in Vecchia's dismissal. See Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 106 (Testimony of David Vecchia), lines 5-8. [Admission 64].

65.  In October of 2000, Vecchia went to a restaurant called Toronto's. See Exhibit "F" hereto, Transcript of Vecchia Termination Proceeding at 106 (Testimony of David Vecchia), lines 6-9. He saw Barbara Murphy there. See, Id. at 106 (Testimony of David Vecchia), lines 11-13. He saw her, and sat at the opposite end of the bar from her.

17

See Exhibit "E" hereto, Vecchia Response to Request to Admissions, ¶66. [Admission 65].

66. Looking back now, Vecchia realizes that upon seeing Murphy at Toronto's in October of 2000, he should have turned around and left. See Exhibit "C" hereto, Vecchia Deposition, p. 79, lines 11-16. [Admission 66].

67. On November 29, 2000, Judge Richard Tobin signed an arrest warrant for Vecchia. Vecchia was arrested and charged with stalking. See Exhibit "B" hereto, Vecchia Answer, ¶60, and Exhibit "A" hereto, Complaint Exhibit 5 thereto (arrest warrant application for Vecchia). See also, Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶71. [Admission 67].

68. After Vecchia's arrest, the City placed him on paid administrative leave from work. See Exhibit "B" hereto, Vecchia Answer, ¶62, and Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶74. [Admission 68].

69. The City terminated Vecchia in 2002, over a year after he was arrested for stalking. See Exhibit "B" hereto, Vecchia Answer, ¶69 and Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶88 and ¶91. [Admission 69].

70. In January of 2002, Vecchia pled guilty to the March 1998 theft of Barbara Murphy's briefcase. See, Exhibit "F" hereto, Transcript of

Vecchia Termination Proceeding at 110 (Testimony of David Vecchia), lines 11-13. [Admission 70].

71. Specifically, on January 23, 2002, Vecchia entered into an agreement to plead guilty to criminal trespass and disorderly conduct. See Exhibit "A" hereto, Complaint, ¶68 [Exhibit 7 to the Complaint contains portions of Court transcript of Vecchia's guilty pleas). See also, Exhibit "B" hereto, Vecchia Answer, ¶68. See also Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶89. [Admission 71].

72. The document attached as Exhibit 5 to Plaintiff's Request for Admissions is an excerpt of the court transcript from the proceedings during which Vecchia entered the above pleas of guilty. That document is a public record and meets the requirements of Rule 803(8) of the Federal Rules of Evidence. The information contained in that document is true and authentic. See Exhibit "D" hereto, Request for Admissions, ¶¶90(a), (b) and (c), and Exhibit "E" hereto, Vecchia Response to Request for Admissions, ¶¶90 (a), (b) and (c). [Admission 72].

## **CONCLUSION**

Based on the foregoing undisputed material facts, as well as the analysis contained in the accompanying supporting memorandum of law, which is incorporated as if fully set forth herein, summary judgment on Plaintiff's claims against David Vecchia for intentional infliction of emotional distress, invasion of privacy and civil assault is warranted.

Dated April 1, 2005

_____
Eva M. Puorro (ct25772)