# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONECTICUT

Return Date: April 30, 2003

```
-------------------------------------------------------X
BARBARA E. MURPHY,                  :        Docket No.
        Plaintiff,                  :
v.                                  :
                                    :        COMPLAINT
THE CITY OF STAMFORD and            :
DAVID VECCHIA,                      :        March 20, 2003
        Defendants.                 :
-------------------------------------------------------X
```

## I.    INTRODUCTION

The Plaintiff, Barbara Murphy (hereinafter, "Murphy"), by and through her

attorneys, the Law Offices of Elisabeth Seieroe Maurer, PC, hereby states and

affirms for her complaint against the City of Stamford (hereinafter, the "City") and

David Vecchia (hereinafter, "Vecchia") as follows:

## II.   NATURE OF THE ACTION

This is an action under 42 U.S.C. §1983 alleging the deprivation of rights,

privileges, and immunities secured by the Constitution and laws of the United States

arising from the negligent supervision of the employees of the City of Stamford, causing

Murphy damage.

By this action, Murphy seeks the following relief for the violation of 42 U.S.C. §1983 and related state claims: compensatory damages, punitive damages, attorney's fees, and such other and further relief that the court finds just.

## III.    JURISDICTION

1.    This action is brought pursuant to 42 U.S.C. §1983 and the Fifth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and the principles of supplemental and pendent jurisdiction.

2.    All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the District of Connecticut.

## IV.    PARTIES

3.    Murphy is an individual who is and was, at all times pertinent hereto, residing at 9 Knollwood Road, Norwalk, Connecticut, 06854.

4.    The City of Stamford, with a principle location at 888 Washington Avenue, P.O. Box 10152, Stamford, Connecticut 06905 is a municipality established in accordance with the laws of the State of Connecticut and is a municipal employer within the meaning of the Municipal Employee Relations Act.

5.    David Vecchia, is an individual who is and was, at all times pertinent hereto, employed by the City of Stamford.

2

## V.    FACTUAL ALLEGATIONS

6.     Murphy began employment with the City in 1983 in the Payroll Department.

7.     In 1993, Vecchia was hired as the Purchasing Agent for the City. Vecchia's position as Purchasing Agent for the City  was a supervisory position.

8.     In 1996, Murphy was transferred to administrative assistant/data systems for the City Fire Department.

9.     In or around 1997, Murphy began working with Vecchia on several City committees. Additionally, Murphy and Vecchia worked together preparing a newsletter relating to what is called the "HTE system". In the preparation of the newsletter, Vecchia supervised Murphy. Also, Vecchia supervised Murphy's work on other designated committees. Murphy and Vecchia also worked on an "End User Manual" for the HTE System.

10.     At the end of 1997 and beginning of 1998, Vecchia began making unwanted sexual advances to Murphy.

11.     Vecchia's unwanted sexual advances came in the form of asking Murphy to lunch, sending candy to her office, sending her cards through interoffice mail and coming to her office uninvited.

12.     Even though both Vecchia and Murphy work for the City, they worked in different buildings at this time.

13.    In late 1997 and late 1998, Murphy repeatedly told Vecchia that he needed to stop making "advances" toward her as she was not interested. After Murphy told Vecchia to stop making "advances" toward her, he began to "stalk" her.

14.    On information and belief, during this period, Mrs. Vecchia decided to have Vecchia followed by an investigator. See Investigator Gary Paist's report that is attached hereto as Exhibit 1.

15.    As Murphy continued her normal routine, she noticed that Vecchia started to appear at venues that she frequented. Murphy had not noticed Vecchia at these locations prior to declining his "advances". Vecchia was generally alone when he was seen and would just stare at Murphy while standing near by. One time, he repeatedly shouted her name in a crowded club.

16.    Vecchia attempted to pay for Murphy's drinks and meals, but Murphy repeatedly declined Vecchia's gifts, even telling the bartender to refuse any drinks on her behalf from Vecchia as she was not interested and he was annoying her.

17.    Murphy began to receive hundreds of frightening phone calls made to her home. The phone calls consisted of someone on the other end breathing heavily, silence or music in the background. Generally, these phone calls would occur shortly after seeing Vecchia at a restaurant or nightclub and continue through the night and into the early morning hours until Murphy eventually took the phone off the hook.

4

18.    Vecchia began to eavesdrop on conversations that Murphy would have with co-workers while at the Government Center so that he could harass and frighten her with the information. Vecchia would send Murphy articles and other materials through interoffice mail related to topics that he had overheard her discussing.

19.    Vecchia located a copy of Murphy's high school yearbook picture and carried the photo of Murphy in his briefcase. The copy of the yearbook page was discovered by Vecchia's ex-wife, a copy of which is attached hereto as Exhibit 2.

20.    Vecchia not only began appearing at the same restaurants, bars and/or night clubs that Murphy did, but he began following her from the establishment to her vehicle when she left.

21.    Murphy began to fear for her safety. Murphy felt that Vecchia was obsessed with her and would continuously follow and harass her.

22.    Murphy was an active athlete. Vecchia began appearing on her running path at the same time that Murphy regularly ran even though it was over fifteen miles from his home and several miles from his place of employment.

23.    At a United Way sponsored race, Vecchia attempted to run the entire race directly in front of Murphy. She became so upset that she vomited and stopped running in the race. Murphy later learned that the mayor of Stamford had observed Vecchia's behavior and mentioned to his staff his concern regarding Vecchia's behavior.

24.    On Valentine's day and Murphy's birthday, she found that someone had tied balloons to her vehicle as it was parked outside of her home.

25.   Vecchia's ex-wife informed police that he had even obtained a copy of an internet article titled "Stopping the Stalker" during this time frame.

26.   Throughout 1998, Vecchia stared at Murphy, followed her to various locations, appeared at her running path, sent her inappropriate gifts through interoffice mail, sent her drinks and food she had repeatedly rejected, and acted in a harassing manner toward Murphy.

27.   One evening as she left a restaurant, Vecchia followed her to her car. As Murphy started the car, Vecchia stood in front of her car, blocking her from leaving. As Murphy drove forward, Vecchia stayed in the way and Murphy was unable to leave. She had to put her car in reverse and drive the wrong way on a one-way street to get away.

28.   On another occasion, Murphy left the same restaurant with a friend. Vecchia followed Murphy and a friend out to their car and watched them drive off. Later that evening Murphy had her side-view mirror of her car smashed while the car sat in her driveway.

29.   On March 20, 1998, Murphy was at Brennan's restaurant in Stamford, Connecticut. Shortly after she arrived, Vecchia appeared and began leering and staring at her. Murphy left once again with someone walking to her car for fear of her safety.

6

30.    During the night of March 20, 1998, Murphy's mother was awakened by noise outside the house. She called to Murphy's room and told her that she heard noises, saw lights and thought someone was trying to break into the house. However, by the time that Murphy arrived at the front of the house, whoever was trying to break in was long gone.

31.    The next morning Murphy discovered her car had been vandalized, her briefcase stolen and the trunk and glove box left in disarray.

32.    Murphy telephoned a friend, Attorney Ben Fraser, and recounted the problems she had been having with Vecchia and her suspicion that he was stalking her. Attorney Fraser advised her to call Vecchia and demand the return of her things. While looking for a pen in her purse, Murphy discovered a set of rosary beads in her purse which did not belong to her.

33.    Murphy called Vecchia's home and left a message on his answering machine requesting the return of her things to the Fire Station by 4:00 p.m. Later that night, at approximately 10:30 p.m., Murphy received a telephone call from Vecchia. He said that he had done what she asked and brought her briefcase to the Fire Station. He went on to say he was sorry and that he did not know why he had broken into her car and that he was sorry for causing so much trouble in her life. Appalled and frightened, Murphy shouted in response; "just leave me alone" and hung up the phone.

34.    When Murphy went to retrieve her things at the Fire Station, she found that most of the contents of her briefcase, including her appointment book, an extensive database she was creating for a local attorney and her cell phone charger were missing. Items that had been in the trunk of her car were now in her briefcase.

35.    Murphy went back to Attorney Fraser who called Vecchia and demanded that he return the remainder of Murphy's belongings. Vecchia agreed to meet Attorney Fraser at Attorney Fraser's office and return some items.

36.    Vecchia arrived at Attorney Fraser's office and returned some broken computer discs that had contained the above-referenced "data base", and a hundred dollars. He said that the items he had were all that he could find as he had thrown most of her things away. He also produced a letter he had written apologizing for his conduct. Vecchia's sister, an attorney located in Washington, DC, participated in the meeting between Vecchia and Attorney Fraser via telephone.

37.    Vecchia and his sister, in a conference with Attorney Fraser, begged that Murphy not to report him to the City. Vecchia promised to stop stalking and harassing Murphy and to seek psychological treatment. However, Vecchia did not stop stalking and harassing Murphy. He continued to follow her to bars and restaurants, and still made numerous hang-up phone calls.

38.    In September of 1998, Attorney Frazier contacted Thomas Cassone (hereinafter, "Cassone"), the Corporation Counsel for the City, to discuss Vecchia's conduct.

8

39.    Cassone referred Attorney Fraser to the City's Human Resources Department.  On September 21, 1998, Murphy and Attorney Fraser met with representatives of Stamford's Human Resources Department, Fred Manfredonia (hereinafter, "Manfredonia") and William Stover (hereinafter, "Stover").  The purpose of the meeting was to inform the City of Vecchia's violations of the City's sexual harassment policy and to file an official complaint against Vecchia with the City.

40.    At that meeting, Manfredonia and Stover indicated that they would follow up with Vecchia, get his version of events, and get back to Attorney Fraser and Murphy.

41.    On information and belief, the basis of which is information provided by Stover and Manfredonia, on September 25, 1998, Manfredonia and Stover met with Vecchia about Murphy's complaint.  On information and belief, the basis of which is information provided by Stover and Manfredonia, Vecchia admitted his prior conduct toward Murphy both at work and outside of work, and his prior agreement to get psychological help and to cease and desist his unwanted behavior towards Murphy.

42.    On September 30, 1998, Manfredonia and Stover met with Attorney Fraser and Murphy to discuss the results of their meeting with Vecchia.  They explained that Vecchia had admitted his harassing conduct both at work and outside of work. Attorney Fraser requested that they (Stover and Manfredonia) get an agreement from Vecchia which stated that : 1) Vecchia would obtain therapy, 2) provide periodic progress reports to the City and through the City, to Attorney Fraser, and 3) leave Murphy alone.

43.    Stover and Manfredonia agreed that the agreement would be promptly reduced to writing, signed by Vecchia and copied to Murphy.  Further, they said that as soon as it was drafted they would get back to Attorney Fraser and Murphy for their input.  Stover and Manfredonia would then have Vecchia sign and, if he broke the agreement, he would be disciplined and/or terminated.

43.    The City never drafted an agreement for Vecchia to sign, never confirmed Vecchia was receiving counseling, and never followed up with Vecchia regarding Vecchia's progress in therapy, even though Manfredonia and Stover committed to doing all three at the September 30, 1998 meeting.

44.    The City never saw to it that Vecchia attended therapy sessions.

45.    The City never received any progress reports from Vecchia.

46.    The City never monitored Vecchia's conduct regarding Murphy in any manner.

47.    On information and belief, Vecchia never obtained psychological treatment for his behavior.

48.    On information and belief, the basis of which is the attached complaint, throughout the year of 1999, Vecchia continued to harass his ex-wife.  His ex-wife filed a complaint alleging Vecchia's unacceptable and distorted behavior with the State of Connecticut Public Safety, Division of State Police, and Redding, a copy of which is attached hereto as Exhibit 3.

49.    In September 2000, Vecchia's harassment of Murphy resumed.

10

50.     In the last week of September of 2000, Murphy was in the Finance area of
Stamford Government Center where she saw Vecchia. As soon as Vecchia noticed
Murphy, he began staring at her. Murphy walked away from Vecchia, but he continued
to stare at her.

51.     Murphy began receiving numerous hang-up telephone calls at work.

52.     On October 5, 2000, Vecchia showed up at a bar where Murphy was with
friends. Vecchia entered the establishment, sat near Murphy and stared at her. Murphy
was so disturbed by Vecchia that she and her friends were forced to leave.

53.     That same night, Murphy's caller ID indicated she had received a phone
call from a pay phone located on Route 7 in Wilton. The pay phone is on Vecchia's way
home from work in Stamford. The following morning, Murphy found a "frog" ornament in
the front lawn of her home.

54.     In October 2000, Murphy reported Vecchia's harassment of her to the
Stamford Police Department (hereinafter, the "Police").
Murphy met with Police Officer Carl Starte in October of 2000 and told him the following:

      (a)     She worked for the City;

      (b)     Through work she became an acquaintance of Vecchia;

      (c)     Vecchia had been stalking her for several years;

      (d)     She reported the stalking/harassment to the Human Resources
            Department personnel and that they had done nothing;

11

(e)     Murphy felt that asking for the help of the police was the only choice at that time. Murphy tried to get a restraining order from the Court but was told that she had to go to the police first.

(f)     Vecchia's conduct was investigated and it was confirmed that he had performed the acts alleged;

(g)     That there was an agreement between the parties, both represented by counsel, that Vecchia would stop the harassing conduct and seek counseling while Murphy would not pursue any further action against Vecchia;

(h)     Vecchia continued to harass Murphy even after the agreement was reached;

(i)      Murphy was afraid for her life and stopped going to the Government Center which severely affected her work, for fear of seeing Vecchia;

(j)      Murphy became frightened for her safety and began to avoid places that she might come in contact with Vecchia or even see him;

(k)     Murphy stopped seeing friends and running for exercise because she was afraid of seeing Vecchia;

(l)      To this day, Murphy continues to look over her shoulder because she is afraid she might see Vecchia and be harassed; and

(m)   Murphy continues to have nightmares due to the harassment of Vecchia.

See: Murphy's Voluntary Statement, attached hereto as Exhibit 4.

55.   After Murphy made the complaint to the Police, Cassone, now the Director of Public Safety, Health, and Welfare, approached her at an employee of the month office celebration on the 7th Floor of the Fire Marshal's Office. Cassone asked Murphy if she would step out in the hallway to speak to him.

56.   In the capacity of Director of Public Safety, Health, and Welfare, Cassone was Murphy's supervisor.

57.   Cassone asked her if she had been telling people that he had not been doing his job properly, in reference to the Stamford Police investigation of Vecchia. Murphy responded that she did not say that he had not been doing his job, but did say that the City and the Department of Human Resources had not been doing their jobs.

58.   In late October or early November of 2000, the Police met with Vecchia regarding Murphy's complaint.

59.   On November 3, 2000, Murphy noticed that someone had fired a bullet into her back deck.

60.   On November 29, 2000, Judge Richard Tobin signed an arrest warrant for Vecchia. Vecchia was arrested and charged with stalking. A complete copy of the Arrest Warrant Application is attached hereto as Exhibit 5.

13

61.    The arrest warrant was issued upon the following information:

    (a)    Murphy worked for the City and through work became acquainted with Vecchia.

    (b)    Vecchia began harassing, following, and stalking her both at work and after work hours.

    (c)    Murphy reported Vecchia's harassing behavior to City officials.

    (d)    The City interviewed Vecchia, he admitted stalking Murphy and he agreed to stop harassing her and seek counseling.

    (e)    Despite Vecchia's agreement, he continued to harass Murphy.

    (f)    Murphy claimed that Vecchia was involved in criminal mischief, harassing telephone calls, hang-up telephone calls, along with other harassing conduct.

    (g)    An officer of the Redding Police Department verified that Vecchia had several complaints filed against him by his ex-wife. The complaints consisted of criminal mischief, harassing telephone calls, unusual behavior, and stalking.

    (h)    It was determined that the harassing telephone calls to Vecchia's ex-wife came from a phone located at Vecchia's mother's home, Vecchia's place of work, and areas around Vecchia's residence.

    (i)    Vecchia's ex-wife had received approximately 75 letters from Vecchia.

14

These facts along with many other circumstances led to the arrest warrant

For Vecchia. See: the Arrest Warrant Application attached hereto as Exhibit 6.

62.    After Vecchia's arrest, the City placed him on paid administrative leave

from work.

63.    On November 30, 2000, Murphy was contacted by Cassone, who in

addition to his position as City Director of Public Safety, Health, and Welfare, is one of

the partners in a private law firm in Stamford.

64.    Cassone informed Murphy that his law firm was representing Vecchia in

his criminal case relating to the stalking charge. When Murphy became upset and

expressed her outrage, Cassone agreed to have his law firm withdraw from

representing Vecchia.

65.    In November 2000, Murphy was in the Stamford Government Center

again, and saw Vecchia in a conference room. Immediately after noticing Vecchia,

Murphy headed for the elevator in an attempt to leave the area before Vecchia saw her.

As she was walking to the elevator to leave, Vecchia came out of the conference room

and followed her to the elevator. As Murphy waited for the elevator, Vecchia walked

back and forth past the elevator several times, staring at her.

66.    On December 18, 2000, Murphy met with representatives of the City,

including Cassone and Manfredonia, to discuss Vecchia's harassment. Murphy

received no follow-up or feedback from anyone from the City regarding the

15

"investigation" of Vecchia's conduct until approximately three months after the meeting with City officials.

67. On March 15, 2001, Murphy was contacted by Manfredonia. He explained to Murphy that the City wanted to bring Vecchia back to work because it was not cost effective to keep paying him to stay home. Manfredonia explained that the City's Corporate Counsel was going to draft an agreement restricting Vecchia's conduct and have him sign the agreement before returning back to work. Manfredonia said he needed Murphy to agree and wanted to know where Murphy went so that it could be added to the agreement and noted that Vecchia should avoid going to those places. Murphy replied that she would not sign any agreement and that she would never tell Manfredonia where she went as it would simply give Vecchia the information he needed to follow her.

66.    Manfredonia also asked Murphy to contact Vecchia's criminal attorney and psychologist to discuss Vecchia's behavior and criminal case.

67.    Murphy objected to having Vecchia back at work. Eventually the City decided to keep Vecchia on administrative leave. At this point in time, despite the fact that, the City had a "zero tolerance" policy regarding sexual harassment and that Vecchia was an admitted stalker who had failed to comply with either his agreement with Murphy or his agreement with the City, the City failed to terminate his employment.

68.    Vecchia entered into an agreement to plead guilty to criminal trespass and disorderly conduct on January 23, 2002. See: portions of the court transcript  <u>attached hereto as Exhibit 7</u>.

69.    Vecchia was terminated by the City over a year after he was arrested for stalking.

70.    Vecchia's unwelcome sexual advances and harassment of Murphy created an intimidating, hostile and offensive work environment, causing Murphy to be fearful and to limit the work places she would go to.

71.    Vecchia's unwelcome sexual advances, stalking  and harassment of Murphy has substantially interfered with her work performance.

72.    Murphy has become fearful and reluctant to go any place, including the Stamford Government Center, where Vecchia worked because she is afraid to come into contact with him.

73.    Murphy has been afraid to apply for other positions and/or assignments with the City because she is afraid that she may come in contact with Vecchia.

74.    The City failed to take reasonable steps to remedy the ongoing sexual harassment of Murphy by Vecchia until long after Vecchia was arrested, spent a year on paid leave, and eventually pled guilty.

75.    The City failed to properly follow through and enforce the agreement that it reached with Vecchia that required Vecchia to stay away from Murphy.

76.    The City failed to obtain a written agreement from Vecchia that he would cease harassing Murphy, as they promised that they would.

77.    The City failed to monitor Vecchia's behavior.

78.    The City failed to properly and immediately investigate Vecchia's conduct in November 2000, but instead waited for the police to arrest Vecchia before taking any action.

79.    The City failed to complete its investigation of Vecchia's harassment of Murphy in a timely manner, but instead neglected their responsibility and "deferred" their investigation until there was an outcome in Vecchia's criminal case.

80.    The City's ongoing failure to remedy the harassment of Murphy by Vecchia for an extended and continuous period of time, constitutes an ongoing policy and practice.

81.    As a result of Vecchia's ongoing harassment of Murphy, she has suffered extreme emotional distress, requiring medical treatment.

82.    As a result of the City's ongoing failure to timely investigate and remedy Vecchia's improper conduct, Murphy has suffered extreme emotional distress, requiring medical treatment.

## AS AND FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. §1983 violation by Vecchia)
### (in his individual capacity)

83.    The allegations of paragraphs 1 – 82 are fully and completely incorporated by reference into this paragraph 83.

84.    At all times relevant herein, Vecchia, in his individual capacity, was a "person" acting under color of state law for purposes of 42 U.S.C. §1983.

85.    Vecchia permitted, tolerated, and engaged in a pattern, practice, and course of conduct that has violated the City's Sexual Harassment Policies and Procedures and such facts and circumstances are relevant and important to a fair, proper, and complete investigation of this complaint.

86.    Vecchia has failed to carry out his duty of supervision by failing to refrain from and enforce the City's Sexual Harassment Polices and Procedures. The City has a "Zero Tolerance" policy, practice and procedure.

87.    As Vecchia was the perpetrator of the sexual harassment, he was well aware his conduct violated the Policy and Procedure of the City.

88.    Vecchia intentionally deprived Murphy of the equal protection of the law by subjecting her to repeated sexual harassment and by not refraining or remedying the situation after Murphy made repeated complaints of sexual harassment. .

89.    As a result of Vecchia's intentional conduct, Murphy has suffered damage that she should be compensated for.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(42 U.S.C. §1983 violation by Vecchia)**
**(in his official capacity)**

90.    The allegations of paragraphs 1 – 89 are fully and completely incorporated by reference into this paragraph 90.

91.    At all relevant times herein, Vecchia, as a Purchasing Agent for the City of Stamford, was a "person" acting under color of state law for purposes of 42 U.S.C. §1983.

92.    Vecchia intentionally subjected Murphy to a deprivation of the equal protection of the law by engaging in repeated acts of sexual harassment and by not adequately refraining or remedying his action when Murphy made complaints of sexual harassment.

93.    As a result of Vecchia's intentional conduct, Murphy has suffered damage that she should be compensated for.

### AS AND FOR A THIRD CAUSE OF ACTION
### (42 U.S.C. §1983 violation by the City of Stamford)

94.    The allegations of paragraphs 1 – 93 are fully and completely incorporated by reference into this paragraph 94.

95.    At all relevant times herein, the City of Stamford, as a local government entity, was a "person" acting under color of state law for purposes of 42 U.S.C. §1983.

96.    The City of Stamford, both directly and through Vecchia, as Purchasing Agent for the City, was aware of and acquiesced in, the deprivation of equal protection of Murphy through:  repeated acts of sexual harassment, failing to enforce and abide by the City's policies and procedures, failing to investigate and/or remedy sexual harassment.

97.    The City has failed to properly train, supervise, control, and discipline Vecchia, Murphy's supervisors, and the Human Resources Department.

98.    The City has failed to make an adequate or effective investigation of Murphy's complaints of sexual harassment.

99.    The City has failed to adequately remediate Murphy's complaints of sexual harassment.

100.    The City, is vested by state law with the authority to make policy for the City to avoid, investigate, and remediate sexual harassment within its' municipal agencies and departments.  The City was aware of: (a) a pattern of sexual harassment by Vecchia who is employed by the City and (b) the City's policies regarding the discipline of employees accused of sexually harassing conduct.  The City should have known that their efforts to eliminate sexual harassment were so inadequate that it was obvious that the failure to correct said policies would cause further sexual harassment of Murphy and other female workers.

101.    As a result of the City's intentional and inadequate conduct, Murphy has suffered damage and she should be compensated.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Negligent Supervision of Vecchia by the City of Stamford)

102.    The allegations of paragraphs 1 – 101 are fully and completely incorporated by reference into this paragraph 102.

21

103.   Prior to Murphy being sexually harassed in 2000, Vecchia had been Accused of similar conduct.

104.   The City was aware that Vecchia had sexually harassed Murphy in 1998.

105.   The City acted in an inadequate manner in its efforts to prohibit sexual harassment that it is well aware of within its workforce.

106.   The City, by its own actions and the actions of its agents, representatives, and/or employees, was informed and notified of prior sexual harassment against Murphy, but neglected to adequately investigate or deter such conduct.

107.   At all times mentioned herein, the City had a duty to the employees of the City, including Murphy, to enact and enforce appropriate policies and guidelines to prohibit sexual harassment in the workplace.

108.   The City breached its duty to their employees which was a substantial factor in Murphy's continued sexual harassment while working for the City.

109.   As a result of the City's conduct, Murphy has suffered damage that she should be compensated for.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Negligent Supervision by the City of Stamford)

110.   The allegations of paragraphs 1 – 109 are fully and completely incorporated by reference into this paragraph 110.

111.   The City was well aware that Vecchia had harassed Murphy for an extended period of time.

112.   The City has acted in an inadequate manner in its efforts to prohibit sexual harassment that it is well aware of within its workforce.

113.   The City, by its own actions and the actions of its agents, representatives, and/or employees, was informed and notified of prior sexual harassment against Murphy, but neglected to adequately investigate, remedy, and deter such conduct.

114.   At all times mentioned herein, the City had a duty to the employees of the City, including Murphy, to enact and enforce appropriate policies and guidelines to prohibit sexual harassment in the workplace.

115.   The City breached of its duty owed to its employees which was a substantial factor in Murphy's continued sexual harassment while working for the City.

116.   As a result of the City's misconduct, Murphy has suffered damage that she should be compensated.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Negligent Retention of Vecchia by the City of Stamford)

117.   The allegations of paragraphs 1 – 116 are fully and completely incorporated by reference into this paragraph 117.

118.   The City was well aware that Vecchia had committed prior acts similar to those for which he was criminally charged.

23

119.    The City was well aware that Vecchia had harassed Murphy for an extended period of time.

120.    Because the City knew of Vecchia's prior harassment and that Vecchia was harassing Murphy, it was apparent that the City's failure to promptly act would be likely to subject Murphy to imminent harm.

121.    The City has acted in an inadequate manner in its efforts to prohibit sexual harassment that it is well aware of within its workforce.

122.    The City, by its own actions and the actions of its agents, representatives, and/or employees, was informed of prior sexual harassment against Murphy, but neglected to adequately investigate, remedy, and deter such conduct.

123.    At all times mentioned herein, the City had a duty to the employees of the City, including Murphy, to enact and enforce appropriate policies and guidelines to prohibit sexual harassment in the workplace.

124.    The City breached of its duty to its employees which was a substantial factor in Murphy's continued sexual harassment while working for the City.

125.    As a result of the City's conduct, Murphy has suffered damage that she should be compensated for.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of Contract By Vecchia)

126.    The allegations of paragraphs 1 – 125 are fully and completely incorporated by reference into this paragraph 126.

24

127.   In an effort to stop Vecchia from harassing Murphy, the City and Vecchia entered into an agreement, that stated Vecchia would be able to remain at work only if he discontinued the harassment of Murphy, sought psychological counseling and reported on the progress of his treatment to the City.

128.   Both the City and Vecchia entered into this agreement intending it to benefit Murphy by discontinuing the harassment against Murphy.

129.   Vecchia breached the contract that he made with the City for the benefit of Murphy by failing to seek psychological counseling, by failing to report his treatment, and by failing to cease harassing Murphy.

130.   As a result of Vecchia's breach of the contract between himself and the City for the benefit of Murphy, Murphy has suffered damage that she should be compensated for.

### AS AND FOR A EIGHTH CAUSE OF ACTION
### (Breach of Contract By the City of Stamford)

131.   The allegations of paragraphs 1 – 130 are fully and completely incorporated by reference into this paragraph 131.

132.   In an effort to stop Vecchia from harassing Murphy, the City and Vecchia entered into an agreement, that stated Vecchia would be able to remain at work only if he discontinued the harassment of Murphy, sought psychological treatment and reported on the process of his psychological treatment.

133.    Both the City and Vecchia entered into this agreement intending it to benefit Murphy by discontinuing Vecchia's harassment of her.

134.    The City breached the contract by failing to reduce the contract to writing, failing to demand status reports regarding Vecchia's psychological treatment and by failing to demand Vecchia's compliance with his agreement.

135.    As a result of the City's conduct, Murphy has suffered damage that she should be compensated for.

### AS AND FOR A NINTH CAUSE OF ACTION
### (Civil Assault by Vecchia)

136.    The allegations of paragraphs 1 – 135 are fully and completely incorporated by reference into this paragraph 136.

137.    Vecchia made many unwelcomed advances at Murphy both while working for the City and after work hours.

138.    Murphy became fearful for her safety as Vecchia continued stalking her.

139.    Vecchia began to show up at places the Murphy would frequent.

140.    Vecchia trespassed on Murphy's property and broke into her vehicle to steal items of hers.

141.    Vecchia would continuously stare at Murphy in an abnormal manner to purposely frighten her.

142.    Vecchia was seized by the police and charged with stalking.

143.   Because of the above-mentioned conduct, Vecchia has committed

assault.

144.   As a result of the Vecchia's conduct, Murphy has suffered damage that

she should be compensated for.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Invasion of Privacy by Intrusion by Vecchia)

145.   The allegations of paragraphs 1 – 144 are fully and completely

incorporated by reference into this paragraph 145.

146.   Vecchia made many unwelcomed advances at Murphy both while working

for the City and after work hours.

147.   Vecchia conduct was a continuous harassment of Murphy for a period of

time.

148.   Vecchia trespassed onto Murphy's property and broke into her vehicle to

steal items of hers.

149.   Vecchia left a bullet on Murphy's deck at home.

150.   Vecchia left a frog head puppet on Murphy's lawn.

151.   Vecchia left balloons on Murphy's car while it was parked at her home.

152.   Vecchia would continuously stare at Murphy in an abnormal manner to

purposely frighten her.

153.   Vecchia intentionally intruded into the solitude of life that Murphy had.

154.   Vecchia intentionally and continuously interfered with the private affairs

and concerns of Murphy.

155.    Vecchia conducted himself in the manner that any reasonable person would find highly offensive.

156.    As a result of Vecchia's conduct, Murphy has suffered damage that she should be compensated for.

### AS AND FOR A ELEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress by Vecchia)

157.    The allegations of paragraphs 1 – 156 are fully and completely incorporated by reference into this paragraph 157.

158.    Vecchia made many unwelcomed advances to Murphy both while working for the City and after work hours.

159.    Murphy became fearful for her safety.

160.    Vecchia intentionally began to show up at places the Murphy would frequent.

161.    Vecchia trespassed onto Murphy's property and broke into her vehicle to steal items of hers.

162.    Vecchia left a bullet on her deck, a frog in the front lawn, balloons on her car, followed her at work, and sent her numerous articles and packages through interoffice mail.

163.    Vecchia would continuously stare at Murphy in an abnormal manner to purposely frighten her.

28

164.   Vecchia intended to inflict emotional distress or he knew or should have known that emotional distress was likely as a result of his conduct.

165.   Vecchia's conduct toward Murphy was extreme and outrageous.

166.   Murphy's emotional distress was caused by the continuous conduct of Vecchia.

167.   Murphy's emotional distress is severe, caused her physical damage and affects her life on a daily basis.

168.   As a result of the Vecchia's conduct, Murphy has suffered damage that she should be compensated for.

## AS AND FOR A TWELTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress by Vecchia)

169.   'The allegations of paragraphs 1 – 168 are fully and completely incorporated by reference into this paragraph 169.

170.   Vecchia made many unwelcomed advances to Murphy both while working for the City and after work hours.

171.   Murphy became fearful for her safety.

172.   Vecchia began to show up at places the Murphy would frequent.

173.   Vecchia trespassed onto Murphy's property and broke into her vehicle to steal items of hers.