# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BARBARA E MURPHY                              CIVIL NO
Plaintiff                                     3:03 cv 00519 (MRK)

v

THE CITY OF STAMFORD AND                      February 27, 2004
DAVID VECCHIA
Defendants

ANSWER OF DAVID VECCHIA

The defendant DAVID VECCHIA, hereby files its Answer to the Complaint of March 20,2003

1-4. As to the allegations set forth Paragraphs 1 through 3, Defendant Vecchia lacks sufficient

knowledge upon which to form a belief, and therefore leaves Plaintiff to her proof.

5-6. Defendant admits the allegations of par. 5 through 6.

7. Defendant admits the first sentence of par.7 and denies that Vecchia was a supervisor of the

plaintiff.

8. Defendant admits the allegation of par. 8.

9. Defendant admits that the first. second and last sentence of par. 9, and denies the third and

fourth sentence since Vecchia had no supervisory authority over plaintiff.

10-11. As to the allegations set forth in Paragraphs 10-11, Defendant Vecchia denies making

sexual advances.

12. Plaintiff has not defined "at this time". Plaintiff and Defendant Vecchia worked in same

building from July, 1993 thru September, 1996.

1

13-34. Defendant denies the allegations of par. 13. through 34 and therefore leaves Plaintiff to her proof.

35 Defendant has no knowledge of sentence 1. Defendant does admit that he spoke to Attorney Fraser and agreed to meet him at his office.

36. Defendant denies returning computer discs at this meeting. Defendant denies sentence 2, he never spoke to Fraser. Defendant admits to sentences 3 and 4.

37. Defendant denies the allegations of par. 37, and therefore leaves Plaintiff to her proof.

38-40.Defendant has no knowledge of allegations of par. 38 through 40, and therefore leaves Plaintiff to her proof.

41. Defendant admits to sentence 1. Defendant denies sentence 2 and therefore leaves Plaintiff to her proof.

42-47. Defendant has no knowledge of par. 42-47.and therefore leaves Plaintiff to her proof.

48-53.Defendant denies the allegations of par. 48- 53. and therefore leaves the Plaintiff to her proof..

54. Defendant denies par.54 and leaves Plaintiff to her proof.

55-57. Defendant has no knowledge of par.55-57 and leaves Plaintiff to her proof.

58. Defendant denies par.58 and leaves plaintiff to her proof..

59. Defendant has no knowledge of the allegation of par. 59..

60. Defendant admits to the allegation of par. 60 and adds that the charge of stalking was dismissed.

61.Defendant has no knowledge of the allegations par. (a) thru (i) and leaves to her proof. Defendant adds that the charge of stalking was dismissed.

62. Defendant admits to par.62.

2

63-64. Defendant has no knowledge of the allegations of par. 63 and 64.

65. Defendant denies para 65 and leaves Plaintiff to her proof.

66-67. Defendant has no knowledge of the allegations of par 66-67 (pages 16 and 17)

and leaves Plaintiff to her proof.

68-69. Defendant admits the allegations of par. 68 and 69.

70-71. Defendant denies the allegation of par. 70 and par. 71.

72-73. Defendant has no knowledge of the allegations of par. 72 and par. 73.

74-82. Defendant denies the allegations of par. 74 through 82.

FIRST CAUSE OF ACTION (p 18)

1-83. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 83 as the answers to paragraphs 1-83.

84-89. The defendant denies the allegations of paragraphs 84 through 89.

SECOND CAUSE OF ACTION (p 19)

1-90. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 90 as the answers to paragraphs 1-90.

91-93 The defendant denies the allegations of paragraphs 91 through 93.

THIRD CAUSE OF ACTION (p 20)

The defendant Vecchia does not respond to this Third Cause of Action as it is not addressed to

defendant Vecchia..

FOURTH CAUSE OF ACTION (p.21)

The defendant Vecchia does not respond to this Fourth Cause of Action as it is not addressed to

defendant Vecchia.

3

FIFTH CAUSE OF ACTION (p. 22)

The defendant Vecchia does not respond to this Fifth Cause of Action as it is not addressed to defendant Vecchia.

SIXTH CAUSE OF ACTION (p. 23)

The defendant Vecchia does not respond to this Sixth Cause of Action as it is not addressed to defendant Vecchia.

SEVENTH CAUSE OF ACTION (p.24)

1- 126. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 126 as the answers to paragraphs 1- 126.

127- 130. The defendant denies the allegations of paragraphs 127 through 130.

EIGHTH CAUSE OF ACTION (p.25)

The defendant Vecchia does not respond to this Eighth Cause of Action as it is not addressed to defendant Vecchia.

NINTH CAUSE OF ACTION (p.26)

1-136. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 136 as the answers to paragraphs 1- 136.

137- 144. The defendant denies the allegations of paragraphs 137 through 144.

TENTH CAUSE OF ACTION (p. 27)

1-145. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 145 as the answers to paragraphs 1- 145.

146- 156 The defendant denies the allegations of paragraphs 146 through 156.

4

ELEVENTH CAUSE OF ACTION (p.28)

1- 157. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 157 as the answers to paragraphs 1- 157.

158- 168. The defendant denies the allegations of paragraphs 158 through 168.

TWELTH CAUSEOF ACTION (p.29).

1-169. The defendant re-alleges and incorporates by reference the answers to paragraphs

1 through 169 as the answers to paragraphs 1- 169.

170- 179. The defendant denies the allegations of paragraphs 170 through 179.

THIRTEENTH CAUSE OF ACTION (p. 30)

The defendant Vecchia does not respond to this Thirteenth  Cause of Action as it is not addressed

to defendant Vecchia.

SPECIAL DEFENSES

1) The court lacks jurisdiction over any claims under 42 USC Section 1983 as the same claims were made in a CHRO/ EEOC complaint filed in September 2001, and those claims were dismissed in February, 2002 and a release of jurisdiction letter was issued in March (CHRO) and April (EEOC) of 2002, giving notice of 90 days to file suit, this lawsuit was filed more than 90 days thereafter, in March, 2003. Thus the claims in this lawsuit are beyond the time periods granted by law and as noted in the Release of Jurisdiction letters of March and April, 2002, and therefore plaintiff's claims are barred by law.

2) Vecchia is not a supervisor of Murphy.

3) The Court should decline jurisdiction over state claims.

4) The state claims are barred by statue of limitations of two years, pursuant to 52-557n, CGS

THE DEFENDANT
DAVID VECCHIA

David Vecchia
PO BOX 159
West Redding, CT 06896
203-744-4307

6

CERTIFICATION

I hereby certify that a copy of the forgoing Production was mailed, postage prepaid, this 28th day of February, 2003 to the following:

Law Offices of Elisabeth S Maurer, PC
871 Ethan Allen Hwy, Suite 202
Ridgefield, CT 06877


James V, Minor
Assistant Corporate Counsel
City of Stamford
888 Washington Boulevard
Box 10152
Stamford, CT 06904-2152


David Vecchia
Defendant
Pro Se

7

# EXHIBIT C

# MURPHY -V- STAMFORD - DAVID VECCHIA - 8/15/03

## Page 1 to Page 120

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT    06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

**Page 1**

1      UNITED STATES DISTRICT COURT
2       DISTRICT OF CONNECTICUT
3 BARBARA E. MURPHY.     CIVIL NO. 3:03CV00519
4     PLAINTIFF.          (DJS)
5 VS             AUGUST 15, 2003
6 THE CITY OF STAMFORD AND
7 DAVID VECCHIA.
8     DEFENDANTS.
9
10      DEPOSITION OF DAVID VECCHIA
11 A P P E A R A N C E S :
12   LAW OFFICES OF ELISABETH SEIEROE MAURER. P.C.
     Attorneys for the Plaintiff
13     871 Ethan Allen Highway, Suite 202
     Ridgefield. Connecticut  06877
14     203-438-1388
   BY: THOMAS W. OZIMKOSKI. JR.. ESQ.
15
   ASSISTANT CORPORATION COUNSEL
16     Attorneys for the Defendant
     City of Stamford
17     888 Washington Boulevard
     Stamford. Connecticut  06904-2152
18     203-977-4087
   BY: JAMES V. MINOR. ESQ.
19
   DAVID VECCHIA. PRO SE
20     P.O. Box 159
     West Redding. Connecticut  06896
21
22        LEEANN J. GARDNER
23        LICENSE NO. 00067
24     REGISTERED PROFESSIONAL REPORTER
25      REGISTERED MERIT REPORTER

**Page 2**

1   ... Deposition of DAVID VECCHIA, being of
2 lawful age, held pursuant to FEDERAL RULES OF CIVIL
3 PROCEDURE, held before Leeann J. Gardner a duly
4 qualified Notary Public, within and for the State of
5 Connecticut, held at the LAW OFFICES OF ELISABETH
6 SEIEROE MAURER, P.C., 871 Ethan Allen Highway,
7 Ridgefield, Connecticut, on August 15, 2003, at 1:05
8 p.m.
9
10 S T I P U L A T I O N S
11   IT IS HEREBY stipulated and agreed by and
12 among counsel for the respective parties that all
13 formalities in connection with the taking of this
14 deposition, including time, place, sufficiency of
15 notice, and the authority of the officer before whom
16 it is being taken may be and are hereby waived.
17 IT IS further stipulated and agreed that
18 objections other than as to form are reserved to the
19 time of trial.
20 IT IS stipulated that the proof of
21 the qualifications of the Notary Public before whom
22 the deposition is being taken is hereby waived.
23 IT IS further stipulated and agreed that
24 the deposition may be signed before any Notary
25 Public.

**Page 3**

1 D A V I D V E C C H I A ,
2   Called as a witness, having first been
3   duly sworn to tell the truth, the whole
4   truth and nothing but the truth, testified
5   as follows:
6 DIRECT EXAMINATION
7   BY MR. OZIMKOSKI:
8    Q.   Mr. Vecchia, as I've explained, my name is
9 Tom Ozimkoski, and I represent Barbara Murphy in this
10 matter. I'm sure you're aware of why we're here
11 today. We're here to ask you a series of questions
12 to gather some information in regards to that case.
13    A.   Uh-huh.
14    Q.   You do understand that you're appearing
15 pro se?
16    A.   Yes.
17    Q.   You've chosen not to have counsel here to
18 represent you?
19    A.   That's correct.
20    Q.   While present here today, is it true that
21 you are not on any medication, drug, alcohol,
22 anything that might alter your responses to my
23 questions?
24    A.   That's true.
25    Q.   I'm going to ask you a series of

**Page 4**

1 questions. It may take a few hours or so.
2    A.   Okay.
3    Q.   If you could please answer yes or no to
4 all the questions that I may ask, that would be
5 appreciated. If the question asks for a brief
6 explanation, if you could please give one.
7    A.   Uh-huh.
8    Q.   If I require something further as far as
9 information, then I'll ask such. Should you fully
10 not understand or completely follow what I'm trying
11 to ask or you don't know how to answer the question
12 properly, just ask me to either restate or rephrase
13 the question. I'll try to do so so you can
14 understand what I'm trying to get at.
15    A.   Uh-huh.
16    Q.   Should you need a break at any time, just
17 ask and we'll be more than happy to take a break.
18 I guess at this point we'll start with the
19 questioning. You had previously been an employee of
20 the City of Stamford, is that correct?
21    A.   That's right.
22    Q.   Throughout the remaining questions, I'm
23 going to refer to the City of Stamford as the City.
24    A.   Fine.
25    Q.   Just so you know where we're going. Were

### Page 5

1   you hired in 1993 to be an employee of the City of
2   Stamford?
3       A.   Yes.
4       Q.   And in what position were you hired for?
5       A.   Purchasing agent.
6       Q.   If you could give me a brief explanation
7   of the duties that were required of you as a
8   purchasing agent?
9       A.   Responsible for the purchases of the City.
10      Q.   The purchases of what exactly?
11      A.   Of everything the City spends money on.
12      Q.   Did you have employees underneath you that
13  you had supervised?
14      A.   Yes.
15      Q.   How many employees underneath you did you
16  supervise?
17      A.   When I started, I think there were ten.
18      Q.   And what was the position of these
19  employees? Were they also purchasing agents or did
20  they have some other titles?
21      A.   They had different titles.
22      Q.   Such as?
23      A.   Buyer, clerks, printers, copy machine
24  operators, mailroom clerk I guess.
25      Q.   Is it my understanding that all of these

### Page 6

1   individuals helped you accomplish your job or what
2   your position required?
3       A.   Well, the mailroom clerks and those people
4   weren't involved with purchasing. That was a
5   different section.
6       Q.   So some of those ten were involved in
7   helping you accomplish what you were supposed to do?
8       A.   Uh-huh.
9       Q.   Was your position deemed a supervisory
10  type position?
11      A.   That's an interesting question. Normally
12  a supervisory position implies that you can hire and
13  fire people and discipline them, but under the set up
14  in the City, I did not have that authority or
15  responsibility.
16      Q.   So the ten employees underneath you were
17  not hired by you?
18      A.   Not hired by me nor did I have any
19  authorization to discipline them or to give them
20  salary increases or to approve salary increases.
21      Q.   So your position was basically to guide
22  them –
23      A.   To be responsible for the department, make
24  sure that they fulfilled their duties and that the
25  groups I was responsible for were successful in

### Page 7

1   accomplishing the work required.
2       Q.   Did you work at any other position within
3   the City?
4       A.   That's the only job I ever held.
5       Q.   And there came a point in time where your
6   position as the purchasing agent was terminated,
7   correct?
8       A.   That's right.
9       Q.   Do you know exactly when you were
10  terminated from the City?
11      A.   December 1st of 2000.
12      Q.   As the purchasing agent for the City, was
13  there some particular individual that you reported
14  to?
15      A.   To Thomas Hamilton.
16      Q.   And what was Mr. Hamilton's position?
17      A.   I'm not sure if it changed before he got
18  there or just after. He was either the director of
19  finance, and then they reorganized the City, he
20  became the director of administrative services I
21  think is his title.
22      Q.   And in addition to Mr. Hamilton, was there
23  somebody else that you reported to?
24      A.   No.
25      Q.   No. Prior to coming to the City, did you

### Page 8

1   have any purchasing or any experience as a purchasing
2   agent?
3       A.   Yes.
4       Q.   In addition to your experience prior to
5   working for the City, did the City supervise or train
6   you in any manner as a purchasing agent?
7       A.   No. Not to say that they didn't pay for
8   some courses that I took, but I had the requisite
9   experience when I got the job.
10      Q.   It's my understanding that you know
11  Barbara Murphy, correct?
12      A.   Yes.
13      Q.   Please note that I'll refer to Barbara
14  Murphy as Barbara throughout the remaining questions.
15      A.   Okay.
16      Q.   During the periods of 1997 to 1998, you
17  had various contact with Barbara, is that correct?
18      A.   Yes.
19      Q.   And one place that you had contact with
20  Barbara was at the work premises, is that correct?
21      A.   At the work premises. Yes.
22      Q.   The work premises would include any of the
23  government buildings. It's my understanding that
24  Barbara did not work in the same building as you,
25  correct?

Page 9

1    A.    That's correct.
2    Q.    Did there ever come a point in time where
3  you had asked Barbara to go out for lunch?
4    A.    No. There was a point in time that she
5  asked me to go to lunch.
6    Q.    And how did you respond to her question?
7    A.    We went to lunch.
8    Q.    Excuse me?
9    A.    We went to lunch.
10    Q.    When she had approached you to ask you for
11  lunch, was that during work time?
12    A.    I don't remember.
13    Q.    Did you ever send Barbara candy at work?
14    A.    I think I sent her some M&M's once.
15    Q.    Do you know what occasion that was sent to
16  her on?
17    A.    No.
18    Q.    And that was sent through the interoffice
19  mail, is that correct?
20    A.    Yes.
21    Q.    In addition to candy, was there ever a
22  time where you sent Barbara cards while at work?
23    A.    I don't remember that.
24    Q.    So you can't recall a time where you sent
25  her a birthday card or a Valentine's card or anything

Page 10

1  of that nature?
2    A.    No. I can't recall any time.
3    Q.    Was there anything else that you sent
4  Barbara via the interoffice mailboxes?
5    A.    I don't remember.
6    Q.    You mentioned that Barbara had asked you
7  to go out to lunch –
8    A.    Yes.
9    Q.    – not vice versa. How many times had
10  Barbara asked you to go to lunch?
11    A.    Once.
12    Q.    Did there come a point in time when
13  Barbara had asked you that she wanted to have no
14  further contact with you?
15    A.    Through the personnel department of the
16  City, yes.
17    Q.    Was that before or after she had asked you
18  to go to lunch?
19    A.    It was after.
20    Q.    Did Barbara ask you more than once that
21  she wanted to have no further contact, whether it was
22  via through her or the City or some City personnel?
23    A.    In 1997, 1998?
24    Q.    Yes.
25    A.    No. Only through the personnel

Page 11

1  department.
2    Q.    Prior to 1997, did she ask you to have no
3  further contact?
4    A.    No.
5    Q.    After 1998, did she ask you to have no
6  further contact?
7    A.    I would guess filing a complaint with the
8  police department and having me arrested would –
9  without saying the words a reasonable person would
10  say that was an indication she didn't want to have
11  any contact with me.
12    Q.    But on a face-to-face basis she never
13  mentioned it?
14    A.    No.
15    Q.    Do you recall a meeting in early 1998 with
16  Attorney Ben Fraser?
17    A.    Yes.
18    Q.    During that meeting, via speaker phone
19  it's my understanding that your sister was present,
20  is that correct?
21    A.    Via speaker phone?
22    Q.    Yes.
23    A.    Yes.
24    Q.    And what is your sister's full name?
25    A.    Janet Vecchia.

Page 12

1    Q.    And what occupation does your sister hold?
2    A.    She's an attorney.
3    Q.    And where does she practice?
4    A.    In Virginia now.
5    Q.    Is she licensed in the State of
6  Connecticut?
7    A.    No.
8    Q.    Was there any one else present, whether it
9  be in person or via speaker phone, at that
10  conference?
11    A.    Let's see. Mr. Fraser, myself. I can't
12  remember if my sister Nancy was sitting in the room
13  there with me with Attorney Fraser and myself or not,
14  or if she sat in the outer lobby.
15    Q.    Is that a complete list of everybody
16  there?
17    A.    I don't remember if Attorney Fraser had a
18  secretary or a clerk there, but I don't think he did.
19    Q.    Okay. And Nancy is your sister also?
20    A.    Yes.
21    Q.    What's her occupation?
22    A.    She's a real estate broker.
23    Q.    So she was there basically for support?
24    A.    Yeah.
25    Q.    During this meeting, I know there were a

Page 13

1 number of things that were discussed, and there were
2 supposedly a few agreements made. I'm going to
3 discuss a few of those agreements. You let me know
4 if they were agreements that you've made or they were
5 agreements that you never made. Was there a point in
6 time during that meeting where you had agreed to stop
7 having contact with Barbara?
8     A.    I don't think I made an agreement to that
9 effect, no. I was told by Attorney Fraser that I
10 shouldn't have any contact with her.
11     Q.    And you never agreed to that statement?
12     A.    I never signed any agreement. I never
13 spoke – I never said a word so – nor did I sign
14 anything so the agreement – all the speaking was
15 between Attorney Fraser and my sister Janet.
16     Q.    So Janet spoke on your behalf at this
17 conference or meeting?
18     A.    Yes. That's why she was involved with the
19 phone call.
20     Q.    So is it fair to say that whatever
21 response Janet gave was an agreement from you?
22     A.    That sounds like a legal question. I'm
23 not prepared to answer that today.
24     Q.    Did Janet make an agreement at that
25 meeting that you would have no further contact with

Page 14

1  Barbara?
2     A.    I don't know. A good part of the meeting
3 was not on the speaker phone. It was just Janet
4 talking, the two of them talking on the phone.
5     Q.    From Janet's perspective, can you tell me
6 briefly what she explained at that conference?
7     A.    No.
8     Q.    During this meeting, do you recall
9 anything that Janet may have said in regards to you
10 harassing Barbara?
11     A.    No.
12     Q.    During that meeting, do you recall
13 anything that Janet may have said in regards to you
14 seeking psychological treatment or help?
15     A.    No.
16     Q.    Do you recall anybody speaking in regards
17 to seeking psychological treatment or help?
18     A.    I recall it came up later. I don't recall
19 it in that conversation at that time.
20     Q.    And when did a conversation regarding
21 psychological treatment or help arise?
22     A.    It would have been over the next couple of
23 days I would suppose.
24     Q.    And who was the discussion among?
25     A.    I would think it must have been among –

Page 15

1 between Attorney Fraser and my sister Janet.
2     Q.    So they had another conversation after
3 this?
4     A.    I think they had two or three
5 conversations.
6     Q.    And were you present for those
7 conversations?
8     A.    No.
9     Q.    Do you recall a time in September of 1998
10 where you had a meeting with Fred Manfredonia and
11 William Stover?
12     A.    Yes.
13     Q.    Before the meeting of September of 1998
14 with Manfredonia and Stover, had you met or spoke
15 with any City worker with regard to complaints made
16 by Barbara Murphy?
17     A.    No.
18     Q.    While meeting in September of 1998 with
19 Manfredonia and Stover, the purpose of that meeting
20 was to discuss complaints made by Barbara Murphy, is
21 that correct?
22     A.    That's correct.
23     Q.    And during that meeting, you had admitted
24 that you had prior unwanted behavior towards Barbara
25 Murphy, is that correct?

Page 16

1     A.    I – prior unwanted behavior? Yeah.
2     Q.    Did you also admit to harassing Barbara in
3 the past?
4     A.    No.
5     Q.    Your behavior towards Barbara that was
6 being discussed was behavior that was both during
7 work and after work, is that correct?
8     A.    During work. No. After work outside the
9 workplace.
10     Q.    So there was no behavior discussed between
11 you and Barbara that happened during work time?
12     A.    I don't think so.
13     Q.    And is it your position that during this
14 second meeting that the discussion of psychological
15 treatment or help did not arise?
16     A.    Repeat that, please.
17     Q.    Is it my understanding that during this
18 second meeting that the area of psychological
19 treatment or help did not arise?
20     A.    I don't know why you have that
21 understanding.
22     Q.    Was there anybody else present at this
23 particular meeting?
24     A.    Fred and Bill and myself. That was it.
25     Q.    At any time after September of 19 – this

Page 17

1  September, 1998, meeting with Manfredonia and Stover,
2  were you ever asked to sign any agreement with the
3  City in regard to having further contact with
4  Barbara?
5    A.  No.
6    Q.  Do you remember any discussion with regard
7  to an agreement related to you having contact with
8  Barbara?
9    A.  Yes.
10   Q.  When did that discussion first arise?
11   A.  At that meeting.
12   Q.  What exactly was said about the agreement,
13  if you can recall?
14   A.  They said they were going to speak to
15  Barbara, and Attorney Fraser I guess was still
16  involved I think, and that they might draw up some
17  agreement.
18   Q.  The agreement was discussed. Was there
19  also an agreement that is once it was drafted and
20  approved that you would sign the agreement?
21   A.  We didn't get that far. I hadn't seen the
22  agreement.
23   Q.  But at that point had you been willing to
24  view the agreement and possibly sign the agreement?
25   A.  I had no choice. I had to look at their

Page 18

1  agreement if that's what they wanted.
2    Q.  And you mentioned you had no choice. Why
3  did you have no choice?
4    A.  I'm an employee of the City and they're
5  the personnel department.
6    Q.  So you do exactly what they tell you to
7  do?
8    A.  No. I would certainly look at the
9  agreement if that's what they asked.
10   Q.  To your knowledge, did the City conduct
11  any type of investigation in regards to Barbara's
12  complaints against you?
13   A.  I don't know what they did.
14   Q.  So as far as you know, there was no
15  investigation into the complaints that Barbara made?
16   A.  They had a meeting with me. I don't know
17  if they – I suppose they must have met with her. I
18  don't know who else she may have met with. I
19  thought they said that she had some other people that
20  came with her to file the complaint or that she
21  supplied affidavits or something of the sort; but
22  specifically there was no formal hearing.
23   Q.  But the City did have an interview with
24  you specifically?
25   A.  We just discussed it.

Page 19

1    Q.  When did the interview take place?
2    A.  Ask your question you asked.
3    Q.  The same one, September, 1998? There
4  wasn't a meeting after that?
5    A.  I think I had a second meeting with them
6  as well a few weeks after that.
7    Q.  Who was present at the second meeting?
8    A.  The same group.
9    Q.  Same individuals. During this interview
10  or meeting, was there a statement taken from you?
11   A.  I don't know. I think they took some
12  notes. I'm sure they took some notes.
13   Q.  You never signed a statement that they had
14  prepared?
15   A.  There was no attorney present if that type
16  of statement, no. I know they took some notes.
17   Q.  There was nothing that you had signed to
18  verify what was said during that conference?
19   A.  No.
20   Q.  As far as the psychological treatment or
21  help, did you ever seek any?
22   A.  Yes.
23   Q.  When did you first seek psychological
24  treatment or help?
25   A.  I don't think that's any of your business.

Page 20

1    Q.  Did you seek psychological treatment or
2  help with regard to the City requesting that you do
3  so?
4    A.  Yes.
5    Q.  Did the City make it mandatory that you
6  seek psychological treatment or help or otherwise
7  lose your job?
8    A.  I never signed any agreement.
9    Q.  I didn't ask if you signed it. Did they
10  make that statement?
11   A.  I don't think so.
12   Q.  On how many occasions did you seek
13  psychological treatment or help?
14   A.  I don't believe that's any of your
15  business.
16   Q.  Are you still seeking psychological
17  treatment or help?
18   A.  Again that's none of your business.
19   Q.  Did you seek psychological treatment prior
20  to 1997?
21   A.  No.
22   Q.  As far as you know, did the City do any
23  type of follow-up on your psychological treatment or
24  help?
25   A.  Yes.

Page 21

1    Q.    They were aware every time you had – had
2    sought psychological treatment or help?
3    A.    No.
4    Q.    Was your psychological treatment or help
5    through a City employee?
6    A.    I'm sorry.
7    Q.    Was your psychological treatment or help
8    through a City employee?
9    A.    Through a City –
10   Q.    Was it a City staff member?
11   A.    Oh, no.
12   Q.    Was it somebody that the City had
13   recommended?
14   A.    No.
15   Q.    Did the City ever give you any, whether it
16   be verbal or written, warning in regards to your
17   behavior towards Barbara?
18   A.    They told me I should have no contact with
19   her in the workplace.
20   Q.    And do you know exactly when they first
21   had stated that to you?
22   A.    I think it was probably the first meeting
23   I had with them in September of '98.
24   Q.    And the warning solely consisted of you
25   should have no further contact with Barbara, is that

Page 23

1    City had placed you on administrative leave?
2    A.    That was in 2000.
3    Q.    Were you placed on administrative leave by
4    your own request or was that the City's doing?
5    A.    The City's doing.
6    Q.    Again, who specifically told you that you
7    were being placed on administrative leave?
8    A.    Mr. – who was the fellow who was the
9    personnel manager? Haselkamp.
10   MR. MINOR:    I can't answer questions,
11   but yes, you're right. I agree with you.
12   A.    Haselkamp.
13   BY MR. OZIMKOSKI:
14   Q.    Hasel Kent?
15   A.    Camp.
16   MR. MINOR:    Haselkamp with a K.
17   H-A-S-E-L-K-A-M-P, I think it is. Something like
18   that.
19   BY MR. OZIMKOSKI:
20   Q.    And if you know, do you know what his
21   position with the City is?
22   A.    I don't know his exact title. Director of
23   personnel, human resources, whatever they call
24   themselves.
25   Q.    Did they tell you you were being placed on

Page 22

1    correct?
2    A.    In the workplace.
3    Q.    In the workplace. Were you ever
4    disciplined further than just a mere warning?
5    A.    No.
6    Q.    Who specifically told you to have no
7    further contact with Barbara?
8    A.    Both Mr. Manfredonia and Mr. Stover.
9    Q.    However, the City never suspended you with
10   regards to your behavior towards Barbara, is that
11   correct?
12   A.    I don't believe she ever filed a formal
13   complaint.
14   Q.    You state she never filed a formal
15   complaint. You're referring to a written complaint?
16   A.    I believe the City has a policy that, you
17   know, someone would have to file a formal complaint
18   and have a formal hearing and – but the first step
19   never occurred so.
20   Q.    So is it my understanding that you're
21   classifying a formal complaint as a written
22   complaint?
23   A.    Yeah. I'm sure they have a policy to that
24   effect. At least I never saw the complaint.
25   Q.    Did there come a point in time where the

Page 24

1    administrative leaving during a hearing?
2    A.    Very brief meeting then they gave me a
3    letter. They sent me a letter the next day.
4    Q.    How did you first come to find out that
5    you were having this meeting or conference with
6    Mr. Kent?
7    A.    How did I come to find out? I read the
8    newspaper. It was in the newspaper he was going to
9    have a meeting with me.
10   Q.    So your only notice of this meeting was
11   through the newspaper?
12   A.    (Nodding head in the affirmative.)
13   Uh-huh.
14   Q.    Yes. What newspaper are you referring to?
15   A.    Stamford Advocate.
16   Q.    And the Stamford Advocate also provided
17   you with the time and place of this hearing?
18   A.    No. I went to work in the morning and I
19   saw Mr. Hamilton, and he said we're going to have the
20   meeting with Mr. Haselkamp, and we had the meeting.
21   Q.    So Mr. Hamilton was present also?
22   A.    Yes.
23   Q.    Was there anybody else that was present?
24   A.    No.
25   Q.    And specifically what was the reason they

Page 25

1 explained to you of why you were being placed on
2 administrative leave?
3   A.   Because I had been arrested the day
4 before.
5   Q.   So the sole reason was because of your
6 arrest?
7   A.   That's prominent in my mind. I don't
8 recall if there was another reason as well.
9   Q.   They never explained it had anything to do
10 with your behavior during work towards Barbara
11 Murphy?
12   A.   It was never discussed, no. It was a very
13 brief meeting.
14   Q.   Were you paid while you were on
15 administrative leave?
16   A.   Yes.
17   Q.   Exactly how long were you on
18 administrative leave?
19   A.   Til — I think they paid me til the end of
20 February, 2002.
21   Q.   And at that point in time were you
22 terminated or were you back to work?
23   A.   Terminated.
24   Q.   I'll give you a copy of that. If you want
25 to review it since you're here, I made you a copy.

Page 26

1 Mr. Vecchia, do you have any objection on
2 me entering this in as an exhibit during this
3 deposition?
4   A.   Do I? Why?
5   Q.   Excuse me?
6   A.   Why?
7   Q.   Do you have any objection as far as its
8 contents, its truth?
9   A.   I have never seen the document before so.
10   Q.   You have never seen the Personnel
11 Procedures?
12   A.   No.
13   Q.   Okay.
14   MR. OZIMKOSKI:   If I could please have
15 that entered as Plaintiff's Exhibit 1, please.
16   (Plaintiff's Exhibit 1: Marked for
17   Identification - described in Index.)
18   BY MR. OZIMKOSKI:
19   Q.   Mr. Vecchia, so it's my understanding, as
20 you mentioned, that you have never seen Personnel
21 Procedures before, is that correct?
22   A.   I don't recall ever spending any time
23 looking at it. Probably spent more time now than if
24 I ever saw it before.
25   Q.   When you were hired, you don't recall

Page 27

1 seeing it?
2   A.   No.
3   Q.   Throughout your employment with the City,
4 you don't recall ever being handed Personnel
5 Procedures?
6   A.   No.
7   Q.   However, you mentioned that you do recall
8 Personnel Procedures being revised, is that correct?
9   A.   I was just surprised on the date on it,
10 1990. They built up a huge personnel department. I
11 thought one of the jobs of one of the people there
12 was to write new procedures. If this is what the
13 City gave you as the latest personnel procedures, I
14 guess it was never revised.
15   Q.   Mr. Vecchia, I would first like to direct
16 your attention to section 1 labeled "Staffing," if
17 you could go to subject 9, "Employee Performance
18 Appraisal."
19   A.   Yep. What page that?
20   Q.   Says 9 right here.
21   A.   Okay.
22   Q.   As I already know, you've never seen this
23 before so I would ask you to take a brief moment and
24 just read the two paragraphs listed under "Annual
25 Appraisals."

Page 28

1   A.   Right. Uh-huh. Okay. I've read it.
2   Q.   Are you aware that the City gives annual
3 appraisals to their employees?
4   A.   Annual appraisals? No, they don't. They
5 don't do that.
6   Q.   Were you ever given an appraisal by the
7 City?
8   A.   I was given wage increases but that's
9 based on union contracts, but I think the only actual
10 performance appraisal was when the city first hires
11 you they put you on a 60 or 90-day trial period.
12   Q.   Probation period?
13   A.   Probation period, and I think at the time
14 the man who was the finance director he gave me a
15 performance review or something after that period of
16 time.
17   Q.   So the only appraisal or annual review
18 that you can recall is this one back in 1993 when you
19 were hired with the City?
20   A.   Yeah. It would have been in, I suppose,
21 the fall of 1993.
22   Q.   Do you have any idea why you weren't given
23 annual appraisals?
24   A.   The City doesn't do it.
25   Q.   The City doesn't do it for any of their

1  employees?
2  A.  I don't know. I just know that, as far as
3  I was concerned, they didn't do it.
4  Q.  Do you have any recollection of the City
5  giving any annual appraisals to the ten employees or
6  individuals underneath you?
7  A.  Not in the -- not in the sense that I'd
8  call it a performance appraisal. There's a sheet
9  that they fill out when someone passes an anniversary
10  date or passes a step increase, and that you put
11  through the department head and the personnel
12  department. It goes to payroll so that the monies --
13  so that they get the additional money, but in the --
14  that's the extent of --
15  Q.  You mentioned that you were not given
16  annual appraisals but at least increases from the
17  City, correct?
18  A.  Uh-huh.
19  Q.  And these increases had nothing to do
20  obviously with an annual appraisal since you weren't
21  given one?
22  A.  No. It's by union agreement that the
23  salary's determined.
24  Q.  I'd like next to direct your attention to
25  section 3, "Employee Discipline," subject 1, labeled,

1  discipline, it's still your position that the City
2  only gave you one oral warning with regard to your
3  behavior towards Barbara, is that correct?
4  A.  You asked about in the time period 1998,
5  and I had a meeting with -- a couple of meetings with
6  them in September of 1998, and then I --
7  Q.  During each meeting in September of 1998,
8  they gave you the same warning?
9  A.  It was the same subject matter.
10  Q.  After September, 1998, did they give you
11  any other oral or written warnings?
12  A.  At a brief discussion with Mr. Stover some
13  time in October or November of 1998. It was the same
14  message.
15  Q.  However, all of these warnings were
16  verbal, is that correct, oral?
17  A.  That's correct.
18  Q.  Never given a written warning?
19  A.  No.
20  Q.  Were you provided with any documentation
21  stating exactly what happened during these
22  conferences or meetings where the warnings occurred?
23  A.  Can you repeat that?
24  Q.  Did you ever sign any documentation?
25  A.  No.

1  "Oral and Written Warnings."
2  A.  Subject 3 is it?
3  Q.  Section 3, "Employee Discipline," subject
4  1.
5  A.  Oh, okay. Roman numeral III. All right.
6  Sorry. "Employee Discipline, Oral and Written
7  Warnings." Okay.
8  Q.  And, again, as you previously stated
9  you're unfamiliar with these Procedures so I would
10  ask you to briefly read through, there's three pages
11  to this particular section.
12  (Pause.)
13  A.  Okay.
14  BY MR. OZIMKOSKI:
15  Q.  You've had ample time to read through
16  there?
17  A.  I didn't realize there was more. There's
18  a couple of different sections in here.
19  (Pause.)
20  BY MR. OZIMKOSKI:
21  Q.  Just the first three pages, just subject
22  1. Did you get through those?
23  A.  Yeah.
24  Q.  Okay. After reading what the City's
25  procedures are supposed to be in regards to

1  Q.  I'd like to direct your attention now to
2  section 3, "Employee Discipline." We're going to go
3  to the Suspension and Terminations, that's subject
4  matter 2.
5  A.  Okay.
6  Q.  You had mentioned prior that you were
7  placed on an administrative leave, is that correct?
8  A.  That's right.
9  Q.  Administrative leave varies from the being
10  suspended by the City, is that correct?
11  A.  I don't know.
12  Q.  You're not sure. During your
13  administrative leave hearing, what questions were
14  asked of you, if any?
15  A.  Did I want to resign.
16  Q.  That was it?
17  A.  Yeah. I think that was it. I told them I
18  wanted to go back to work.
19  Q.  What conversation followed prior to the
20  statement do you want to resign, if you can recall?
21  A.  There wasn't much talking. It was a very
22  brief meeting. If it was 5 minutes, I would be
23  surprised.
24  Q.  Did you have the impression during this
25  meeting that it was almost a forced resignation the

Page 33

1  the City was looking for?
2      A.    A forced resignation.
3      Q.    Meaning, if you don't resign, you're going
4  to be terminated?
5      A.    Oh. We didn't discuss it.
6      Q.    Did you have a chance to explain your side
7  of we'll say the story or explanations of your
8  behavior to the City?
9      A.    They didn't ask me. At that time, you
10  know, there was no discussion.
11      Q.    You never had an opportunity to explain
12  your thoughts with regards to Barbara's complaints?
13      A.    No. I think Mr. Haselkamp was clear that
14  he couldn't allow me to go back to work.
15      Q.    Was there any other reason given to you
16  for being placed on administrative leave?
17      A.    Any other reason than what?
18      Q.    Than the complaints by Barbara Murphy
19  against you.
20      A.    No.
21      Q.    During your hearing or meeting with
22  regards to administrative leave, was there any talk
23  of an investigation that was being done into
24  Barbara's complaints?
25      A.    I don't remember if they said anything

Page 34

1  about investigation. Certainly the police department
2  filed a report.
3      Q.    Did anybody from the City state any course
4  of action that would be taken with regards to
5  Barbara's complaints?
6      A.    I don't recall at any time or not if they
7  said, you know, we would be having another meeting,
8  or if that came about later on.
9      Q.    If it didn't come about at that time, what
10  exactly was said at the time that it did come about?
11      A.    Well, I know I did have a meeting with
12  them and with the City, and it would have been
13  January or February of 2001 I guess.
14      Q.    And, again, how did you come to learn that
15  you were even having this meeting?
16      A.    I don't recall if the attorney I had hired
17  contacted the City or if the City contacted the
18  attorney, one way or the other.
19      Q.    And who was present at this meeting?
20      A.    I was, Attorney Katz, I believe
21  Mr. Stover, Manfredonia.
22      Q.    I'm sorry.
23      A.    There may have been some union people,
24  too.
25      Q.    You may have answered this, already. Do

Page 35

1  you know the purpose of this meeting, what the
2  purpose of the meeting was?
3      A.    I guess to discuss the whole situation.
4  If they had a specific purpose, I don't know.
5      Q.    The "situation" meaning the complaints by
6  Barbara?
7      A.    The fact that -- the fact I had been
8  arrested and the fact that I was on administrative
9  leave.
10      Q.    So there was a combination of things that
11  needed to be discussed?
12      A.    I think so.
13      Q.    Were they all discussed at this meeting?
14      A.    Let's see. I believe there were questions
15  about what contact I had had with Barbara Murphy
16  between the previous meetings in September of 1998
17  and December of 2000.
18      Q.    Did the topic come up that you had made a
19  prior agreement to not have further contact with
20  Barbara?
21      A.    The City said that.
22      Q.    However, at this point in time, the City
23  had still never provided you with a written agreement
24  stating to the effect you would have no further
25  contact with Barbara, is that correct?

Page 36

1      A.    It doesn't exist.
2      Q.    There came a point in time when you
3  actually had a termination hearing, correct?
4      A.    Yes.
5      Q.    Do you remember exactly when that was?
6      A.    I believe it was -- I don't know the exact
7  date. It was somewhere after February 15th of 2002.
8      Q.    So from the January slash February, 2000,
9  meeting that you had just mentioned prior to the
10  February, 2002, termination hearing, was there any
11  further discussions with any City personnel with
12  regards to the complaints made by Barbara?
13      A.    I know Attorney Katz had some
14  conversations with Mr. Manfredonia and with Barry
15  Boodman.
16      Q.    However, you were not present during these
17  conversations?
18      A.    I don't remember ever sitting down with
19  Barry. I don't think there was meeting that I sat
20  down with Fred and Bill Stover at either until
21  February of 2002.
22      Q.    Again, to make it simple, I'm going to use
23  the period from February of 2000 to February of 2002.
24  During that particular period, did you continue to
25  seek psychological treatment or help?

**Page 37**

1    A.    I don't think it's any of your business.
2    Q.    During that same period of time, if you
3    know, did the City continue to monitor whether or not
4    you were seeking psychological treatment or help?
5    A.    I had no contact with the City. I
6    couldn't tell you what they were doing.
7    Q.    You had no contact with the City from
8    February of 2000 til 2002 of February?
9    A.    Other than seeing Fred Manfredonia at some
10    Unemployment hearings, I don't think I had any other
11    dealings with it.
12    Q.    However, during that period, you were
13    still placed on administrative leave?
14    A.    Uh-huh.
15    Q.    You can't recall any day between February
16    of 2000 and 2002 where you visited any government
17    building?
18    A.    Where I visited any government building?
19    I had some Freedom of Information issues with the
20    City so I saw some people in the law department.
21    Q.    During that period of time, did you ever
22    enter the building that Barbara had worked in?
23    A.    The fire department? No.
24    Q.    Yes. To your knowledge, have there ever
25    been any other complaints filed against you excluding

**Page 39**

1    complaints?
2    A.    No. The only other person at the City
3    that I would have discussed it with would have been
4    the union president on the day I was put on
5    administrative leave, and I don't think -- I think we
6    discussed the City's action and not anything else,
7    the City's action putting me on administrative leave.
8    I don't think we discussed Barbara Murphy, and I
9    think at the meeting I have with the City in February
10    of 2001, I think there was -- some of the officers
11    from the union were there.
12    Q.    You mentioned that meeting was in February
13    of 2001, is that what you just stated?
14    A.    Let's see now. I was put on
15    administrative leave in December of 2000, so yes, it
16    was in either January or February of 2001, you know,
17    within 60 or 75 days or something like that of being
18    put on administrative leave.
19    Q.    And that meeting took place at one of the
20    City buildings?
21    A.    In the law department.
22    Q.    What exactly was the conversation at that
23    meeting?
24    A.    What I recall is that the question came up
25    of what contact I had had with Barbara Murphy after

**Page 38**

1    Barbara's complaints?
2    A.    To my knowledge, no.
3    Q.    To your knowledge, have there ever been
4    any other complaints by another City employee against
5    another City co-worker or employee, any other
6    complaints within, whether it be one of your
7    employees against another supervisor or someone else?
8    A.    I have no firsthand knowledge of it. A
9    reasonable person would expect they would have
10    occurred.
11    Q.    Was the City well aware of the arrest made
12    of you prior to the one particular meeting that you
13    had stated where it came up as conversation? I
14    believe that was in February of 2002.
15    A.    Were they well aware of it?
16    Q.    Yes.
17    A.    Yeah.
18    Q.    At any other time, if you can recall, did
19    you speak to any City employees or personnel with
20    regards to the complaints made by Barbara?
21    A.    Repeat that question again.
22    Q.    Other than the events or the days that
23    we've discussed already, were there any other dates
24    or times that you have spoken to any other City
25    employee or personnel with regards to Barbara's

**Page 40**

1    the September, 1998, meetings through December of
2    2000.
3    Q.    Okay. So you were first spoken to by any
4    City official I will say in late 1997, 1998 with
5    regard to Barbara's complaints, is that correct?
6    A.    The only time I spoke to any City official
7    or anything was in September of 1998. That was at
8    the meetings with Mr. Manfredonia and Stover that we
9    previously discussed.
10    Q.    Okay. And then --
11    A.    Then the next City official I spoke to
12    about Barbara Murphy was a Stamford Police Officer.
13    Q.    Okay. And in December of 2000 you were
14    placed on administrative leave, correct?
15    A.    That's right.
16    Q.    And the issue still at that point was
17    discussions in regards to the complaints made by
18    Barbara Murphy?
19    A.    No. The issue in December, 2000, was I
20    had been arrested the day before and I came back to
21    work, and they told me I couldn't come back to work.
22    Q.    But you also mentioned that the complaints
23    by Barbara were also discussed, is that correct?
24    A.    No. I told you the meeting with
25    Mr. Hamilton and Mr. Haselkamp was very brief. The

## Page 41

1  discussions there were that I couldn't come back to
2  work, that my choices were to resign or be put on
3  administrative leave.
4      Q.    After being placed on administrative
5  leave, then you've had, I believe it was, two
6  conversations after, again, with regards to Barbara
7  Murphy's complaints?
8      A.    I'm sure there was at least one. That
9  would have been in January or February of 2001.
10  There might have been another one after that, and
11  there were conversations between Attorney Katz and
12  Mr. Manfredonia and the personnel department and
13  Mr. Boodman in the law department.
14      Q.    Was there any discussion on exactly when
15  your administrative leave would expire?
16      A.    Well, that was part of the discussion in
17  that it had become an issue the City was sensitive
18  about because some of the elected officials were
19  questioning why was the City continuing to pay me.
20      Q.    Were you ever told when exactly you might
21  be coming off of administrative leave?
22      A.    No. I think the mayor was interviewed by
23  the paper, and he said that – something to the
24  effect that I'd stay on administrative leave until
25  the case was resolved.

## Page 42

1  .   Q.    "The case," what case are you referring
2  to?
3      A.    The fact that I had been arrested and that
4  the City, you know – I don't recall what the mayor
5  exactly said. My understanding was that the City had
6  to treat me as innocent until I was proven guilty.
7      Q.    So it's your understanding that the arrest
8  was the sole reason for administrative leave?
9      A.    Yep. As I said, I had no conversations
10  with anybody from the City from September of 1998
11  until the Stamford Police Officer showed up at my
12  house with an arrest warrant, and I, you know, have
13  no idea if – well, I imagine, you know, what I'm
14  surmising is that if Barbara Murphy had come back to
15  the City in that period of time, September of 1998 to
16  December of 2000, and had another complaint, that
17  they would have called me in for another meeting, so
18  I think it's reasonable to make the assumption that
19  she never came back to the City with another
20  complaint.
21      Q.    You mentioned prior you were unaware of
22  these Personnel Procedures, or not necessarily that
23  you were unaware but that you have personally never
24  seen them?
25      A.    I don't recall sitting down and spending

## Page 43

1  as much time as I have with you this afternoon
2  reviewing this.
3      Q.    Are you aware of any policies and
4  procedures that the City may have in regards to
5  harassment amongst employees?
6      A.    I've had it waved in my face a number of
7  times in the past couple of months or past year or
8  so.
9      Q.    Prior to 19 – December of 1997, had you
10  seen or heard of harassment policies or procedures?
11      A.    I went to a meeting once some time in '93
12  or '94, something like that.
13      Q.    But since 1993 or '94, you haven't
14  attended any other meeting or seen policies or
15  procedures?
16      A.    I don't know. I think – I think your
17  office petitioned to see my personnel folder so you
18  can look at that.
19      Q.    After 1997, 1998, did any City official or
20  employee ever bring to your attention the harassment
21  policies and procedures?
22      A.    Let's see. After 1997, 1998?
23      Q.    Yes.
24      A.    I don't recall if the meetings in –
25  meeting I had in February, 2001, if it was brought up

## Page 44

1  there. I don't remember any great discussion about
2  it, but, you know, somebody might have brought it up.
3  I think Fred might have brought it up in one of the
4  Unemployment hearings I went to, Fred Manfredonia.
5      Q.    And approximately what time period was
6  that, if you can recall?
7      A.    It would have been some time in April,
8  May, June, 2002.
9      Q.    Okay.
10      A.    Certainly it was brought up at the –
11  let's see, I had a hearing about getting my job back
12  after the union had filed a grievance against the
13  City. We had the hearing last October of 2003. I
14  recall the attorney that the City had hired putting
15  the policy in exhibit like you did with this other
16  thing.
17      Q.    This is while you were being questioned
18  during the hearing?
19      A.    I think – I don't think we went over the
20  policy paragraph by paragraph. I believe it was put
21  in as an exhibit for the judges, I guess, to look at.
22      Q.    But since, we'll say, 1993, 1994, it
23  hasn't been a requirement or hasn't been made
24  mandatory by the City that you either attend
25  conferences or be familiar with harassment policies

**Page 45**

1  and procedures?
2      A.    I know I went to a conference once at the
3  Landmark Club. I thought that was in the mid '90's
4  or '94, '95, I'm not sure.
5      Q.    This is after the 1993, '94, so you have
6  attended two meetings?
7      A.    No. Once.
8      Q.    Same meeting?
9      A.    Okay. Other than that, I don't recall
10  going to any other meetings. I might have.
11      Q.    To your knowledge, does the City require
12  any of its employees or workers to attend harassment
13  conferences or meetings –
14      A.    Do they –
15      Q.    – explaining the policies and procedures?
16      A.    I would expect they do.
17      Q.    But you personally haven't attended any?
18      A.    I did.
19      Q.    Since that one?
20      A.    I don't recall going to another one.
21      Q.    As far as you know, does the City have any
22  type of what they call a no tolerance policy towards
23  people accused of harassment?
24      A.    I've read in the Stamford Advocate that
25  they put that into effect some time in – some time

**Page 46**

1  in 2001 or 2002.
2      Q.    However, at that time you were on
3  administrative leave, correct?
4      A.    That's right.
5      Q.    So prior to 2001, 2002, you've never heard
6  of such a policy?
7      A.    No. I didn't say that. Oh, zero
8  tolerance policy?
9      Q.    Yes.
10      A.    I don't believe they had a policy at that
11  time. I thought that was a new creation.
12      Q.    As far as you know, does the City have any
13  posters or paper posted in the workplace in regards
14  to a harassment policy?
15      A.    I don't remember. I haven't been there in
16  a couple of years.
17  MR. OZIMKOSKI:    At this time if we
18  could take a five-minute break, please.
19  THE WITNESS:    Okay.
20  (Whereupon, a recess was taken at 2:10
21  p.m. until 2:13 p.m.)
22  BY MR. OZIMKOSKI:
23      Q.    Mr. Vecchia, I want to ask you a few more
24  questions.
25      A.    Sure.

**Page 47**

1      Q.    The first is, I have some conflicting
2  dates here. I want to again ask you between the end
3  of 1997 and December of 2000 when you were placed on
4  administrative leave –
5      A.    End of 1997 or 1998?
6      Q.    End of '97, beginning of '98, we'll go end
7  of '97.
8      A.    End of '97.
9      Q.    Meaning November, December of '97 up until
10  the day you were placed on administrative leave.
11  Approximately how many meetings or conferences had
12  you had with City officials with regards to Barbara's
13  complaints?
14      A.    Two in September of '98 and one brief
15  conversation in probably late October, 1998.
16      Q.    And that's it?
17      A.    Yeah.
18      Q.    In your opinion, did the City properly
19  investigate the complaints of Barbara Murphy?
20  MR. MINOR:    I object to the form, but
21  you can answer. I have to object to the form.
22      A.    Do I think they properly investigated it?
23  BY MR. OZIMKOSKI:
24      Q.    Yes.
25      A.    Yeah, as far as I was concerned.

**Page 48**

1      Q.    In your opinion, do you believe that
2  administrative leave was the proper discipline
3  procedure that you should have been given?
4  MR. MINOR:    Object to form. You can
5  still answer.
6      A.    I think I should have been allowed to go
7  back to work.
8  MR. OZIMKOSKI:    No further questions.
9  Do you have anything?
10  MR. MINOR:    I have a few.
11  CROSS EXAMINATION
12  BY MR. MINOR:
13      Q.    Mr. Vecchia, I see you brought some
14  material with you, and –
15      A.    These are all the things –
16      Q.    No. Let's just stick with the – this.
17      A.    This here (indicating)?
18      Q.    Yes.
19      A.    All right.
20      Q.    All right.
21  MR. MINOR:    And what I'd like to do
22  is mark this, but this is the copy that you sent me
23  to the Request to Admit so how do you want to work
24  that? Shall we make a copy first?
25  MR. OZIMKOSKI:    That's our Request to

Page 49

1  Admit?
2      MR. MINOR:    Yes.
3      MR. OZIMKOSKI:    And you both have one?
4      THE WITNESS:    I got it in the mail
5  today, yes.
6      MR. MINOR:    Yes. And since you sent
7  it to me, I'm sure you have one.
8      MR. OZIMKOSKI:    Yeah. Let me see if I
9  can get one. If we could take two minutes. I'll see
10  if I can locate my copy.
11      (Whereupon, a recess was taken at 2:17
12      p.m. until 2:23 p.m.)
13      (Defendant's Exhibits A, B and C:
14      Marked for identification - described in Index.)
15      BY MR. MINOR:
16      Q.    Mr. Vecchia, the first document is the one
17  headed Affidavit, and I'm going to ask you some
18  questions on that, but before I do, let me ask you a
19  few preliminary.
20      First of all, it's my understanding that
21  you have a Bachelor's Degree, isn't that correct?
22      A.    Yes.
23      Q.    And you have a Master's, an MBA?
24      A.    Right.
25      Q.    And where's your Bachelor's from?

Page 50

1      A.    From University of Notre Dame.
2      Q.    And your MBA?
3      A.    From the University of Connecticut.
4      Q.    Prior to working for the City of Stamford,
5  what major jobs did you hold?
6      A.    I had worked in purchasing at Pitney
7  Bowes, at Pick Design, Corometrics Medical Systems,
8  U.S. Surgical and General Datacom.
9      Q.    Prior to working for the City of Stamford,
10  which company had you worked for?
11      A.    I just – I worked for all of them.
12      Q.    Did you do them in the order that you
13  worked for them?
14      A.    Yes.
15      Q.    So the last one that you worked for before
16  the City was?
17      A.    General Datacom.
18      Q.    Okay. And I caught the names except for
19  Pick Designs. How do you spell that and what do they
20  do?
21      A.    It's a small company right up the street
22  here, the Perkin Elmer building. They made
23  mechanical parts and sold them as a distributor
24  through a catalog.
25      Q.    Had you ever been disciplined in any of

Page 51

1  those jobs?
2      A.    No.
3      Q.    All right. Had you served with the
4  military?
5      A.    Yes.
6      Q.    And from when to when?
7      A.    I was in active duty from October of 1968
8  through September of '68 and then four years in the
9  Reserves.
10      Q.    And did you – active duty doing what?
11      A.    I had taken ROTC in college and I
12  graduated in June of '68 as a second lieutenant and
13  then went to Fort Benning, the infantry school, in
14  October of '68 and then to military intelligence
15  school in January of '69 and Vietnam in April of '69,
16  and I was in Vietnam until, let's see, yeah,
17  beginning of – I came home the beginning of – the
18  end of August, beginning of September of '69, and
19  that was it for active duty. Then I went into
20  Reserve unit in Danbury, it was the military
21  intelligence unit, and I was there for four years.
22      Q.    And when you were in the Danbury unit, did
23  you do the one weekend a month and two weeks during
24  the year?
25      A.    Yes.

Page 52

1      Q.    Okay. What did you finish as, a first
2  lieutenant or captain?
3      A.    Captain.
4      Q.    All right. And in Vietnam, could you just
5  tell us briefly what you did?
6      A.    I was an adviser living in a little
7  village in the middle of Econ Delta, and I went on
8  operations with the Vietnamese troops and primarily
9  was there to call in the American gun ships and med
10  evac helicopters and fill out a report every month on
11  what was going on in that district.
12      Q.    Did you receive any awards from your
13  Vietnam duty?
14      A.    I have two Bronze Stars and an Army
15  Commendation.
16      Q.    And how about a Combat Infantry Badge?
17      A.    No. I was a military intelligence officer
18  so you don't get them.
19      Q.    What did you get the two Bronze Stars for?
20      A.    Let's see. I got one of them one night we
21  were mortared in the village and the radios were
22  knocked out and the places where I was so we couldn't
23  call in the med evac helicopters or gun ships. So we
24  were mortared for an hour or more or something so I
25  ended up having to run through the village to another

Page 53

1  place where there were radios that still had
2  communications to talk to the helicopter pilots.
3      Q.    And the second one?
4      A.    Was for meritorious service.
5      Q.    I believe you testified earlier that you
6  had lunch with Barbara Murphy. Was that 1997 or
7  1998?
8      A.    January of 1998.
9      Q.    And other than that lunch, did you ever
10  have a meal with her again?
11      A.    I probably seen her or I had seen her at
12  the bar in Brennan's, and I think once or twice we
13  had ordered like some type of a large plate or
14  platter of some hors d'oeuvres, that was it.
15      Q.    Okay. Brennan's meaning a bar and
16  restaurant in Stamford?
17      A.    Yes.
18      Q.    Did she sit down and share that with you,
19  or did you order it, send it over to her?
20      A.    She was right there with me.
21      Q.    So you would say that she sat down and
22  shared it with you?
23      A.    Yeah.
24      Q.    Were you on friendly terms when you did
25  that?

Page 55

1      Q.    All right. And, by the way, during this
2  time period, 1997, 1998, your place of business was
3  at Government Center at 888 Washington Boulevard,
4  isn't that correct?
5      A.    Yes.
6      Q.    And what was the place of business of
7  Barbara Murphy?
8      A.    The fire department on, I don't know,
9  something Main Street, 600 Main or something.
10      Q.    How many blocks away?
11      A.    One, two – we had to go through the mall
12  – four blocks, five blocks.
13      Q.    And in addition to returning items at the
14  fire department which was four blocks away and to
15  Attorney Fraser at his office, by the way, was his
16  office in Greenwich or Stamford?
17      A.    Greenwich.
18      Q.    Did you also make a payment of $100 –
19      A.    Yes.
20      Q.    – to pay for some of the items damaged?
21      A.    I think Attorney Fraser had said some
22  things were broken.
23      Q.    And would it be fair to say that at the
24  end of your meetings with Mr. Fraser, which I think
25  you already discussed, your sister Janet, taking part

Page 54

1      A.    Yes.
2      Q.    Was she with other people?
3      A.    Sometimes she was by herself, sometimes
4  with her girlfriends. I don't recall that specific
5  time.
6      Q.    All right. In any case, I think you
7  discussed earlier that at one point you had a meeting
8  with Ben Fraser who you – did you understand him to
9  be Barbara Murphy's attorney?
10      A.    No doubt about it, yep.
11      Q.    Okay. Now, that meeting was caused by an
12  incident in March of 1998, isn't that correct?
13      A.    Right. That's right.
14      Q.    And isn't it correct that that involved
15  you breaking into the car owned by Barbara Murphy
16  which was parked in her Norwalk address, removing
17  some items, destroying them and later admitting to
18  that?
19      A.    That's right.
20      Q.    And you returned whatever items were
21  intact and some of the items that were destroyed to
22  Barbara Murphy?
23      A.    Returned them to her by bringing them to
24  Attorney Fraser's office and leaving some things at
25  the fire department one night.

Page 56

1  through a speaker phone, that there was an agreement
2  you leave Barbara alone?
3      A.    Yeah. That I wouldn't talk to her.
4      Q.    And there was also some discussion that
5  you would seek counseling.
6      A.    Yes.
7      Q.    And, by the way, the day after this
8  break-in of Barbara's car where you removed these
9  items, did Barbara call your home?
10      A.    Yes.
11      Q.    Did she talk to your wife?
12      A.    No. She left a message on the answering
13  machine.
14      Q.    Did your wife hear it?
15      A.    Yes.
16      Q.    Did that have something to do with your
17  wife instituting a divorce against you?
18      A.    I guess.
19      Q.    Did your wife institute a divorce against
20  you?
21      A.    Yes.
22      Q.    Is that divorce concluded?
23      A.    Yes.
24      Q.    Did you lose the marital home?
25      A.    Yes.

**Page 57**

1   Q.   What else – what other economic
2 consequences to you were caused by the divorce?
3   A.   I still pay alimony, child support.
4   Q.   How much per year?
5   A.   Combined? About 30,000.
6   Q.   And at the time you you were ordered to
7 make these payments of child support and alimony,
8 what was your salary with the City of Stamford?
9   A.   Around 90,000.
10   Q.   What is your salary today?
11   A.   None of your business.
12   Q.   What is your employment today?
13   A.   None of your business.
14   Q.   Are you working as a purchasing agent?
15   A.   It's none of your business.
16   Q.   Well, let me just say for the record, it
17 is my business. You have to answer all the questions
18 that I ask.
19   A.   I did.
20   Q.   By being responsive to the questions that
21 I ask.
22   A.   I don't believe it's any of your business.
23   Q.   Are you making a fraction of what you used
24 to make with as a purchasing agent with the City of
25 Stamford?

**Page 58**

1   A.   I work a lot of different jobs so it's not
2 a fraction but it's less.
3   Q.   All right. Have you ever moved to modify
4 your child alimony and support obligations?
5   A.   I did it a few months ago.
6   Q.   Did you get a decision?
7   A.   They reduced the both of them, but I'm
8 still paying close to $30,000.
9   Q.   Did you honor your agreement with
10 Mr. Fraser that you would leave Barbara alone?
11   A.   I have never spoken to her again.
12   Q.   Since that meeting in March of 1998 at Ben
13 Fraser's office that you discussed with Janet being
14 on the phone –
15   A.   I think the only conversations I've had
16 with her since then are she called up some time in
17 July of 1998 that there was a new fire chief and that
18 he wanted some training on the – this purchasing
19 requisition system and that she called up and she
20 wanted to set up an appointment for him to come over
21 and see me, and then the only other time – I think
22 it could have been even the same day – I saw her
23 that evening at Brennan's and I went over, tried to
24 apologize to her, and she just, you know, didn't –
25 waved me off.

**Page 59**

1   Q.   After the meeting that you had in
2 Mr. Fraser's office in Greenwich in March of 1998, I
3 think you discussed meetings with personnel and the
4 human relations department of the City of Stamford in
5 September of 1998, what is your understanding of why
6 you were called to that meeting in September, '98?
7   A.   Because she had come to the personnel
8 department and made a complaint.
9   Q.   Is it your understanding that she claimed
10 that you violated your agreement to leave her alone?
11 Withdrawn.
12 What was the nature of her complaint as you
13 understand it?
14   A.   That I had taken her briefcase in March of
15 1998 and that I was bothering her.
16   Q.   Okay. She didn't wait from September –
17 in September she wasn't complaining about the
18 briefcase. Isn't it true that she complained about
19 conduct after March of '98 where you were bothering
20 her?
21   A.   No. I think at the time in September of
22 1998 that Mr. Manfredonia had shown me a letter that
23 I had written to Barbara apologizing so that it was
24 certainly discussed.
25   Q.   All right. That was a handwritten letter

**Page 60**

1 that you wrote to Barbara?
2   A.   Yes. I'm sure surprised you didn't have
3 it here today.
4   Q.   So that came up in the meeting with
5 Mr. Manfredonia?
6   A.   He had a copy because I had never saved a
7 copy of it, and I remember asking him to make me a
8 copy of it.
9   Q.   Do you have a copy of it now?
10   A.   Not with me.
11   Q.   But I mean you do have it?
12   A.   I've seen it many times since then, yes.
13 It's been waved in my face.
14   Q.   Okay. So, in any case, the March incident
15 did come up, your letter of apology came up?
16   A.   Yes.
17   Q.   But isn't it true that various contacts
18 you had with Barbara Murphy to include meetings at
19 Alive at Five, a United Way 5K running event and
20 other instances where Barbara felt you made contact
21 with her in violation of the agreement, didn't that
22 come up as well?
23   A.   I don't know if those – if that – Alive
24 at Five, that came up somewhere along the line. I
25 don't know if it was at that time or the road race I

## Page 61

1  had seen her at, but I think she was complaining more
2  that she had seen me at Brennan's.
3  　Q.　Brennan's being that same bar that we
4  talked about earlier?
5  　A.　Yes.
6  　Q.　All right. What did she complain about
7  that happened at Brennan's? What did you do that
8  upset her?
9  　A.　I don't remember specifically now.
10  　Q.　Okay. In September of 1998 – withdrawn.
11  Going back to March of 1998, do you
12  remember telling your wife that you were worried you
13  would be arrested or fired?
14  　A.　Yeah. I had taken her briefcase. Yeah.
15  　Q.　By the way, were you under the influence
16  of alcohol when you took her briefcase?
17  　A.　Yes.
18  　Q.　Did you think you had a problem with
19  alcohol during that time?
20  　A.　At that time? No.
21  　Q.　Do you admit to having a problem with
22  alcohol at any time?
23  　A.　You're asking now do I admit to it? Yeah.
24  Looking back, yeah.
25  　Q.　In September of '98, do you know if – was

## Page 62

1  -your sister Janet involved in any of the discussions
2  with the City of Stamford personnel people?
3  　A.　She was never present at any of those
4  meetings. I had talked to her about it on the phone,
5  and I think I found out about a year and a half or
6  two years later that she had spoken to the personnel
7  people on the phone. She had never told me she
8  called them.
9  　Q.　Is it your understanding that she asked
10  the personnel department not to fire you?
11  　A.　That's what Mr. Manfredonia has testified
12  to.
13  　Q.　And not to arrest you?
14  　A.　I don't know. I know that they had a
15  conversation, that he told her that – or she told
16  him that I had some marital troubles and that, I
17  guess, that she asked him not to fire me.
18  　Q.　"She" being Barbara Murphy or "she" being
19  Janet?
20  　A.　No, she being my sister Janet.
21  　Q.　Okay. By the way, in September of 1998,
22  your divorce was proceeding, was it not?
23  　A.　My wife filed, served me with papers, I
24  think, a couple of days after I had my first
25  conversation with Mr. Manfredonia and Stover.

## Page 63

1  　Q.　Would you say that there was an oral
2  agreement after your two meetings with
3  Mr. Manfredonia and Mr. Stover that you would leave
4  Barbara alone?
5  　A.　I agreed that I would have no contact with
6  her in the workplace, and I told them that they had
7  no right to tell me what to do outside the workplace.
8  　Q.　Was there any agreement that you get
9  counseling?
10  　A.　Yes.
11  　Q.　Were you ever offered a written document
12  prepared by Mr. Manfredonia, Mr. Stover –
13  　A.　No.
14  　Q.　– memorializing that agreement?
15  　A.　No.
16  　Q.　Do you know if they discussed this with
17  Janet?
18  　A.　I don't know that they did.
19  　Q.　Do you know if your sister Janet objected
20  to any written agreement?
21  　A.　I don't know. I don't know the – I never
22  asked her about her discussion with them.
23  　Q.　Did your sister Janet know that you were
24  being sued for divorce by your wife?
25  　A.　When?

## Page 64

1  　Q.　In September of 1998.
2  　A.　Prior to the conversation with
3  Mr. Manfredonia –
4  　Q.　No. At any time in September.
5  　A.　I don't know when she exactly knew. If
6  not September, in October.
7  　Q.　Okay. Did you keep your word that you
8  would leave Barbara alone?
9  　A.　The only time I have spoken to her since
10  then is the time I related to you in July of – no.
11  That was –
12  　Q.　I'm talking about after September of 1998.
13  　A.　After September of 1998, I have never had
14  another conversation with her.
15  　Q.　Why were you arrested then in October,
16  November of 2000?
17  　A.　Because of Detective Strate's
18  investigation.
19  　Q.　All right. We'll go over that. But it's
20  clear that Barbara felt you violated that agreement
21  and that you were bothering her?
22  　A.　That's what she testified to.
23  　Q.　Okay. We'll go into the details about
24  that later. Ultimately did you plead guilty to the
25  criminal charges?

Page 65

1    A.   I pled guilty to taking her briefcase in
2  1998, and my option was if I also didn't plead guilty
3  to staring at her in a bar that instead of allowing
4  me to plead guilty to a misdemeanor of taking her
5  briefcase, the prosecutor was going to try it as a
6  felony of taking her briefcase, and I already had my
7  written apology that said it to me.
8    Q.   So you pled guilty to two misdemeanors?
9    A.   Right.
10   Q.   And your understanding is one of them was
11 the briefcase?
12   A.   Right.
13   Q.   And one of them was staring at her at
14 Brennan's?
15   A.   No. At another place.
16   Q.   Another bar?
17   A.   Taranto.
18   Q.   Okay. Which is what?
19   A.   It's another bar, restaurant.
20   Q.   And as a result of your guilty plea, you
21 were shortly thereafter terminated from the City of
22 Stamford?
23   A.   Right.
24   Q.   And I believe you testified your union
25 filed a grievance, and there was a hearing and there

Page 66

1  was a written decision, was there not?
2    A.   Right.
3    Q.   You've read that written decision?
4    A.   Uh-huh.
5    Q.   And we'll get into details of that in a
6  few minutes, but have you taken any steps, you or
7  your union, to appeal it or do anything further?
8    A.   Not yet.
9    Q.   I'm sorry?
10   A.   Not yet.
11   Q.   Is it your understanding that you could
12 still do something about it?
13   A.   I think so.
14   Q.   You've been served with a Complaint in
15 Federal Court which has brought you here today for
16 this deposition, have you not?
17   A.   Yes.
18   Q.   And you've chosen to be acting as your own
19 attorney?
20   A.   That's correct.
21   Q.   Let me ask you this, are you acting as
22 your own attorney because you feel you don't need an
23 attorney or because you can't afford an attorney?
24   A.   Why are you asking?
25   Q.   I'll withdraw it. Did you pay a sum to

Page 67

1  Mark Katz for his criminal representation?
2    A.   Yes.
3    Q.   And did you -- have you paid any other
4  expenses for any other attorneys as a result of this
5  termination, arrest and conviction?
6    A.   No.
7    Q.   Your union represented you before the
8  Board of Mediation and Arbitration?
9    A.   Yes.
10   Q.   And you didn't have any private counsel
11 for that?
12   A.   No.
13   Q.   You also mentioned a hearing that
14 Mr. Manfredonia attended involving Unemployment?
15   A.   Yes.
16   Q.   Was that after your termination, and when
17 you applied for Unemployment, the City objected to
18 you receiving it?
19   A.   Yes.
20   Q.   What was the result of that hearing?
21   A.   I received Unemployment Compensation.
22   Q.   How long did you receive the Unemployment
23 Compensation, for the maximum length of time you
24 could, or did you get a job?
25   A.   I was still collecting when I got a job.

Page 68

1    Q.   Do you remember how long you collected?
2    A.   Oh, how long did I collect? From April
3  through mid December -- from April of 2002 through
4  December 15th, 2002.
5    Q.   Now, having worked for the City for
6  approximately, I guess, slightly under 10 years, you
7  had accrued a pension contribution?
8    A.   Yes.
9    Q.   Did you withdraw that pension
10 contribution?
11   A.   No.
12   Q.   So it's still in the hands of the City?
13   A.   Yes.
14   Q.   And you invested in your retirement?
15   A.   Yes.
16   Q.   Okay. Let's look at Exhibit A, which is
17 this document (indicating), and I don't want to go
18 through it in any great detail, but let me just ask
19 you, and I'll direct your attention to certain
20 portions of it. Would you agree --
21   A.   If I were you, I wouldn't want to go
22 through it either.
23   Q.   -- if you agree or disagree. All right.
24 In the second paragraph it says that Murphy met
25 yourself as a purchasing agent, they were

## Page 69

1  acquaintances through work and nothing more, Vecchia
2  was stalking her. Had you ever been in a supervisory
3  position over Barbara Murphy?
4      A.    No.
5      Q.    When you went to lunch with Barbara
6  Murphy, who was her supervisor?
7      A.    I don't know if she works for the fire
8  chief or if she works for Peter Brown, the deputy
9  chief, one or the other.
10     Q.    But the fire – you have nothing to do, no
11 supervisory control?
12     A.    No.
13     Q.    Over her or the fire department?
14     A.    Right.
15     Q.    By the way, have you ever done appraisals
16 for any of the people that worked for you?
17     A.    Done appraisals.
18     Q.    Annual performance appraisals.
19     A.    What I've done is filled out the step
20 increase form.
21     Q.    Have you ever disciplined anybody who
22 worked for you in the City of Stamford?
23     A.    No.
24     Q.    Have you ever terminated anybody in
25 private business when you were working for private

## Page 70

1  companies?
2      A.    No.
3      Q.    Have you ever been involved in any
4  discipline yourself prior to working for City of
5  Stamford?
6      A.    No. I never had the authority to
7  discipline. I was reading this Personnel Procedure.
8  It talks here about departments have the
9  responsibility or authority to discipline people, and
10 under the way the City is set up, the department head
11 is the finance director.
12     Q.    Your department of purchasing agent –
13     A.    It's not a department. The City calls
14 them bureaus.
15     Q.    So the only person who could discipline
16 would be the finance commissioner, who, in 1998, was
17 whom?
18     A.    Tom Hamilton.
19     Q.    All right. Going to paragraph 3 of
20 Exhibit A, while employed at Government Center Murphy
21 reported Vecchia's harassing behavior to –
22     A.    Where are we now?
23     Q.    Third paragraph, to Fred Manfredonia and
24 Bill Stover of the human resources division, both men
25 called in yourself, who had admitted his obsession

## Page 71

1  with Murphy but promised to stop and seek counseling.
2  Agree or disagree with that?
3      A.    I don't think I ever said I had an
4  obsession. I think that's some editorial flourish.
5  by –
6      Q.    How about the promise to stop and seek
7  counseling?
8      A.    I told them that I would have no contact
9  with her in the workplace.
10     Q.    And that Murphy was represented by Ben
11 Fraser and you were represented by your sister?
12     A.    No, never happened.
13     Q.    All right. How about breaking into her
14 vehicle in Norwalk in March of 1998?
15     A.    Where are we now?
16     Q.    Same paragraph.
17     A.    Admitted to breaking – yes.
18     Q.    All right. Skip to the beginning of the
19 page that has – it says page 3 of 12 up here.
20     A.    Yep, got it.
21     Q.    And at the top, that an agreement was
22 reached in late March of 1998 between all parties.
23 That the agreement required David Vecchia seek
24 immediate counseling and the immediate and permanent
25 cessation of stalking, annoying and frightening

## Page 72

1  behavior towards Barbara Murphy. Agree or disagree?
2      A.    I agree that I would have no contact with
3  Barbara Murphy, and the rest of it's Deputy Strate's
4  editorial flourish.
5      Q.    So you don't agree that you stalked,
6  annoyed or frightened her?
7      A.    Right.
8      Q.    All right. Next sentence, that if Vecchia
9  did this, Murphy would not take further action with
10 the police or City of Stamford. Is that your
11 understanding from either Janet or directly from
12 Barbara or from Ben Fraser?
13     A.    My understanding was she could do whatever
14 she wanted to do.
15     Q.    Next sentence, that copies of reports from
16 Vecchia's therapies would be required periodically to
17 monitor to ensure Murphy's safety. Agree or
18 disagree?
19     A.    Nobody ever asked for any reports.
20     Q.    By the way, did you get this counselor
21 through the EAP program from the City of Stamford?
22     A.    Yes.
23     Q.    And the City of Stamford, therefore, paid
24 for this counselor, or did you pay out of your own
25 pocket?

**Page 73**

1   A.   No, I made sure that it was someone
2 covered by the insurance.
3   Q.   And you're saying nobody asked for
4 reports. Do you know if this individual you saw gave
5 reports to anybody aside from yourself?
6   A.   I never signed any release.
7   Q.   Did you see this individual, and I'm
8 talking about prior to your arrest now, more than six
9 or less than six times?
10   A.   I don't think it's any of your business.
11   Q.   All right. This one I am going to ask you
12 if you don't answer yes, you could say I don't know
13 or, yes, it was more than six, less than six, but you
14 can't say it's none of my business because it is my
15 business, and I can go and get a Court Order against
16 you. I'm just telling you. You're still saying it's
17 none of my business?
18   A.   I don't think you have a right to ask me
19 the question.
20   Q.   I do. It's my position that I do, and if
21 a judge agrees, that means you're going to have to
22 come back again.
23   A.   I don't think you have a right to ask me
24 the question.
25   Q.   All right. Well, I'm claiming it, and

**Page 74**

1 we'll find out later on from a judge whether you have
2 to come back again.
3 All right. Next sentence, that these terms
4 were firmed up and accepted on March 26, 1998. Agree
5 or disagree?
6   A.   These terms were firmed up and accepted.
7 What is that?
8   Q.   I don't know.
9   A.   Those aren't terms I — language that I
10 would have used.
11   Q.   But did you agree to something with
12 Mr. Fraser, and did you accept what these terms of
13 the agreement were on March 26, 1998?
14   A.   I had agreed that I would have no contact
15 with Barbara Murphy.
16   Q.   All right. Next paragraph, about the
17 middle of the paragraph, it says, "Stover and
18 Manfredonia told Murphy and Fraser they had spoken to
19 Vecchia on September 25, 1998."
20   A.   Where are we now?
21   Q.   Right here (indicating).
22   A.   Okay. In the middle of the sentence
23 there, that a second meeting was documented.
24   Q.   Right. That they told Murphy and Fraser
25 they met with you September 25th, you waived your

**Page 75**

1 right to counsel, you didn't want to further
2 humiliate yourself, you acknowledged prior conduct
3 and the deal regarding your getting help. Agree or
4 disagree?
5   A.   "And the deal they had made in the past
6 regarding his getting help." Yes.
7   Q.   That you were advised by Stover and
8 Manfredonia not to have any contact whatsoever with
9 Murphy and that they would put together a written
10 agreement for execution by yourself. Agree or
11 disagree?
12   A.   That I wouldn't — shouldn't have any
13 contact with her in the workplace.
14   Q.   You disagree with the written agreement?
15   A.   That they would put together a written
16 agreement or execution. They said they were going to
17 prepare something for me to look at.
18   Q.   Did you agree to sign it?
19   A.   I told the attorney here I wouldn't agree
20 to signing anything unless I had seen something.
21   Q.   But did you at any point say, "All right,
22 gentlemen, you put it in writing and I'll sign it if
23 I agree with what you say"?
24   A.   I don't think I said that.
25   Q.   What did you say? You didn't say

**Page 76**

1 anything?
2   A.   I think they told me they were going to
3 prepare a written agreement.
4   Q.   So you didn't say yes or no?
5   A.   I don't think they gave me a choice.
6   Q.   But you didn't — you didn't say
7 affirmatively, "Okay, fine, you put together a
8 written agreement and I'll sign it"?
9   A.   Sitting here today, I don't think I agreed
10 to sign anything somebody prepared unless I knew what
11 it said, unless I had read it.
12   Q.   Okay.
13   A.   I expected that they were going to prepare
14 a written agreement.
15   Q.   Okay.
16   A.   And then I would have the option if I
17 wanted to call it or if I wanted to call the union in
18 or bring an attorney in or —
19   Q.   All right. Let's skip to the next page,
20 page 4 of 12, paragraph 10. The prior relates to
21 Alive at Five, road races, Brennan's, sending candy,
22 and so on. Let's go to paragraph 10, that Vecchia
23 suspended his pursuit of Murphy, but, in early
24 October of this year, which would be 2000, Murphy saw
25 Vecchia in Taranto's, T-A-R-A-N-T-O-S, which is

## Page 77

1  located on Glenbrook Road in Stamford, Connecticut.
2  The first part of that sentence, you suspended your
3  pursuit –
4      A.   Well, I object to the language.
5      Q.   Okay. Would you agree that from 1998
6  through 2000 you didn't have contact with Barbara
7  Murphy in the workplace?
8      A.   I saw her a few times, but I never spoke
9  to her.
10     Q.   Would you agree that you didn't pursue it?
11     A.   I did not pursue it.
12     Q.   Would you agree that you honored your
13  agreement not to bother her, as you understood it,
14  made in September of 1998?
15     A.   I had no contact with her in the
16  workplace. I have never spoken to her again, and, to
17  the best of my knowledge, she never complained to the
18  City again.
19     Q.   All right. Would you agree that in
20  October, 2000, you saw her in Taranto's?
21     A.   Yes.
22     Q.   All right. Let me continue to read. That
23  Murphy was in Taranto's with a male friend, agree or
24  disagree?
25     A.   I didn't know that – who she was with.

## Page 78

1      Q.   Murphy observed you walking alone and both
2  of you had eye contact, agree or disagree?
3      A.   I saw her there, yeah.
4      Q.   That you abruptly came to a stop and
5  stared at her?
6      A.   I was surprised to see her. I never saw
7  her there before.
8      Q.   You walked over to the bar, sat five
9  stools away, ordered a drink and continued to stare
10  at her?
11     A.   I thought it was – five stools away – I
12  thought it was further than that. I don't remember
13  – I did not continue to stare at her.
14     Q.   That after 10 minutes of this, Murphy told
15  her male friend she couldn't stay there any longer
16  now that you knew that she came here and that you
17  were continuing to stare at her and that Murphy left.
18  Agree or disagree?
19     A.   I did not continue to stare at her, and
20  she left.
21     Q.   By the way, was this the first time you
22  had ever gone to Taranto's?
23     A.   No.
24     Q.   You had been there in the past?
25     A.   Yes.

## Page 79

1      Q.   And you had never seen her there before?
2      A.   Right.
3      Q.   So when you went there that night, was it
4  your intention to see her?
5      A.   No. As I said before, I was surprised
6  that she was there.
7      Q.   Why didn't you, as soon as you saw her,
8  turn around and leave?
9      A.   Why should I? I had seen her plenty of
10  times in Brennan's in that time period.
11     Q.   Well, let me ask you this, in hindsight,
12  having been arrested, convicted and terminated –
13     A.   In hindsight, yeah.
14     Q.   – do you think it would have been a good
15  idea to turn around and leave?
16     A.   Yeah.
17     Q.   All right. Continuing on – I'm trying to
18  speed this up – Murphy checked her caller ID, there
19  was a Wilton number on the caller ID, she later found
20  out where it was from, someplace off Route 7. Did
21  you make that phone call to her from a pay phone?
22     A.   No.
23     Q.   Later on it says, the morning after she
24  observed a plastic green frog ornament with red lips
25  on her front lawn. Did you put that green frog

## Page 80

1  ornament on her lawn?
2      A.   No.
3      Q.   Okay. Paragraph 11, next paragraph, it
4  says that same week in early October of 2000, within
5  a few days of your meeting at Taranto's, she saw you
6  in Government Center on the 10th floor. Agree or
7  disagree?
8      A.   I don't remember seeing her.
9      Q.   All right. Next sentence, he walked by,
10  saw her, stared at her. Agree or disagree?
11     A.   I didn't see her.
12     Q.   Paragraph 12, next page, page 6 of 12, a
13  few days later, the first week of November, Murphy
14  went to Government Center 4th floor to see a friend,
15  she walked by the conference room with a training
16  class in session and she saw you sitting in the
17  class. Agree or disagree?
18     A.   This was a class on the finance system,
19  and I taught the first half of the class, and the
20  comptroller wanted me to stay for the rest of it in
21  case there were questions in her half of the
22  presentation that tied into purchasing.
23  There was a third part of the class as well
24  to do with capital projects, which I had no
25  involvement with, and I left after that, and this was