# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BARBARA E MURPHY                           CIVIL NO
Plaintiff                                  3:03 cv 00519 (MRK)

v

THE CITY OF STAMFORD AND                   May 12, 2004
DAVID VECCHIA
Defendants

ANSWER OF DAVID VECCHIA

The defendant DAVID VECCHIA, hereby files its Answer to the Plaintiff's Request

for Admissions of October 29, 2003 and April 6, 2004

1. Defendant admits the allegation of par. 1.

2. Defendant agrees in part to para 2; Supervisory position for the purchasing mission

with no authority to discipline, promote, or increase wages of employees.

3. Yes

4. Yes

5. Yes

6. Defendant Vecchia denies making sexual advances to Murphy.

7. a. Defendant Vecchia denies asking Murphy to lunch.

7 b. Defendant sent candy one time

7 c Defendant has no knowledge of this allegation.

7 d Defendant has no knowledge of this allegation,

8 Defendant denies par. 8.

9   Defendant denies para 9.

10  Defendant denies para 10

11  Defendant denies para 11.

12  Defendant denies para 12 in 1997 and  1998 and admits to one time.

13  Defendant has no knowledge and leaves Plaintiff to her proof.

14 ·Defendant has no knowledge and leaves Plaintiff to her proof

15  Defendant has no knowledge and leaves Plaintiff to her proof

16  Defendant has no knowledge and leaves Plaintiff to her proof

17  Defendant has no knowledge and leaves Plaintiff to her proof

18  Defendant has no knowledge and leaves Plaintiff to her proof

19  Defendant has no knowledge and leaves Plaintiff to her proof

20  Defendant has no knowledge and leaves Plaintiff to her proof

21  Defendant admits to para 21.

22  Defendant has no knowledge and leaves Plaintiff to her proof

23  Defendant has no knowledge and leaves Plaintiff to her proof

24  Defendant has no knowledge and leaves Plaintiff to her proof

25  Defendant does not understand the question

26  Defendant does not understand the question.

27  Defendant has no knowledge and leaves Plaintiff to her proof

28  Defendant has no knowledge and leaves Plaintiff to her proof

29  Defendant has no knowledge and leaves Plaintiff to her proof

30  Defendant has no knowledge and leaves Plaintiff to her proof

31  Defendant has no knowledge and leaves Plaintiff to her proof

32  Defendant has no knowledge and leaves Plaintiff to her proof

33  Defendant has no knowledge and leaves Plaintiff to her proof

34  In April, 1998 at recommendation of legal counsel.

35  a-e; Defendant has no knowledge and leaves Plaintiff to her proof

36  a-d; Defendant has no knowledge and leaves Plaintiff to her proof

37  Defendant has no knowledge and leaves Plaintiff to her proof

38  a-Defendant admits to on or about March 20, 1998.
    b- Defendant has no knowledge and leaves Plaintiff to her proof
    c- Defendant has no knowledge and leaves Plaintiff to her proof
    d- Allegations are confused; Admit to criminal trepass in entering car
    at Plaintiff Murphy's home,
    e- Same as 38d
    f- Defendant admits to taking things from Murphy's car.
    g- Defendant has no knowledge and leaves Plaintiff to her proof
    h- Defendant has no knowledge and leaves Plaintiff to her proof

39  Defendant admits to para 39

40  a-d Defendant admits to 40 a-d

    e- Murphy"'s response was it did not bother her, she had done things she
    regretted.

41  a-b Defendant has no knowledge and leaves Plaintiff to her proof Defendant has no
    knowledge and leaves Plaintiff to her proof

42  Yes

43  Yes

44  Yes to a through h; Sentence I through j Defendant has no knowledge and leaves Plaintiff to
    her proof; k Yes

45  Defendant has no knowledge and leaves Plaintiff to her proof

46  Defendant has no knowledge and leaves Plaintiff to her proof

47  Defendant has no knowledge and leaves Plaintiff to her proof

48  Defendant has no knowledge and leaves Plaintiff to her proof

49 Yes

50 Defendant Vecchia admitted to breaking into Murphy''s car.

51 Defendant Vecchia agreed to have no contact with Murphy at work,

52 City suggested I utilize the Employee Assistance Plan.

53 Correct

54 Defendant has no knowledge and leaves Plaintiff to her proof

55 Correct and there was no agreement to do so.

56 Defendant has no knowledge and leaves Plaintiff to her proof

57 Correct and there was no agreement to do so.

58 Defendant has no knowledge and leaves Plaintiff to her proof

59 Disagree and leave Plaintiff to her proof

60 Deny; and leave Plaintiff to her proof

61 Defendant has no knowledge and leaves Plaintiff to her proof

62 Complaint is an allegation; Information is not true.

63 Deny and leave Plaintiff to her proof.

64 Defendant has no knowledge and leaves Plaintiff to her proof

65 Deny and leave Plaintiff to her proof.

66 Admit to being at bar and seeing Murphy. Sat at opposite end of bar from her.

67 Deny and leave Plaintiff to her proof.

68 Deny and leave Plaintiff to her proof.

69 Defendant has no knowledge and leaves Plaintiff to her proof

70 No

71 Yes and charges were dismissed.

72  Exhibit 4 are unproven allegations.

73  Deny

74  Yes

75  Defendant has no knowledge and leaves Plaintiff to her proof

76  Defendant has no knowledge and leaves Plaintiff to her proof

77  Defendant has no knowledge and leaves Plaintiff to her proof

78  Deny

79  Deny

80  Defendant admitted to sending candy once.

81  Deny

82  Deny

83  Deny

84  Deny

85  Deny

86  Deny

87  Deny

88  Yes

89  Yes

90  Yes

91  Yes

92  Yes

93  Deny harassing Murphy

94  Defendant has no knowledge and leaves Plaintiff to her proof

95  Defendant has no knowledge and leaves Plaintiff to her proof

96  Defendant has no knowledge and leaves Plaintiff to her proof

97  Defendant has no knowledge and leaves Plaintiff to her proof

98  Defendant has no knowledge and leaves Plaintiff to her proof

99  Deny

100  Deny

101  Deny

102  Deny

103  Deny

104 Defendant has no knowledge and leaves Plaintiff to her proof

105 Deny

106 Deny

107 Deny

108 Deny

109 Deny

110 Deny

111 Defendant has no knowledge and leaves Plaintiff to her proof

May 12, 2004

Defendant
David Vecchia
PO Box 159
West Redding, CT 06896

CERTIFICATION

I HEREBY CERTIFY THAT A COPY OF THE FORGOING WAS MAILED , POSTAGE PAID, THIS 12TH DAY OF May, 2004 TO THE FOLLOWING;

Law offices of Elisabeth S Maurer, PC
871 Ethan Allen Hwy, Suite 202
Ridgedale,CT 06877


James V Minor
Assistant Corporate Counsel
City of Stamford
888 Washingtpm Boulevard
Box 10152
Stamford, CT 06904-2152

David Vecchia
Defendant
Pro Se

# EXHIBIT F

BOARD OF MEDIATION AND ARBITRATION
38 Wolcott Hill Road
Wethersfield, CT   06109

# COPY

IN THE MATTER OF:

DAY 2

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CITY OF STAMFORD        :      Case No.
                        :      2002-A-0842
    -and-               :
                        :
AFSCME CO 4, LOCAL 2657 :(David Vecchia Termination)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


Held on Monday, October 21, 2002 before:


DAVID DEE, ESQ., Chair
ROBERT CANNING, Management Advocate
JOHN P. COLANGELO, Union Advocate

2

```
 1                         APPEARANCES

 2

 3

 4      REPRESENTING TOWN OF STAMFORD:

 5           KAINEN, ESCALERA & MCHALE, P.C.
             21 Oak Street
 6           Hartford, CT   06106
             (860) 493-0870
 7                By:  Patrick J. McHale, Esq.

 8

 9

10      REPRESENTING THE UNION:

11           AFSCME Co. 4
             444 East Main Street
12           New Britain, CT   06051
                  By:  Nicholas D'Andrea, Staff Rep

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          <u>WITNESSES</u>

2

3

     <u>DAVID VECCHIA</u>
4
     Direct Examination by Mr. McHale .............. 55
5    No Cross-Examination

6

     <u>BARBARA MURPHY</u>
7
     Direct Examination by Mr. McHale .............. 121
8    No Cross-Examination

9

     <u>MARY VECCHIA</u>
10
     Direct Examination by Mr. McHale .............. 129
11   No Cross-Examination

12

     <u>WILLIAM STOVER</u>
13
     Direct Examination by Mr. McHale ............. 140
14   Cross-Examination by Mr. D'Andrea ............ 145

15

     <u>FRED MANFREDONIA</u>
16
     Direct Examination by Mr. D'Andrea ........... 156
17   Cross-Examination by Mr. McHale .............. 158

18

     <u>WILLIAM STOVER</u>
19
     Direct Examination by Mr. D'Andrea ........... 167
20   No Cross-Examination

21

     <u>DAVID VECCHIA</u>
22
     Direct Examination by Mr. D'Andrea ........... 180
23   No Cross-Examination

24

25

6

1          (On the record:  10:02 a.m.)

2

3          ARBITRATOR:  Good morning, everyone.

4     This is the second hearing on case number

5     2002-A-0842.  I'm passing around a sheet,

6     if you would all sign in please I would

7     appreciate it.

8          Have the parties discussed an issue

9     for the panel?

10          MR. MCHALE:  Mr. Dee, this is the

11     City's proposed submission.

12          ARBITRATOR:  Would the Union kindly

13     review that and indicate whether or not

14     they object.

15          MR. D'ANDREA:  Mr. Dee, this is the

16     Union's submission.

17          ARBITRATOR:  Do you have one more?

18          MR. D'ANDREA:  Yes, I do, sir.

19          ARBITRATOR:  There's only a slight

20     variation between the two.

21          MR. MCHALE:  Yes, there is a slight

22     variation.  The only difference, as I read

23     it, is that the City's submission points

24     out that the panel's remedy needs to be

25     consistent with the applicable Collective

1    Bargaining Agreement.  And that's what the

2    language' in the Collective Bargaining

3    Agreement provides so I would hope we could

4    agree to that.

5         ARBITRATOR:  Does the Union have a

6    response?

7         MR. D'ANDREA:  Mr. Chairman, we

8    wouldn't be here if it wasn't for the

9    Collective Bargaining Agreement.  I think

10   the Union's submission is more traditional

11   and we would stand with it.

12        ARBITRATOR:  And the City is unwilling

13   to accept the Union's submission?

14        MR. MCHALE:  That's correct.

15        ARBITRATOR:  I would agree with the

16   Union on this point that the Union's issue

17   is more traditional and in line with what

18   this panel has accepted in the past.

19        So the panel is going to formulate

20   the issue as follows:  Did the City have

21   just cause to discharge David Va-chee-a

22   (phonetic) --

23        MR. D'ANDREA:  Vek-kia (phonetic).

24        ARBITRATOR:  -- Vecchia, thank you --

25   if not, what shall the remedy be?

1          MR. D'ANDREA:  Mr. Chair, may we be

2     advised, sir, of who's in the room?

3          THE ARBITRATOR:  In one moment when

4     the attendance sheet comes around.

5          Are there any joint agreements?

6          MR. MCHALE:  There are not.  The City

7     has prepared a number of exhibits that we

8     think are pro forma exhibits of the

9     grievance procedure, the contract, the

10    relevant documents that have been

11    communicated to the grievant regarding a

12    paid leave of absence that preceded the

13    pre-termination hearing, ultimately the

14    termination, and hoped that they could be

15    submitted jointly.  But we have no

16    agreement in advance.

17          ARBITRATOR:  Why don't you provide

18    your first proposed joint exhibit.

19          MR. MCHALE:  This is the Collective

20    Bargaining Agreement between the City of

21    Stamford and Stamford Municipal

22    Supervisory Employees Union, covering the

23    period of July 1, 2001 through June 30,

24    2005.  The contract is a 40-page document,

25    I have reproduced the relevant pages with

1           Anybody on this side going to

2       testify?'

3           MR. MCHALE:  Mr. Vecchia ought to

4       raise his right hand.

5           ARBITRATOR:  Raise your right hand,

6       please.

7

8           (Witnesses duly sworn by the

9       Arbitrator.)

10

11          ARBITRATOR:  Does the City desire to

12      make an opening statement?

13          MR. MCHALE:  We would, Mr. Dee.  And

14      because this case involves a long period

15      of activity over a three-year period, I

16      would request the panel's indulgence to

17      make kind of a detailed opening statement

18      so you understand the facts we intend to

19      present.

20          I'll do my best to present it to you

21      expeditiously and efficiently but I would

22      like to get into the outset what we intend

23      to prove today.

24          ARBITRATOR:  Whenever you're ready.

25          MR. MCHALE:  Okay.  Terrorism, sadly,

1              MR. D'ANDREA:  Mr. Chairman, the Union

2      reiterates its position and believes that

3      this gentleman's rights would be violated

4      if he were forced to testify against

5      himself.

6              ARBITRATOR:  I am going to overrule

7      your objection and require that your client

8      take the witness stand.

9

10

11         DAVID VECCHIA, called as a witness,

12      having been previously duly sworn by the

13      Arbitrator, testified as follows:

14

15              ARBITRATOR:  Good morning.

16              THE WITNESS:  Hello.

17              ARBITRATOR:  Please state and spell

18      your name for the record, please.

19              THE WITNESS:  David Vecchia.  V, as in

20      victory, -e-c-c-h-i-a.

21              ARBITRATOR:  You may inquire when

22      ready.

23

24

25              DIRECT EXAMINATION

1

2    BY MR. MCHALE:

3        Q.    Mr. Vecchia, it's my understanding that you

4    were hired by the City of Stamford to be its

5    purchasing agent sometime in 1993?

6        A.    That's correct.  I took a Civil Service

7    test and I was interviewed and hired for the job.

8        Q.    Is that the only position you have held

9    with the City?

10       A.    That's correct.

11       Q.    Who's Barbara Murphy?

12       A.    Barbara Murphy is an employee of the City

13   of Stamford.

14       Q.    How do you know her?

15       A.    For the first four years I worked there,

16   she worked in the Payroll Department, which was about

17   100 feet from the Purchasing Department, so I would

18   see her every day.

19       Q.    Did you work with her on a couple of

20   committees?

21       A.    I think before in 1996 her job was

22   eliminated in the Payroll Department I think probably

23   because she was involved in theft of funds from the

24   Payroll Department --

25       Q.    Let me ask you the question again.  Did you

1  work with her on a number of committees?

2       A.    I'm answering the question --

3       Q.    Mr. Vecchia --

4              ARBITRATOR:  Gentlemen, please stop.

5       You may have a lot to say.

6              THE WITNESS:  I'm sorry, sir.

7              ARBITRATOR:  You may at some point

8       have a lot to say but you must answer the

9       questions as asked.  You have an advocate

10      here who will be able to elaborate

11      concerning your testimony on

12      cross-examination or if he wants to call

13      you in his case in chief.

14             THE WITNESS:  I was answering to the

15      best of my ability.

16             ARBITRATOR:  Sir, I am speaking.  If

17      the question requires a yes or no, that's

18      the answer I expect.  Don't go off on these

19      narratives.  Just listen to the question

20      and then answer it.

21             Ask the question, please.

22  BY MR. MCHALE:

23      Q.    Mr. Vecchia, did you work with

24  Barbara Murphy on a number of committees?

25      A.    One committee.

1    Q.    Did you invite her to lunch?

2    A.    No, she invited me.

3    Q.    She invited you?

4    A.    Yes.

5    Q.    Interesting.  How did that come about?

6    A.    Yes or no?

7             ARBITRATOR:  It requires more than a

8         yes or no answer.

9             THE WITNESS:  In the fall of 1997 we

10        were working on the committee and she and

11        another employee, Alice Helms, volunteered

12        to write and edit a newsletter that was

13        going out to -- I'll have to backtrack

14        again.

15             The City purchased a new financial

16        system and it was installed in the summer

17        of 1997.  That was one of the purposes of

18        these meetings.  And I was involved with

19        training the city employees that was using

20        the system.  And there were still a lot of

21        people who had a lot of questions about how

22        to use the system after that.

23             So it was decided by the director of

24        finance that we should put out a

25        newsletter, just essentially something

1    for people to refer to that would be a

2    point of reference for the most frequent

3    questions.

4        And Barbara and Alice volunteered to

5    put out the newsletter.  So they each

6    put out three or four issues of the

7    newsletter.

8        And I had spoken to the comptroller

9    about giving them something for putting out

10   the newsletter and we decided that we would

11   buy them each a gift certificate from it

12   was either Macy's or Filene's and give it

13   to them since they weren't being paid for

14   putting out the newsletter.

15       So I wrote a requisition, the

16   comptroller approved it, and with city

17   funds we gave them each a gift certificate

18   for $50.

19       Ms. Murphy was very surprised about

20   that and she said the city had never given

21   her anything for doing anything.  And I

22   think it was in January of 1998 she invited

23   me to go to lunch.

24   BY MR. MCHALE:

25       Q.    Just the two of you?

1        A.    That's correct.

2        Q.    Did she pay for the lunch?

3        A.    I don't remember who paid for it.

4        Q.    You don't remember.  Would you remember if

5    you paid?

6        A.    As I said, sir, I don't remember who paid

7    for the lunch.

8        Q.    Prior to September of 1998, the period of

9    1997 through 1998, did you make it a practice of

10   sending Ms. Murphy candy?

11       A.    I think I did it once.  I did it one time.

12       Q.    Did you do it at the time she got a

13   promotion to administrative assistant down at the

14   fire department?

15       A.    No.

16       Q.    Did you do it at Christmastime?

17       A.    No.

18       Q.    Did you do it at Valentine's Day?

19       A.    No.

20       Q.    When did you send her the candy,

21   Mr. Vecchia?

22       A.    I think I sent it to her sometime in 1998.

23   January or February of 1998.

24       Q.    Did she tell you to stop?

25       A.    No.

1      Q.    Never said anything about it?

2      A.    No.

3      Q.    Why did you send her the candy?

4      A.    I believe at that time -- I think I sent

5   her some M & Ms, something like that. I don't

6   remember why. Something about the color of M & Ms, I

7   don't remember specifically what the reason was.

8      Q.    What about the color?

9      A.    I don't remember what it was.

10     Q.    What color?

11     A.    I think they were M & Ms. I can't remember

12   what the reason is.

13     Q.    What is the Alive at Five?

14     A.    Alive at Five is concerts that are held in

15   the Green across the street from City Hall. I

16   think the city, along with the Downtown Service

17   Districts, which is a group of merchants or

18   something, paid for having a band play and they sell

19   food and drinks.

20     Q.    Are you familiar with an establishment in

21   the Shippan section of the city known as Brennan's?

22     A.    Yes.

23     Q.    What is it?

24     A.    It's a bar. Bar and restaurant.

25     Q.    Did you become attracted to Barbara Murphy

1    at any time during the period of 1997 or 1998?

2        A.    I liked seeing her, liked speaking to her,

3    yes.

4        Q.    Did you follow her to Alive at Five?

5        A.    No.

6        Q.    Did you follow her to Brennan's?

7        A.    I saw her once at the Alive at Five and she

8    said she and her friends were going to Brennan's, why

9    didn't I join them there.

10        Q.    So you followed her there?

11        A.    I didn't say that.    I went there.

12        Q.    You went there?

13        A.    That's right.

14        Q.    In response to her invitation?

15        A.    In response to her saying she and her

16    friends were going to be there, why didn't I join

17    them there.    That evening, after we went to

18    Brennan's, we went to a second place about a mile

19    away by the water in Shippan.

20        Q.    And you went with her?

21        A.    I went in my car.

22        Q.    You went separately?

23        A.    That's correct.

24        Q.    Over the course of this period, and you

25    have heard me, Mr. Vecchia, in my opening statements

1 · explain to the panel the facts that the City is

2  prepared to introduce today. I mentioned about you

3 · going to Brennan's and staring at Barbara Murphy?

4      A.    Yes.

5      Q.    Is that true?

6      A.    I have been to Brennan's. I have probably

7  been there in the period 1997 to 2000 I might have

8  been there 300 times.

9      Q.    When did you first go?

10      A.    I first went to Brennan's -- I worked for

11  Pitney-Bowes in Stamford previously and I had been to

12  Brennan's then.

13      Q.    When was that?

14      A.    That would have been in -- that would have

15  been back in the eighties. I had been there a few

16  times in the nineties and met some people I know from

17  Pitney-Bowes there.

18      Q.    Did you call out Barbara Murphy's name

19  loudly at Brennan's one night?

20      A.    I think I did it once.

21      Q.    Why?

22      A.    I don't remember why.

23      Q.    Did you ever follow her out of the bar?

24      A.    No.

25      Q.    Did you ever stand in front of her car --

```
 1        A.    No.

 2        Q.    -- so she couldn't drive away?

 3        A.    No.

 4        Q.    Did the owner of Brennan's ever have to

 5   tell you stop following her?

 6        A.    No.

 7        Q.    Never happened?

 8        A.    Never happened.

 9        Q.    Never once?

10        A.    Never once.

11        Q.    Mr. Vecchia, I'm not looking to cause you

12   any unnecessary embarrassment nor am I looking to

13   have you the subject of any further criminal charges.

14   You're testifying under oath today, do you understand

15   that?

16        A.    I understand.

17        Q.    And you understand the rules about perjury;

18   is that right?

19        A.    I do.  My answer is never once.

20        Q.    Never once?

21        A.    No.

22        Q.    Did you engage in any inappropriate

23   behavior towards Barbara Murphy at Brennan's?

24        A.    I don't recall any.

25        Q.    Never?
```

```
 1        A.    Never.

 2        Q.    The yelling wasn't inappropriate in your

 3   mind?

 4        A.    That was inappropriate.

 5        Q.    It was?

 6        A.    Yes.

 7        Q.    So you did one bad thing?

 8        A.    One.

 9        Q.    Did you buy her a meal?

10        A.    We had a meal together in January of 1998

11   and that was at Antonio's, that she invited me.

12        Q.    How about Brennan's, did you buy her meal

13   at Brennan's?

14        A.    I might have bought her a drink, she might

15   have bought me drinks.  We probably shared drinks.

16   People at Brennan's are always buying each other

17   shots.  Somebody would buy the bar shots.  And

18   sometimes she wouldn't want to finish the shot

19   and she would hand it to me and say finish it for

20   me.

21        Q.    So it's your testimony that you and

22   Barbara Murphy were chums?

23        A.    Yes, that's my testimony.

24        Q.    You were friends?

25        A.    Yes.
```

1    Q.    You drank together?

2    A.    Yes.   In the period of 1997 and early 1998.

3    Q.    Is that right?

4    A.    Yes.

5    Q.    So you didn't make her feel uncomfortable

6    at all is your testimony?

7    A.    In the period of 1997, 1998 I told you she

8    invited me to lunch.

9    Q.    But as a result of your behavior at

10   Brennan's, you were there, your testimony is, as

11   friends?

12   A.    That's correct.

13   Q.    You were there drinking together?

14   A.    That's correct.

15   Q.    And you did nothing to her that caused her

16   to be uncomfortable, other than on one occasion

17   yelling out her name.   Is that your testimony?

18   A.    That is my testimony.

19   Q.    Did you break into her car?

20   A.    I did in March of 1998.

21   Q.    You did?

22   A.    Yes.

23   Q.    Why?

24   A.    I don't know.   I mean, I know --

25   Q.    She was your friend?

```
 1        A.    Let me finish.

 2                  ARBITRATOR:  Thank you.  You need to

 3              allow him to answer the question, please.

 4                  MR. MCHALE:  I'm sorry.

 5                  THE WITNESS:  That that night in March

 6              of 1998 normally I just drink beer if I

 7              went to Brennan's.  It was somebody's

 8              birthday, I think, and they kept buying

 9              shots of -- it's a German liqueur, it's a

10              dark liqueur.  I don't remember the name of

11              it.  It's a strong, dark liqueur.

12                  And they kept buying shots and I may

13              have had five or six of them.  I know that

14              that evening I went to Barbara Murphy's car

15              and I took her briefcase and some other

16              things.

17      BY MR. MCHALE:

18        Q.    Let's not get there yet.  My question was

19      why did you break into her car, and your testimony is

20      you don't remember?

21        A.    No, that wasn't my testimony.  I said I

22      didn't know.

23        Q.    You didn't know what?

24        A.    Why I broke into her car.

25        Q.    Oh, you don't know?
```

1    A.    No.

2    Q.    How did you know where she lives?

3    A.    She told me.

4    Q.    She told you what?

5    A.    She told me where she lives.

6    Q.    When did she tell you?

7    A.    Probably one of the times I saw her at

8  Brennan's.

9    Q.    Did she tell you how to get there?

10    A.    Maybe she had.

11    Q.    Maybe she had?

12    A.    No.

13    Q.    You don't know whether she had?

14    A.    I assume if I knew I think she had.

15    Q.    Did she give you written directions?

16    A.    I don't recall.

17    Q.    Well, let me get this straight.  This is

18  March 20th of 1998, right?

19    A.    That's correct, sir.

20    Q.    And you saw her at Brennan's that night,

21  right?

22    A.    Yes, sir.

23    Q.    And she left without you, right?

24    A.    That's correct, sir.

25    Q.    And you got from Brennan's to her home that

```
 1   night, right?

 2         A.    Yes, sir.

 3         Q.    Now, had you been to her house ever --

 4         A.    No, sir.

 5         Q.    -- let me finish the question -- ever

 6   prior to March 20th of 1998?

 7         A.    No, sir.

 8         Q.    So you had never been there before.  So

 9   this was your maiden voyage to Barbara Murphy's home

10   that night?

11         A.    I had never been there before that night,

12   sir.

13         Q.    Now, how did you know what exits to

14   take and what lights to turn at and what streets to

15   go on?

16         A.    I know the Norwalk, Stamford, Fairfield

17   County area very well, sir.

18         Q.    You know the area very well, but how

19   did you know where her particular house in the area

20   was?

21         A.    I think she had told me.

22         Q.    You don't remember whether she gave you

23   directions or what she gave you?

24         A.    My testimony is that she had told me.

25         Q.    Where was her car parked when you broke
```

1   into it?

2       A.   In her driveway.

3       Q.   How close was her driveway to her home?

4       A.   Her driveway leads to her home.

5       Q.   Is she in a palatial mansion where the

6   driveway is apart from the dwelling, or is it pretty

7   much one on top of the other?

8       A.   The driveway leads to the home.

9       Q.   How close --

10      A.   How close?

11      Q.   -- was the car, Mr. Vecchia, when you

12  broke into it?

13      A.   Close to what?  The road?

14      Q.   Let me ask the question again.  Sorry if I

15  wasn't clear.

16          How near to her home, Barbara Murphy's home

17  I'm talking about, was her car on the evening of

18  March 20th, 1998 when you decided for reasons unknown

19  to break into it?

20      A.   Again how close to what, sir?

21      Q.   How close to her home?

22      A.   Two car lengths.

23      Q.   Two car lengths, so quite close.  What did

24  you look for in her car?

25      A.   I don't know.

```
 1        Q.    Where did you go?

 2        A.    Where did I go?

 3        Q.    Yes.

 4        A.    I took the briefcase and things from the

 5   car and I walked away, and I immediately realized

 6   this was a stupid thing to do and I walked back

 7   to the car to put them back in and the door was

 8   locked.

 9        Q.    The door was locked.  Did you go in the

10   trunk?

11        A.    No.

12        Q.    Did you go in her glove compartment?

13        A.    I don't remember.  I may have.

14        Q.    So then what did you do with her stuff?

15        A.    As I said, I intended to walk back to the

16   car, put it back into her car and the door was

17   locked.

18        Q.    So you realized you made a bad decision?

19        A.    Immediately.

20        Q.    But you locked the door somehow?

21        A.    Right.

22        Q.    And you couldn't put it back?

23        A.    That's right.

24        Q.    So you had her bag?

25        A.    So I walked back to my car and drove away.
```

1   I went to a Dunkin' Donuts on Route 1 and got a cup
2   of coffee and sat there and thought what am I going
3   to do now?

4        Q.   Let me ask you a question.  What time of
5   night was this when you broke into her car?

6        A.   Sometime after midnight.

7        Q.   So you went to the Dunkin' Donuts and you
8   gave it some thought, you had coffee, then what did
9   you do?  What did you do with her personal belongings
10  that you had?

11       A.   And then I went home.  And my first thought
12  was that I'll throw everything away.  And I opened
13  the briefcase and there were a lot of papers in there
14  for W-2 forms for taxes and bank statements and
15  things like that so they are the types of forms that
16  are not irreplaceable but just difficult to get back
17  again, takes a lot of time.

18            I think prior to doing that there were
19  other things in the briefcase that I was going to
20  throw away and I started tearing things up and
21  throwing them away.

22       Q.   What did you tear up?

23       A.   I don't know.  Papers.

24       Q.   Why?

25       A.   As I said, I was going to throw it away.



1    Q.   Why did you need to tear it up if you were

2  going to throw it away?

3    A.   Primarily because I shouldn't have had

4  them.

5    Q.   So what things did you tear up?

6    A.   There were papers. I think you said there

7  were some disks. I think I probably smashed some of

8  the disks and threw them away.

9    Q.   Smashed the computer disks?

10    A.   I stepped on them.

11    Q.   You stepped on them?

12    A.   Stamped them with my foot, probably.

13    Q.   And broke them?

14    A.   That's correct.

15    Q.   And then what did do you with them?

16    A.   I threw them in the trash.

17    Q.   Where?

18    A.   At my home.

19    Q.   At your home?

20    A.   Yes.

21    Q.   Do you remember the papers that were in the

22  briefcase?

23    A.   I remember some. Like I said, I remember

24  the tax forms.

25    Q.   Do you remember her mother's checkbook?

```
 1        A.    No.

 2        Q.    Do you remember her appointment book?

 3        A.    No.

 4        Q.    Would you remember it if it was there?

 5        A.    I don't remember.

 6        Q.    Were you drunk?

 7        A.    Yes.

 8        Q.    You were?

 9        A.    Yes.  I think I probably had sobered up by

10   then.

11        Q.    By then you had?

12        A.    Somewhat.  I drove 25 miles home.

13        Q.    So you went from Barbara Murphy's home to

14   the Dunkin' Donuts and then you went to your home?

15        A.    Yes.

16        Q.    And the next day Barbara Murphy called you,

17   didn't she?

18        A.    The next morning, Saturday morning, I had

19   to go to Stamford to work for something.  And I went

20   to work and came home about 2:30 and my wife said

21   that she had come in, found a message on the

22   answering machine that a woman named Barbara Murphy

23   had called and wanted to know if I had her briefcase.

24   And so my wife Mary's concern was who was this woman

25   and why would you have her briefcase.
```

1      Q.   And what did you say to her?

2      A.   I told her that I had taken her briefcase

3 and that I would probably be arrested.  And Mary left

4 and I didn't see her again for four or five days.

5      Q.   You didn't see who for four or five days?

6      A.   My wife.

7      Q.   Did you tell Mary you were attracted to

8 Barbara Murphy?

9      A.   I don't think Mary stuck around long enough

10 for any conversation.

11     Q.   Were you attracted to her?

12     A.   As I said, I liked her as a friend.

13     Q.   Were you obsessed with her?

14     A.   I don't think so.

15          Where were we?  So the message was to call

16 Barbara Murphy.

17     Q.   Was that the message or was the message if

18 you have my briefcase return it to the fire

19 department?

20     A.   The message was to call her.

21     Q.   To call her?  Did you hear the message?

22     A.   No.

23     Q.   You didn't hear it, your wife heard it?

24     A.   Yes.

25     Q.   Did she delete it after she listened to it?

1        A.    She took the tape.

2        Q.    So you never heard Barbara's message?

3        A.    No.

4        Q.    So you called her?

5        A.    So I called Barbara Murphy at her house.    I

6    don't know, you said something about 10:00 at night

7    but I have seen some of the other papers that the

8    City or you have presented some other place phone

9    records of Barbara Murphy that said I called her at

10   4:00 in the afternoon.

11       Q.    What do you say?

12       A.    I thought I called her in the afternoon

13   myself.

14       Q.    Did you talk to her?

15       A.    I talked to her.

16       Q.    What did you say to her?

17       A:    And I told her that I had taken her

18   briefcase, that I was sorry, that I didn't know why I

19   had done it.    And she said it didn't bother her but

20   her mother was very upset.

21       Q.    She said it didn't bother her that you had

22   broken into her car and stole her briefcase?

23       A.    That's my testimony.

24       Q.    I want to make sure I understand.

25       A.    You heard me correctly.

```
 1        Q.    Okay.

 2        A.    And I said, I'll bring the things back to

 3   you.  And she said don't bring them to the house, she

 4   said to bring them to the fire department.

 5        Q.    Why would she say that if none of this

 6   bothered her?

 7        A.    She told me it bothered her mother, sir.

 8        Q.    Oh.

 9        A.    So I brought them down to the fire house at

10   about 6:00 that evening.  And I went home.

11        Q.    Did you gather all of this destroyed

12   computer disk material --

13        A.    No.

14        Q.    -- let me finish the question, please,

15   Mr. Vecchia.

16              You testified you took the briefcase and

17   there were papers in there and you tore them up, and

18   there were computer disks in there and you stepped on

19   them and crushed them and broke them up, and that you

20   threw those things in the trash in your home.  And

21   you talked to Barbara and she asked you to return

22   them to the fire department.

23              And I'm asking you whether you had gathered

24   the things you had destroyed, put them back in the

25   briefcase prior to returning them?
```

1    A.   No.  So I brought them to the fire
2   department at 6:00 that evening and went home.  And I
3   think on Sunday morning there was a message on the
4   answering machine from Attorney Fraser in Greenwich
5   that I should call him.
6    Q.   And did you?
7    A.   I called him and he said he was calling me
8   regarding Barbara Murphy and that I should make an
9   appointment to see him on Monday.
10    Q.   Were you surprised to get this call?
11    A.   Yes, because I had called -- I believe I
12   then called Barbara Murphy back and asked her who
13   Ben Fraser was.
14    Q.   Did she tell you?
15    A.   And she told me he was an attorney.  And
16   that was about the extent of our conversation.
17    Q.   On either this call on Sunday or the prior
18   call on Saturday when you disclosed to her that in
19   fact you had her briefcase, did she tell you to leave
20   her the hell alone?
21    A.   She didn't say that.
22    Q.   She didn't tell you to leave her alone?
23    A.   That's correct, sir.
24         Where was I?  Sunday, talking to
25   Mr. Fraser.

1    Q.    Let's just stop, Mr. Vecchia, and I want

2    to ask you some questions about your call to

3    Barbara Murphy after Mr. Fraser called you.

4         You called Barbara to ask who he was?

5    A.    That's correct.

6    Q.    And what did she say?

7    A.    I think she told me he was an attorney.

8    Q.    And did you ask her any further questions?

9    A.    No.

10    Q.    You weren't surprised she decided to engage

11    a lawyer since none of this bothered her?

12    A.    She told me it bothered her mother.  I said

13    that -- she had told me on Saturday that it didn't

14    bother me but it bothered her mother.

15    Q.    When you called her on Sunday to inquire as

16    to who Ben Fraser was, she told you he was a lawyer.

17    Did the conversation end right there?

18    A.    That's it.

19    Q.    Did you ask her any questions about why was

20    a lawyer calling, why was a lawyer involved?

21    A.    No.  I was wrong, sir.

22    Q.    So you called Mr. Fraser?

23    A.    I called and made an appointment to see him

24    Monday afternoon.

25    Q.    Did you get your sister, Janet, involved?

1       A.    Somewhere between Sunday and Monday -- I

2    think Monday afternoon around noontime or something

3    one of my sisters must have called Janet and told her

4    what had happened.

5       Q.    How did your sister who called Janet know?

6       A.    I think I had gone to see my sister Nancy

7    and talked to her.  Nancy said I should talk to

8    Janet, she's an attorney, and that's how my sister

9    Janet knew.

10      Q.    Did you go to see Mr. Fraser?

11      A.    I went to see Mr. Fraser.

12      Q.    Did you --

13      A.    I left out some things.

14      Q.    I don't want you to address them right now.

15   You will --

16      A.    But I want --

17      Q.    -- have a chance to --

18            ARBITRATOR:  Gentlemen, one at a time.

19         Let me ask a question.

20            The City had indicated in its opening

21         statement that in October of '98 an

22         agreement was entered into between the City

23         and the grievant concerning Barbara Murphy.

24         Is that agreement in writing?

25            MR. MCHALE:  It is not.

1                      ARBITRATOR:   You can continue.

2    BY MR. MCHALE:

3        Q.   What did you say to Mr. Fraser when you met

4    with him on that Monday in March?

5        A.   I didn't speak with Mr. Fraser.

6        Q.   You didn't speak with him?

7        A.   No.

8        Q.   Who was in attendance at the meeting?

9        A.   I went and my sister Nancy was there.

10   Nancy never spoke.

11       Q.   Who else was there?

12       A.   That was it.

13       Q.   Was Mr. Fraser there?

14       A.   Of course.

15       Q.   It was just the three of you?

16       A.   Yes, that's correct.

17       Q.   What did he say?

18       A.   Mr. Fraser never spoke to me.

19       Q.   Did anyone say any words during this

20   meeting?

21       A.   My sister Janet called him on the phone and

22   Mr. Fraser spoke to Janet.

23       Q.   I'm talking about this meeting you had on

24   this Monday in March.

25       A.   Yes.

1    Q.   I'm not talking about when he called you on

2    the phone.

3    A.   I'm telling you what happened.

4    Q.   I want to know what happened during the

5    meeting.  You're telling me what happened during the

6    phone conversation?

7    A.   That was the meeting, sir.

8    Q.   Where did you go?

9    A.   To Mr. Fraser's office in Greenwich.  I sat

10   in front of Mr. Fraser's desk, my sister Nancy sat in

11   the outside lobby.  My sister Janet had previously

12   called Mr. Fraser saying that she would represent me

13   and that I would go to the meeting as he had

14   requested but I would say nothing.  I went to the

15   meeting; I said nothing.

16   Q.   Why would you say nothing?

17   A.   Because my sister had advised me that you

18   could be prosecuted for this.  She didn't know what

19   Mr. Fraser's background -- she said if he's a skilled

20   criminal attorney he could rip you apart and there's

21   no sense of your going there and saying anything.

22        She was told to call Mr. Fraser sometime

23   between noon and 4:00 on that Monday afternoon saying

24   that she would represent me and that I would come to

25   the meeting as he requested but that at 4:00 she

1    would call him on the phone and she would speak to
2    him.

3        Q.    Did Mr. Fraser tell you that he wanted you
4    to seek counseling for your problem?

5        A.    Mr. Fraser didn't say anything directed to
6    me, he spoke to my attorney.

7        Q.    Did he tell your attorney that?

8        A.    I don't know if Mr. Fraser said that or
9    not.

10       Q.    You don't know whether the issue of
11   counseling arose during this discussion?

12       A.    It must -- yes, it did raise -- or arose.

13       Q.    And did he require that you agree to seek
14   immediate counseling?

15       A.    Did he require that I agree?  He told Janet
16   that I should seek counseling.

17       Q.    Did he tell you that you needed to
18   permanently cease your stalking of Barbara Murphy?

19       A.    He didn't tell me that.

20       Q.    Did he tell your sister that?

21       A.    I would think he must have told Janet that
22   I have no contact with Barbara.

23       Q.    Is that your understanding of what he was
24   requesting?

25       A.    That was my understanding.

1    Q.   Did you agree to that?

2    A.   Yes.

3    Q.   Mr. Vecchia, you were afraid they were

4  going to report this either to the city or the

5  police, weren't you?

6    A.   That's right.

7    Q.   And you didn't want them to do that, did

8  you?

9    A.   That's correct.

10   Q.   Why?

11   A.   Because I was wrong.  You wouldn't let me

12  go back a minute ago.

13   Q.   I won't let you go back now.

14   A.   I can't answer your question then, sir.

15   Q.   My question is why were you concerned about

16  them reporting it to the city?

17   A.   Because Saturday when I went to the fire

18  department and left the things for Barbara I also had

19  written her a letter saying that I was sorry for what

20  I had done, that I --

21   Q.   Okay, let's stop right there.

22   A.   I think it was at that time I left her the

23  letter in her briefcase.

24   Q.   You brought up the letter?

25   A.   Yes, sir.

1    Q.   Is this the letter that you wrote?

2    A.   That's correct.

3         MR. MCHALE:   I would like to introduce

4    this letter as an exhibit into this

5    proceeding.

6         THE WITNESS:   I'm mistaken, it wasn't

7    on the Saturday that I wrote the letter.

8         MR. MCHALE:   There's no question

9    pending, Mr. Vecchia.

10        ARBITRATOR:   Is there any objection to

11   this letter being marked as City 4?

12        MR. D'ANDREA:   Mr. Chairman, can

13   counsel describe relevance?

14        ARBITRATOR:   Your client has indicated

15   he wrote the letter and left it in the

16   briefcase.

17        MR. D'ANDREA:   All right, sir.

18        ARBITRATOR:   City 4.

19

20        (City Exhibit 4:   Marked into

21   evidence.)

22

23   BY MR. MCHALE:

24   Q.   Mr. Vecchia, you said you wrote this

25   letter; is that right?

```
 1        A.    That's correct, sir.
 2        Q.    How did you present it to Barbara Murphy?
 3        A.    I think I left it at the fire department on
 4   Saturday afternoon.
 5        Q.    Now, why were you there on Saturday?
 6        A.    Because that's what Ms. Murphy had
 7   requested.
 8        Q.    This is when you returned her briefcase for
 9   the first time, your first trip to the fire
10   department?
11        A.    I think that's when I wrote it. It was
12   either then or I left it with Mr. Fraser on Monday.
13        Q.    One of those trips?
14        A.    Yes.
15        Q.    I can't make out your handwriting,
16   Mr. Vecchia, can you read it to us?
17        A.    "Barbara, This is all I have, it was thrown
18   in the trash at my house and in my panic I forgot it.
19             "Anything else missing was thrown out
20   elsewhere and I cannot recover.
21             "Please use enclosed money to purchase any
22   items you are missing.  If more is needed, I will
23   reimburse you.
24             "I do not know why I did this, and regret
25   the pain that it has brought your family.
```

1        "My life is in your hands.  Please give me

2  time, a chance to solve my problems and redeem my

3  life.  David."

4        Q.   You say you regret the pain it has brought

5  to your family, what pain?

6        A.   She had told me it had upset her mother.

7        Q.   You said, "My life is in your hands."  What

8  do you intend by that statement?

9        A.   I think you answered that question a few

10  moments ago, sir, when you said I was concerned about

11  my job.

12        Q.   You were worried if the City of Stamford's

13  Human Resources Department found out about this they

14  would fire you?  Is that right?

15        A.   First issue --

16        Q.   Is that right?

17        A.   First issue, she could have me arrested.

18        Q.   That was one concern?

19        A.   That's right.

20        Q.   And with regard to your employment, did you

21  have concern?

22        A.   I didn't know how it would be dealt with by

23  the city.

24        Q.   How did you or your lawyer resolve this

25  problem you had with Barbara Murphy and her lawyer,

1    Ben Fraser?

2         A.    I think it was left that Mr. Fraser would

3    call Janet and check with her.

4         Q.    Did you agree that you would seek immediate

5    counseling?

6         A.    Yes.

7         Q.    Did you agree that you would permanently

8    cease any stalking or annoying or frightening

9    behavior towards Barbara Murphy?

10        A.    I think your using the word "stalking" to

11   be inflammatory, sir, I don't think that word was

12   brought up.

13        Q.    Why don't you choose the term.

14        A.    That I wouldn't have any contact with

15   Barbara Murphy, that I wouldn't speak to her.

16        Q.    You agreed to no contact with her?

17        A.    Yes.

18        Q.    And did Barbara Murphy agree as long as you

19   did that --

20        A.    No, I'm mistaken.  I believe Mr. Fraser did

21   use the term "stalking," because I recall the

22   conversation with my sister as to what the law was

23   about stalking and she said she didn't know what the

24   laws in Connecticut were, she's an attorney in

25   Maryland and Washington, D.C.

88

1    Q.    Did you agree you wouldn't have any further

2    contact with Barbara Murphy?

3    A.    That's correct.

4    Q.    And did she agree she wouldn't go to the

5    police?

6    A.    No, I don't think Mr. Fraser kept -- he

7    kept that open, I believe.

8    Q.    And why would he keep it open?

9    A.    That was his right to do so, sir.

10    Q.    What was he concerned about?

11    A.    I don't know, I never spoke to him.

12    Q.    But your sister did.

13    A.    You can subpoena her.

14    Q.    You didn't talk to her about what

15    conversation she had with him?

16    A.    I told you what my conversation was.

17    Q.    Did you have conversations with your sister

18    about her conversations with Ben Fraser?

19    A.    I did.

20    Q.    And did she tell you what Ben Fraser said

21    to her?

22    A.    That I should seek counseling, that I

23    shouldn't speak to Barbara Murphy.

24    Q.    Did you attend counseling sessions after

25    this?

```
1        A.    I did.

2        Q.    How many?

3        A.    I don't recall, sir.

4        Q.    One?

5        A.    More than that, sir.

6        Q.    Ten?

7        A.    May have been.

8        Q.    Did you leave Barbara Murphy alone?

9        A.    I haven't spoken to Barbara Murphy --

10       Q.    I didn't ask if you spoke to her.  Did

11  you have any contact with her following this

12  meeting --

13       A.    I haven't spoken --

14       Q.    Let me finish the question, please.  There

15  are a number of questions I need to ask you, let me

16  finish the question and you can answer and we can get

17  on with this.

18       A.    Sorry.

19       Q.    After this meeting that you had in

20  Mr. Fraser's office, did you have any contact with

21  Barbara Murphy thereafter?

22       A.    What do you mean by contact, sir?

23       Q.    Did you see her?

24       A.    Yes.

25       Q.    Did you go to Brennan's?
```

1       A.    Yes.

2.      Q.    Did you stare at her like before?

3       A.    No.

4       Q.    You didn't stare at her?

5       A.    No.

6       Q.    No bad behavior towards her at all?

7       A.    No.

8       Q.    Did you follow her out of the bar?

9       A.    No.

10      Q.    Did there come a time when Barbara Murphy

11   brought this to the attention of the City's Human

12   Resources Department?

13      A.    You testified that she went --

14      Q.    I'm asking you.

15      A.    I was called into a meeting with

16   Mr. Manfredonia and Mr. Stover --

17              ARBITRATOR:  You can't look at your

18         papers, sir.

19              THE WITNESS:  Oh, I can't.  It was in

20         September of 1998 I think when -- I don't

21         even know your name.

22   BY MR. MCHALE:

23      Q.    It doesn't matter.

24      A.    When you were going through your

25   presentation you referred to some date in 1998 that

1    they had a meeting with me.  I have the minutes of

2    the meeting from the City.

3        Q.    Did you show up on Ms. Murphy's jogging

4    route at any time after this March 20, 1998 break-in

5    to her car?

6        A.    Did I show up on her jogging route?

7        Q.    Yeah, did you?

8        A.    I went jogging myself, sir.

9        Q.    You did?

10       A.    Yes.

11       Q.    Where did you jog?

12       A.    In Stamford.

13       Q.    Where do you live?  Or where did you live

14   at the time?

15       A.    Which period of time are we talking about?

16       Q.    In 1997, 1998.

17       A.    I lived in Redding.

18       Q.    You lived in Redding?

19       A.    I worked in Stamford.

20       Q.    And you jogged?

21       A.    Yes.

22       Q.    And where did you jog?

23       A.    I sometimes jogged at Stamford High School,

24   I jogged in Stamford, one of the parking lots there,

25   I jogged in Shippan and --

```
 1        Q.    Did you --

 2                  ARBITRATOR:   Let the witness finish

 3             his answer.

 4   BY MR. MCHALE:

 5        Q.    Did you ever jog with Ms. Murphy?

 6        A.    I never jogged with her.

 7        Q.    My question is, did you begin to show up

 8   after this 1998 incident where you broke into her

 9   car, did you show up on the routes she had been

10   taking for jogging?

11        A.    I don't know what routes she takes.

12        Q.    So you don't ever remember seeing her

13   jogging at all?

14        A.    No.

15        Q.    Do you remember a road race --

16        A.    Yes.

17        Q.    Let me finish the question.  Do you

18   remember a road race, the High Ridge Road race I

19   believe it is referred to as?

20        A.    It's in the industrial park, yes.

21        Q.    Do you remember jogging next to

22   Barbara Murphy during that road race?

23        A.    No, sir.  I ran in the road race.  It was a

24   road race that the mayor's wife was the sponsor of it

25   and the posters are all around the city inviting
```

1    employees to run in the race.  I know at one of my

2    meetings with Mr. Manfredonia he brought up the road

3    race and I told him, oh, the mayor ran in the race as

4    well, you accused me of following Barbara Murphy

5    maybe I was following the mayor.

6         Q.    Were you following Barbara Murphy?

7         A.    No, I wasn't.

8         Q.    Were you jogging next to her?

9         A.    No.

10        Q.    Had you been running for years prior to

11   1998?

12        A.    Yes, sir.  Out of high school I had a

13   scholarship for academics and cross-country.  I ran

14   in many road races.  In one of my meetings with the

15   city I believe I brought them T-shirts from races

16   that I had run in 1997 and 1998 and showed them that

17   I had run in other races and asked them if they

18   wanted some documentation of it I would be happy to

19   bring it to them.  They said it wasn't necessary.

20        Q.    Tell me what was your habit in terms of

21   running, would you run out of the office?

22        A.    Yes, sir.

23        Q.    Would you run at lunch time?

24        A.    No, sir.  After work.

25        Q.    You ran after work?

```
 1        A.    Yes.

 2        Q.    Where would you get changed?

 3        A.    I would either change at work or change in

 4   my car.

 5        Q.    Change in your car?

 6        A.    Yes, sir.

 7        Q.    And you would run out of the City Hall

 8   property?

 9        A.    No, sir.

10        Q.    Where would you go?

11        A.    I would go to one of the parks at Shippan

12   on the water and park my car and I'd run in Shippan

13   sometimes or at the high school or at the industrial

14   park.

15        Q.    Would you run by yourself?

16        A.    Primarily, yes.

17        Q.    Did you have any running pals that you ran

18   with?

19        A.    No.

20        Q.    Always alone?

21        A.    Yes.

22        Q.    You never once remember bumping into

23   Barbara Murphy on any of your runs?

24        A.    No, sir.

25        Q.    I would like to turn your attention now to
```

1   this meeting that you had with Mr. Stover and

2   Mr. Manfredonia in September of 1998.  How did that

3   arise?

4        A.    Mr. Manfredonia came to my office and said

5   he wanted to talk to me.  We had been talking earlier

6   that week I think it was about furniture purchases

7   and I thought he wanted to talk to me about that.  He

8   said no, that wasn't the matter.  He asked me to come

9   down to the conference room with him, and I think

10  Mr. Stover was sitting there.

11       Q.    Did they advise you of your rights to union

12  representation?

13       A.    They did.

14       Q.    And did you decline?

15       A.    I did.

16       Q.    What did they want to talk to you about?

17       A.    They said that Barbara Murphy had

18  complained to them.

19       Q.    About what?

20       A.    That I had been bothering her.

21       Q.    Had been bothering her?

22       A.    Yes, sir.

23       Q.    Did they give you anything more specific

24  than that about how you had been bothering her?

25       A.    No.

```
 1        Q.    Isn't it true that you admitted to
 2   Mr. Stover and Mr. Manfredonia that you had stolen
 3   Barbara's briefcase back in March of 1998?
 4        A.    They had a copy of the letter and I said
 5   yes, I had done that.
 6        Q.    Isn't it true you had admitted to them
 7   that you had a habit of going to Brennan's where
 8   Barbara Murphy would be and staring at her?
 9        A.    No, that's not true, sir.
10        Q.    Did you admit to them you were interested
11   in having a relationship with her?
12        A.    As a friend I told them that.
13        Q.    You told them what?
14        A.    That I was interested in her as a friend.
15        Q.    Did you admit to them that you were
16   obsessed with Barbara Murphy?
17        A.    No, sir.
18        Q.    What did Mr. Stover and Mr. Manfredonia say
19   to you regarding this conduct?
20        A.    They said they were investigating the
21   complaint, that they had not made any judgment, and
22   that they would get back to me.
23        Q.    Did they finally at some point get back to
24   you?
25        A.    I think about two weeks later -- you have
```

1    the date.  Again, I have the minutes of the second

2    meeting.

3        Q.    I don't need exact dates.

4        A.    In September I think they got back to me

5    again and they asked me some more questions.  And I

6    think they told me that I shouldn't have any contact

7    with Barbara Murphy in the workplace.

8        Q.    Okay, let's stop there.  They told you that

9    you shouldn't have any contact with Barbara Murphy in

10   the workplace.  Did they say that, "in the

11   workplace"?

12       A.    Yes, because we discussed it at length.

13       Q.    They said "in the workplace"?

14       A.    Yes.

15       Q.    They didn't place any restriction on your

16   contact --

17       A.    No, we talked about that.  They told me if

18   I ever see her on the street make sure I go the other

19   way.  I asked them do I have the right for them to

20   dictate where I went on my own time, after work.  And

21   Mr. Stover started saying that he did and --

22       Q.    Did you --

23              ARBITRATOR:  Gentlemen.  He did not

24         finish his answer.  Go ahead.

25              THE WITNESS:  Mr. Manfredonia started

1          telling me, you know, that this included

2          after work and on the weekends that they

3          could tell me what to do.  Mr. Stover

4          backed off and said no, they didn't have

5          the right to do that.

6              I think at that time I also said

7          something to them about I was a Vietnam

8          war veteran and they had some nerve

9          telling me what to do outside of the

10         workplace.

11   BY MR. MCHALE:

12       Q.   So you were offended?

13       A.   I thought they had no right.

14       Q.   So your feeling was they had no right to

15   regulate any of your behavior out of work; is that

16   right?

17       A.   Regarding --

18       Q.   Is that right?

19       A.   Regarding where I went they had no right to

20   tell me where I could go, sir.

21       Q.   And if they were concerned you were

22   stalking Barbara Murphy, as far as you were concerned

23   they had no right to prohibit it?

24       A.   Well, sir --

25       Q.   Is that right?

1        A.    You wouldn't let me finish it.

2                ARBITRATOR:    It's a yes or no.

3                THE WITNESS:    Would you repeat the

4        question.

5    BY MR. MCHALE:

6        Q.    Was it your position that they had no right

7    to interfere with your right to stalk Barbara Murphy

8    if that was your desire?  Is that your position?

9        A.    I don't think that was the question they

10    asked me.

11        Q.    That's not what I said.

12        A.    You're phrasing the question to be

13    inflammatory, sir, and that wasn't even the question

14    that was raised.

15        Q.    I'm asking you a question here today now.

16    Is it your position that the City did not have the

17    right to restrict your access to Barbara Murphy

18    outside of work?

19        A.    I think my position then was that they

20    could not tell me where I could go, what restaurants

21    I could go to, what places I could go to.

22        Q.    Isn't it true that they directed you that

23    you shall have no further contact with her, either

24    inside or outside of work, is that true?

25        A.    That's not true, sir.

1      Q.    Did they direct you that if you saw her out

2   anywhere, you should leave?

3      A.    No, that's not true, sir.

4      Q.    They didn't tell you that?

5      A.    No, sir.  We discussed in the workplace

6   and --

7      Q.    There's no question pending.

8              ARBITRATOR:  You answered the

9          question.

10             THE WITNESS:  Okay.

11   BY MR. MCHALE:

12     Q.    Did they tell you that Barbara Murphy had

13   requested the right to ensure that you were receiving

14   counseling and so you were to provide her with

15   reports as necessary regarding that?

16     A.    No, they didn't tell me that she had

17   requested it, no.  They made the suggestion that I

18   use the City's employee's assistance money, take

19   advantage of it.

20     Q.    And did you agree?

21     A.    I said yes, I would go for counseling.

22     Q.    And why?  Why did you agree to go for

23   counseling?

24     A.    Because I wanted my job.  That would seem

25   like an easy solution.

1      Q.    Was this a contingency on keeping your job?

2      A.    They didn't put it that way, sir.

3      Q.    So why did you agree?

4      A.    Because it was a simple thing to do.

5      Q.    Did they tell you that the file would

6  remain open while they monitored your future conduct?

7      A.    What they told me is that they would be

8  back to me with a written agreement.

9      Q.    Agreement to what effect?

10     A.    I don't know, sir, it was their term.

11     Q.    How did you understand the agreement that

12  you had reached with them?

13     A.    That I should have no contact with

14  Barbara Murphy in the workplace.  Specifically I

15  talked to them about what if I see her on the

16  elevator and, you know, if it's inadvertent then just

17  go about your business.  If you see her in the

18  hallway, don't stop and talk to her, just go about

19  your business.

20          We discussed a potential interaction

21  regarding work, and there isn't any dealings that she

22  had with me or with the Purchasing Department, that

23  didn't arise, but they, you know, essentially deal

24  with her if you have circumstances to deal with her

25  in a businesslike manner.

1      Q.    In your position and the position she held

2    at that time, this being the time of September of

3    1998, there was no reasonable expectation you would

4    need to deal with her at work, was there?

5      A.    She was working --

6      Q.    Was there?  Did you need to deal with

7    Barbara Murphy in your respective positions at that

8    time?

9      A.    Not on a daily basis, sir.  Occasionally,

10   yes, there may have been.

11     Q.    Occasionally?

12     A.    There was once in the two and a half years

13   that transpired after that that I had some dealings

14   with her.

15     Q.    Isn't it true that if you saw her at

16   Brennan's that you should leave?

17     A.    No, sir.

18     Q.    Isn't it true that they told you if you saw

19   her out at any establishment you should leave?

20     A.    No.

21     Q.    Yes or no?

22     A.    You're wrong again, sir.

23     Q.    They didn't tell you you should have no

24   contact with Barbara Murphy whatsoever?

25     A.    I told you again Mr. Manfredonia tried to

1    dictate to me they could control wherever I went and

2    Mr. Stover told him no, he couldn't say that.

3        Q.    So the City placed no restrictions on your

4    future conduct with Barbara Murphy outside of work,

5    is that true?

6        A.    They told me I should limit my dealings

7    with her in the workplace.

8        Q.    Just in the workplace?

9        A.    That's correct.

10       Q.    So you left your meeting with them feeling

11    you were free to engage in any social interactions

12    you wanted with her after this incident?

13       A.    No.    That I shouldn't talk to her.    That

14    she didn't want to have any dealings with me and that

15    I shouldn't talk to her.

16       Q.    Anywhere?

17       A.    Anywhere.

18       Q.    So you couldn't talk to her anywhere --

19       A.    Now, are you saying this is a condition of

20    employment?

21       Q.    That's not my question.    My question --

22       A.    This is --

23            ARBITRATOR:    Gentlemen, one at a time.

24            Let him ask a question, please.

25            THE WITNESS:    Thank you.

BY MR. MCHALE:

    Q.   I think what you testified to just now is that you shouldn't have any conversation with her, that's what the City told you, that's what Mr. Manfredonia and Mr. Stover told you; is that right?

    A.   I can't answer that yes or no, sir.

    Q.   You can't remember?

    A.   No.  I said I couldn't answer that yes or no.  I need to elaborate on that.

    Q.   Well, it's a question that calls for a yes or no answer.

    A.   No, it's not, sir.

    Q.   Let me ask it again.  Did the City's representatives tell you that you should not have any conversation with Barbara Murphy following this meeting in September of 1998?

    A.   That I shouldn't have any dealings with her in the workplace they told me.  And as advice, not as an edict from the City, but as advice that I should limit my contact with her.

    Q.   Mr. Vecchia, why would the City's representatives have been concerned about your contact with her at the workplace when all of your misconduct with her up until that time took place

1 | outside of work?

2 |     A.   Because I think they wanted to just get rid

3 | of the problem. And as it turns out, when I went

4 | back to see Mr. Stover about -- let's see, it must

5 | have been the end of October, asking about a written

6 | statement he told me that as far as he was concerned

7 | the City wasn't involved, that it had ended in March

8 | of '98.

9 |     Q.   What ended in March of '98?

10 |     A.  Ms. Murphy's complaint. That whatever the

11 | circumstances were, that it ended in March of '98 and

12 | that the City was not involved.

13 |     Q.   So in September, and I think some of the

14 | meetings extended into October of 1998, did

15 | Mr. Stover and Mr. Manfredonia tell you that you

16 | should have no interaction and contact with

17 | Barbara Murphy and to cease your pursuit of her, yes

18 | or no?

19 |     A.   No.

20 |     Q.   Did you tell them that you were fearful of

21 | losing your job at this time?

22 |     A.   I don't know if I said it in that many

23 | words, but I'm sure they got the sense that I was.

24 |     Q.   Now, why were you concerned about losing

25 | your job when in your own words you didn't do

1    anything?

2        A.    Well, I have been working 30 years and I

3    have never been called into a hearing with the

4    Personnel Department.  It's not a plus.

5        Q.    Isn't it true, Mr. Vecchia, that you were

6    told that any future inappropriate interactions or

7    contact with Ms. Murphy by you going forward would

8    result in your dismissal?

9        A.    They told me I should have no contact with

10   her in the workplace.

11        Q.    So that was the extent of it, just that at

12   work?

13        A.    That's correct.  I told you Mr. Stover

14   corrected Mr. Manfredonia and told him they could not

15   dictate to me things outside of the workplace.

16        Q.    You did tell me that.  So you left that

17   room feeling it couldn't be held against you anything

18   you did to Barbara Murphy outside of work; is that

19   right?

20        A.    No, that's not correct, sir.

21        Q.    If you broke into her car at home again,

22   which is where you broke into her car back on

23   March 20th, 1998, did you feel the City wouldn't have

24   a problem with that?

25        A.    I would think the fact that, yeah, it would

1    be an issue for the City and that it would end up on

2    the front page of the newspaper.

3         Q.    Would that have been a problem with your

4    future employment?

5         A.    I didn't know.  I didn't want to find out.

6         Q.-   In October of 2002 you went to a restaurant

7    in Stamford known as Toronto's, didn't you?

8         A.    In October of 2002?

9         Q.    Yes.

10        A.    Yes.

11        Q.    And you saw Barbara Murphy there, didn't

12   you?

13        A.    Yes.

14        Q.    And you stared at her?

15        A.    No.

16        Q.    And you sat several stools away from her?

17        A.    Not several stools.  It's a very long bar

18   at Toronto's.  It's three times the length of this

19   table here, and I may have been at two or three

20   chairs on this side and I believe she was at the far

21   end.  So the bar may be twice as long as this room,

22   and so if I was at one end and she was at the far

23   end, sir.

24        Q.    How far away from you was she, sir?

25        A.    How long is this room?

1      Q.    I don't know.

2      A.    It was twice the length of this room.

3      Q.    Did you look at her?

4      A.    I didn't see her when I first came in.

5   And I was talking to someone. I think it was

6   World Series time and I was talking to someone there

7   and I happened to look up and I saw her there.

8      Q.    Did you think anything of it?

9      A.    I was surprised to see her. I had never

10   seen her there.

11      Q.    Why didn't you leave?

12      A.    Why should I?

13      Q.    You saw no problem with your staying?

14      A.    I didn't talk to her. I had no interaction

15   with her.

16      Q.    No interaction at all?

17      A.    That's correct.

18      Q.    Nothing inappropriate in that incident in

19   Toronto's?

20      A.    That's correct.

21      Q.    Mr. Vecchia, do you remember appearing in

22   court on January 23rd, 2002?

23      A.    I was in court in January, that may have

24   been the date.

25      Q.    Do you remember an appearance in state

1    court on a criminal matter where you were represented

2    by Attorney Mark Katz on that day?

3         A.    Can I see that to refresh my memory, sir?

4         Q.    No, not yet, sir.  My question is do you

5    remember being in court?

6         A.    In January of 2002, yes.

7              MR. MCHALE:  I would like this to be

8         marked.  That's a transcript at the hearing

9         at which Mr. Vecchia appeared January 23,

10        2002.

11             ARBITRATOR:  Any objection?

12             MR. D'ANDREA:  No.

13             ARBITRATOR:  City 5.

14

15             (City Exhibit 5:  Marked into

16        evidence.)

17

18   BY MR. MCHALE:

19        Q.    Just with regard to this incident at

20   Toronto's, you pled guilty to a crime involving

21   your behavior at Toronto's on that day, didn't you,

22   sir?

23        A.    I don't know, sir.  Let me see the

24   transcript so I can read it.

25        Q.    You don't remember what crimes you have

1    pled to in your life?

2        A.    Oh, I do, sir.

3        Q.    How many crimes have you pled to?

4        A.    One.

5        Q.    One?

6        A.    Yes, sir.

7        Q.    Are you sure?

8        A.    One, sir.

9        Q.    Just one?

10       A.    Yes, sir.

11       Q.    What was that crime you pled guilty to?

12       A.    Taking Barbara Murphy's briefcase in March

13   of 1998.

14       Q.    And that was it?

15       A.    Yes, sir.

16       Q.    The theft of her briefcase?

17       A.    Yes, sir.

18       Q.    You didn't plead guilty to a crime

19   involving your interaction with her at Toronto's?

20       A.    There's a story there, sir.

21       Q.    There's a question.  You did not plead

22   guilty to a crime, is that your testimony?

23       A.    My testimony is there's a story there, sir.

24       Q.    I'm going to ask you a very specific

25   question.

1       A.    And I gave you a very specific answer.

2                   ARBITRATOR:  Gentlemen.  Again, let

3             him can ask the question and then you can

4             answer it.

5                   Ask the question.

6    BY MR. MCHALE:

7       Q.    Mr. Vecchia, did you plead guilty to a

8    crime involving your conduct at Toronto's in the

9    presence of Barbara Murphy in October of 2000?

10      A.    No, sir.

11      Q.    You did not?  Do you remember when you

12   appeared before Judge Nigro on January 23rd of 2002?

13      A.    I don't understand why everyone else has a

14   copy except the person testifying.

15      Q.    Do you remember when you appeared before

16   Judge --

17                  ARBITRATOR:  Answer the question, if

18            you can.

19                  THE WITNESS:  Yes.

20   BY MR. MCHALE:

21      Q.    And what were you charged with at the time

22   you stood before Judge Nigro?

23      A.    I was charged with a misdemeanor of

24   criminal trespass.

25      Q.    You were charged with criminal trespassing

1    in the first degree?

2        A.    Yes, sir.

3        Q.    In violation of the statute, and that was

4    concerning your conduct on March 20th, 1998 when

5    you --

6        A.    Approximately four years previously, yes.

7              ARBITRATOR:    Sir, let him ask the

8              question.

9              Ask the question, please.

10   BY MR. MCHALE:

11       Q.    The first crime you were charged with was

12   criminal trespassing in the first degree and that was

13   arising out of your conduct when you broke into

14   Barbara Murphy's car in March of 1998; is that

15   correct?

16       A.    That's correct, sir.

17       Q.    And the second crime you were charged with

18   was disorderly conduct and that charge surrounded

19   your conduct with Barbara Murphy in October of 2000

20   at Toronto's; is that correct?

21       A.    They are linked together, sir.

22       Q.    Is that correct?

23       A.    They are linked together, sir.

24       Q.    You pled guilty to both of those charges,

25   did you not?

1        A.    They were linked together, sir.

2        Q.    Did you plead guilty to both of those

3    charges?

4        A.    They were linked together, sir.

5              ARBITRATOR:  I will instruct you to

6        answer the question yes or no.

7              THE WITNESS:  I answered the question

8        to the best of my ability.

9              ARBITRATOR:  Are you saying you can't

10       answer that question yes or no?

11             THE WITNESS:  That's correct.

12             ARBITRATOR:  Move on, please.

13   BY MR. MCHALE:

14       Q.    Prior to accepting your plea of guilty with

15   regard to both of these charges, did the judge ask

16   the prosecutor to explain to you the facts on which

17   you were plea'ing?

18       A.    I don't know if he asked them or if that's

19   just a part of how they operate, sir.

20       Q.    Did they explain to you what they were

21   prepared to prove?

22       A.    In the court?

23       Q.    Yes, on January 23rd?

24       A.    No.

25       Q.    I'm looking at the transcript and the court

1   says, "I'm going to ask the states attorney to

2   describe what it is he claims he would present, and I

3   want you to listen to what he says and I'm going to

4   ask you if these are the claims you're entering a

5   plea of guilty to."

6            Do you remember the judge saying that?

7        A.   No.

8        Q.   No, okay.   The prosecutor then states,

9   "Your Honor, regarding the criminal trespass in the

10  first degree, the victim in that case is an

11  individual by the name of Barbara Murphy.   I

12  believe the defendant met her at their workplace.

13  Thereafter during evening hours he would bother her

14  repeatedly."

15           Do you remember the prosecutor saying that?

16       A.   No.

17       Q.   You don't remember any of this?   Are you

18  saying it didn't happen, Mr. Vecchia?

19       A.   No, I didn't say that, sir.

20       Q.   You just can't remember it?

21       A.   I told you regarding the two charges, they

22  were linked together.   And you care to emphasize that

23  they are separate.

24                ARBITRATOR:   The transcript speaks for

25                itself.   It's a part of the record.   You

1          can cite it in your brief.

2              MR. MCHALE:   Thank you.

3              ARBITRATOR:   You can't make him say

4          what you want him to.   He has a right to

5          testify the way he sees fit.

6              MR. MCHALE:   Okay.   May I have a

7          one-minute recess, please?

8              ARBITRATOR:   Yes.

9

10             (Break taken:   12:23 pm to 12:26 pm)

11

12             ARBITRATOR:   Back on the record,

13         please.

14             MR. MCHALE:   The City has no further

15         questions for this witness at this time.

16             ARBITRATOR:   Cross-exam?

17             MR. D'ANDREA:   No cross-examination.

18             ARBITRATOR:   Thank you.

19             Now that you have presented the

20         grievant, has that assisted you in your

21         decision as to whether or not you will be

22         calling --

23

24             (Attorney Maurer entered the hearing

25         room.)

1           ARBITRATOR:  Cross-examination?

2           MR. MCHALE:  No.

3           ARBITRATOR:  Does the Union have any

4       further witnesses?

5           MR. D'ANDREA:  I am going to call the

6       grievant to the stand, sir.

7           ARBITRATOR:  How long do you believe

8       his testimony will take?

9           MR. D'ANDREA:  Not long.  15 minutes.

10          ARBITRATOR:  Let's take five.

11

12          (Break taken:  2:44 pm to 2:50 pm)

13

14

15          DAVID VECCHIA, called as a witness,

16      having been previously duly sworn by the

17      Arbitrator, testified as follows:

18

19          ARBITRATOR:  Back on the record.

20          Mr. Vecchia, you're still under oath.

21          Please inquire.

22

23          DIRECT EXAMINATION

24

25  BY MR. D'ANDREA:

1          Q.    Mr. Vecchia, what was occurring in your

2    recollection at the meeting that you had with

3    your representatives and the City regarding the

4    Barbara Murphy case?

5                    ARBITRATOR:  What meeting, what time?

6                    THE WITNESS:  The first meeting I had

7             with the City --

8                    ARBITRATOR:  I need a date.

9                    THE WITNESS:  It was in January of

10            2001.  I was terminated in December of

11            2000.  And at that meeting the City called

12            me in and they wanted to discuss the

13            administrative leave I was on and they

14            wanted some information.  And at that

15            meeting I went through with them every time

16            I had seen Barbara Murphy since September

17            of 1998.  I told them that I had seen her.

18                There's an employee of the accounts

19            payable department which is adjacent to

20            the Purchasing Department, his name was

21            Victor Ink, there was a surprise birthday

22            party for him, held at a restaurant in

23            Stamford --

24                    ARBITRATOR:  The question from your

25            advocate was why did you think you were

1          there?  Was it just to explain your

2          contacts with Ms. Murphy?

3                  THE WITNESS:  That's one of the

4          subjects that came up.

5                  ARBITRATOR:  And what was another

6          subject that came up?

7                  THE WITNESS:  Contacts about Murphy?

8   BY MR. D'ANDREA:

9       Q.   Was there any discussion about any

10  agreement at that meeting?

11      A.   We went back and reviewed the meeting that

12  I had with them two and a half years previous in

13  September of 1998, and essentially the same

14  discussion that's being held here today is that I

15  told them that I agreed in 1998 that --

16                  ARBITRATOR:  We have already heard

17          your testimony concerning that.  Is there

18          anything else?

19                  THE WITNESS:  I think we covered --

20  BY MR. D'ANDREA:

21      Q.   Was any directive given to you at that

22  meeting if you recall?

23                  MR. MCHALE:  What meeting?  I'm not

24          clear what meeting we are talking about.

25  BY MR. D'ANDREA:

1           Q.    The meeting you were just --

2           A.    January of 2001?  No, I was already on paid

3      administrative leave.  The meeting where there was

4      some discussion of agreement goes back to September

5      of 1998.

6           Q.    And what agreement was made between you and

7      the City at that time?

8                      MR. MCHALE:  This testimony has been

9                 asked.

10                     ARBITRATOR:  Excuse me, asked and

11                answered a number of times.  Do you have

12                anything new of this witness?

13     BY MR. D'ANDREA:

14          Q.    Having heard the testimony of both of the

15     gentlemen from the Human Resource Department, do you

16     have anything to add?

17                     ARBITRATOR:  That you haven't already

18                testified to?

19                     THE WITNESS:  Yes.  That even after

20                the September and early October meeting in

21                1998 I had gone back to Mr. Stover

22                specifically and asked him about a written

23                agreement, and he told me that there

24                wouldn't be any.  That as far as the City

25                was concerned that they were not involved,

1    that it ended in March of 1998.

2   BY MR. D'ANDREA:

3        Q.   So you understood that there would be no

4   jeopardy with regard to your losing your job because

5   of any of the actions that were to take place at

6   court?

7                    ARBITRATOR:   That's a totally

8              different question.

9   BY MR. D'ANDREA:

10       Q.   Is that correct?

11                   ARBITRATOR:   Now you have to put us in

12             the right time frame, which was did

13             anything happen between '98 and '01 and he

14             said yes.  I went back to Mr. Stover, I

15             asked him if there would be a written

16             agreement, Mr. Stover said no, just an oral

17             agreement.  Now you have to ask a different

18             question.

19  BY MR. D'ANDREA:

20       Q.   Was there any agreement beyond that?

21       A.   No.

22       Q.   And how did you understand the agreement

23   and your involvement prospectively with Barbara

24   Murphy?

25                   ARBITRATOR:   Asked and answered.

1    BY MR. D'ANDREA:

2        Q.    Did you understand that you should have no

3    contact with her at the Toronto establishment?

4                ARBITRATOR:    Asked and answered.    He's

5            already testified that he had nothing to

6            do --

7    BY MR. D'ANDREA:

8        Q.    Did you plead guilty for having seen her at

9    the Toronto restaurant?

10       A.    That's what I tried to explain before.

11               MR. MCHALE:    I object.    The plea

12           agreement is in evidence.

13               ARBITRATOR:    He can say what else to

14           say.

15               THE WITNESS:    That's what I tried to

16           explain before when the good attorney

17           wanted me to give a yes or no answer and

18           I said it can't be answered yes or no,

19           that it was more involved.    I was

20           originally arrested for the charge of

21           stalking.    And I went back to court over

22           20 times and the prosecutor realized he

23           had no evidence.

24               What he did have was my letter from

25           March of 1998 that I had taken

1    Barbara Murphy's briefcase.  I mean, it's

2    clear-cut, there's no way of denying that I

3    took it.  I went and met with her attorney,

4    he told me that he had to give something to

5    the other side.  And he said that he was

6    going to prosecute taking her briefcase as

7    a felony unless I agreed to plead guilty to

8    a misdemeanor for taking her briefcase in

9    February of 1998, and also that I agreed

10   that I was in Toronto's and that I stared

11   at her.

12       I told them for three months that I

13   wouldn't agree to it that I stared at her,

14   that I hadn't done anything.  And he

15   finally gave me an ultimatum in February

16   that either I plead guilty to those two

17   charges or he would proceed on the felony

18   charge for taking her briefcase.

19       And my attorney advised at the time,

20   he said, you don't want to be charged with

21   a felony, it can go to a trial and you

22   don't know what's going to happen.  And we

23   had some discussion and he said that's how

24   justice is done, he said.

25   BY MR. D'ANDREA:

1      Q.    So you had to take the plea on the Toronto

2   case?

3      A.    I had to take that or get charged with a

4   felony and then take my chances with a felony.

5      Q.    So you always maintained that you never

6   stared at her at Toronto's?

7      A.    I didn't stare at her.  I had seen her many

8   times between 1998 and 2000.  I had seen her at

9   Brennan's a number of times.  I sat across from her

10   at a party this employee I was talking about, we sat

11   across from each other for two and a half hours.  We

12   were closer than I'm sitting from the judge's chair,

13   and she never objected to it.

14      Q.    And are there any extenuating circumstances

15   that you could raise with regard to this matter?

16      A.    You know, there was some talk about that

17   she had seen me in the Government Center.  I never

18   saw her on the 10th floor.  And I told them at the

19   meeting in January that I had seen her at the

20   elevator, that I was teaching a class on financial

21   policy in the Board of Finance conference room.

22   There are three chapters of the class and my part of

23   the class involved going to the first two.

24            I left after the second part.  I walked out

25   to the elevator, she was standing there.  I was

1  surprised to see her.  I walked past her to the

2  cafeteria.  Was not going to get on the elevator with

3  her.  If anything from the meetings with Mr. Stover

4  he said don't get on an elevator with her.  I walked

5  past her, got my cup of coffee and got on the

6  elevator.  And those are things I told the City in

7  January 2001.

8       Q.   Is there anything that you have to say in

9  your defense today, sir?

10      A.   At the time I was fired, you know,

11  Mr. Iadarola asked specifically of the City what are

12  the specific reasons you're firing him, and the reply

13  back to him is we don't have to tell you.  I mean, we

14  are still at that point today.

15      Q.   Sir, did you collect unemployment

16  compensation while you were out of work?

17      A.   Yes, I'm still collecting unemployment

18  compensation.  I applied for it, the City initially

19  fought it and I went through two hearings, and then

20  the City appealed it at the Board of Review,

21  the Board of Review ruled on it and I'm still

22  collecting.

23      Q.   And was your case deemed to be an improper

24  discharge by the State of Connecticut?

25           MR. MCHALE:  I object.

1          THE WITNESS:   Three times.

2          ARBITRATOR:   There's an objection, you

3      cannot answer the question.

4          MR. MCHALE:   Mr. Vecchia testified his

5      discharge was ruled improper by the State

6      of Connecticut.   The State of Connecticut

7      doesn't make a determination as to whether

8      a termination is objectionable or not.   It

9      only makes a determination as to whether

10     unemployment compensation benefits will be

11     awarded.

12         ARBITRATOR:   Objection sustained.

13  BY MR. D'ANDREA:

14     Q.   Is there anything else, sir, you would like

15  to add in the matter of your discharge?

16     A.   No.

17         MR. D'ANDREA:   That's all the

18     questions I have on direct.

19         ARBITRATOR:   Cross-exam?

20         MR. MCHALE:   Nothing further.

21         ARBITRATOR:   You may step down.

22         Any further witnesses?

23         MR. D'ANDREA:   No further witnesses.

24         ARBITRATOR:   Any rebuttal from the

25     City?

1                    MR. MCHALE:    No.

2          ARBITRATOR:    Let's go off the record

3      for a moment.

4

5          (Off record:  3:00 pm to 3:02 pm)

6

7          ARBITRATOR:    This arbitration is

8      concluded for today's purposes.    The panel

9      has ordered that briefs be postmarked on or

10     before December 9th, 2002, with reply

11     briefs postmarked on or before December

12     18th, 2002.

13          Mr. D'Andrea, I'm certain you can

14     explain to your client the procedure, but I

15     will take the opportunity to do that at

16     this point.

17          Mr. Vecchia, what will happen at this

18     point is that both parties have an

19     opportunity to submit their arguments,

20     legal, factual or otherwise, in writing to

21     the panel.  Those briefs must be postmarked

22     on or before December 9th.

23          The parties then can reply to the

24     contents of the briefs and those

25     briefs must be postmarked on or before

CERTIFICATE

I, SANDY K. VISENTIN, LSR, CSR #234, Registered

Professional Reporter and Notary Public, duly

commissioned and qualified in and for the State of

Connecticut, do hereby certify that the foregoing 191

pages are a complete and accurate computer-aided

transcription of my original notes taken in the

Matter of the Arbitration between CITY OF

STAMFORD and AFSME COUNCIL 4, LOCAL 2657,

(Grievant: David Vecchia), held at Board of Mediation

and Arbitration, 38 Wolcott Hill Road, Wethersfield,

Connecticut, on October 21, 2002.


_11-4-02_                  _Sandy K. Visentin_
DATE                      SANDY K. VISENTIN
                          CSR, RPR and Notary Public
                          CT Lic. #SHR.234


My Commission Expires:
August 31, 2006