UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------------------X
BARBARA E. MURPHY,            :      3:03 CV 00519 (MRK)
        Plaintiff,            :
                             :
        v.                    :
                             :
                             :
THE CITY OF STAMFORD and      :
DAVID VECCHIA,                :      May 10, 2005
        Defendants.          :
-------------------------------------------------X
```

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE CITY OF STAMFORD'S
## MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Barbara Murphy ("Murphy") respectfully submits this Memorandum

of Law with Plaintiff's Statement of Facts in Dispute pursuant to Local Rule 56 (a)2

with its Appendix in Opposition to the City of Stamford's ("City") Motion for Summary

Judgment. The City's motion must be denied because there remains material and

genuine issues of fact in dispute. Further, even if this Court were to find that there

were not factual issues in dispute that must be tried to a jury, the City cannot win on

the law.

It is Murphy's position that the City was compelled by Federal and State law as

well as their own policy to prevent, investigate and remediate incidents of sexual

harassment. The City knew of David Vecchia's ("Vecchia") behavior, not only because

Vecchia was a high level supervisory employee himself but because the Assistant

Chief of the Fire Department Peter Brown, knew and notified the Human Resources Department of the City.

The City's admitted failure to investigate and punish Vecchia when the Assistant Chief informed them of his concerns and the impact of Vecchia's behavior on Murphy allowed the behavior to escalate and the damage to occur. Why the City failed to investigate is made clear by the Human Resources department investigator, Fred Manfredonia's comment to the Stamford Advocate reporter when he was arrested for stalking his prior girlfriend in late 2003. He told the reporter that stalking was not important, "like spitting on the sidewalk." Similarly, the City failed to educate and train its employees about sexual harassment, failed to enforce its own policies, and failed to enforce the agreements it made with its employees.

## I.    Factual Statement

David Vecchia was the Purchasing Agent for the City beginning in 1993 while Murphy was an administrative assistant first in the Payroll Dept. and then in the Fire Department. Transcript of October 21, 2002 [Day 2] hearing before the Board of Mediation and Arbitration, In the Matter of City of Stamford and AFSCME Co. 4, Local 2657 (David Vecchia Termination) (No. 2002-A-0842) (Dee, Arb.) ("Vecchia Termination Proceeding"), at 22 (Opening Statement of the City), lines 9-10. Vecchia had a high-level, supervisory position with the City. Id. at 22, lines 10-11.

Vecchia was in the Supervisors Union and the department head of the Purchasing Division. Murphy was an account clerk in the Payroll division, both of which were divisions in the Finance department of the City. Both offices were located in the Finance department along with other divisions such as the accounts payable and accounts receivable. Murphy

2

considered Vecchia and all employees of the MAA Union to be supervisory positions of the Finance department of which Barbara Murphy was a subordinate employee. Murphy Aff. Para. 4.

The City appointed Murphy to a couple of committees in 1996, with other city employees, including Vecchia. Vecchia Termination Proceeding at 22 (Opening Statement of the City), lines 18-20. Vecchia Response to Request for Admissions, ¶4. While serving on such committees, Murphy was assigned to work on a number of projects, including the City's review of their purchasing regulations as well as newsletters and manuals . Vecchia Termination Proceeding at 22, lines 21-25.

Vecchia was older, married, and had children when he became enamored with Murphy. Id. at 23, lines 4-6. Vecchia's attraction toward Murphy was clearly not shared by her. Id. at 23, lines 6-8. Vecchia's attraction grew into an obsession. Id. at 23, line 9.

Vecchia first invited Barbara Murphy to lunch to ostensibly thank her for work she had done. Id. at 23, lines 11-15. During lunch, Vecchia told Murphy that he found her to be a very pretty woman. Id. at 23, lines 21-22. Vecchia's remark made her feel very uncomfortable. Id. at 23, lines 24-25.

Vecchia then began sending candy to Murphy at different times. Id. at 24, lines 1-2. Vecchia sent Murphy candy for her promotion in 1996 to administrative assistant. Id. at 24, lines 2-6. Id. at 59 (Testimony of David Vecchia), lines 8-11. See also, Vecchia Response to Request for Admissions, ¶7b and ¶80. Vecchia would send Murphy candy at Christmastime or Valentine's day. Vecchia Termination Proceeding at 24, lines 6-7. Vecchia sent candy to Murphy through the interoffice mail so that co-

3

workers who would see candy delivered to her would tease her. Id. at 24, lines 6-10. See Vecchia Deposition, p. 9, lines 14-20.

Murphy asked Vecchia to stop sending things through the interoffice mail. Id. at 24, lines 11-13. Murphy said to her supervisors and co-workers that she did not want anything from Vecchia and would tell him to stop sending the candy. The response was, "don't tell him to stop, we will eat the candies". Peter Brown Deposition ("Brown Dep") P. 6, lines 5-10. Murphy told Vecchia to stop sending the candies and he continued. Finally, Murphy told Vecchia that she was getting in trouble and to stop, which he did. Murphy Aff. Para. 9. Prior to March 1998, Murphy had told Chief Brown that Vecchia was bringing her candy at work. Brown Dep., p. 7, lines 12-14.

Vecchia then began to show up to the office to see Murphy. There was no need for Vecchia to come to the firehouse. Brown Dep. p 6, lines 13-15. However, if Vecchia were coming to see Brown on a purchasing matter, there would be no reason to turn him away. Murphy asked Chief Brown if it would be okay to tell Vecchia that the Fire Department was not allowed visitors. Brown Dep. P. 6, lines 21 through p. 7, line 4. Murphy related this to Vecchia and he stopped coming into the office. Murphy Aff. Para. 10.

Vecchia then began sending articles and items through the interoffice mail he thought Murphy would be interested in. Murphy would throw the items away hoping that he would stop. Murphy Aff. Para. 11.

Murphy told Chiefs Brown, Granier, Lehn and Harold Jackson about Vecchia's behavior . Murphy Aff. Para. 12. Murphy told Chief Brown about Vecchia following her at Brennan's. Brown Dep. p. 9, lines 9-12. Murphy told Brown she would get hang

4

up calls at the firehouse that she thought were Vecchia. Brown Dep P. 19, lines 6-9. Before the break in to Murphy's car, Murphy told Brown:

-    about balloons being left on her car at work and at home. Brown Dep P. 19, line 23 through p. 20, line 2.

-    about walking out of Brennan's, going home, getting a hang up call, calling back to Brennan's and being told Vecchia was at the phone at Brennan's. Brown Dep p. 2, lines 2-8.

-    about Vecchia seeing her at the Government Center and following/staring at her again Brown Dep P. 28, lines 15 through p. 26, line 4.

-    about the bullet on her porch. Brown Dep P. 29, lines 13-16.

-    she wouldn't go to the Government Center as long as Vecchia was there; Brown Dep P. 10, lines 8-9.

Brown saw a change in Murphy ; at first she had a great work ethic; but Vecchia's actions affected her ability to function. She would come into Brown's office and cry; she would have to get away from her desk. Brown Dep P. 30; lines 11-22. Chief Granier and Chief Malone were aware of this situation. Brown Dep p. 32, lines 9-17.

Vecchia's unwanted contact with Murphy escalated. Vecchia Termination Proceeding at 24, line 14. An event associated with the City, the Downtown Council, the District Counsel and local businesses called "Alive at Five" was held regularly each Thursday of the month in the City. Id. at 24, lines 14-20. Murphy would attend those events with friends. Id. at 24, lines 20-22. Vecchia started showing up at those events and over time placed himself closer and closer to Murphy. Id. at 24, lines 22-24.

Vecchia also learned that Murphy and her friends would go to a neighborhood bar known as Brennan's. Vecchia Termination Proceeding at 24, line 25, and at 25, lines 1-3. Vecchia started to show up at Brennan's. Id. at 25, lines 7-8.

Over time, from 1997 through 1998, Vecchia's conduct became increasingly aggressive. Id. at 25, lines 10-13. The patrons of the bar became familiar with Vecchia's behavior. Id. at 27, lines 12-13. Brennan's owners and bartenders had to tell Vecchia to leave Murphy alone. Id. at 27, lines 15-17. While at Brennan's, whenever a chair would open up near Murphy, Vecchia would try to get closer to her. Id. at 27, lines 1-3. Occasionally, just as Murphy was leaving Brennan's, Vecchia would walk out stand in front of her car so she couldn't drive forward. Id. at 27, lines 8-11. Vecchia would also try to buy Murphy drinks. Id. at 25, lines 14-15. See Vecchia Response to Request for Admissions, ¶12. Vecchia one night paid Murphy's food tab. Vecchia Termination Proceeding at 25, lines 16-19. Murphy thanked Vecchia for paying her food tab, but made it very clear to him that he should not do that again. Id. at 25, lines 24-25, and at 26, line 1.

Vecchia's conduct became more aggressive during this period. Id. at 26, lines 15-17. Vecchia, on one occasion, yelled out Murphy's name "Murphy, Murphy, Murphy, Barbara Murphy". Id. at 26, lines 17-20. Id. at 62 (Testimony of David Vecchia), lines 18-21. Such behavior was so strange and bizarre to the point that she would have to go and tell him to please stop and that he was embarrassing her. Id. at 26, lines 21-23. Murphy, due to Vecchia's behavior, was now reluctant to go to Brennan's. Id. at 27, lines 20-23. Murphy would leave when she saw Vecchia there. Id. at 28, lines 6-7.

6

Murphy began receiving dozens of calls late at night during which someone would call and hang up. Id. at 28, lines 9-13.    At this point, Murphy was 'freaked out' by Vecchia's behavior. Id. at 28, lines 17-18.

On March 20, 1998, Murphy was at Brennan's. Id. at 28, lines 18-22.  That night Vecchia continually stared at Murphy. Id. at 28, lines 23-25. Id. at 67 (Testimony of David Vecchia), lines 18-21.  Murphy left Brennan's without Vecchia. Id. at 67 (Testimony of David Vecchia), lines 23-24.  Murphy asked a friend to walk with her out to her car.  She drove her friend home, and returned to her home for the night. Id. at 29, lines 1-5.

That night Vecchia went to Murphy's home, broke into her car, and took a briefcase and other items. Id. at 66 (Testimony of David Vecchia), lines 14-16. Murphy's mother woke Murphy to tell her that she believed someone was in their driveway. Id. at 29, lines 10-14. The next morning, Murphy discovered that a briefcase in her car was gone. Id. at 30, lines 2-5.

Within days Chief Brown knew about Vecchia's break in of Murphy's car.  Brown Dep. P. 7, lines 21-25.  Chief  Brown called Human Resources to tell them there was a potential problem.  Brown Dep. P. 7, lines 24-p. 8, lines 1-5.  The situation with Vecchia was becoming serious.  Murphy had come in very upset, looking scared, she was breaking down, crying.  Brown had no experience dealing with this; he called Human Resources for some direction in dealing with this situation that was affecting the operations within the department. Brown Dep.P. 8, lines 12-24.  Chief Brown wasn't used to dealing with people experiencing an emotional breakdown in the office. Id., P. 15, lines 10-13.

7

Soon after the car break in, Brown spoke once to the Assistant Director of the Human Resources Department William Stover ("Stover") and once to an investigator in Human Resources Fred Manfredonia ("Manfredonia"). Id., P. 8, lines 7-9. Stover had Manfredonia get in touch with Brown. Id., P. 13, lines 18-22. Chief Brown told Stover that Vecchia's conduct was affecting the department, i.e., Barbara in her job. Id. P. 9, lines 18-25. Brown told Stover that they needed to limit Vecchia's contact with Barbara to zero, including phone calls. Id., P. 19, lines 2-5.

Manfredonia said to Brown that he was going to look into it and handle it. Brown told Manfredonia that Vecchia needed to be told that he can't come near the firehouse or call there. Manfredonia said they'd take care of it. Id. P. 14, lines 7-20. Brown reiterated to Manfredonia that we have to make sure there's some kind of barrier between Murphy and Vecchia. Id., P. 15, lines 19-25.

The next time Brown heard anything from Human Resources about Vecchia was in September 1998. Id., P. 16, lines 3-6. Chief Brown never received anything back in writing or a phone call from Manfredonia, that Manfredonia had spoken to Vecchia and told him don't go near the firehouse. Id. p. 17, lines 1-12

When the City was deliberately indifferent to her plight, Murphy tried to handle the matter on her own. Murphy could barely speak or walk. She went to the firehouse to retrieve her briefcase, realizing that Vecchia has surely been stalking her. Vecchia Termination Proceeding at 33, lines 21-25, and at 34, line 1. Based on what Murphy found in her briefcase when she retrieved it from the firehouse, she realized Vecchia had gone through her entire car. Id. at 34, lines 21-23.

8

On Sunday afternoon March 22, 1998, Barbara Murphy met with and told her family lawyer Ben Fraser ("Fraser") what happened, and what items were taken from her, returned to her and still missing from her briefcase. Id. at 35, lines 5-10. After Attorney Fraser called Vecchia, he brought a brown envelope to the Fire Department with more things in it that are destroyed. Vecchia goes to Fraser's office with more items, a letter of apology and $100 in cash. Murphy Aff. Para. 24.

At this point, Murphy had an emotional breakdown. Vecchia Termination Proceeding at 32, lines 24-25, and at 33, line 1.

The next day, Vecchia's wife told him she found a message on the answering machine that a woman named Barbara Murphy had called and wanted to know if Vecchia had her briefcase. Id. at 73 (Testimony of David Vecchia), lines 18-23. See also Vecchia Response to Request for Admissions, ¶39. Later that night, Vecchia called Murphy. See Vecchia Response to Request for Admissions, ¶40a. Vecchia told Murphy that he had taken her briefcase. Vecchia Termination Proceeding, at 75 (Testimony of David Vecchia), lines 17-19. He also told her that he had brought her briefcase to the Fire Station. See Vecchia Response to Request for Admissions, ¶40b, c and d.

Subsequent to Vecchia's break in to Murphy's car, Attorney Fraser demanded that Vecchia return the remainder of Murphy's belongings he had taken. See Vecchia Response to Request for Admissions, ¶42. Vecchia gave Attorney Fraser a letter in which Vecchia, apologized and stated that his life is in Murphy's hands. Vecchia Termination Proceeding at 36, lines 7-13. See Answer of David Vecchia herein ("Vecchia Answer"), ¶35. See also Vecchia Response to Request for Admissions,

9

¶43.   Vecchia returned some broken computer disks and gave Attorney Fraser one hundred dollars. See Vecchia Response to Request for Admissions, ¶44a.

Vecchia understood and agreed with Fraser that he was to  have no contact whatsoever with Murphy. Vecchia Termination Proceeding at 82 (Testimony of David Vecchia), lines 3, 21-25.   See Vecchia Deposition, p. 13, lines 8-10. Vecchia Termination Proceeding at 83 (Testimony of David Vecchia), lines 1-2, and at 87, lines 14-17. See also Vecchia Deposition, p. 74, lines 11-15. Vecchia also agreed that he would seek  counseling. Vecchia Termination Proceeding at 87 (Testimony of David Vecchia), lines 4-6. See also, Vecchia Response to Request for Admissions, ¶44k

In April of 1998, Vecchia obtained a copy of an internet article titled "Stopping the Stalker". See Vecchia Response to Request for Admissions, ¶34.   In May of 1998, Vecchia  resumed stalking Murphy. Vecchia Termination Proceeding at 38, lines 1-2. Murphy  receives repeated phone calls on the  nights she sees Vecchia. The caller does not speak but instead breathes into the phone before hanging up. Id. at 38, lines 2-7.

At this time Murphy was well known  as being an avid runner.   She would run with friends during the day and after work. Id. at 38, lines 8-13. Vecchia starts appearing on Murphy's jogging route.  Murphy entered  the High Ridge Road Race in the summer of 1998. Id. at 38, lines 17-21. See also, id. at 92 (Testimony of David Vecchia), lines 23-25, and at 93 (Testimony of David Vecchia), at line 1.  The City posted notices around the City inviting employees to run in that race. Id. Vecchia appeared and ran right next to her, just a few feet from her.  Murphy stops, runs away, and cannot continue in the race. Id. at 38  lines 21-25.

Murphy tells Fraser that Vecchia is stalking her again, that she cannot sleep, is getting sick, having stomach problems, and that she, her mother and her son are sleeping in the same room. Id. at 39, lines 16-20. Vecchia knew where Murphy lives, and is now stalking her again, despite the promises he made. Id. at 39, lines 21-23. In September of 1998, Murphy filed a complaint with Stover's office regarding Vecchia. Id. at 140 (Testimony of William Stover), lines 22-25. Murphy explained to Stover and Manfredonia what happened, dating all the way back to the beginning, id. at 40 (Opening Statement of the City), lines 14-16, and described how Vecchia had stalked, harassed and followed her, went to bars and city events where she frequented and broke into her car at her home. Id. at 142 (Testimony of William Stover), lines 20-25 and at 143, lines 1-7. Murphy told Stover and Manfredonia she needed help, that she's a nervous wreck and that Vecchia was making her sick. Id. at 40 (Opening Statement of the City), lines 18-20. She asked them to please make this behavior by Vecchia stop. Id. at 41, line 1.

During a September 25, 1998 meeting with Stover and Manfredonia, Vecchia admitted that he had broken into Murphy's car, and taken her belongings. Id. at 41 (Opening Statement of the City), lines 9-11. Vecchia also admitted that he had engaged in the behavior described in Murphy's complaint to the City. Id. at 143 (Testimony of William Stover), lines 14-15. Vecchia knew that Murphy wanted no further contact with him. See Vecchia Deposition, p. 10, lines 12-16, 25 and p. 11, lines 1, 5-11.

Manfredonia and Stover reported to Murphy that Vecchia was in love with her and had admitted to the car break in, the late night phone calls, sending her things at

11

the office, going to the fire house to see her, leaving things on her car, following her, shouting at her in the bar, trying to buy her drinks and food, trying to stop her from leaving places, running at places she had been, taking her personal things as well as other incidents she had reported to them. Murphy Aff. Para. 28.

Stover and Manfredonia stated that they would get an agreement that Vecchia would sign. William Stover Deposition P 28, lines 19-20. It would include that Vecchia would get therapy, leave Murphy alone, in and out of the workplace, provide reports of therapy and if he broke the agreement he would be fired. Murphy Aff. Para. 29. Stover agreed to get authorization for access to Vecchia's doctor's reports and evaluations. Stover Dep. P. 29, lines 1-8. The City never got a written waiver from Vecchia. Stover Dep. P. 32, lines 9-13.

Stover and Manfredonia did not tell Vecchia that Murphy wanted Vecchia to get counseling and provide reports regarding counseling. Vecchia Termination Proceeding at 100 lines 12-16. Vecchia again agreed to go to counseling. Id. at 100 (Testimony of David Vecchia), lines 23-25.

The City never followed up with Vecchia's progress in therapy. See Vecchia Response to Request for Admissions, ¶55, ¶57. Stover made no effort to verify Vecchia's counseling. Stover Dep.P. 32, line 25 through p. 33, lines 1-2. Manfredonia and Stover did not tell Vecchia that counseling was mandatory to keep his job with the City. Vecchia Termination Proceeding at 101, lines 1-2.

Manfredonia and Stover told Vecchia that they would get back to Vecchia with a written agreement for him. Id. at 101 lines 7-8. The City never drafted any agreement. Vecchia Response to Request for Admissions, ¶53. Vecchia thought that

12

the "written agreement" would require that Vecchia have no contact with Murphy in the workplace. Vecchia Termination Proceeding at 101 lines 11-14.

The City placed no restrictions on Vecchia's dealings with Murphy outside of work. The City only told Vecchia that he should limit his dealings with Murphy in the workplace. Id.102 lines 3-9.

Vecchia met with Stover in the end of October 1998. Vecchia asked Stover about the written agreement Stover told Vecchia that as far as he was concerned, the City was not involved in Murphy's complaint and that her complaint ended in March of 1998. Id. at 105 lines 2-8. The City did not tell Vecchia that any future inappropriate contact with Murphy would result in Vecchia's dismissal. Id. at 106 lines 5-8.

After September of 1998, Vecchia continued to go to Brennan's and saw Murphy there "plenty of times". Vecchia Dep p. 83, lines 1-15, and p. 96, lines 14-17. Murphy was exhausted with the lack of action and felt that it was a futile to speak with the City. She had changed her entire lifestyle to limit her potential exposure to Vecchia, running indoors or with a companion, taking different routes to wherever she went, sticking with her immediate family and going out with Fire Department members. She stopped going to the Government Center completely. Murphy Aff. Para 34-35.

Murphy was severely depressed. She felt that the City did not care if she was dead or alive, that Vecchia was more important to the City than she was as he was the Purchasing Agent and she was just a clerk. Murphy Aff. Para 34-35. Murphy does not know if the stalking stopped because she changed her entire lifestyle to protect herself from Vecchia. She lived each day in constant fear of seeing Vecchia. Id. Para 36. Murphy never heard from the City again until she went to the Police. Id. Para. 37.

While Murphy was at Toronto's in October, 2000, Vecchia came in, sat a few bar stools down from her, ordered a drink and continued to stare at her. Vecchia Termination Proceeding at 43, lines 8-12. Murphy is "understandably freaked out". Id. at 43, lines 18-19. Murphy knew what was going to happen next because she had been through it so many times before. She disconnected her phone. Id. at 44, lines 4-8. The next morning, she realized she had received a phone call at 11:11pm the night before from a pay phone in Route 7, which was on the way to Vecchia's home in West Redding, Connecticut. Id. at 44, lines 9-15. That same morning she found a green plastic frog with red lips on her front lawn. Id. at 44, lines 16-19. Leaving that plastic frog on her front lawn was like what Vecchia had done to her before. Id. at 44, lines 20-22.

Murphy felt terrorized. Id. at 44, lines 23-24. Soon after, Vecchia, upon seeing Murphy on the 10th floor of the Government Center, stood and stared at her. Murphy left quickly. Id. at 44, line 25, and at 45, lines 1-5. A week later, Murphy, while on the 4th floor of the Government Center, saw Vecchia in a conference room. She walked to the elevator. Vecchia immediately walked out of the conference room and followed her. He walked past her several times while staring at her. She was afraid that Vecchia was going to get into the elevator with her, but he did not. She left. Id. at 45, lines 6-16.

After so many times trying to get the City to complete the agreement and not getting it, Murphy was just exhausted with the lack of action and felt that it was a futile to speak with the City. Murphy Aff. Para 34-35. She went to the Stamford Police. Officer Strate obtained Fraser's notes of the March 1998 meetings, information from Vecchia's ex-wife, and

14

information from two other police departments that confirmed that Vecchia had stalked his own family. See Arrest Warrant Application. On October 12, 2000, Officer Strate requested copies of all investigative files regarding the City's investigation of Murphy's complaints against Vecchia, which William Stover and Manfredonia agreed to provide. No such file was ever produced. Arrest Warrant Application page 1, paragraph 4. Manfredonia stated that they did not have any such file, that they did not consider the complaint official and that they weren't sure if they even took notes on the issue. Murphy Aff. Para. 32.

Mary Vecchia reported to Officer Strate that she realized on March 21, 1998 that Vecchia was also stalking her. Arrest Warrant Application, pp. 9-10, para. 19. Vecchia's conduct toward his wife was similar to his conduct toward Murphy, i.e, the phone calls, the stalking, the following. Vecchia Termination Proceeding at 46, line 8. Mary Vecchia showed Officer Strate some things that Vecchia had been carrying in his briefcase including a page from Murphy's high school yearbook, which contained her photograph. Id. at 46, lines 20-25, and at 47, line 1. See also, id at 131 lines 15-20. Mary Vecchia also showed Officer Strate about 60 pages of internet material that Vecchia had in his briefcase on stalking. Id. at 47 lines 2-4. See also, id. at 132 lines 8-17.

On March 21, 1998 Vecchia had explained to Mary Vecchia that he broke into Murphy's car, that he had an obsession with Murphy and that he was depressed when he learned Murphy did not have the same attraction for him. Id. at 47, lines 9-15. Prior to, during and after Mary Vecchia's divorce from Vecchia, Vecchia followed Mary Vecchia and their children to various places and at church functions. Id. at 134, lines 11-13. Vecchia made numerous phone calls to Mary Vecchia's home. Id. at 134, lines

20-22. Vecchia also sent many, many letters to Mary Vecchia during that time. Id. at 134, lines 23-25, and at 135, lines 1-2. Vecchia's stalking and harassment of Mary Vecchia showed a pattern of the same kind conduct that Vecchia engaged in towards Murphy. Id. at 136 lines 8-15. Mary Vecchia testified that she hired an investigator to monitor her husband's conduct. She received his report dated March 28, 1998 Id. at 138, lines 14-17.

Vecchia was arrested November 29, 2000 and placed on paid administrative leave. The City did not make any decision regarding disciplining Vecchia until he actually pled guilty to criminal trespass and disorderly conduct in 2002. Id. at 148 lines 18-20. In March 2001, the City discussed with Murphy permitting Vecchia to return to work with the City. Id. at 162 (Testimony of Fred Manfredonia), lines 4-6. Murphy was very concerned that Vecchia would be returning to work. In preference to following their own policy and investigating and terminating Vecchia, the City attempted to bring Vecchia back to work by requiring Murphy to identify where she would be around the clock so that Vecchia would know exactly where to find her to continue his stalking. Murphy refused to cooperate. Id. at 162, lines 10-24.

In February 2002, the City terminated Vecchia because Vecchia while at Toronto's restaurant, stared at Murphy, making her feel very uncomfortable to the point where she had to leave. Id at 175 lines 14-18. Vecchia's discharge was related to the City's sexual harassment policy as Vecchia had engaged in inappropriate conduct toward an employee. Id. at 150 (Testimony of William Stover), lines 9-15.

16

## II.    Standard for Motions for Summary Judgment

The City fails to discuss – or even acknowledge -- that it must meet very high

standards to obtain summary judgment in this case.  In civil rights and discrimination

cases, that standard is especially stringent.

Summary judgment may be granted only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c).  In deciding a motion for summary judgment, this Court

> must review the record as a whole, credit all evidence favoring the nonmovant, give
> the nonmovant the benefit of all reasonable inferences, and disregard all evidence
> favorable to the movant that a jury would not have to believe.

Santossio v. City of Bridgeport, 2004 U.S. Dist. LEXIS 21109 (D. Conn., 2004) (Chatigny,

J.), citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 147 L. Ed. 2d

105, 120 S. Ct. 2097 (2000).  "[I]n assessing the record to determine if a genuine issue of

material fact exists, all ambiguities must be resolved and all inferences drawn in favor of

the party against whom summary judgment is sought".  Carlton v. Mystic Transportation,

202 F.3d 129 (2d Cir. 2000).

### A.    The City Cannot Meet the Standard for Summary Judgment in a
Discrimination Case

A movant's burden in seeking summary judgment is especially rigorous in

discrimination cases and in civil rights cases such as this one presenting issues of intent.

For example, Judge Chatigny of this Court recently noted in Santossio, supra that:

> **[s]ummary judgment should be granted sparingly in civil rights cases
> presenting issues of intent**.  In a proper case, however, summary judgment helps

17

[*9] conserve judicial and litigant resources because, if there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law, a verdict in favor of the nonmovant could not be sustained.

<u>Santossio</u>, 2004 U.S. Dist. LEXIS at *8-9 (D. Conn., 2004) (emphasis added) (*claims*

*brought pursuant to 42 U.S.C.S. §1983, alleging violations of the First Amendment and*

*Equal Protection Clause of the Fourteenth Amendment*).

The Second Circuit Court has also warned that

**[a] trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue**. See <u>Montana v. First Fed. Sav. & Loan Ass'n</u>, 869 F.2d 100, 103 (2d Cir. 1989); <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir.), cert. denied [**11] , 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985); <u>Patrick v. LeFevre</u>, 745 F.2d 153, 159 (2d Cir. 1984). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination. Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.

<u>Gallo v. Prudential Residential Servs., Ltd. Pshp.</u>, 22 F.3d 1219, 1224 (2d Cir., 1994)

(emphasis added) (reversed grant of summary judgment in employer's favor in plaintiff

employee's action for violations of Age Discrimination in Employment Act of 1967 and New

York Human Rights Law). See also <u>Carlton v. Mystic</u> Transportation, 202 F.3d 129, 134

(2d Cir. 2000) (reversed grant of summary judgment in employer's favor, noting that

"[b]ecause this is a discrimination case where intent and state of mind are in dispute,

summary judgment is ordinarily inappropriate...Thus, a trial court should exercise caution

when granting summary judgment to an employer, where, as here, its intent is a genuine

factual issue") (citations omitted); <u>Burford v. McDonald's Corp.</u>, 321 F. Supp. 2d 358, 362

(D. Conn., 2004) (Kravitz, J.) (emphasized that "additional considerations apply when ruling

on a motion for summary judgment in an employment discrimination case...[where] state

18

of mind is at issue" and that the Second Circuit Court "affirm[s] a grant of summary

judgment in favor of an employer sparingly because careful scrutiny of the factual

allegations may reveal circumstantial evidence to support the required inference of

discrimination." ).

### B.    Summary Judgment Is Inappropriate Where The Issue Is Whether An Employer's Action Was Effective, Remedial And Prompt

The Second Circuit in Gallagher v. Delaney, 139 F.3d 338 (2d Cir 1998) found

the granting of summary judgment to an employer to be in error saying:

> If the evidence creates an issue of fact as to whether an employer's
> action is effectively remedial and prompt, summary judgment is
> inappropriate. See, e.g., Kotcher v. Rosa and Sullivan Appliance Ctr.,
> Inc., 957 F.2d 59, 63-64 (2d. Cir. 1992); cf. Reed v. A.W. Lawrence &
> Co., 95 F.3d 1170, 1181 (2d. Cir. 1996) (the "question of whether an
> employer has provided a 'reasonable avenue of complaint' is a
> question for the jury;" assessment of the response of the employer to
> known inappropriate conduct should be by the jury). Id. at 348.
> Accord: Ayers v. Conn. Judicial Branch, 91 Fair Empl. Prac. Cas.
> (BNA) 1161 (D Ct 2002) (If the evidence creates an issue of fact as to
> whether an employer's action is effectively remedial and prompt,
> summary judgment is inappropriate.)

As indicated below, the City has failed satisfy its burden to prove that no genuine issue of

material fact exists as to Plaintiff's claims or that it is entitled to judgment on the law.

### III.    Murphy's Complaint was Timely Filed

The City asserts that because Murphy filed her complaint under 42 U.S.C.

§1983 more than ninety days after she received her "Right To Sue" letter from the

EEOC, her claim is untimely.  The Second Circuit disagrees.

Annis v. County of Westchester, 36 F.3d 251 (2d Cir. 1994) tells us:

19

As a threshold matter, we conclude that the core conduct of which Annis complains--sex discrimination--is covered by § 1983. The Supreme Court declared fifteen years ago that individuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment. Davis v. Passman, 442 U.S. 228, 234-35, 60 L. Ed. 2d 846, 99 S. Ct. 2264 (1979). Id. at 254.

Therefore, irrespective of whether Annis is pleading sex discrimination or sexual harassment, we hold that she has pleaded a claim under § 1983. The only remaining question is whether she may bring her claim without concurrently pleading a violation of Title VII, and satisfying the procedural requirements of that law. On that count, it is clear that Congress did not intend to make Title VII the exclusive remedy for employment discrimination claims, at least not those claims cognizable under the Constitution. Id.

We therefore hold that an employment discrimination plaintiff alleging the violation of a constitutional right may bring suit under § 1983 alone, and is not required to plead concurrently a violation of Title VII. Id. at 255.

Similarly, Ericson v. City of Meriden, 113 F. Supp. 2d 276 (D CT 2000) holds:

A plaintiff may state a section 1983 claim for a violation of the Fourteenth Amendment's equal protection clause against a public official for improper sexual conduct toward an employee that created a hostile work environment. Saulpaugh, 4 F.3d at 143-44. Id. at 290.

In Sec. 1983 actions, the statute of limitations is based on the state's residual

personal injury statute.   Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d. Cir 2002).

In Connecticut that period is three years. Lyon v. Jones, 260 F. Supp. 2d 507 (D CT

2003)

"When a [section] 1983 action is filed in the District of Connecticut, it is subject to a three-year statute of limitations." Walker v. Jastremski, 159 F.3d 117, 119 (2d Cir. 1998). Id. at 513.

Therefore, Murphy's claim was timely filed within three years and did not need

to be filed within ninety days of the Right to Sue Letter because she did not present a

claim based on Title VII.

## IV.    Murphy's Complaint Properly Alleges a Claim Under § 1983

The City asserts that Murphy has failed to sufficiently plead or offer evidence

that Murphy suffered sex discrimination because the City has no policy to tolerate off-

duty stalking. The City misperceives the Complaint.

### A.    Municipal Liability May be Based on a Failure to Act

The Supreme Court in <u>City of Canton v. Harris</u>, 489 U.S. 378 (1989) said:

> <u>Monell's</u> rule that a city is not liable under § 1983 unless a municipal
> policy causes a constitutional deprivation will not be satisfied by merely
> alleging that the existing training program for a class of employees, such
> as police officers, represents a policy for which the city is responsible.
> That much may be true. The issue in a case like this one, however, is
> <u>whether that training program is adequate; and if it is not, the question</u>
> <u>becomes whether such inadequate training can justifiably be said to</u>
> <u>represent "city policy."</u> It may seem contrary to common sense to assert
> that a municipality will actually have a policy of not taking reasonable
> steps to train its employees. But it may happen that in light of the duties
> assigned to specific officers or employees the need for more or different
> training is so obvious, and the inadequacy so likely to result in the
> violation of constitutional rights, that the policymakers of the city can
> reasonably be said to have been deliberately indifferent to the need. In
> that event, the failure to provide proper training may fairly be said to
> represent a policy for which the city is responsible, and for which the city
> may be held liable if it actually causes injury.

<u>Id</u>. at 389 (emphasis added).

Murphy has asserted a claim based on failure to investigate or

remediate sexual harassment in the form of on-duty and off-duty "stalking"

pursuant to the City's own Zero Tolerance Sexual Harassment Policy.

**B.    Municipal Liability may be Premised on a Failure to Prevent Harassment**

In a case where the plaintiff sought to hold a municipality liable for sexual

harassment, the District of New Jersey in <u>Reynolds v. Avalon</u>, 799 F. Supp. 442 ( D.

NJ 1992) analyzed the claim as follows:

> In order to hold the Borough liable for the harassment itself, plaintiff must be able to show that the failure of the policymaking officials to take action to prevent or stop the harassment -- in the absence of actual knowledge of the particular acts against plaintiff -- constituted deliberate indifference. We think such a showing is possible. The <u>Canton</u> majority's formulation of the deliberate indifference standard, as turning on the obviousness of the need for more training and the likelihood that  the inadequacy will result in the violation of constitutional rights, see <u>Id</u>. at 1205, does not on its face require actual knowledge of a previous or ongoing violation. In her concurring opinion, Justice O'Conner (joined by Justices Scalia and Kennedy) <u>clearly held that both actual and constructive notice of the need for preventative action can form the basis of a showing of deliberate indifference. See id</u>. at 1208; see also <u>Simmons v. City of Philadelphia,</u> 947 F.2d 1042, 1061 n. 14 (3d Cir. 1991) (Becker, J.) (noting that deliberate indifference under the Canton standard might be shown where defendants either knew or should have known of  the constitutional deprivation), cert. denied, 118 L. Ed. 2d 391, 112 S.Ct. 1671 (1992). **Thus, Justice O'Conner made clear that certain situations present a potential for constitutional violations by employees that are so obvious and so clearly likely to occur, that a municipality's failure to take preventative action will rise to the level of deliberate indifference even before any particular violation has occurred or been brought to the attention of policymakers.** <u>Id</u>. at 445 emphasis added.
>
> *****
>
> Similarly, plaintiffs may be able to show that the risk of sexual harassment occurring in the workplace is obvious, and that the failure to inform employees of a policy against sexual harassment and to institute procedures for reporting and investigating such allegations creates an extremely high risk that constitutional violations involving sexual harassment will occur. n4

n4 *********It was clear at that time that sexual harassment in the workplace was actionable as a violation of the equal protection clause. ******************* Andrews v. Philadelphia, 895 F.2d 1469, 1479 (3d Cir. 1990) (denying qualified immunity to city officials for sexual harassment claim on ground that "the right to be free of discrimination based upon sex in the workplace, was well grounded in law and widely known to the public by 1986").

Additionally, EEOC regulations have been in effect since 1980, which provide guidelines for employers to follow in preventing sexual harassment, **including the institution of reporting and investigation procedures.**

**An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.**

29 CFR § 1604.11. These guidelines were, of course, promulgated pursuant to Title VII, which imposes different requirements on employers with respect to sexual harassment than does the equal protection clause. They are relevant here, however, as an indication of the extent to which the need for employers to take action to prevent sexual harassment was obvious in 1987. **************************

   The availability of this constructive notice prong of the deliberate indifference standard set forth in Canton is of particularly crucial importance in sexual harassment cases because such incidents are by their very nature far less likely to be reported than other types of constitutional violations. While the types of constitutional violations discussed by the Court in Canton -- those committed by police officers against citizens -- are almost certain to be brought to the attention of high level officials either through citizen complaints or media attention, incidents of sexual harassment in the workplace often go unreported. There are a number of disincentives to reporting peculiar to this type of violation, which stem from the social taboos surrounding sexual matters in general, the tendency of victims to feel embarrassment and guilt regarding such incidents, as well as fears that complaints will be ill-received by supervisors and thus impact negatively on the victim's employment status. n5 **Thus, it is reasonable to suppose that in the absence of affirmative steps to encourage the reporting of sexual harassment in the workplace, the likelihood that higher level officials  in policymaking positions will have knowledge of such incidents in time to take meaningful corrective action is particularly small.**

n5 The reluctance of victims to report sexual harassment has been widely recognized. See, e.g., Robinson v. Jacksonville Shipyards, Inc., 760 F.Supp. 1486, 1507 (M.D.Fla. 1991) (finding that formal complaints re: sexual harassment are rare "because the victim of harassment fears an escalation of the problem, retaliation from the harasser, and embarrassment in the process of reporting"); Silverstein v. Metroplex Communications, Inc., 678 F.Supp. 863, 867 (S.D.Fla. 1988) ("it is undoubtedly often true that a victim of sexual harassment will be extremely reluctant to complain about misconduct"); Broderick v. Ruder, 685 F.Supp. 1269, 1279 (D.D.C. 1988) ("plaintiff and other women were for obvious reasons reluctant to voice their displeasure" about sexual harassment); Snodgrass v. Brown, No. 89-1171 (D.Kan. Nov. 26, 1990) (1990 WL 198431) ("sexual harassment victims often fear retribution or being labeled a troublemaker"); Sykes, The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines, 101 Harv.L.Rev. 563, 607 (1988) ("victims of sexual harassment may be reluctant to file suit or even to report incidents to their employers for fear of reprisal or a tainted reputation in the labor market").

We hold that a reasonable jury might find that the risk of sexual harassment in the workplace is so obvious that an employer's failure to take action to prevent or stop it from occurring -- even in the absence of actual knowledge of its occurrence -- constitutes deliberate indifference, where the employer has also failed to take any steps to encourage the reporting of such incidents. Therefore, we find that defendants have failed to demonstrate, as a matter of law, that the failure of Borough officials to prevent or stop the harassment of Susan Reynolds did not constitute a policy for which the Borough can be held liable under § 1983. Defendants' motion for summary judgment against the Borough on this ground will therefore be denied. Id. at 446 emphasis added.

Similarly, the failure to take prophylactic measures can rise to the level of

deliberate indifference even in the absence of actual knowledge of the harassment.

Mejia v. City of New York, 228 F. Supp. 2d 234 (EDNY 2002) describes various forms

of proof including:

Second, the need for a policy has been found when the danger of a constitutional deprivation is high but the victim has strong disincentives against reporting it, for example, when there are allegations of sexual harassment or sexual abuse of children. See Estes, 926 F. Supp. at 988 (need for policy on sexual abuse of children by school officials because children are more vulnerable than adults and less likely to

report abuse); Reynolds, 799 F. Supp. at 447 (need for sexual harassment policy because "these incidents by their very nature are far less likely to be reported than other types of constitutional violations"). In these situations, the presence or extent of serious problems within a particular organization are often hidden by the strong disincentives to report, but the existence of such problems is generally known to the public. Accordingly, these courts held that the failure of an organization to take prophylactic measures can rise to the level of deliberate indifference, even in the absence of actual knowledge of abuse or harassment. See Estes, 926 F. Supp. at 988; Reynolds, 799 F. Supp. at 447. Id. at 245

The evidence will show that the City of Stamford did not consider sexual harassment

"serious", that even though it purported to have a "Zero Tolerance" policy, that policy

was inadequately trained on, inadequately investigated if investigated at all when

incidents of harassment were reported to the Human Resources department and the

perpetrators were inadequately disciplined if disciplined at all.

## C.    Municipal Liability May be Premised on a Failure to Supervise and Investigate

As early as 1986 the Second Circuit premised municipal liability on  deliberate

indifference evidenced by a city's failure to adequately investigate claims of

constitutional violations, saying in  Fiacco v. Rensselaer, 783 F.2d 319  (2d Cir 1986):

Rather it is that the City was knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force and that this indifference was demonstrated by the failure of the City defendants to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force. We see no logical flaw in such a hypothesis, and we reject the notion advanced by the City defendants that a municipality may not be held liable under § 1983 on the basis of a policy of deliberate indifference to the constitutional rights of persons within its domain. Id. at 326. Accord: Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119 (2d Cir. 1991) ; Gentile v. County of Suffolk, 926 F.2d 142, 153   (2d Cir. 1991) ( the County's liability is based  "upon the County's long history of negligent disciplinary practices regarding law enforcement personnel,

25

which gave rise to the individual defendants' conduct in promoting the malicious prosecution of plaintiffs."); <u>Walker v. New York</u>, 974 F.2d 293 (2d Cir 1992) (failure to train) <u>Vann v. City of New York</u>, 72 F.3d 1040 (2d Cir 1995) (failure to supervise)

Similarly, the following cases have found that a failure to investigate employees' constitutional violations may create a municipal policy of deliberate indifference leading to a finding of municipal liability. <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966 (3d Cir. 1996) (judgment as a matter of law reversed; question of fact whether Pittsburgh's investigatory procedures against officers were adequate), cert. denied, 117 S. Ct. 1086 (1997); <u>Vann v. City of New York</u>, 72 F.3d 1040 (2d Cir. 1995) (summary judgment reversed; question of fact whether police system showed deliberate indifference in monitoring complaints); <u>Parrish v. Luckie</u>, 963 F.2d 201 (8th Cir. 1992) (jury verdict against North Little Rock, Arkansas affirmed); <u>Gentile v. County of Suffolk</u>, 926 F.2d 142 (2d Cir. 1991) (verdict against county affirmed); <u>Bordanaro v. McLeod</u>, 871 F.2d 1151 (1st Cir. 1989) (verdict affirmed, City of Everett, Massachusetts, liable), cert. denied, 493 U.S. 820 (1989); <u>Fiacco v. City of Renselaer</u>, 783 F.2d 319 (2d Cir. 1986) (verdict against Rensselaer, New York, affirmed), cert. denied, 480 U.S. 922 (1987); <u>Gonsalves v. City of New Bedford</u>, 939 F. Supp. 915 (D. Mass. 1996) (imposing municipal liability on City Council and Mayor); <u>Hogan v. Franco</u>, 896 F. Supp. 1313 (N.D.N.Y. 1995) (summary judgment in favor of Utica, New York, denied); <u>Illiano v. Clay Township</u>, 892 F. Supp. 117 (E.D. Pa. 1995) (Clay Township's motion to dismiss denied); <u>Carney v. White</u>, 843 F. Supp. 462 (E.D. Wis. 1994) (Village of Darien's summary judgment denied), aff'd, 60 F.3d 1273 (7th Cir. 1995); <u>Cox v. District of Columbia</u>, 821 F. Supp. 1 (D.D.C. 1993) (verdict against Washington, D.C.), aff'd,

26

40 F.3d 475 (D.C. Cir. 1994); Brown v. City of Margate, 842 F. Supp. 515 (S.D. Fla.

1993) (Margate, Florida's summary judgment denied), aff'd, 56 F.3d 1390 (11th Cir.

1995); Curran v. City of Boston, 777 F. Supp. 116 (D. Mass. 1991) (Boston's motion to

dismiss denied); Vasquez v. Reid, No. 90 C. 1585, 1990 WL 207456, at *1 (N.D. Ill.

Dec. 6, 1990) (Chicago's motion to dismiss denied); Sango v. City of New York, No. 83

CV 5177, 1989 WL 86995, at *1 (E.D.N.Y. July 25, 1989) (New York's summary

judgment denied).

## D.    Municipal Liability May be Premised on a Failure to Investigate and Remediate

The Second Circuit in Gierlinger v. New York State Police, 15 F.3d 32, 34 (2d

Cir. 1994):

> It was the plaintiff's theory that the constitutional right she claimed the
> defendants violated under 42 U.S.C. § 1983 was her right under the
> Equal Protection Clause of the Fourteenth Amendment to be free from
> sexual harassment. See Bohen v. City of East Chicago, Ind., 799 F.2d
> 1180, 1185 (7th Cir. 1986) ("Sexual harassment of female employees
> by a state employer constitutes sex discrimination for purposes of the
> equal protection clause of the fourteenth amendment."); see also Davis
> v. Passman, 442 U.S. 228, 234-35, 60 L. Ed. 2d 846, 99 S. Ct. 2264
> (1979). Section 1983 liability can be imposed upon individual
> employers, or responsible supervisors, for failing properly to
> investigate and address allegations of sexual harassment when
> through this failure, the conduct becomes an accepted custom or
> practice of the employer. See Bohen, 799 F.2d at 1189.  Id.  Accord:
> Zahra v. Town of Southold, 48 F.3d 674,685  (2d Cir 1995) (that
> "municipal inaction such as the persistent failure to discipline
> subordinates who violate [persons'] civil rights could give rise to an
> inference of an unlawful municipal policy of ratification of
> unconstitutional conduct,")

In Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426 (2d

Cir 1999), in a Title VII case, the Court found that an employer could be liable for co-

worker harassment if:

27

In contrast, if the harasser is the victim's co-worker, the employer will
be liable only if it is negligent, that is, if it either "provided no
reasonable avenue for complaint or knew of the harassment but did
nothing about it." Murray v. New York Univ. College of Detistry, 57 F.3d
243, 249 (2d Cir. 1995) (citation omitted); see Faragher, 118 S. Ct. at
2289 (noting general agreement among circuits that negligence
standard governs employer liability for co-worker harassment);
Kracunas v. Iona College, 119 F.3d 80, 89 (2d Cir. 1997) (holding that
employer may be liable for harassment of nonsupervisory personnel if
it "failed to provide a reasonable avenue for complaint or if it knew, or
in the exercise of reasonable care should have known, about the
harassment yet failed to take appropriate remedial action"); 29 C.F.R §
1604.11(d) (1998) (holding employers liable for co-worker harassment
if "the employer (or its agents or supervisory employees) knows or
should have known of the conduct, unless it can show that it took
immediate and appropriate corrective action"). Id. at 441.

As Judge Hall in Richardson v. Metro. Dist. Comm'n, 2003 U.S. Dist. LEXIS

12757 (DCt 2003) found:

> The Second Circuit has previously ruled that "a municipal policy may
> be inferred from the informal acts or omissions of supervisory
> municipal officials . . . and that 'municipal inaction such as the
> persistent failure to discipline subordinates who violate [persons'] civil
> rights could give rise to an inference of an unlawful municipal policy of
> ratification of unconstitutional conduct,'" Zahra v. Town of Southold, 48
> F.3d 674, 685 (2d Cir. 1995) (citing Batista v. Rodriquez, 702 F.2d
> 393, 397). See also Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123
> (policy may be inferred from "evidence that the municipality had notice
> of but repeatedly failed to make any meaningful investigation into
> charges that police officers had used excessive force in violation of the
> complainants' civil rights"); Turpin v. Mailet, 619 F.2d 196, 201 ("where
> senior personnel have knowledge of a pattern of constitutionally
> offensive acts by their subordinates but fail to take remedial steps, the
> municipality may be held liable for a subsequent violation if the
> superior's inaction amounts to deliberate indifference or to tacit
> authorization of the offensive acts").

> The facts presented by Richardson show that she complained about
> Johnson's conduct, that his supervisors knew of the problem, but that
> no disciplinary or corrective action was taken.

**V.    The City Has Failed to Sustain Its Burden to Prove That Municipal
Liability Does Not Exist Under Plaintiff's State Claims of Negligent
Retention, Negligent Supervision, Negligent Infliction of Emotional
Distress and Intentional Infliction of Emotional Distress
(Cause of Action Nos. 4, 5, 6, 11 and 12)**

**A.    The Continuing Violation Theory Applies Here**

The City argues that all of Plaintiff's negligence based claims are barred

by statutes of limitations under Connecticut General Statutes ("C.G.S.") §52-

584 (setting forth a two-year statute of limitations for negligence claims) and

§52-577 (setting forth a three years statute of limitations for intentional tort).

The City argues further that the "continuing violation" theory, which

when applicable tolls the running of applicable statutes of limitations, is

inapplicable.  As discussed below, the cases cited by the City in support of this

argument are distinguishable and thus do not apply here.

The "continuing violation doctrine generally provides that where there is

a discriminatory practice or policy, the accrual time for the statute of limitations

may be delayed until the last act in furtherance of the policy". Velez v.

Reynolds, 325 F. Supp. 2d 293, 312 (S.D.N.Y., 2004), citing, Harris v. City of

New York, 186 F.3d 243, 248 (2d Cir. 1998).   Moreover,

> to invoke the [continuing violation] doctrine, a plaintiff must
> demonstrate either (1) a specific ongoing discriminatory policy or
> practice, or (2) specific and related instances of discrimination
> that are permitted to continue unremedied for so long as to
> amount to a discriminatory policy or practice. See Bendik v. Credit
> Suisse Fist Boston (USA), Inc., 2004 U.S. Dist. LEXIS 5750, No.
> 02 Civ. 9554, 2004 WL 736852, at *6 (S.D.N.Y. Apr. 5, 2004);
> Branch v. Guilderland Cent. Sch., 239 F. Supp. 2d 242, 253
> (N.D.N.Y. 2003). [**45]  If the plaintiff can sufficiently allege "the
> existence of an ongoing policy of discrimination and some non-

time-barred acts taken in furtherance of that policy," acts outside of the limitations period may be considered as part of the timely claim. <u>Bendik</u>, 2004 U.S. Dist. LEXIS 5750, 2004 WL 736852, at *6.

In 2002, the United States Supreme Court in <u>National Railroad Passenger Corp. v. Morgan</u> eliminated the continuing violation doctrine for Title VII claims involving discrete discriminatory acts, as opposed to claims alleging a hostile work environment. <u>See Morgan</u>, 536 U.S. 101, 109-16, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). The principle in <u>Morgan</u> has been applied to § 1983 employment discrimination claims. <u>See</u>, <u>e.g.</u>, <u>Carmellino v. Dist. 20 of the N.Y. City Dep't of Educ.</u>, 2004 U.S. Dist. LEXIS 5754, No. 03 Civ. 5942, 2004 WL 736988, at *12-*13 (S.D.N.Y. Apr. 6, 2004). The decision in <u>Morgan</u>, however, was based on the particular language in Title VII, 42 U.S.C. § 2000e-5(e) (1), <u>see Morgan</u>, 536 U.S. at 109-15, and the Court **expressly did not "consider the timely filing question with respect to 'pattern-or-practice' claims," id. at 115 n.9. [**46] Thus the continuing violation doctrine may be available for § 1983 claims based on, for example, an ongoing municipal policy or custom**. <u>See</u> <u>Branch</u>, 239 F. Supp. 2d at 253-54 (discussing Morgan and finding retaliation claims timely where complaint alleged "a 'policy' or 'custom'" and thus provided "a permissible and appropriate basis for invocation of the continuing violations doctrine").

<u>Velez v. Reynolds</u>, 325 F. Supp. 2d 293, 312 (S.D.N.Y., 2004) (emphasis added). <u>See also</u>, <u>Knight v. Hartford Police Dep't</u>, 2004 U.S. Dist. LEXIS 24092 (D. Conn., 2004) <u>citing</u> <u>Lambert v. Genesee Hospital</u>, 10 F.3d 46, 53 (2d. Cir. 1993) <u>and</u> <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 220 (2d Cir. 2004) ("*[a]cts would come within [the continuing violation doctrine]... and withstand a statute of limitations defense if one act, not barred by an applicable time limitation, together with the other discriminatory acts alleged, further a discriminatory policy or mechanism...This exception permits an action for acts which, alone, would not be timely, if the action is based on at least one act which is not barred by the limitation*").

In this case, Plaintiff Murphy alleges that "[t]he City's ongoing failure to remedy the harassment of Murphy by [Defendant David] Vecchia for an extended and continuous period of time, constitutes an ongoing policy and practice". Complaint, ¶80. The Complaint alleges that such 'ongoing failure' by the City manifested itself because the City, among other things:

(i)     "failed to take reasonable steps to remedy the ongoing sexual harassment of Murphy by Vecchia [which the complaint alleges began in 1997] until long after Vecchia was arrested [in 2000], spent a year on paid leave, and eventually pled guilty [in 2002]", Complaint ¶74;

(ii)    "failed to properly follow through and enforce the agreement that it reached with Vecchia [in 1998] that required Vecchia to stay away from Murphy", Complaint ¶75;

(iii)   "failed to obtain a written agreement from Vecchia that he would cease harassing Murphy, as they promised they would", Complaint ¶76;

(iv)    "failed to complete its investigation of Vecchia's harassment of Murphy in a timely manner, but instead neglected their responsibility and 'deferred' their investigation until there was an outcome in Vecchia's criminal case", Complaint ¶79;

(v)     "was aware of and acquiesced in, the deprivation of equal protection of Murphy through: repeated acts of sexual harassment, failing to enforce and abide by the City's policies and procedures, failing to investigate and/or remedy sexual harassment", Complaint ¶96;

(vi)    "failed to properly train, supervise, control, and discipline Vecchia, Murphy's supervisors, and the Human Resources Department", Complaint, ¶97;

(vii)   "failed to make an adequate or effective investigation of Murphy's complaints of sexual harassment", Complaint ¶98;

(viii)  "failed to adequately remediate Murphy's complaints of sexual harassment", Complaint ¶99;

31

(ix)　　"was aware that Vecchia had sexually harassed Murphy in 1998", Complaint, ¶ 104;

(x)　　"acted in an inadequate manner in its efforts to prohibit sexual harassment that it is well aware of within its workforce", Complaint ¶¶105, 112, 121;

(xi)　　"was informed of and notified of prior sexual harassment against Murphy, but neglected to adequately investigate or deter such conduct", Complaint ¶¶106, 113;

(xii)　　"breached its duty to the employees of the City, including Murphy, "to enact and enforce appropriate policies and guidelines to prohibit sexual harassment in the workplace", Complaint, ¶¶107, 108, 114, 115, 123, 124;

(xiii)　　"was well aware that Vecchia had committed prior acts similar for those which he was criminally charged" and that "Vecchia had harassed Murphy for an extended period of time", Complaint ¶118, 119;

(xiv)　　"was informed of prior sexual harassment against Murphy, but neglected to adequately investigate, remedy, and deter such conduct", Complaint ¶122.

As indicated above, the Complaint's alleges that during the period 1997 through 2002 there existed an ongoing "policy' or "custom" of inaction by the City to remedy sexual harassment by its employees, such as Vecchia, despite knowing for years that such harassment was occurring. Accordingly, the 'continuing violation' doctrine tolls the running of the applicable statutes of limitation through the end of that period.

Annis v. County of Westchester, 136 F.3d 239 (2d Cir. 1998), Selan v. .Kiley, 969 F.2d 560 (7th Cir. 1992) and Miner v. Town of Cheshire, 126 F. Supp.2d 184 (D. Conn. 2000), cited by the City in its discussion of the

32

"continuing violation" theory, are distinguishable to the circumstances of this case, and thus are not applicable here.

For example, in <u>Annis</u> the Second Circuit Court of Appeals held that because the plaintiff failed to present any evidence of discriminatory events occurring during a six year period, the discrimination suffered by the plaintiff before and after that six year gap cannot be joined as a "continuing violation. <u>Annis</u>, 136 F.3d at 246. As indicated above, in contrast to <u>Annis</u>, Plaintiff has alleged and presented evidence illustrating the City's "custom" or "practice" through its "ongoing failure to remedy the harassment of Murphy by [Defendant David] Vecchia for an extended and continuous period of time", Complaint ¶80. There was not any gap in the City's failure in this regard.

The City's also claims, without any supporting evidence whatsoever, that there was a 'gap' in Vecchia's harassment of Murphy September 1998 through October, 2000. This claim is not supported by citation to any evidence and should be stricken. Murphy indicated in her deposition testimony that during that period, she was "hiding", "stopped doing everything", ceased participating in the activities she once enjoyed, such as running and going to the "Y", stopped frequenting the places she once frequented to meet friends and socialize, and other than going to work she for the most part remained home. <u>See</u> Exhibit 6, Murphy Deposition, 2/5/04, at p. 91, line 5 through p. 95, line 10. She also admitted during that time that she could not confirm for sure that Vecchia had stopped stalking her during that time because she for the

most part did not go anywhere except to and from work, until October of 2000. Id., at p. 91, lines 5-25, and p. 92, lines 5-14.

Selan, supra, also cited by the City is also distinguishable to this case. The 7th Circuit Court of Appeals in Selan was asked to overturn the lower court's holding that the 'continuing violation" doctrine was not applicable because "the complaint did not allege a continuing violation but rather, **only two acts** [a May 31, 1985 transfer/demotion, and a July 25, 1988 removal of privileges] that were more than three years apart". Selan, 969 F.2d at 565. Moreover, the Court noted as also significant in its decision that fact that the 1985 demotion/transfer that the plaintiff had experienced was "precisely the major, permanent change in employment status" that should have put plaintiff on notice of her claims. Id. at 567.

As indicated above, in contrast to Selan Murphy's complaint does not allege only two acts occurring years apart, but a continuing violation over time. Selan is thus completely distinguishable from this case.

Miner, supra, also cited by the City in the section of its brief discussion the "continuing violation", is also for similar reasons inapplicable here. The Court in Miner held that the 'continuing violation' doctrine was inapplicable, on the grounds that the complaint was "totally devoid of a specific allegation of sexual harassment occurring within the limitations period", made "no allegations that the sexual harassment was a policy or practice of the Town", and pled only two specific instances of sexual harassment occurring "in or around August or September 1997". Miner, 126 F. Supp.2d at 190-192.

In contrast to <u>Miner</u>, Murphy's complaint alleges that the failure to investigate, remediate, or punish sexual harassment became a policy or practice of the City. Murphy's complaint also contains specific instances of sexual harassment occurring within the limitations period alleged by the City to apply. <u>See e.g.</u> Complaint, ¶¶ 50 (September, 2000 harassment in workplace by Vecchia); ¶51 (hang up calls at work); ¶52 (October 5, 2000, harassment of Murphy while at bar with friends; and repeated hang up phone calls at her home; Murphy found "frog" ornament" that following morning on the lawn in front of her home); ¶59 (November 3, 2000, bullet lodged into Murphy's back deck); ¶65 (November 2000, workplace harassment). Thus, the <u>Miner</u> case is materially distinguishable from this case.

### B.    There is No 'Jurisdictional Problem' With Plaintiff's Claim For Negligent Infliction of Emotional Distress

The City next argues that there is a "jurisdictional problem" with Plaintiff's negligence based claims, because "Plaintiff as a member of a union failed to exhaust her remedy under the collective bargaining unit before she sued in federal court for negligence infliction of emotional distress". In purported support of this argument, the City cites a case from the Connecticut Appellate Court, <u>Sobczak v. Board of Education of the City of Meridien</u>, 88 Conn. App. 99 (2005). The <u>Sobczak</u> Court found that the plaintiff's claims for wrongful termination and negligent infliction of emotional distress were subject to the grievance procedures **as defined in the plaintiff's collective**

35

**bargaining agreement**, and thus held that Sobczak's failure to bring those

claims through those grievance procedures mandated their dismissal from the

Connecticut Courts. Id., at 109.

The City in this argument presents absolutely no evidence of what

Murphy's collective bargaining agreement provides, and what provisions

thereof allegedly require her to bring these claims through the grievance

procedures of the collective bargaining agreement. Accordingly, because the

City provides absolutely no evidence in support of this defense, it should be

stricken and denied in its entirety.

## C.   Murphy has suffered Damage in the form of Mental Distress

The City asserts that Murphy has provided no evidence of damage as

she continues to be employed by the City. The City is in error both factually

and legally.

There is no question that damages may be awarded for embarrassment and

humiliation in an action based on violation of constitutional rights. See Carey v.

Piphus, 435 U.S. 247, 264, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)

> Distress is a personal injury familiar to the law, customarily proved by
> showing the nature and circumstances of the wrong and its effect on the
> plaintiff. n20 In sum, then, [HN9]although mental and emotional distress
> caused by the denial of procedural due process itself is compensable
> under § 1983,

Further, punitive damages are also available under Sec. 1983, as described in Smith

v. Wade, 461 U.S. 30, 56 (U.S., 1983)

> We hold that a jury may be permitted to assess punitive damages in an
> action under § 1983 when the defendant's conduct is shown to be

36

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. Because the jury instructions in this case are in accord with this rule, the judgment of the Court of Appeals is affirmed

Smith v. Wade, 461 U.S. 30, 56 (U.S., 1983)

The City's assertion that there has been no evidence of damage to Murphy is wrong.

The following include examples of Murphy's distress caused by the City's deliberate

indifference, failure to investigate, remediate or punish Vecchia:

- Vecchia's remark to Barbara Murphy during that lunch meeting made her feel very uncomfortable. Vecchia Termination Proceeding at 23, lines 24-25.

- Brown noticed a change in Murphy ; at first she had a great work ethic; but Vecchia's actions affected her ability to function. She would come into Brown's office and cry; she would have to get away from her desk. Brown Dep P. 30; lines 11-22. This was in 1998; this also occurred in 2000. Brown Dep p. 31, lines 8-10.

- Such behavior was strange and bizarre to the point that she would have to go and tell him to please stop such behavior, and that he was embarrassing her. Vecchia Termination Proceeding at 26, lines 21-23.

- At this point, Barbara Murphy became 'freaked out' from Vecchia's behavior towards her. Id. at 28, lines 17-18.

- At the time he found out about the car break in, Murphy was getting very upset about it. Brown Dep. P. 7, lines 24-p. 8, lines 1-5.

- Murphy had come in very upset, looking scared and she was breaking down, crying. Id., p. 8, lines 12-24.

- Brown was looking for help, because he wasn't used to dealing with people experiencing an emotional breakdown in the office. Id., P. 15, lines 10-13.

- Fraser suggested Murphy call Vecchia and ask for the items back. She hesitated, crying and said "what if it wasn't him. I could be fired for

37

calling him and accusing him, he's a boss." See, Vecchia Termination Proceeding at 32, lines 6-12, 19-20, 22-24.

- Barbara Murphy could barely speak or walk. That next morning she went to the central firehouse to retrieve her briefcase, realizing that Vecchia has surely been stalking her. Id. at 33, lines 21-25, and at 34, line 1.

- At this point, Barbara Murphy had an emotional breakdown. Id. at 32, lines 24-25, and at 33, line 1.

- While Barbara Murphy was running in the High Ridge Road Race in the summer of 1998, Vecchia appeared and ran right next to her, just a few feet from her. Barbara Murphy cannot take this anymore. She stops, runs away, and cannot continue in the race. Id. at 38 lines 21-25.

- Barbara Murphy tells Attorney Frasier at this time that Vecchia is bothering her again, that she cannot sleep, is getting sick and having stomach problems, and that she, her mother and her son are sleeping in the same room. Id. at 39, lines 16-20.

- Barbara Murphy told Stover and Manfredonia during that meeting that she needs help, that she's a nervous wreck and that Vecchia conduct toward her was making her sick. Id. at 40 (Opening Statement of the City), lines 18-20.

- Murphy was exhausted and depressed by the whole situation. After a while of no response by the City Murphy stopped calling Ben Fraser and bothering him because the City was not going to get us the agreement. Murphy Aff. Para. 30.

- Barbara Murphy was exhausted with the lack of action and felt that it was a futile to speak with the City. Id., Para 34-35.

- Murphy was severely depressed at this point. She had the feeling that the City did not care if she was dead or alive, that Vecchia was more important to the City than she was as he was the Purchasing Agent and she was just a clerk, and easily replaced. Id., Para 34-35.

- At this time, Barbara Murphy is "understandably freaked out". Vecchia Termination Proceeding at 43, lines 18-19.

- At this time Barbara Murphy felt terrorized. Id. at 44, lines 23-24.

- Barbara Murphy was terrified of Vecchia. Murphy Aff. Para. 40-44.

Further, as Dr. Hamilton's notes indicate, Murphy suffers from Post Traumatic Stress

Disorder. See Exhibit 14, at 3/21/01 session ( Dr. Hamilton's case notes.) Thus it can be

seen that there are significant material and genuine factual issues in dispute as to the damage

suffered by Murphy thereby precluding summary judgment for the City.

### CONCLUSION

For all of the reasons stated above, Barbara Murphy respectfully requests that

this Court deny the City's motion in every regard.

PLAINTIFF,
BARBARA E. MURPHY

BY: _____

Elisabeth Seieroe Maurer (ct11445)
Eva M. Puorro (ct25772)
Maurer & Associates, PC
871 Ethan Allen Hwy., Suite 202
Ridgefield, CT 06877
Phone (203) 438-1388
Fax (203) 431-0357
E-mail esmaurer@maurerandassociates.com