UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------X
BARBARA E. MURPHY,           :    DN 3:03 CV 00519 (MRK)
       Plaintiff,            :
                             :
        v.                   :
THE CITY OF STAMFORD and     :
DAVID VECCHIA,               :    May 10, 2005
Defendants.                  :
-------------------------------------------------X

## LOCAL RULE 56(a)2 STATEMENT OF FACTS IN DISPUTE

Plaintiff Barbara Murphy submits this Local Rule 56 (a) 2 Statement of Facts in Dispute in opposition to The City of Stamford (the "City")'s Motion for Summary Judgment. Pursuant to Local Rule 56(a) 3, each statement of fact is supported by a citation to affidavits, deposition excerpts or to Exhibits, all of which are listed in an Appendix submitted with Plaintiff's opposition to the City's Motion for Summary Judgment.

Plaintiff's Statement of Facts In Dispute is contained in the paragraphs below designated by letter. See paragraphs "A" through "JJJ" below (at times with sub-paragraphs).

The City's "Rule 56(a)(1) Statement of Facts Not In Dispute" has been copied verbatim and included in this document, for the reader's convenience. Using the

same paragraph numbers that the City used in that document, the City's "Rule 56(a)(1) Statement of Facts Not In Dispute" is listed in paragraphs 1 through 62 below.

1.     In 1996, Barbara Murphy was promoted from a position in the Finance Dept at 888 Washington Boulevard (Government Center) to Administrative Assistant at the Fire Department Headquarters at 629 Main Street, blocks away from Government Center. Plaintiff's Complaint, p. 3, ¶ 8;  Plaintiff's Depo. p. 6, line 24 thru p. 7, line 7, p. 8, lines 4-16.

A.     Plaintiff admits paragraph 1 except that the Fire Department is located within 6 blocks of the Government Center.  Barbara Murphy Affidavit dated May 5, 2005, paragraph 2 and submitted herewith, (hereinafter, "Murphy Aff. Para.___").[1]

2.     After 1996, Barbara Murphy reported to the Fire Chief and Assistant Chief Peter Brown. Plaintiff's Depo. p. 14, line 9 thru p. 15, line 2.

B.     Plaintiff admits paragraph 2 except that Barbara Murphy reported to all of the Chief Officers on the third floor, which included and still includes the Chief, Asst

---

[1] Unless otherwise indicated, citations apply to the entire paragraph in which they appear.

2

Chief(s) and the Deputy Chief in the Training division, but primarily to Asst. Chief Peter Brown.  Murphy Aff., Para. 3.


3.      Defendant David Vecchia was the purchasing agent, and was a co-worker and not a supervisor to Barbara Murphy; he worked on the 10th floor of 888 Washington Blvd, Stamford, CT. Plaintiff's Complaint, p. 3, ¶ 7; Vecchia Depo, p. 5, line 5, p. 8, line 21; pg. 88, lines 16-24;  Plaintiff's Depo, p. 9, line 11-19.

C.      Undisputed that David Vecchia was the Purchasing Agent for the City of Stamford and that he worked on the 10th floor of the Government Center.  The remainder of paragraph 3 is disputed.

C1)     Vecchia was the City's purchasing agent.  See, Transcript of October 21, 2002 [Day 2] hearing before the Board of Mediation and Arbitration, In the Matter of City of Stamford and AFSCME Co. 4, Local 2657 (David Vecchia Termination) (No. 2002-A-0842) (Dee, Arb.) (referred to hereinafter as the "Transcript of Vecchia Termination Proceeding"), at 22 (Opening Statement of the City), lines 9-10.

C2)     Vecchia had a high-level, supervisory position with the City.  Id. at 22, lines 10-11.

C3)     Vecchia was in the Supervisors Union and Barbara Murphy considered him to be a supervisor. He was the department head of the Purchasing Division. Barbara Murphy was an account clerk in the Payroll division, both of which were divisions in the Finance department of the City. Both offices were located in the same area of the same floor of the Government Center which was know as the Finance department along with other divisions such as the accounts payable and accounts receivable.  Barbara Murphy considered Mr. Vecchia, Mr. Ruszkowski, Mr. Hamilton, Mr. Lucia, and Mr. Santorella, etc and all employees of the MAA Union in the Finance department to be supervisory positions of the Finance department of which Barbara Murphy was a subordinate employee.  Murphy Aff. Para. 4.

C4)     Vecchia's position as Purchasing Agent for the City was a supervisory position.   See Response by David Vecchia dated May 12, 2004 to Plaintiff's Request for Admissions (hereinafter referred to as "Vecchia Response to Request for Admissions"), ¶2.

C5)     Vecchia was a division head in the department that Barbara Murphy worked.  Additionally, he was in charge of the New HTE financial system. He was also the head of the purchasing agreement committee that Barbara Murphy was on and was supervisory in the HTE newsletter committee

4

that Barbara Murphy was on along with Alice Cools and Marianne Fitzgerald. What they did on the newsletter was approved by him as the newsletter was to show employees tips on how to use the system he was in charge of and to supply user friendly information on the new system. Murphy Aff. Para. 5.

C6)     Transcript of Deposition of Barbara Murphy ("Murphy Dep."), p. 78, lines 1-5: Vecchia had power to take Barbara Murphy off the committee. The result: "And then I would look not promotable and things like that for what I wanted to do, which I got in a position as an administrative assistant data services from the city at the payroll department".

C7)     Barbara Murphy considered Vecchia to be a supervisor and she wanted another position in the finance department that would work directly with the new financial system. Murphy Aff., Para. 6.

C8)     Murphy Dep., p. 81, lines 3-17: "He was my supervisor of that committee. I didn't know the legal ramifications of what he could or could not have done as far as really firing me. In the city of Stamford anything could happen. But I did know that if I didn't do well on there that I wouldn't be able to be on the HTE committee, and I wouldn't get another position as administrative assistant data systems. …. Yes he was the supervisor. If he didn't like something in the book, he took it out. He was the HTE manual. If

he didn't like the newsletter, the article was omitted if he didn't like something in it".

4.      In 1997, after working on a committee with Mr. Vecchia, Mr. Vecchia went out to lunch with Ms. Murphy and told her that she is attractive. Plaintiff set all of this out in her arrest warrant affidavit dated November 26, 2000, a true and accurate copy of which is attached hereto as Ex. A.  Plaintiff's Complaint, p. 3, ¶ 9; Plaintiff's Depo, p. 16, line 17 thru p. 17, line 21; Plaintiff's Arrest Warrant Affidavit ("AWA")[2], Ex. A, p. 2.

D.      Undisputed that Barbara Murphy worked on a couple of committees with Vecchia, that she had lunch with Vecchia and that she signed a statement for the police in November 2000. The implication that her statement recounted every interaction with Vecchia completely is disputed.  Further, the purpose and content of the lunch are disputed in at least the following ways.

---

[2] The Court should note that the document that the City refers to as "Plaintiff's Arrest Warrant Affidavit" ("AWA") and attaches as Exhibit "A" to the City's "Rule 56(a)(1) Statement of Facts Not In Dispute" was not submitted by the City in complete form.  Other parts of that document are missing from the City's Exhibit "A". "Plaintiff's Arrest Warrant Affidavit", referred to by the City as the "AWA", is one of several attachments to an "Application for Arrest Warrant" dated November 29, 2000, all of which were submitted by Police Officer Carl Strate to the Court in support of the application for David Vecchia's arrest in the year 2000.  That "Application for Arrest Warrant" dated November 29, 2000, consists of a twelve-page affidavit of Officer Strate, with the following exhibits thereto:  (1) Seven-page "Voluntary Statement" (in affidavit form) of Barbara Murphy dated October 26, 2000; (2) unsworn report dated March 24, 1998 from K. Parker Mayo, Inc. Detective Agency; (3) copy of a page from Barbara Murphy's high school yearbook, which was in Vecchia's briefcase according to his ex-wife Mary Vecchia; (4) two-page sworn statement of Mary Vecchia dated September 11, 1999.  Plaintiff has enclosed a copy of all of those documents with her opposition to the City's motion for summary judgment. See Plaintiff's Appendix, Exhibit 4 thereto.

D1)    The City appointed Barbara Murphy to a couple of committees in 1996, with other city employees, including Vecchia.  See, Transcript of Vecchia Termination Proceeding at 22 (Opening Statement of the City), lines 18-20.  See also Vecchia Response to Request for Admissions, ¶4.

D2)    While serving on such committees, Barbara Murphy was assigned to work on a number of projects, including the City's review of their purchasing regulations as well as newsletters and manuals that the City had been working on.  See Transcript of Vecchia Termination Proceeding at 22, lines 21-25.

D3)    It was through Barbara Murphy's committee work with the City in 1996 that she had her first significant interactions with Vecchia.  Id. at 23, lines 1-3.

D4)    During Barbara Murphy's first significant interactions with Vecchia, Vecchia was married, had children and became enamored with her. Id. at 23, lines 4-6.

D5)    Vecchia developed an attraction towards Barbara Murphy her that was clearly not shared by her.  Id. at 23, lines 6-8.

D6)    Vecchia's attraction towards Barbara Murphy grew into an obsession.  Id. at 23, line 9.

D7)     Vecchia first invited Barbara Murphy to lunch to thank her ostensibly for work she had done on the committees that they were assigned to. Id. at 23, lines 11-15.

D8)     During that lunch meeting, Vecchia explained to Barbara Murphy that he found her to be a very pretty woman.     Id. at 23, lines 21-22.

D9)     Vecchia's remark to Barbara Murphy during that lunch meeting made her feel very uncomfortable.  Id. at 23, lines 24-25.

D10)  Vecchia asked Barbara Murphy to lunch to go over the user manual they had worked on together, and then rather than discussing the manual with Barbara Murphy, Vecchia told Barbara Murphy that he thought Barbara Murphy was attractive.  Barbara Murphy felt uncomfortable and hurried through the lunch. Afterward, Vecchia kept the manual and would not return it even after many requests unless Barbara Murphy came to pick it up. Asst. Chief Brown ultimately went and got the manual after Barbara Murphy explained the uncomfortable situation that occurred at lunch.  Murphy Aff. Para. 7.  Murphy Dep. P. 16 line 17 through p. 17, line 13, and p. 18 lines 7-14.  See Transcript of deposition herein of David Vecchia, August 15, 2003 ("Vecchia Dep."), p. 53, lines 5-8.

5.    Ms. Murphy avoided Mr. Vecchia and did nothing to encourage any romantic relationship with him.  Plaintiff's Complaint, p. 4, ¶ 13.

E.    Plaintiff does not dispute paragraph 5, however disputes the City's interpretation of Complaint, p. 4, ¶ 13 and the extent of Vecchia's harassment.

E1)    Paragraph 13 of the Complaint states that in 1997-8, Barbara Murphy repeatedly told Vecchia that he needed to stop making 'advances' toward her as she was not interested, and that after she told him this, he started to 'stalk' her.

E2)    Chief Graner, Assistant Chief Brown, Deputy Chief Lehn, and Harold Jackson (account clerk who also worked in the Admin office of the fire department) all witnessed Vecchia's advances.  Murphy Aff. Para. 8.

E3)    Vecchia then began sending candy to Barbara Murphy at different times.  See, Transcript of Vecchia Termination Proceeding at 24, lines 1-2.  Vecchia sent Barbara Murphy candy for her promotion in 1996 to the position of administrative assistant at the fire department.  Id. at 24, lines 2-6, and at 59 (Testimony of David Vecchia), lines 8-11.  See also, Vecchia Response to Request for Admissions, ¶7b and ¶80.

9

E4)    Vecchia would send Barbara Murphy candy at Christmastime or Valentine's day. See Transcript of Vecchia Termination Proceeding at 24, lines 6-7. Vecchia sent that candy to Barbara Murphy through the interoffice mail so that co-workers who would see this candy delivered to her would tease her. Id. at 24, lines 6-10. See also Vecchia Dep., p. 9, lines 14-20.

E5)    Barbara Murphy asked Vecchia to stop sending things to her through the interoffice mail immediately. See Transcript of Vecchia Termination Proceeding at 24, lines 11-13.

E6)    Murphy said to her supervisors and co-workers that she did not want anything from Vecchia and would tell him to stop sending the candies, etc. The response was, by the Officers of the department, "don't tell him to stop, we will eat the candies". Murphy told Vecchia to stop sending the candies and he continued. Finally, after repeated requests from Murphy to stop sending the candy, Murphy told Vecchia that she was getting in trouble and to please stop at which time he did. Murphy Aff. Para. 9.

E7)    Prior to March 1998, Murphy had mentioned to Brown that Vecchia giving her candy at work. Transcript of deposition of Peter Brown, November 6, 2003 ("Brown Dep."), p. 7, lines 12-14. When he first heard about the candy, he had not realized the potential seriousness of the situation;

at this time Murphy told Brown she wants Vecchia sending her candy to stop; Brown said what, we're getting free candy here, not realizing the seriousness of the situation.  Brown Dep. p. 6, lines 5-10.

E8)    Vecchia then began to show up to the office to see Barbara Murphy.  Chief Brown dealt with Vecchia quite a bit.  There was no need for Vecchia to come to the firehouse.  Brown Dep. p 6, lines 13-15.  If Vecchia was coming upstairs to see Brown on a purchasing matter, there would be no reason to turn him away.  To Brown's recollection, he never recalls Vecchia ever coming there AND being turned away.  Id., P 17, lines 6-14.  Murphy asked Chief Brown if it would be okay to tell Vecchia that the Fire Department was not allowed visitors and Brown said ok.  Id., P. 6, lines 21 through p. 7, line 4.   Murphy related this to Vecchia and he stopped coming into the office.  Murphy Aff. Para. 10.

E9)    Vecchia then began sending articles and items he thought Murphy would be interested in.  Murphy would throw the items away hoping that he would stop. Murphy Aff. Para. 11.

E10)   Murphy at all times relayed Vecchia's behavior to everyone in the Administrative Office of the Fire Department, including Chiefs Brown, Granier, Lehn and Harold Jackson . Murphy Aff. Para. 12.

E11)   Murphy told Brown about Vecchia following her at Brennan's. Brown Dep. p. 9, lines 9-12.

E12)   Murphy told Brown she would get hang up calls at the firehouse; she would tell Brown she thought it was Vecchia making the hang up calls. Brown Dep P. 19, lines 6-9.

E13)   Murphy told Brown about the frog left in her yard.  Brown Dep P. 19, lines 17-22.

E14)   Before the break in to Barbara Murphy's car, Murphy told Brown about balloons being left on her car.  Brown Dep P. 19, line 23 through p. 20, line 2.

E15)   Murphy told Brown about walking out of Brennan's, going home, getting a hang up call, calling back to Brennan's and being told Vecchia was at the phone at Brennan's.  Brown Dep p. 2, lines 2-8.

E16)   Murphy told Brown about Vecchia seeing her at the Government Center and following/staring at her again, and also told him about her going to the police. Brown Dep P. 28, lines 15 through p. 26, line 4.

E17)   Barbara Murphy told Brown that she decided to go to the police about Vecchia. Brown Dep P. 29, lines 7-12.

E18)   Barbara Murphy also told Brown about the bullet on her porch. Government Center Brown Dep P. 29, lines 13-16.

E19)   Barbara Murphy told him she wouldn't go to the Government Center as long as Vecchia was there; so, Brown told Murphy he would go there for her.  Brown Dep P. 10, lines 8-9.

E20)   Barbara Murphy mentioned to Brown that she was seeking counseling.  Brown Dep P. 30, lines 5-7.

E21)   Brown noticed a change in Barbara Murphy; at first she had a great work ethic; but Vecchia's actions affected her ability to function.  She would come into Brown's office and cry; she would have to get away from her desk.  Brown Dep P. 30; lines 11-22.  This was in 1998; this also occurred in 2000.  Id., p. 31, lines 8-10.

E22)   Chief Granier and Chief Malone were aware of this situation between Vecchia and Murphy.  Chief McGrath was also, although that would have been later on since McGrath began in 2000 with the dept.  Brown Dep p. 32, lines 9-17.

E23)   Vecchia's contact with Barbara Murphy escalated.  See, Transcript of Vecchia Termination Proceeding at 24, line 14.  A commonly known event associated with the City, the Downtown Council, the District

Counsel and local businesses called "Alive at Five" was held regularly each Thursday of the month in the City. Id. at 24, lines 14-20. Barbara Murphy would attend those events with girl friends and other friends. Id. at 24, lines 20-22. Vecchia started showing up at those events and over time placed himself closer and closer to Barbara Murphy. Id. at 24, lines 22-24.

6.    During 1997 to 1998, Mr. Vecchia started going to the same bars as Ms. Murphy, and annoyed her at these bars by trying to buy her drinks or food, which she refused. Plaintiff's Complaint, p. 4, ¶¶ 15&16; Plaintiff's Depo, p. 171, lines 4 thru 15.

F.    Plaintiff disputes paragraph 6, as it is incomplete and therefore grossly inaccurate.

F1)    Vecchia also learned that Barbara Murphy and her friends would on occasion gather at a neighborhood bar in the Shippan section of Stamford known as Brennan's. Transcript of Vecchia Termination Proceeding at 24, line 25, and at 25, lines 1-3. Vecchia started to show up at Brennan's. Id. at 25, lines 7-8. While showing up at Brennan's Vecchia at first would stay away from Barbara Murphy, have a beer and not bother anyone. Id. at 25, lines 8-10.

F2)    However, over time, from the period of 1997 through the period

of 1998, Vecchia's conduct became increasingly aggressive.  Id. at 25, lines

10-13.  The patrons of the bar became familiar with such behavior by Vecchia.

Id. at 27, lines 12-13.  From time to time, Brennan's owners and bartenders

had to talk to Vecchia and tell him to leave Barbara Murphy alone.  Id. at 27,

lines 15-17.  At Brennan's Vecchia would stare at Barbara Murphy.  Id. at 25,

line 14.

F3)    Vecchia has been to Brennan's, a neighborhood bar located in

the Shippan section of Stamford, during the period of 1997 to 2000, probably

around 300 times.  See, id. at 62 (Testimony of David Vecchia), lines 6-8.

F4)    While at Brennan's, whenever a chair would open up near

Barbara Murphy, Vecchia would from time to time try to get closer to her by

sitting in that chair.  Id. at 27, lines 1-3.  Occasionally, just as Barbara Murphy

was leaving Brennan's, Vecchia would walk out of Brennan's and stand in

front of her car so she couldn't drive forward or backward.  Id. at 27, lines 8-

11.

F5)    Vecchia would also try to buy Barbara Murphy drinks at

Brennan's.  Id. at 25, lines 14-15. See Vecchia Response to Request for

Admissions, ¶12.  Vecchia one night paid Barbara Murphy's food tab without

her knowing while she was having dinner at Brennan's with a girl friend. See Transcript of Vecchia Termination Proceeding at 25, lines 16-19. Murphy did not feel comfortable that Vecchia paid her food tab at Brennan's and felt such behavior was inappropriate. Id. at 25, lines 19-21. Murphy thanked Vecchia for paying her food tab that night, but made it very clear to him that he should not do that again. Id. at 25, lines 24-25, and at 26, line 1. She told the bartender that she would not accept him paying for her food tab or any tab for her again in the future. Id. at 26, lines 1-4.

F6)     Vecchia's contact with Barbara Murphy continued to become more aggressive over time during this same period. Id. at 26, lines 15-17. Vecchia, on one occasion, yelled out Barbara Murphy's name several times in a loud voice "Murphy, Murphy, Murphy, Barbara Murphy". Id. at 26, lines 17-20. Id., at 62 (Testimony of David Vecchia), lines 18-21. Such behavior was strange and bizarre to the point that she would have to go and tell him to please stop such behavior, and that he was embarrassing her. Id. at 26, lines 21-23.

F7)     Barbara Murphy and her friends had been going to Brennan's for years. However, Barbara Murphy, due to Vecchia's behavior, was now

16

reluctant to go there again. Id. at 27, lines 20-23. Barbara Murphy began

leaving Brennan's when she saw Vecchia in there. Id. at 28, lines 6-7.

      F8)    Barbara Murphy began receiving phone calls late at night at her

home, during which someone would call and hang up. Id. at 28, lines 9-13.

      F9)    At this point, Barbara Murphy became 'freaked out' from

Vecchia's behavior towards her. Id. at 28, lines 17-18.


      7.    On March 20, 1998, Mr. Vecchia, after drinking at the same bar as Ms.

Murphy, broke into her car after midnight, parked at her home in Norwalk, CT. Plaintiff's

Complaint, p. 7, ¶ 31; p. 6, ¶ 29; Plaintiff's Depo, p. 19, line 21-24; EX. A, Arrest

warrant affidavit ("AWA"), p. 4, 1st paragraph.

      G.    Plaintiff disputes paragraph 7 because it cites the wrong paragraph of the

Arrest Warrant Application and is grossly incomplete as to the factual occurrences in

question and the City's knowledge of the extent of Vecchia's stalking and its impact on

Murphy. In fact, the City has conceded at least the following:

      G1)    On March 20, 1998, Barbara Murphy was at Brennan's in

anticipation of her fortieth birthday, which was going to take place five days

later. See Transcript of Vecchia Termination Proceeding at 28, lines 18-22.

Vecchia was also at Brennan's on March 20, 1998. Upon his arrival, he saw, and continually stared at, Barbara Murphy. Id. at 28, lines 23-25. Id. at 67 (Testimony of David Vecchia), lines 18-21. On March 20, 1998, Barbara Murphy left Brennan's without Vecchia. Id. at 67 (Testimony of David Vecchia), lines 23-24. Upon seeing Vecchia's behavior towards her at Brennan's on March 20, 1998, Barbara Murphy asked a friend to walk with her out to her car. She drove her friend home, and returned to her home for the night. Id. at 29, lines 1-5.

G2)     On that same evening of March 20, 1998, Barbara Murphy's mother (who was living with her) woke Murphy during the night to tell her that she believed someone was in their driveway. Id. at 29, lines 10-14. The next morning, Saturday March 21, 1998, Murphy discovered that a briefcase she left in her car was gone. Id. at 30, lines 2-5.

G3)     No one else in Murphy's life was, at this time, causing her any kind of stress or bothering her or paying any unusual attention to her. Id. at 30, lines 18-22. Barbara Murphy, who worked as a payroll clerk and administrative assistant for the City, was very reluctant to voice her suspicions that Vecchia took her briefcase out of her car. Id. at 30, line 25, and at 31, lines 1-3.

18

G4)    Vecchia broke into Barbara Murphy's car in March of 1998. <u>See</u> <u>id.</u> at 65 (Testimony of David Vecchia), lines 19-21. In March of 1998, Vecchia went to Barbara Murphy's car, broke into her car, and took from her car a briefcase and other items. <u>Id.</u> at 66 (Testimony of David Vecchia), lines 14-16. and at 65 (Testimony of David Vecchia), lines 19-21.

G5)    In March of 1998, Vecchia went to Barbara Murphy's home, broke into her car, and took from her car a briefcase and other items. <u>Id.</u> at 66 (Testimony of David Vecchia), lines 14-16.

G6)    Vecchia "admits to criminal trespass in entering car at Murphy's home". and "admits to taking things from Murphy's car". <u>See</u> Vecchia Response to Request for Admissions, ¶38d and f, respectively.

G7)    At this time, Barbara Murphy said to Brown that she wanted to make it clear that she didn't want Vecchia in the firehouse; then at some point around this time, Brown found out about Vecchia's break in of Murphy's car; at this time Murphy was getting very upset about it. Brown Dep. P. 7, lines 21-25. When Murphy was telling Brown about the problem with Vecchia's car break in, she also told him this all probably started when she went to lunch with him. Brown Dep. P. 12, lines 19-25.

G8)    At the time he found out about the car break in, Murphy was getting very upset about it.  Therefore, Brown called human resources to tell them there was a potential problem, and that Vecchia can't have contact with Murphy.  Brown Dep. P. 7, lines 24-p. 8, lines 1-5.

G9)    During this contact to human resources, the situation with Vecchia was becoming, he felt, 'somewhat serious'.  Barbara Murphy had come in very upset, looking scared and she was breaking down, crying. Brown had no experience dealing with something like this; therefore he called human resources for some direction in dealing with and handling this situation. He wanted them to know that there was a problem outside the dept that was affecting the operations within the department.  Brown Dep. P. 8, lines 12-24.

G10)   Brown was looking for help, because he wasn't used to dealing with people experiencing an emotional breakdown in the office. Brown Dep P. 15, lines 10-13.

G11)   Soon after the car break-in on March 20, 1998, Brown spoke once to Bill Stover and, later, once to Fred Manfredonia.  Brown Dep P. 8, lines 7-9.   Those conversations took place after the car break in.  Id.  He spoke to Bill Stover first, who then had Fred Manfredonia get in touch with Brown.  Id., p. 13, lines 18-22.

G12)   Brown told Stover that something outside, i.e., Vecchia, was affecting inside the dept, i.e., Barbara in her job as administrative assistant to the fire chief. Id., p. 9, lines 18-25.  Brown told Stover that they need to limit Vecchia's contact with Barbara Murphy to zero, including phone calls. Id., p. 19, lines 2-5.

G13)   Fred Manfredonia said to Brown:  that he was going to look into it and handle it.  Brown told Fred Manfredonia that Vecchia needs to be told that he can't come near the firehouse or call there.  These were some of the things human resources said they'd take care of. Id., p. 14, lines 7-20.  Brown reiterated to Fred Manfredonia what he had talked to Bill Stover about, that we have to make sure there's some kind of barrier between Barbara Murphy and Vecchia, and something needs to be done so there's no interface between Vecchia and Barbara Murphy. Id., p. 15, lines 19-25.

G14)   This conversation took "not long after" car break in. Id., p. 14, lines 25 through p. 15, line 2.  Brown may have had more than one phone call conversation with Manfredonia. Id., p. 28, lines 3-4.

G15)   The next time Brown heard anything from human resources about it was when Cassone was involved in September 1998. Id., p. 16, lines 3-6.

G16)  Brown never received anything back in writing or a phone call from Fred Manfredonia, that Fred Manfredonia had spoken to Vecchia and told him don't go near the firehouse because we have a policy to have people called in.  Id., p. 17, lines    Brown only ASSUMED that Fred Manfredonia did this.  Id., p. 17, lines 8-12.

G17)  Manfredonia and Stover did not come to talk to Brown about what was going on.  The only contact he had with them were the total of two phone calls he had with them (detailed above), and then later on they made clear 'in passing' that things were bring handled the best they could.  Id., p. 22, lines 20 through p. 23, line 1.

G18)  Brown doesn't recall ever being asked for, by human resources, or giving to human resources, an official statement.  Id., p. 28, lines 1-2.


8.     Ms. Murphy called Mr. Vecchia at his home to demand the return of items that he took from her car, and after he returned her briefcase, but not some of the items he took, she called her private attorney Mr. Ben Fraser for assistance.  Plaintiff's Complaint, p. 7, ¶¶ 32-34;  Plaintiff's Depo, p. 20, line 21 thru p. 23, line 20;  EX. A, AWA, p. 4, 2nd paragraph.

H.     Plaintiff disputes the assertions in paragraph 8 as they are not chronologically accurate or complete in the description of the material facts. Material facts in dispute include the following:

H1)     On March 21, 1998, Barbara Murphy went to her car to find her briefcase gone so she thought she was robbed. She had been to Brennan's the night before where she had seen Vecchia. She called Brennan's to see if they would check the garbage bin and the parking areas. Barbara Murphy asked the fellow she had asked to walk her out of Brennan's because she was afraid of Vecchia if he had seen the briefcase. Murphy Aff. Para. 13-15.

H2)     At that point it occurred to Murphy that Vecchia was at Brennan's and she recalled her mother heard someone in the driveway that evening. She called Ben Fraser, an attorney for advice because she was scared and in disbelief. See Murphy Aff. Para. 17.

H3)     He suggested Murphy call Vecchia and ask for the items back. She hesitated, crying and said "what if it wasn't him. I could be fired for calling him and accusing him, he's a boss." She called Vecchia's residence again and left a message stating would he please return her briefcase, leave it at the Fire Department before 4:30 pm. At 10:15ish pm Vecchia called and said he did what Murphy requested and that he was sorry. Murphy said "Now leave

me alone" and hung up.  Murphy Aff. Para. 15-23.  See, Transcript of Vecchia Termination Proceeding at 32, lines 6-12, 19-20, 22-24.

H4)    Barbara Murphy could barely speak or walk.  That next morning she went to the central firehouse to retrieve her briefcase, realizing that Vecchia has surely been stalking her.  See id. at 33, lines 21-25, and at 34, line 1.  Based on what Barbara Murphy found in her briefcase when she retrieved it from the firehouse, she realized Vecchia had gone through her entire car.  Id. at 34, lines 21-23.

H5)  On Sunday afternoon March 22, 1998, Barbara Murphy met with and told her family lawyer Ben Frasier ("Frasier") what happened, and what items were taken from her, returned to her and still missing from her briefcase.  Id. at 35, lines 5-10. After Attorney Fraser calls Vecchia, Vecchia brings a brown envelope to the Fire Department the next day and it has more things in it that are destroyed and some items are still missing.  Fraser calls him and Vecchia goes to Fraser's office with more items, a letter of apology and $100 in cash and is begging Ben not to get him in trouble and he is sorry he is sick etc.  Murphy Aff. Para. 24.

H6)    At this point, Barbara Murphy had an emotional breakdown.  See Transcript of Vecchia Termination Proceeding at 32, lines 24-25, and at 33, line 1.

H7)    On the morning of next day, March 21, 1998, Vecchia returned home from work at 2:30pm.  Upon returning home, Vecchia's wife told him she found a message on the answering machine that a woman named Barbara Murphy had called and wanted to know if Vecchia had her briefcase.  See id. at 73 (Testimony of David Vecchia), lines 18-23.  See also Vecchia Response to Request for Admissions, ¶39.

H8)    Later that night, at about 10:30 pm, Vecchia called Murphy.  See Vecchia Response to Request for Admissions, ¶40a.

H9)    During that telephone call, Vecchia told Barbara Murphy that he had taken her briefcase, that he was sorry and that he didn't know why he had done it.  See Transcript of David Vecchia Termination Proceeding at 75 (Testimony of David Vecchia), lines 17-19.

H10)   He also told her that he had done what she asked and brought her briefcase, as Murphy requested in her telephone message, to the Fire Station, told her that he was sorry, stated that he did not know why he had

broken into Murphy's car and that he was sorry for causing so much trouble in her life.  See Vecchia Response to Request for Admissions, ¶40b, c and d.

9.    Attorney Fraser had meetings with Mr. Vecchia and, using a speakerphone, with Mr. Vecchia's sister, an attorney who assisted her brother. Plaintiff's Complaint, p. 8, ¶¶ 36&37; Plaintiff's Depo, p. 24, line 18 thru p. 25, line 19; EX. A, AWA, p. 5, 2nd and 3rd paragraphs.

I.    Undisputed.

10.   Mr. Vecchia admitted to Ms. Murphy in a handwritten note that he broke into her, took her briefcase and damaged some items for which he paid $100.  Plaintiff's Complaint, p. 8, ¶ 36; Plaintiff's Depo, p. 24, line 23 thru p. 25, line 4; EX. A, AWA, p. 5. 1st paragraph.

J.    Plaintiff disputes the assertions in paragraph 10 as they are incomplete and inaccurate.  In fact, the City and Vecchia have admitted at least the following:

J1)  Vecchia went to see Attorney Frasier.  During that meeting, Vecchia gave Attorney Frasier a letter written by Vecchia in which Vecchia, among other things, apologized for his behavior, stated that he does not know way he did what he did, described himself as having personal problems and

26