stated that his life is in Barbara Murphy's hands. <u>See</u> Transcript of Vecchia Termination Proceeding at 36, lines 7-13.

J2)    At that time, Vecchia also delivered to Attorney Frasier a check for $100. He told Attorney Frasier that he could not recover all of the items he took from Barbara Murphy's car because he threw some of her possessions in trash bins on his way home from her Norwalk home. <u>Id.</u> at 36, lines 14-20.

J3)    Subsequent to Vecchia's break in to Murphy's car, he received a call from Ben Frasier, Esq., Barbara Murphy's attorney, in which Attorney Frasier demanded that Vecchia return the remainder of Murphy's belongings he had taken during his break-in of Murphy's car. <u>See</u> Vecchia Response to Request for Admissions, ¶42.

J4)    Subsequent to Vecchia's break in to Murphy's car, Vecchia spoke with and agreed to meet Ben Frasier, Esq., Barbara Murphy's attorney, and return the items he had taken. <u>See</u> Answer of David Vecchia herein ("Vecchia Answer"), ¶35. <u>See also</u> Vecchia Response to Request for Admissions, ¶43.

J5)    During Vecchia's meeting with Attorney Frasier, Vecchia's sister, an attorney, participated via telephone. <u>See</u> Vecchia Answer, ¶36.

27

J6)    Vecchia arrived at Attorney Frasier's office and returned some broken computer disks that had contained an extensive database that she was creating for a local attorney, and gave Attorney Frasier one hundred dollars. <u>See</u> Vecchia Response to Request for Admissions, ¶44a.

J7)    During that meeting, Vecchia said that the items he had brought with him and returned during that meeting were all that he could find, and that he had thrown out most of the things he had taken from her car. <u>See</u> Vecchia Response to Request for Admissions, at ¶44b and c.

J8)    During that meeting, Vecchia produced to Attorney Frasier a letter he wrote to Murphy apologizing for his conduct (with respect to the break-in of her car). <u>See</u> Vecchia Answer, ¶36. <u>See also</u> Vecchia Response to Request for Admissions, ¶44d.

J9)    In that letter Vecchia states as follows: "Barbara, this is all I have, it was thrown in the trash at my house and in my panic I forgot it. Anything else missing was thrown out elsewhere and I cannot recover. Please use enclosed money to purchase any items you are missing. If more is needed, I will reimburse you. I do not know why I did this, and regret the pain that is has brought your family. My life is in your hands. Please give me time, a chance to solve my problems and redeem my life. David". <u>See</u> Transcript of

28

Vecchia Termination Proceeding at 85 (Testimony of David Vecchia), lines 17-25, and at 86, lines 1-3.

J10)   The document attached as Exhibit 2 to Plaintiff's Request for Admissions is a copy of that letter that Vecchia wrote, apologizing for his conduct.  The information contained in that Exhibit 2 is true and authentic. See, Vecchia Response to Request for Admissions, ¶44e, f and g.

J11)   Vecchia understood that during his meeting with Attorney Frasier, Attorney Frasier was requesting that Vecchia have no contact whatsoever with Barbara Murphy.  See, Transcript of Vecchia Termination Proceeding at 82 (Testimony of David Vecchia), lines 3, 21-25.

J12)   Vecchia understood that during his meeting with Attorney Frasier, he "was told by Attorney Frasier that I shouldn't have any contact with her [Barbara Murphy]".  See Vecchia Dep., p. 13, lines 8-10.

J13)   Vecchia agreed, as requested by Attorney Frasier, that he would not have any contact whatsoever with Barbara Murphy and that he would not speak to her.  See, Transcript of Vecchia Termination Proceeding at 83 (Testimony of David Vecchia), lines 1-2, and at 87, lines 14-17.  See also Vecchia Dep., p. 74, lines 11-15.

J14)    During the meeting in Attorney Frasier's office, Vecchia also

agreed that he would seek immediate counseling.  See, Transcript of Vecchia

Termination Proceeding at 87 (Testimony of David Vecchia), lines 4-6.  See

also, Vecchia Response to Request for Admissions, ¶44k

J15)    Vecchia was concerned he was going to be reported to the City

or the police, because on Saturday he had left at the fire department the items

he had taken from Barbara Murphy's car with letter he wrote stating he was

sorry for what he had done.  See, Transcript of Vecchia Termination

Proceeding at 83 (Testimony of David Vecchia), lines 17-20.


11.    Mr. Vecchia, in his handwritten apology note, begged Ms. Murphy not to

call the police or tell Stamford officials since he did not want to lose his job or be

arrested.  Plaintiff's Complaint, p. 8, ¶¶ 36&37;  Plaintiff's Depo, p. 25, lines 16 thru

19.

K.    Undisputed that Vecchia in his handwritten apology note asked Murphy

not to report him to the City. The remainder of paragraph 11 is disputed.

K1) The portion of paragraph 11 stating "since he did not want to lose

his job or be arrested" is not supported by the documents cited therein.  The

cited documents say that Vecchia did not want Barbara Murphy to report

Vecchia "to the city".  Complaint, ¶37; Murphy Dep., p. 25, l 17-18.


12.    Ms. Murphy and her attorney agreed not to report Mr. Vecchia's

conduct to Stamford officials or the police if Mr. Vecchia left Ms. Murphy alone and

got counseling. Vecchia dep p. 62, lines 14-25. Plaintiff's Complaint, p. 8, ¶ 37.

L.    Undisputed that Murphy and her attorney agreed not to report Vecchia

to the City provided Vecchia honored the agreement he made with them.  The

remainder of paragraph 12 is disputed.

L1)    The documents cited in the City's paragraph 12 state that

Murphy agreed not to report Vecchia "to the city"; they do not state she agreed

not to report Vecchia to "Stamford officials or the police".

L2)    In April of 1998, Attorney Frasier tried to help his client Barbara

Murphy by negotiating an agreement with Vecchia through Vecchia's sister, an

attorney who was acting as Vecchia's counsel at that time.  <u>See</u>, Transcript of

Vecchia Termination Proceeding at 37, lines 8-11.

L3)    Pursuant to the terms of that agreement, Vecchia promised and

agreed that he would have no contact whatsoever with Barbara Murphy, that

he would get counseling and submit evidence of his counseling so Barbara Murphy would know he is receiving help. Id. at 37, lines 12-16.

L4)    Under that agreement, Barbara Murphy agreed that as long as Vecchia has no contact with her and leaves her alone, she will not report any of Vecchia's conduct to the City. Id. at 37, lines 17-19.

13.    In June 1998 the City of Stamford adopted an expanded "sexual harassment policy" (updating a previous one dated 1993) which it required everyone to read and sign, and for all supervisors to attend a workshop explaining it. Manfredonia Affidavit, ¶ 4, p.2.

M.    Undisputed that in June 1998 the City issued another 'sexual harassment policy'; that Barbara Murphy was asked to read and sign that policy. Murphy disputes the remainder of paragraph 13. Disputed facts during this period include the following:

M1)    For about two months after entering into the agreement [with Murphy], things were quiet with Vecchia. See, Transcript of Vecchia Termination Proceeding at 37, lines 21-22.

M2)    However, in May of 1998, two months after that agreement was entered into, Vecchia once again resumes the same behavior toward Barbara Murphy.  Id. at 38, lines 1-2.

M3)    At this time, Vecchia starts again to go to Brennan's and sees Barbara Murphy while there.  Barbara Murphy once again begins to receive repeated phone calls at her home on the same night she sees Vecchia at Brennan's.  During those calls, the caller does not speak at all, but instead breathes into the phone before hanging up.  Id. at 38, lines 2-7.

M4)    At this time Barbara Murphy was well known to her friends as being an avid runner.   She would run with friends during the day and after work, and often ran on a route in Shippan, a section of Stamford.  Id. at 38, lines 8-13. Vecchia starts appearing on Barbara Murphy's jogging route. During these incidents Vecchia doesn't touch her or say anything to her.  Id. at 38, lines 14-16.

M5)    Barbara Murphy, who was an avid road runner at the time, also often entered into road races.  She entered into the High Ridge Road Race in the summer of 1998, which was sponsored by the wife of the Mayor of Stamford.  Id. at 38, lines 17-21.  See also, id. at 92 (Testimony of David

Vecchia), lines 23-25, and at 93 (Testimony of David Vecchia), at line 1.  The City posted notices around the City inviting employees to run in that race.  Id.

M6)    While Barbara Murphy was running in the High Ridge Road Race in the summer of 1998, Vecchia appeared and ran right next to her, just a few feet from her.  Barbara Murphy cannot take this anymore.  She stops, runs away, and cannot continue in the race.  Id. at 38  lines 21-25.

M7)    Barbara Murphy still didn't want to hurt Vecchia but felt she just could not stop his harassment of her.  Id. at 38, line 25, and at 39, lines 1-2.

M8)    Barbara Murphy called her attorney Ben Frasier.  Id. at 39, line 13.  Barbara Murphy tells Attorney Frasier at this time that Vecchia is bothering her again, that she cannot sleep, is getting sick and having stomach problems, and that she, her mother and her son are sleeping in the same room.  Id. at 39, lines 16-20.

M9)    Vecchia at this time knew where Murphy lives, and is now paying attention to and having contact with her again, despite the promises he made in the agreement (described above) he entered into with Barbara Murphy.  Id. at 39, lines 21-23.

M10)  After Vecchia's meeting with Attorney Frasier, Vecchia saw Barbara Murphy.  See, id. at 89 (Testimony of David Vecchia), lines 19-24.

34

M11)   In April of 1998, Vecchia obtained a copy of an internet article titled "Stopping the Stalker".  See Vecchia Response to Request for Admissions, ¶34 (states he did so "at the recommendation of legal counsel").

M12)   In July of 1998, Vecchia saw Murphy again at Brennan's. Vecchia approached Murphy and tried to talk to her.  Murphy "waved him off", not wanting to talk to him.  See Vecchia Deposition, p. 58, lines 15-25.

M13)   In the summer of 1998, Vecchia ran in the High Ridge Road race sponsored by the City.  See, Transcript of Vecchia Termination Proceeding at 92 (Testimony of David Vecchia), lines 17-25.


14.     In September, 1998, Ms. Murphy told her private attorney, Ben Fraser, that Mr. Vecchia violated his agreement to leave her alone and was annoying her at bars, calling her from payphones, etc.  Plaintiff's Complaint, p. 8, ¶ 37; Plaintiff's Depo, p. 25, line 25 thru p. 26, line 8; EX. A, AWA, p. 5, 3rd and 4th paragraphs.

N.     Undisputed that Murphy discussed with Ben Frasier Vecchia's violation of the agreement he made with Murphy and Frasier.  Murphy disputes the remainder of paragraph 14.  Complaint, p. 8, ¶ 37 does not support the statement contained in paragraph 14.   Moreover, the excerpts of Murphy's Deposition and "AWA" cited in

paragraph 14 do not say <u>when</u> Murphy told Frasier that Vecchia violated the agreement. – i.e., they do not say this occurred in September 1998.

15.    Mr. Fraser spoke to the City's Legal Director, Tom Cassone, who set up a meeting with Human Resources. Plaintiff's Complaint, pp. 8&9, ¶¶ 38&39; Plaintiff's Depo, p. 25, line 20; p. 31, lines 1-21.

O.    Undisputed that Frasier spoke with Cassone.  Plaintiff disputes the remainder of paragraph 15.  The documents cited in paragraph 15 do not say Cassone set up a meeting.

16.    On September 21, 1998, Ms. Murphy and Ben Fraser, her private attorney, met with Personnel (Bill Stover, Assistant Director, and Fred Manfredonia) to explain what Mr. Vecchia had been doing.  Plaintiff's Complaint, p. 9, ¶ 39; Plaintiff's Depo, p. 31, line 1 thru p. 32, line 13;  Stover Depo, p. 6, lines 3-18; (4) EX. A, AWA, p. 5, last paragraph.

P.    Undisputed that Murphy and Frasier met with Stover and Manfredonia on September 21, 1998 to tell them that what Vecchia had done violated their own harassment policy.  Dispute the remainder of paragraph 16 as it does not accurately

36

reflect either the underlying documents or the occurrences of the day as admitted by the City.

       P1)    The quoted excerpt from Murphy's deposition also states that she went to the meeting to tell them that what Vecchia had done violated their own harassment policy.

       P2)    The quoted paragraph from the "AWA" also states that she filed a formal complaint at that meeting.

       P3)    The quoted ¶39 of the Complaint states that she had that meeting with them "to inform the City of Vecchia's violations of the City's sexual harassment policy and to file an official complaint against Vecchia with the City".

       P4)    In September of 1998, Barbara Murphy filed a complaint with William Stover ("Stover")'s office regarding Vecchia's conduct toward her. See, Transcript of Vecchia Termination Proceeding at 140 (Testimony of William Stover), lines 22-25.

       P5)    The complaint that Barbara Murphy filed with Stover's office in September of 1998 was substantially the same in sum and substance as the opening statement made by the City on October 21, 2002 [Day 2] of the hearing before the Board of Mediation and Arbitration, In the Matter of City of

Stamford and AFSCME Co. 4, Local 2657 (David Vecchia Termination) (No. 2002-A-0842) (Dee, Arb.).  Id. at 141, lines 1-4.

P6)    On September 21, 1998, Attorney Frasier and Barbara Murphy met with Stover and Fred Manfredonia ("Manfredonia") to explain to them what happened.  Id. at 40 (Opening Statement of the City), lines 9-14.  See also, id. at 142 (Testimony of William Stover), lines 20-25, and at 143, lines 1-7.

P7)    During that meeting in September of 1998, Attorney Frasier and Barbara Murphy explained to Stover and Manfredonia all of what happened with respect to Vecchia, dating all the way back to the beginning,  id. at 40 (Opening Statement of the City), lines 14-16, and described how Vecchia had stalked, harassed and followed her, went to bars and city events where she frequented and broke into her car at her home.  Id. at 142 (Testimony of William Stover), lines 20-25 and at 143, lines 1-7.

P8)    Barbara Murphy told Stover and Manfredonia during that meeting that she needs help, that she's a nervous wreck and that Vecchia conduct toward her was making her sick.  Id. at 40 (Opening Statement of the City), lines 18-20.

P9)    She asked Stover and Manfredonia during that meeting to please make this behavior by Vecchia stop.  Id. at 41, line 1.

17.    On September 25, 1998 Personnel met with Mr. Vecchia, who admitted the March 1988 break-in of Ms. Murphy's car that he agreed to leave her alone. Plaintiff's Complaint, p. 9, ¶ 41; Transcript of deposition herein of William Stover, August 28, 2003 ("Stover Dep."), p. 19, line 5-7.

Q.    Undisputed that Vecchia met with City officials on September 25, 1998, and that according to what Stover and Manfredonia told Murphy, during that meeting Vecchia admitted to his prior conduct toward Murphy both in and outside of work, and his prior agreement to get help and stop his unwanted harassment and stalking of Murphy.  The remainder is disputed as it does not coincide with the cited documents or City's prior admissions.

Q1)    During that September 25, 1998 meeting, Vecchia admitted that he had broken into Barbara Murphy's car, and took some of her belongings during that theft.  See Transcript of Vecchia Termination Proceeding at 41 (Opening Statement of the City), lines 9-11.

Q2)    Vecchia also admitted during that meeting that he had engaged in the behavior that was described in Barbara Murphy's complaint to the City. Id. at 143 (Testimony of William Stover), lines 14-15.

39

Q3)    The complaint states that on information and belief, Vecchia during this meeting admitted to his prior conduct toward Murphy <u>both in and outside of work</u> and his prior agreement to <u>get psychological help</u> and to cease and desist from his unwanted behavior toward Murphy.

Q4)    Vecchia attended a meeting in September of 1998 with William Stover ("Stover") and Fred Manfredonia ("Manfredonia").  During that meeting, Stover and Manfredonia told Vecchia that Barbara Murphy complained about Vecchia and told them that he was bothering her.  <u>See</u>, Transcript of Vecchia Termination Proceeding, <u>supra</u>, at 95 (Testimony of David Vecchia), lines 4-20.  <u>See</u> <u>also</u>, Vecchia Answer, ¶41, and Vecchia Dep., p. 59, lines 14-15.

Q5)    It was Vecchia's understanding that Barbara Murphy, through the complaint she made with the personnel department in 1998 that Murphy had asked through the personnel department that Vecchia have <u>no</u> further contact with her.  <u>See</u> Vecchia Dep., p. 10, lines 12-16, 25 and p. 11, lines 1, 5-11.  After 1998, Murphy continued to ask that Vecchia have no further contact with her, for example, by filing the criminal complaint against Vecchia.  <u>See</u> Vecchia Dep., p. 11, lines 7-11.

Q6)    During his meeting with Stover and Manfredonia in September 1998, Vecchia admitted that he had broken into Barbara Murphy's car, and

stolen her briefcase from that car, in March of 1998. See, Transcript of

Vecchia Termination Proceeding at 96 (Testimony of David Vecchia), lines 1-

5, and Vecchia Response to Request for Admissions, ¶50.

Q7)    During that meeting, Vecchia admitted that he had committed

"prior unwanted behavior towards Barbara Murphy". See Vecchia Dep., p. 15,

lines 23-25, and p. 16, line 1.

Q8)    During that meeting, Stover and Manfredonia also told Vecchia

that they were investigating the complaint Barbara Murphy made against

Vecchia, that they had not made any decision on that complaint, and that they

would get back to Vecchia. See, Transcript of Vecchia Termination

Proceeding at 96 (Testimony of David Vecchia), lines 18-22.

Q9)    During that meeting, Stover and Manfredonia also told Vecchia

that they were investigating the complaint Barbara Murphy made against

Vecchia, that they had not made any decision on that complaint, and that they

would get back to Vecchia. See, Transcript of Vecchia Termination

Proceeding at 96 (Testimony of David Vecchia), lines 18-22.


18.    On September 30, 1998 there was a second meeting with Ms. Murphy

and her attorney, and they agreed with the following resolution - Mr. Vecchia would

leave Ms. Murphy alone, not stalk or harass her, seek counseling, and keep the City informed that he was getting counseling.  Plaintiff's Complaint, p. 9, ¶ 42; Stover Depo, p. 29, line 19 thru p. 30, line 4; p. 71, line 16.

R.    Paragraph 18 is disputed.

R1)    Murphy and Ben Frasier met with City representatives on September 30, 1998.  Complaint, ¶42.

R2)    Does not fully and accurately state what the 'agreement' was during the September 30th meeting:   the Complaint ¶¶42 and 43:  it was agreed that the City would (1) draft a written agreement stating that Vecchia would get therapy, provide periodic reports to the City and through the City to Atty Frasier, and that he would leave BM alone,   (2) that upon the agreement's drafting the City would solicit input from BM and Frasier; and (3) that the written agreement would be promptly reduced to writing and signed by Vecchia and copied to Murphy. See also, Murphy Dep. P. 33, lines 1-12.

R3)    After Manfredonia and Stover met with Vecchia they reported to Fraser and Murphy  that Vecchia was in love with Murphy and had admitted to the car break in, the late night phone calls, sending her things at the office, going to the fire house to see her, leaving things on her car, following her, shouting at her in the bar, trying to  buy her drinks and food, trying to stop her

from leaving places, running at places she had been, taking her personal

things as well as other incidents she had reported to them. Murphy Aff. Para.

28.

R4)     They said Vecchia had confessed that he wanted to date

Murphy and that he was stupid.  They said he appeared angry with himself for

being so stupid.  Mr. Manfredonia even went as far as to say, "You have that

effect on men".  Murphy Aff. Para. 28.

R5)     They asked Murphy what relief she wanted. She said she didn't

care as long as he left her alone, went  away and she never saw him again.

They suggested the same type of arrangement that she attempted to get from

Mr. Vecchia previously.   They said he would be terminated if he didn't stick to

the agreement.  Murphy said "I never wanted to hurt anyone or have anyone

fired but he left me no choice_____ if they got the agreement I would be okay

with that." Murphy Aff. Para. 29.

R6)     Stover and Manfredonia  stated that they would get draft an

agreement that Vecchia would sign.  Stover Dep. P 28, lines 19-20.   The

agreement would include that Vecchia would get therapy, leave Murphy alone,

in and out of the workplace, provide reports of therapy and if he broke the

agreement he would be fired.  Murphy Aff. Para. 29.  Stover agreed to Ben

Frasier's request to get authorization for access to doctor's reports and evaluations.  Stover Dep. P. 29, lines 1-8.  They did not get a written waiver from Vecchia allowing the City to get Vecchia's doctor's notes. Stover Dep. P. 32, lines 9-13.  Not that he recalls.  Id.

  R7)  This agreement was to be reviewed by Murphy and Ben Fraser and then signed by Vecchia.  A copy was to go to Ben Fraser. Ben called the human resources dept a few times but never got any response.  Murphy was exhausted and depressed by the whole situation.  After a while of no response by the City Murphy stopped calling Ben Fraser and bothering him because the City was not going to get us the agreement.  Murphy Aff. Para. 30.

19. In September 1998, Mr. Vecchia's wife started a lawsuit for dissolution of marriage, partially because of Mr. Vecchia's actions towards Ms. Murphy.  Vecchia depo p. 56, line 12-20; p. 62, line 23

S. Undisputed that in September 1998 Vecchia's wife filed for dissolution of marriage.  Plaintiff disputes the remainder of paragraph 19 because Vecchia's deposition does not say what City asserts  , Vecchia Dep p. 56:  when asked whether Murphy's call to Vecchia about items stolen from her car, had something to do with Mrs. Vecchia filing for divorce, Vecchia responds "I guess".

44

20.     On October 15, 1998, Bill Stover and Fred Manfredonia met with Mr.
Vecchia and told him that he must not harass or annoy Ms. Murphy; that if he met her
by chance, he would have to turn around and leave; that he would have to get
counseling and keep the city informed of his counseling; that his supervisor would be
told of this agreement; that his file would be kept "open" and if he violated this "clear
directive" he would be disciplined, up to and including termination. Stover dep 30;
Manfredonia aff ¶ 11-13; Vecchia dep pgs. 19, 20 and 63. Stover Depo, p. 27, line 3; p.
29, line 11-13, 19 thru p. 30, line 14; p. 31, line 18.

T.     Undisputed that in October of 1998, the City entered into an agreement
with Vecchia that was never put into writing.  See Transcript of Vecchia Termination
Proceeding at 79 (Testimony of David Vecchia), lines 21-25.  Plaintiff disputes the
remainder of paragraph 20.

T1)     Manfredonia and Stover contacted Vecchia in September of
1998 after their meeting with him.  During this contact, they asked Vecchia
more questions and instructed Vecchia not to have any contact with Barbara
Murphy in the workplace.  See Transcript of Vecchia Termination Proceeding
at 96 (Testimony of David Vecchia), lines 4-7.

45

T2) Vecchia agreed at this time to cease contact with Murphy at work. <u>See</u> Vecchia Response to Request for Admissions, ¶51.

T3)    During that follow up contact with Vecchia in September of 1998, Vecchia told them he was a Vietnam war veteran and they had some nerve telling him what to do outside of the workplace.  <u>See</u> Transcript of Vecchia Termination Proceeding at 98 (Testimony of David Vecchia), lines 8-10.

T4)    Stover and Manfredonia did not instruct Vecchia to have no further contact with Barbara Murphy outside of the workplace.  <u>See</u> Transcript of Vecchia Termination Proceeding at 99 (Testimony of David Vecchia), lines 22-25.

T5)    Stover and Manfredonia did not tell Vecchia that Barbara Murphy had requested the right to ensure that Vecchia was receiving counseling and was providing reports as necessary regarding such counseling.  <u>See</u> Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 12-16.

T6)    Stover and Manfredonia suggested to Vecchia that he use a program sponsored by the City that provides its employees with funds for services such as counseling.  <u>See</u> Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 17-20.

46

T7)     Vecchia told Manfredonia and Stover during that meeting that he would use that program to obtain counseling.  <u>See</u> Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 21-23.

T8)     During that meeting, Vecchia agreed to go to counseling because he wanted his job.  <u>See</u> Transcript of Vecchia Termination Proceeding at 100 (Testimony of David Vecchia), lines 23-25.

T9)     The City never followed up with Vecchia regarding Vecchia's progress in therapy.  <u>See</u> Vecchia Response to Request for Admissions, ¶55. Stover testified that he had no knowledge about any efforts taken to verify that Vecchia was seeking psychological treatment. Stover Dep.  P. 32, lines 25 through p. 33, lines 1-2.  Stover admits he did not follow up on that, someone else like Manfredonia may have, there were two people in their office.  Stover Dep P. 33, lines 10-13. and p. 74, lines 16-20.

T10)   The City never received any progress reports from Vecchia.  <u>See</u> Vecchia Response to Request for Admissions, ¶57.

T11)   Manfredonia and Stover did not ever tell Vecchia that he must go to counseling in order to keep his job with the City.  <u>See</u> Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 1-2.

T12)    Manfredonia and Stover told Vecchia that they would get back to Vecchia with a written agreement for him.  <u>See</u> Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 7-8.

T13)    The City never drafted a written agreement for Vecchia to sign. <u>See</u> Vecchia Response to Request for Admissions, ¶53.

T14)    It was Vecchia's understanding that the "written agreement" that Manfredonia and Stover referred to would require that Vecchia have no contact with Barbara Murphy in the workplace.  <u>See</u> Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 11-14.

T15)    Manfredonia and Stover told Vecchia if circumstances at work require that he interact with Barbara Murphy at work, that he deal with Barbara Murphy in a businesslike manner.  <u>See</u> Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 23-25.

T16)    The City placed no restrictions on Vecchia's dealings with Barbara Murphy outside of work.  The City only told Vecchia that he should limit his dealings with Barbara Murphy in the workplace.  <u>See</u> Transcript of Vecchia Termination Proceeding at 102 (Testimony of David Vecchia), lines 3-9.

48

T17)   Vecchia went back to meet with Stover in the end of October 1998.  Vecchia asked Stover about the written agreement Stover and Manfredonia had mentioned to Vecchia during their September 1998 meeting. Stover told Vecchia that as far as he was concerned, the City was not involved in Barbara Murphy's complaint and that her complaint ended in March of 1998. See Transcript of Vecchia Termination Proceeding at 105 (Testimony of David Vecchia), lines 2-8.

T18)   The City did not tell Vecchia that any future inappropriate interactions or contact with Barbara Murphy would result in Vecchia's dismissal.  See Transcript of Vecchia Termination Proceeding at 106 (Testimony of David Vecchia), lines 5-8.


21.     Mr. Vecchia's supervisor, Tom Hamilton, was told of the agreement that Mr. Vecchia was to leave Ms. Murphy alone.  Hamilton depo. Pgs. 33-34; Manfredonia aff. ¶ 11.

U.  Undisputed.

22.    Mr. Vecchia went to a counselor for several months and stopped. Stover depo pg. 74. Vecchia Depo, p. 19, line 20 thru 22;  p. 20, line 22-25, p. 63, line 8-10; Stover Depo, p.74, line 22 to p. 75, line 8; Strate Depo, p. 49, line 20-21.

V.    Undisputed that Vecchia went to counseling two or three times and stopped.  It is disputed as to whether it was a condition of the purported agreement with the City, whether the City followed up with Vecchia regarding his treatment, whether the City reported any treatment to Ben Fraser or Murphy, and whether Vecchia ever provided any progress reports to the City.

V1)    Mary Vecchia reported to Officer Strate that after the March meeting with Ben Fraser , " That David was to get therapy, but, only attended 2-3 sessions, then felt he wouldn't be arrested, so stopped." Arrest Warrant Application, p. 10, para 21.

V2)    The City never followed up with Vecchia regarding Vecchia's progress in therapy.  See Vecchia Response to Request for Admissions, ¶55.

V3)    The City never received any progress reports from Vecchia.  See Vecchia Response to Request for Admissions, ¶57.

V4)    Manfredonia and Stover did not ever tell Vecchia that he must go to counseling in order to keep his job with the City.  See Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 1-2.

50

23.    Mr. Stover kept an "investigation file" with his handwritten notes of the 9/21 and 9/30/98 meetings with Ms. Murphy and her attorney, and the 9/25/98 and 10/15/98 meetings with Mr. Vecchia. Stover depo p. 32, line 23-24. A true and accurate copy of those notes are attached hereto as Ex. G.

W.    Paragraph 23 is disputed.

W1)    These documents were produced during discovery.  However on October 12, 2000, Officer Strate of the Stamford Police Department requested copies of all investigative files regarding the City's investigation of Murphy's complaints against Vecchia, which William Stover and Fred Manfredonia agreed to provide.  No such file was ever produced. Arrest Warrant Application page 1, paragraph 4.   Therefore, there is no way to know whether these documents were created contemporaneously with the meetings in question, after Officer Strate requested them, or after this matter was instituted.

W2)    Murphy was told by Officer Strate that he went to the Human Resources department to get the file from them for the investigation.   Stover and/or Manfredonia stated that they did not have any such file, that they did not consider the complaint official and that they weren't sure if they even took notes on the issue. Officer Strate came back to Murphy  and asked her if she