was telling the truth about complaining to the City because Stover and/or Manfredonia told Officer Strate that there was no formal complaint and no file. Murphy Aff. Para. 32.

24. Mr. Stover admitted that there was no written agreement with Mr. Vecchia, but Mr. Stover felt that Mr. Vecchia would be hurt by such an agreement and Ms. Murphy did not want to hurt Mr. Vecchia at work, since the agreement would be in his file and a public document. Stover dep 28, line 10-17; p. 36, line 14-25.

X. Undisputed that there was no written agreement. The remainder of paragraph 24 is disputed.

X1) Stover and Manfredonia asked Murphy what relief she wanted. She said she didn't care as long as he left her alone, went away and she never saw him again. They suggested the same type of arrangement that she attempted to get from Vecchia previously. Stover and Manfredonia said Vecchia would be terminated if he didn't stick to the agreement. Murphy said "I never wanted to hurt anyone or have anyone fired but he (Vecchia) left me no choice_____ if they got the agreement I would be okay with that." Murphy Aff. Para. 29.

52

X2) Stover and Manfredonia told Murphy that they would get draft an agreement that Vecchia would sign. The agreement would include that Vecchia would get therapy, leave Murphy alone in and out of the workplace, provide reports of therapy and if he broke the agreement he would be fired. Murphy Aff. Para. 29.

X3) This was to be reviewed by Murphy and Ben Fraser and then signed by Vecchia. A copy was to go to Ben Fraser. Ben called the human resources department repeatedly to get the draft agreement or even the completed agreement, but never got any response. Murphy was exhausted and depressed by the whole situation. After a period of time wherein the City did not respond to Ben Fraser, Murphy stopped calling Ben Fraser and bothering him because it was clear that the City was not going to get the agreement. Murphy Aff. Para. 30.

X4) Manfredonia and Stover told Vecchia that they would get back to Vecchia with a written agreement for him. See Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 7-8.

X5) The City never drafted a written agreement for Vecchia to sign. See Vecchia Response to Request for Admissions, ¶53.

   X6) It was Vecchia's understanding that the "written agreement" that Manfredonia and Stover referred to would require that Vecchia have no contact with Barbara Murphy in the workplace.  <u>See</u> Transcript of Vecchia Termination Proceeding at 101 (Testimony of David Vecchia), lines 11-14.

   X7) Vecchia went back to meet with Stover in the end of October 1998. Vecchia asked Stover about the written agreement Stover and Manfredonia had mentioned to Vecchia during their September 1998 meeting. Stover told Vecchia that as far as he was concerned, the City was not involved in Barbara Murphy's complaint and that her complaint ended in March of 1998. <u>See</u> Transcript of Vecchia Termination Proceeding at 105 (Testimony of David Vecchia), lines 2-8.

   25. Over the next two years, Ms. Murphy did not complain to Mr. Stover, Mr. Manfredonia or Mr. Cassone about Mr. Vecchia.  Stover, depo p. 73, line 3-5. Manfredonia affidavit, p. 4, ¶ 14; Cassone aff ¶ 8.

Y.   Undisputed. Dispute any implication that Vecchia did not stalk Murphy during this period of time or that the City was unaware of Vecchia's behavior or Murphy's suffering.

Y1)   After September of 1998, Vecchia continued to go to Brennan's. During that period, he saw Barbara Murphy there "plenty of times". Vecchia Dep., p. 83, lines 1-15, and p. 96, lines 14-17. He did not cease his pattern of continuing to go to Brennan's regularly. Id.

Y2)   Barbara Murphy was exhausted with the lack of action and felt that it was a futile to speak with the City. She had changed her entire lifestyle to limit her potential exposure to Vecchia, running indoors or with a companion, taking different routes to wherever she went, sticking with her immediate family and going out occasionally with the Fire Department members. She stopped going to the Government Center completely. Murphy Aff. Para 34-35.

Y3)   Murphy was severely depressed at this point. She had the feeling that the City did not care if she was dead or alive, that Vecchia was more important to the City than she was as he was the Purchasing Agent and she was just a clerk, and easily replaced. Murphy Aff. Para 34-35.

Y4)   Murphy does not know if the stalking stopped for the two-year period because she changed her entire lifestyle to protect herself from him.

She lived each day in constant fear of seeing Vecchia. She stopped running outside, avoided going to the Government Center for fear of seeing Vecchia, she did not go to any training courses or meetings. Murphy Aff. Para 36.

26. Over the next two years, Mr. Stover, Mr. Cassone and Mr. Manfredonia asked Ms. Murphy if she was ok, and she told them she was. Stover dep p. 73, line 3-5; Cassone aff ¶ 8; Manfredonia aff ¶ 14.

Z. Disputed.

Z1) Murphy never heard from the City again until she went to the Police. Although she saw Cassone, Stover and Manfredonia over the two year interval, any comment from them inquiring about her was an entirely superficial greeting. They neither expected a response nor waited for one. Murphy Aff. Para. 37.

27. In October 2000, Ms. Murphy went to the Stamford police department for help since she thought Mr. Vecchia had broken his agreement, based upon an incident where he stared at her at a Stamford restaurant, Taranto's and subsequently someone left a balloon on her lawn. Attached hereto is a true and accurate copy of that arrest warrant affidavit dated November 26, 2000. Ex. A, EX. A, AWA, p.2, 6, last paragraph.

56

AA. Undisputed that Murphy went to the Stamford Police in October 2000. Dispute the remainder as incomplete and inaccurate recitation of the actions leading up to her complaint. Further, The City's own admissions contradict their current assertions.

AA1) In October of 2000, Barbara Murphy was in a restaurant known as Toronto's with her friend Fred Tuchinardi. Transcript of Vecchia Termination Proceeding at 42, lines 22-25.

AA2) While Barbara Murphy was at Toronto's in October, 2000 with her friend, Vecchia came in, looked at her, sat a few bar stools down from her, ordered a drink and continued to stare at her. Transcript of Vecchia Termination Proceeding at 43, lines 8-12.

AA3) At this time, Barbara Murphy is "understandably freaked out". Transcript of Vecchia Termination Proceeding at 43, lines 18-19.

AA4) Barbara Murphy knew what was going to happen next because she had caller ID on her phone and had been through it so many times before. She therefore disconnected her phone. Transcript of Vecchia Termination Proceeding at 44, lines 4-8.

AA5) The morning after Barbara Murphy disconnected her phone, she plugged it back in. She realized she had received a phone call at 11:11pm the night before from a pay phone in Route 7, which was on the way to Vecchia's

57

home located at that time in West Redding, Connecticut. Transcript of Vecchia Termination Proceeding at 44, lines 9-15.

AA6) That same morning, Barbara Murphy also found a green plastic frog with red lips on her front lawn. Transcript of Vecchia Termination Proceeding at 44, lines 16-19.

AA7) Leaving that plastic frog on her front lawn was consistent with the kinds of things Vecchia had been doing to her two years before. Transcript of Vecchia Termination Proceeding at 44, lines 20-22.

AA8) At this time Barbara Murphy felt terrorized. Transcript of Vecchia Termination Proceeding at 44, lines 23-24.

AA9) On another occasion, Vecchia, upon seeing Barbara Murphy on the 10th floor of the Government Center, stood and stared at her. Barbara Murphy left quickly. Transcript of Vecchia Termination Proceeding at 44, line 25, and at 45, lines 1-5.

AA10) One week after that incident on the 10th floor of the Government Center, Barbara Murphy, while visiting friends on the 4th floor of the Government Center, saw Vecchia in a conference room, at which time she exited, walked to the elevator and pressed the button for the elevator. Vecchia saw her as she exited and immediately walked out of the conference room

where he was, and followed her. He walked passed her several times while staring at her. She was afraid that Vecchia was going to get into the elevator with her, but he did not. She left. Transcript of Vecchia Termination Proceeding at 45, lines 6-16.

AA11) The document referred to by the City does not contain the "fact" asserted by the City.

AA12) As indicated in footnote 2 herein, supra, the document designated by the City as "Plaintiff's Arrest Warrant Affidavit" and/or "AWA" is incomplete, because it was a sub-part to an Arrest Warrant Application dated November 29, 2000 submitted by Officer Carl Strate in support of his application for David Vecchia's arrest in the year 2000. That Arrest Warrant Application consists of the following sub-parts: (1) Seven-page "Voluntary Statement" (in affidavit form) of Barbara Murphy dated October 26, 2000; (2) unsworn report from K. Parker Mayo, Inc. Detective Agency, dated March 24, 1998; (3) copy of a page from Barbara Murphy's high school yearbook, which Vecchia had in his briefcase according to Mary Vecchia; (4) two-page sworn statement of Mary Vecchia dated September 11, 1999. Plaintiff has enclosed a copy of all of those documents with her opposition to the City's motion for summary judgment. See Plaintiff's Appendix, Exhibit 4 thereto.

28.    In that affidavit, Ms. Murphy repeated the history of Mr. Vecchia's stalking her, the September 1998 agreement to leave her alone, and after a period of two years, he started again. Ex. A,  EX. A, AWA pgs. 2-6.

BB.    Undisputed that she provided a sworn statement to the Stamford Police. Disputed that Vecchia did not stalk her between September 1998 and October 2000. It is further disputed that the only source of information regarding Vecchia's stalking was Murphy as Officer Strate refers to notes from Ben Fraser, an interview with Kris Seaborne, an interview with Mary Vecchia and the report of a private investigator all of which confirms Vecchia's stalking behavior.

BB1)    Murphy does not know if the Stalking stopped for the two-year period because she had changed everything.  She was in constant fear of seeing Vecchia.  She stopped running outside, avoided going to the Government Center for fear of seeing Vecchia, she did not go to any training courses or meetings . Murphy Aff. Para 36.

BB2)    After so many times trying to get the City to give the agreement and not getting it, Barbara Murphy was just exhausted with the lack of action and felt that it was a futile to speak with the City.  She had changed everything in her way of doing things such as going out, running, taking different routes to

wherever she went, sticking only with her immediate family and going out with the Fire Dept occasionally. She stopped going to the Govt Ctr completely. Murphy Aff. Para 34-35.

BB3) Murphy was severely depressed at this point. She had the feeling that the City did not care if she was dead or alive and that Vecchia was more important to the City than she was as he was the Purchasing Agent and she was just a clerk, admin. asst and easily replaced. Murphy Aff. Para 34-35.

BB4) Murphy does not know if the Stalking stopped for the two-year period because she had changed everything. She was in constant fear of seeing Vecchia. She stopped running outside, avoided going to the Government Center for fear of seeing Vecchia, she did not go to any training courses or meetings . Murphy Aff. Para 36.

BB5) As part of Murphy's interview with Officer Strate, she stated that she did not know if Vecchia was doing anything prior to the fall of 2000 but that she did think he was now. Murphy Statement attached to Arrest Warrant Application.

29.     The Stamford police officer (Detective Carl Strate) obtained Ms. Murphy's attorney's private notes of the March 1998 meetings, the notes of Mr. Stover as to the meetings in September, 1998, information from Mr. Vecchia's ex-wife, and information from two other police departments that confirmed that Mr. Vecchia had harassed and stalked members of his own family after the start of the dissolution in September, 1998 and during the period of 1998 to 2000. Strate Depo, pp. 20, line 12-12; p. 30, line8-23; p. 34, line 9-21; p. 40, line2 to p.43, line 22; p. 45, lines1-25; p. 52, lines 18-24; p. 55, lines 2-19; line 25 to p. 56, line 9.

CC.     Undisputed that Officer Strate obtained notes from Ben Fraser, information from Mary Vecchia, Mr. Vecchia's ex-wife, and information from two other police departments that confirmed that Mr. Vecchia had harassed and stalked members of his own family after the start of the dissolution in September, 1998 and during the period of 1998 to 2000.

Disputed that Officer Strate obtained notes from William Stover regarding meetings in September 1998 and that Mary Vecchia reported that Vecchia began stalking her in September 1998. Further disputed is any inference or assertion that this paragraph encompasses the totality of Officer Strate's investigation.

        CC1)    The notes purportedly taken by Stover during various meetings in September 1998 were produced during discovery. However, on October 12,

62

2000, Officer Strate of the Stamford Police Department requested copies of all investigative files regarding the City's investigation of Murphy's complaints against Vecchia, which William Stover and Fred Manfredonia agreed to do. No such file was ever produced. Arrest Warrant Application page 1, paragraph 4. Therefore, there is no way to know whether these documents were produced contemporaneously with the meetings in question, after Officer Strate requested them, or after this matter was instituted.

CC2) Murphy was told by Officer Strate that he went to the Human Resources department to get the file from them for the investigation. Mr. Stover and/or Manfredonia stated that they did not have any such file, that they did not consider the complaint official and that they weren't sure if they even took notes on the issue. The police came back to Murphy and asked her if she was not telling the truth because the City said what they said to the police. Murphy Aff. Para. 32.

CC3) Mary Vecchia reported to Officer Strate that she realized on March 21, 1998 that Vecchia was also stalking her. Arrest Warrant Application, pp.9- 10, para. 19.

CC4) Officer Carl Strate of the City's Police Department was assigned to Barbara Murphy's file. Vecchia Termination Proceeding at 46, lines 1-2.

CC5)  Vecchia's wife Mary Vecchia wanted to speak to Officer Strate. Id. at 46, lines 5-6.

CC6)  Apparently, Vecchia's conduct toward his wife Mary was similar to his conduct towards Barbara Murphy, i.e, the phone calls, the stalking, the following. Id. at 46, lines 8-11.

CC7)  During Mary Vecchia's meeting with Officer Strate, she asked him whether Barbara Murphy was the woman her husband was accused of stalking. Id. at 46, lines 12, 16-18.

CC8)  During that meeting, Mary Vecchia tells Officer Strate that she would like to show him some things that Vecchia had been carrying in his briefcase. Those items included a page from Barbara Murphy's high school yearbook, which contained Barbara Murphy's high school photograph. Id. at 46, lines 20-25, and at 47, line 1. See also, id at 131 (Testimony of Mary Vecchia), lines 15-20.

CC9)  Mary Vecchia also showed Officer Strate about 60 pages of internet material that Vecchia had been carrying around in his briefcase. That internet material related to the subject of stalking. Id. at 47 (Opening Statement by the City), lines 2-4. See also, id. at 132 (Testimony of Mary Vecchia), lines 8-17.

64

CC10) Mary Vecchia also told Officer Strate that she heard the voice mail message that Barbara Murphy had left for Vecchia on March 21, 1998 when her car was broken into. Id. at 45 (Opening Statement of the City), lines 5-8.

CC11) Mary Vecchia asked her husband about it and he explained to her that he broke into Barbara Murphy's car, that he had an obsession for Barbara Murphy and that he was depressed when he learned Barbara Murphy did not have the same attraction for him. Id. at 47, lines 9-15.

CC12) Vecchia stalked Mary Vecchia prior to their divorce. Id. at 134 (Testimony of Mary Vecchia), lines 7-9.

CC13) Prior to Mary Vecchia's divorce from Vecchia, Vecchia followed Mary Vecchia and their children in various places and at church functions. Id. at 134, lines 11-13. Vecchia's and Mary Vecchia's children have no contact with Vecchia. Id. at 134, lines 12-13.

CC14) At that time just prior to their divorce, Vecchia also made numerous phone calls to Mary Vecchia's home. Id. at 134, lines 20-22.

CC15) Vecchia also sent many, many letters to Mary Vecchia during that time. Id. at 134, lines 23-25, and at 135, lines 1-2.

CC16)   Mary Vecchia hired a private investigator to monitor Vecchia. Id. at 135, lines 6-9.

CC17)   Vecchia's stalking and harassment of Mary Vecchia as reflected in a statement that Mary Vecchia made to the State Police in Redding, shows a pattern of the same kind conduct that Vecchia engaged in towards Barbara Murphy. Id. at 136 (statement made by the City through its counsel), lines 8-15.

CC18)   Mary Vecchia testified that she hired an investigator to monitor her husband's conduct, and that the City's Exhibit 10, a report addressed to Mary Vecchia from her private investigator dated March 28, 1998, was the letter she received from the private investigator. Id. at 138, lines 14-17.

30.   On November 30, 2000 Mr. Vecchia was arrested, pursuant to an arrest warrant, for stalking Ms. Murphy. Plaintiff's Complaint, p. 13, ¶ 61.

DD   Undisputed that Vecchia was arrested on November 30. 2000 for stalking Barbara Murphy over "the past three years" . Arrest Warrant Application, p.12, para. 26.

31. On December 1, 2000, Mr. Vecchia was placed on paid administrative leave, pending a meeting where he could refute the charges made by Ms. Murphy that he started stalking her in October 2000. Plaintiff's Complaint, p. 15, ¶ 63; Stover Dep., p. 42, line 4-8, 18-22.

EE. Undisputed that Vecchia was placed on paid administrative leave. Plaintiff disputes that any such limitation on the paid leave existed.

EE1) The City did not make any decision regarding Vecchia until he actually pled guilty to criminal trespass and disorderly conduct in 2002. Transcript of Vecchia Termination Proceeding at 148 (Testimony of William Stover), lines 18-20.

32. Mr. Katz, the criminal attorney for Mr. Vecchia, wrote Mr. Manfredonia by letter dated January 12, 2000, that Mr. Vecchia should not be contacted except through him, and that Mr. Vecchia did nothing wrong, since after September, 1998 there were only a few "chance meetings" with Ms. Murphy. Manfredonia affidavit, ¶ 20,

FF. Disputed. Plaintiff has not seen such a letter even though discovery demanded all correspondence and it is not attached. Further, Vecchia was arrested on November 30, 2000. The City had two months to interview him prior to this purported letter and did not do so.

67

33. Mr. Katz again made this denial of any conduct that would constitute harassment or stalking at a meeting on February 7, 2001, with Mr. Stover and Mr. Manfredonia. Stover Dep., p. 47, line 25 to p. 48, line 12.  Manfredonia affidavit ¶ 21.

GG. Undisputed, except as follows:  disputed that Attorney Katz's bare denial was sufficient to protect Vecchia for fourteen months from any investigation by the City or from termination as the Sexual Harassment Policy in effect in 2000 was a Zero Tolerance Policy which allowed termination on the first offense. See: Sexual Harassment Policy dated June 24, 1998  (Plaintiff's Exhibit 13).

34. In March, 2001, the Board of Finance of the City, upset that Mr. Vecchia was on paid leave during the pendency of the criminal case, requested Personnel to attempt to work out an agreement between Ms. Murphy and Mr. Vecchia so he could return to work, and not cross paths with Ms. Murphy, on or off duty.  Plaintiff's Complaint, p. 16, ¶ 68; Stover Dep., p. 52, line 15 thru p. 53, line 18.

HH. With respect to paragraph 34, it is undisputed that the City, in preference to following their own policy and investigating and terminating Vecchia, attempted to bring Vecchia back to work by requiring Barbara Murphy to identify where she would be

68

around the clock so that Vecchia would know exactly where to find her to continue his stalking.

Disputed facts already conceded by the City.

HH1) During the period of Vecchia's paid leave, the City discussed with Barbara Murphy permitting Vecchia to return to work with the City. Transcript of Vecchia Termination Proceeding at 162 (Testimony of Fred Manfredonia), lines 4-6.

HH2) Specifically, at that time, Manfredonia contacted Barbara Murphy at the direction of the Director of Legal Affairs to discuss Vecchia's possible return to work with the City. Barbara Murphy was very concerned that Vecchia would be returning to work. The City, in the event the decision was made to permit Vecchia's return to work, by attempted to draft a document to present to Vecchia whereby he would agree to absolutely limit places he would attend in the City, such as certain bars, restaurants or otherwise. In connection with that effort, the City asked Barbara Murphy to provide a list of what places should be included in that document. Id. at 162, lines 10-24.

35.   Mr. Manfredonia's attempt to have Mr. Vecchia and Ms. Murphy agree what after-hours bars and restaurants would be "off-limits" to Mr. Vecchia was rejected by Ms. Murphy. Manfredonia aff ¶ 22. Plaintiff's Complaint, p. 16, ¶ 68.

I I.   Undisputed that the City, in preference to following their own policy and investigating and terminating Vecchia, attempted to bring Vecchia back to work by requiring Barbara Murphy to identify where she would be around the clock so that Vecchia would know exactly where to find her to continue his stalking and that Barbara Murphy refused to cooperate.

Disputed Facts:

I I 1)   Vecchia violated his agreement with Barbara Murphy and her attorney Ben Fraser in March 1998. Transcript of Vecchia Termination Proceeding at 40 (Opening Statement of the City), lines 9-14. See also, id. at 142 (Testimony of William Stover), lines 20-25, and at 143, lines 1-7.

I I 2)   Vecchia violated his "agreement" with the City in October 2000 both during work hours and after work hours. Id. at 42, line 22 through 45, lines 6-16.

I I 3)   Barbara Murphy had sharply circumscribed her life for over two years to avoid any possible contact with Vecchia. Murphy Aff. Para.34-36

I I 4)   Barbara Murphy was terrified of Vecchia. Murphy Aff. Para. 40-44.

I I 5)   Barbara Murphy offered to go on paid leave to allow Vecchia to return to work thus saving the City the substantial difference in their salaries. Murphy Aff. Para. 44.

36.   Mr. Stover did not feel that he could fire Mr. Vecchia until the criminal proceedings were concluded, as the charges involved only Ms. Murphy as to Mr. Vecchia's "staring" at her on three occasions in October and early November, 2000 (two at Government Center and one at Taranto's restaurant), and Ms. Murphy could not prove that Mr. Vecchia made a hang-up call from a Wilton payphone, or that Mr. Vecchia put a balloon on her lawn or a bullet on her deck. Stover Dep p. 44, line 8-16; 24 to p.45, line 1-14; and p.46, line 1-23.

JJ.   Undisputed that Vecchia was terminated after Vecchia pled guilty to criminal trespass and disorderly conduct.

Disputed that the City did not have the authority or a policy that allowed and entitled it to investigate and terminate Vecchia prior to his plea agreement. Disputed facts include:

71