Corporation Counsel. And they say, Tom, we have a problem, your purchasing agent is stalking Barbara Murphy. Tom Cassone directed him to the Human Resources Department, since under that policy Human Resources is the department responsible for investigating.

And in September, specifically on September 21st, 1998, Mr. Fraser, Attorney Fraser, and Barbara Murphy went to meet with Bill Stover, the gentleman to my left, and Fred Manfredonia, also in the Human Resources Department, to explain to them what had happened. Explained it all dating back to the beginning, as I just explained it to you this morning and told him about the problem.

Barbara Murphy said, I need help, I'm a nervous wreck, it's making me sick, told them the whole story.

Even then on September 21st, 1998 after all this she says, I don't want to hurt him. She's sympathetic that he has personal problems. I don't want him fired. I don't want him to lose his job over this.

Please make it stop.

September 25th, 1998 Mr. Stover, Mr. Manfredonia meet with Mr. Vecchia, advised him of his right to union representation at this meeting. He declined union representation.

They shared with him what Mr. Fraser and Ms. Murphy had shared with them. Mr. Vecchia admitted that he had no other choice, that he had broken into her car, took some of her stuff, said he was having problems, was fearful of losing his job. Didn't want to lose his job. He was remorseful.

Mr. Stover, Mr. Manfredonia then met again with Barbara Murphy and her lawyer, Ben Fraser. Ms. Murphy and Mr. Fraser said, we wouldn't take it any further if he agrees to leave her alone and get help. And demanded that the City leave the matter open, leave the file open, so that if this started in any way again the City could take appropriate action against this man. The City agreed.

The City met with Mr. Vecchia on

October 15th of 1998. He directed that Mr. Vecchia shall have no contact with Barbara Murphy, no contact at work, no contact out of work. He shall receive counseling for his problem. That he shall submit proof of his counseling so that Barbara Murphy would know that he is being treated for this ailment, if that's what it was.

He told him if it happened again, if he had any contact with her, if he harassed her, if he bothered her, if he did anything to her that upset her, he would be fired. And they all hoped that the matter would go away.

And for two years after this David Vecchia did not bother Barbara Murphy, did not show up at Brennan's and stare her down, did not follow her out. She got no phone calls late in the evening at her home. Nothing.

And then in October of 2000, Barbara Murphy was in Stamford at a restaurant bar known as Toronto's with a friend, a guy named Fred Tuchinardi. She

was at the bar.

Pribr to this incident on October 20th, she would see Mr. Vecchia from afar in the City Government Center and he would walk away and he would do just as he promised he would do: no contact, no conversations, no staring, nothing.

Well, in October of 2000 at Toronto's, Mr. Vecchia came in, looked at Barbara Murphy, stared at her, and sat a few bar stools down from her, ordered a drink and continued to stare at her.

Barbara Murphy had never seen him at this place before. She was hoping when he saw her he would leave as he had promised to do. He didn't. He stayed and he stared.

At this point Barbara Murphy is understandably freaked out again. She's worried it's starting again and she can't understand why he didn't leave.

Mr. Tuchinardi, she explains to him the situation, and he says let me take him outside and deal with this guy. She says, no, you can't do that, we have to go.

And Barbara Murphy left. Mr. Vecchia stared at her as she walked out of Toronto's.

She went home. She knew what was going to happen next because she had been through it so many times before, so she disconnected her phone. She had caller ID on her phone.

She woke up the next morning, she plugged her phone back in and she had a phone call that she received at 11:11 p.m. that night from a pay phone on Route 7 in Wilton right on the way, coincidentally maybe, to Mr. Vecchia's home at the time in West Redding, Connecticut.

She went out of her house and she found a frog. We have it here. A little green plastic frog with red lips stuck in her lawn. She can't prove that Mr. Vecchia put it there, but it's consistent with the kinds of things he had been doing to her two years before.

And as you can imagine, she felt terrorized. There are two other smaller incidents at the city. Mr. Vecchia saw her

on the 10th floor of the Government Center where his office was. Unlike in the past during the past two years when he would walk away, he stood there and stared at her. Barbara Murphy left quickly.

A week or so later, she was on the 4th floor visiting a friend in the Government Center. She noticed he was in a conference room. Barbara Murphy exited, got to the elevators, pushed for the elevator, Mr. Vecchia walked and followed her. She describes it, walked passed her several times staring at her. She was very much in fear. She was fearful that he was going to get into the elevator with her. He didn't. She left.

At this point she went to the police. Probably should have done it sooner. On October 26th of 2000 she filed a criminal complaint about everything that this man had done to her; from the break-in of her car to the damaging of her property to the staring to the stalking to everything that happened beginning in October of 2000.

Officer Carl Strate of the City of

Stamford Police Department is assigned to her file. He meets with her, interviews her, takes her statement. Officer Strate learns that Mary Vecchia, a new name, Mary Vecchia, David Vecchia's wife, wanted to speak with him. Mary had some things she wanted to share.

Apparently David Vecchia's conduct towards Mary was similar towards his conduct towards Barbara Murphy: the phone calls, the stalking, the following.

Officer Strate meets with Mary Vecchia and Mary Vecchia is very prepared. She's got boxes of materials. I hope you're the man who can help me, she says to Officer Strate. Let me ask you a question, is Barbara Murphy the woman my husband is stalking?

Jeez, why do you ask?

Well, here's what he has been carrying around in his briefcase, she says to Officer Strate. Brings out a photograph, which we have for you, pictures of Ms. Murphy's high school yearbook, a page with about twelve pictures, one of which

was Barbara Murphy.

About 60 pages of Internet material that he was carrying around with him on the subject of stalking. Chilling.

Mary Vecchia heard the voice mail message that Barbara Murphy had left back on March 21st, 1998 when her car was broken into. She heard the message and she realized there was a problem. She asked her husband about it and he explained to her that he had broken into this woman's car, that he had an obsession for her, and that he was depressed when he learned that she did not share the same attraction.

On November 29th of 2000, Officer Strate prepared an affidavit for an arrest warrant, a judge of the Superior Court of Stamford signed it, and Mr. Vecchia was arrested and charged with stalking.

He didn't show up for work on the 30th of November. The City learned of his arrest. And on December 1 of 2000 Mr. Vecchia was placed on a paid leave of

absence, pending the City's continuing investigation of these developments.

Mind you, the City hadn't been informed by Barbara Murphy of anything that had happened beginning in October of 2000 and continuing. She had chosen at that point, properly, to go to the police.

On December 18th of 2000, the City's Human Resource representatives meet with Barbara Murphy and learn of these incidents at Toronto's and the subsequent incidents at the Government Center.

In January of 2001, the City's Human Resource representatives meet with Mr. Vecchia, his criminal lawyer, Attorney Mark Katz. Mr. Vecchia took the Fifth Amendment at the time, didn't want to answer any questions about what happened in October of 2000 or subsequently.

And so the City had no choice at that time it felt but to continue Mr. Vecchia on a paid leave of absence while the criminal matter was resolved. So Mr. Vecchia enjoyed a paid leave of absence for the next 14 months. The City had no purchasing

agent during that time.

On January 23rd, this year, 2002, David Vecchia pled guilty to two crimes involving Barbara Murphy. He pled guilty to criminal trespass surrounding the March 20th, 1998 break-in of her car, theft and destruction of her personal property. Pleads guilty to an incident involving his conduct in October of 2000 at Toronto's when he stared her down. Pled guilty to disorderly conduct.

Received a one-year sentence, suspended, three years probation. Ordered to have counseling. And ordered again by the court to have no contact with Barbara Murphy.

On February 7th of 2002, the City holds a predisciplinary hearing, provided Mr. Vecchia with notice of it, his Union representative accompanied him. He went to the City's Human Resources Department and claimed he did nothing wrong.

Mr. Vecchia was fired on February 15th of 2002 due to his harassment and stalking of Barbara Murphy in violation of the

City's very specific directive for when they met with him after he broke into her car after she brought it to their attention.

As far as the City was concerned, his admissions with regard to the criminal matters, specifically the October 2000 incident, decided the issue. He was to have no contact with her. He pled guilty to a crime regarding his conduct on October of 2000 where he did have contact with her, the crime of disorderly conduct.

This is exactly what the City told Mr. Vecchia what was going to happen if he continued to have contact with her, so no one should have been surprised.

The matter has been grieved. We're here before this panel. And after all of that, it's kind of ironic, but after all of that this entire case is about four months of pay. And why is that? It's because on June 30 of 2002, the City, along with 91 other positions, decided to eliminate the position of purchasing agent.

And the duties for that position were

reassigned to the position of productivity and benchmarking manager. The same supervisors bargaining unit that Mr. Vecchia's position had been before.

The City communicated its decision to lay off those positions to the union representing the supervisors unit. And there's been no grievances or challenges filed by the union in any of those layoffs, specifically with regard to this layoff of the purchasing agent position.

Thank you.

ARBITRATOR: Does the Union desire to submit an opening statement?

MR. D'ANDREA: We have no statement to make and reserve our right.

ARBITRATOR: Okay. Call your first witness, please.

MR. MCHALE: Call David Vecchia.

MR. D'ANDREA: Mr. Chairman, we object on the basis that our grievant is being asked to testify against himself. If the City has a case that supports the issue that's before your panel, let them proceed and let them do so

to prove their case without using Mr. Vecchia to testify against himself in this matter.

ARBITRATOR: Does the City have some authority for calling the grievant as a witness in this case?

MR. MCHALE: Well, we think we have every right to call him. There's no Fifth Amendment privilege here, Mr. Dee. Mr. Vecchia has been convicted of crimes for his conduct already. Can't be charged with them again.

There's a regulation that this board has promulgated, Section 31-91-38 on witnesses. Attorney Maurer has asked that Mr. Vecchia be sequestered during the presentation of the witnesses that I've subpoenaed on the grounds that they are not psychologically fit to have him stare at them while they testify. I don't think he has any right to do that, by the way.

The regulations provide that all witnesses called shall be subject to cross-examination. Paragraph D of the

regulation says, "The chairman of the panel shall have the power to retire any witnesses during testimony of other witnesses, except the following shall not be so retired: 1, persons who are a direct party in interest. Except that if such person is to be a witness, such person shall be the first to present testimony."

And so I would like him to be first.

ARBITRATOR: Mr. D'Andrea, would you like to be heard?

MR. D'ANDREA: Mr. Chairman, may I have a short caucus with my grievant?

ARBITRATOR: For what purpose?

MR. D'ANDREA: For the purpose of responding to this.

ARBITRATOR: I will give you about one minute.

MR. D'ANDREA: Thank you, sir.

(Break taken: 11:05 am to 11:21 am)

ARBITRATOR: Let's go back on the record. Union?

MR. D'ANDREA: Mr. Chairman, the Union reiterates its position and believes that this gentleman's rights would be violated if he were forced to testify against himself.

ARBITRATOR: I am going to overrule your objection and require that your client take the witness stand.

DAVID VECCHIA, called as a witness, having been previously duly sworn by the Arbitrator, testified as follows:

ARBITRATOR: Good morning.

THE WITNESS: Hello.

ARBITRATOR: Please state and spell your name for the record, please.

THE WITNESS: David Vecchia. V, as in victory, -e-c-c-h-i-a.

ARBITRATOR: You may inquire when ready.

DIRECT EXAMINATION

BY MR. MCHALE:

Q. Mr. Vecchia, it's my understanding that you were hired by the City of Stamford to be its purchasing agent sometime in 1993?

A. That's correct. I took a Civil Service test and I was interviewed and hired for the job.

Q. Is that the only position you have held with the City?

A. That's correct.

Q. Who's Barbara Murphy?

A. Barbara Murphy is an employee of the City of Stamford.

Q. How do you know her?

A. For the first four years I worked there, she worked in the Payroll Department, which was about 100 feet from the Purchasing Department, so I would see her every day.

Q. Did you work with her on a couple of committees?

A. I think before in 1996 her job was eliminated in the Payroll Department I think probably because she was involved in theft of funds from the Payroll Department --

Q. Let me ask you the question again. Did you

work with her on a number of committees?

A. I'm answering the question --

Q. Mr. Vecchia --

ARBITRATOR: Gentlemen, please stop. You may have a lot to say.

THE WITNESS: I'm sorry, sir.

ARBITRATOR: You may at some point have a lot to say but you must answer the questions as asked. You have an advocate here who will be able to elaborate concerning your testimony on cross-examination or if he wants to call you in his case in chief.

THE WITNESS: I was answering to the best of my ability.

ARBITRATOR: Sir, I am speaking. If the question requires a yes or no, that's the answer I expect. Don't go off on these narratives. Just listen to the question and then answer it.

Ask the question, please.

BY MR. MCHALE:

Q. Mr. Vecchia, did you work with Barbara Murphy on a number of committees?

A. One committee.

Q. Did you invite her to lunch?
A. No, she invited me.
Q. She invited you?
A. Yes.
Q. Interesting. How did that come about?
A. Yes or no?

ARBITRATOR: It requires more than a yes or no answer.

THE WITNESS: In the fall of 1997 we were working on the committee and she and another employee, Alice Helms, volunteered to write and edit a newsletter that was going out to -- I'll have to backtrack again.

The City purchased a new financial system and it was installed in the summer of 1997. That was one of the purposes of these meetings. And I was involved with training the city employees that was using the system. And there were still a lot of people who had a lot of questions about how to use the system after that.

So it was decided by the director of finance that we should put out a newsletter, just essentially something

for people to refer to that would be a point of reference for the most frequent questions.

And Barbara and Alice volunteered to put out the newsletter. So they each put out three or four issues of the newsletter.

And I had spoken to the comptroller about giving them something for putting out the newsletter and we decided that we would buy them each a gift certificate from it was either Macy's or Filene's and give it to them since they weren't being paid for putting out the newsletter.

So I wrote a requisition, the comptroller approved it, and with city funds we gave them each a gift certificate for $50.

Ms. Murphy was very surprised about that and she said the city had never given her anything for doing anything. And I think it was in January of 1998 she invited me to go to lunch.

BY MR. MCHALE:

Q. Just the two of you?

A. That's correct.

Q. Did she pay for the lunch?

A. I don't remember who paid for it.

Q. You don't remember. Would you remember if you paid?

A. As I said, sir, I don't remember who paid for the lunch.

Q. Prior to September of 1998, the period of 1997 through 1998, did you make it a practice of sending Ms. Murphy candy?

A. I think I did it once. I did it one time.

Q. Did you do it at the time she got a promotion to administrative assistant down at the fire department?

A. No.

Q. Did you do it at Christmastime?

A. No.

Q. Did you do it at Valentine's Day?

A. No.

Q. When did you send her the candy, Mr. Vecchia?

A. I think I sent it to her sometime in 1998. January or February of 1998.

Q. Did she tell you to stop?

A. No.