ARBITRATOR: You can continue.

BY MR. MCHALE:

Q. What did you say to Mr. Fraser when you met with him on that Monday in March?

A. I didn't speak with Mr. Fraser.

Q. You didn't speak with him?

A. No.

Q. Who was in attendance at the meeting?

A. I went and my sister Nancy was there. Nancy never spoke.

Q. Who else was there?

A. That was it.

Q. Was Mr. Fraser there?

A. Of course.

Q. It was just the three of you?

A. Yes, that's correct.

Q. What did he say?

A. Mr. Fraser never spoke to me.

Q. Did anyone say any words during this meeting?

A. My sister Janet called him on the phone and Mr. Fraser spoke to Janet.

Q. I'm talking about this meeting you had on this Monday in March.

A. Yes.

Q. I'm not talking about when he called you on the phone.

A. I'm telling you what happened.

Q. I want to know what happened during the meeting. You're telling me what happened during the phone conversation?

A. That was the meeting, sir.

Q. Where did you go?

A. To Mr. Fraser's office in Greenwich. I sat in front of Mr. Fraser's desk, my sister Nancy sat in the outside lobby. My sister Janet had previously called Mr. Fraser saying that she would represent me and that I would go to the meeting as he had requested but I would say nothing. I went to the meeting; I said nothing.

Q. Why would you say nothing?

A. Because my sister had advised me that you could be prosecuted for this. She didn't know what Mr. Fraser's background -- she said if he's a skilled criminal attorney he could rip you apart and there's no sense of your going there and saying anything.

She was told to call Mr. Fraser sometime between noon and 4:00 on that Monday afternoon saying that she would represent me and that I would come to the meeting as he requested but that at 4:00 she

would call him on the phone and she would speak to him.

Q. Did Mr. Fraser tell you that he wanted you to seek counseling for your problem?

A. Mr. Fraser didn't say anything directed to me, he spoke to my attorney.

Q. Did he tell your attorney that?

A. I don't know if Mr. Fraser said that or not.

Q. You don't know whether the issue of counseling arose during this discussion?

A. It must -- yes, it did raise -- or arose.

Q. And did he require that you agree to seek immediate counseling?

A. Did he require that I agree? He told Janet that I should seek counseling.

Q. Did he tell you that you needed to permanently cease your stalking of Barbara Murphy?

A. He didn't tell me that.

Q. Did he tell your sister that?

A. I would think he must have told Janet that I have no contact with Barbara.

Q. Is that your understanding of what he was requesting?

A. That was my understanding.

Q. Did you agree to that?

A. Yes.

Q. Mr. Vecchia, you were afraid they were going to report this either to the city or the police, weren't you?

A. That's right.

Q. And you didn't want them to do that, did you?

A. That's correct.

Q. Why?

A. Because I was wrong. You wouldn't let me go back a minute ago.

Q. I won't let you go back now.

A. I can't answer your question then, sir.

Q. My question is why were you concerned about them reporting it to the city?

A. Because Saturday when I went to the fire department and left the things for Barbara I also had written her a letter saying that I was sorry for what I had done, that I --

Q. Okay, let's stop right there.

A. I think it was at that time I left her the letter in her briefcase.

Q. You brought up the letter?

A. Yes, sir.

Q. Is this the letter that you wrote?

A. That's correct.

MR. MCHALE: I would like to introduce this letter as an exhibit into this proceeding.

THE WITNESS: I'm mistaken, it wasn't on the Saturday that I wrote the letter.

MR. MCHALE: There's no question pending, Mr. Vecchia.

ARBITRATOR: Is there any objection to this letter being marked as City 4?

MR. D'ANDREA: Mr. Chairman, can counsel describe relevance?

ARBITRATOR: Your client has indicated he wrote the letter and left it in the briefcase.

MR. D'ANDREA: All right, sir.

ARBITRATOR: City 4.

(City Exhibit 4: Marked into evidence.)

BY MR. MCHALE:

Q. Mr. Vecchia, you said you wrote this letter; is that right?

A. That's correct, sir.

Q. How did you present it to Barbara Murphy?

A. I think I left it at the fire department on Saturday afternoon.

Q. Now, why were you there on Saturday?

A. Because that's what Ms. Murphy had requested.

Q. This is when you returned her briefcase for the first time, your first trip to the fire department?

A. I think that's when I wrote it. It was either then or I left it with Mr. Fraser on Monday.

Q. One of those trips?

A. Yes.

Q. I can't make out your handwriting, Mr. Vecchia, can you read it to us?

A. "Barbara, This is all I have, it was thrown in the trash at my house and in my panic I forgot it.

"Anything else missing was thrown out elsewhere and I cannot recover.

"Please use enclosed money to purchase any items you are missing. If more is needed, I will reimburse you.

"I do not know why I did this, and regret the pain that it has brought your family.

"My life is in your hands. Please give me time, a chance to solve my problems and redeem my life. David."

Q. You say you regret the pain it has brought to your family, what pain?

A. She had told me it had upset her mother.

Q. You said, "My life is in your hands." What do you intend by that statement?

A. I think you answered that question a few moments ago, sir, when you said I was concerned about my job.

Q. You were worried if the City of Stamford's Human Resources Department found out about this they would fire you? Is that right?

A. First issue --

Q. Is that right?

A. First issue, she could have me arrested.

Q. That was one concern?

A. That's right.

Q. And with regard to your employment, did you have concern?

A. I didn't know how it would be dealt with by the city.

Q. How did you or your lawyer resolve this problem you had with Barbara Murphy and her lawyer,

Ben Fraser?

A. I think it was left that Mr. Fraser would call Janet and check with her.

Q. Did you agree that you would seek immediate counseling?

A. Yes.

Q. Did you agree that you would permanently cease any stalking or annoying or frightening behavior towards Barbara Murphy?

A. I think your using the word "stalking" to be inflammatory, sir, I don't think that word was brought up.

Q. Why don't you choose the term.

A. That I wouldn't have any contact with Barbara Murphy, that I wouldn't speak to her.

Q. You agreed to no contact with her?

A. Yes.

Q. And did Barbara Murphy agree as long as you did that --

A. No, I'm mistaken. I believe Mr. Fraser did use the term "stalking," because I recall the conversation with my sister as to what the law was about stalking and she said she didn't know what the laws in Connecticut were, she's an attorney in Maryland and Washington, D.C.

Q. Did you agree you wouldn't have any further contact with Barbara Murphy?

A. That's correct.

Q. And did she agree she wouldn't go to the police?

A. No, I don't think Mr. Fraser kept -- he kept that open, I believe.

Q. And why would he keep it open?

A. That was his right to do so, sir.

Q. What was he concerned about?

A. I don't know, I never spoke to him.

Q. But your sister did.

A. You can subpoena her.

Q. You didn't talk to her about what conversation she had with him?

A. I told you what my conversation was.

Q. Did you have conversations with your sister about her conversations with Ben Fraser?

A. I did.

Q. And did she tell you what Ben Fraser said to her?

A. That I should seek counseling, that I shouldn't speak to Barbara Murphy.

Q. Did you attend counseling sessions after this?

A. I did.
Q. How many?
A. I don't recall, sir.
Q. One?
A. More than that, sir.
Q. Ten?
A. May have been.
Q. Did you leave Barbara Murphy alone?
A. I haven't spoken to Barbara Murphy --
Q. I didn't ask if you spoke to her. Did you have any contact with her following this meeting --
A. I haven't spoken --
Q. Let me finish the question, please. There are a number of questions I need to ask you, let me finish the question and you can answer and we can get on with this.
A. Sorry.
Q. After this meeting that you had in Mr. Fraser's office, did you have any contact with Barbara Murphy thereafter?
A. What do you mean by contact, sir?
Q. Did you see her?
A. Yes.
Q. Did you go to Brennan's?

A. Yes.

Q. Did you stare at her like before?

A. No.

Q. You didn't stare at her?

A. No.

Q. No bad behavior towards her at all?

A. No.

Q. Did you follow her out of the bar?

A. No.

Q. Did there come a time when Barbara Murphy brought this to the attention of the City's Human Resources Department?

A. You testified that she went --

Q. I'm asking you.

A. I was called into a meeting with Mr. Manfredonia and Mr. Stover --

ARBITRATOR: You can't look at your papers, sir.

THE WITNESS: Oh, I can't. It was in September of 1998 I think when -- I don't even know your name.

BY MR. MCHALE:

Q. It doesn't matter.

A. When you were going through your presentation you referred to some date in 1998 that

they had a meeting with me. I have the minutes of the meeting from the City.

Q. Did you show up on Ms. Murphy's jogging route at any time after this March 20, 1998 break-in to her car?

A. Did I show up on her jogging route?

Q. Yeah, did you?

A. I went jogging myself, sir.

Q. You did?

A. Yes.

Q. Where did you jog?

A. In Stamford.

Q. Where do you live? Or where did you live at the time?

A. Which period of time are we talking about?

Q. In 1997, 1998.

A. I lived in Redding.

Q. You lived in Redding?

A. I worked in Stamford.

Q. And you jogged?

A. Yes.

Q. And where did you jog?

A. I sometimes jogged at Stamford High School, I jogged in Stamford, one of the parking lots there, I jogged in Shippan and --

Q. Did you --

ARBITRATOR: Let the witness finish his answer.

BY MR. MCHALE:

Q. Did you ever jog with Ms. Murphy?

A. I never jogged with her.

Q. My question is, did you begin to show up after this 1998 incident where you broke into her car, did you show up on the routes she had been taking for jogging?

A. I don't know what routes she takes.

Q. So you don't ever remember seeing her jogging at all?

A. No.

Q. Do you remember a road race --

A. Yes.

Q. Let me finish the question. Do you remember a road race, the High Ridge Road race I believe it is referred to as?

A. It's in the industrial park, yes.

Q. Do you remember jogging next to Barbara Murphy during that road race?

A. No, sir. I ran in the road race. It was a road race that the mayor's wife was the sponsor of it and the posters are all around the city inviting

employees to run in the race. I know at one of my meetings with Mr. Manfredonia he brought up the road race and I told him, oh, the mayor ran in the race as well, you accused me of following Barbara Murphy maybe I was following the mayor.

Q. Were you following Barbara Murphy?

A. No, I wasn't.

Q. Were you jogging next to her?

A. No.

Q. Had you been running for years prior to 1998?

A. Yes, sir. Out of high school I had a scholarship for academics and cross-country. I ran in many road races. In one of my meetings with the city I believe I brought them T-shirts from races that I had run in 1997 and 1998 and showed them that I had run in other races and asked them if they wanted some documentation of it I would be happy to bring it to them. They said it wasn't necessary.

Q. Tell me what was your habit in terms of running, would you run out of the office?

A. Yes, sir.

Q. Would you run at lunch time?

A. No, sir. After work.

Q. You ran after work?

A. Yes.

Q. Where would you get changed?

A. I would either change at work or change in my car.

Q. Change in your car?

A. Yes, sir.

Q. And you would run out of the City Hall property?

A. No, sir.

Q. Where would you go?

A. I would go to one of the parks at Shippan on the water and park my car and I'd run in Shippan sometimes or at the high school or at the industrial park.

Q. Would you run by yourself?

A. Primarily, yes.

Q. Did you have any running pals that you ran with?

A. No.

Q. Always alone?

A. Yes.

Q. You never once remember bumping into Barbara Murphy on any of your runs?

A. No, sir.

Q. I would like to turn your attention now to

this meeting that you had with Mr. Stover and Mr. Manfredonia in September of 1998. How did that arise?

A. Mr. Manfredonia came to my office and said he wanted to talk to me. We had been talking earlier that week I think it was about furniture purchases and I thought he wanted to talk to me about that. He said no, that wasn't the matter. He asked me to come down to the conference room with him, and I think Mr. Stover was sitting there.

Q. Did they advise you of your rights to union representation?

A. They did.

Q. And did you decline?

A. I did.

Q. What did they want to talk to you about?

A. They said that Barbara Murphy had complained to them.

Q. About what?

A. That I had been bothering her.

Q. Had been bothering her?

A. Yes, sir.

Q. Did they give you anything more specific than that about how you had been bothering her?

A. No.

Q. Isn't it true that you admitted to Mr. Stover and Mr. Manfredonia that you had stolen Barbara's briefcase back in March of 1998?

A. They had a copy of the letter and I said yes, I had done that.

Q. Isn't it true you had admitted to them that you had a habit of going to Brennan's where Barbara Murphy would be and staring at her?

A. No, that's not true, sir.

Q. Did you admit to them you were interested in having a relationship with her?

A. As a friend I told them that.

Q. You told them what?

A. That I was interested in her as a friend.

Q. Did you admit to them that you were obsessed with Barbara Murphy?

A. No, sir.

Q. What did Mr. Stover and Mr. Manfredonia say to you regarding this conduct?

A. They said they were investigating the complaint, that they had not made any judgment, and that they would get back to me.

Q. Did they finally at some point get back to you?

A. I think about two weeks later -- you have

the date. Again, I have the minutes of the second meeting.

Q. I don't need exact dates.

A. In September I think they got back to me again and they asked me some more questions. And I think they told me that I shouldn't have any contact with Barbara Murphy in the workplace.

Q. Okay, let's stop there. They told you that you shouldn't have any contact with Barbara Murphy in the workplace. Did they say that, "in the workplace"?

A. Yes, because we discussed it at length.

Q. They said "in the workplace"?

A. Yes.

Q. They didn't place any restriction on your contact --

A. No, we talked about that. They told me if I ever see her on the street make sure I go the other way. I asked them do I have the right for them to dictate where I went on my own time, after work. And Mr. Stover started saying that he did and --

Q. Did you --

ARBITRATOR: Gentlemen. He did not finish his answer. Go ahead.

THE WITNESS: Mr. Manfredonia started

telling me, you know, that this included after work and on the weekends that they could tell me what to do. Mr. Stover backed off and said no, they didn't have the right to do that.

I think at that time I also said something to them about I was a Vietnam war veteran and they had some nerve telling me what to do outside of the workplace.

BY MR. MCHALE:

Q. So you were offended?

A. I thought they had no right.

Q. So your feeling was they had no right to regulate any of your behavior out of work; is that right?

A. Regarding --

Q. Is that right?

A. Regarding where I went they had no right to tell me where I could go, sir.

Q. And if they were concerned you were stalking Barbara Murphy, as far as you were concerned they had no right to prohibit it?

A. Well, sir --

Q. Is that right?

A. You wouldn't let me finish it.

ARBITRATOR: It's a yes or no.

THE WITNESS: Would you repeat the question.

BY MR. MCHALE:

Q. Was it your position that they had no right to interfere with your right to stalk Barbara Murphy if that was your desire? Is that your position?

A. I don't think that was the question they asked me.

Q. That's not what I said.

A. You're phrasing the question to be inflammatory, sir, and that wasn't even the question that was raised.

Q. I'm asking you a question here today now. Is it your position that the City did not have the right to restrict your access to Barbara Murphy outside of work?

A. I think my position then was that they could not tell me where I could go, what restaurants I could go to, what places I could go to.

Q. Isn't it true that they directed you that you shall have no further contact with her, either inside or outside of work, is that true?

A. That's not true, sir.