1    Q.   Did they direct you that if you saw her out
2  anywhere, you should leave?

3    A.   No, that's not true, sir.

4    Q.   They didn't tell you that?

5    A.   No, sir.  We discussed in the workplace
6  and --

7    Q.   There's no question pending.

8             ARBITRATOR:   You answered the
9         question.

10            THE WITNESS:   Okay.

11  BY MR. MCHALE:

12    Q.   Did they tell you that Barbara Murphy had
13  requested the right to ensure that you were receiving
14  counseling and so you were to provide her with
15  reports as necessary regarding that?

16    A.   No, they didn't tell me that she had
17  requested it, no.  They made the suggestion that I
18  use the City's employee's assistance money, take
19  advantage of it.

20    Q.   And did you agree?

21    A.   I said yes, I would go for counseling.

22    Q.   And why?  Why did you agree to go for
23  counseling?

24    A.   Because I wanted my job.  That would seem
25  like an easy solution.

1       Q.    Was this a contingency on keeping your job?

2       A.    They didn't put it that way, sir.

3       Q.    So why did you agree?

4       A.    Because it was a simple thing to do.

5       Q.    Did they tell you that the file would

6   remain open while they monitored your future conduct?

7       A.    What they told me is that they would be

8   back to me with a written agreement.

9       Q.    Agreement to what effect?

10      A.    I don't know, sir, it was their term.

11      Q.    How did you understand the agreement that

12  you had reached with them?

13      A.    That I should have no contact with

14  Barbara Murphy in the workplace.  Specifically I

15  talked to them about what if I see her on the

16  elevator and, you know, if it's inadvertent then just

17  go about your business.  If you see her in the

18  hallway, don't stop and talk to her, just go about

19  your business.

20          We discussed a potential interaction

21  regarding work, and there isn't any dealings that she

22  had with me or with the Purchasing Department, that

23  didn't arise, but they, you know, essentially deal

24  with her if you have circumstances to deal with her

25  in a businesslike manner.

1    Q.   In your position and the position she held

2    at that time, this being the time of September of

3    1998, there was no reasonable expectation you would

4    need to deal with her at work, was there?

5    A.   She was working --

6    Q.   Was there?  Did you need to deal with

7    Barbara Murphy in your respective positions at that

8    time?

9    A.   Not on a daily basis, sir.  Occasionally,

10   yes, there may have been.

11   Q.   Occasionally?

12   A.   There was once in the two and a half years

13   that transpired after that that I had some dealings

14   with her.

15   Q.   Isn't it true that if you saw her at

16   Brennan's that you should leave?

17   A.   No, sir.

18   Q.   Isn't it true that they told you if you saw

19   her out at any establishment you should leave?

20   A.   No.

21   Q.   Yes or no?

22   A.   You're wrong again, sir.

23   Q.   They didn't tell you you should have no

24   contact with Barbara Murphy whatsoever?

25   A.   I told you again Mr. Manfredonia tried to

1    dictate to me they could control wherever I went and

2    Mr. Stover told him no, he couldn't say that.

3        Q.   So the City placed no restrictions on your

4    future conduct with Barbara Murphy outside of work,

5    is that true?

6        A.   They told me I should limit my dealings

7    with her in the workplace.

8        Q.   Just in the workplace?

9        A.   That's correct.

10       Q.   So you left your meeting with them feeling

11   you were free to engage in any social interactions

12   you wanted with her after this incident?

13       A.   No.  That I shouldn't talk to her.  That

14   she didn't want to have any dealings with me and that

15   I shouldn't talk to her.

16.      Q.   Anywhere?

17       A.   Anywhere.

18       Q.   So you couldn't talk to her anywhere --

19       A.   Now, are you saying this is a condition of

20   employment?

21       Q.   That's not my question.  My question --

22       A.   This is --

23                 ARBITRATOR:  Gentlemen, one at a time.

24            Let him ask a question, please.

25                 THE WITNESS:  Thank you.

BY MR. MCHALE:

    Q.    I think what you testified to just now is
that you shouldn't have any conversation with her,
that's what the City told you, that's what
Mr. Manfredonia and Mr. Stover told you; is that
right?

    A.    I can't answer that yes or no, sir.

    Q.    You can't remember?

    A.    No.   I said I couldn't answer that yes or
no.   I need to elaborate on that.

    Q.    Well, it's a question that calls for a yes
or no answer.

    A.    No, it's not, sir.

    Q.    Let me ask it again.   Did the City's
representatives tell you that you should not have any
conversation with Barbara Murphy following this
meeting in September of 1998?

    A.    That I shouldn't have any dealings with her
in the workplace they told me.   And as advice, not as
an edict from the City, but as advice that I should
limit my contact with her.

    Q.    Mr. Vecchia, why would the City's
representatives have been concerned about your
contact with her at the workplace when all of your
misconduct with her up until that time took place

1    outside of work?

2    A.    Because I think they wanted to just get rid

3    of the problem.  And as it turns out, when I went

4    back to see Mr. Stover about -- let's see, it must

5    have been the end of October, asking about a written

6    statement he told me that as far as he was concerned

7    the City wasn't involved, that it had ended in March

8    of '98.

9    Q.    What ended in March of '98?

10   A.    Ms. Murphy's complaint.  That whatever the

11   circumstances were, that it ended in March of '98 and

12   that the City was not involved.

13   Q.    So in September, and I think some of the

14   meetings extended into October of 1998, did

15   Mr. Stover and Mr. Manfredonia tell you that you

16   should have no interaction and contact with

17   Barbara Murphy and to cease your pursuit of her, yes

18   or no?

19   A.    No.

20   Q.    Did you tell them that you were fearful of

21   losing your job at this time?

22   A.    I don't know if I said it in that many

23   words, but I'm sure they got the sense that I was.

24   Q.    Now, why were you concerned about losing

25   your job when in your own words you didn't do

1    anything?

2        A.    Well, I have been working 30 years and I

3    have never been called into a hearing with the

4    Personnel Department.    It's not a plus.

5        Q.    Isn't it true, Mr. Vecchia, that you were

6    told that any future inappropriate interactions or

7    contact with Ms. Murphy by you going forward would

8    result in your dismissal?

9        A.    They told me I should have no contact with

10    her in the workplace.

11        Q.    So that was the extent of it, just that at

12    work?

13        A.    That's correct.    I told you Mr. Stover

14    corrected Mr. Manfredonia and told him they could not

15    dictate to me things outside of the workplace.

16        Q.    You did tell me that.    So you left that

17    room feeling it couldn't be held against you anything

18    you did to Barbara Murphy outside of work; is that

19    right?

20        A.    No, that's not correct, sir.

21        Q.    If you broke into her car at home again,

22    which is where you broke into her car back on

23    March 20th, 1998, did you feel the City wouldn't have

24    a problem with that?

25        A.    I would think the fact that, yeah, it would

```
 1    be and use for the City and that I would endose
 2    the front page of the newspaper.

 3         Q.    Would that have been a problem with your
 4    future employment?

 5         A.    I didn't know.  I didn't want to find out.

 6         Q.    In October of 2002 you went to a restaurant
 7    in Stamford known as Toronto's, didn't you?

 8         A.    In October of 2002?

 9         Q.    Yes.

10         A.    Yes.

11         Q.    And you saw Barbara Murphy there, didn't
12    you?

13         A.    Yes.

14         Q.    And you stared at her?

15         A.    No.

16         Q.    And you sat several stools away from her?

17         A.    Not several stools.  It's a very long bar
18    at Toronto's.  It's three times the length of this
19    table here, and I may have been at two or three
20    chairs on this side and I believe she was at the far
21    end.  So the bar may be twice as long as this room,
22    and so if I was at one end and she was at the far
23    end, sir.

24         Q.    How far away from you was she, sir?

25         A.    How long is this room?
```

1          Q.    I don't know.

2          A.    It was twice the length of this room.

3          Q.    Did you look at her?

4          A.    I didn't see her when I first came in.

5    And I was talking to someone.  I think it was

6    World Series time and I was talking to someone there

7    and I happened to look up and I saw her there.

8          Q.    Did you think anything of it?

9          A.    I was surprised to see her.  I had never

10   seen her there.

11         Q.    Why didn't you leave?

12         A.    Why should I?

13         Q.    You saw no problem with your staying?

14         A.    I didn't talk to her.  I had no interaction

15   with her.

16         Q.    No interaction at all?

17         A.    That's correct.

18         Q.    Nothing inappropriate in that incident in

19   Toronto's?

20         A.    That's correct.

21         Q.    Mr. Vecchia, do you remember appearing in

22   court on January 23rd, 2002?

23         A.    I was in court in January, that may have

24   been the date.

25         Q.    Do you remember an appearance in state

109

1    court, criminal matter where you were represented
2    by Attorney Mark Katz on that day?
3        A.    Can I see that to refresh my memory, sir?
4        Q.    No, not yet, sir.  My question is do you
5    remember being in court?
6        A.    In January of 2002, yes.
7              MR. MCHALE:  I would like this to be
8        marked.  That's a transcript at the hearing
9        at which Mr. Vecchia appeared January 23,
10       2002.
11             ARBITRATOR:  Any objection?
12             MR. D'ANDREA:  No.
13             ARBITRATOR:  City 5.
14
15
16             (City Exhibit 5:  Marked into
17        evidence.)
18   BY MR. MCHALE:
19       Q.    Just with regard to this incident at
20   Toronto's, you pled guilty to a crime involving
21   your behavior at Toronto's on that day, didn't you,
22   sir?
23       A.    I don't know, sir.  Let me see the
24   transcript so I can read it.
25       Q.    You don't remember what crimes you have

1      pled guilty in your life?

2          A.    Oh, I do, sir.

3          Q.    How many crimes have you pled to?

4          A.    One.

5          Q.    One?

6          A.    Yes, sir.

7          Q.    Are you sure?

8          A.    One, sir.

9          Q.    Just one?

10         A.    Yes, sir.

11         Q.    What was that crime you pled guilty to?

12         A.    Taking Barbara Murphy's briefcase in March

13     of 1998.

14         Q.    And that was it?

15         A.    Yes, sir.

16         Q.    The theft of her briefcase?

17         A.    Yes, sir.

18         Q.    You didn't plead guilty to a crime

19     involving your interaction with her at Toronto's?

20         A.    There's a story there, sir.

21         Q.    There's a question.  You did not plead

22     guilty to a crime, is that your testimony?

23         A.    My testimony is there's a story there, sir.

24         Q.    I'm going to ask you a very specific

25     question.

1      A.    And I gave you a very specific answer.

2                  ARBITRATOR:  Gentlemen.  Again, let

3             him can ask the question and then you can

4             answer it.

5                  Ask the question.

6  BY MR. MCHALE:

7       Q.    Mr. Vecchia, did you plead guilty to a

8  crime involving your conduct at Toronto's in the

9  presence of Barbara Murphy in October of 2000?

10      A.    No, sir.

11      Q.    You did not?  Do you remember when you

12  appeared before Judge Nigro on January 23rd of 2002?

13      A.    I don't understand why everyone else has a

14  copy except the person testifying.

15      Q.    Do you remember when you appeared before

16  Judge --

17                  ARBITRATOR:  Answer the question, if

18             you can.

19                  THE WITNESS:  Yes.

20  BY MR. MCHALE:

21      Q.    And what were you charged with at the time

22  you stood before Judge Nigro?

23      A.    I was charged with a misdemeanor of

24  criminal trespass.

25      Q.    You were charged with criminal trespassing

1  in the first degree?

2         A.    Yes, sir.

3         Q.    In violation of the statute, and that was

4  concerning your conduct on March 20th, 1998 when

5  you --

6         A.    Approximately four years previously, yes.

7                ARBITRATOR:   Sir, let him ask the

8         question.

9                Ask the question, please.

10  BY MR. MCHALE:

11         Q.    The first crime you were charged with was

12  criminal trespassing in the first degree and that was

13  arising out of your conduct when you broke into

14  Barbara Murphy's car in March of 1998; is that

15  correct?

16         A.    That's correct, sir.

17         Q.    And the second crime you were charged with

18  was disorderly conduct and that charge surrounded

19  your conduct with Barbara Murphy in October of 2000

20  at Toronto's; is that correct?

21         A.    They are linked together, sir.

22         Q.    Is that correct?

23         A.    They are linked together, sir.

24         Q.    You pled guilty to both of those charges,

25  did you not?

1          A.   They were linked together, sir.

2          Q.   Did you plead guilty to both of those

3     charges?

4          A.   They were linked together, sir.

5               ARBITRATOR:  I will instruct you to

6          answer the question yes or no.

7               THE WITNESS:  I answered the question

8          to the best of my ability.

9               ARBITRATOR:  Are you saying you can't

10         answer that question yes or no?

11              THE WITNESS:  That's correct.

12              ARBITRATOR:  Move on, please.

13    BY MR. MCHALE:

14         Q.   Prior to accepting your plea of guilty with

15    regard to both of these charges, did the judge ask

16    the prosecutor to explain to you the facts on which

17    you were plea'ing?

18         A.   I don't know if he asked them or if that's

19    just a part of how they operate, sir.

20         Q.   Did they explain to you what they were

21    prepared to prove?

22         A.   In the court?

23         Q.   Yes, on January 23rd?

24         A.   No.

25         Q.   I'm looking at the transcript and the court

1    says, "I'm going to ask the states attorney to

2    describe what it is he claims he would present, and I

3    want you to listen to what he says and I'm going to

4    ask you if these are the claims you're entering a

5    plea of guilty to."

6         Do you remember the judge saying that?

7         A.    No.

8         Q.    No, okay.  The prosecutor then states,

9    "Your Honor, regarding the criminal trespass in the

10   first degree, the victim in that case is an

11   individual by the name of Barbara Murphy.  I

12   believe the defendant met her at their workplace.

13   Thereafter during evening hours he would bother her

14   repeatedly."

15        Do you remember the prosecutor saying that?

16        A.    No.

17        Q.    You don't remember any of this?  Are you

18   saying it didn't happen, Mr. Vecchia?

19        A.    No, I didn't say that, sir.

20        Q.    You just can't remember it?

21        A.    I told you regarding the two charges, they

22   were linked together.  And you care to emphasize that

23   they are separate.

24             ARBITRATOR:  The transcript speaks for

25             itself.  It's a part of the record.  You

1    can cite it in your brief.

2           MR. MCHALE:  Thank you.

3           ARBITRATOR:  You can't make him say

4    what you want him to.  He has a right to

5    testify the way he sees fit.

6           MR. MCHALE:  Okay.  May I have a

7    one-minute recess, please?

8           ARBITRATOR:  Yes.

9

10          (Break taken:  12:23 pm to 12:26 pm)

11

12          ARBITRATOR:  Back on the record,

13    please.

14          MR. MCHALE:  The City has no further

15    questions for this witness at this time.

16          ARBITRATOR:  Cross-exam?

17          MR. D'ANDREA:  No cross-examination.

18          ARBITRATOR:  Thank you.

19          Now that you have presented the

20    grievant, has that assisted you in your

21    decision as to whether or not you will be

22    calling --

23

24          (Attorney Maurer entered the hearing

25    room.)

116

ARBITRATOR:  I'm sorry, let me repeat the question to the City.

First the Union does not have any cross-examination of the grievant at this time.  They do have the right obviously to call them in their case in chief.

I was inquiring of the City whether or not after the grievant's testimony has clarified their position as to whether or not they will be calling his ex-wife or Ms. Murphy.

MR. MCHALE:  I will need to call both of those witnesses to testify with regard to the conduct at issue here.

ARBITRATOR:  Regarding the conduct prior to March of '98?

MR. MCHALE:  No.

ARBITRATOR:  Or the conduct of October of 2000 or both?

MR. MCHALE:  Well, regarding a little bit of both.

ARBITRATOR:  Which witnesses were you going to call first?

MR. MCHALE:  I was going to call

Barbara Murphy first.

ARBITRATOR:  Which means we need to address the question of Ms. Murphy being in the presence of the grievant at this time.

If appropriate precautions are made, is there any set of circumstances that you can foresee where Ms. Murphy will come into this room; if you're sitting with her, for instance, and we face the witness chair away from the grievant, facing I believe that's north.

MS. MAURER:  The doctor's opinion, which I have here, suggests that you can expect a fairly major meltdown.  Possibly I understand that we have security in the building.

ARBITRATOR:  That was going to be my next question.  If the security guard is present and essentially sitting with her --

MS. MAURER:  I think she would be better off if I sat with her, but also could Mr. Vecchia possibly sit further away?

ARBITRATOR:  I don't foresee that as a

1    problem.  He can sit at the back table.  He

2    would still have an opportunity to

3    communicate with his advocate.

4        MS. MAURER:  Let me talk to her.

5        ARBITRATOR:  How long do you think

6    your testimony is going to be of

7    Ms. Murphy?

8        MR. MCHALE:  It's hard to say,

9    Mr. Dee.  Probably not very long.  Less

10    than an hour certainly, maybe even less

11    than that.

12        MS. MAURER:  Please, don't make her

13    wait any longer.

14        ARBITRATOR:  Please go speak to her

15    then.  We are not going to break for lunch

16    at this time.

17

18        (Break taken:  12:31 pm to 12:39 pm)

19

20        MR. D'ANDREA:  Mr. Chairman, the Union

21    would like to rise an objection as much as

22    it's unable to see the witness giving

23    testimony.

24        ARBITRATOR:  You can hear her

25    testimony.  Please sit down, your objection

1    is overruled.

2         I'm going to swear you in at this

3    time.  Can you please raise your right

4    hand.

5

6         BARBARA MURPHY, called as a witness,

7    having been first duly sworn by the

8    Arbitrator, testified as follows:

9

10        ARBITRATOR:  Please state and spell

11   your name for the record.

12        THE WITNESS:  Barbara E. Murphy.

13   B-a-r-b-a-r-a, E., and then M-u-r-p-h-y.

14        ARBITRATOR:  Thank you.

15        Prior to your direct of Ms. Murphy,

16   and Mr. D'Andrea you need to listen to

17   this, it seems to me from your opening

18   statement but most importantly from the

19   testimony of the grievant, the parties had

20   an agreement in March of 2000.

21        There is some dispute as to the extent

22   of the agreement but at the minimum we have

23   an agreement between the parties that there

24   was to be no contact between the grievant

25   and Ms. Murphy.