The dispute arises as to whether or not that agreement extended to any off-premises, nonemployment-related conduct. Other than that, there seems to be a consensus.

With that said, the panel doesn't deem it necessary that we get into the specifics as testified by the grievant or in your opening statement concerning the grievant's conduct between I believe it was '97 --

MR. MCHALE: '97 and '98.

ARBITRATOR: -- and '98 because this agreement was reached between his employer and himself. What the panel deems important at this time is what occurred in 2000 for the City to act to, number one, suspend with pay the grievant and then, two, terminate his employment.

And we would like you to inquire on this basis. You don't need to go into all of the nuances of the prior conduct as outlined.

MR. MCHALE: Fine.

ARBITRATOR: With that, you can inquire.

## DIRECT EXAMINATION

BY MR. MCHALE:

    Q.    Barbara, you're here today because I subpoenaed you; is that right?

    A.    Correct.

    Q.    Did you at some point file a criminal complaint against David Vecchia for stalking?

    A.    Yes, I did.

        MR. D'ANDREA:  Mr. Chairman, could counsel for the City please speak louder.

BY MR. MCHALE:

    Q.    Did you give a voluntary sworn statement to the police officer Carl Strate regarding your complaint?

    A.    Yes, I did.

    Q.    Is that your complaint?

    A.    Probably.  I didn't bring my glasses, they are in the other room.  Sorry.

        MR. D'ANDREA:  Mr. Chairman, we also cannot hear the witness.

        THE WITNESS:  Probably this is it, but I don't have my glasses so she is going to get them so I can read it to see if it's

1   me.
2              Looks like my signature. Yes, I did
3   voluntarily put a complaint in against
4   Vecchia to the police. Absolutely.
5          ARBITRATOR: Okay, we'll wait for your
6   glasses.
7                    (Pause.)
8          ARBITRATOR: With the benefit of your
9   glasses, can you now answer the question?
10         THE WITNESS: Yes, this is my
11  signature. It appears to be all over, yes.
12  BY MR. MCHALE:
13      Q.   Is this statement yours?
14      A.   This is me. Yes. Yes. Yes.
15      Q.   Did you provide the information?
16      A.   Absolutely.
17         MR. MCHALE: I would like to introduce
18  that statement.
19         ARBITRATOR: Any objection from the
20  Union as this being marked as City 6?
21         MR. D'ANDREA: Mr. Chairman, we're
22  objecting as to relevance. This is not
23  known to us.
24         ARBITRATOR: Overruled. City 6.
25

```
 1                    (City Exhibit 6:  Marked into
 2          evidence.)
 3
 4   BY MR. MCHALE:
 5       Q.   Ms. Murphy, prior to the time that
 6   Mr. Vecchia was sentenced during his criminal
 7   charges, did you have occasion to write a letter to
 8   the court expressing your opinion about his
 9   application for accelerated rehabilitation?
10       A.   Yes, I did.
11       Q.   I will present you a letter dated
12   January 10th, 2002 from you to the Honorable Richard
13   Comerford.  Is that your letter?
14       A.   Yes.  But I believe I signed it at one
15   time.
16       Q.   It was signed at one point?
17       A.   Yes.
18            MR. MCHALE:  I'll introduce that
19       letter.
20            ARBITRATOR:  Would the witness please
21       raise your voice somewhat when answering
22       the questions.
23            THE WITNESS:  I have never been known
24       to be inaudible, so this is a twist.
25            ARBITRATOR:  Any objection to this
```

letter coming in? She just testified this is a letter she wrote, any objection, about his application for AR?

MR. D'ANDREA: We object for the same reason that which has been marked City 6.

ARBITRATOR: City 7. Objection overruled.

(City Exhibit 7: Marked into evidence.)

BY MR. MCHALE:

Q. Ms. Murphy, I would like to turn your attention now to an incident that occurred in October of 2000 at Toronto's Restaurant in Stamford.

A. Okay.

Q. I understand you were there with Mr. Tuchinardi?

A. That's correct.

Q. And what happened as regards Mr. Vecchia?

A. We were sitting at the bar at Toronto's. Mr. Tuchinardi was sitting to the right of me, I was sitting to the left of him, and facing towards him which also faces towards the door to come into the restaurant, bar, whatever. And we were there to see

1  some country music thing because that's what
2  Mr. Tuchinardi is into.
3          MR. D'ANDREA: Mr. Chairman, could you
4     please instruct the witness to speak
5     louder.
6          THE WITNESS: I can turn around and
7     you can look right at me.
8          ARBITRATOR: Look at me.
9          THE WITNESS: We were at Toronto's
10    sitting at the bar, I was facing the door,
11    Mr. Tuchinardi was facing me. Mr. Vecchia
12    walked in and directly saw me and stood
13    there. And he stood at the end of the bar,
14    got a drink and kept looking at me.
15         Mr. Tuchinardi is "Boom." I said,
16    "Boom, oh, my God, David Vecchia is here."
17         Boom said, "Don't worry, you're with
18    me."
19         I said, whatever, "I don't know if I
20    can stay here."
21         He said, "Just relax, maybe he will
22    leave." Because he's supposed to leave.
23    When he sees me, the agreement is he's
24    supposed to go the other direction.
25         Well, we waited about 10 minutes, I

1  couldn't take any more and I said I want to
2  go and we left, walked past, Vecchia stood
3  right there and stared at me all of the way
4  out the damn door.

BY MR. MCHALE:

Q. Did you go home after you left Toronto's later that night?

A. Yes, I went home eventually. I don't know if I went right home. I can't remember if we went right home. I'm thinking we did, I'm not sure.

Q. It's not important. Were you concerned you were going to get more telephone calls?

A. I was concerned I didn't know what he was doing, he was following us.

Q. Did you turn off your phone?

A. I turned off my phone all of the time since pretty much 1998 because the phone rings all night long.

Q. Did you turn on your phone the next morning?

A. I did turn on my phone and look at the caller IDs. And on the phone was a seven number, I don't know, six, some number, and I didn't think anything of it because I didn't know. 762. And I went out to go get my paper, and when I went out to

1  get my paper like I do every morning there was this
2  thing on my lawn.
3       And I said, oh, my God to myself, and I
4  went back in and I wrote down the number and I
5  figured it has to be a Wilton number or some number
6  because 762.
7       And then I called everybody to ask if
8  anybody called me, all of my family members,
9  whatever. I even asked my uncle was working on my
10 stairways so I didn't know if his wife left him a
11 little ornament because earlier there was a snake
12 found where my uncle was ripping up my stuff so I
13 didn't know if his wife was being funny and leaving
14 an ornament.
15      I called Boom, did you leave an ornament?
16 I called everybody in the world to find out if they
17 did this, and nobody did it.
18      And I said, Holy Christ, he did this, here
19 he goes he's doing it again, pretty much in my mind.
20 Q.   What was he doing again?
21 A.   Pretty much the same thing he did in 1998,
22 leaving crap on my lawn. It just seemed like the
23 start of all that happened before. Breaking my
24 mirror when he saw me, breaking into my car, leaving
25 stuff on my car. Obviously hanging out in my yard

1  because that's where my car is and things like that.
2  And phone calls going to start, everything was going
3  to start all over again. I didn't want it to start
4  all over again. Because he made me crazy. So that's
5  what happened. And he said he would stay away from
6  me. So there you are.
7              MR. MCHALE: I have no further
8        questions.
9              THE WITNESS: Did you ask another
10       question?
11             ARBITRATOR: Cross-examination?
12             MR. D'ANDREA: Mr. Chairman, may I
13       have a few minutes with my grievant, sir?
14             ARBITRATOR: Take a minute, please.
15
16             (Off record: 12:48 pm to 12:50 pm)
17
18             MR. D'ANDREA: Mr. Chairman, we have
19       no questions for the witness.
20             MR. MCHALE: Thank you, Barbara.
21             THE WITNESS: That's it?
22             MR. MCHALE: Yes.
23             ARBITRATOR: Thank you.
24
25             (Witness excused.)

    MARY VECCHIA, called as a witness, having been first duly sworn by the Arbitrator, testified as follows:

  ARBITRATOR: Good afternoon. Please state and spell your name for the record.

  THE WITNESS: It's Mary Vecchia, V-e-c-c-h-i-a.

  ARBITRATOR: Thank you.

  You may inquire.

### DIRECT EXAMINATION

BY MR. MCHALE:

  Q. Ms. Vecchia, you're here today because I subpoenaed you; is that right?

  A. Yes.

  Q. When did you become aware that your ex-husband, David Vecchia, was stalking Barbara Murphy?

  A. I wasn't really sure the exact time but he was not coming home around 1997.

  MR. D'ANDREA: Mr. Chairman, we can't hear the witness.

1  ARBITRATOR: Would you please keep
2  your voice up.
3  THE WITNESS: I'm sorry. Around 1997
4  I felt my husband was not coming home
5  appropriately.
6  MR. D'ANDREA: Mr. Chairman, I didn't
7  hear the end of that.
8  THE WITNESS: Appropriately.
9  MR. D'ANDREA: He was not coming home
10 appropriately?
11 THE WITNESS: Right, he was not coming
12 home at a normal time.
13 BY MR. MCHALE:
14 Q. Did you have occasion to hear a voice mail
15 message on your home answering machine --
16 A. Yes.
17 Q. -- regarding a break-in of a woman's car?
18 A. Yes.
19 Q. Who left you that message?
20 A. Barbara Murphy.
21 Q. Did you have occasion to look in your
22 husband's briefcase and find objects related to
23 Barbara Murphy?
24 ARBITRATOR: One moment, please. This
25 is the type of question that we actually

1 have an admission from the relevant that it

2 occurred. So if we have it on record, it's

3 something that we don't need to cover

4 again.

5     MR. MCHALE: We have an admission

6 that what occurred, Mr. Dee, just so I'm

7 clear?

8     ARBITRATOR: That he broke into the

9 car.

10     MR. MCHALE: I'm not asking about the

11 car. I'm asking about items she found in a

12 briefcase, different matter.

13     ARBITRATOR: My apologies.

14 BY MR. MCHALE:

15     Q. I'm asking whether you had occasion to

16 find items in your husband's briefcase concerning

17 Barbara Murphy?

18     A. Yes.

19     Q. Did you find a yearbook picture?

20     A. Yes.

21     Q. Is that what you found in his briefcase?

22     A. Yes.

23     MR. MCHALE: Could we mark that as an

24 exhibit, please.

25     ARBITRATOR: Any objection?

1           MR. D'ANDREA: No, sir.
2           ARBITRATOR: City 8.
3
4           (City Exhibit 8: Marked into
5    evidence.)
6
7  BY MR. MCHALE:
8      Q.  Did you find items downloaded from the
9  Internet in his briefcase?
10     A.  Yes.
11     Q.  What did those items pertain to?
12     A.  Stalking.
13     Q.  I'm sorry?
14     A.  Stalking.
15     Q.  Stalking?
16     A.  Articles.
17     Q.  Articles?
18     A.  Yes.
19     Q.  Newspaper articles?
20     A.  No, Internet.
21     Q.  On the subject of stalking?
22     A.  On the subject.
23     Q.  Did you confront your husband about what
24  you had discovered?
25     A.  No, I did not.

1  Q.   Ms. Vecchia, did you have occasion to give
2  a sworn statement to the State of Connecticut State
3  Police in September of 1999 regarding your husband's
4  behavior?
5      A.   I believe it was a detective.
6      Q.   Is that a copy of your sworn statement?
7      A.   Yes.
8              MR. D'ANDREA:  Mr. Chairman, I object
9      to the admission of this as evidence.
10             ARBITRATOR:  Well, I'll show you a
11     copy.  Can you be more detailed, please, on
12     your objection?
13             MR. D'ANDREA:  Mr. Chairman, we don't
14     see the relevance in this matter.  This is
15     a discharge case, sir, and we don't see how
16     there's any relevance to the statement that
17     Mrs. Vecchia has given.
18             ARBITRATOR:  Well, it goes directly to
19     your client's conduct, possibly his state
20     of mind, so therefore I'm going to overrule
21     your objection and mark this as City 9.
22
23             (City Exhibit 9:  Marked into
24     evidence.)
25

BY MR. MCHALE:

   Q.   Ms. Vecchia, when were you divorced from your husband?

   A.   Last year in August.

   Q.   August of 2001?

   A.   Yes.

   Q.   Did your husband stalk you prior to your divorce?

   A.   Yes.

   Q.   What did he do?

   A.   He followed the children and I in various places, church functions, and my children have no contact with him.

      MR. D'ANDREA:   We didn't hear that, Mr. Chairman.

      THE WITNESS:   I said my children have no contact with him at this point.

      MR. D'ANDREA:   Thank you.

BY MR. MCHALE:

   Q.   Did he make numerous phone calls to your home?

   A.   Yes.

   Q.   Did he send you letters?

   A.   Yes.

   Q.   How many?

1 many letters. I don't have the total
2 amount but many, many letters.
3     Q. Does he continue to stalk you?
4     A. A month ago he entered a library where we
5 were.
6     Q. Did you have occasion to hire a private
7 investigator --
8     A. Yes.
9     Q. -- to watch your husband?
10     A. Just one time.
11     Q. Did he prepare a report of his
12 investigation?
13     A. Yes, he did.
14     Q. Did he provide it to you?
15     A. The detective?
16     Q. The investigator?
17     A. Right.
18     Q. Is that a copy of his report?
19     A. Yes.
20     ARBITRATOR: Does this report have
21 information that's directly related to the
22 grievant's termination?
23     MR. MCHALE: Yes.
24     ARBITRATOR: So that I'm clear, what
25 we have marked as City 9, it was my

| | |
|---|---|
| 1 | on the stand and further representation was there |
| 2 | was information in this report that also |
| 3 | directly related to the grievant's |
| 4 | termination and not just his conduct |
| 5 | concerning his ex-wife and the divorce? |
| 6 | MR. MCHALE: I didn't mean to make any |
| 7 | such representation, and I hope that I |
| 8 | didn't. The conduct in the statement that |
| 9 | Ms. Vecchia gave was a statement she gave |
| 10 | to the State Police in Redding regarding |
| 11 | his harassment and stalking of her. Which |
| 12 | if you look at the information in the |
| 13 | allegation shows a pattern towards the |
| 14 | kind of conduct he engaged in towards |
| 15 | Barbara Murphy. And it's for that purpose |
| 16 | that I introduced that report. |
| 17 | ARBITRATOR: I'll allow the items to |
| 18 | be marked as City 9 with the caveat that I |
| 19 | think we're getting far afield here of the |
| 20 | discharge itself. What weight, if any, the |
| 21 | panel will give that will be determined at |
| 22 | a later date once we hear arguments in the |
| 23 | brief, but I don't believe we need to go |
| 24 | too far that -- |
| 25 | MR. MCHALE: I'm not going any |

I have no further questions.

MR. D'ANDREA: Mr. Chairman, did you say this is going to be marked City 9?

ARBITRATOR: No. I was commenting on City 9. I thought City 9 had information which pertained directly to your client's discharge. The City explained to me that it does not necessarily have information in it directly related to his discharge but possibly his conduct towards his ex-wife during this period of time.

And what I said was I'll leave it marked as City 9 but how much weight I'm going to give that document will be determined at a later date.

MR. MCHALE: Mr. Dee, I understood your question about whether it relates to this conduct surrounding the discharge as referring to this document, this document that's a letter dated March 24, 1998 from the private investigator to Mary Vecchia.

I didn't mean to confuse you but I thought you were referring to that document when I said it relates to his conduct, his

misconduct with regard to Barbara Murphy.

ARBITRATOR: And this is the one we will mark as City 10?

MR. MCHALE: Yes.

ARBITRATOR: So the investigator's report of March 28th, 1998 is City 10.

MR. D'ANDREA: Mr. Chairman, we would like to register our objection of City 10 and state for the record that this document is signed by a Mr. Gary Paist allegedly and there's no certification that that is correct nor is this person present. This is no more than hearsay.

MR. MCHALE: Barbara Murphy testified that she hired the investigator and this is the letter she received from the investigator -- Mrs. Vecchia, I'm sorry.

ARBITRATOR: This is an arbitration hearing, not a court of law, so hearsay evidence is admissible. We'll take it for what it's worth. She's authenticated a document as best she can and we'll mark it as City 10.

(City Exhibit 10: Marked into

(evidence.)

    MR. MCHALE: I have no further questions of this witness.

    ARBITRATOR: Any cross-exam?

    MR. D'ANDREA: Mr. Chairman, may I have a minute with my grievant?

    ARBITRATOR: Certainly.

(Break taken: 1:03 pm to 1:05 pm)

    MR. D'ANDREA: Mr. Chairman, we have no questions.

    ARBITRATOR: Thank you.

    Let's go off the record for a moment.

(Lunch break: 1:06 pm to 1:41 pm)

<u>WILLIAM STOVER</u>, called as a witness, having been previously duly sworn by the Arbitrator, testified as follows:

    ARBITRATOR: Would you please state and spell your name.

    THE WITNESS: It's William Stover,