ARBITRATOR: You're under oath from this morning.

Would you please inquire.

### DIRECT EXAMINATION

BY MR. MCHALE:

Q. Mr. Stover, what position do you hold with the City of Stamford?

A. The director of Human Resources.

Q. And how long have you held that position?

A. Since December of 2000.

Q. And what positions did you hold prior to December of 2000?

A. Assistant director of Human Resources.

Q. And when did you begin as the assistant director?

A. I believe it was in September of '98. Prior to that I was a labor relations specialist for about a year and a half.

Q. Did there come a time in September of 1998 when Barbara Murphy filed a complaint with your office regarding David Vecchia's conduct toward her?

A. Yes.

```
 1          Q    And was her complaint substantially the
 2    same as my rendition of that during my opening
 3    statement?
 4          A    Yes, it was.
 5                    MR. D'ANDREA: Objection.
 6                    ARBITRATOR: And your objection is?
 7                    MR. D'ANDREA: The question is not
 8          specific.
 9                    ARBITRATOR: I believe the question is
10          specific.
11                    MR. D'ANDREA: Would you repeat the
12          question, please.
13                    MR. MCHALE: We presented a variety of
14          testimony and I think my question of
15          Mr. Stover was I asked him if he heard my
16          opening statement where I explained what
17          the complaint was, and I asked Mr. Stover
18          what she explained to him about was
19          substantially the same as what I described
20          during my opening statement.
21                    MR. D'ANDREA: Mr. Chairman, the
22          purpose of the testimony as we see it is to
23          give a firsthand account statement of the
24          City's statement; it's not a firsthand
25          account, it's a statement.
```

/141/

1  ARBITRATOR: I think what he's trying
2  to do is alleviate again going over
3  testimony that was presented earlier
4  through the witness and actually through
5  your client. You would have the right
6  to cross-examine on any of the statements.
7  If you're not comfortable with that, we
8  will have him go through what the complaint
9  was.
10  MR. D'ANDREA: I wish you would.
11  BY MR. MCHALE:
12  Q. Mr. Stover, first of all, who came to see
13  you?
14  A. Initially I received a phone call from
15  Tom Cassone, who was the Corporation Counsel at the
16  time. He indicated to me that he received a call
17  from either Attorney Fraser and Ms. Murphy. So I
18  went over to the fire department where Ms. Murphy
19  works, with Fred Manfredonia from my office, and met
20  with Ms. Murphy and Mr. Fraser.
21  Q. And what did she tell you?
22  A. She laid out a series of incidents that had
23  taken place, this would have been in '98 so it would
24  have been over the past year or so, where Mr. Vecchia
25  had engaged in harassing behavior, stalking her,

1  following her, going to bars that she frequented,
2  going to city events that she frequented, those types
3  of things.
4      Q.   Did she tell you the story of the break-in
5  of her car?
6      A.   I was going to say culminating in the
7  break-in of her motor vehicle at her house.
8      Q.   What did you do in response to
9  Barbara Murphy's complaint?
10     A.   After we talked to her, we scheduled a
11 meeting with Mr. Vecchia.  He was offered union
12 representation, he declined.  We reviewed the
13 incidents that Ms. Murphy alleged took place.
14 Mr. Vecchia indicated, in fact, that he had engaged
15 in that behavior.  He was clearly fearful for his
16 job.  He was basically cooperative in the sense that
17 he responded that he had broken into her car and that
18 he had acted the way she had indicated.
19     Q.   What, if any, directive did you give to
20 Mr. Vecchia regarding his future conduct towards
21 Barbara Murphy?
22     A.   After we met with David that first time, we
23 went back and met with the complainant again.  And
24 she had indicated, and she was very clear, she did
25 not want Mr. Vecchia to lose his job as a result of

1  this. She just wanted him to leave her alone. That
2  was her major objective.
3       So we went back to him and gave him a
4  clear directive that he was not to engage her in
5  any way either at the workplace or outside the
6  workplace, that he was to leave her alone, and his
7  failure to do so would result in his termination of
8  employment.
9       Q.  Did the City of Stamford eliminate the
10 position of purchasing agent?
11      A.  Yes.
12      Q.  And when?
13      A.  Just this past year. The city went through
14 a very difficult budget year, as I'm sure many cities
15 did. In fact, during the budget process we were
16 faced with a tremendous deficit. As a result of
17 that, we had started earlier in the year putting a
18 hiring freeze on. In the end, we eliminated from
19 last year's budget which would have been '00-'01 to
20 '02-'03 budget we eliminated approximately 92
21 positions from the budget. Among those was the
22 purchasing agent position.
23           MR. MCHALE:  No further questions of
24      this witness.
25           ARBITRATOR:  What month?

1    THE WITNESS: The position was
2    eliminated, the mayor's budget would have
3    been sent down I believe the first week of
4    March and then it goes through a series of
5    board approval. I believe middle of May is
6    when final budget is approved.
7        ARBITRATOR: Of this --
8        THE WITNESS: Yeah, '02, subsequent to
9    termination.
10        ARBITRATOR: Cross-exam?
11        MR. D'ANDREA: Yes.
12
13
14             CROSS-EXAMINATION
15
16   BY MR. D'ANDREA:
17       Q.   Is there a written complaint from
18   Barbara Murphy that came to you?
19       A.   No.
20       Q.   When you had this interview with her, did
21   you make any promises with regard to Vecchia's
22   continued employment?
23       A.   No.
24       Q.   Did you have anything to say to her with
25   regard to his continued employment?

1  A. Other than trying to meet with her
2  objectives, which was to be left alone but not have
3  Mr. Vecchia lose his job, no.
4  Q. At any time did you speak with Mr. Vecchia
5  about this incident that she related to you?
6  A. What incident? I'm unclear as to what
7  you're asking.
8  Q. Well, about her complaints?
9  A. We met with her in September of '98 and
10 within, I'd say, two or three days of meeting with
11 her we met with Mr. Vecchia. And then within a
12 couple of days or three days of meeting with
13 Mr. Vecchia we met with Ms. Murphy again.
14 Q. When you met with Mr. Vecchia, was there
15 some conditions that were imposed on him?
16 A. Yeah, I believe I answered those earlier.
17 He was given the directive to stay away from
18 Ms. Murphy in the workplace and outside of the
19 workplace, to cease his stalking and pursuit of her.
20 Q. Do you recall at any time in your
21 discussion that there was some controversy raised
22 over whether outside involvement had any relevance or
23 impact to on the job?
24 A. There was no confusion in my mind.
25 Q. You made no distinction between whether he

1  was involved outside of work or inside of work?
2     A.   No.  That statement by Mr. Vecchia is not
3  accurate.
4     Q.   Did you relate to Mr. Vecchia any rules or
5  policies regarding inside/outside the workplace
6  involvement with Ms. Murphy?
7     A.   Did we give him any policies regarding
8  that?
9     Q.   Yes, any rules or any --
10    A.   No, other than a very explicit directive
11 that he was not to have any contact with her, no.
12    Q.   What resulted in your suspension with pay?
13 What caused that suspension of pay with Vecchia?
14    A.   What caused it?
15    Q.   Yes.
16    A.   Well, his initial arrest in December of
17 2000.
18    Q.   What impact, if any, did this have on
19 Mr. Vecchia's employment?
20    A.   Following, he was placed on paid
21 suspension -- administrative leave I believe is what
22 it was.  Once --
23    Q.   For what cause?
24    A.   Because we had an arrest of an employee for
25 stalking an employee, a coworker, so we felt it

1  prudent at that time to place him on administrative
2  leave. But not to negatively impact Mr. Vecchia, we
3  made it a paid leave so there was no disciplinary
4  action taken against him at that point.
5     Q.  So then the arrest did not cause you in any
6  way to warn him about his employment or continued
7  employment or separation from it?
8     A.  I have no idea what that question was.
9  Sorry, Nick, maybe if you say it a different way I
10 could understand.
11    Q.  Okay. There was no relationship between
12 Mr. Vecchia's continued employment and the arrest; is
13 that correct?
14    A.  I still don't understand what you're asking
15 me.
16    Q.  Did the arrest, in terms of how the City
17 viewed it --
18    A.  We viewed it as an arrest. We didn't make
19 any decision regarding Mr. Vecchia until actually he
20 pled guilty to two counts.
21    Q.  How did you feel it related to the City,
22 any rules or policies that the City had?
23    A.  He broke -- he basically violated the
24 directive he was given to cease his pursuit of
25 Ms. Murphy. And by his own admission to the court in

1  his guilty plea he admitted that he stared at her in
2  Toronto's and pursued her in that manner. So that to
3  me is pretty clear.
4      Q.   And following the conviction, did you seek
5  to take action to separate him from his employment?
6      A.   That's what I just said, yes.
7      Q.   And for what cause?
8      A.   For just cause. He violated a directive
9  and he stalked an employee after he was told not to.
10 I think that's sufficient terms to separate his
11 employment.
12     Q.   Did you ever consider bringing Vecchia back
13 to work during the paid leave, Bill?
14     A.   No.
15     Q.   During the paid leave did the City ask
16 Barbara Murphy about bringing Mr. Vecchia back to
17 work?
18     A.   No, I don't believe so. I wasn't involved
19 in any conversation like that.
20     Q.   Has Ms. Murphy made claims against the City
21 that have money attached?
22     A.   Are you asking me if she's filed a lawsuit
23 against the City?
24     Q.   Yes.
25     A.   Not to my knowledge, no.

1    Q.    Were there any suits related to the City
2  that may have involved CHRO?
3    A.    She did file a CHRO complaint, yes.  And
4  it's been dismissed.
5    Q.    Do you recall what the claims were?
6    A.    I believe sexual harassment, I think.  I
7  think it was filed under sexual harassment.
8    Q.    In the statement of counsel on opening of
9  the hearing, the City of Stamford's sexual harassment
10 policy was submitted and identified as City 2.  It
11 says "As adopted June 24th, 1998."  Is there
12 any relevance to this policy and Mr. Vecchia's
13 discharge?
14   A.    Insofar as Mr. Vecchia engaged in
15 inappropriate conduct towards an employee, yes.  But,
16 again, I indicated the reason why we terminated
17 Mr. Vecchia was because he was given an explicit
18 directive to stay away from her and he violated that
19 directive.
20         MR. D'ANDREA:  Could I have two
21    minutes with my grievant?
22         ARBITRATOR:  Are you finished with
23    this witness?
24         MR. D'ANDREA:  No.  I would like to
25    confer with him outside before I proceed.

```
 1              ARBITRATOR:  Okay.
 2
 3             (Off record:  2:02 pm to 2:06 pm)
 4
 5   BY MR. D'ANDREA:
 6      Q.   Bill, did you clearly understand that there
 7   was an agreement between yourself and Mr. Vecchia?
 8      A.   Yes.
 9      Q.   Do you believe Mr. Vecchia understood the
10   agreement?
11      A.   Yes, I believe he did.
12      Q.   -- in the same regard that you understood
13   it?
14      A.   Yes, I believe he understood it clearly.
15      Q.   Bill, the City's sexual harassment
16   policy, did you have any hand or part in developing
17   this?
18      A.   I believe someone else in my office
19   drafted it.  I'm sure I reviewed it at some point or
20   another.
21      Q.   Did you mention any discussion you had with
22   Vecchia when you came to this, as you say, directive
23   that there would be a settlement agreement reduced to
24   writing?
25      A.   I didn't say that.
```

```
 1      Q.   Did not?
 2      A.   No, I didn't -- did I say that earlier?
 3      Q.   Did not mention that to Mr. Vecchia?
 4      A.   No.
 5           MR. D'ANDREA: Mr. Chairman, I want to
 6   point to City 2 and I want to ask Bill if
 7   he's familiar with the informal resolution
 8   procedures, No. 4 on page 3.
 9           MR. MCHALE: Would you like him to
10   have a copy?
11           MR. D'ANDREA: Yes.
12           THE WITNESS: Page 3?
13   BY MR. D'ANDREA:
14      Q.   Yes.
15      A.   (Reviewing). Yes.
16      Q.   Now, in the session that you had involving
17   Vecchia and Murphy in attempting to mediate their
18   differences, it says here that the settlement
19   agreement must be in writing, signed by both parties,
20   and approved by the director of Human Resources. Now
21   that's you, isn't it Bill?
22      A.   I am now the director of Human Resources,
23   yes.
24      Q.   Were you at the time you had the
25   discussions with Vecchia?
```

```
 1      A.   No.  No, I was not the director.
 2      Q.   Who was at that time?
 3      A.   Jim Haselkamp was the director of Human
 4   Resources.
 5      Q.   Did he prepare the settlement agreement?
 6      A.   I don't believe there ever was a settlement
 7   agreement drafted.
 8      Q.   Never was?
 9      A.   No.
10      Q.   Is this a violation clearly of your own
11   sexual harassment policy, in your opinion?
12      A.   In my opinion, no, I don't think it is.  I
13   think at times all different types of situations
14   call for all different types of resolutions.  In this
15   case Ms. Murphy was satisfied with a resolution, it
16   was a clear resolution made clear to Mr. Vecchia.
17   Clearly for a period of time he complied with that
18   directive.
19           So the fact that there wasn't a settlement
20   agreement drafted, I can tell you right now we have
21   other situations where we have employees that may
22   make comments, inappropriate comments, that they are
23   brought in and they are counseled on it, we don't
24   necessarily draft a settlement agreement in that
25   situation.  Each situation calls for a different type
```

1  of solution, resolution.

2      Q.   Is there anywhere in this document that
3  you could point out to me that would make me
4  understand that this statement here, this settlement
5  agreement, must be in writing, et cetera, could be
6  taken another way, such as you described on the
7  witness stand?

8      A.   Well, again, I can tell you right now --

9      Q.   Well --

10      A.   You want a yes or no?

11      Q.   Yes.

12      A.   I think situations come about where a
13  resolution can take place.

14      Q.   That's not --

15          ARBITRATOR:  Let him finish the
16      answer.

17          MR. D'ANDREA:  Sir, it only requires a
18      yes or no response.  He's not answering the
19      question.

20  BY MR. D'ANDREA:

21      Q.   Is there anywhere else in this document,
22  other than the sentence I pointed out to you, where I
23  could understand that there is a statement that's
24  contra to the one I'm finding here?

25      A.   You're asking me to answer about what

understand and I can't answer that question with a yes or no. I'm not trying to be evasive here.

    Q.   Would you be able to find something that's contra in this document, yes or no?

    MR. MCHALE: I object to this questioning. The document speaks for itself. If Mr. D'Andrea has a question about Mr. Stover's conduct, what he did or didn't do, that's fine.

    ARBITRATOR: The witness has testified that in his mind there are situations when a settlement agreement does not have to be put in writing. It would be up to this panel to decide whether or not that is in violation of the policy.

    MR. D'ANDREA: Bill, thank you for your response to my question.

    I don't have anything else for Bill.

    ARBITRATOR: Any redirect?

    MR. MCHALE: No.

    ARBITRATOR: Thank you.

    (Witness excused.)

1   ARBITRATOR: Your next witness?

2   MR. MCHALE: Yes, Fred Manfredonia.

5   FRED MANFREDONIA, called as a witness,
6   having been previously duly sworn by the
7   Arbitrator, testified as follows:

9   ARBITRATOR: Good afternoon. You have
10  been previously sworn.
11  Would you please state and spell your
12  name for the record.
13  THE WITNESS: Fred Manfredonia,
14  M-a-n-f-r-e-d-o-n-i-a.
15  ARBITRATOR: Thank you.
16  You may inquire.

18  DIRECT EXAMINATION

20  BY MR. MCHALE:
21  Q.  Mr. Manfredonia, what position do you hold
22  with the City of Stamford?
23  A.  Human resources specialist.
24  Q.  How long have you held that position?
25  A.  Approximately five years.

1  Q.  I am calling you, Mr. Manfredonia, as a
2  witness to testify only about one issue, and that
3  issue deals with the impact that Mr. Vecchia's arrest
4  and 14-month paid leave and subsequent conviction of
5  two crimes had on your workplace.
6        Do you know that there was publicity
7  regarding his paid suspension in the local papers in
8  Stamford?
9  A.  I do.
10 Q.  How do you know that?
11 A.  Numerous people -- well, it had become
12 quite the topic of conversation throughout the city
13 on a daily basis and occupied pretty much
14 predominantly everybody's time.
15 Q.  Was it in the newspapers?
16 A.  It was.
17 Q.  Were you the liaison from the Human
18 Resources Department to the Finance Department?
19 A.  I was.
20 Q.  Any employee complaints arising out of that
21 department, would they come to your attention?
22 A.  They would.
23 Q.  At the time that Mr. Vecchia pled guilty to
24 these two crimes, did you have any concerns expressed
25 to you from any employees in the department regarding

1   his possible return to work?

2       A.   I did.

3       Q.   And what did they tell you?

4       A.   Three women from the department that was immediately adjacent to where Mr. Vecchia's office was came to me on three separate occasions, individually, and expressed extreme concern and fear that Mr. Vecchia could possibly be returning to his position and subsequently back to his office location.

            MR. MCHALE:  No further questions.
            ARBITRATOR:  Cross-exam?

CROSS-EXAMINATION

BY MR. D'ANDREA:

        Q.   What did the three people who complained have to do with Mr. Vecchia's discharge?

        A.   Nothing.

        Q.   Did you make notes of the meeting that you had with Mr. Vecchia in which you promised to put together a settlement agreement such as was alluded to with regard to the sexual harassment policy in Mr. Stover's case?

```
 1     A.   We never made any such agreement.  And the
 2  reason we didn't make that agreement was simply that
 3  Ms. Murphy had expressed to us time and time again
 4  that she in no way wanted to harm Mr. Vecchia
 5  irreparably, and if we documented anything such as
 6  the outcome of the meeting, that would become a part
 7  of Mr. Vecchia's personnel file and would remain
 8  there.  She did not want that to happen.
 9     Q.   So is it fair to say, then, that
10  Mr. Vecchia had no warning that he, in fact, would be
11  fired for any of the activity he had involving
12  Ms. Murphy?
13     A.   No, that's not fair.  We made it perfectly
14  clear to him in very definite terms of what our
15  expectations were if he was going to remain in the
16  employment of the City back in '98.
17     Q.   What were those terms, sir?
18     A.   The terms were that he would avoid complete
19  contact with Ms. Murphy both in and out of the
20  workplace, that he would not harass her, he would
21  not talk to her.  He had agreed, in fact, that if he
22  saw her walking down the hall coming toward him he
23  would turn and go the other way.  It was very clear,
24  and he made it perfectly clear to us, that he
25  understood us.
```