```
 1      Q.   Sir, I heard you say walking down the hall
 2 but was there any reference to maybe walking into the
 3 barroom or the like?
 4      A.   We made it perfectly clear that his contact
 5 should be completely avoided out of the office as
 6 well.
 7      Q.   And did you question or did any subject
 8 come up with regard to Mr. Vecchia's rights under law
 9 outside of the workplace?
10           MR. MCHALE:  I object.  I don't know
11      what his question is getting at.
12           THE WITNESS:  I'm not clear on it
13      either.
14 BY MR. D'ANDREA:
15      Q.   Well, was there any question that Mr. --
16           MR. MCHALE:  Who asked the question?
17 BY MR. D'ANDREA:
18      Q.   Was there any question involving the
19 discussion that you had with Mr. Vecchia at that time
20 that any of his civil rights would be violated were
21 you to be attempting to control his activity outside
22 of the workplace?
23      A.   Mr. Vecchia entered into this agreement on
24 his own.  At no time did he ask us or present to us
25 that his civil rights were being violated or
```

1  otherwise. At the time he was very concerned about
2  maintaining his job and getting his life back in
3  line, and he agreed to it. Had he raised it, we
4  probably would have addressed it then. But it
5  was not raised. Not him nor by any of his
6  representatives.
7      Q.   What representatives, sir, were present at
8  that meeting you said he had representatives?
9      A.   Which meeting?
10     Q.   Well, the meeting you said none of his
11 representatives --
12          MR. MCHALE:  He wasn't referring to a
13          meeting in fairness to the witness.
14          THE WITNESS:  What I was really
15          talking about is generally throughout the
16          time we had numerous meetings with
17          Mr. Vecchia at which time he had his union
18          representatives, he had his counsel
19          representing him. It was never a question.
20          Civil rights, this is the first we have
21          even heard about civil rights.
22 BY MR. D'ANDREA:
23     Q.   Had you ever considered bringing
24 Mr. Vecchia to work during the paid leave?
25     A.   There was always a question of whether or

1  not Mr. Vecchia would return to work, but we were
2  pending any decision -- any further action pending
3  the outcome of his criminal charges.
4      Q.   During the paid leave, did the City ask
5  Barbara Murphy about bringing Mr. Vecchia back to
6  work?
7      A.   We did.
8      Q.   And what was the result of your discussion
9  with Barbara Murphy?
10     A.   I contacted Ms. Murphy at the direction of
11 the director of Legal Affairs.  At the time there
12 were a number of periods where Mr. Vecchia's case was
13 coming on the calendar for final determination.
14 There was a high level of concern by Ms. Murphy and
15 fear that he would be returning.  To try to alleviate
16 some of those fears if in fact the decision was going
17 to be made that he was going to return to work, we
18 simply wanted to try to put something in writing to
19 present to Mr. Vecchia whereby he would absolutely
20 limit any positions or any places he might attend to
21 in the City, meaning bars, restaurants, or otherwise.
22 I had asked Ms. Murphy to try to present to me the
23 best list she could possibly give to me that would
24 indicate those places.
25     Q.   And was that ever done, sir?

1   A.   Was not.

2   Q.   And was there a reason why it was not done,
3   sir?

4   A.   Because at the time we just thought it was
5   an effort in futility.

6   Q.   And what did that mean, effort in futility?

7   A.   There was no reason. All it did was cause
8   more anxiety on Ms. Murphy's part at the possibility
9   that he could be returning to work. And rather than
10  doing that, because we had not made a conclusion, we
11  felt the best thing to do was just let course take
12  its time.

13  Q.   So is it fair to say, sir, what would have
14  been appropriate for the City's purposes, listing
15  places and situations where he might make agreement
16  not to engage her, instead you deferred to what
17  Ms. Murphy thought was acceptable?

18  A.   No, absolutely not.

19  Q.   Well, wasn't it your testimony that it
20  was your suggestion in a discussion with her that
21  she make a listing of places where she might
22  encounter Mr. Vecchia and that if she gave you that
23  kind of information you could get assurances from
24  Vecchia that he wouldn't be in attendance at those
25  places?

1   A.   No, I never gave any indication that there
2 would be any assurances of anything. We were simply
3 in a fact gathering mode, we were simply trying to
4 understand and get better information. It was simply
5 exploratory. It was not intended to have any
6 subsequent purpose other than the possibility of
7 trying to limit their interaction in the event
8 Mr. Vecchia returned to work.
9   Q.   How would you so do that with this list?
10   A.   I don't know, we didn't conclude anything.
11 Again, I will just state what I just said, which was
12 it was simply a fact gathering, exploratory exercise
13 on my part to start proceedings in the event that
14 Mr. Vecchia did in fact return to work. We had not
15 made any conclusions one way or another at that
16 point.
17   Q.   Are you familiar with any complaint that
18 Ms. Murphy has made against the City with regard to
19 CHRO?
20   A.   I am.
21   Q.   Were you in any way actively involved in
22 that, sir?
23   A.   I was.
24   Q.   And how so?
25   A.   I was asked to respond to a series of

1  questions that were presented to CHRO and to provide
2  information relevant to those questions.
3      Q. Are there any money claims being made by
4  Ms. Murphy or any attorney representing her?
5      A. To the best of my knowledge, I have not in
6  fact seen anything. I have heard.
7      Q. And from what source have you heard, sir?
8      A. Just through Bill Stover, contact director
9  of Legal Affairs.
10     Q. Well, you heard Mr. Stover's testimony
11 earlier that he said that there were no claims made
12 for money against the City?
13     A. Well, formally if you're asking about a
14 formal claim, no. Was there a letter that apparently
15 was written that had some suggestion, I would have to
16 say yes.
17     Q. And was that done by her attorney?
18     A. I'm assuming so.
19     Q. And did that letter precede the discharge
20 of Mr. Vecchia?
21     A. I really -- I don't know the specifics of
22 the letter.
23         MR. MCHALE: He testified he didn't
24     see the letter.
25         THE WITNESS: I didn't see the letter.

1  MR. D'ANDREA: That's all the questions I have.

ARBITRATOR: Redirect?

MR. MCHALE: No.

MR. D'ANDREA: Mr. Chairman, I would like to recall Mr. Stover.

ARBITRATOR: Well, I don't know if the City is finished with their case.

MR. MCHALE: The City does rest.

ARBITRATOR: You would like to call Mr. Stover on your case?

MR. D'ANDREA: Yes, on the basis of --

ARBITRATOR: You don't have to give me a basis, this is your case in chief. The City rests.


WILLIAM STOVER, called as a witness, having been previously duly sworn by the Arbitrator, testified as follows:


ARBITRATOR: You're still under oath. Ask away.

DIRECT EXAMINATION

BY MR. D'ANDREA:

Q. Mr. Stover, you're aware of a letter sent by Barbara Murphy's attorney seeking monies from the City with regard to this matter?

A. Yes, I am.

Q. And did the letter precede Mr. Vecchia's termination?

A. I have never seen the letter.

Q. And who received the letter?

A. I believe Corporation Counsel, Andrew McDonald.

Q. And do you know when, sir?

A. No. I've never seen the letter. I know he mentioned it to me; when exactly he mentioned it to me I'm not sure.

Q. Did it enter into any recommendations by any of your superiors to discharge Mr. Vecchia?

A. Absolutely not.

Q. There was a verbal agreement reached on October 15, '98 according to your testimony; is that not correct?

MR. MCHALE: Mr. Stover has been asked this question numerous times. It's been

```
 1              answered.
 2                   ARBITRATOR:  Yes, he has.
 3   BY MR. D'ANDREA:
 4       Q.   When was the Union first involved?
 5                   MR. MCHALE:  I don't understand the
 6              question, Mr. Dee.
 7   BY MR. D'ANDREA:
 8       Q.   In the matter of Mr. Vecchia's case, when
 9   did you first involve the Union?
10       A.   There was a Union representative available
11   for Mr. Vecchia when we brought him in.
12       Q.   No, I meant when was --
13       A.   You asked me when the union was first
14   involved.
15                   ARBITRATOR:  We understand that he
16              waived his right --
17                   THE WITNESS:  The Union president --
18                   ARBITRATOR:  One at a time.  He waived
19              his right to Union representation.  If you
20              know, when did the grievant first exercise
21              his right to utilize the services of his
22              Union?
23                   THE WITNESS:  It probably wasn't
24              until -- the first time I remember being in
25              a meeting with Mr. Vecchia and his Union
```

169

1  rep would have been in a meeting after he
2  had been arrested.
3  BY MR. D'ANDREA:
4      Q. And was there any agreement made with the
5  Union at that time when the Union was present with
6  regard to what was or was not expected of
7  Mr. Vecchia?
8      A. At that point everything had transpired.
9  This would have been in 2000 -- no, it might have
10 been in 2001. So the Union was not involved in the
11 agreement that was made in '98. That was an
12 agreement with Mr. Vecchia and the City.
13     Q. So is it your testimony, Mr. Stover, that
14 the Union never was a party or knowledgeable of the
15 fact that an agreement had been made between you and
16 the grievant?
17     A. I never discussed it with the Union.
18 Whether Mr. Vecchia discussed it with the Union or
19 not, I don't know.
20     Q. Bill, we looked at the sexual harassment
21 policy of the City and you commented that there were
22 various responses that the City might make with
23 regard to informal resolution procedures?
24     A. Yes.
25     Q. You have been present while we've had a

1  representative from the Connecticut State Police
2  here and also we've had some changing of the
3  seats of witnesses and of the grievant shuffling
4  around --

        ARBITRATOR:  Do you have a question here?

BY MR. D'ANDREA:

Q.  -- and considering all of that, Bill --

        MR. MCHALE:  What is the question?

BY MR. D'ANDREA:

Q.  -- what kind of case, if not this case, could you describe as being relevant for a settlement agreement to be in writing signed by both parties and approved by the director of Human Resources?

A.  That's a difficult question to answer and I'll tell you why. In the human resources world nothing is simply as easy as it seems. When we have complaints that come in from employees, and we get them, obviously our goal is to try to resolve those complaints.

        In some situations the complainants may want a written agreement or written assurances on something. In other cases they may not want those assurances. In this case the complainant did not want a written agreement. We gave her what she

1  wanted.

2      Mr. Vecchia was aware of the agreement. He
3  agreed to it. He understood it. There's no doubt in
4  my mind that he understood the agreement.

5      So I can't give you a specific when an
6  informal would work and when it wouldn't. I think it
7  depends on the circumstances and we have to use
8  discretion and judgment, and that's what we did in
9  this case.

10      Q. Bill, on January 8th of '01 in the Human
11  Resource conference room, did you meet with
12  Mr. Vecchia and Mr. Manfredonia?

13      A. Yes.

14      Q. And at that time did you request and did
15  Mr. Vecchia supply to you a comprehensive listing of
16  the places and events when he saw Ms. Murphy?

17      A. I don't know if I requested. I do know
18  that Mr. Vecchia told of some circumstances where he
19  had contact with Ms. Murphy.

20      Q. Did you take specific notes on that date
21  that you recall that --

22      A. I did take notes.

23      Q. And later they were given to Mr. Vecchia?

24      A. Yeah.

25      Q. If I can show you this document, would it

1  jog your memory on the events surrounding a meeting
2  that took place at Toronto's between Murphy and
3  Vecchia?
4          MR. MCHALE: I object. The witness
5      hasn't indicated that he needs his memory
6      jogged. He's answered every question
7      that's been asked of him.
8  BY MR. D'ANDREA:
9      Q. I'll make my question more direct, Bill.
10 Do you remember taking notes that, in fact, Vecchia
11 and Murphy met at Toronto's some time in the fall of
12 2000?
13     A. Yes.
14     Q. Wasn't it your testimony earlier that
15 Vecchia was fired for that event?
16     A. He was fired for violating the directive
17 that he stay away from Ms. Murphy.
18     Q. Yet in January 8th of '01 you yourself made
19 note that he had done this. Why then did you wait so
20 long for him to be discharged for this activity?
21     A. He had an arrest and obviously we were
22 concerned about what the outcome of that was, as
23 well. We also had an ongoing investigation.
24     Q. How did the arrest have any affect on the
25 decision with regard to their meeting at Toronto's in

1  January of '01?

2     A.   The arrest predated that.

3     Q.   I understand. But how did even the
4  conviction have any impact on this incident which you
5  say caused you to fire him? Why would that have been
6  relevant in your mind?

7     A.   What wouldn't have been relevant in my
8  mind?

9     Q.   You say you finally discharged him for the
10 meeting in Toronto's?

11    A.   Correct.

12    Q.   Which violated an agreement you say you had
13 with him?

14    A.   Right.

15    Q.   Now, when you knew about this in January of
16 '01, why did you not then act on it, and isn't it --
17 first, why did you then not act on it?

18    A.   Because we had not completed our
19 investigation at that point. I think I made that
20 clear, at least I remember saying at the end of that
21 meeting that we did not close the matter at that
22 point.

23    Q.   Didn't he tell you this voluntarily that he
24 met with her?

25    A.   I don't know whether he told us that or

1  whether his attorney told us that.
2      Q.  Well, he didn't deny it, that was for
3  sure?
4      A.  That he went to Toronto's?
5      Q.  And met her?
6      A.  Right. No, if my notes say that, that's
7  what they say. I believe in the notes, though, if I
8  remember correctly, he says that he did not stare at
9  her. You have got the notes there, is that what the
10 notes say?
11     Q.  I think they are consistent with his
12 earlier testimony, if that's what you mean?
13     A.  Can I -- I believe the notes say that he
14 did not stare.
15              ARBITRATOR: Are you going to request
16          that that be admitted as an exhibit?
17              MR. D'ANDREA: I think, Mr. Chairman,
18          for our purposes Bill's testimony was
19          sufficient.
20              ARBITRATOR: Do you have any further
21          questions?
22 BY MR. D'ANDREA:
23     Q.  What, with regard to the conviction that
24 you later became aware of, spurred you to discharge
25 Mr. Vecchia?

1    MR. MCHALE: Mr. Dee, this question
2    has been asked several times and answered
3    several times. I object to the
4    questioning; it's repetitive, it's
5    redundant.
6    MR. D'ANDREA: I don't think it is,
7    sir.
8    ARBITRATOR: Answer the question,
9    please. Let's move on.
10   THE WITNESS: What was it? The fact
11   that he violated the directive --
12   BY MR. D'ANDREA:
13   Q. No, no, what was it --
14   A. That he was in a bar in Toronto's where
15   Ms. Murphy was and he stared at her, making her feel
16   very uncomfortable to the point where she had to
17   leave that bar. That's why we terminated
18   Mr. Vecchia.
19   Q. And that became known to you, again, as a
20   result of the conviction?
21   A. Correct. Yes.
22   Q. Thank you for answering the question.
23   A. You're welcome.
24   ARBITRATOR: Any cross?
25   MR. MCHALE: None.

```
 1              MR. D'ANDREA:  I'm not through yet.
 2              ARBITRATOR:  Are you through with this
 3    witness?
 4              MR. D'ANDREA:  No, I'm not through
 5    with this witness.
 6              ARBITRATOR:  I just asked you if you
 7    had any more questions and you said no.
 8              MR. D'ANDREA:  I didn't say no.
 9              ARBITRATOR:  Go ahead.
10    BY MR. D'ANDREA:
11         Q.   Bill, there's a document, court document,
12    that's been marked City 5.  I have a copy of it
13    right here.  By this instrument did you become aware
14    of the violation you say which took place at
15    Toronto's?
16         A.   I believe we had a hearing in February in
17    the law department, if I remember correctly --
18         Q.   But that's not responsive to the question.
19    The question is by this document --
20         A.   I'm telling you how I became aware of it.
21    Oh, the answer is no, I did not become aware of it by
22    this document.
23         Q.   How then, sir, do you measure that about
24    with the answer you gave earlier that it was only on
25    the conviction that you became armed with the cause
```

1   for the discharge if it's not contained in here that
2   he admitted to being with her at the Toronto's
3   restaurant?
4              MR. MCHALE:  I object to the question.
5        Bill didn't testify that anything about
6        that document led to that decision.  He
7        didn't have the document at the time he
8        decided to terminate, that's his testimony.
9        So that's unfair.
10             MR. D'ANDREA:  No, he didn't say that.
11             MR. MCHALE:  He became aware of the
12        conviction, not that piece of paper.
13  BY MR. D'ANDREA:
14       Q.   Did you say you became aware of the
15  conviction that indicated that he saw her at
16  Toronto's?
17       A.   I became aware of the incident because at
18  the predisciplinary hearing his attorney explained
19  the plea bargain to us where he indicated that the
20  disorderly conduct charges because of staring at the
21  bar at Toronto's.  I did not have this document until
22  Mr. McHale ordered it through the courts.
23       Q.   So the discharge was predicated on the
24  January '01 --
25       A.   No.

```
 1        Q.    What was it predicated on?  You said it was
 2   predicated on --
 3        A.    There was a meeting in February of '02.  At
 4   that meeting Mr. Iadarola was there, I believe,
 5   Mr. Beva was there, I believe, Attorney Katz was
 6   there, Mr. Vecchia, myself, and Mr. Manfredonia.  At
 7   that meeting Attorney Katz explained the plea
 8   bargain that was reached where Mr. Vecchia pled
 9   guilty to two separate situations; one involving
10   his criminal conduct by breaking into her car in '98,
11   the other with respect to his criminal conduct when
12   he went into Toronto's in 2000 and stared at
13   Ms. Murphy.
14              He was very clear about those at that
15   meeting, at that predisciplinary hearing.  Subsequent
16   to that, we made a decision to terminate
17   Mr. Vecchia's employment.
18        Q.    How much after that did you say?
19        A.    I think it was within a week after
20   that we made the decision to terminate his
21   employment.
22        Q.    Thank you.
23        A.    You're welcome.
24              MR. D'ANDREA:  That's all the
25         questions I have.
```

1          ARBITRATOR: Cross-examination?
2          MR. MCHALE: No.
3          ARBITRATOR: Does the Union have any
4     further witnesses?
5          MR. D'ANDREA: I am going to call the
6     grievant to the stand, sir.
7          ARBITRATOR: How long do you believe
8     his testimony will take?
9          MR. D'ANDREA: Not long. 15 minutes.
10         ARBITRATOR: Let's take five.
11
12         (Break taken: 2:44 pm to 2:50 pm)
13
14
15         DAVID VECCHIA, called as a witness,
16    having been previously duly sworn by the
17    Arbitrator, testified as follows:
18
19         ARBITRATOR: Back on the record.
20    Mr. Vecchia, you're still under oath.
21    Please inquire.
22
23              DIRECT EXAMINATION
24
25    BY MR. D'ANDREA: