Page 73

A. No, I made sure that it was someone covered by the insurance.
Q. And you're saying nobody asked for reports. Do you know if this individual you saw gave reports to anybody aside from yourself?
A. I never signed any release.
Q. Did you see this individual, and I'm talking about prior to your arrest now, more than six or less than six times?
A. I don't think it's any of your business.
Q. All right. This one I am going to ask you if you don't answer yes, you could say I don't know or, yes, it was more than six, less than six, but you can't say it's none of my business because it is my business, and I can go and get a Court Order against you. I'm just telling you. You're still saying it's none of my business?
A. I don't think you have a right to ask me the question.
Q. I do. It's my position that I do, and if a judge agrees, that means you're going to have to come back again.
A. I don't think you have a right to ask me the question.
Q. All right. Well, I'm claiming it, and

Page 74

we'll find out later on from a judge whether you have to come back again.
All right. Next sentence, that these terms were firmed up and accepted on March 26, 1998. Agree or disagree?
A. These terms were firmed up and accepted. What is that?
Q. I don't know.
A. Those aren't terms I -- language that I would have used.
Q. But did you agree to something with Mr. Fraser, and did you accept what these terms of the agreement were on March 26, 1998?
A. I had agreed that I would have no contact with Barbara Murphy.
Q. All right. Next paragraph, about the middle of the paragraph, it says, "Stover and Manfredonia told Murphy and Fraser they had spoken to Vecchia on September 25, 1998."
A. Where are we now?
Q. Right here (indicating).
A. Okay. In the middle of the sentence there, that a second meeting was documented.
Q. Right. That they told Murphy and Fraser they met with you September 25th, you waived your

Page 75

right to counsel, you didn't want to further humiliate yourself, you acknowledged prior conduct and the deal regarding your getting help. Agree or disagree?
A. "And the deal they had made in the past regarding his getting help." Yes.
Q. That you were advised by Stover and Manfredonia not to have any contact whatsoever with Murphy and that they would put together a written agreement for execution by yourself. Agree or disagree?
A. That I wouldn't -- shouldn't have any contact with her in the workplace.
Q. You disagree with the written agreement?
A. That they would put together a written agreement or execution. They said they were going to prepare something for me to look at.
Q. Did you agree to sign it?
A. I told the attorney here I wouldn't agree to signing anything unless I had seen something.
Q. But did you at any point say, "All right, gentlemen, you put it in writing and I'll sign it if I agree with what you say"?
A. I don't think I said that.
Q. What did you say? You didn't say

Page 76

anything?
A. I think they told me they were going to prepare a written agreement.
Q. So you didn't say yes or no?
A. I don't think they gave me a choice.
Q. But you didn't -- you didn't say affirmatively, "Okay, fine, you put together a written agreement and I'll sign it"?
A. Sitting here today, I don't think I agreed to sign anything somebody prepared unless I knew what it said, unless I had read it.
Q. Okay.
A. I expected that they were going to prepare a written agreement.
Q. Okay.
A. And then I would have the option if I wanted to call it or if I wanted to call the union in or bring an attorney in or --
Q. All right. Let's skip to the next page, page 4 of 12, paragraph 10. The prior relates to Alive at Five, road races, Brennan's, sending candy, and so on. Let's go to paragraph 10, that Vecchia suspended his pursuit of Murphy, but, in early October of this year, which would be 2000, Murphy saw Vecchia in Taranto's, T-A-R-A-N-T-O-S, which is

located on Glenbrook Road in Stamford, Connecticut. The first part of that sentence, you suspended your pursuit --
A. Well, I object to the language.
Q. Okay. Would you agree that from 1998 through 2000 you didn't have contact with Barbara Murphy in the workplace?
A. I saw her a few times, but I never spoke to her.
Q. Would you agree that you didn't pursue it?
A. I did not pursue it.
Q. Would you agree that you honored your agreement not to bother her, as you understood it, made in September of 1998?
A. I had no contact with her in the workplace. I have never spoken to her again, and, to the best of my knowledge, she never complained to the City again.
Q. All right. Would you agree that in October, 2000, you saw her in Taranto's?
A. Yes.
Q. All right. Let me continue to read. That Murphy was in Taranto's with a male friend, agree or disagree?
A. I didn't know that -- who she was with.

Q. Murphy observed you walking alone and both of you had eye contact, agree or disagree?
A. I saw her there, yeah.
Q. That you abruptly came to a stop and stared at her?
A. I was surprised to see her. I never saw her there before.
Q. You walked over to the bar, sat five stools away, ordered a drink and continued to stare at her?
A. I thought it was -- five stools away -- I thought it was further than that. I don't remember -- I did not continue to stare at her.
Q. That after 10 minutes of this, Murphy told her male friend she couldn't stay there any longer now that you knew that she came here and that you were continuing to stare at her and that Murphy left. Agree or disagree?
A. I did not continue to stare at her, and she left.
Q. By the way, was this the first time you had ever gone to Taranto's?
A. No.
Q. You had been there in the past?
A. Yes.

Q. And you had never seen her there before?
A. Right.
Q. So when you went there that night, was it your intention to see her?
A. No. As I said before, I was surprised that she was there.
Q. Why didn't you, as soon as you saw her, turn around and leave?
A. Why should I? I had seen her plenty of times in Brennan's in that time period.
Q. Well, let me ask you this, in hindsight, having been arrested, convicted and terminated --
A. In hindsight, yeah.
Q. -- do you think it would have been a good idea to turn around and leave?
A. Yeah.
Q. All right. Continuing on -- I'm trying to speed this up -- Murphy checked her caller ID, there was a Wilton number on the caller ID, she later found out where it was from, someplace off Route 7. Did you make that phone call to her from a pay phone?
A. No.
Q. Later on it says, the morning after she observed a plastic green frog ornament with red lips on her front lawn. Did you put that green frog

ornament on her lawn?
A. No.
Q. Okay. Paragraph 11, next paragraph, it says that same week in early October of 2000, within a few days of your meeting at Taranto's, she saw you in Government Center on the 10th floor. Agree or disagree?
A. I don't remember seeing her.
Q. All right. Next sentence, he walked by, saw her, stared at her. Agree or disagree?
A. I didn't see her.
Q. Paragraph 12, next page, page 6 of 12, a few days later, the first week of November, Murphy went to Government Center 4th floor to see a friend, she walked by the conference room with a training class in session and she saw you sitting in the class. Agree or disagree?
A. This was a class on the finance system, and I taught the first half of the class, and the comptroller wanted me to stay for the rest of it in case there were questions in her half of the presentation that tied into purchasing. There was a third part of the class as well to do with capital projects, which I had no involvement with, and I left after that, and this was

Page 81

In the board of finance conference room on the 4th floor. I walked out of the conference room, you walk to the left, take a right, near the elevators the conference room is on the same floor as the cafeteria, the 3rd or 4th floor. When I took the second turn, she was standing in front of the elevators. I didn't know if she was going up the elevator or down, but certainly I remember part of my conversation with Stover and Manfredonia going back a year plus from that is that, when they had talked to me about having no contact with her at the Government Center, that if you ever see her on the elevator and you're on, just step off.

So I took that corner and she was standing there, I walked by her, took the left-hand turn, went into the cafeteria, got a cup of coffee, I came back, she was gone. I went back to my office on the 10th floor.

*Q. Okay. All right. So I won't bother to go into the rest of it, but basically to the extent that Barbara Murphy relates that you made her nervous and at least as far as that particular incident, you thought you were just doing your job and you did nothing wrong, you had no intent to harass or annoy her?*

Page 82

A. As far as what, please? As far as this thing where she was standing in front of the elevator?

*Q. Right.*

A. I finished –

*Q. You continually walked back and forth past her.*

A. No. I walked past her and took the left-hand turn into the cafeteria.

*Q. Okay. Okay. Page 7 of 12, paragraph 13, she mentions a bullet left on her deck. Did you leave a 38 caliber copper jacketed bullet on her deck?*

A. No, nor was I ever questioned by anybody about all this stuff, nor was I ever questioned by him, the Norwalk police officer.

*Q. Okay. The next paragraph, 14, where he, Officer Strate, interviews one of Barbara Murphy's friends, Chris Seaborne, S-E-A-B-O-R-N-E, and there's discussion of Brennan's, all of that was prior to September of 1998, isn't that correct?*

A. There was a period two to three years ago, yeah. That would have been in 1997, 1998, I gather, she's talking about.

*Q. So you, after September of '98, other than*

Page 83

*the incident at Taranto's that you discussed, you didn't see her at Brennan's?*

A. No. I never said that. I saw her there plenty of times.

*Q. After September of '98?*

A. Yep.

*Q. And that's because you never made the agreement that you wouldn't see her –*

A. No. I never made the agreement to the City that they could tell me where I can or could not go in Stamford.

*Q. So you didn't change your pattern of where you went after September of '98? You continued to go to Brennan's and you continued to see her?*

A. I continued to go to Brennan's, and sometimes she was there, but I never spoke to her or had any contact with her, nor apparently did she ever complain about it to the City.

*Q. After September of '98, did you pay for her tab at the bar?*

A. No.

*Q. Okay. Page 8 of 12 mentions Alive at Five. Was that before or after September of '98?*

A. I went to Alive at Five, I don't know when it started, '97, '98, '99, 2000, 2001. Two thousand.

Page 84

*Q. And you saw Barbara Murphy at that time?*

A. Did I ever see her there?

*Q. Yes.*

A. Yes, she was probably there sometimes.

*Q. All right. Page 9 of 12, paragraph 19, on March 21, 1998, there was a message on Mary Vecchia's answering machine, the caller being a woman identifying herself as Barbara Murphy asking David, meaning you, to return her briefcase and the stuff you took out of her car. Agree or disagree?*

A. Where are we?

*Q. Page 9 of 12, paragraph 19.*

A. I never heard the message. My wife told me it was on the answering machine.

*Q. And Mary realized Murphy's photo was on the copy of a page out of the Stamford High School yearbook and that she had found in David's briefcase.*

A. I don't know.

*Q. That when Mary approached David and told him of the message, he became very upset and stated he was going to get arrested. Agree or disagree?*

A. I told her that I had taken her pocketbook, that I could get arrested.

*Q. And when Mary asked David about his behavior, he replied he thought Murphy liked him as*

Page 85

she was nice to him.
A. I don't recall saying that.
Q. Paragraph 21, that Mary, your ex-wife, knew about Janet, your sister, getting involved in late March of 1998, that David was to get therapy but only attended two to three sessions, then felt he wouldn't be arrested so stopped. Agree or disagree?
A. I don't think she had any knowledge of it.
Q. That your wife had, ex-wife, had no knowledge of your attendance?
A. Right.
Q. Paragraph 22, that Mary Vecchia showed Officer Strate, S-T-R-A-T-E, a book entitled, quote, "Stopping a Stalker," closed quote, that she found in David's briefcase.
A. I don't know. That when Attorney Fraser had talked to my sister Janet, he had told her that I could be charged with stalking, and neither Janet nor I knew what the law was so she said to go on the internet and see what you could find out. So I had gone on the internet, made copies of a lot of different things. I probably had them in the briefcase.
Q. That Mary became very concerned and stated you were in Vietnam and, in quotes, special

Page 86

operations, closed quote, specializing in espionage. Agree or disagree?
A. That Mary became -- I have no idea what she's talking about.
Q. How about special operations specializing in espionage?
A. I don't know what she's talking about. Why don't you ask me about paragraph 23 where the Stamford Police Officers searched the house that I had lived in for 20 months.
Q. I'm not going to ask you about that.
A. When he finds a bullet and says that it was my bullet.
Q. I'm not going to ask you about the rest of it. Okay. Let's just go quickly to B, which is Barbara Murphy's voluntary statement. Okay. Look at the first page, which is labeled 2 of 7, okay, middle of the second paragraph, "I did happen to work on two committees with him," and you worked on a newsletter and manual for HTE system. What does she mean by that? Do you agree or disagree?
A. Let's see. The City had bought a new financial system, the HTE system.
Q. What does that stand for?
A. Someone's initials. I don't know.

Page 87

Q. But it's a financial system?
A. Yeah. Part of it's purchasing requisition, on line purchasing and requisition system, and --
Q. Well, do you remember anything about the two committees?
A. Some time in -- I'm trying to think of the time -- I think it must have been '97, the mayor brought in a consultant, I can't remember the guy's name, and he held these big meetings, about 25 people there, about process mapping, and one of the things they decided to do was take all the steps someone has to do from creating a requisition through buying the material through delivery of the material, processing the invoices, and I think Peter Brown, the deputy fire chief, was invited to go to the meetings and he didn't want to go, he had a schedule conflict, and Barbara came to the meetings. So that would have been one committee, and then the second committee would have been, I think, again, it would have been in the summer, fall of 1997. The City was implementing this HTE financial system, and I was involved with training all the users for the system, and we, meaning Mr. Hamilton, the director of finance and the fellow who was the

Page 88

comptroller at the time, a guy named Rob Straut (phonetic), and some other people decided that in addition to the training that we also had to have some reference material for the people to refer back to if they ran into a problem with the system, or that there were a lot of people asking the same questions over and over again, that it would be helpful to have some type of a newsletter that would have the most frequently asked questions that people could refer to, and let's see, how did Barbara get involved with that? I know there's a woman Alice Helms who worked in the Public Works Department who volunteered for it, and I guess Barbara must have volunteered for it as well to assist in the layout of this newsletter.
Q. Okay. Just to cut to the chase, did any of these committees or any of this work to do this manual or any other activities give you power over Barbara Murphy?
A. No.
Q. Did it make you her boss?
A. No.
Q. Could you influence her career?
A. No.
Q. Could you -- if she did a poor job, could

Page 89

*you --*

A. No. She was -- it was -- it wasn't part of her job.

*Q. It was a voluntary activity on her part?*

A. Right.

*Q. And didn't give you any power over her in terms of making you her supervisor?*

A. I never got involved with what went into the newsletter or the layout of it.

*Q. In any case, she goes on to say that you went to Antonio's in Stamford and there was the two of you and that you did this as a thank you for working on the manual. Agree or disagree?*

A. I believe she invited me to lunch because in the process of preparing this newsletter, both she and Alice Healms, you know, someone had to spend a lot of time laying the thing out, and both of them have very good, I guess that would be, I don't know, power point skills or something, putting together a newsletter, and that's something I didn't know how to do, and I don't know if the comptroller if he knew how to do it or if he wanted to do it and Mr. Hamilton as well, and I think we were talking one time, the comptroller and myself, about how much time they must have spent because they did a nice job of

Page 90

putting it together, and we had no authority to pay them by the hour or something to do it. So we decided that we'd give them a gift certificate and that, you know, in thanks for putting the thing together because it helped us both out. We wouldn't have to answer a lot of the repetitious questions because people would be distributed the newsletter and would be there as a point of reference. So I got some gift certificates from Macy's, I think it was, and gave them to the comptroller and he put them through the requisition, I got reimbursed for the gift certificates. I gave one to Alice and one to Barbara Murphy.

*Q. How about the lunch, did you pay or did the City pay?*

A. She invited me. I think I paid for it.

*Q. She goes on to say that you made a comment about her being pretty?*

A. I don't remember.

*Q. All right.*

A. I guess if you're filing a complaint and that's your point, I guess you put that in there.

*Q. All right. I'll skip over the next couple of paragraphs because I think we've already discussed it. Going to page -- the next page, next page again,*

Page 91

*1998 he -- okay. Page 5 of 7 it discusses the meeting with yourself and Ben, meaning Ben Fraser, and your returning stuff to the firehouse and giving her the hundred dollars for the stuff that was missing.*

*"At this point, Ben meets several times in his office or over the phone with David and/or his sisters discussing this problem and for David to get some help. Ben specifically told them for David to stay away from me. I didn't want to ruin his life, but I knew he needed help and couldn't take this any more. All I wanted was for him to leave me alone. Everyone agreed that David would get help. He was remorseful and would stay away from me." This was in the spring of 1998. Do you have any disagreement with that paragraph?*

A. I was at Mr. Fraser's office twice. I don't know how many times my sister Janet spoke to him. No.

*Q. Next paragraph, things were quiet for a little while, I thought everything was okay until May of 1998, you started to show up at Brennan's again. You started showing up at road races, I was in a race in High Ridge, you showed up and ran right in front of her the whole time, she had to stop in the*

Page 92

*middle of the race. Agree or disagree?*

A. Let's see. Did I go to Brennan's, yes. Did I run in a road race, yes. Did I know she was going to be there, no. Did I purposely run right in front of her? I wouldn't know how to do that. When asked by -- this was a race -- I don't know if -- I guess the City didn't sponsor it but at the time the mayor's wife was something to do with the YMCA or whatever group was sponsoring it. There were posters all over the place for it.

I know when I talked to Fred and Bill Stover, they did bring that up. I was in the room with the conversation. They claimed I went there because she was there. I said maybe I went there because the mayor was there and I was following him because he ran in the race. I don't remember if there were other City employees running in the race as well.

*Q. All right. So I take it that you deny any intent to -- that you did run in front of her or that you --*

A. I ran in the race. Where she was in relation to me, I don't know.

*Q. Okay. Did anybody ever comment to you by -- saying, "David, what you did was inappropriate," such*

Page 93

as the mayor or Mr. Hamilton or anybody else --
A. No.
Q. -- at the time of the race?
A. I didn't do anything inappropriate.
Q. Okay. Skipping to page 6 of 7, middle of the page, everything got quiet and in October 5, 2000, I got a plastic thing from Hallmark stuck in the lawn and then talking about the phone. I think we already discussed this. You deny sticking anything in her lawn?
A. Right.
Q. Do you deny making the phone call from that Wilton pay phone?
A. Yes.
Q. But you agree that you did see her at Taranto's, and we won't go over that again?
A. Right.
Q. Did she get a Restraining Order against you, Barbara Murphy?
A. No.
Q. Do you know if she ever attempted to get a Restraining Order against you?
A. I think when I was arrested, there's automatically some type of order that says I have no contact with her.

Page 94

Q. All right. Last thing, and, again, this hopefully will be brief, this is Exhibit C, the Arbitration Award, and I won't bother to go over all of it, but you do remember that on February -- actually it doesn't give the hearing date -- do you remember attending a hearing before the Board of Mediation and Arbitration in Wethersfield?
A. Yes.
Q. And the City was represented by Attorney McHale, M-C-H-A-L-E, and the union was a Mr. D'Andrea, D'A-N-D-R-E-A. Do you remember that?
A. Yes.
Q. From your recollection, what do you remember about the meeting? Who else was there? How long did it take and did you testify?
A. Let's see. I remember the first day we went there we got a start-up, and then I don't know if it was Attorney McHale, or what's the lady's name who runs this place? Elisabeth --
Q. Maurer.
A. -- Maurer said something about there was a Restraining Order in place, and they suspended the meeting and rescheduled it for about another month out, and then we met again and there was a State Trooper there that time, and at the meeting I was

Page 95

there, Nick D'Andrea from the union was there.
Q. Is he an attorney?
A. I don't know what Nick is to tell you the truth. A couple of City employees or officers of the union, Antonio Idorolla (phonetic) and Tim.
Q. Gable?
A. Gable.
Q. Those were union representatives on your side?
A. Right, and then the City's side it was this Attorney McHale, and he had a bunch of people with him. I don't know who they were, and then Fred Manfredonia and Bill Stover and then Attorney Maurer, and then as witnesses Barbara Murphy came in and my wife Mary Vecchia came in.
Q. By the way, you were divorced at this time, were you not?
A. Yes.
Q. Okay. So the award date is February 14, 2003, so do you remember what month and what year these two meetings were?
A. It says -- they were about six months before that, October; September, October.
Q. Of 2002?
A. October of 2002. Yeah, that's right.

Page 96

Q. All right. In going over the facts again, a lot of this is something that we've already discussed, but let me just ask you this, during the time period 1997, 1998, after your meeting with Ben Fraser, after your meeting in September of 1998 with City personnel where you agreed to stop having contact with Barbara Murphy, did you -- were you aware that any contact that you had outside of work such as at Brennan's or road races or at Alive at Five, whether accidental or not, was causing her to be terrorized, frightened, unable to sleep?
A. No.
Q. Fearful for her life?
A. I saw her plenty of times at Brennan's, I had no contact with her, but I saw her plenty of times, and it wasn't like she tore out the door when I walked in the place.
Q. So were -- nobody ever told you, "Hey, Dave, Barbara is really upset and it might be a good idea if you not run into her" --
A. I had no other discussion with anyone from the City after September of 1998 until the Stamford Police Officer showed up in November of 2000.
Q. So in November of 2000 when the Stamford Police Officer showed up to arrest you, were you

Page 97

*surprised that you were being arrested?*
A. Yeah.
*Q. In fact, did you talk to the two police officers who made the custody arrest?*
A. Did I talk to them? I think they talked to me.
*Q. And did you say something to the effect that you never touched her, you never bothered her and you never talked to her?*
A. I may have. I mean, I would have, you know. Given the opportunity, I would tell them that now.
*Q. Okay. All right. It then discusses the fact that in November of 2000 you were arrested for stalking Ms. Murphy. On December 1, 2000, you were placed on paid administrative leave of absence based on your arrest. Now, isn't it true that paid administrative leave of absence means that you were not allowed to return to work?*
A. Right.
*Q. You were suspended from all duties?*
A. (Nodding head in the affirmative.)
*Q. You had to turn in your pen and your access card?*

Page 98

A. Yeah. I had no work to do.
*Q. By the way, during the, what was it, 14 months that you were on paid administrative leave until you were terminated, did you work anywhere else?*
A. I had some part-time jobs, yeah.
*Q. And I think it was your testimony earlier you wanted to return to work?*
A. I had told Mr. Haselkamp and Hamilton on December 1st that that's why I came in there, because I wanted to go back to work.
*Q. Did you ever seek, through Mark Katz, your criminal attorney --*
A. I believe he and Barry Boodman had some discussions about that, and I, somewhere in not this particular pile of paper but other piles of paper that I have accumulated, I think Barbara had filed a Human Rights complaint. I think it's in that pile of paper there's something to the effect that Fred had contacted her about me coming back to work and that she called -- she called Tom Cassone about it, her attorney. I'm sure you have letters in your office from some of the attorneys that she had previously that must have dealt with that.
*Q. All right. Did -- let me ask this, were*

Page 99

*you made the following offer, Mr. Vecchia, come back to work, we're paying you and you're not doing your job, but the condition of you coming back to work is that you can't see Barbara off duty in any bars in Stamford, you've got to stay away from all places that she goes to, was that offer ever put to you?*
A. No.
*Q. So was that offer ever put to Mark Katz?*
A. He never presented it to me so I would say no.
*Q. Okay. So it's not like you had the opportunity to come back to work if you would agree not to go to certain places off duty and you turned it down because you didn't want to do that?*
A. I don't believe there was ever an offer from the City to that effect.
*Q. Okay. All right. And, finally, it says you were on paid administrative leave for over 14 months. On January 23, 2002, you pled guilty to the crime of criminal trespass which is breaking into her car, stealing her briefcase and pleading guilty to disorderly conduct for your October, 2000, activity in a bar in Stamford. Is that the Taranto's?*
A. Yep.
*Q. Did you feel that you did commit*

Page 100

*disorderly conduct when you stared at her at Taranto's?*
A. No. As Mr. Katz says, that's how some of these things are the same.
*Q. So I think you testified earlier you --*
A. The option was plead guilty to that or they're going to prosecute taking her briefcase four years before that as a felony other than a misdemeanor, and you have the facts against you you wrote a letter telling everybody you took it.
*Q. In other words, the evidence was solid against you on the stealing of the briefcase, they could have pursued a felony, you didn't want a felony on your record, and that's why you did what you did?*
A. Yeah.
*Q. How much, by the way, did you pay Mr. Katz?*
A. Why? I don't think it's any of your business.
*Q. Okay. It talks about the sentence which is a one-year suspended sentence, three years of probation, with special conditions, one, psychiatric counseling and any type of substance abuse counseling deemed appropriate by the Office of Adult Probation. Two, no conduct of any kind with Ms. Murphy. Three,*

Page 101

*no objection by Mr. Vecchia to any kind of civil Restraining Order that Ms. Murphy may seek against you during the three-year period of probation. Is that your understanding of what the sentence was?*
A. Yes.
Q. *Okay. It says that there was another meeting on February 7, 2002, with yourself, Mark Katz, Mr. Stover, Mr. Manfredonia, and that was where you were -- after that meeting you were terminated. And then, finally, it says that your position and 91 other positions were eliminated from the budget due to a deficit. Is that your understanding?*
A. That's what the City says.
Q. *And do you have any evidence that contradicts that?*
A. Evidence that contradicts?
Q. *Yes.*
A. I haven't done anything about it if that's what you're asking.
Q. *All right. I take it you disagree with the decision of the Board of Mediation and Arbitration that there was just cause to terminate you?*
A. I disagree with it, yes.
Q. *I take it you disagree with the conclusion*

Page 102

*of the Board of Mediation and Arbitration that your office duty conduct led to the inability of other employees to work with you, namely, the inability of Barbara Murphy to work with you?*
A. No. That's not what they based it on. Didn't they say something about Fred said he had complaints from three people?
Q. *No. I'm reading under "Discussion," which is their conclusion. They're talking in general that a discharge is justified if off duty conduct effects three things, and it says that your off duty conduct, egregious, met the third criteria, which is off duty behavior resulting in the unability of other employees to work with you.*
A. You think that's referring to whom?
Q. *To you.*
A. No. The "other employees," is referring to whom?
Q. *No. I think that's just a general statement. I think what they're saying is that your off duty conduct led Barbara Murphy to be unable to work with you and that's why it was justified that the City terminate you.*
A. Then that negates the fact that I never did work with her between September of 1998 and 2001.

Page 103

I think that statement was swayed by some statement from Mr. Manfredonia that said two other employees told him that they'd be frightened if I came back to work.
Q. *I don't see that. Do you remember that being in this?*
A. I don't know if it's in this. I know that testimony came up, was made by Mr. Manfredonia, and that I've since sent a Freedom of Information letter to the City about that, asking who the employees were, and they replied it was verbal.
Q. *All right. Let me just ask you --*
A. It has nothing to do with this, though, right?
Q. *Do you agree or disagree with the decision of the Board of Mediation and Arbitration that you stalked Barbara Murphy?*
A. I don't think that's the -- what they said.
Q. *All right. Let me ask it this way, do you agree or disagree that you stalked Barbara Murphy?*
A. I didn't stalk Barbara Murphy.
Q. *Despite the fact that you pled guilty to a misdemeanor?*
A. I pled guilty to taking her briefcase.

Page 104

Q. *Now, you were arrested in November of 2000 for events that took place in March of 1998.*
A. Right.
Q. *Wasn't it your understanding that the statute of limitations had passed on that?*
A. As a misdemeanor, not as a felony.
Q. *And why could they prosecute you as a felony?*
A. Because I guess Mr. Katz told me they can do whatever they want.
Q. *All right. So sitting here today, you don't think you stalked Barbara Murphy?*
A. I did not stalk Barbara Murphy.
Q. *Sitting here today, do you think that you violated your agreement in September of 1998 with Mr. Manfredonia and Mr. Stover --*
A. My verbal agreement was that I would have no contact with her in the workplace.
Q. *And you -- did you or did you not violate that?*
A. I had no contact with her in the workplace.
Q. *All right. So not only did you not stalk Barbara Murphy but you didn't violate your agreement that you would have no contact with her in the*

Page 105

workplace?
A. That's correct.
Q. So if you didn't have any contact with her in the workplace after September, 1998, except for the accidental contact that I think you testified, meaning outside the elevator or she seeing you in a conference, then you're not guilty of sexual harassment?
A. Never come up.
Q. But you're being sued for sexual harassment?
A. I'm not guilty.
Q. And you were fired for sexual harassment?
A. I don't think that's what the letter says.
Q. Okay. Why did the Board of Mediation and Arbitration uphold the grievance?
A. I don't know.
Q. Well, in the last paragraph in the last page it says, "The City made efforts to resolve this matter amicably with the grievant. The grievant was warned his employment could be terminated if his conduct continued. The grievant demonstrated he was unwilling to follow the directives from the City to cease and desist his behavior towards Ms. Murphy. The City's discharge of the grievant was such

Page 106

justifiable and warranted." Do you feel that the Board of Mediation and Arbitration was correct in writing that paragraph?
A. I already told you about that.
Q. You don't even agree that you were unwilling to follow the directive from the City to cease and desist your behavior towards Ms. Murphy?
A. I agreed that – what I discussed with Mr. Stover and Mr. Manfredonia and agreed to was to have no contact with her in the workplace, and I had no contact with her.
Q. Okay.
MR. MINOR: I think that's all my questions. Let me just check.
(Pause.)
BY MR. MINOR:
Q. Do you remember ever having any contact with Tom Cassone at any of these meetings, disciplinary meetings?
A. He never went to them.
Q. Did he ever warn you privately, "Hey, Dave, lay off Barbara Murphy"?
A. Never had any of those conversations.
(Pause.)
BY MR. MINOR:

Page 107

Q. Do you remember reading the Memorandum of Decision dated August 27, 2001, on the divorce?
A. I suppose I have.
Q. Do you remember the Judge describing your behavior as, quote, increasingly strange behavior, you were moody and distant, anebriated, cruel and hurtful to your wife and children and you had a bizarre fixation with a female co-worker, closed quote?
A. No, I don't remember that.
Q. Do you remember the phrase "bizarre fixation with a female co-worker"?
A. No.
Q. The Judge who wrote this, did he have a hearing where you testified?
A. Yeah, we had a trial.
Q. And who was your attorney?
A. Peter Bozay (phonetic).
Q. Who was your wife's attorney, ex-wife?
A. Judith Goldberg.
Q. How long did the hearing last, one day, two days?
A. Two weeks.
Q. Two weeks. And this is after you agreed to most of the issues except for, I guess, property

Page 108

and alimony?
A. The whole thing was about two weeks.
Q. You filed a Commission on Human Rights and Opportunities complaint against the City?
A. Uh-huh.
Q. And what was the result of that?
A. Nothing. Nothing happened.
Q. And that was done on your own, or did you have any legal assistance?
A. On my own.
Q. Did you do it before or after Barbara filed a CHRO Complaint against the City?
A. After.
Q. Did you see her CHRO complaint before you did yours?
A. I don't know. I had a lot of trouble getting that.
Q. By the way, in her CHRO complaint against the City, she claims that you hammered a bullet into her deck on November 3, 2000, after you found out that she went to the police. Now, I think you already denied leaving the bullet on her deck?
A. That's right.
Q. And you, I think you said that, Norwalk Police never interviewed you or discussed this with

Page 109

you?

A. No.

Q. When did you find out -- did you know that she had gone to the police before you were arrested?

A. No.

Q. Do you deny that you created -- do you agree or disagree that you created a hostile workplace for Barbara Murphy?

A. I never had any contact with her.

Q. Did you see the letter that Barbara Murphy wrote to Judge Comerford opposing your motion for Accelerated Rehabilitation dated January, 2002?

A. I saw it for a couple of minutes. Attorney Katz had given me a copy. I guess the prosecutor must have let him see it and let me read it then he took it back.

Q. Do you agree or disagree with the following statement in that letter, that in March and I guess September, 1998, Barbara Murphy had no desire to have you prosecuted or fired, she just wanted to be left alone, "and the only reason I did not pursue criminal charges in 1998 were Mr. Vecchia's repeated representations that he would get help and leave me alone." Agree or disagree?

A. What are you asking me?

Page 110

Q. Did you make repeated representations that you would get help and leave her alone?

A. I agreed that I wouldn't have any contact with her, and I didn't.

Q. After you got a decision from the Commission on Human Rights and Opportunities saying that there was no finding of reasonable cause and you had 90 days to sue, you obviously didn't sue, did you?

A. No.

MR. MINOR: Okay. That's all I have. Thank you.

MR. OZIMKOSKI: I have a few more questions for you.

REDIRECT EXAMINATION

BY MR. OZIMKOSKI:

Q. You had mentioned that you had run into Barbara at Brennan's, is that correct?

A. That's right.

Q. Did you ever run into Barbara at Brennan's prior to 1997?

A. No.

Q. So from 1998 up until December of 2000, approximately how many times would you say that you had seen Barbara at Brennan's?

Page 111

A. Nineteen ninety-seven to 2000?

Q. Uh-huh. Yes.

A. A hundred.

Q. And you mentioned another bar. Was it Torpedo's?

A. Taranto's.

Q. Taranto's.

A. Uh-huh.

Q. In that same time frame, how many times would you estimate that you had run into Barbara?

A. Once.

Q. Are there any other bars or restaurants that you had frequented between 1997 and December of 2000 where you may have seen Barbara?

A. I don't remember seeing her anyplace else.

Q. You mentioned you had written an apology letter to Barbara, correct?

A. Uh-huh.

Q. And that was an apology solely for stealing her briefcase?

A. That's all that had happened, yeah.

Q. You mentioned that Janet was involved, your sister Janet, in a few conversations with various individuals. Was there a point in time where you had asked Janet to speak on your behalf?

Page 112

A. I think what had happened was back in March of 1998 Attorney Fraser had called my home and on a Sunday left a message that he wanted me to call him. I called him on Monday. No. I called him back on Sunday. He said he wanted to see me Monday afternoon. I had told my sister Nancy, and she had called my sister Janet, and I spoke to Janet around -- I think I saw Fraser around 4:00 o'clock on Monday afternoon and I spoke to Janet around one, and she said you're crazy to go talk to some criminal lawyer by yourself, that you'll be nervous and that he'll eat you alive. So she said that she'd call him on the phone and tell him that if he had anything to say to you, she could say it to him.

Q. So you were aware that Janet was having conversations on your behalf with --

A. On that day, yeah, because we went to his office and I sat at the desk in front of Attorney Fraser, and he and I never said a word to each other. My sister Janet talked to him on the phone.

MR. MINOR: Off the record.

(Off the record discussion.)

BY MR. OZIMKOSKI:

Q. Continuing with the questioning with

Page 113

regards to Janet, she was involved in other conversations on your behalf, is that correct?
A. Yes.
Q. And you were aware that she was having other conversations?
A. No. I didn't know about some of them.
Q. You found out that she was having conversations after the fact?
A. Some of them I found out almost two years later that she had had the conversation with Fred Manfredonia and Mr. Stover in December of 1998.
Q. So it's your statement today that your sister Janet was acting on your behalf with no knowledge to yourself?
A. In that case I was surprised. I didn't know she had called him.
Q. You had mentioned that you worked on one committee and a newsletter with Barbara, correct?
A. That's right.
Q. Were there any other committees or any other projects that you had worked on with Barbara?
A. I don't recall any.
Q. Excuse me?
A. I don't recall any, no.
Q. On these two particular projects, were you

Page 114

in charge of the projects?
A. No.
Q. You mentioned that you had been teaching a class. Is that a class you were teaching for the City?
A. Yes.
Q. And how long a period did you teach for?
A. I'm not sure. Which class are we talking about because I think the discussions today I talked about two different times teaching classes.
Q. What classes did you teach for the City?
A. One was this HTE training where it involved, I guess, anybody who used the system, so probably about 250 people in probably groups of 6 or 8, so that must have been at least 25 if not 30 sessions, different small groups of people.
Q. And for what period did you teach that particular class?
A. Probably over an 8 or 10-week period.
Q. And what's the time frame, if you can give me the year or month?
A. I think it was in 1997, but I don't know.
Q. While teaching this class, Barbara was a student at one time?
A. I would imagine she must have come to one

Page 115

of the classes.
Q. So if Barbara did attend a class, most likely it was just one class?
A. That's usually all most people required. I think she knew how to use the computer pretty well. There were some people that came to multiple sessions because they had never sat in front of a computer before.
Q. Were there any other classes that you taught that you specifically remember having Barbara as a student in the class?
A. No.
Q. You gave a little testimony in regards to the Arrest Warrant Application.
A. Uh-huh.
Q. There was mention in the application also that your wife had accused you of such harassment, is that correct?
A. She accused me of a lot of things.
Q. Your wife had accused you of making numerous phone calls to her residence after you were no longer there, correct?
A. Yes. Three times she tried to get Restraining Orders and was denied three times.
Q. And Barbara Murphy had also mentioned that

Page 116

you had made numerous phone calls to her residence, correct?
A. I read that.
Q. Did you make those phone calls?
A. No.
Q. Did you ever call Barbara Murphy?
A. I called her when she called the house and asked if I had taken her pocketbook.
Q. So between the period of January of 1998 to December of 2000, you never once called Barbara except for that one occasion?
A. That's right.
Q. Did there come a point in time where you actually believed that Barbara liked you?
A. No.
Q. You repeatedly said that you admitted to taking of her briefcase, correct?
A. Yes.
Q. Can you give me the particular reason why you decided to steal her briefcase?
A. No.
Q. Was there anything in particular you were looking for in her briefcase?
A. No.
Q. When you stole the briefcase, it was

*located in her car at her residence, is that correct?*

A. Yes.

MR. OZIMKOSKI: No further questions.

THE WITNESS: I recall that at the time I took it I had it in my hand and I walked away from the car and thought that this was a stupid thing to do. What are you going to do with it? What do you want it for? I tried putting it back in her car and I had locked the door.

MR. OZIMKOSKI: No further questions.

MR. MINOR: I have nothing.

(Whereupon, the witness was excused and the deposition concluded at 4:11 p.m.)

CERTIFICATEOFDEPONENT

I, DAVID VECCHIA, have read the foregoing transcript of the testimony given at the deposition on Friday, August 15, 2003, and it is true and accurate to the best of my knowledge as originally transcribed and/or with the changes as noted on the attached Errata Sheet.

DAVID VECCHIA

Subscribed and sworn to before me this day of , 2003.

My Commission Expires:

3:03CV00519(DJS)
BARBARA E. MURPHY VS THE CITY OF STAMFORD
DAVID VECCHIA
AUGUST 15, 2003 (LG)

STATE OF CONNECTICUT)
) ss:
COUNTY OF HARTFORD )

I, Leeann J. Gardner, a Notary Public within and for the State of Connecticut, do hereby certify that the deposition of DAVID VECCHIA, was taken before me pursuant to Federal Rules of Civil Procedure, of the Practice Book, at the LAW OFFICES OF ELISABETH SEIEROE MAURER, P.C., 871 Ethan Allen Highway, Ridgefield, Connecticut, on August 15, 2003, at 1:05 p.m.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and his testimony stenographically reported by me and subsequently transcribed as herebefore appears.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the events of said cause.

Dated at Hartford, Connecticut this day of , 2003.

Leeann J. Gardner
Notary Public
My Commission Expires
May 31, 2005

INDEX

WITNESS: DIRECT CROSS REDIRECT RECROSS
DAVID VECCHIA 3 48 110 --

DEFENDANT'S EXHIBITS
(Marked for Identification)
EXHIBITS PAGE
A Affidavit 49
B Ms. Murphy's Statement 49
C Arbitration Award 49

PLAINTIFF'S EXHIBITS
1 Personnel Procedures 26
(Exhibits retained by Mr. Ozimkoski.)

# WORD INDEX

Look-See Concordance Report

---

UNIQUE WORDS: 1,572
TOTAL OCCURRENCES: 6,344
NOISE WORDS: 384
TOTAL WORDS IN FILE: 20,280

---

SINGLE FILE CONCORDANCE

---

CASE INSENSITIVE

---

NOISE WORD LIST(S): NOISE.NOI

---

COVER PAGES = 1

---

INCLUDES ALL TEXT OCCURRENCES

---

DATES ON

---

INCLUDES PURE NUMBERS

---

POSSESSIVE FORMS ON

– $ –

$100 [1] *55:18*
$30,000 [1] *58:8*

– 1 –

1 [8] *26:15, 16; 27:16; 29:25; 30:4, 22; 97:15; 120:17*
10 [4] *68:6; 76:20, 22; 78:14*
10-week [1] *114:19*
10th [2] *80:6; 81:17*
11 [1] *80:3*
110 [1] *120:3*
12 [8] *71:19; 76:20; 80:12; 82:10; 83:22; 84:5, 12*
13 [1] *82:10*
14 [4] *82:17; 95:19; 98:2; 99:18*
15 [4] *2:7; 118:4, 19; 119:9*
15th [2] *36:7; 68:4*
19 [4] *16:25; 43:9; 84:5, 12*
1968 [1] *51:7*
1990 [1] *27:10*
1993 [6] *5:1; 28:18, 21; 43:13; 44:22; 45:5*
1994 [1] *44:22*
1997 [18] *8:16; 10:23; 11:2; 20:20; 40:4; 43:9, 19, 22; 47:3, 5; 53:6; 55:2; 82:23; 87:22; 96:4; 110:21; 111:13; 114:22*
1998 [69] *8:16; 10:23; 11:5, 15; 15:9, 13, 18; 17:1; 19:3; 31:4, 6, 7, 10, 13; 35:16; 40:1, 4, 7; 42:10, 15; 43:19, 22; 47:5, 15; 53:7, 8; 54:12; 55:2; 58:12, 17; 59:2, 5, 15, 22; 61:10, 11; 62:21; 64:1, 12, 13; 65:2; 70:16; 71:14, 22; 74:4, 13, 19; 77:5, 14; 82:21, 23; 84:6; 85:5; 91:1, 15, 22; 96:4, 5, 22; 102:25; 104:2, 15; 105:4; 109:19, 22; 110:23; 112:2; 113:11; 116:9*
1:05 [2] *2:7; 119:10*
1st [2] *7:11; 98:10*

– 2 –

2 [2] *32:4; 86:17*
20 [1] *86:10*
2000 [31] *7:11; 23:2; 35:17; 36:8, 23; 37:8, 16; 39:15; 40:2, 13, 19; 42:16; 47:3; 64:16; 76:24; 77:6, 20; 80:4; 83:25; 93:7; 96:23, 24; 97:14, 15; 99:22; 104:1; 108:20; 110:23; 111:1, 14; 116:10*
2001 [11] *34:13; 39:10, 13, 16; 41:9; 43:25; 46:1, 5; 83:25; 102:25; 107:2*
2002 [18] *25:20; 36:7, 10, 21, 23; 37:8, 16; 38:14; 44:8; 46:1, 5; 68:3, 4; 95:24, 25; 99:19; 101:7; 109:12*
2003 [8] *2:7; 44:13; 95:20; 118:4, 12, 19; 119:9, 22*
2005 [1] *119:25*
21 [2] *84:6; 85:3*
22 [1] *85:12*
23 [2] *86:8; 99:19*
25 [3] *74:19; 87:10; 114:15*
250 [1] *114:14*
25th [1] *74:25*
26 [3] *74:4, 13; 120:17*
27 [1] *107:2*
2:10 [1] *46:20*
2:13 [1] *46:21*
2:17 [1] *49:11*
2:23 [1] *49:12*

– 3 –

3 [8] *29:25; 30:2, 3; 32:2; 70:19; 71:19; 108:20; 120:3*
30 [1] *114:15*
30,000 [1] *57:5*
31 [1] *119:25*
38 [1] *82:12*
3:03cv00519 [1] *118:18*
3rd [1] *81:5*

– 4 –

4 [1] *76:20*
48 [1] *120:3*
49 [3] *120:9, 10, 11*
4:00 [1] *112:9*
4:11 [1] *117:13*
4th [3] *80:14; 81:1, 5*

– 5 –

5 [3] *32:22; 91:1; 93:6*
5k [1] *60:19*

– 6 –

6 [3] *80:12; 93:5; 114:14*
60 [2] *28:11; 39:17*
600 [1] *55:9*
68 [3] *51:8, 12, 14*
69 [3] *51:15, 18*

– 7 –

7 [6] *79:20; 82:10; 86:17; 91:1; 93:5; 101:7*
75 [1] *39:17*

– 8 –

8 [3] *83:22; 114:15, 19*
871 [2] *2:6; 119:8*
888 [1] *55:3*

– 9 –

9 [4] *27:17, 20; 84:5, 12*
90 [1] *110:8*
90's [1] *45:3*
90,000 [1] *57:9*
90-day [1] *28:11*
91 [1] *101:10*
93 [1] *43:11*
94 [4] *43:12, 13; 45:4, 5*
95 [1] *45:4*
97 [6] *47:6, 7, 8, 9; 83:25; 87:8*
98 [12] *21:23; 47:6, 14; 59:6, 19; 61:25; 82:25; 83:5, 13, 19, 23, 25*
99 [1] *83:25*

– A –

abruptly [1] *78:4*
absence [2] *97:16, 19*
abuse [1] *100:23*
accelerated [1] *109:12*
accept [1] *74:12*
accepted [2] *74:4, 6*
access [1] *97:25*
accidental [2] *96:10; 105:5*
accomplish [2] *6:1, 7*
accomplishing [1] *7:1*
accrued [1] *68:7*
accumulated [1] *98:17*
accurate [1] *118:5*
accused [4] *45:23; 115:17, 19, 20*
acknowledged [1] *75:2*
acquaintances [1] *69:1*
acting [3] *66:18, 21; 113:13*
action [4] *34:4; 39:6, 7; 72:9*
active [3] *51:7, 10, 19*
activities [1] *88:18*
activity [2]

89:4; 99:22
actual [1] 28:9
addition [5] 7:22; 8:4; 9:21; 55:13; 88:3
additional [1] 29:13
address [1] 54:16
administrative [34] 7:20; 23:1, 3, 7; 24:1; 25:2, 15, 18; 32:7, 9, 13; 33:16, 22; 35:8; 37:13; 39:5, 7, 15, 18; 40:14; 41:3, 4, 15, 21, 24; 42:8; 46:3; 47:4, 10; 48:2; 97:16, 18; 98:3; 99:18
admit [5] 16:2; 48:23; 49:1; 61:21, 23
admitted [4] 15:23; 70:25; 71:17; 116:16
admitting [1] 54:17
adult [1] 100:24
advised [1] 75:7
..dviser [1] 52:6
advocate [3] 24:15, 16; 45:24
affidavit [2] 49:17; 120:9
affidavits [1] 18:21
affirmative [2] 24:12; 97:23
affirmatively [1] 76:7
afford [1] 66:23
afternoon [3] 43:1; 112:6, 10
age [1] 2:2
agent [10] 5:5, 8; 7:6, 12; 8:2, 6; 57:14, 24; 68:25; 70:12
agents [1] 5:19
agree [40] 23:11; 68:20, 23; 71:2; 72:1, 2, 5, 17; 74:4, 11; 75:3, 10, 18, 19, 23; 77:5, 10, 12, 19, 23; 78:2, 18; 80:6, 10, 17; 84:10, 21; 85:7; 86:2, 21; 89:13; 92:1; 93:15; 99:12; 103:15, 21; 106:5; 109:7, 17, 24
agreed [14] 2:11, 17, 23; 13:6, 11; 63:5; 74:14; 76:9; 91:13; 96:6; 106:8, 9; 107:24; 110:3
agreement [45] 13:8, 12, 14, 21, 24; 17:2, 7, 12, 17, 18, 19, 20, 22, 24; 18:1, 9; 20:8; 29:22; 35:19, 23; 56:1; 58:9; 59:10; 60:21; 63:2, 8, 14, 20; 64:20; 71:21, 23; 74:13; 75:10, 14, 16; 76:3, 8, 14; 77:13; 83:8, 9; 104:15, 17, 24
agreements [4] 13:2, 3, 4, 5
agrees [1] 73:21
alcohol [4] 3:21; 61:16, 19, 22
alice [3] 88:11; 89:16; 90:13
alimony [4] 57:3, 7; 58:4; 108:1
alive [7] 60:19, 23; 76:21; 83:22, 24; 96:9; 112:13
allen [2] 2:6; 119:8
allow [1] 33:14
allowed [2] 48:6; 97:19
allowing [1] 65:3
alone [10] 56:2; 58:10; 59:10; 63:4; 64:8; 78:1; 91:12; 109:21, 24; 110:2
alter [1] 3:22
american [1] 52:9
amicably [1] 105:20
amongst [1] 43:5
ample [1] 30:15
anebriated [1] 107:6
anniversary [1] 29:9
annoy [1] 81:24
annoyed [1] 72:6
annoying [1] 71:25
annual [9] 27:24; 28:2, 4, 17, 23; 29:5, 16, 20; 69:18
answer [9] 4:3, 11; 13:23; 23:10; 47:21; 48:5; 57:17; 73:12; 90:6
answered [1] 34:25
answering [3] 56:12; 84:7, 14
antonio [1] 95:5
antonio's [1] 89:11
anybody [12] 14:16; 16:22; 24:23; 34:3; 42:10; 69:21, 24; 73:5; 82:14; 92:24; 93:1; 114:13
anyplace [1] 111:15
anywhere [1] 98:4
apologize [1] 58:24
apologizing [1] 59:23
apology [4] 60:15; 65:7; 111:16, 19
apparently [1] 83:17
appeal [1] 66:7
appearing [1] 3:14
appears [1] 119:16
application [2] 115:14, 16
applied [1] 67:17
appointment [1] 58:20
appraisal [6] 27:18; 28:6, 10, 17; 29:8, 20
appraisals [9] 27:25; 28:3, 4, 23; 29:5, 16; 69:15, 17, 18
appreciated [1] 4:5
approached [2] 9:10; 84:19
appropriate [1] 100:24
approve [1] 6:20
approved [1] 17:20
approximately [4] 44:5; 47:11; 68:6; 110:24
april [4] 44:7; 51:15; 68:2, 3
arbitration [9] 67:8; 94:3, 7; 101:22; 102:1; 103:16; 105:16; 106:2; 120:11
area [1] 16:18
aren't [1] 74:9
arise [4] 14:21; 16:15, 19; 17:10
army [1] 52:14
arrest [11] 25:6; 38:11; 42:7, 12; 62:13; 67:5; 73:8; 96:25; 97:4, 17; 115:14
arrested [16] 11:8; 25:3; 35:8; 40:20; 42:3; 61:13; 64:15; 79:12; 84:21, 23; 85:7; 93:23; 97:1, 14; 104:1; 109:4
aside [1] 73:5
asking [8] 60:7; 61:23; 66:24; 84:8; 88:6; 101:19; 103:10; 109:25
asks [1] 4:5
assist [1] 88:14
assistance [1] 108:9
assumption [1] 42:18
attached [1] 118:7
attempted [1] 93:21
attend [3] 44:24; 45:12; 115:2
attendance [1] 85:10
attended [5] 43:14; 45:6, 17; 67:14; 85:6
attending [1] 94:6
attention [5] 27:16; 29:24; 32:1; 43:20; 68:19
attorney [38] 11:16; 12:2, 13, 17; 13:9, 15; 15:1; 17:15; 19:15; 34:16, 18, 20; 36:13; 41:11; 44:14; 54:9, 24; 55:15, 21; 66:19, 22, 23; 75:19; 76:18; 85:16; 94:9, 18; 95:2, 11, 13; 98:13, 22; 107:17, 19; 109:14; 112:2, 19
attorneys [2] 67:4; 98:23
august [6] 2:7; 51:18; 107:2; 118:4, 19; 119:9
authority [5] 2:15; 6:14; 70:6, 9; 90:1
authorization [1] 6:19
automatically [1] 93:24
award [3] 94:3; 95:19; 120:11
awards [1] 52:12
aware [9] 3:10; 21:1; 28:2; 38:11, 15; 43:3; 96:8; 112:16; 113:4

– B –

bachelor's [2] 49:21, 25
badge [1] 52:16
bar [10] 53:12, 15; 61:3; 65:3, 16, 19; 78:8; 83:20; 99:23; 111:4
barbara [118] 3:9; 8:11, 13, 14, 17, 20, 24; 9:3, 13, 22; 10:4, 6, 10, 13, 20; 13:7; 14:1, 10; 15:16, 20, 24; 16:2, 5, 11; 17:4, 8, 15; 18:15; 21:17, 25; 22:7, 10; 25:10; 31:3; 33:18; 35:6, 15, 20, 25; 36:12; 37:22; 38:20; 39:8, 25; 40:12, 18, 23; 41:6; 42:14; 47:19; 53:6; 54:9, 15, 22; 55:7; 56:2, 9; 58:10; 59:23; 60:1, 18, 20; 62:18; 63:4; 64:8, 20; 69:3, 5; 72:1, 3, 12; 74:15; 77:6; 81:21; 82:18; 84:1, 8; 86:16; 87:18; 88:10, 13, 19; 90:13; 93:19; 95:14; 96:7, 19; 98:17; 99:4; 102:4, 21; 103:17, 21, 22; 104:12, 13, 24; 106:22; 108:11; 109:8, 10, 19; 110:18, 20, 25; 111:10, 14, 17; 113:18, 21; 114:23;

115:2, 10, 25; 116:6, 10, 14; 118:18
barbara's [9]
18:11; 33:12, 24; 34:5; 38:1, 25; 40:5; 47:12; 56:8
barry [3]
36:14, 19; 98:14
bars [2]
99:4; 111:12
based [3]
28:9; 97:16; 102:5
basically [3]
6:21; 12:23; 81:20
basis [1]
11:12
behalf [5]
13:16; 111:25; 112:17; 113:2, 13
behavior [18]
15:24; 16:1, 5, 6, 10; 21:17; 22:10; 25:10; 31:3; 33:8; 70:21; 72:1; 84:25; 102:13; 105:24; 106:7; 107:5
believe [17]
20:14; 22:12, 16; 34:20; 35:14; 36:6; 38:14; 41:5; 44:20; 46:10; 48:1; 53:5; 57:22; 65:24; 89:14; 98:14; 99:15
believed [1]
116:14
ben [10]
11:16; 54:8; 58:12; 71:10; 72:12; 91:2, 6, 9; 96:4
benning [1]
51:13
bill [5]
16:24; 36:20; 70:24; 92:11; 95:13
birthday [1]
9:25
bizarre [2]
107:8, 11
blocks [4]
55:10, 12, 14
board [8]
67:8; 81:1; 94:6; 101:21; 102:1; 103:16; 105:15; 106:2
boodman [3]
36:15; 41:13; 98:14
book [2]
85:13; 119:7
boss [1]
88:21
bother [3]
77:13; 81:19; 94:3
bothered [1]
97:8
bothering [3]
59:15, 19; 64:21
bought [1]
86:22
boulevard [1]
55:3
bowes [1]
50:7
bozay [1]
107:18
break [3]
4:16, 17; 46:18
break-in [1]
56:8
breaking [4]
54:15; 71:13, 17; 99:20
brennan's [20]
53:12, 15; 58:23; 61:2, 3, 7; 65:14; 76:21; 79:10; 82:20; 83:2, 14, 15; 91:22; 92:2; 96:9, 14; 110:18, 20, 25
brief [10]
4:5; 5:6; 24:2; 25:13; 27:23; 31:12; 32:22; 40:25; 47:14; 94:2
briefcase [21]
59:14, 18; 61:14, 16; 65:1, 5, 6, 11; 84:9, 17; 85:15, 23; 99:21; 100:7, 12; 103:25; 111:20; 116:17, 20, 23, 25
briefly [3]
14:6; 30:10; 52:5
bringing [1]
54:23
broken [1]
55:22
broker [1]
12:22
bronze [2]
52:14, 19
brown [2]
69:8; 87:15
budget [1]
101:11
building [5]
8:24; 37:17, 18, 22; 50:22
buildings [2]
8:23; 39:20
built [1]
27:10
bullet [6]
82:11, 12; 86:12, 13; 108:19, 22
bunch [1]
95:11
bureaus [1]
70:14
business [17]
19:25; 20:15, 18; 37:1; 55:2, 6; 57:11, 13, 15, 17, 22; 69:25; 73:10, 14, 15, 17; 100:19
buyer [1]
5:23
buying [1]
87:13

– C –

cafeteria [3]
81:5, 16; 82:9
caliber [1]
82:12
call [14]
13:19; 23:23; 29:8; 45:22; 52:9, 23; 56:9; 76:17; 79:21; 93:12; 112:3, 13; 116:6
caller [3]
79:18, 19; 84:7
calls [4]
70:13; 115:21; 116:1, 4
camp [1]
23:15
candy [3]
9:13, 21; 76:21
capital [1]
80:24
captain [2]
52:2, 3
car [7]
54:15; 56:8; 84:10; 99:21; 117:1, 6, 8
card [3]
9:25; 97:25
cards [1]
9:22
career [1]
88:23
case [9]
3:12; 41:25; 42:1; 54:6; 60:14; 80:21; 89:10; 113:15
cassone [2]
98:21; 106:18
catalog [1]
50:24
caught [1]
50:18
caused [2]
54:11; 57:2
cease [2]
105:24; 106:7
center [5]
55:3; 70:20; 80:6, 14; 81:12
certificate [1]
90:4
certificates [2]
90:9, 12
certify [3]
119:5, 11, 17
cessation [1]
71:25
chance [1]
33:6
change [1]
83:12
changed [1]
7:17
changes [1]
118:6
charge [1]
114:1
charged [1]
85:18
charges [2]
64:25; 109:22
chase [1]
88:16
check [1]
106:14
checked [1]
79:18
chief [4]
58:17; 69:8, 9; 87:16
child [3]
57:3, 7; 58:4
children [1]
107:7
choice [4]
17:25; 18:2, 3; 76:5
choices [1]
41:2
chosen [2]
3:17; 66:18
chris [1]
82:19
chro [3]
108:12, 14, 18
city [131]
4:20, 23; 5:1, 9, 11; 6:14; 7:3, 10, 12, 19, 25; 8:5; 10:16, 22; 15:15; 17:3; 18:4, 10, 23; 20:2, 5, 22; 21:5, 8, 9, 10, 12, 15; 22:9, 16; 23:1, 21; 27:3, 13; 28:2, 7, 10, 19, 24, 25; 29:4, 17; 31:1; 32:10; 33:1, 8; 34:3, 12, 17; 35:21, 22; 36:11; 37:3, 5, 7, 20; 38:4, 5, 11, 19, 24; 39:2, 9; 20; 40:4, 6, 11; 41:17, 19; 42:4, 5, 10, 15, 19; 43:4, 19; 44:13, 14, 24; 45:11, 21; 46:12; 47:12, 18; 50:4, 9, 16; 57:8, 24; 59:4; 62:2; 65:21; 67:17; 68:5, 12; 69:22; 70:4, 10, 13; 72:10, 21, 23; 77:18; 83:10, 18; 86:22; 87:22; 90:15; 92:7, 17; 94:9; 95:4; 96:6, 22; 99:16; 101:13; 102:23; 103:10; 105:19, 23; 106:6; 108:4, 12, 19; 114:5, 11; 118:18
city's [7]
23:4, 5; 30:24; 39:6, 7; 95:10; 105:25
civil [3]
2:2; 101:1; 119:6
claimed [2]
59:9; 92:13
claiming [1]
73:25
claims [1]
108:19
class [13]
80:16, 17, 18, 19, 23; 114:4, 8, 18, 23; 115:2, 3, 11
classes [4]
114:10, 11; 115:1, 9
classifying [1]
22:21
clear [2]
33:13; 64:20
clerk [2]
5:24; 12:18
clerks [2]
5:23; 6:3
closed [3]
85:14; 86:1; 107:8
club [1]
45:3
co-worker [3]
38:5; 107:8, 12
coffee [1]
81:16
collect [1]
68:2
collected [1]
68:1
collecting [1]
67:25
college [1]
51:11
combat [1]
52:16
combination [1]
35:10
combined [1]

57:5
comerford [1]
109:11
coming [4]
7:25; 41:21; 98:20; 99:3
commendation [1]
52:15
comment [2]
90:17; 92:24
commission [4]
108:3; 110:6; 118:14; 119:25
commissioner [1]
70:16
commit [1]
99:25
committee [3]
87:19, 20; 113:18
committees [4]
86:19; 87:6; 88:17; 113:20
communications [1]
53:2
companies [1]
70:1
company [2]
50:10, 21
mpensation [2]
67:21, 23
complain [2]
61:6; 83:18
complained [2]
59:18; 77:17
complaining [2]
59:17; 61:1
complaint [20]
11:7; 18:20; 22:13, 15, 17, 21, 22, 24; 42:16, 20; 59:8, 12; 66:14; 90:21; 98:18; 108:4, 12, 14, 18
complaints [23]
15:15; 20; 18:12, 15; 33:12, 18, 24; 34:5; 35:5; 36:12; 37:25; 38:1, 4, 6, 20; 39:1; 40:5, 17, 22; 41:7; 47:13, 19; 102:7
complete [1]
12:15
completely [1]
4:10
comptroller [5]
80:20; 88:1; 89:21, 24; 90:11
computer [2]
115:5, 7
concerned [3]
29:3; 47:25; 85:24
concluded [2]
56:22; 117:13
conclusion [2]
101:25; 102:9
condition [1]
99:3
conditions [1]
100:22
conduct [11]
18:10; 59:19; 75:2; 99:22; 100:1, 25; 102:2, 10, 11, 21; 105:22
conference [11]
12:10; 13:17; 14:6; 19:18; 24:5; 45:2; 80:15; 81:1, 2, 4; 105:7
conferences [4]
31:22; 44:25; 45:13; 47:11
conflict [1]
87:17
conflicting [1]
47:1
connecticut [9]
2:5, 7; 12:6; 50:3; 77:1; 119:1, 4, 9, 21
connection [1]
2:13
consequences [1]
57:2
consisted [1]
21:24
consultant [1]
87:9
contact [47]
8:17, 19; 10:14, 21; 11:3, 6, 11; 13:7, 10, 25; 17:3, 7; 21:18, 25; 22:7; 35:15, 19, 25; 37:5, 7; 39:25; 60:20; 63:5; 71:8; 72:2; 74:14; 75:8, 13; 77:6, 15; 78:2; 81:11; 83:17; 93:25; 96:7, 8, 15; 104:18, 21, 25; 105:3, 5; 106:10, 11, 17; 109:9; 110:3
contacted [3]
34:17; 98:20
contacts [1]
60:17
contents [1]
26:8
continually [1]
82:6
continue [5]
36:24; 37:3; 77:22; 78:13, 19
continued [5]
78:9; 83:13, 14, 15; 105:22
continuing [4]
41:19; 78:17; 79:17; 112:25
contracts [1]
28:9
contradicts [2]
101:15, 16
contribution [2]
68:7, 10
control [1]
69:11
conversation [14]
14:19, 20; 15:2; 32:19; 38:13; 39:22; 47:15; 62:15, 25; 64:2, 14; 81:9; 92:13; 113:10
conversations [14]
15:5, 7; 36:14, 17; 41:6, 11; 42:9; 58:15; 106:23; 111:23; 112:17; 113:2, 5, 8
convicted [1]
79:12
conviction [1]
67:5
copies [2]
72:15; 85:21
copper [1]
82:12
copy [12]
5:23; 25:24, 25; 48:22, 24; 49:10; 60:6, 7, 8, 9; 84:16; 109:14
corner [1]
81:14
corometrics [1]
50:7
counsel [6]
2:12; 3:17; 67:10; 75:1; 119:14, 18
counseling [7]
56:5; 63:9; 71:1, 7, 24; 100:23
counselor [2]
72:20, 24
county [1]
119:2
couple [9]
14:22; 30:18; 31:5; 43:7; 46:16; 62:24; 90:23; 95:4; 109:13
course [1]
34:3
courses [1]
8:8
court [2]
66:15; 73:15
covered [1]
73:2
crazy [1]
112:11
created [2]
109:6, 7
creating [1]
87:13
creation [1]
46:11
crime [1]
99:20
criminal [6]
64:25; 67:1; 98:13; 99:20; 109:22; 112:11
criteria [1]
102:12
cross [2]
48:11; 120:2
cruel [1]
107:6
cup [1]
81:16
custody [1]
97:4
cut [1]
88:16

– D –

d'a-n-d-r-e-a [1]
94:11
d'andrea [2]
94:11; 95:1
d'oeuvres [1]
53:14
damaged [1]
55:20
dame [1]
50:1
danbury [2]
51:20, 22
datacom [2]
50:8, 17
date [5]
27:9; 29:10; 36:7; 94:5; 95:19
dated [3]
107:2; 109:12; 119:21
dates [2]
38:23; 47:2
dave [2]
96:19; 106:22
david [16]
2:1; 71:23; 84:8, 19, 24; 85:5; 91:7, 8, 9, 13; 92:25; 118:2, 9, 19; 119:5; 120:3
david's [2]
84:17; 85:15
day [13]
24:3; 25:3; 37:15; 39:4; 40:20; 47:10; 56:7; 58:22; 94:16; 107:21; 112:18; 118:12; 119:22
days [8]
14:23; 38:22; 39:17; 62:24; 80:5, 13; 107:22; 110:8
deal [2]
75:3, 5
dealings [1]
37:11
dealt [1]
98:24
december [18]
7:11; 35:17; 39:15; 40:1, 13, 19; 42:16; 43:9; 47:3, 9; 68:3, 4; 97:15; 98:10; 110:23; 111:13; 113:11; 116:10
decided [4]
87:12; 88:2; 90:3; 116:20
decision [7]
58:6; 66:1, 3; 101:21; 103:15; 107:2; 110:5
deck [4]
82:11, 13; 108:20, 22
deemed [2]
6:9; 100:24
defendant's [2]
49:13; 120:6
deficit [1]
101:12
degree [1]
49:21
delivery [1]
87:14
delta [1]
52:7
demonstrated [1]
105:22
denied [2]
108:22; 115:24
deny [4]
92:19; 93:9, 12; 109:6
department [25]
6:23; 10:15; 11:1, 8; 18:5; 27:10; 29:11, 12; 34:1; 37:20, 23; 39:21; 41:12, 13; 54:25; 55:8, 14; 59:4, 8; 62:10; 69:13; 70:10, 12, 13; 88:12
departments [1]
70:8
deposition [9]
2:1, 14, 22, 24; 26:3; 66:16; 117:13; 118:4; 119:5
deputy [3]
69:8; 72:3; 87:15
described [2]
26:17; 49:14
describing [1]
107:4
design [1]
50:7

designs [1] 50:19
desire [1] 109:19
desist [2] 105:24; 106:7
desk [1] 112:19
despite [1] 103:23
destroyed [1] 54:21
destroying [1] 54:17
detail [1] 68:18
details [2] 64:23; 66:5
detective [1] 64:17
determined [1] 29:23
direct [6] 3:6; 27:15; 29:24; 32:1; 68:19; 120:2
directive [1] 106:6
directives [1] 105:23
director [6] 7:18, 20; 23:22; 28:14; 70:11; 87:25
disagree [29] 68:23; 71:2; 72:1, 18; 74:5; 75:4, 11, 14; 77:24; 78:2, 18; 80:7, 10, 17; 84:10, 21; 85:7; 86:2, 21; 89:13; 92:1; 101:20, 24, 25; 103:15, 21; 109:7, 17, 24
disagreement [1] 91:15
discharge [2] 102:10; 105:25
disciplinary [1] 106:19
discipline [12] 6:13, 19; 29:25; 30:3, 6; 31:1; 32:2; 48:2; 70:4, 7, 9, 15
disciplined [3] 22:4; 50:25; 69:21
discuss [4] 13:3; 15:20; 33:5; 35:3
discussed [26] 13:1; 16:6, 10; 17:18; 18:25; 25:12; 35:11, 13; 38:23; 39:3, 6, 8; 40:9, 23; 54:7; 55:25; 58:13; 59:3, 24; 63:16; 83:1; 90:24; 93:9; 96:3; 106:8; 108:25
discusses [2] 91:1; 97:13
discussing [1] 91:8
discussion [15] 14:24; 16:14; 17:6, 10; 31:12; 33:10; 41:14, 16; 44:1; 56:4; 63:22; 82:20; 96:21; 102:8; 112:23
discussions [6] 36:11; 40:17; 41:1; 62:1; 98:15; 114:9
disorderly [2] 99:22; 100:1
distant [1] 107:6
distributed [1] 90:7
distributor [1] 50:23
district [1] 52:11
division [1] 70:24
divorce [7] 56:17, 19, 22; 57:2; 62:22; 63:24; 107:2
divorced [1] 95:16
djs [1] 118:18
document [4] 26:9; 49:16; 63:11; 68:17
documentation [2] 31:20, 24
documented [1] 74:23
doesn't [4] 28:24, 25; 36:1; 94:5
dollars [1] 91:4
door [2] 96:16; 117:9
doubt [1] 54:10
drafted [1] 17:19
draw [1] 17:16
drink [1] 78:9
drug [1] 3:21
due [1] 101:11
duly [2] 2:3; 3:3
duties [3] 5:7; 6:24; 97:22
duty [11] 51:7, 10, 19; 52:13; 99:4, 13; 102:2, 10, 11, 12, 21

– E –

eap [1] 72:21
early [3] 11:15; 76:23; 80:4
eat [1] 112:13
econ [1] 52:7
economic [1] 57:1
editorial [2] 71:4; 72:4
effect [8] 13:9; 22:24; 35:24; 41:24; 45:25; 97:7; 98:19; 99:16
effects [1] 102:10
efforts [1] 105:19
egregious [1] 102:12
elected [1] 41:18
elevator [4] 81:8, 12; 82:3; 105:6
elevators [2] 81:3, 7
eliminated [1] 101:11
elisabeth [3] 2:5; 94:19; 119:8
elmer [1] 50:22
employed [1] 70:20
employee [14] 4:19; 5:1; 18:4; 21:5, 8; 27:17; 29:25; 30:3, 6; 32:2; 38:4, 5, 25; 43:20
employees [18] 5:12, 15, 19; 6:16; 28:3; 29:1, 5; 38:7, 19; 43:5; 45:12; 92:17; 95:4; 102:3, 14, 17; 103:2, 10
employment [3] 27:3; 57:12; 105:21
end [8] 25:19; 47:2, 5, 6, 8; 51:18; 55:24
ended [1] 52:25
ensure [1] 72:17
enter [1] 37:22
entered [1] 26:15
entering [1] 26:2
entitled [1] 85:13
errata [1] 118:7
espionage [2] 86:1, 6
estate [1] 12:22
estimate [1] 111:10
ethan [2] 2:6; 119:8
evac [2] 52:10, 23
evening [1] 58:23
event [1] 60:19
events [3] 38:22; 104:2; 119:19
everybody [2] 12:15; 100:10
evidence [3] 100:11; 101:14, 16
ex-wife [3] 85:3, 9; 107:19
exact [2] 23:22; 36:6
exactly [14] 5:10; 7:9; 17:12; 18:6; 21:20; 25:17; 31:21; 34:10; 36:5; 39:22; 41:14, 20; 42:5; 64:5
examination [3] 3:6; 48:11; 110:15
examined [1] 119:13
except [4] 50:18; 105:4; 107:25; 116:11
excluding [1] 37:25
excuse [3] 9:8; 26:5; 113:23
excused [1] 117:12
execution [2] 75:10, 16
exhibit [8] 26:2, 15, 16; 44:15, 21; 68:16; 70:20; 94:2
exhibits [5] 49:13; 120:6, 8, 16, 19
exist [1] 36:1
expect [2] 38:9; 45:16
expected [1] 76:13
expenses [1] 67:4
experience [3] 8:1, 4, 9
expire [1] 41:15
expires [2] 118:14; 119:25
explain [2] 33:6, 11
explained [4] 3:8; 14:6; 25:1, 9
explaining [1] 45:15
explanation [2] 4:6; 5:6
explanations [1] 33:7
extent [2] 29:14; 81:20
eye [1] 78:2

– F –

face [2] 43:6; 60:13
face-to-face [1] 11:12
fact [9] 35:7, 8; 42:3; 97:3, 14; 102:24; 103:23; 113:8
facts [2] 96:1; 100:9
fair [2] 13:20; 55:23
fall [2] 28:21; 87:21
familiar [1] 44:25
fearful [1] 96:13
february [20] 25:20; 34:13; 36:7, 8, 10, 21,

23; 37:8, 15; 38:14; 39:9, 12, 16; 41:9; 43:25; 94:4; 95:19; 101:7
federal [3] 2:2; 66:15; 119:6
feel [3] 66:22; 99:25; 106:1
fellow [2] 23:8; 87:25
felony [6] 65:6; 100:8, 13; 104:6, 8
felt [3] 60:20; 64:20; 85:6
female [2] 107:8, 12
file [2] 18:20; 22:17
filed [10] 22:12, 14; 34:2; 37:25; 44:12; 62:23; 65:25; 98:17; 108:3, 12
filing [2] 11:7; 90:21
fill [2] 29:9; 52:10
ed [1] 69:19
finance [7] 7:19; 28:14; 70:11, 16; 80:18; 81:1; 87:25
financial [3] 86:23; 87:1, 22
find [5] 24:4, 7; 74:1; 85:20; 109:3
finding [1] 110:7
finds [1] 86:12
fine [2] 4:24; 76:7
finish [1] 52:1
finished [1] 82:5
fire [12] 6:13; 37:23; 54:25; 55:8, 14; 58:17; 62:10, 17; 69:7, 10, 13; 87:16
fired [3] 61:13; 105:13; 109:20
firehouse [1] 91:3
firmed [2] 74:4, 6
first [24] 3:2; 17:10; 19:23; 21:20, 22; 22:18; 24:4; 27:15; 28:10; 30:21; 40:3; 47:1; 48:24; 49:16, 20; 52:1; 62:24; 77:2; 78:21; 80:13, 19; 86:17; 94:16; 119:12
firsthand [1] 38:8
five [9] 55:12; 60:19, 24; 76:21; 78:8, 11; 83:23, 24; 96:10
five-minute [1] 46:18
fixation [2] 107:8, 12
floor [6] 80:6, 14; 81:2, 4, 5, 18
flourish [2] 71:4; 72:4
folder [1] 43:17
follow [3] 4:10; 105:23; 106:6
follow-up [1] 20:23
followed [1] 32:19
following [3] 92:15; 99:1; 109:18
follows [1] 3:5
forced [2] 32:25; 33:2
foregoing [1] 118:3
form [5] 2:18; 47:20, 21; 48:4; 69:20
formal [6] 18:22; 22:12, 14, 17, 18, 21
formalities [1] 2:13
fort [1] 51:13
forth [1] 82:6
found [7] 62:5; 79:19; 84:17; 85:14; 108:20; 113:7, 9
four [5] 51:8, 21; 55:12, 14; 100:7
fraction [2] 57:23; 58:2
frame [2] 111:9; 114:20
fraser [24] 11:16; 12:11, 13, 17; 13:9, 15; 15:1; 17:15; 54:8; 55:15, 21, 24; 58:10; 71:11; 72:12; 74:12, 18, 24; 85:16; 91:2; 96:5; 112:2, 9, 20
fraser's [4] 54:24; 58:13; 59:2; 91:17
fred [12] 15:10; 16:24; 36:20; 37:9; 44:3, 4; 70:23; 92:11; 95:12; 98:19; 102:6; 113:10
freedom [2] 37:19; 103:9
frequented [1] 111:13
frequently [1] 88:9
friday [1] 118:4
friend [3] 77:23; 78:15; 80:14
friendly [1] 53:24
friends [1] 82:19
frightened [3] 72:6; 96:11; 103:3
frightening [1] 71:25
frog [2] 79:24, 25
front [8] 79:25; 81:6; 82:2; 91:25; 92:5, 20; 112:19; 115:7
fulfilled [1] 6:24
full [1] 11:24
fully [1] 4:9

– G –

gable [2] 95:6, 7
gardner [3] 2:3; 119:3, 23
gather [2] 3:12; 82:23
gave [11] 13:21; 24:2; 27:13; 28:14; 31:2, 8; 73:4; 76:5; 90:10, 12; 115:13
gentlemen [1] 75:22
gift [3] 90:3, 9, 12
girlfriends [1] 54:4
give [12] 4:6; 5:6; 6:19; 21:15; 25:24; 31:10; 88:18; 89:6; 90:3; 94:5; 114:20; 116:19
given [11] 28:6, 8, 22; 29:15, 21; 31:18; 33:15; 48:3; 97:11; 109:14; 118:3
gives [1] 28:2
giving [2] 29:5; 91:3
glenbrook [1] 77:1
goes [4] 29:12; 89:10; 90:17; 99:6
goldberg [1] 107:20
government [8] 8:23; 37:16, 18; 55:3; 70:20; 80:6, 14; 81:11
graduated [1] 51:12
great [2] 44:1; 68:18
green [2] 79:24, 25
greenwich [3] 55:16, 17; 59:2
grievance [3] 44:12; 65:25; 105:16
grievant [4] 105:20, 22, 25
group [2] 19:8; 92:9
groups [3] 6:25; 114:14, 16
guess [21] 4:18; 5:24; 11:7; 17:15; 27:14; 34:13; 35:3; 44:21; 56:18; 62:17; 68:6; 88:13; 89:18; 90:21, 22; 92:7; 104:9; 107:25; 109:14, 19; 114:13
guide [1] 6:21
guilty [14] 42:6; 64:24; 65:1, 2, 4, 8, 20; 99:19, 21; 100:6; 103:23, 25; 105:7, 12
gun [2] 52:9, 23
guy [1] 88:1
guy's [1] 87:9

– H –

h-a-s-e-l-k-a-m-p [1] 23:17
hadn't [1] 17:21
half [3] 62:5; 80:19, 21
hallmark [1] 93:7
hamilton [10] 7:15, 22; 24:19, 21; 40:25; 70:18; 87:24; 89:23; 93:1; 98:9
hamilton's [1] 7:16
hammered [1] 108:19
hand [1] 117:5
handed [1] 27:4
hands [1] 68:12
handwritten [1] 59:25
happy [1] 4:17
harass [1] 81:24
harassing [3] 14:10; 16:2; 70:21
harassment [11] 43:5, 10, 20; 44:25; 45:12, 23; 46:14; 105:8, 11, 13; 115:17
hartford [2] 119:2, 21
hasel [1] 23:14
haselkamp [7] 23:9, 12, 16; 24:20; 33:13; 40:25; 98:9
hasn't [2] 44:23
haven't [4] 43:13; 45:17; 46:15; 101:18
he'll [1] 112:12
head [4] 24:12; 29:11; 70:10; 97:23
headed [1] 49:17
healms [1] 89:16
hear [1] 56:14
heard [3] 43:10; 46:5; 84:13

hearing [18] 18:22; 22:18; 24:1, 17; 32:13; 33:21; 36:3, 10; 44:11, 13, 18; 65:25; 67:13, 20; 94:5, 6; 107:15, 21
hearings [2] 37:10; 44:4
held [5] 2:2, 3, 5; 7:4; 87:10
helicopter [1] 53:2
helicopters [2] 52:10, 23
helms [1] 88:12
help [24] 14:14, 17, 21; 16:15, 19; 19:21, 24; 20:2, 6, 13, 17, 24; 21:2, 4, 7; 36:25; 37:4; 75:3, 6; 91:9, 11, 13; 109:23; 110:2
helped [2] 6:1; 90:5
helpful [1] 88:8
helping [1] 6:7
herebefore [1] 119:15
hereby [4] 2:11, 16, 22; 119:4
hereto [1] 119:18
hey [2] 96:18; 106:21
high [2] 84:16; 91:24
highway [2] 2:6; 119:9
hindsight [2] 79:11, 13
hire [1] 6:12
hired [8] 5:1, 4; 6:17, 18; 26:25; 28:19; 34:16; 44:14
hires [1] 28:10
hold [2] 12:1; 50:5
home [4] 51:17; 56:9, 24; 112:2
honor [1] 58:9
honored [1] 77:12
hopefully [1] 94:2
hors [1] 53:14
hostile [1] 109:7
hour [2] 52:24; 90:2
hours [1] 4:1
house [3] 42:12; 86:9; 116:7
hte [4] 86:20, 23; 87:22; 114:12
huge [1] 27:10
human [6] 23:23; 59:4; 70:24; 98:18; 108:3; 110:6
humiliate [1] 75:2
hundred [2] 91:4; 111:3
hurtful [1] 107:7

– I –

i'd [5] 29:7, 24; 32:1; 41:24; 48:21
i've [8] 3:8; 28:1; 43:6; 45:24; 58:15; 60:12; 69:19; 103:9
id [2] 79:18, 19
idea [5] 28:22; 42:13; 79:15; 86:3; 96:20
identification [3] 26:17; 49:14; 120:7
identifying [1] 84:8
idorolla [1] 95:5
iii [1] 30:5
imagine [2] 42:13; 114:25
immediate [2] 71:24
implementing [1] 87:22
implies [1] 6:12
impression [1] 32:24
inability [2] 102:2, 3
inappropriate [2] 92:25; 93:4
incident [4] 54:12; 60:14; 81:22; 83:1
include [2] 8:22; 60:18
increase [2] 29:10; 69:20
increases [5] 6:20; 28:8; 29:16, 19
increasingly [1] 107:5
index [2] 26:17; 49:14
indicating [3] 48:17; 68:17; 74:21
indication [1] 11:10
individual [3] 7:13; 73:4, 7
individuals [4] 6:1; 19:9; 29:6; 111:24
infantry [2] 51:13; 52:16
influence [2] 61:15; 88:23
information [4] 3:12; 4:9; 37:19; 103:9
initials [1] 86:25
innocent [1] 42:6
instances [1] 60:20
institute [1] 56:19
instituting [1] 56:17
insurance [1] 73:2
intact [1] 54:21
intelligence [3] 51:14, 21; 52:17
intent [2] 81:24; 92:20
intention [1] 79:4
interested [1] 119:19
interesting [1] 6:11
internet [2] 85:20, 21
interoffice [2] 9:18; 10:4
interview [3] 18:23; 19:1, 9
interviewed [2] 41:22; 108:25
interviews [1] 82:18
invested [1] 68:14
investigate [1] 47:19
investigated [1] 47:22
investigation [5] 18:11, 15; 33:23; 34:1; 64:18
invited [3] 87:16; 89:14; 90:16
invoices [1] 87:15
involved [14] 6:4, 6; 13:18; 17:16; 54:14; 62:1; 70:3; 85:4; 87:23; 88:11; 89:8; 111:22; 113:1; 114:13
involvement [1] 80:25
involving [1] 67:14
issue [3] 40:16, 19; 41:17
issues [2] 37:19; 107:25
items [6] 54:17, 20, 21; 55:13, 20; 56:9

– J –

jacketed [1] 82:12
janet [32] 11:25; 13:15, 16, 21, 24; 14:3, 9, 13; 15:1; 55:25; 58:13; 62:1, 19, 20; 63:17, 19, 23; 72:11; 85:4, 17, 18; 91:18; 111:22, 23, 25; 112:8; 10, 16, 21; 113:1, 13
janet's [1] 14:5
january [9] 34:13; 36:8; 39:16; 41:9; 51:15; 53:8; 99:19; 109:12; 116:9
job [12] 6:1; 7:4; 8:9; 20:7; 44:11; 67:24, 25; 81:23; 88:25; 89:3, 25; 99:3
jobs [5] 27:11; 50:5; 51:1; 58:1; 98:6
judge [5] 73:21; 74:1; 107:4, 14; 109:11
judges [1] 44:21
judith [1] 107:20
july [2] 58:17; 64:10
june [2] 44:8; 51:12
justifiable [1] 106:1
justified [2] 102:10, 22

– K –

katz [11] 34:20; 36:13; 41:11; 67:1; 98:12; 99:8; 100:3, 17; 101:8; 104:9; 109:14
keep [1] 64:7
kent [2] 23:14; 24:6
knocked [1] 52:22
knowledge [11] 18:10; 37:24; 38:2, 3, 8; 45:11; 77:17; 85:8, 10; 113:14; 118:5

– L –

labeled [3] 27:16; 29:25; 86:17
lady's [1] 94:18
landmark [1] 45:3
language [2] 74:9; 77:4
large [1] 53:13
last [6] 44:13; 50:15; 94:1; 105:18; 107:21
late [4] 40:4; 47:15; 71:22; 85:5
latest [1] 27:13
law [6] 2:5; 37:20; 39:21; 41:13; 85:19; 119:7
lawful [1] 2:2
lawn [4] 79:25; 80:1; 93:8, 10