# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------x
BARBARA E. MURPHY,            :
                              :
        Plaintiff,            :
                              :    CIVIL ACTION NO.
        Versus                :    3:03 CV 00519 (DJS)
                              :
THE CITY OF STAMFORD and DAVID:
VECCHIA,                      :
        Defendants.           :
------------------------------x

COPY

D E P O S I T I O N

    Deposition of BARBARA E. MURPHY taken on behalf of the Defendants before Donna M. Miani, CSR, a Notary Public, in and for the State of Connecticut, on Thursday, February 5, 2004, at 11:25 a.m., at the law offices of ELISABETH SEIEROE MAURER, 871 Ethan Allen Highway, Ridgefield, Connecticut.

GOLDFARB & AJELLO REPORTING SERVICES
24 EAST AVENUE   #1372
NEW CANAAN, CONNECTICUT   06840
(203) 972-8320

A P P E A R A N C E S:

REPRESENTING THE PLAINTIFF:

    LAW OFFICES OF ELISABETH SEIEROE MAURER
    871 Ethan Allen Highway
    Ridgefield, Connecticut  06877
    BY:  ELISABETH SEIEROE MAURER, ESQUIRE

REPRESENTING THE DEFENDANTS:

    CORPORATION COUNSEL, CITY OF STAMFORD
    Government Center
    888 Washington Boulevard
    Stamford, Connecticut  06901
    BY:  JAMES V. MINOR, ESQUIRE

ALSO IN ATTENDANCE:

    David Vecchia
    Officer Ekstrom, Ridgefield Police Department

S T I P U L A T I O N S

1
2
3
4
5        IT IS HEREBY STIPULATED AND AGREED
6  by and between counsel for the parties that the
7  proof of the authority of the Notary Public before
8  whom this deposition is taken is waived;
9
10       IT IS FURTHER STIPULATED AND AGREED
11 that notice of the time and place of the taking of
12 the deposition are waived;
13
14       IT IS FURTHER STIPULATED AND AGREED
15 that all objections, except as to the form of the
16 question, are reserved until the time of trial;
17
18       IT IS FURTHER STIPULATED AND AGREED
19 that the deposition may be signed before any Notary
20 Public.
21         * * * * *
22
23
24
25

```
 1    BARBARA  E.  MURPHY,
 2              871 Ethan Allen Highway, Ridgefield,
 3         Connecticut, 06877, called as a witness,
 4         having been first duly sworn by Donna M.
 5         Miani, a Notary Public in and for the State
 6         of Connecticut, was examined and testified as
 7         follows:
 8              MR. MINOR:  Usual stipulations or
 9         reading and signing?
10              MS. MAURER:  We will read and sign,
11         and usual stipulations.
12              MR. MINOR:  Okay.  On reading and
13         signing, can we agree that within thirty days
14         after you receive it, if it's not signed,
15         it's deemed correct?
16              MS. MAURER:  Yes.
17              MR. MINOR:  Okay.
18
19    DIRECT EXAMINATION BY MR. MINOR:
20         Q.   Here are the exhibits, but let's just go
21    through the preliminaries.  If I ask a question and it's
22    unclear, don't hesitate to tell me.
23              If you don't understand my question, if you
24    need to break, don't hesitate to ask for a break.
25              If you need to consult --
```

```
 1          A.      I need a break.
 2          Q.      Not yet.
 3                  If you need to consult your attorney, you can
 4   consult your attorney.
 5                  We'll be reading a lot of documents, and if
 6   you're bothered out of your mind and you need to do jumping
 7   jackings or something, we can do that.
 8                  Probably because of all the documents, this
 9   will go until about three o'clock, and I don't anticipate
10   we're going to get done today.  So take it easy and relax.
11                  And again, if you need to stretch or
12   something, just tell us and we'll do it.  Okay?
13          A.      Yes.
14          Q.      And the other thing is you have to answer
15   audibly.  The most important person in the room is the court
16   reporter.  Normally people say uh-huh, but you can't do
17   that.  You have to say yes, no so that she unambiguously has
18   an answer to the question.  Nodding your head obviously
19   doesn't work either.  So that's why it's important if you
20   don't understand my question or you want me to ask it again,
21   go ahead, and I'll try to break it down and make it more
22   simple.
23                          MR. MINOR:  Okay.  Let's mark as the
24                  first exhibit -- I'm a defendant.  So what
25                  are we going to use, A?
```

```
 1                    (Defendants' Exhibit A
 2               received and marked for identification:
 3               Complaint, numerous pages.)
 4   BY MR. MINOR:
 5        Q.    We've agreed that you are the plaintiff and
 6   you're suing both the city of Stamford and David Vecchia; is
 7   that correct?
 8        A.    Yes.
 9        Q.    And this document marked as Exhibit A for
10   identification is a copy of a Complaint that your attorney
11   prepared.
12               Have you seen this recently?
13        A.    Yes.
14        Q.    Okay.  And we're not going to go through it
15   line by line, but let's start at page three at the top.
16               Paragraph six, you began employment with the
17   city of Stamford in 1983 in the payroll department; isn't
18   that correct?
19        A.    Correct.
20        Q.    And your attorney alleges that in 1993
21   Mr. Vecchia was hired as a purchasing agent for the City.
22               Is that to your knowledge correct?
23        A.    Correct.
24        Q.    Okay.  And in 1996 you were transferred to
25   the fire department?
```

```
 1         A.    Correct.
 2         Q.    Now, it says here administrative assistant/
 3   data systems.
 4               What was your title?
 5         A.    That's the title. Administrative assistant/
 6   data information services. It was the -- that's the job
 7   title.
 8         Q.    I gotcha.
 9               And I take it that was an increase from
10   salary from your previous position?
11         A.    Correct.
12         Q.    And what was your title when you were working
13   for payroll?
14         A.    Account clerk two.
15         Q.    And roughly ballpark what was your salary as
16   account clerk two?
17         A.    I don't remember.
18         Q.    What was your salary when you were first
19   promoted in 1996 to administrative assistant for the fire
20   department?
21         A.    Maybe forty-nine thousand. I'm not sure.
22         Q.    Okay. And what is your salary today?
23         A.    Fifty-one thousand.
24         Q.    And you're still holding the same position?
25         A.    Correct.
```

| | | |
|---|---|---|
| 1 | Q. | And it's still the same title? |
| 2 | A. | Correct. |
| 3 | Q. | Now, it's the city fire department. |
| 4 | | Isn't it true that when you were working for payroll you were working at what is known as the Government Center on 888 Washington Boulevard? |
| 7 | A. | Correct. |
| 8 | Q. | And the fire department is a separate building on a separate street? |
| 10 | A. | Correct. |
| 11 | Q. | And what is that street? |
| 12 | A. | 629 Main Street. |
| 13 | Q. | And that is a typical firehouse with garages for fire vehicles on the ground floor and then your office is what, second or third floor? |
| 16 | A. | Third floor. |
| 17 | Q. | Which is the top floor? |
| 18 | A. | Correct. |
| 19 | Q. | And could you tell us briefly what are your duties as administrative assistant for the city of Stamford. Let's keep it simple and make it what are your duties today just roughly. |
| 23 | A. | I am the chief's assistant, and I'm also an assistant to the assistant chiefs and support assistant to deputy chiefs, and I help prepare budgets, and I answer |

1  phone calls, and I make appointments and I -- did I say
2  budget.
3           Do the budget, and I do the payroll, and I
4  keep up their data systems, and I basically do everything
5  there. Do the accounts payable. I'm the office person. I
6  run the office as it were.
7      Q.   Gotcha.
8           Okay. Now, it says in the Complaint the next
9  paragraph, in or around 1997 you began working with
10 Mr. Vecchia on several city committees.
11          At this time you were working at 169 Main
12 Street, the fire station, and Mr. Vecchia was still working
13 at 888 Washington Boulevard; isn't that correct?
14     A.   629 Main Street, yes.
15     Q.   So when you worked on several city
16 committees, did you go over to 888 Washington Boulevard to
17 work --
18     A.   Yes.
19     Q.   -- on those committees?
20          Okay. And it says one of them additionally
21 you worked with Mr. Vecchia preparing a newsletter relating
22 to what is called the HTE system. And you worked on an end-
23 user manual for the HTE system.
24          What is the HTE system?
25     A.   It's the financial system that the city of

1 Stamford uses for budgeting, accounts payable, accounts
2 receivable, purchasing. It's their financial system.
3     Q. And the end-user manual, was that so other
4 people could learn how to use the system?
5     A. Correct.
6     Q. And the newsletter was to tell people how to
7 use the system?
8     A. Correct.
9     Q. And it says you served on several city
10 committees.
11     What were those, two separate committees or
12 one committee doing two different things?
13     A. Those were two separate committees. The
14 newsletter was a separate from the end-user manual.
15     Q. Okay. And this was in 1997?
16     A. Yes.
17     Q. Was it before 1997?
18     A. It could have started in 1996 before I went
19 over to the fire department.
20     Q. Okay. Now, was this something that you were
21 required to do as part of your job as an administrative
22 assistant, or was it something that you volunteered to do?
23     A. This was nothing to do with administrative
24 assistant. This stemmed from me working in the payroll
25 department and the HTE system starting with the city.

```
 1              And everyone was being trained on it, and I
 2   just found a big interest on it and joined the committee to
 3   do -- they were looking for people to help other people who
 4   weren't quite sure how to use the system.  So we started a
 5   newsletter, and we started making a manual to help people
 6   out.
 7         Q.    Okay.  And what was Mr. Vecchia's role in
 8   that committee?
 9         A.    He was the purchasing agent.  So he at the
10   time, in my understanding, in charge of the HTE system.  So
11   all these committees filtered out through him.
12         Q.    And who else was on the committee, it wasn't
13   just you two; was it?
14         A.    Alice Jesadowitz, Maryann Fitzgerald.  I'm
15   not quite sure who else.  I can't remember at this time.
16         Q.    Was there anybody from data processing?
17         A.    Maryann Fitzgerald was from data processing.
18         Q.    And again, all of you people were there
19   because you wanted to -- in other words, you were
20   volunteers?
21         A.    Volunteers, yes, I guess.  I'm not sure about
22   Alice and Maryann.  I don't know if they -- I think we were
23   just the brighter -- not brighter.  I don't want to say
24   brighter.  We were more apt to help people out.  We were
25   helping HTE.  So.
```

```
 1              Q.      Were there any other committees that you
 2    worked with Mr. Vecchia besides this committee dealing with
 3    the HTE system?
 4              A.      There's another committee, but I don't know
 5    if it was related to the HTE system. The purchasing
 6    policies and procedures committee. I was on that.
 7              Q.      Okay. And was that the same people or
 8    different people?
 9              A.      Those were different people.
10              Q.      And who was on that committee?
11              A.      Tom Hamilton, Rob Ruszkowski. Some people
12    from operations. I don't know really who. I can't
13    remember.
14              Q.      Okay.
15              A.      Peter Lucia might have been on. I'm not
16    quite familiar.
17              Q.      Okay. Now, when you were working as an
18    account clerk two for payroll, who was your boss?
19              A.      At what time?
20              Q.      Any time before you got promoted. Let's take
21    the last year that you were working as account clerk two
22    before you were promoted to an administrative assistant with
23    the fire department.
24              A.      I didn't have a direct boss in payroll
25    necessarily.
```

```
 1           Q.     Who was your --
 2           A.     Tom Hamilton.
 3           Q.     And Tom Hamilton was the finance director?
 4           A.     Correct.
 5           Q.     So did you get annual performance reviews
 6   prior to your -- let's say in '96?
 7           A.     I've never had an annual performance review.
 8           Q.     Okay.  Were you supposed to?
 9           A.     Not to my knowledge.
10           Q.     Okay.  Who had the power to discipline you,
11   for instance, if you did something wrong or you didn't show
12   up for work; would that have been anybody besides Tom
13   Hamilton?
14           A.     It could have been Peter Mynarski.  It could
15   have been Tom Hamilton.
16           Q.     And Peter Mynarski is what?
17           A.     Nothing at this time.
18           Q.     But he was then?
19           A.     I don't know.  Everybody was filling in
20   different positions because the two people that were my
21   bosses were -- one left and the other one was moved to
22   another area.
23           Q.     Okay.  Was one of those people who used to be
24   your boss who was moved Peter Lucia?
25           A.     Correct.
```

1    Q.    And what was Peter Lucia's job title before
2  he moved?
3    A.    Payroll supervisor.
4    Q.    And then he was moved to what position?
5    A.    I have no idea.  Something in finance.
6  Audit-ish I think.
7    Q.    Okay.
8    A.    I don't know the official title.
9    Q.    All right.  Now, after you were promoted to
10 administrative assistant in the fire department, who was the
11 person who would discipline you if you did something wrong?
12   A.    Peter Brown, assistant fire chief or at
13 different times, the fire chief depending on which chief was
14 in capacity.
15   Q.    So if I understand the chain of command
16 correctly, there was you, Peter Brown was the assistant
17 chief and then whoever the chief was, and that changed over
18 the years?
19   A.    Right.
20   Q.    And was one of the functions of Peter Brown
21 to be in charge of the staff or the office people as opposed
22 to the line firefighters?
23         That's poorly worded.
24         Why was it Peter Brown as opposed to another
25 assistant chief?

```
 1         A.    Peter Brown was the assistant chief of
 2   administration.
 3         Q.    Gotcha.
 4         A.    And actually there was no other assistant
 5   chief. That was a newly created position later on in life.
 6         Q.    So there were deputy chiefs?
 7         A.    That were my supervisors, no.
 8         Q.    Okay. So Peter Brown was assistant chief in
 9   charge of administration?
10         A.    Correct.
11         Q.    And that is still the case today?
12         A.    Correct.
13         Q.    Now, have you, since your promotion to
14   administrative assistant, gotten performance reviews annual?
15         A.    I might have. I don't recall. Not
16   regularly.
17         Q.    Have you ever been disciplined --
18         A.    No.
19         Q.    -- since you've been transferred as
20   administrative assistant?
21         A.    No.
22         Q.    Okay. And you don't remember any performance
23   reviews.
24               Have you ever received awards since 1996 when
25   you were promoted to administrative assistant?
```

```
 1         A.      What type of award?
 2         Q.      Accommodations.
 3         A.      Does the city give out awards?
 4                 I wasn't aware of that.
 5         Q.      Not to me, but.
 6         A.      So I'm unaware of any awards that are
 7  available to employees.
 8         Q.      Okay. Okay.
 9                 Next paragraph, it says at the end of 1997
10  and beginning of 1998, Mr. Vecchia began making unwanted
11  sexual advances to you.
12                 Now, when was the first time, what year or
13  month if you remember, that you felt Mr. Vecchia did
14  something inappropriate?
15         A.      When he started sending candies to the office
16  at the fire department.
17         Q.      Was there one time when he took you to lunch?
18         A.      Yes.
19         Q.      Was that before the candy through the
20  interoffice mail?
21         A.      I don't recall if it was before or after or
22  right at the same time.
23         Q.      Okay. What was the occasion of him inviting
24  you to lunch?
25         A.      We were going to go over the user manual that
```

```
 1   I had put together.
 2         Q.    And do you remember what time?
 3               Was this in '97, '98?
 4         A.    I do not.
 5         Q.    Okay.
 6         A.    It was before -- it was before March of '98.
 7         Q.    Okay.
 8         A.    But I don't know if it was -- what time in
 9   '97 or what.
10         Q.    What was it about that luncheon that you felt
11   was inappropriate?
12         A.    Instead of talking about the manual, he went
13   on to say how he thought I was very good looking.
14         Q.    Was this the first time he did something like
15   that?
16         A.    Yes.
17         Q.    Was this the first time you two had been
18   alone at a lunch --
19         A.    Correct.
20         Q.    -- or meal?
21         A.    Correct.
22         Q.    And all the other occasions you were in a
23   group?
24         A.    I never went to lunch with him before that.
25         Q.    Okay.  But I mean in the office contacts that
```

```
 1   you had working in your previous job for payroll, you were
 2   always with other people in a work situation?
 3                    MS. MAURER:  I'm sorry.  I don't even
 4              understand the question.
 5                    MR. MINOR:  All right.  Skip it.
 6   Let's go on.
 7        Q.   After that lunch where he told you he thought
 8   you were attractive, did you tell him then that you didn't
 9   appreciate the comment or something along those lines?
10        A.   I was taken back by the comment, and I didn't
11   really -- I didn't say anything really and just muddled
12   through to another sentence to get away from that sentence,
13   and he took -- we had finished the lunch.  He took the
14   manual, and that was the last time I went near him.
15        Q.   Okay.  And that was also the end of your
16   service on the committee?
17        A.   I had asked for my manual back many times,
18   and he always said I had to come over and get it, and I
19   never went to get it.
20        Q.   And meaning that you were working at the fire
21   station on Main Street, and he wanted you to come to his
22   office at 888 Washington Boulevard?
23        A.   Right.
24        Q.   And he worked on the tenth floor?
25        A.   He did work on the tenth floor.
```

```
 1          Q.    Purchasing and payroll were close to each
 2   other on the tenth floor?
 3          A.    Very close.
 4          Q.    All right.  Please go to page seven and look
 5   at the top paragraph, number thirty.
 6                It states, during the night of March 20,
 7   1998, your mother was awakened by a noise outside the
 8   house.  She called to you, said she heard noises, saw
 9   lights, thought someone was trying to break into the house.
10   You went to the front of the house and didn't see anybody
11   trying to break in.
12                And then the next paragraph, the next morning
13   you discovered your car had been vandalized, your briefcase
14   stolen and the trunk and glove box left in disarray.
15                Did it refresh your recollection on
16   Mr. Vecchia breaking into your car?
17                MS. MAURER:  I didn't know that she
18                didn't.
19          A.    I don't understand what you just asked me.
20          Q.    Here's the question.  Let me rephrase.
21                When you got up in the morning, you saw that
22   someone broke into your car --
23          A.    Correct.
24          Q.    -- and you guessed that it was Mr. Vecchia?
25          A.    I thought it could be.
```