```
1          Q.    How did you determine that it was
2    Mr. Vecchia?
3          A.    Because all of a sudden standing there I
4    realized he was out the night before as well as I was.  And
5    his behavior prior to that led me to think that he could
6    have taken it, although I was not completely sure at that
7    time.
8          Q.    Okay.  You car was unlocked?
9          A.    I do not know.
10         Q.    Did he break any window?
11         A.    The window was not broken.
12         Q.    And you noticed your briefcase was missing?
13         A.    Correct.
14         Q.    All right.  You go on in the next paragraph
15   to say that you telephoned Attorney Ben Fraser and expressed
16   a suspicion that Mr. Vecchia was stalking you.  Attorney
17   Fraser advised you to call Mr. Vecchia and demand the return
18   of your things.  While looking for a pen in your purse, you
19   discovered a set of rosary beads which did not belong to
20   you.
21               What happened after you called Mr. Vecchia?
22               Let me rephrase.
23               Did you call Mr. Vecchia at home, at his
24   home?
25         A.    Yes.
```

1   Q.   And did you get him or the answering machine?
2        If you don't know --
3   A.   No, I know. I just -- I got an answering
4   machine.
5   Q.   Okay. And what message did you leave?
6   A.   I said this is Barbara Murphy. This is a
7   call for David Vecchia. It's imperative that I have my
8   briefcase. I have some very important documents that have
9   to be taken care of or something. Please return my
10  briefcase to Central Station Firehouse before 4:30.
11  Q.   And did Mr. Vecchia call you then or later
12  that day?
13  A.   I did not hear from Mr. Vecchia until 10:30
14  at night, and the briefcase was not at the fire department
15  until later that night. I called the fire department to
16  check to see if it came back, and then I thought maybe
17  Vecchia didn't do it, and now I'm in trouble because I now
18  said something over the phone. And so then he called at
19  10:30, and I was like oh, my God.
20       MS. MAURER:   Ms. Murphy, I'm going to
21       direct you to answer the questions that are
22       asked of you.
23  A.   Okay. What was the questions? I'm sorry.
24  Q.   Your answered it. But my next question would
25  be what happened, and I think you said at 10:30 at night he

```
 1   called you, meaning he called you at home?
 2         A.    Correct.
 3         Q.    And he admitted that he took it?
 4         A.    Yes.
 5         Q.    Okay.  And what was the next event?
 6         A.    What do you mean?
 7         Q.    All right.
 8         A.    I hung up on him after saying leave me
 9   alone.  That was what I would call an event, and then I
10   threw up.
11               Which event would you like?  I don't know.
12         Q.    That's fine.
13               So you hung up on him.
14               It confirmed your suspicion that it was him,
15   correct, and you were upset?
16         A.    (Witness indicated her response with a head
17   gesture.)
18         Q.    You have to say yes.
19         A.    Oh, yes.
20               MS. MAURER:  Are you okay?
21               Do you want to walk outside?
22               THE WITNESS:  No, I'm okay.
23               MS. MAURER:  All right.
24         Q.    All right.  Directing your attention to the
25   top of the page, the next page, page eight.
```

1   So the next day when you went to the fire
2   station, and you looked at your briefcase, certain things
3   were missing as alleged in paragraph thirty-four of your
4   Complaint. And then you called Attorney Fraser again.
5           And Attorney Fraser called Mr. Vecchia; is
6   that what happened?
7       A.   Correct.
8       Q.   And Attorney Fraser then told Mr. Vecchia
9   that he wanted Mr. Vecchia to return the remainder of your
10  belongings.
11      A.   Correct.
12      Q.   And Mr. Vecchia agreed to meet Attorney
13  Fraser at his office and return items.
14      A.   Correct.
15      Q.   By the way, where was Attorney Fraser's
16  office?
17      A.   In Greenwich.
18      Q.   And can we agree that Attorney Ben Fraser was
19  in private practice?
20      A.   Yes.
21      Q.   And in 1998 he had assisted you in -- no,
22  prior to 1998 he had assisted you, and he assisted members
23  of your family in doing legal work?
24      A.   Correct.
25      Q.   And you considered him to be your personal

1  attorney?
2      A.   Correct.
3      Q.   And your family's personal attorney?
4      A.   Pretty much.
5      Q.   And today as of some time in 19 -- excuse me,
6  in 2003, he's deceased?
7      A.   Correct.
8           MS. MAURER:  Okay.  We're going to
9      take a little break.  Come on.
10          ( R E C E S S )
11          (Defendants' Exhibits B through I
12     received and marked for identification:
13     Various documents.)
14 BY MR. MINOR:
15     Q.   All right.  Paragraph thirty-six and
16 paragraph thirty-seven, if you could just read them quickly
17 to yourself and tell me when you're ready.  Okay?
18          So after Attorney Fraser called Mr. Vecchia
19 and demanded a return of the remainder of the items,
20 Mr. Vecchia did meet with Mr. Fraser at his office and
21 returned some items; isn't that correct?
22     A.   Yes.
23     Q.   And some items were destroyed, and he paid
24 Attorney Fraser a hundred dollars as payment for those
25 destroyed items; is that correct?

```
1         A.      He gave a hundred dollars, yes.
2         Q.      And he also gave a letter that he had written
3  apologizing for his conduct?
4         A.      Correct.
5         Q.      And Attorney Fraser spoke to his sister,
6  Mr. Vecchia's sister, who was an attorney from Washington,
7  D.C. --
8         A.      Correct.
9         Q.      -- is that correct?
10                And is it your understanding that
11 Mr. Vecchia's sister had various discussions with
12 Mr. Fraser, and as a result, Mr. Vecchia promised to stop
13 stalking and harassing you and to seek psychological
14 treatment?
15        A.      That was my understanding.
16        Q.      And that Mr. Vecchia and his sister told
17 Attorney Fraser that Mr. Vecchia did not want you to report
18 him to the city; is that correct?
19        A.      That is very much correct.
20        Q.      But in the next paragraph, thirty-eight,
21 states that in September of 1998 Attorney Fraser contacted
22 Thomas Cassone, who was the corporation counsel, to discuss
23 Mr. Vecchia's conduct; is that correct?
24        A.      Correct.
25        Q.      Now, is that because Mr. Vecchia did not keep
```

1  his agreement that he made with Attorney Fraser that he
2  would stop harassing you and stalking you?
3      A.   Correct.
4      Q.   And so because he didn't keep his agreement
5  that he wouldn't harass you or stalk you, you or your
6  attorney felt that the next step would be to report him to
7  the city; is that correct?
8      A.   Correct.
9      Q.   And reporting to the city meaning that
10 Attorney Cassone was the corporation counsel and would know
11 what to do?
12     A.   We were asking his advice, yes.
13     Q.   Okay.
14          MS. MAURER:   Do you need to ask me a
15     question?
16          THE WITNESS:   About that time --
17          MS. MAURER:   Right. He'll raise
18     that.
19     Q.   I want to refer you to Exhibit D for
20 identification, and do you recognize this document?
21     A.   Yes.
22     Q.   And this is a policy put out by the city
23 concerning sexual harassment.
24     A.   Correct, but on my policy that I got on the
25 whole staff at the firehouse, there was a signature page

1  that everyone had to sign and return to Human Resources.
2      Q.   Okay.  Prior to Attorney Fraser talking to
3  Mr. Cassone, did you have a class on this policy, and is
4  that when you signed that you had the class or received the
5  policy?
6      A.   We received the policy.
7      Q.   You didn't attend a class?
8      A.   I don't know that there was a class for
9  this.
10     Q.   Okay.
11     A.   In my time at the city of Stamford, there was
12  a policy that -- I mean a class that I went to, but I don't
13  know which came first, this or the class.
14     Q.   Okay.  But in any case, you remember the one
15  copy that you saw had a signature page for each person that
16  was supposed -- that worked for the -- that was supposed to
17  acknowledge receipt of the policy?
18     A.   Correct.
19     Q.   Okay.  Now, do you remember if this policy
20  and your understanding of it did that -- was that one of the
21  reasons why Attorney Fraser talked to Mr. Cassone?
22          In other words, did your reading the policy
23  make you say to yourself I think --
24     A.   The policy had --
25              MS. MAURER:   Let him ask the

```
 1                    question.
 2        A.          I'm sorry.
 3        Q.          -- I think I'm going to report Mr. Vecchia
 4   because I think he's in violation of this policy?
 5                    THE WITNESS:    Do I just answer yes
 6                    or no or what?
 7                    MS. MAURER:    We're not sure what the
 8                    question is at this point.
 9        Q.          All right.  Let me skip it.  I'll go on.
10                    MS. MAURER:    Objection.
11                    But also I would appreciate if you go
12                    back and ask her if this is the policy she
13                    got because this is different in shape,
14                    although not in content as far as I can tell,
15                    with the policy that you showed me.  It had
16                    a cover letter and signature page.
17        A.          Okay.  That was what I was trying to -- this
18   could be the policy, but mine had a different page on it and
19   there was different -- it looked different than this a
20   little.
21        Q.          All right.
22        A.          Like I had a signature page.  It might have
23   had an open page.  I don't have the other one to compare.
24        Q.          When you read this policy -- by the way, is
25   Exhibit D, despite the fact that there are differences like
```

1  a cover sheet and a signature page, is that the same policy
2  that you read back in 1998?
3          A.    It could be, yes.
4                MS. MAURER:    No.
5          A.    Okay.  No.
6                MS. MAURER:    I'm not telling you how
7          to answer.  I'm just saying if you know that
8          that's the same policy, you can say that.  If
9          you don't know that, don't speculate.
10         A.    I don't know if this is the specific policy
11 because I don't recall all the words of the policy, and I
12 don't -- I did not read this whole thing.  Unless I had the
13 one I had and this one, I can't tell you if this is the
14 exact same words.
15         Q.    Okay.  Whether that is the exact same one
16 that you got in 1998, would you agree that it was some time
17 after June 24, 1998 that you got this policy and signed for
18 it?
19         A.    I believe, yes.
20         Q.    And do you remember whether this policy that
21 you signed for was something that caused you to contact
22 through your attorney Mr. Cassone?
23                MS. MAURER:    Answer his question and
24         then you can speak to me.
25         A.    What was the question; did this reading of

1   the sexual harassment policy, was that one of the reasons
2   why Ben Fraser contacted Tom Cassone?
3           It wasn't one of the reasons, but it helped
4   to -- you know, it was, as I said, by the way, and it made
5   it more concrete to contact. We were going to contact
6   either way.
7       Q.   Okay.
8       A.   But it was a -- I said, as a matter of fact,
9   there's a policy out now. And so, yes. Yes-ish.
10      Q.   Okay.
11      A.   I don't know. Sorry.
12              MS. MAURER: Ask -- wait one moment.
13      Q.   All right. Page nine, top of the page,
14  paragraph thirty-one.
15      A.   I don't have a thirty-one.
16      Q.   You don't?
17      A.   No, not on page nine.
18      Q.   You don't have page nine, thirty-nine?
19      A.   Thirty-nine, yes.
20      Q.   Okay. All right.
21          Again, I don't want to -- if you could just
22  read the whole page.
23      A.   Okay.
24      Q.   Then I'll ask a few questions. And I'm going
25  to be highlighting so you don't have to.

1           Okay.  Attorney Cassone referred you and
2  Attorney Fraser to the city's Human Resources department,
3  and subsequently on September 21, 1998, you and Attorney
4  Fraser met with Fred Manfredonia and William Stover, who
5  were employees of the city of Stamford and who worked in the
6  human relations department; is that correct?
7       A.   Yes.
8       Q.   And Bill Stover was the director of human
9  relations?
10      A.   Correct.
11      Q.   And Fred Manfredonia was whatever -- do you
12 know what his job title was?
13      A.   (Witness indicated her response with a head
14 gesture.)
15      Q.   But he was an assistant to Mr. Stover?
16      A.   Yes.
17      Q.   And you met with Attorney Fraser and those
18 two individuals and you basically explained what Mr. Vecchia
19 had done that you felt violated the sexual harassment
20 policy?
21      A.   Correct.
22      Q.   And that was your filing of an official
23 complaint?
24      A.   Correct.
25      Q.   Okay.  And then Mr. Stover and

1  Mr. Manfredonia met with Mr. Vecchia to get his version of
2  the events, and subsequently they got back to you and to
3  your attorney, Ben Fraser; is that correct?
4        A.    Correct.
5        Q.    And they met with Mr. Vecchia on
6  September 25, and Mr. Vecchia admitted his prior conduct
7  towards you at work and outside of work and his prior
8  agreement to get help and to stop his unwanted behavior
9  towards you?
10       A.    Correct.
11       Q.    Now, you weren't at that meeting, but that's
12 what you were told by Mr. Stover and Mr. Manfredonia; isn't
13 that correct?
14       A.    I was at that meeting.
15       Q.    You were at that meeting?
16       A.    I wasn't at Vecchia's meeting, I was at the
17 meeting and this meeting.
18       Q.    Okay.  And then the next paragraph says on
19 September 30, Manfredonia and Stover met with you and Ben
20 Fraser and they told you what happened when they met with
21 Mr. Vecchia; is that correct?
22       A.    Okay.  Correct.
23       Q.    And Mr. Vecchia admitted that he harassed --
24 or he admitted his harassing conduct both at work and
25 outside of work according to them.

```
 1        A.      Correct.
 2        Q.      And your attorney suggested that Stover and
 3   Manfredonia get an agreement from Mr. Vecchia which said,
 4   one, he would obtain therapy; two, provide progress reports
 5   to the city and through the city to Attorney Fraser and
 6   three, leave you alone; is that correct?
 7        A.      Correct.  And they agreed.
 8        Q.      All right.  And you were satisfied with that
 9   agreement; you and your attorney, Ben Fraser?
10                In other words, after September 30, 1998, you
11   thought you had a deal?
12        A.      Yes.
13        Q.      You didn't say, no, that's not enough, I want
14   the SOB fired?
15        A.      I did not say that.
16        Q.      Okay.  All right.
17                Let's go to Exhibit B.
18                Now, looking at the first page of Exhibit B,
19   is this a statement that you gave on October 26, 2000 to
20   Officer Carl Strate of the Stamford Police Department, and
21   the first page is a form that the police department gives
22   you entitled Voluntary Statement.
23        A.      Correct.
24        Q.      Okay.  And then attached to that, if you can
25   just briefly look through it, there's pages two through
```

```
 1    seven of a typed statement with your initials and signature
 2    and Officer Strate's signature on the bottom of the page.
 3              And is that what you remember you gave to
 4    Officer Strate on October 26, 2000?
 5         A.   Yes.
 6         Q.   And this relates to Mr. Vecchia's conduct
 7    towards you?
 8         A.   Correct.
 9         Q.   And when you gave this statement to Officer
10    Strate, the intent of giving this is to file a formal
11    complaint with the police department to have Mr. Vecchia
12    arrested?
13         A.   Correct.
14         Q.   Okay.  And just looking at the first page,
15    would you agree with me that the time started was at 5:25
16    p.m. and the time finished down here was 7:45 p.m.?
17         A.   Okay.
18         Q.   So you spent a fair amount of time doing this
19    statement?
20         A.   Correct.
21         Q.   Okay.  All right.
22              I refer you to page five of seven, and at the
23    top of page five of seven you discuss the March 1998
24    incident where Mr. Vecchia broke into your car which was
25    parked at your home in Norwalk, took some items, including
```

1   your briefcase, and as a result, there was a meeting with
2   Attorney Fraser at Attorney Fraser's office; is that
3   correct?
4        A.    Yes.
5        Q.    And prior to that, you went through all of
6   the harassment and stalking that you felt Mr. Vecchia had
7   done to you in 1997 and 1998; correct?
8              In other words, we're at page five, but
9   before that, pages two, three, four go over all of the
10  details of Mr. Vecchia's stalking and harassing you.
11       A.    As much as I could get out at that time I
12  did.
13       Q.    Okay. And then in the third paragraph of
14  page five you state that Ben met several times at his office
15  and over the phone with David, Ben by the way is Ben Fraser,
16  your attorney, and David is Mr. Vecchia; isn't that correct?
17       A.    Yes.
18       Q.    Or his sisters, meaning his sister, the
19  attorney in Washington, D.C.?
20       A.    I think another sister went with David, too.
21       Q.    Okay.
22       A.    Outside of this call to the sister in D.C.,
23  I think he was accompanied with other family members.
24       Q.    Okay. And again, in that paragraph you state
25  that Mr. Vecchia agreed to stay away from you and leave you

```
 1   alone, and he would get help, and he was remorseful.
 2              And this was in the spring of 1998.
 3        A.    Okay.
 4        Q.    Then you state that in May of 1998,
 5   Mr. Vecchia didn't leave you alone --
 6        A.    Correct.
 7        Q.    -- he showed up at Brennan's, and you started
 8   getting phone calls?
 9              MS. MAURER:   Speak.
10        A.    Correct.
11        Q.    And he started showing up at road races.
12        A.    Correct.
13        Q.    And you would see him running after work in
14   the Shippan area.
15        A.    Correct.
16        Q.    And you were in a race in High Ridge where he
17   showed up and ran right in front of you the whole time so
18   you had to stop in the middle of the race?
19        A.    Correct.
20        Q.    Then in the next paragraph, let me just read
21   it and see if you agree or disagree.
22              "After talking with my friend Ben," meaning
23   Ben Fraser, "we agreed that we should take this to the City
24   of Stamford so I called Tom Cassone who was a Corporation
25   Counsel and was advised to go to The Human Resources
```

1    Division in the City of Stamford."
2                Is that correct?
3        A.    Yes.
4        Q.    And you did this while working at the fire
5    department, and you had just finished discussing the sexual
6    harassment policy which you were required to sign?
7        A.    Correct.
8        Q.    And Mr. Vecchia's conduct seemed like it fell
9    into the category of sexual harassment?
10       A.    Absolutely.
11       Q.    And then the next paragraph states that in
12   the middle of September 1998, you met with Mr. Bill Stover
13   and Fred Manfredonia, which is what you just testified
14   about; correct?
15       A.    Correct.
16       Q.    And that's when you made the first formal
17   complaint with the city?
18       A.    That's correct.
19       Q.    Okay. And continuing on to the next page,
20   you said you wanted David, meaning Mr. Vecchia, to leave you
21   alone and get help, that you weren't out to hurt him, you
22   just wanted him to leave you alone; is that correct?
23       A.    I did want him to leave me alone. Always.
24       Q.    And then skipping over a sentence, Ben and I
25   told Bill Stover and Fred Manfredonia that you wouldn't take

```
 1   this any further if David got help and we received proof
 2   that he was getting help and that he had to stay away from
 3   you; is that correct?
 4        A.    Correct.  Yes.
 5        Q.    Now, do you know if Mr. Vecchia did, in fact,
 6   receive psychological counseling?
 7              And let me ask this in two parts.
 8              I think we've agreed that in March of 1998
 9   after his break-in to your car, and after Ben Fraser met
10   with him at his office and had discussions with his sister,
11   the attorney, that Mr. Vecchia agreed to leave you alone, he
12   gave you a written apology and he said he would get help.
13              Do you know if he got help after that March
14   1998 --
15        A.    I don't.
16        Q.    Okay.  Now, in September of 1998, isn't it
17   true that Mr. Vecchia did essentially the same thing; he
18   said I'm sorry, I'll get help, I'll leave Barbara Murphy
19   alone?
20              Do you know if he got psychological help
21   after September 1998?
22        A.    We don't know that.
23        Q.    Okay.
24              MS. MAURER:  You can speak if you --
25              We need to go back to that question
```

```
1                    and clarify the answer.  She does have some
2                    information.  It's not direct.
3                         MR. MINOR:   Okay.
4                         MS. MAURER:   So why don't you go
5                    ahead and share that.
6          A.   Okay.  Working with Officer Strate, he came
7   back and told me that Vecchia did go to get help.  His wife
8   had told Strate that he did go to get help, but after like
9   going twice or three times, he told his wife that he didn't
10  have to go any more because no one's watching him.
11         Q.   Gotcha.
12                        MR. MINOR:   Okay.  Off the record.
13                    (DISCUSSION OFF THE RECORD)
14  BY MR. MINOR:
15         Q.   The paragraph in the middle of the page
16  beginning everything got quiet and then only now on October
17  5, 2000 did I get a plastic thing, a funny face type of
18  thing on a stick that was left in your yard by your steps
19  stuck in the lawn, which is the type of thing that
20  Mr. Vecchia did before.
21              Was that the -- did you agree with that
22  statement?
23         A.   Yes.
24         Q.   And did that scare you?
25         A.   Absolutely.
```