```
 1        Q.    And is that one of the reasons why you went
 2   to Officer Strate to file this complaint?
 3        A.    Yes.
 4        Q.    And it goes on in that paragraph to say that
 5   you had a late night call and it came from a Wilton phone
 6   number, and you believe that that was by Mr. Vecchia since
 7   he passes through Wilton to get to his home; is that
 8   correct?
 9        A.    Correct.
10        Q.    And then a few days prior to the I guess
11   October 5, 2000 frog stuck in your lawn incident, you saw
12   Mr. Vecchia at Tarantos.
13        A.    Yes.
14        Q.    And Tarantos is a restaurant/bar?
15        A.    It was.  It is no longer.
16        Q.    And you were there with a male friend when
17   Mr. Vecchia walked in, saw you and he didn't leave.
18        A.    Correct.
19        Q.    Now, wasn't it the agreement that if
20   Mr. Vecchia should run into you either during work-hours or
21   after work-hours that he would turn around and leave?
22        A.    Correct.
23        Q.    And this time he didn't?
24        A.    He did not.
25        Q.    And it says that quote, "I just didn't want
```

1  this to start up all over again.  I also saw him at The
2  Government Center the same week, he made me feel very
3  uncomfortable, he just looked at me and stood there, it was
4  very odd."  Close quote.
5              So you felt that Mr. Vecchia by staring at
6  you at the Government Center, seeing you at Tarantos and the
7  phone call and the frog was stalking you again?
8       A.     Correct.
9       Q.     And in breach of his agreement?
10      A.     Correct.
11      Q.     And forgetting his agreement, scaring me.
12             Okay.  And then it concludes by saying, I
13 tried to get a restraining order before but you were told to
14 go to the police.
15             Was one of the reasons why you were filing
16 this complaint to get a restraining order from the police
17 that Mr. Vecchia not bother you?
18      A.     That was one of the reasons.
19      Q.     Okay.  And the next page you state that you
20 want Mr. Vecchia to know how serious this is, and if he
21 starts to do this again, he'll be arrested.
22             Does that mean that if Mr. Vecchia stalks you
23 that you wanted him arrested?
24             Let me rephrase it.
25             Would you agree that you felt that he already

1    was stalking you in breach of his agreement and that you
2    wanted him arrested?
3        A.    Yes.
4        Q.    Okay. You signed that on the bottom of the
5    page, and ultimately Mr. Vecchia was arrested; isn't that
6    correct?
7        A.    Correct.
8        Q.    Now, in addition to your statement which you
9    gave on October 26th, 2000, Officer Strate did further work
10   to verify your complaint that Mr. Vecchia was stalking you;
11   did he not?
12       A.    Yes, he did.
13       Q.    Okay. Let me show you.
14             MS. MAURER:    To clarify, he wasn't
15             stalking Carl Strate, he was stalking Barbara
16             Murphy.
17             THE WITNESS:   I'm sorry. I didn't
18             hear that.
19             MR. MINOR:    I'm sorry if I said that
20             he was stalking him.
21             MS. MAURER:    If there are things you
22             think you're missing, then you go back and
23             ask for clarification.
24       A.    Can we start at the beginning?
25       Q.    No, let's not.

```
 1                    Okay.  Exhibit E, I think I have -- I seem to
 2   be missing another copy of Exhibit E.
 3                    All right.  So let's go over Exhibit E
 4   briefly and then we'll probably break for lunch.
 5                    Can you identify Exhibit E?
 6        A.    It's an arrest warrant application.
 7        Q.    Have you seen this before?
 8        A.    I saw it -- a couple pages were missing.  I
 9   saw this a while ago.
10        Q.    All right.  Now, during the course of the
11   investigation, did Officer Strate keep you informed, or did
12   you call him and ask him what was going on?
13        A.    He would call and ask me more questions and
14   tell me somewhat of what was going on, but he didn't tell me
15   an awful lot.  And when I asked some questions, he said he
16   can't answer them.  Some of them, so.
17        Q.    But you knew --
18        A.    Yes, he was going on with the investigation.
19        Q.    You knew that he was going on with the
20   investigation and that he ultimately on November 29, 2000
21   presented his own affidavit showing the results of his
22   investigation to the court.
23                    And if you see on the last page of that
24   actually he signs it.  I correct myself on November 28th,
25   2000, and it was signed by the prosecutor and the judge on
```

1    the 29th of November.
2            So he just didn't take your statement and
3    then seek an arrest warrant, he did further investigation;
4    isn't that correct?
5        A.    He investigated it, yes.
6        Q.    Okay. Now, directing your attention to the
7    first page of the affidavit, and paragraph two, I'm just
8    going to ask you if you agree, disagree or maybe you don't
9    know, and the answer is I don't know.
10           Do you remember that it was on Wednesday,
11   October 11 at 4:50 p.m. you came to the police headquarters
12   to see Officer Strate because you contacted him earlier in
13   the day requesting an interview regarding an ongoing
14   problem?
15           Does that sound right to you?
16           MS. MAURER:  I'm going to point out
17           on that the date of the voluntary statement
18           is 10/26.
19           MR. MINOR:  Right.
20       Q.    My next question is going to be you saw him
21   earlier before you came in to give your voluntary statement.
22       A.    I might have.
23       Q.    Okay. So you don't --
24       A.    I know I went in to talk to him. I don't
25   know if that's the date, but it was after work, and we

```
 1   started it, but he may have gone and then we had to make
 2   another appointment to come back and give the whole deal.
 3          Q.    Okay.
 4          A.    Right. Okay. Because I recall that.
 5          Q.    Okay. And on paragraph four, the bottom of
 6   the page, the day after October 11 or October 12th, Officer
 7   Strate went to the Human Resources department and talked to
 8   people there.
 9                Agree, disagree or do you know?
10          A.    Do I know that he went the next day?
11          Q.    Or some time.
12          A.    Yes, I knew he went over to the Human
13   Resources department, yes.
14          Q.    Okay. And paragraph five on the next page,
15   that on Friday, October 13, he received the notes of
16   Attorney Ben Fraser who had represented you when
17   Mr. Vecchia's inappropriate behavior in March of 1998 was
18   discussed.
19                Do you know if that's true or no, don't know?
20                Let me ask it this way.
21                Do you remember him getting the notes of
22   Attorney Ben Fraser?
23          A.    Yes.
24          Q.    Did you give him the notes, or did he contact
25   Ben Fraser directly?
```

| | | |
|---|---|---|
| 1 | A. | I don't recall. |
| 2 | Q. | Okay. And the next paragraph, Ben Fraser's |

3  notes documents what happened in March and his involvement
4  with the car break-in and the negotiations and Mr. Vecchia's
5  agreement.

6      A.    Are you asking me if that's what this says
7  here?

8      Q.    No.

9      A.    What are you asking me?

10      Q.    Okay. Read the paragraph. Just so you know,
11  I'm asking something that's a summary of what's in that
12  paragraph, and then just tell me whether you agree, disagree
13  or maybe you don't know.

14      A.    I know he got notes from Ben, and I imagine
15  this is true.

16      Q.    That the notes were of the meetings in
17  March --

18      A.    Yes.

19      Q.    -- the conversations and then at the end of
20  paragraph six it says that the deal or the terms of the
21  agreement were accepted on March 26, 1998, which was that
22  Mr. Vecchia would get therapy and leave you alone.

23      A.    Okay.

24      Q.    And that's your recollection?

25      A.    Yes.

1    Q.   So you don't disagree with what Officer
2  Strate says in that paragraph?
3    A.   No.
4    Q.   All right. And then paragraph seven, Officer
5  Strate relates that he and Attorney Fraser met in September
6  of 1998 with Human Resources, and there was a second deal;
7  if that's a fair summary?
8    A.   Yes.
9    Q.   And the next paragraph states on October 26,
10 you gave your statement that we just talked about.
11   A.   Okay.
12   Q.   And in paragraph nine, the last sentence says
13 that after you complained to Human Resources in September of
14 1998, if Mr. Vecchia left you alone, you wouldn't go to the
15 police.
16   A.   Correct.
17   Q.   All right. Paragraph ten I'll read it.
18        Quote, "That Vecchia suspended his pursuit of
19 Murphy, but, in early October of this year, Murphy saw
20 Vecchia in Tarantos, which is located on Glenbrook Road in
21 Stamford, Connecticut. That Murphy was in Tarantos with a
22 male friend sitting at the bar, facing the door. That
23 Murphy observed Vecchia walking alone, at which time, both
24 parties had eye contact. That Vecchia immediately came to
25 an abrupt stop, and just stared at Murphy. That Vecchia

1  then walked over to the bar, sat five stools away, ordered a
2  drink, and continued to stare at Murphy. That after
3  approximately ten minutes of this, Murphy told her male
4  friend, that she couldn't stay there any longer, that
5  Vecchia now knew she came there, he was drinking, and he was
6  continuing to stare at her."
7         Agree, disagree?
8     A.    Agree.
9     Q.    Okay. And I'm not going to read it all
10 through, but it continues to say that you left with your
11 male friend, and Vecchia watched you exit. And then it
12 continues to say that when you got home that night you got
13 the late night call at 11:11 p.m. from a Wilton telephone
14 number and that you suspected Mr. Vecchia made it because it
15 was on his way home in Redding, Connecticut. And the next
16 morning, that's when you saw the plastic green frog ornament
17 on your front lawn.
18    A.    I saw the phone call in the morning also.
19    Q.    Okay.
20    A.    I didn't know the phone was going. I shut
21 the phone off at night because of the continuous calls from
22 Vecchia --
23    Q.    Gotcha.
24    A.    -- throughout my life.
25    Q.    So he stared at you at Tarantos. You got the

```
 1   phone call, which you saw the next morning, and then you saw
 2   the frog ornament.
 3        A.    I saw the frog first, went back in and saw
 4   the phone number. Said oh, my God, here we go.
 5        Q.    Okay. To summarize, that was in your mind
 6   definitely Mr. Vecchia, breaks his agreement to leave you
 7   alone.
 8        A.    It was definitely breaking an agreement but
 9   that wasn't my first thought in my mind. My first thought
10   in my mind was oh, my God, he's after me.
11        Q.    And that was what I was going to ask.
12              That it wasn't he not only broke his
13   agreement to leave you alone but he was stalking you and
14   harassing you as bad or worse than he had in the past; is
15   that a fair summary?
16        A.    It was all starting again.
17        Q.    Okay. And that's what caused you to come to
18   the police and report his behavior to Officer Strate?
19        A.    Correct.
20        Q.    All right. And again, just trying to move
21   through this, in the next paragraph you relate the staring
22   incident where Vecchia saw you on the tenth floor of the
23   Government Center, you became nervous and uncomfortable and
24   he just stood there and watched you.
25        A.    That's correct.
```

1  Q.    And again, you were nervous, anxious,
2  concerned, you tried to stop Vecchia's behavior by not
3  getting him in trouble and now you feel that Mr. Vecchia is
4  starting up all over again.
5  A.    Correct.
6  Q.    And that you can't sleep at night, Vecchia
7  knows where you live, knows your car and your phone number;
8  correct?
9  A.    Correct.
10 Q.    And that was one of the reasons why you were
11 upset?
12 A.    Correct.
13 Q.    Okay. By the way, it says that you altered
14 your lifestyle, that means that you stopped running where
15 you used to run?
16 A.    Correct.
17 Q.    You stopped going to events that you used to
18 go to?
19 A.    Correct.
20 Q.    You stopped going to Brennan's?
21 A.    Correct.
22 Q.    Which was one of the places you ran into
23 Mr. Vecchia, and now you felt that you couldn't go back to
24 Tarantos again.
25 A.    I don't go anywhere pretty much, correct.

```
 1          Q.      Okay.  All right.
 2                  In the next paragraph that relates a separate
 3  incident where you ran into Mr. Vecchia on the fourth floor
 4  of the Government Center when you were going to see a
 5  friend, and again, Mr. Vecchia, when he ran into you, didn't
 6  leave but he followed you, stared at you and caused you to
 7  be alarmed to the point where you thought you would scream?
 8          A.      Very much so.
 9          Q.      And it says that you can't sleep at night.
10  You hear noises, you're afraid to look outside, and this is
11  making you crazy.
12          A.      Correct.
13          Q.      And you thought of purchasing a handgun for
14  your protection.
15          A.      Absolutely.
16          Q.      And that's why you came to the police for
17  help.
18          A.      Correct.
19          Q.      Okay.  A few more minutes.
20                  And the next paragraph, thirteen, it relates
21  that on November 3, 2000 Officer Strate received a report
22  from the Norwalk Police Department of a bullet that was
23  placed on your -- on the deck of your home in Norwalk, and
24  you felt the bullet was left on your deck by Mr. Vecchia to
25  scare you.  And it was a .38 caliber bullet that did not
```

```
 1   appear to have been fired.
 2              Agree, disagree, maybe you don't know?
 3         A.   I assumed it was fired because it was lodged
 4   into the wood of the deck, but the cop later said this
 5   hasn't been fired. So that is what happened, and that is
 6   what I thought.
 7         Q.   Okay. And in the next paragraph states that
 8   on November 11, Officer Strate talked to a Kris Seaborne,
 9   who basically verified things that you said about
10   Mr. Vecchia's conduct at Brennan's; correct?
11         A.   Correct.
12         Q.   And Kris Seaborne is a female friend of
13   yours?
14         A.   Yes.
15         Q.   Okay. Do you know if Kris Seaborne contacted
16   Officer Strate or did he contact her?
17         A.   He contacted her. I gave him her number.
18         Q.   And she was an independent witness to verify
19   what you said about Mr. Vecchia's conduct at Brennan's?
20         A.   Yes.
21         Q.   Okay. And the next paragraph on the next
22   page, even though the 15th must have been -- something
23   happened, but in any case, the paragraph begins that on
24   Saturday, 11/18/00, Officer Strate talked to the Redding
25   Police Department and that one of the officers there gave
```

```
 1   him information about Mr. Vecchia, his wife, Mary, and two
 2   children and their divorce.
 3              Did you know that Officer Strate contacted
 4   the Redding Police Department and then later on Mary
 5   Vecchia, the then wife and now ex-wife of Mr. Vecchia?
 6        A.    Did I know on that particular day?
 7        Q.    No.
 8        A.    Did I know in this whole process?
 9        Q.    Right.
10        A.    Yes.
11        Q.    All right.  And going back in time, this was
12   done by Officer Strate in November of 2000.
13              In your testimony earlier, you said that in
14   March of 1998 after the break-in of your car, you left a
15   message on the machine of Mr. Vecchia's home.
16              In between that March 1998 date and November
17   of 2000, had you spoken to Mary Vecchia at all?
18        A.    No.
19        Q.    Okay.  So you only knew about the situation
20   either through Officer Strate or perhaps through Ben Fraser
21   who spoke to Mr. Vecchia's sister that there was a divorce
22   between Mr. Vecchia and his wife?
23        A.    I believe I didn't hear that from Ben.
24        Q.    Okay.  So it was just basically from Officer
25   Strate?
```

```
 1        A.      It could have been.
 2        Q.      Okay.
 3                MS. MAURER:   Jim, I'm going to ask
 4        you to clarify one thing.
 5                She had this because Carl Strate gave
 6        it to us.  If you're asking her if she knew
 7        at the time, I think she's been pretty clear.
 8                MR. MINOR:    I understand that she
 9        didn't know --
10                MS. MAURER:   Okay.
11                MR. MINOR:    -- specific dates.
12                MS. MAURER:   Well, I'm also concerned
13        that Officer Strate didn't inappropriately
14        disclose his investigation at the time.
15                MR. MINOR:    Correct.
16        Q.      Okay.  I would agree with that, and I'm not
17   trying to imply that he was telling you all along all of
18   this happening.
19                And in any case, you're aware that in
20   addition to talking to the Redding police officer and Mary
21   Vecchia, he received some documentation from Mary Vecchia
22   concerning you, such as your high school -- photocopy of
23   your high school picture, high school year book picture?
24        A.      Yes.
25        Q.      And that Mary Vecchia had Mr. Vecchia
```

```
 1  followed by a private investigator, who followed him to
 2  Brennan's on March 20, 1998, and he got a copy of that
 3  report.
 4       A.    Who did?
 5       Q.    Officer Strate.
 6             Are you aware that Officer Strate got a copy
 7  of the private investigator's report?
 8       A.    Because it said, yes.  Yes, I'm aware.
 9       Q.    All right.  And that was one of the things
10  that he used in his arrest warrant affidavit?
11       A.    That's what it says, yes.
12       Q.    Okay.  And that I'm going to the next page,
13  paragraph twenty, Mary Vecchia also produced copies of phone
14  records from her house and Mr. Vecchia's house in Redding
15  showing that he made calls to your residence and your phone
16  number.
17             Are you aware either then or subsequently
18  that she produced those phone calls that verified what you
19  suspected?
20       A.    Am I aware then; when?
21       Q.    No.
22             Do you know today that Officer Strate got
23  this material from Mary Vecchia?
24       A.    Yes, I know that.
25       Q.    Okay.  In paragraph twenty-one, Janet Vecchia
```

1  was involved in March of 1998, that David was to get therapy
2  but only attended two to three sessions, but when he felt he
3  wasn't going to be arrested he stopped. And that he
4  admitted his attraction, obsession for you and he became
5  very depressed when you did not feel the same.
6              Are you aware that Officer Strate found out
7  about Janet Vecchia, meaning the sister of Mr. Vecchia,
8  through Mary?
9       A.   I know that Officer Strate found out about
10 Janet Vecchia through Ben and I.
11      Q.   Okay.
12      A.   By reading this, he also heard it from Mary.
13      Q.   And the next page, paragraph twenty-four,
14 that Mary Vecchia basically confirmed to Officer Strate that
15 what Mr. Vecchia did to you, he did the same compulsive,
16 relentless and unpredictable behavior towards Mary Vecchia,
17 leaving things at her house, sending letters, having strange
18 occurrences at her house and that she and their children are
19 extremely fearful of Mr. Vecchia.
20      A.   Yes.
21      Q.   And in the next paragraph, that Mr. Vecchia
22 frequented the area of the children's therapist, watching
23 her from the street after he was unhappy about the
24 children's therapist advising the courts that he should not
25 be allowed near his children.

1              Did you know that?
2        A.    I know that.
3        Q.    And that in the last paragraph it relates to
4  one of the other items Officer Strate learned about was a
5  book and material from the Internet concerning stalking.
6  The book being titled quote "Stopping a Stalker" closed
7  quote.
8              That something that you learned about?
9        A.    Yeah.
10       Q.    Okay.  Just let me conclude by saying after
11 this arrest warrant was presented to the judge and the judge
12 signed it and Mr. Vecchia was arrested, were you aware that
13 Mr. Vecchia was suspended from his job with the city of
14 Stamford?
15       A.    I became aware of that.
16       Q.    All right.  And --
17       A.    Suspended with pay.
18       Q.    Suspended with pay.
19             And did you have contact with Mr. Stover or
20 Mr. Manfredonia before going to Carl Strate or after going
21 to Carl Strate to complain about the Tarantos and the frog
22 and so on?
23       A.    I went to the police only.  I did not go back
24 to Human Resources.
25       Q.    Okay.  But subsequently did they contact you

```
1   after they learned Mr. Vecchia was arrested?
2                Meaning Mr. Manfredonia or Mr. Stover.
3       A.    Not for some time.
4       Q.    And what happened when they contacted you?
5       A.    Stover -- I don't really know what time --
6   when they contacted or whatever, but -- I'm sorry,
7   Manfredonia called and said they were tired of paying him
8   and that they're going to get an agreement and that I should
9   sign the agreement and tell them where I go so he can't
10  follow me, but they need him to come back to work.
11              MR. MINOR:   Okay.   It's one clock.
12         Why don't we break for lunch.
13         (Lunch recess taken at 1:00 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    AFTERNOON SESSION        FEBRUARY 5, 2004      2:07 P.M.
 2                  (Defendants' Exhibit J
 3         received and marked for identification:
 4         Arbitration award, six pages;
 5                  (Defendants' Exhibit K
 6         received and marked for identification:
 7         Affidavit of William Stover, four pages.)
 8
 9    B A R B A R A   E .   M U R P H Y   resumed testifying as
10              follows:
11
12   CONTINUED DETECTIVE EXAMINATION BY MR. MINOR:
13         Q.    Okay.  Exhibit F, here's your copies.
14               And then Exhibit G, I'm just going to ask you
15   a couple brief questions about F and then I'll ask more
16   about G.
17               Have you ever seen Exhibit F before?
18         A.    No.
19         Q.    Did you know that Mark Katz was the attorney
20   representing Mr. Vecchia in his criminal matter?
21         A.    Yes.
22         Q.    Did you have any conversations with Attorney
23   Katz about the case?
24         A.    No.
25         Q.    How did you know that Attorney Katz
```