```
 1   represented him; somebody tell you?
 2        A.    I don't recall how I first found out.
 3        Q.    Okay.
 4        A.    But he was at the trial. So I -- it kind
 5   of confirmed it.
 6        Q.    Right.
 7              Are you aware that Attorney Katz told the
 8   city and human relations that Mr. Vecchia would not give
 9   permission to have the city confirm any treatment he got
10   with a psychologist?
11              MS. MAURER:    When would that be?
12              Objection, vague.
13        Q.    Any time after his arrest.
14        A.    Could you ask me the question again because I
15   didn't even hear it.
16        Q.    Sure.
17              Were you aware that Mr. Katz told the city
18   that Mr. Vecchia would not waive any privilege he had
19   concerning psychological treatment?
20        A.    I was not aware of that.
21        Q.    Okay.
22        A.    But can I also say I don't want to -- know
23   what waive any privilege means.
24        Q.    Okay. Do you know that Mr. Katz refused the
25   city any information about whether Mr. Vecchia was seeing a
```

1  psychologist, how often he saw a psychologist, what the
2  psychologist said?
3       A.   No, I'm not aware of any of that.
4       Q.   Okay. Were you aware that Mr. Katz took the
5  position that Mr. Vecchia would never be convicted of any
6  criminal act?
7       A.   No.
8       Q.   That Mr. Katz told the city not to contact
9  Mr. Vecchia at all except through him?
10      A.   No.
11      Q.   In the second page of Exhibit F, let me just
12 read you -- I'm not asking you to read it if that's what
13 you're --
14      A.   Oh, okay.
15      Q.   Since you didn't see this document, that's
16 why I'm not asking.
17           Again, from Exhibit F, which you haven't seen
18 before, Mr. Katz, Attorney Katz, writes, "Andrew McDonald
19 was not pleased with the manner in which Ms. Murphy's
20 January, 1998 complaints were handled."
21           Do you know whether if that's true or not?
22      A.   I do not know anything about that.
23      Q.   Did you ever talk to Andrew McDonald about
24 the way the city handled your complaint?
25      A.   I never spoke to Andrew McDonald about the

```
 1   complaint.
 2        Q.    Did you ever see Andrew McDonald at any of
 3   the subsequent proceedings, the criminal trial of
 4   Mr. Vecchia, his arbitration contesting his termination, any
 5   of those proceedings?
 6        A.    I saw him at the conviction place, trial.
 7        Q.    Where Mr. Vecchia pled guilty?
 8        A.    The trial that we went -- yes, I guess.  Yes.
 9        Q.    Did you talk to him at all?
10        A.    I said hello, yes.
11        Q.    And I assume he said hello?
12        A.    I imagine.
13        Q.    But he didn't talk to you about the case?
14        A.    No.
15        Q.    What do you remember about your attending
16   court from Mr. Vecchia's criminal proceedings?
17              Do you remember first of all how many times
18   you went?
19        A.    I'm not sure.  I might have gone twice.  I'm
20   not sure.  I think -- I don't even think I went twice.  I
21   think I went once because it didn't happen the first time or
22   something.
23        Q.    All right.  Wasn't it true that you went
24   there expecting something to happen, it turns out it was
25   postponed and nobody told you?
```

1     A.     Oh, that could be, yes.

2     Q.     And then you did attend a criminal court
3  proceeding where you saw Attorney Katz, the state's
4  attorney, Mr. Vecchia and other people?

5     A.     In the courthouse?

6     Q.     In the courthouse.

7     A.     Yes.

8     Q.     Did anybody testify or was that just a plea
9  bargain?

10            In other words, did the trial start and then
11 a plea bargain happened, or did they just come with a plea
12 bargain?

13    A.     I really was not understanding what was
14 happening when everything was happening at the court.

15    Q.     But you didn't testify?

16    A.     I did not.

17    Q.     Did you talk to the state's attorney who was
18 handling the file?

19    A.     Probably.  I forget his name.

20           Forensic (phonetic), that who you mean?

21    Q.     Paul Forensic.

22    A.     Yes, I spoke to him.

23    Q.     And did you talk to him because he was
24 preparing you for testimony, getting ready for trial, or did
25 he just talk to you about the case?

```
 1        A.     Talked to me about the case and what was
 2   happening at that day.
 3        Q.     Okay.
 4        A.     I'm not sure if I talked to him prior to
 5   that.  I don't remember.
 6        Q.     Okay.  Do you know if you talked to him that
 7   day, or did you talk to him in person?
 8        A.     That day I talked to him in person.
 9        Q.     Prior to that?
10        A.     Of the trial.
11        Q.     Did you talk to him on the phone?
12        A.     I talked to the victim's advocate woman an
13   awful lot.  I don't recall if I talked to him.
14        Q.     Okay.
15        A.     I might have talked to him, but I can't
16   remember.  I'm sorry.
17        Q.     Okay.
18        A.     Okay.
19               MR. MINOR:  Off the record.
20               (OFF THE RECORD)
21   BY MR. MINOR:
22        Q.     Exhibit G, do you recognize this three page
23   document?
24        A.     Yes, I do.  I absolutely do.
25        Q.     And this is a letter that you prepared?
```

```
 1        A.    Correct.
 2        Q.    And this is letter that you sent to Judge
 3   Comerford?
 4        A.    Yes, I did.
 5        Q.    Okay. Now, this letter that you wrote in
 6   January of 2002 was because you received a notice that
 7   Mr. Vecchia was applying for something called accelerated
 8   rehabilitation; is that correct?
 9        A.    I don't know if I heard it, got a notice, a
10   piece of paper actually, but I was responding to the fact
11   that that was the thought process of what was going to be
12   happening.  I don't know if there was an actual piece of
13   paper.
14        Q.    And you were notified because you were the
15   victim of Mr. Vecchia?
16        A.    Correct.
17        Q.    And you were allowed input into whether
18   Mr. Vecchia should be allowed the benefits of accelerated
19   rehabilitation?
20        A.    I don't know if I was allowed or I just wrote
21   this because I felt -- I don't know allowed.  I don't know
22   what you mean.
23        Q.    Do you know what accelerated
24   rehabilitation --
25        A.    Yes, I do know what that means.  It says if
```

1   he behaves for a certain amount of time, it's off his record
2   for the rest of his life or whatever.
3         Q.    And you didn't like that?
4         A.    No.
5         Q.    One of the reasons I think you testified
6   earlier for going to the police is that you wanted
7   Mr. Vecchia to have a restraining order so he wouldn't
8   bother you again?
9         A.    I went to the police because I was afraid out
10  of my mind. And in that police interview, I told Carl
11  Strate that I tried to get a restraining order, and I don't
12  know what I'm getting from here, could you get a restraining
13  order or could he be arrested.
14        I went there to find out what I could do.
15  That's the reason I went to the police. I didn't go there
16  just for a restraining order. I wanted that to start, but I
17  also wanted this all -- I wanted this to stop. This
18  behavior towards me to stop. However it was going to
19  happen. I didn't know how it was going to happen.
20        Q.    And you understood that if he were allowed to
21  have accelerated rehabilitation, eventually the end result
22  would be it was as if he was never arrested?
23        A.    I was concerned for myself that he would just
24  come back and get me again.
25        Q.    Okay. So you wrote this letter explaining to

```
 1   the judge why you didn't want him to have that?
 2        A.    Exactly.
 3        Q.    Okay.  All right.
 4              Let's skip down to the paragraph at the
 5   bottom of page one, beginning with his conduct.  Let me just
 6   read it.
 7              "His conduct affected not only me, but my
 8   mother, (76 years old) and son (22 years old), who have
 9   lived with me through this harassment.  They, too, have had
10   to live with the fear that these incidents might escalate to
11   violence at any time."
12              Now, your mother was Patricia who passed away
13   recently?
14        A.    That's correct.
15        Q.    And your son is Jason?
16        A.    Right.
17        Q.    And they lived with you in your house in
18   Norwalk?
19        A.    That's correct.
20        Q.    And so they were affected by the fact that in
21   March of '98 he broke into your car?
22        A.    That's correct.
23        Q.    And then you suspected in October of 2000 he
24   put the frog on your lawn?
25        A.    That's correct.
```

```
 1              Q.      And some time later in 2000 he put the bullet
 2    on your deck?
 3              A.      That's correct.
 4                      MS. MAURER:  Do you want to go out?
 5                      THE WITNESS:  I do want to go out.
 6                      MS. MAURER:  Okay.
 7                      THE WITNESS:  I'm sorry.  Excuse
 8              me.
 9                          ( R E C E S S )
10    BY MR. MINOR:
11              Q.      Skip to the next page, which is page two.
12                      That paragraph begins, "In 1998, I had no
13    desire to have Mr. Vecchia prosecuted or fired from his job.
14    I just wanted to be left alone.  Through my attorney, and
15    subsequently through the City of Stamford, Mr. Vecchia was
16    allowed frequent opportunities to seek counseling or other
17    forms of therapy to resolve his bizaare, frightening and
18    unsolicited behavior towards me.  The only reason that I did
19    not pursue criminal charges or civil remedies in 1998 were
20    Mr. Vecchia's repeated representations that he would get
21    help and leave me alone.  He repeatedly reneged on his
22    promises that year and resumed his harassment of me."
23                      So that's correct?
24              A.      In 1998 this did -- that is correct.
25              Q.      And only after Mr. Vecchia broke his
```

69

1  agreements made in March of '98 and September of '98 --
2      A.    That is not correct.
3      Q.    -- did you go to the police?
4      A.    Oh, yes, that is correct.
5      Q.    In 2000.  Okay.
6      A.    Yes.  Sorry.
7      Q.    Also after Mr. Vecchia was arrested, and
8  suspended with pay, again you didn't feel like you changed
9  your position because he stalked you despite promising on
10 two occasions to leave you alone; isn't that correct?
11     A.    Correct.
12     Q.    Okay.  Next paragraph, the only reason that
13 Mr. Vecchia stopped stalking you was because you had
14 focused -- because he had focused his anti-social behavior
15 towards his ex-wife.  "After he stopped harassing her and
16 her family, he refocused his threatening behavior towards me
17 in October 2000;" is that correct?
18     A.    I wrote that, yes.
19     Q.    Okay.
20     A.    That was my feeling.
21     Q.    By the way, did you have help -- did Ben
22 Fraser help you with this letter, or did you do it yourself?
23     A.    I did it myself, and then gave it to Ben and
24 then he corrected my English often because I don't
25 necessarily have the best --

```
 1          Q.      Right.
 2          A.      -- English.
 3          Q.      I've read a lot of Ben's stuff.
 4          A.      Oh, this is actually -- then you would know
 5   that.
 6          Q.      This is more simple than he normally does.
 7          A.      This is basically me, and he just cleaned it
 8   up because --
 9          Q.      Right.
10          A.      -- because he writes better than me.
11                  Or he helped me.  He didn't write it at all.
12   This is all me with him just saying, okay, you don't need to
13   have thirty ands in a sentence or maybe you shouldn't use
14   that word there because it's a vulgarity of some sort.
15          Q.      Gotcha.
16                  So in the paragraph which is a little bit
17   below halfway, "Mr. Vecchia has been given numerous
18   opportunities to demonstrate that he is 'not likely to
19   offend in the future.'  He has repeatedly failed those
20   opportunities."
21                  Is it a fair summary of this paragraph and
22   the letter is that Mr. Vecchia would have to meet the
23   standard to obtain accelerated rehabilitation of not being
24   likely to offend in the future, and you felt that based on
25   his past record, he could not do that?
```

```
 1                    MS. MAURER:    That's a compound
 2            question.
 3       Q.   If you understand it.
 4                    MS. MAURER:    If you understand it,
 5            you can answer it.
 6       A.   Can I just say what I meant by this?
 7       Q.   Sure.  Say what you mean.
 8       A.   From me telling David to just leave me alone
 9  from at the office, at the -- wherever I was, from Ben
10  telling him, his sisters, everyone, to leave me alone and
11  finally the city, the man doesn't stop.
12            Yes, I do not think that accelerated
13  rehabilitation -- he was -- he would stop just because
14  someone else told him because it got as bad as it could get.
15  And if he had accelerated rehabilitation, and he came after
16  me again, then it would start all over again from square
17  one, and he would be able to just keep doing this to me for
18  the rest of my life without any recourse I thought for me.
19       Q.   And you say that at the very end, that you
20  oppose accelerated rehabilitation because Mr. Vecchia is
21  likely to offend in the future?
22       A.   Oh, I'm sorry.
23       Q.   And "He has demonstrated it repeatedly."
24            And then the next page you ask in the second
25  paragraph that he be convicted of the crime he committed,
```

1   stalking, and be placed on stringent monitoring by
2   probation, and that he face immediate consequences if there
3   are further violations.
4              So that's the way you felt when you wrote
5   this letter?
6         A.   That is the way I felt when I wrote this
7   letter.
8         Q.   And there came a point after you wrote this
9   letter that Mr. Vecchia did plead guilty to a couple
10  charges; isn't that correct?
11        A.   I believe so.
12        Q.   And were you there when he pled guilty?
13        A.   Right.
14        Q.   And were you aware that one of the conditions
15  is that he received a suspended jail sentence, that he be on
16  probation for a number of years, that he seek counseling and
17  that he leave you alone?
18        A.   Yes.
19        Q.   Since he was arrested in the end of November
20  of 2000 until today, has Mr. Vecchia left you alone other
21  than being here today?
22        A.   I don't know.
23        Q.   Okay.
24        A.   That's -- I don't know.
25        Q.   Have you ever contacted his -- well, has

1  anybody after he was arrested, like a probation officer or
2  the woman you mentioned, the victim's rights advocate,
3  contacted you to ask you how things are going or whether
4  Mr. Vecchia has been bothering you?
5       A.    No.
6       Q.    Have you or through your attorney contacted
7  them?
8       A.    No.
9       Q.    Okay. All right.
10      A.    The victim's advocate woman may have called
11 me once or twice afterwards, but I don't know but relatively
12 short time.
13      Q.    Short time after the guilty plea?
14      A.    Right.
15      Q.    But nothing recently?
16      A.    Right.
17      Q.    All right. I show you Exhibit C, which is
18 the CHRO complaint that you filed.
19            MR. MINOR:    And everybody should have
20            a copy of that.
21            MS. MAURER:   I should?
22            MR. MINOR:    I think so. If you
23            don't, I'll get you one.
24            MS. MAURER:   I do not have one in my
25            pile.

```
 1                          MR. MINOR:   Okay.  I'm sure I've got
 2              a ton of them.  Maybe I didn't pass them out.
 3              Sorry about that.
 4   BY MR. MINOR:
 5         Q.   Okay.  Do you recognize Exhibit C?
 6         A.   Vaguely.
 7         Q.   Okay.  This was prepared by an attorney.
 8              If you look at the third page, which is in
 9   the beginning --
10         A.   Lew Chimes, correct.
11         Q.   So Lew Chimes was your attorney.
12              And did he help you prepare this document?
13         A.   Yes.
14         Q.   Okay.  And at the last page, page nine,
15   that's your signature?
16         A.   I'm sure.  Yes.
17         Q.   And you signed it some time in September
18   2001.  Actually 15 September, 2001; is that correct?
19         A.   Correct.
20         Q.   And it looks like Lew Chimes' signature?
21         A.   Correct.
22         Q.   Now, prior to retaining Attorney Chimes, who
23   had an office in New Haven; correct?
24         A.   Yes, he does I think.  I never went there.
25         Q.   Did you retain Vickie Ditalito (phonetic) as
```

```
 1    your attorney?
 2         A.    Yes, I did.
 3         Q.    And she wrote a letter to the city of
 4    Stamford?
 5         A.    Yes, she did.
 6         Q.    Okay.  And eventually did she recommend that
 7    you use Attorney Chimes, or did you find him on your own?
 8         A.    She might have -- I think she recommended him
 9    and my brother-in-law knew of him.  So it kind of fit.
10         Q.    Okay.  Now, in October of 2001 --
11         A.    Actually, we didn't know of him.  Of
12    Garrison's, Garrison's firm.
13         Q.    He's a member of Garrison's firm?
14         A.    Right.  That's what it was.
15         Q.    And Garrison's firm in New Haven has a
16    reputation for doing civil rights employment law?
17         A.    I have no idea.
18         Q.    Okay.
19         A.    I would think, yes.
20         Q.    Now, in October of 2001, this was after
21    Mr. Vecchia was arrested but before he pled guilty.
22               Can we agree on that?
23         A.    This was before he pled guilty.
24         Q.    All right.  Okay.
25               So he was still on suspension with pay?
```

```
1         A.    I think so, yes.

2         Q.    Because he wasn't fired until after he pled
3    guilty?

4         A.    Okay. That's correct. Yes.

5               Don't you know that already?

6         Q.    Yes.

7         A.    I'm sorry.

8         Q.    So why did you go to Attorney Chimes to have
9    this CHRO complaint filed; if you remember?

10        A.    Because I didn't think the city was handling
11   Vecchia and my situation appropriately.

12        Q.    Okay. What in particular was the city doing
13   wrong?

14        A.    They didn't stop him or didn't follow-up on
15   things in my opinion.

16        Q.    Okay. How about his paid suspension; did
17   that bother you, the fact that he was sitting home
18   collecting full salary?

19        A.    It didn't actually bother me. It didn't
20   really affect me, but it was just a little ridiculous in my
21   opinion, in my head; but, no, it didn't bother me.

22        Q.    Okay. So your complaint concerning the city
23   was that they didn't handle the Vecchia situation after the
24   September of 1998 meetings; if you remember?

25        A.    What was that? I'm sorry.
```

1   Q.   I'll withdraw it. Let's just go over the
2  complaint because I think the complaint itself will say.
3       Okay. Page three, looking at paragraphs one
4  through nine, I think we've already been over this, that
5  from '93 until '96 you worked in payroll. And in '96 you
6  were promoted to the fire department. That in approximately
7  '96 you worked with Mr. Vecchia on several committees.
8       Now, paragraph ten, "Mr. Vecchia supervised
9  the work that I did on the newsletter and on the
10 committees."
11  A.   Correct.
12  Q.   Now, did he have the -- was he your overall
13 supervisor?
14  A.   Overall of what? At my job?
15  Q.   Right, of your job as administrative
16 assistant in the fire department.
17  A.   David Vecchia?
18  Q.   Yes.
19  A.   No.
20  Q.   Wouldn't he be a co-employee, an equal
21 employee as opposed to supervisor?
22          MS. MAURER: You're asking her for a
23          legal opinion, which I'm going to direct her
24          not to give you.
25  Q.   I'm still --

```
 1                    MS. MAURER:    Don't answer.
 2            Q.      In '96 when you were serving on the committee
 3    with Mr. Vecchia, did he have the power to fire you?
 4            A.      To take me off the committee, sure.
 5            Q.      Okay.  Did he have the power to discipline
 6    you?
 7            A.      I'm sure that he could have went to Hamilton,
 8    who was -- who was my person and his person, and as an
 9    MAA -- he is MAA and I was MEA.  I felt he was in a
10    supervisory position, and he could have had my -- not fire
11    me for not coming to work, but if I didn't do something he
12    particularly cared for in the committees I was on, had me
13    off the committees.  And then I would look not promotable
14    and things like that for what I wanted to do, which I got in
15    a position as administrative assistant data services from
16    the city at the payroll department.
17            Q.      Okay.  Is it your testimony earlier that in
18    1996 or 1997 when you had the luncheon with him -- by the
19    way, was that at Antonio's?
20            A.      The restaurant on the top of the hill on West
21    Main.  It used to be the old Lucma (phonetic) House.  It
22    could be Antonio's.  I don't know the name of it.  It's
23    Italian.
24            Q.      That was the end of your working on the
25    committee?
```

```
 1                In other words, you didn't work on the
 2   committee after that luncheon at Tarantos (sic); isn't that
 3   correct?
 4          A.    I stopped doing everything pretty much.
 5          Q.    Okay.  And my understanding was, from your
 6   earlier testimony, that he invited you to lunch to go over
 7   the manual, which was already done and your work had already
 8   been done on that committee?
 9          A.    It was not complete.  It was the draft manual
10   that we were going to work on, and he took all my -- he took
11   the manual and all my things that were there, and that was
12   the last of the manual discussion.
13                And I said I actually needed the manual back
14   because I still needed to -- for my own reference because I
15   needed it to do the HTE system, and it took some time to get
16   that back.
17          Q.    Okay.  And you testified earlier that you
18   asked him for it back and he told you to come over and get
19   it?
20          A.    And get it.
21          Q.    And you didn't?
22          A.    That's correct.
23          Q.    And you topped off that luncheon where he
24   complimented you, and you felt bothered by his compliment,
25   you didn't see him again?
```