```
1            A.    Correct.

2            Q.    Socially, alone, except through chance

3    meetings at Government Center?

4                      MS. MAURER:   I'm sorry.

5            Q.    All right.  Okay.

6                  You didn't see him again after he took you to

7    lunch?

8            A.    I saw him multiple times after that because

9    he followed me everywhere.

10           Q.    Okay.  Let me rephrase.

11                 Did you go over to the Government Center

12   after that lunch to meet with him?

13           A.    Never.

14           Q.    Did you go out to lunch with him again?

15           A.    Never.

16           Q.    Did you have any meal with him again?

17           A.    Never.

18           Q.    You were never in a position where you were

19   alone with him without other people being around?

20           A.    Only when he followed me out to the car or

21   something like that.  In the aggressive, only in stalking-

22   wise.

23           Q.    Okay.  So are you saying that Mr. Vecchia,

24   when you served on that committee, was in the chain of

25   command, your direct supervisor who could write a review or
```

```
 1   fire you or discipline you in any way?

 2        A.    He was my supervisor of that committee.  I

 3   don't know the legal ramifications of what he could or could

 4   not have done as far as really firing me.  In the city of

 5   Stamford anything could happen.

 6             But I did know that if I didn't do well on

 7   there that I wouldn't be able to be on the HTE committee,

 8   and I wouldn't get another position as administrative

 9   assistant data systems.

10             You know, I wanted to be involved in

11   everything.  It was a nice thing to have on my little

12   package of things I do to get something.  So, yeah.

13             I don't know.

14             Yes, he was the supervisor.  If he didn't

15   like something in the book, he took it out.  He was the HTE

16   manual.  If he didn't like the newsletter, the article was

17   omitted if he didn't like something in it.

18        Q.    Did he, in fact, say anything to Tom Hamilton

19   or the fire chief about your performance on the committee?

20        A.    I have no idea what conversations he had with

21   them.

22        Q.    Did anybody tell you, Barbara, Dave Vecchia

23   said something that you weren't doing your job on the --

24        A.    No.

25        Q.    -- committee?
```

```
 1            A.    No.

 2            Q.    By the way, have you tried to get promoted to

 3    any other position from 1997 until today with the city of

 4    Stamford?

 5            A.    I applied for a job recently, administrative

 6    assistant but not to take the job, just to get on the list.

 7            Q.    How recently; in the past year, six months?

 8            A.    Past year.

 9            Q.    Did you take a test?

10            A.    No, we did one of those you just fill out the

11    paper and say what you could do type of thing.

12            Q.    Was there a list created by Human Resources?

13                  In other words --

14            A.    I don't recall.  Mary Judge got the job.  So

15    I don't really -- it was administrative assistant planning

16    and zoning.

17            Q.    Okay.

18            A.    I knew I wasn't going to get it when I

19    applied.  I just wanted to be on the list.

20            Q.    Are you still on the list?

21            A.    I don't know.

22            Q.    In summary, are you aware of any job

23    repercussions that came from Mr. Vecchia?

24            A.    Like him doing something to me jobwise --

25            Q.    Right.
```

```
1            A.     -- that affected me getting something?

2            Q.     Or affected you in any way.

3            A.     Not -- well --

4            Q.     I mean in terms --

5            A.     I mean not going on any -- I don't know what

6      you're trying to -- I don't know where you're -- like did I

7      get punished because of him in any way?

8                   What are you trying to ask me?

9            Q.     I know you got punished because he stalked

10     you.  I'm saying did he do anything with your superiors,

11     human relations, anybody in the city that was a black mark

12     on your record?

13           A.     Not that I'm aware of.

14           Q.     Okay.  All right.

15                  Paragraph twelve, Mr. Vecchia invited you to

16     lunch, and I assume that was Tarantos (sic) that we just

17     talked about?

18                        MS. MAURER:   Antonio's.

19                        MR. MINOR:    I'm sorry.  Antonio's.

20           Q.     Is that what we just talked about?

21           A.     Correct.

22           Q.     And sent you candies and cards through the

23     interoffice mail and came to your office "to see me.  I did

24     not work in the same building as Mr. Vecchia."

25                  Did there come a time when you told the chief
```

```
 1    or Peter Brown that you didn't want Mr. Vecchia coming?

 2            A.      Yes.

 3            Q.      And what happened?

 4            A.      I told David that I'm not allowed to have

 5    visits to -- in the fire department.

 6            Q.      Okay.  And after then was he able to come

 7    visit you in your --

 8            A.      No.

 9            Q.      -- office?

10                    Is that because in order to get to your

11    office you have to go through a desk on the first floor

12    where someone asks, you know, how they can help you?

13            A.      No.  I don't know what you're saying

14    actually.

15            Q.      In other words, does a visitor who wants to

16    go see the chiefs or your chief and your office, can they

17    just walk in off the street?

18            A.      No, you cannot.

19            Q.      What do you have a do?

20            A.      You have to sign in and be announced.

21            Q.      And if Mr. Vecchia attempted to sign in and

22    be announced after you complained to the chief, would he be

23    allowed?

24            A.      No.

25            Q.      Okay.  And do you remember what year it was
```

85

1  that you told the chief and Mr. Vecchia was put on the Do

2  Not Admit list?

3              Was it before or after the March '98 car

4  break-in?

5        A.    After.

6        Q.    Okay.  Shortly after, a month or two?

7        A.    No, well after.

8        Q.    Okay.  Was it before September '98?

9        A.    No.

10       Q.    It was after September '98?

11       A.    I'm pretty sure.

12             I don't know.  I'm not clear.

13       Q.    Okay.

14       A.    I don't know when it was.

15       Q.    But in any case, when you told the chief --

16  by the way, who was the chief in '98; Chief Grainer?

17       A.    There was a Chief Grainer and a Chief Malone

18  and Chief McGrath, and I'm not sure of the time -- dates

19  that they came on and left and switched.

20       Q.    So it wouldn't be McGrath, but it could be

21  either --

22       A.    It was Grainer or --

23       Q.    Or Malone?

24       A.    Grainer was there when Vecchia was coming to

25  the building.  Grainer was there for the candies.  Malone

1    was there for the meeting of Cassone coming over.

2              Q.    Okay.  Which would be September of '98?

3              A.    It could be, yes.  Uh-huh.

4              Q.    Okay.  After you let -- well, who did you

5    tell, by the way, in the fire department first, Peter Brown,

6    Chief Grainer or Chief Malone, about the March '98 break-in

7    and the fact that you were concerned about Mr. Vecchia

8    stalking you?

9              A.    Everybody on the third floor practically.

10             Q.    Okay.  Did they cooperate in the sense that

11   they said they wouldn't allow Mr. Vecchia to come see you?

12             A.    That didn't happen I think until later.

13             Q.    All right.  Isn't it true though that one of

14   your duties was to go over to 888 Washington Boulevard, and

15   after you told Peter Brown --

16             A.    I was never going there again.

17             Q.    You were never going there again?

18             A.    That would be correct.

19             Q.    He covered for you or somebody else did?

20             A.    Or it didn't happen.

21             Q.    Or it didn't happen?

22             A.    Exactly.

23             Q.    Only when you really really had to be there,

24   did you go to Government Center.  Okay.

25             A.    With people.

1        Q.    Right.

2              Was there ever any time that either Peter

3    Brown or the chief, whether it was Grainer or Malone or

4    McGrath, were there any time where they were not responsive

5    to your requests concerning avoiding Mr. Vecchia?

6              In other words, if you told them you didn't

7    want to see him, you didn't want to go over there, did they

8    cooperate with you?

9        A.    Yes.

10       Q.    Is there any way that they didn't cooperate

11   with you or ignore you or say, Barbara, that's ridiculous,

12   you still have to go over there?

13       A.    I'm sure if I made a complete stink, I

14   wouldn't have had to, but some meetings I did go to, but

15   they were there and said I would be fine.

16       Q.    What I'm trying to get at is tell me what it

17   is exactly; did they cooperate with you; did they

18   accommodate you when they knew you were concerned about

19   Mr. Vecchia?

20       A.    When it got to the point of seriousness,

21   yes.

22       Q.    Okay.

23       A.    Well, it was all serious, but when I got over

24   the -- I don't know.

25       Q.    All right.

```
1              A.      I don't know what you're trying to ask me,
2     Jim.
3              Q.      I don't want to beat a dead horse.  So we'll
4     go on.
5              A.      I don't know what you're trying --
6              Q.      We'll go on.
7                      Next page.
8              A.      You're turning pages and not asking me
9     everything on the pages.  So I don't know what --
10             Q.      I'm trying not to go over every detail.
11                     Now, on page five, paragraphs thirty-six,
12    thirty-seven, thirty-eight, thirty-nine --
13             A.      Okay.
14             Q.      -- are things that you felt the city did
15    wrong; is that correct?
16             A.      That's correct.
17             Q.      All right.  And you're saying that after
18    September 30, 1998, Manfredonia and Stover met with Ben
19    Fraser and yourself, and they were to get a written
20    agreement with Mr. Vecchia and that Mr. Vecchia would obtain
21    therapy, provide periodic progress reports and leave you
22    alone?
23             A.      That's true.
24             Q.      And paragraph thirty-six says the city never
25    followed up with Vecchia?
```

1                        How do you know that?

2          A.     Because we never heard anything and Ben

3  called them, and they never responded back.

4          Q.     Okay.  The next paragraph, "The City never

5  obtained a written agreement from Vecchia."

6                        How do you know that?

7          A.     Because they said they were going to give me

8  a copy and Ben a copy, and we never got it.

9          Q.     By the way, did Ben get a written agreement

10  with him in March '98 after meeting with his sister?

11         A.     No, I don't think so.  I don't know.

12         Q.     Did you know that in September of '98 Mary

13  Vecchia started a divorce against Mr. Vecchia?

14         A.     Did I know that at the time?  No.

15         Q.     Okay.

16         A.     I didn't know anything about David and his

17  wife.

18         Q.     Did you subsequently learn that Mary brought

19  a divorce against Mr. Vecchia which started in September of

20  '98?

21         A.     Only after all this started on the arrest

22  type thing.

23         Q.     And did you later come to learn that

24  Mr. Vecchia's attorney advised him not to sign any agreement

25  despite his promise to Mr. Stover and Manfredonia --

1          A.     I was unaware of that.

2          Q.     -- that he was going to?

3          A.     I was unaware of anything -- I was unaware of

4     his conversation with his lawyer.

5          Q.     Okay.  But did somebody tell you the reason

6     why we didn't have a written agreement was because

7     Mr. Vecchia's attorney won't let him sign a written

8     agreement?

9          A.     No, nobody told me that.

10              MS. MAURER:    What attorney are we

11              referring to?

12              MR. MINOR:    His divorce attorney.

13              MS. MAURER:    His divorce attorney.

14          A.     No.  No attorney, divorce or otherwise, told

15     me that he wasn't going to sign anything.

16          Q.     All right.  And in paragraph forty it says,

17     "On information and belief, Vecchia never obtained

18     psychological treatment for his behavior, in violation of

19     his agreement."

20              We know that from previous testimony that he

21     did see a psychologist a couple of times because that's what

22     Mary told Officer Strate; isn't that correct?

23          A.     That's what we read, yes.  Yes.

24          Q.     Okay.

25          A.     We didn't know that then.

1        Q.      And the next paragraph, forty-one, "In

2   October 2000, Vecchia stalking and harassment of me

3   resumed;" is that correct?

4        A.      Correct.

5        Q.      All right.  So you would agree that from

6   September 30, 1998 through October 2000, Mr. Vecchia did

7   keep his agreement not to stalk and harass you?

8        A.      I cannot agree to that, no.

9        Q.      Why not?

10        A.      Because I don't know if he was stalking me

11   because I stopped doing everything.  I was hiding.  I was

12   more so hiding from him.  I was hiding.

13        Q.      All right.

14        A.      So I didn't see him stalking me because I was

15   in my little sheltered place.

16        Q.      Okay.

17        A.      I didn't go anywhere where he would be.  I

18   didn't do anything.  I stopped everything.  So unless he

19   came and I was looking out my window out of my house, pretty

20   much I don't -- I looked for him every day to see if I can

21   see him because that's how I am to this very minute.

22        Q.      Okay.  The reason why you may not have seen

23   him is that you changed going to places like Brennan's?

24        A.      Everything.

25        Q.      Running?

```
 1              A.      Correct.

 2                      Working out at the Y.

 3              Q.      Working out at the Y.

 4              A.      Work at the attorneys' office freelancing.

 5   Stopped everything.  I worked at other attorneys' offices.

 6              Q.      Okay.  And because of your changed

 7   behavior -- all right.  I think I understand what you're

 8   saying.

 9                      But in any case, in October of 2000 when you

10   did see him at Tarantos and at Government Center and you got

11   the phone call, that's the first time that you saw him

12   stalking and harassing you?

13              A.      That's because it's basically the first time

14   I ventured out.

15              Q.      Okay.

16              A.      And there he was.

17              Q.      Now, earlier I think you answered one of my

18   questions saying that the reason why he suspended his

19   stalking of you was because he was doing the same activity

20   with his wife and his kids.

21                      MS. MAURER:   I'm going to object.

22                      She has no way to know that.  She

23                      really doesn't.  All she has is what

24                      Mr. Strate told her.

25              Q.      All right.  You don't remember saying that?
```

1            MS. MAURER:   She doesn't remember

2       saying that.

3       Q.    Okay.  Paragraph ten of the Strate arrest

4  warrant application, Exhibit E.

5       A.    Where am I?

6       Q.    Just read paragraph ten of Exhibit E.

7       A.    Okay.

8       Q.    Isn't it a fair statement and isn't that what

9  Officer Strate swore to in his arrest warrant affidavit that

10  he suspended his stalking of you, meaning Mr. Vecchia,

11  between September '98 and October of 2000 and he was

12  stalking and harassing his wife and his children?

13       A.    What?

14       Q.    Just read paragraph ten and tell me whether

15  you agree or disagree with that.

16            MS. MAURER:   Are you asking her to

17       agree that that's what the paragraph says?

18            MR. MINOR:   Not really.

19       Q.    I'm asking:  Is that your understanding of

20  what happened, and if it isn't, what is your understanding?

21            MS. MAURER:   I'm going to point out

22       that paragraph ten doesn't say anything

23       about stalking his wife.

24            MR. MINOR:   Okay.  Let me withdraw

25       the question.

1       Q.    In paragraph -- in Exhibit G.

2       A.    Is that G?

3       Q.    Just read --

4       A.    No, we knew that.  Right.

5       Q.    Would you agree that you wrote in paragraph

6    (sic) G, which is a letter to Judge Comerford --

7       A.    I did write that.

8       Q.    -- that the only reason he stopped stalking

9    me was that he had focused his anti-social behavior against

10   his wife.

11            So is it true or untrue?

12      A.    Well, I assumed based on all this stuff from

13   the court and the newspaper articles and all that came out,

14   that he's stalking his wife.

15            How could he be stalking me and her?

16      Q.    But, in fact, do you really know that he

17   wasn't stalking you?

18      A.    I don't -- I don't know that.  You see what

19   I'm saying.

20      Q.    Right, you don't know.

21      A.    He was very busy at that time according to

22   all the newspaper articles and everything in the world

23   saying that he's stalking his kids, attorney, his poor

24   children, his wife.  So I wrote maybe that's why he

25   stopped.  That's the intention of that sentence.

1          Like I didn't specifically know that, but in

2    my emotional letter to this judge begging him not to let

3    this man go free or -- whatever's in it is what I wrote.

4          Do I really know that he wasn't sitting on my

5    damn deck when I'm sleeping or whatever?  No, I don't know

6    it.

7          Do I not know that he's not still sitting

8    somewhere looking at me?  I do not know it at all.

9          Q.     Okay.  I gotcha.

10         A.     That's the beauty of stalking.

11              THE WITNESS:  I'm sorry.

12         Q.     Okay.  Do you think that if the city had

13   obtained a written agreement in September of '98 from

14   Mr. Vecchia it would have changed what happened in October

15   of 2000?

16         A.     I have no idea right now.

17         Q.     Do you think that if Mr. Vecchia had gone to

18   more counseling in September of '98, it would have stopped

19   or prevented what happened in October of 2000?

20         A.     I don't know.  I could hope, but I don't

21   know.

22         Q.     Okay.  Towards the end of your CHRO

23   complaint, paragraph seventy-two and page seven, Respondent

24   City of Stamford failed to properly and immediately

25   investigate Vecchia's conduct in November of 2000 and waited

```
1    for the police to arrest Vecchia before taking any action.

2              You didn't report the resumptions of the

3    stalking about Mr. Vecchia to Mr. Manfredonia and

4    Mr. Stover, instead you went to the police; isn't that

5    correct?

6         A.    It is correct.

7         Q.    Okay.  And, of course, Carl Strate is a

8    police officer for the city of Stamford?

9         A.    Yes, he is.

10        Q.    Okay.  By the way, would you agree with me

11   that Carl Strate was very thorough in this investigation?

12        A.    I think so.

13        Q.    And he talked to you initially.  Then he got

14   a sworn statement, which took a couple of hours.  Then he I

15   think if I recite correctly, correct me if I'm wrong, he

16   talked to Norwalk about the bullet.  He talked to the police

17   department about Mr. Vecchia's ex-wife complaining.  He

18   talked to Mary Vecchia who gave him various materials, told

19   him various things.  He talked to Kris Seaborne, a witness,

20   about what happened at Brennan's, and not in this report,

21   but in another report, I think he talked to Boom Tuccinardi.

22              Are you aware of that?

23        A.    Yes, I am.

24        Q.    And who is Boom Tuccinardi?

25        A.    It's Fred Tuccinardi a/k/a Boom.
```

```
 1                           He's a family friend, yes.

 2              Q.    And he's another witness to what happened in

 3    the bars?

 4              A.    In one bar.

 5              Q.    Brennan's?

 6              A.    Tarantos.

 7              Q.    Tarantos.  Okay.

 8                    So he interviewed those two witnesses and he

 9    put together that --

10              A.    He might have interviewed more.  I don't

11    know.

12              Q.    All right.  So he worked hard?

13              A.    I think so.

14              Q.    He did a good job?

15              A.    I think so.

16              Q.    He got Mr. Vecchia arrested?

17              A.    His arrest warrant application.  Mr. Vecchia

18    was arrested.

19              Q.    Right.

20                    And that worked in terms of, as far as you

21    know, Mr. Vecchia not stalking you or harassing you from the

22    time he was arrested until today?

23                    As far as you know.

24              A.    I can't answer that.  I don't know that.

25              Q.    You can't.  Okay.
```

1                    As far as you can prove, you may suspect and

2    you may fear that Mr. Vecchia is harassing you, stalking

3    you, but you haven't --

4          A.    I have no proof that that man is doing

5    anything to me at this time.

6          Q.    Okay.  So the arrest did some good?

7          A.    If you call it good, yes.

8          Q.    Okay.

9          A.    If it did do that, yes.

10         Q.    Okay.  Okay.

11                    MR. MINOR:    Off the record.

12                (DISCUSSION OFF THE RECORD)

13                    MR. MINOR:    I think that I have four

14               more documents to go through.  I probably

15               have at least another hour and a half to two

16               hours.

17                    I think that Ms. Murphy has shown that

18               her stamina is at an end, and I think we've

19               agreed to continue the deposition to another

20               day, mutually convenient to all parties, and

21               I guess that's it.

22                    Is that fair?

23                    MS. MAURER:    Agreed.

24               (Deposition adjourned at 3:06 p.m.)

25

1

2

3

4                     I, BARBARA MURPHY, have read the

5            foregoing pages, and find the answers to the

6            questions therein contained to be true and correct

7            with the exception of changes, if any, as may be

8            noted on the Correction Page.

9

10           _____              _____
             Dated                               Barbara Murphy
11

12                  Subscribed and sworn to before me this

13           day of                    , 2004.

14

15

16                                      _____
                                        Notary Public
17
      My Commission expires:
18

19

20

21

22

23

24

25

```
1                            I N D E X

2

3

4    WITNESS:                                          PAGE

5           BARBARA MURPHY                                4

6

7    DIRECT EXAMINATION BY MR. MINOR                     4

8

9                          E X H I B I T S

10

11   DEFENDANTS' EXHIBITS FOR IDENTIFICATION:

12

13   A       Complaint                                    6

14   B       Barbara Murphy statement to police          24

15   C       CHRO complaint                              24

16   D       Sexual harassment policy                    24

17   E       Arrest warrant affidavit                    24

18   F       Letter, January 12, 2001                    24

19   G       Barbara Murphy letter to Judge Comerford    24

20   H       CHRO letter, February 11, 2002              24

21   I       Release of Jurisdiction                     24

22   J       Arbitration award                           59

23   K       William Stover affidavit                    59

24

25
```

```
 1   STATE OF CONNECTICUT   )

 2                          )   ss:   Ansonia

 3   COUNTY OF NEW HAVEN    )

 4

 5   -      I, Donna M. Miani, a Certified Court Reporter and

 6   Notary Public within and for the State of Connecticut, do

 7   hereby certify that within deposition of BARBARA MURPHY

 8   was held before me on the 5th day of February, 2004.

 9          I further certify that after said deposition was

10   recorded stenographically by me, it was reduced to type-

11   writing by me and I hereby submit that the within contents

12   of said deposition are true and accurate to the best of my

13   ability.

14          I further certify that I am not a relative of nor

15   an attorney for any of the parties connected with the

16   testimony of the witness.

17          Dated at Ansonia, Connecticut, on the 20th day of

18   February, 2004.

19

20

21                              Donna M. Miani, CSR
                                Certified Court Reporter
22

23

24   My commission expires July 31, 2008.

25
```