# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------x
BARBARA E. MURPHY,                 :
                                   :
                Plaintiff,         :
                                   :    CIVIL ACTION NO.
             Versus                :    3:03 CV 00519 (DJS)
                                   :
THE CITY OF STAMFORD and DAVID     :
VECCHIA,                           :
                Defendants.        :
----------------------------------x
```

COPY

# D E P O S I T I O N

Continued telephonic deposition of

BARBARA E. MURPHY taken on behalf of the Defendant

before Donna M. Miani, CSR, a Notary Public,

in and for the State of Connecticut, on Friday,

June 11, 2004, at 11:25 a.m., at the Law Offices

of ELISABETH SEIEROE MAURER, 871 Ethan Allen

Highway, Ridgefield, Connecticut.

GOLDFARB & AJELLO REPORTING SERVICES
24 EAST AVENUE  #1372
NEW CANAAN, CONNECTICUT  06840
(203) 972-8320

A P P E A R A N C E S:

REPRESENTING THE PLAINTIFF:

        LAW OFFICES OF ELISABETH SEIEROE MAURER
        871 Ethan Allen Highway
        Ridgefield, Connecticut  06877
        BY:  ELISABETH SEIEROE MAURER, ESQUIRE


REPRESENTING THE DEFENDANT CITY OF STAMFORD: (VIA TELEPHONE)

        CORPORATION COUNSEL, CITY OF STAMFORD
        Government Center
        888 Washington Boulevard
        Stamford, Connecticut  06901
        BY:  JAMES V. MINOR, ESQUIRE


REPRESENTING THE DEFENDANT DAVID VECCHIA: (VIA TELEPHONE)

        DAVID VECCHIA, PRO SE
        P.O. Box 159
        West Redding, Connecticut  06896

STIPULATIONS

        IT IS HEREBY STIPULATED AND AGREED
by and between counsel for the parties that the
proof of the authority of the Notary Public before
whom this deposition is taken is waived;

        IT IS FURTHER STIPULATED AND AGREED
that notice of the time and place of the taking of
the deposition are waived;

        IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form of the
question, are reserved until the time of trial;

        IT IS FURTHER STIPULATED AND AGREED
that the deposition may be signed before any Notary
Public.

                    `* * * * *

```
 1    B A R B A R A   E .   M U R P H Y ,

 2                    871 Ethan Allen Highway, Ridgefield,

 3                    Connecticut, 06877, re-called as a witness,

 4                    having been duly sworn by Donna M. Miani,

 5                    a Notary Public in and for the State of

 6                    Connecticut, was further examined and

 7                    testified as follows:

 8                        MR. MINOR:   I am James Minor,

 9                    Assistant City Attorney, and we are doing a

10                    continued deposition of Barbara Murphy

11                    pursuant to the Notice and also to court

12                    order so that I and Mr. Vecchia are in a room

13                    using a speakerphone at the Government

14                    Center, 888 Washington Boulevard, Stamford

15                    and Barbara Murphy and her attorney and the

16                    court reporter are in Ridgefield; is that

17                    correct?

18                        MS. MAURER:   I'm not sure who you're

19                    asking, but this is Attorney Maurer, and

20                    yes, that is correct.

21                        MR. MINOR:   Right.  Okay.

22                        So we have marked Exhibits A through K

23                    already, and you have those available, Lisa,

24                    or Attorney Maurer?

25                        MS. MAURER:   Yes, they are with me
```

```
1              now.

2

3     CONTINUED DIRECT EXAMINATION BY MR. MINOR:

4          Q.    Okay.  And, Barbara, I'm going to continue

5     asking deposition questions like I did before.

6                Again, just reiterate that, if you don't

7     understand, tell me; if you don't hear me, tell me.  If you

8     need a break, then tell your attorney, and we'll take a

9     break.

10               Can you hear me okay, Barbara?

11         A.    Yes, I can.

12         Q.    Okay.  All right.

13               MR. MINOR:   I'd like to mark at this

14               time as Exhibit L, which I believe is the

15               next deposition exhibit, the medical

16               documents that were redacted and are attached

17               to a certificate of service dated April 21,

18               2004 signed by Attorney Maurer.  And I

19               counted forty-two pages, that includes

20               various bills.

21               Could we do that now, please.

22               Off the record while that's being

23               marked.

24               (OFF THE RECORD)

25               (Defendant's Exhibit L
```

1            received and marked for identification:

2            Medical reports and various bills.)

3    BY MR. MINOR:

4        Q.    Okay.  Ms. Murphy, Exhibit L is approximately

5    forty-two pages of notes and bills from your treating

6    psychiatrist, and I would like to ask you that -- first of

7    all, do you have those in front of you?

8        A.    Yes, I do.

9        Q.    Okay.  And the first page has a date of

10   October 9, 1998.

11       A.    Correct.

12       Q.    Do you see that?

13       A.    Yes.

14       Q.    Barbara, are you looking or did you say yes

15   and I didn't hear you?

16       A.    I said I have this paper in front of me.

17       Q.    All right.  And you have the first page --

18       A.    10/9/98.

19       Q.    -- which is 1/9/98?

20       A.    Correct.

21       Q.    Okay.  Can I ask you if the last time you saw

22   this doctor was approximately November of 2002?

23       A.    Was that the last time I saw him?

24       Q.    Yes.

25       A.    In my life?

```
 1              Q.    Well, let me ask it this way.

 2                    Are you continuing to see him?

 3         A.    Yes.

 4         Q.    Okay.  All right.

 5                    Because the last note I have is November 22,

 6     2002, which is like four or five pages from the end before

 7     the bills.

 8                              MS. MAURER:    Attorney Minor?

 9                              MR. MINOR:    Yes.

10                              MS. MAURER:    The reason why that is

11                         the date is because that is the time when I

12                         approached Dr. Hamilton to provide me this

13                         material.  I would assume that he keeps

14                         similar notes now.  I just haven't requested

15                         them from him.

16                              MR. MINOR:    Okay.  All right.

17         Q.    So my question then is:  Do you know roughly

18     how many times you've seen him since November of 2002?

19         A.    No.

20         Q.    Is it more than six or more than twelve?

21         A.    I don't know.  Probably more than six.  I

22     don't know if it's more than twelve.  It might be more than

23     twelve.

24         Q.    All right.

25         A.    I don't know.  Sorry.
```

```
1          Q.      And this doctor saw your mother before she
2    passed away?
3          A.      That's correct.
4          Q.      And I see from the first page that when you
5    first saw him that you were seeking assistance for
6    depression, and if you could look at the first paragraph and
7    tell me if that's correct.
8          A.      Okay.  Correct.
9          Q.      Okay.  And it mentions that your mother was
10   in ill health at this time and that she had a history of
11   various problems to include cancer, a cerebral aneurysm and
12   aphasia; is that correct?
13         A.      She had that and quite a bit more.
14         Q.      And going to page three, at the middle of the
15   page, it has Impression and then skipped lines for AXIS I,
16   AXIS II.  If you could tell me when you get to that page.
17         A.      I'm here.  I'm here.
18         Q.      All right.  And so the Impression was that
19   you were suffering from major depression; is that correct?
20         A.      I don't know what this means.
21                 This stuff here it seems like that's his
22   impression.
23         Q.      Okay.
24         A.      But I don't know what the AXIS and all that
25   stuff means.
```

1          Q.    Okay.   Would you agree though that you felt

2     that you were suffering from major depression?

3          A.    Yes.

4          Q.    And that you had severe stress?

5          A.    Absolutely.

6          Q.    And he prescribed you medication to

7     include -- well, at the bottom about five lines up, Zoloft?

8          A.    Correct.

9          Q.    And prior to seeing this doctor,

10    Dr. Hamilton, in -- his office is in Ridgefield?

11                    MS. MAURER:   I would remind you that

12                    that is part of our confidentiality

13                    agreement, that information.

14                    MR. MINOR:   All right.   Then I'll

15                    strike that.

16         Q.    Have you seen any other physicians prior to

17    this one for depression?

18         A.    I didn't hear the question.

19         Q.    Okay.

20         A.    Sorry.

21         Q.    I believe the he mentions that you had

22    received prior treatment for anxiety.

23                    Do you remember doing that before seeing this

24    physician in October '98?

25         A.    I saw --

1          Q.     And he refers, on page two, the middle of the

2     page, previous psychiatric treatment.

3          A.     Okay.  Yes.

4          Q.     All right.  And it says that you had

5     counseling and you had anti-anxiety medicines; is that

6     correct?

7          A.     That's correct.

8          Q.     All right.  Do you know when; approximately

9     what year that you had been taking anti-anxiety medicine

10    prior to seeing this doctor?

11         A.     I'm trying to remember.

12         Q.     Let me make it more specific.

13               When was the first time, if you remember,

14    that you started taking any medication for depression or

15    anxiety?

16         A.     I don't recall the date or the years.  It was

17    when Jason was younger.

18               Did you hear me?

19         Q.     No, I'm sorry.  I didn't hear you.  I guess

20    you must not be speaking closely enough because I didn't

21    hear your response.  I think you're saying yes or no, and I

22    don't hear it.

23               MS. MAURER:   I'm going to put the

24               phone closer to her, and we'll see if it

25               helps.

1       Q.    Okay.  I'm sorry.  If you can repeat your

2  answer.

3       A.    I don't recall the day, but it was when Jason

4  was younger.  My son, Jason.  And probably middle school

5  maybe.  I want to say in the '90s -- early '90s.

6       Q.    All right.  And was that the first time that

7  you took medications after you had received counseling at

8  Family and Children's Services?

9       A.    It wasn't for depression.  It was for

10  anxiety.

11      Q.    Okay.

12      A.    It was Xanax.

13      Q.    So you went there not so much for yourself

14  but for your son, and as a result of that, you received

15  medication for anxiety; is that correct?

16      A.    No, I was going to the counselor regarding my

17  son and myself because I was a single parent.  At that time,

18  an issue came up that was causing me anxiety, and the social

19  worker said that she could recommend a doctor that was --

20  doctor to maybe give me something that would calm me down so

21  I wouldn't be so anxiety ridden.  But it had nothing to do

22  with Jason, as it were.  It was some other situation.

23      Q.    All right.  Let me ask you it this way.

24            Prior to getting the Zoloft from this

25  treating physician in October of '98, say two years prior,

1    from '96 to '98, had you been taking any medication for

2    anxiety or depression?

3         A.    No.

4         Q.    Okay.  Now, going to page four, which has on

5    top 10/19/98.  Tell me when you have it.

6         A.    Okay.

7         Q.    And would you agree that in the second

8    paragraph the notes indicate that you mentioned a man was

9    stalking you in city government?

10         A.    Yes.

11         Q.    And to paraphrase the next couple of

12    sentences, you met with an attorney and the man's attorney,

13    which was his sister and this man who stalked you made an

14    agreement to back off, but this recurred in the last few

15    months so that you brought it to Human Resources at the

16    city; is that correct?

17         A.    Correct.

18         Q.    All right.  Let's skip to -- I have page

19    fifteen, and the top of it says 4/26/99.  Tell me when you

20    get there.

21         A.    I'm there.

22         Q.    All right.  On this note, which is dated

23    4/26/99, at the bottom paragraph it mentions that there's a

24    diagnosis of bipolar.

25              Do you remember being diagnosed as having

```
 1   bipolar as a problem in addition to anxiety and depression?
 2          A.    I don't think this was shared with me, that I
 3   was bipolar.  I didn't discover.
 4          Q.    Okay.  So you don't remember the doctor
 5   talking about that diagnosis of being bipolar?
 6          A.    He might have.  I don't recall.  I remember
 7   him talking about it at one point.  I don't know when
 8   though.
 9                        MS. MAURER:   Ms. Murphy, I'm going to
10                   direct you please do not speculate.
11                        THE WITNESS:    Okay.
12                        MS. MAURER:   Give Attorney Minor only
13                   what you know for fact.
14          A.    Okay.  I don't know when we talked about it.
15          Q.    Do you know the difference between bipolar
16   and -- well, what is your understanding of the term bipolar?
17          A.    That you can be happy and that you can be
18   sad.
19          Q.    Okay.  Do you think that you are bipolar
20   today?
21                        MS. MAURER:   I'm going to direct her
22                   not to answer.  She is not a doctor.
23          Q.    Well, let me ask it this way.
24                   Do you disagree with the diagnosis of being
25   bipolar?
```

1              MS. MAURER:   Same objection.

2         Q.    All right.  Please go to page nineteen, which

3    has a date of 3/21/01 on top, and tell me when you're

4    there.

5         A.    I'm here.

6         Q.    Okay.  I would just like to ask about the

7    first paragraph.  So if you could read that first paragraph

8    and tell me when you're ready.

9         A.    The first paragraph, I finished reading.

10        Q.    Okay.  And you would agree with me at the

11   time you were seeing this physician, his note that you were

12   a single woman living with your mother who was also a

13   patient of the doctor's and you saw him for various problems

14   in your past, and during the course of the treatment, you

15   mentioned that you were stalked by a city employee.

16              Would you agree with that?

17        A.    No.

18              THE WITNESS:   Can we step out?

19        Q.    All right.  Is there anything wrong in the

20   first paragraph that you would disagree with?

21              MS. MAURER:   I'm sorry, Jim, I didn't

22              speak quickly enough.

23              MR. MINOR:   I didn't know whose no

24              that was.  Was that you?

25              MS. MAURER:   No, that was Ms. Murphy,

```
 1                   and she just asked, after she had answered
 2                   that question, if she could speak to me.
 3                        MR. MINOR:  Oh, I'm sorry.  Just tell
 4                   me when you're ready.
 5                        MS. MAURER:  All right.  Thank you.
 6                        Off the record, please.
 7                   (DISCUSSION OFF THE RECORD)
 8    BY MR. MINOR:
 9        Q.    Let me rephrase.  All right?
10              Would you agree with me, Ms. Murphy, that
11    when you first started treating with this doctor, you had
12    problems in addition to stalking, and that included first
13    the fact that you were living with your mother who had
14    health problems.
15              Would you agree with that?
16        A.    Yes.
17        Q.    All right.  That you had the stress of being
18    a single mother who was not receiving support for raising
19    your son.
20              Would you agree with that?
21        A.    No.
22        Q.    What do you disagree with that?
23        A.    I was -- I didn't need support at that time,
24    and I hadn't seen the father and was not in the picture or
25    anything.  I was just -- had nothing to do with the support
```

1    of a child.  I had a teenage kid who -- just being teenage

2    problems I would say.

3        Q.    All right.  That in addition to living with

4    your mother who had health problems and having a teenage

5    son, that you yourself had various health problems that

6    caused you anxiety; correct or incorrect?

7        A.    I don't understand what you're asking.

8        Q.    Did you have problems, for instance, with

9    your back which prevented you from running or which caused

10   the doctor to advise you not to run?

11       A.    I don't know at this time 3/21/01 if that was

12   an issue at all.  This doctor certainly didn't tell me to

13   run or not to run.

14       Q.    All right.  And there is also a mention that

15   you had problems at work, mainly that in 1994 there was an

16   investigation in the department and that your boss was

17   transferred.

18           Do you remember that being a factor in

19   causing you anxiety?

20       A.    Are you talking about the first paragraph

21   still, or have you moved down?

22       Q.    No, I'm talking in general.

23       A.    Oh, because I'm looking at the first

24   paragraph to try to figure how to answer the question that

25   you're asking me.

1    Q.    I'm trying to summarize everything without

2    going back through the preceding seventeen pages or fifteen

3    pages.

4    A.    What was the question again?

5    Q.    That you mentioned to the doctor that one

6    factor that caused you anxiety was in 1994 the department

7    you were working in had an investigation and that your boss

8    was transferred to a different department and that caused

9    you anxiety.

10                     Agree or disagree?

11                     MS. MAURER:    Are you asking if she

12                     mentioned that at any time during the

13                     multiple years of treatment or at this time

14                     in 2001?

15    Q.    I'm just asking if you remember that being a

16    factor causing you anxiety, whether you mentioned it to the

17    doctor or not.

18    A.    An investigation in the department that I was

19    in caused me great anxiety.  Seeing the FBI caused me great

20    anxiety.  My boss leaving did not necessarily cause me great

21    anxiety.

22                     And I believe at that time, 1994, as I said

23    earlier on, in the early '90s I think I got Xanax which I

24    was seeing the child guidance people, whatever.  She

25    mentioned -- because I mentioned what was going on at work,

1    and she suggested that was causing me stress, and she

2    suggested that I see Dr. -- I don't recall his name and

3    that's when I got Xanax.

4          Q.    All right.  And another thing that caused

5    anxiety was a car accident that you had.

6                Agree or disagree?

7          A.    I think car accidents are stressful in

8    anyone's life.

9          Q.    All right.

10         A.    I've had more than one car accident.  So I

11   don't know which one you're talking about.

12         Q.    And how much of the depression and anxiety

13   that you were seeking treatment for do you think were

14   related to stalking as opposed to these other problems, such

15   as your mother, your son, work problems unrelated to

16   stalking and so on?

17               MS. MAURER:   I'm going to object

18               because she's not a doctor; however, I'm

19               going to allow her to answer.

20         A.    I say all of it.  It was the straw that broke

21   the camel's back.  And if you look at the first page, I went

22   to -- called him in the spring of 1998 after Vecchia broke

23   into my car, and I found out I was being stalked.

24               It was just too much at that point, and then

25   I didn't show up.  And if you recall, I finally showed up in

1   October after the city didn't do anything in August, saying

2   I can't take much more, you have to help me.

3            So that's how I recall being -- going there

4   and it was accumulative probably but set off by stalking

5   that I just couldn't believe was happening to me, and I

6   couldn't function, and I need to function because I had to

7   take care of my mother, my son and myself.

8       Q.   I think you answered my question.

9            Going to the next page, the page that has as

10  the last paragraph, "I think she has Post Traumatic Stress

11  Disorder."

12           If you could read that paragraph and the

13  paragraph above it, and tell me when you're ready.  Okay.

14                   MR. MINOR:   It will only take me a

15                   minute.  Do you mind if I take a quick break,

16                   and I'll come back in two minutes without

17                   hanging up or taking a longer break?

18                   MS. MAURER:   That's fine.

19                   Off the record.

20                   ( R E C E S S )

21                   MR. MINOR:   Okay, I'm back.

22  BY MR. MINOR:

23      Q.   Barbara, in the middle of the second to last

24  paragraph, the physician's note reads that you feel like

25  your privacy is invaded, that you felt threatened and felt

1   intruded upon and you may not have any recourse or relief

2   from the situation.

3              Would you agree with that statement?

4        A.    Totally, yes.

5        Q.    And it goes on, The fact that the city is

6   thinking of bringing him back to work only minimizes your

7   pain and suffering.

8              Do you understand that to mean that you felt

9   the city was not taking your suffering seriously enough?

10             In other words, people were downplaying it or

11  minimizing it?

12             Is that what the note means?

13       A.    I don't know what the note means.  I was

14  taking it that it was a misprint and it should be that the

15  fact was that the city was bringing him back only maximized

16  my pain and suffering.

17             So I don't know if that's a typo or what he

18  meant.  That's his notes.

19       Q.    Okay.  And that you were talking to an

20  attorney and you were in the process of writing a letter

21  threatening a suit if the city brings back Mr. Vecchia.

22       A.    Correct.

23       Q.    Do you remember which attorney you were

24  talking to at that time?

25             Was it Vickie DeToledo?