```
1          A.     I couldn't be sure.  I'm pretty positive, but
2   I couldn't be sure.
3          Q.     And it goes on to give a diagnosis of post
4   traumatic stress disorder.
5                 Do you remember the doctor using that term?
6          A.     Yes.
7          Q.     And what did he attribute, to your knowledge,
8   the post traumatic stress disorder to?
9          A.     The stalking and the city bringing -- talking
10  to me before bringing him back.  Signing an agreement, you
11  know, there's a whole --
12         Q.     Okay.  If you could go to the next page and
13  read that paragraph briefly, which begins 3/30/01.
14         A.     Okay.
15                MS. MAURER:    We're ready.
16         Q.     Okay.  In that the doctor says that you
17  handed a letter to the city protesting the return of
18  Mr. Vecchia, and Mr. Vecchia was on paid leave.
19                Do you agree with that?
20         A.     I handed a letter to the city protesting the
21  return of him stalking, yes, and him admitting.
22         Q.     The next sentences goes on to say that you
23  felt the city should pay you to be on paid leave.
24                Do you remember telling the doctor that?
25                I'm sorry, did you respond?
```

1      A.     I did not.

2      Q.     Okay.

3             MS. MAURER:  I want to make clear

4      that the sentence did not say that she

5      reports that to the doctor.  It says -- I

6      guess the question comes up maybe they

7      should pay her to be on a paid leave.

8  BY MR. MINOR:

9      Q.     Okay.  Let me withdraw the question and ask

10 this.

11            Do you remember being upset that Mr. Vecchia

12 was on paid leave, first of all?

13     A.     Yes.

14     Q.     And do you remember asking anybody at the

15 city that you be placed on paid leave as well?

16     A.     Tom Cassone called me the day Vecchia was

17 arrested or the day after, after I read an article in the

18 paper saying he was arrested and put on paid leave and that

19 Cassone's office was representing him.

20            And Cassone called that morning and I said --

21 I was yelling at Cassone on the phone, first after not

22 wanting to talk to him.  I said to Cassone you're going to

23 pay for me.  You're representing Vecchia, you're supposed to

24 be the city corporation counsel.  Shouldn't -- maybe you

25 should represent me.  Aren't you supposed to be representing

1  the employee? I don't understand what's happening. You're
2  putting him on paid leave, you're going to pay me.
3              So, yeah, I do recall saying that in outrage
4  and frustration, yes, very much so. And I probably said
5  that to the psychologist at one point because I was aghast
6  by the whole thing.
7       Q.    All right. Speaking of Tom Cassone, did he
8  later explain to you that his partner was going to represent
9  Mr. Vecchia, not knowing that Mr. Vecchia was a city
10 employee and had a problem, and as soon as he found out, he
11 returned the retainer check of Mr. Vecchia and withdrew from
12 representation?
13      A.    Cassone did not say that to me, no. Cassone
14 said to me that same time on the phone, he said Bello didn't
15 know, and I'll get him off the case. Don't worry. We're
16 off, don't worry or something like that after I was
17 screaming and yelling at him. But, no, he didn't say when
18 he found out they took the retainer.
19             And that's it.
20      Q.    All right. And do you accept the explanation
21 that his partner, Bob Bello, initially agreed to represent
22 Mr. Vecchia, not knowing of the situation, and when Tom
23 Cassone told him, he withdrew from that representation?
24      A.    No.
25                    MS. MAURER: I'm going to object. It

```
 1                    calls for speculation, which she has no
 2                    basis to make.
 3          Q.     Well, I'd still like to know do you accept
 4   that explanation, or do you think Mr. Cassone was not
 5   telling you the truth when he gave that explanation?
 6          A.     I can't really tell you if he was telling me
 7   the truth.  I don't accept that explanation because that's
 8   not how it was explained to me on the phone, and quite
 9   frankly it was a heightened phone call.
10                    That's the end of my answer.
11          Q.     Okay.  So today do you still think that Tom
12   Cassone did something wrong when his partner initially
13   agreed to represent Mr. Vecchia and then withdrew from that
14   representation?
15          A.     Yes, I do because Mr. Cassone on the phone
16   said to me do you have a problem with that.
17                    So, yeah.  Yeah.  He did something wrong.
18   The fact that he asked me do I have a problem with his
19   partner representing Vecchia, yeah.
20                    And that's when I said you're the city --
21   that's when this whole thing came down with you're the city
22   attorney, how could your partner represent -- isn't that a
23   conflict of interest?
24                    You're going to pay for him, and you
25   represent me.  How can you represent both of us?
```

```
 1              Yeah, yes.  He did it wrong.  He did it big-
 2   time wrong.  Only when I was so adamant or whatever that he
 3   was taken off, that they're not going to be on the case.
 4   And then later on somebody said that Bello didn't know.  I
 5   don't know who said it.  I don't know how Bello did not
 6   know.  Tom Cassone was a corporation counsel of the city and
 7   Vecchia was not a small -- it's crazy.  I don't know.
 8                    MS. MAURER:  Jim, could you give me
 9              just one minute?
10                    MR. MINOR:  Sure.  Tell me when
11              you're ready.
12                    MS. MAURER:  Okay.
13         (Attorney Maurer exited and re-entered the room.)
14                    MS. MAURER:  I'm back.  Go ahead.
15                    Okay.  You can go ahead.
16   BY MR. MINOR:
17        Q.   All right.  Other than that phone call with
18   Tom Cassone, before I get off the subject, did Tom Cassone
19   do anything else wrong in this entire Dave Vecchia
20   proceeding?
21        A.   I'm thinking.
22             Well, Tom Cassone approached me at one of the
23   employee of the month meetings where one of my fire
24   marshalls was being given an employee of the month, and he
25   asked me to step outside, and outside he said what are you
```

1  doing telling people I'm not doing my job.
2            And I said I didn't tell people you're not
3  doing your job. He said, well, that's what I'm hearing.
4  You're telling people I'm not doing my job.
5            I said, Tom, why would I say you're not doing
6  your job. You told me to go to Human Resources. I said
7  Human Resources is not doing their job. So I didn't think
8  that was the greatest thing in the world.
9       Q.   So was that early on before Mr. Vecchia got
10 arrested or before he was fired, or can you place when that
11 occurred?
12      A.   I have to look back at the employee of the
13 month records to come up with a specific date.
14      Q.   All right. But other than that interchange
15 and other than the phone call where you were upset because
16 Mr. Vecchia was represented by Bob Bello, is there any other
17 interaction with Mr. Cassone that bothered you?
18      A.   I can't recall at this time.
19      Q.   Okay. All right.
20           Let's go to the next page and rather than
21 have you read it, let me just ask a couple of questions and
22 I'll try to quote. The next page is headed 4/9/01.
23           And it mentions that your letter that was
24 sent to the city received a response, and the response from
25 the city was angry and dismissive.

```
 1                    Do you remember that?
 2        A.     Yes.
 3        Q.     It also mentions that your attorney has
 4  withdrawn from your case because she knows many of the
 5  employees involved that work with the city.
 6                    Do you remember that?
 7        A.     Yes.
 8        Q.     Was that Vickie DeToledo?
 9        A.     Correct.
10        Q.     All right.  Why do you feel the response from
11  the city to your letter was quote "angry and dismissive"
12  close quote?
13        A.     Not having the letter in front of me, it's
14  difficult for me to recall every part of it.  But it pretty
15  much said that, to my recollection, Cassone was saying how
16  he thought we were friends, and he can't believe this, and
17  this is ridiculous that this is even a thought process and
18  something similar to that.  And that to me appeared to be an
19  angry-ish response.  But I don't have the letter in front of
20  me to tell you better right now.
21                    Do you have the letter?
22        Q.     That's all right.  I don't need to know the
23  details.
24        A.     Well, I do.
25        Q.     Specifically you don't remember the details,
```

1  you just felt that the letter played down your feelings; is
2  that it?
3        A.    I can't recall what the letter said.  I just
4  think --
5        Q.    Let me go on.
6        A.    Okay.  Good.
7        Q.    It then states that you got a different
8  attorney practicing out of New Haven who lives in Stamford.
9              Is that Attorney Chimes, Lew Chimes?
10       A.    Yes.
11       Q.    And it mentions that you were angry at the
12 city's response.
13             Now, was the letter that received a response
14 that made you angry, was that written by Lew Chimes making a
15 demand or was that written by Vickie DeToledo; if you
16 remember?
17       A.    I don't understand your question.
18       Q.    All right.  Do you know which attorney wrote
19 the letter that got the response that made you angry?
20       A.    Vickie DeToledo wrote the initial letter and
21 Cassone responded as well as I think a couple people
22 responded.  That's the other attorney's name.
23       Q.    McDonald?
24       A.    Yes, Andrew McDonald's letter was the one
25 that I was disappointed in Cassone but because he said this

1  was very sad and angry from him that I would even accuse the
2  city of any of this.  But McDonald's, now that I remember,
3  is the one that was like this is ridiculous.  We had no idea
4  about any of this, and we've done the best we can or
5  something.  I don't know.  I can't remember what it said.
6         Q.    All right.  So you believe that the letter
7  might have been written by Andy McDonald who was then
8  corporation counsel, and you don't remember any letter
9  written by Tom Cassone; do you?
10        A.    Yes.
11        Q.    I'm sorry.  I didn't hear you.
12        A.    Yes, there was two letters.
13        Q.    Oh, you do remember?
14        A.    There was two letters written, one by Cassone
15 written by Vickie and one by McDonald responding to our
16 letters, yes.
17        Q.    And I take it both letters were upsetting to
18 you?
19        A.    Yes, they were upsetting.  That was a good
20 word.
21        Q.    I'll look for them on the break.
22              MR. VECCHIA:   Are the letters
23              available?
24              MR. MINOR:   They're not marked for an
25              exhibit though.

```
 1          Q.    All right.  I'd like to go on, skipping a
 2   few pages.  The next letter is headed November 20, 2001.
 3   Tell me when you're there.
 4          A.    I'm there.
 5                MS. MAURER:  We're there.
 6          Q.    Okay.  In this letter it mentions that a
 7   criminal trial was going to proceed in the next week.
 8                Do you remember that?
 9          A.    I didn't hear the question.
10          Q.    All right.  In November of 2001, do you
11   remember a cause of anxiety or being upset was the upcoming
12   criminal trial where you may be called to testify?
13                Criminal trial meaning the trial against
14   Mr. Vecchia.
15          A.    Yes.
16          Q.    And let me just quote you, the middle of the
17   second paragraph.  Mr. Vecchia has been suspended from work
18   since last December.  As best you can tell, Mr. Vecchia has
19   not been stalking you but who was to say when one is being
20   stalked, whether someone is really there or not.
21                Do you remember that being your feeling, that
22   you didn't know if Mr. Vecchia was stalking you but you
23   weren't sure at any time when he was or wasn't?
24          A.    That was my feeling, but can I just add that
25   you said you wanted to quote me.  This is the doctor's
```

1  notes.
2        Q.    No, I understand.
3        A.    Well, you said you're quoting me.
4        Q.    I'm not saying -- this is a paraphrase of
5  what the doctor wrote, and I agree this isn't your quotes.
6        A.    And it can be his interpretation also.
7  Whether as best he can there and maybe it's him saying, you
8  can't tell someone's stalking you or not.  Although that is
9  today my belief.  I don't know if I'm being stalked or not.
10       Q.    Okay.  The paragraph goes on to state that
11 you retained a lawyer and goes on to state -- and is the
12 lawyer Lew Chimes again?
13       A.    Yes.
14       Q.    All right.  And your lawyer was going to
15 respond to your concerns about the stalking, and then it
16 goes on to say that you were a city employee for eighteen
17 years and involved in doing various projects, such as the
18 annual softball game.  And you've -- the last sentence reads
19 you feel very angry the city didn't support your complaint
20 or do anything about the man involved.
21              Do you remember that being a source of
22 anxiety?
23       A.    Yes.
24       Q.    All right.  Now, at this point do you
25 remember how long it took Mr. Vecchia from being arrested to

1  entering a guilty plea; how long that process took, six
2  month, a year, a year plus?
3       A.    Probably over a year.
4       Q.    And would you agree with me that that was up
5  to the state of Connecticut and the prosecutor, not up to
6  the city prosecutor?
7       A.    Would I agree what was -- no, I need to
8  understand the question.
9             Is it the criminal case took a year?
10      Q.    Yes.
11      A.    And that the criminal case had nothing to do
12 with the city doing what?
13      Q.    No, the criminal case is out of the hands of
14 the city, and if there was -- if it took a long time for
15 Mr. Vecchia's criminal proceeding to end in a guilty plea,
16 that was beyond the control of the city; agree or disagree.
17      A.    From the time of his arrest to the time of
18 the court hearing?
19      Q.    Yes.
20            No, from the time of his arrest and the
21 various court hearings until the time he entered a guilty
22 plea.
23      A.    I wouldn't know if the city had anything to
24 do with that at all. I don't know any connection.
25      Q.    All right. Let me just ask: Why do you feel

1  that after Mr. Vecchia was arrested and put on suspension,
2  the city didn't support your complaint or do anything about
3  Mr. Vecchia?
4       A.   Because they waited until he was arrested to
5  do anything when I went to them since 1998, and they didn't
6  do anything in the meantime. They didn't respond to any --
7  whether he was getting treatment, they didn't tell me about
8  anything.
9            So I just lived in a void until it became my
10 awareness again in 2001 that I was being stalked, and once
11 again, they didn't do nothing. And it was under my
12 impression that when the police, who are city employees,
13 went to the Human Resources Department, Human Resources said
14 specifically something to the effect of we didn't know it
15 was a real complaint, or we'll see if we have any notes.
16           So that also made me feel a little like the
17 city didn't give two hoots on whether or not a person was
18 being stalked or not. And I knew all the players personally
19 outside of Vecchia.
20           The lawyers, they were friends. I played
21 softball with Cassone. We went to him right off the bat. I
22 knew everyone, and I worked there for twenty years almost,
23 and no one did anything. Not one thing. Not even called
24 during that time to see if I was okay. Didn't offer me
25 Employees Assistance Program, didn't do anything.

```
 1              I did it all on my own.  I went to a shrink
 2   on my own because I was upset.  I did the police by myself.
 3   I did everything on my own because the city didn't help me
 4   one time, and I trusted them to do that.
 5         Q.    I understand.
 6              By the way, was the bill from this doctor --
 7   you didn't pay that out-of-pocket; did you?
 8              In other words, it was paid for by the city's
 9   insurance?
10         A.    It was paid for by my insurance that I have
11   through the city, and I paid the co-deductible and I also
12   pay for insurance out of my paycheck.  So I consider it my
13   insurance as well as the city's.
14         Q.    Okay.  Do you know how much out-of-pocket you
15   have been for seeing this doctor from the beginning until
16   today?
17         A.    No.
18         Q.    Roughly under a hundred?
19         A.    No.
20         Q.    Under a thousand?
21         A.    Well, over a hundred but I have no idea.
22         Q.    When you say your co-pay, that's a co-pay per
23   visit or overall?
24         A.    I don't know.  I didn't pay -- I pay him up
25   front because he's out of network, and then I do an 82 but
```

```
 1   they refused the last couple of years' claims, and I had to
 2   pay it out of my own -- what do you call it where you put
 3   money aside?
 4                  Flexible spending.  So they haven't been
 5   paying for it lately.
 6         Q.       All right.  So you're saying --
 7         A.       So it's a combination, Jim.  It's not a
 8   co-pay.  He's not in the co-pay.  I didn't mean to say
 9   co-pay.
10         Q.       Okay.  Do you recall roughly how much you had
11   to pay, first of all, out of your pocket, including the
12   deductible medical insurance thing that gets deducted from
13   your paycheck?
14         A.       To me, millions.  Specifically, I have no
15   idea.
16         Q.       Okay.
17         A.       Okay.
18                  MS. MAURER:    Jim, could we take a
19                  quick bathroom break?
20         Q.       Okay.  I'm going on unless you have something
21   for me like --
22         A.       We want to go to the potty.
23                  MR. MINOR:    Okay.  You want to take a
24                  break?
25                  MS. MAURER:    That would be gratefully
```

x

```
 1                appreciated.
 2                     MR. MINOR:   Okay.
 3                     ( R E C E S S )
 4   BY MR. MINOR:
 5        Q.      All right.  I would like you to go to page
 6   twenty-eight, by my count, and it's a half page headed
 7   1/14/2002.
 8                     MR. VECCHIA:   The date of the page?
 9                     MR. MINOR:   1/14/2002.
10        Q.      Tell me when you're there.
11                     MS. MAURER:   We're there.
12        Q.      Okay.  In this one it says that there was a
13   court hearing and the defendant, Mr. Vecchia, refused to
14   accept a plea bargain, and you were discomforted by his
15   staring at you the whole time in the court, and your sister
16   and friends and other people noticed this.
17                Is that a --
18        A.      Agree.
19        Q.      -- what you remember, that occurred?
20                Is that what you remember that occurred?
21        A.      I agree.
22        Q.      And that this frightened you; agree or
23   disagree?
24        A.      Agree.
25        Q.      And it mentions at the end, the corporation
```

```
 1  counsel also came, which surprised you because you feel that
 2  you and the corporation counsel are at odds.
 3              Is that Mr. McDonald, Andrew McDonald, or
 4  Tom Cassone?
 5       A.     The corporation counsel that showed was
 6  Andrew McDonald, but I was not surprised that he was there.
 7  So the doctor misunderstood this.  I was surprised he came
 8  up and was chitty-chatty with me.  You know, like in the
 9  little -- I don't know.  He was chitty-chatty, and I just
10  felt uncomfortable because he hadn't spoken to me at all,
11  and he wrote the letter saying whatever to Vickie.
12       Q.     All right.
13       A.     To say that surprised me that he came up to
14  me but not that I was at court, no.
15       Q.     All right.  And then going to the next page
16  headed 1/25/2002.  Tell me when you're there.
17       A.     There.
18       Q.     And it says in this that Mr. Vecchia pled
19  guilty to less than the stalking charges, breaking into your
20  car and trespassing.  He was given probation, mandatory
21  psychiatric treatment, and he's mandated to stay away from
22  you.
23              Do you remember that?
24       A.     Yes.
25       Q.     And the downside to this is that he didn't
```

1  plead or there was nothing mentioned about stalking behavior
2  itself, but on the other hand, there's a restraining order
3  against him.
4        Do you remember that?
5        A.   I remember there's a restraining order.  I
6  don't necessarily that I said that.  This is his thoughts.
7  I don't know -- I may have said like he wasn't charged with
8  stalking.  So that's not the greater -- he would be great --
9  it would be nice if he was charged with stalking, but I
10 don't recall this necessarily.
11       Q.   And then later on it mentions a newspaper
12 article, and the doctor's note says that city counsel said
13 it would not open an investigation into the employee.
14       Do you know what that refers to -- well,
15 first of all, do you remember a newspaper article?
16       A.   I don't know if he made a mistake here.
17       Q.   All right.  Well, it's not --
18       A.   I don't know because it said would not open
19 an investigation, and then it said when that would be one,
20 and I don't know what the outcome would be.  So I don't
21 know.
22       Q.   Do you remember any newspaper article
23 upsetting you about the guilty plea?
24       A.   Every newspaper article about the whole case
25 from the start to the end upset me.

1  Q.  All right. And that wasn't because of what
2  the newspaper said but simply because it was a newspaper
3  article that you felt did what?
4  A.  It is what the newspaper article said.
5  Q.  All right. So why was it upsetting you every
6  time there was a newspaper article, just because you felt
7  that it invaded your privacy or what was the reason?
8  A.  It was upsetting to see my case in the paper
9  and upsetting that the city wasn't sure -- reading how the
10  city wasn't sure what they were going to do and, you know,
11  just different things. People knowing it was me because it
12  wasn't hard to figure out who it was if you were working for
13  the city.
14  Q.  All right. Because the newspaper article
15  didn't mention you by name?
16  A.  No, they did not and that was very nice of
17  them.
18  Q.  But it mentioned Mr. Vecchia, and you felt it
19  wasn't hard for people who knew Mr. Vecchia and I imagine
20  knew you to know that you were the person who was the
21  stalking victim?
22  A.  It mentioned a payroll person was moved to
23  the fire department. It mentioned -- so that was kind of --
24  I was the only one that that happened to. So it was kind
25  of, you know, the whole world knew I was being stalked,

```
 1   which is fine.  The whole articles were just upsetting,
 2   Jim.  It wasn't because of any content necessarily.  They
 3   were just all upsetting.
 4        Q.   All right.  I gotcha.
 5             Let's go -- skip two pages to the one headed
 6   2/25/2002.  And tell me when you're there.
 7             MS. MAURER:  Yes, we're there.
 8        Q.   In about the third or fourth sentence, it
 9   says, "Things have gotten further mixed up since the trial
10   was completed.  The deadline to file with the Human Rights
11   Commission is up and also there are questions about her
12   pursuing the suit with the City."
13             And here's my question.  You were confused or
14   you were upset that your lawyer informed you that he
15   missed filing with the Human Rights Commission.
16             Do you remember anything about a lawyer
17   telling you that he missed the date to file with the Human
18   Rights Commission?
19             MS. MAURER:  I'm going to object.
20             That's attorney-client privilege, and I'm
21             going to direct her not to answer.
22        Q.   All right.  Let me ask it this way.
23             Did there come a time when you stopped using
24   Lew Chimes as your attorney?
25        A.   Yes.
```