1  Q.    And do you know what deadline was missed?
2  A.    Not specifically, no.
3        Did you hear my answer?
4  Q.    Yes, I heard.
5        All right. And then go down to the next paragraph beginning the whole idea about filing a civil suit is uncomfortable, you feel that Mr. Vecchia has already lost his family, his job, he's living with his mother apparently in Bethel, you're afraid that he may continue to stalk you and perhaps even hurt you, and the idea of suing him seems like that might aggravate a somewhat unstable situation.
13       Do you remember feeling that?
14 A.    Yes, I wasn't sure if I should file a suit against David Vecchia.
16 Q.    All right. Now, you would agree that you did file a Commission on Human Rights and Opportunities complaint against the city, which I believe is marked as Exhibit C in this deposition. And if I could ask you to just take a quick look at Exhibit C.
21       MS. MAURER:  It's this one.
22 Q.    Okay.
23       MS. MAURER:  Do you want us to review the exhibit?
25 Q.    Well, just take a quick look at the Human

```
 1   Rights complaint because my next question is:  Did you
 2   prepare this on your own; did you prepare it with the
 3   assistance of an attorney, and if so, which attorney?
 4           A.    This -- I prepared part of it and then Lew
 5   Chimes.
 6           Q.    All right.  So Lew Chimes prepared it.
 7                 And do you remember --
 8                 MS. MAURER:  I'm sorry, that's
 9                 misstating what she just said.
10           Q.    I'm sorry.  Then maybe I didn't hear you
11   correctly.
12                 What did you respond?
13           A.    I prepared it along with and then Lew Chimes
14   also helped.
15           Q.    All right.  Well, that's my question.
16                 So you did some and Lew Chimes was your
17   attorney who also helped you?
18           A.    Yes.
19           Q.    And do you remember receiving a decision from
20   the CHRO, which is marked Exhibit H, and if you can take a
21   look at that, tell me when you're ready.
22                 And also take a look at Exhibit I, please,
23   and tell me when you're ready.
24                 MS. MAURER:  She has those in front
25                 of her.
```

| | |
|---|---|
| 1 | Do you want her to read them? |
| 2 | Q. No, I just want to -- Exhibit I, which is the |
| 3 | letter from CHRO dated March 3, 2002, it says underlined, |
| 4 | "The Complainant must bring an action in Superior Court |
| 5 | within ninety days of receipt of this release." |
| 6 | Do you remember reading that when you |
| 7 | received the letter? |
| 8 | A. No. |
| 9 | Q. All right. Do you remember getting this |
| 10 | letter at all? |
| 11 | A. I think so. |
| 12 | Q. All right. In that letter the sentence I |
| 13 | just read you is the deadline that you have ninety days and |
| 14 | it also mentions two years. |
| 15 | Is that the deadline that you were referring |
| 16 | to? |
| 17 | A. It might have been. |
| 18 | MS. MAURER: I'm going to direct |
| 19 | Ms. Murphy, again, please not to speculate. |
| 20 | THE WITNESS: Oh. |
| 21 | MS. MAURER: To give only information |
| 22 | that she's sure of. |
| 23 | A. I don't know. |
| 24 | Q. All right. In any event, you don't remember |
| 25 | worrying about the fact that this letter said you had three |

1   months from March 3, 2002 to sue on your complaint?
2       A.   I was reading, and I didn't hear what you
3   were asking.
4       Q.   Okay.  I think I asked you earlier do you
5   remember receiving a letter.  You said yes, but an earlier
6   question I asked was do you remember that sentence about
7   having three months to sue after March 2002, and I wasn't
8   sure of your response.
9       A.   I do not recall.
10      Q.   Okay.  Would you agree with me that you
11  didn't sue within three months of March 2002?
12      A.   I don't know.
13      Q.   Did you ever make a conscious decision based
14  upon advice of your attorney or advice of friends or anyone
15  else to not sue the city for the allegations that were
16  contained in your CHRO complaint?
17      A.   I never made a decision not to sue the city.
18      Q.   All right.  So your intention was always to
19  sue the city?
20      A.   Yes.
21      Q.   But you didn't use Attorney Chimes, you used
22  Attorney Maurer.
23           Sorry about that.  It's the loudspeaker
24  announcement.
25           Is there any reason why you -- well, why

```
1    didn't you sue within three months of March 2002; do you
2    know that?
3         A.    I do not know.
4         Q.    Okay.  Do you remember looking for an
5    attorney until you found Attorney Maurer to represent you?
6                   MS. MAURER:  Would you repeat the
7                   question?
8                   MR. MINOR:  Yes.
9         Q.    Did you try to find -- eventually after you
10   no longer used Attorney Chimes, you eventually retained
11   Attorney Maurer; that's correct, isn't it?
12        A.    After I no longer had Attorney Chimes, I then
13   got Attorney Maurer?
14                  MS. MAURER:  We're asking you was
15                  that the question.
16                  MR. MINOR:  Okay.  I didn't hear you.
17                  I'm sorry.  There's a loudspeaker going
18                  on.
19                  All right.  Let me withdraw the
20                  question.
21        Q.    Would you agree with me that Exhibit A, which
22   is the federal lawsuit, is dated March 20, 2003, a year
23   after the Release of Jurisdiction letter, Exhibit I, which
24   is March 30, 2002?
25        A.    Yes.
```

```
 1        Q.    All right.  Why was there a delay between the
 2   March 2002 letter from CHRO and your federal lawsuit; if you
 3   know?
 4        A.    Attorney Chimes decided he didn't want to
 5   represent me any more, and then I had to find another
 6   attorney.
 7        Q.    Okay.  And it just took you a period of time
 8   to find Attorney Maurer; is that it?
 9        A.    Yes.
10        Q.    All right.  By the way, did you pay anything
11   out of your pocket for Attorney Chimes, and if so, do you
12   remember how much?
13        A.    I don't remember how much, but yes, I did.
14        Q.    Was it over five hundred, under five hundred
15   dollars?
16        A.    Over.
17        Q.    And do you know if you paid anything out of
18   your pocket to Vickie DeToledo?
19        A.    I did not.
20        Q.    All right.  If you could go to page
21   thirty-seven, the note headed 10/17/2002, and tell me when
22   you're there.
23        A.    Okay.
24              MR. VECCHIA:  This is on the
25              original suit?
```

1           MR. MINOR:    No, this is the doctor's
2   notes.
3           MR. VECCHIA:    All right.
4   BY MR. MINOR:
5      Q.   In this note it mentions that you were
6   feeling better, you were joking and laughing, that you were
7   planning to sue the city and you feel more in control if
8   you're suing then if you were being sued against.
9           Do you read that note?
10     A.   I read what it says here, yes.
11     Q.   All right.  Well, first of all, do you
12  remember being relieved after you participated in the
13  arbitration of Mr. Vecchia's grievance and that was over and
14  done with?
15     A.   Do I remember -- what was the question?
16     Q.   All right.  Let me rephrase it.
17     A.   Just ask the question.
18     Q.   Do you remember that prior to October of 2002
19  you had to go to the town of Wethersfield for a hearing
20  before the Board of Mediation and Arbitration on
21  Mr. Vecchia's grievance?
22     A.   Yes.
23     Q.   And that was upsetting to you?
24     A.   Yes, it was.
25     Q.   And I believe you had to go twice or once?

```
 1         A.      I went twice.
 2         Q.      And after you gave testimony, was that the
 3  last time you saw Mr. Vecchia in person until your
 4  deposition a couple months ago?
 5         A.      2002, until my deposition?
 6                 Probably. I don't know.
 7         Q.      All right. And it also mentions that you
 8  continue with your massage class.
 9         A.      What page was that again?
10         Q.      That's the same page, 10/17/2002.
11         A.      I'm sorry. I flipped pages.
12         Q.      All right. It's not important because I'm
13  not going to ask you about the page.
14                 Just tell us this, what is the massage class
15  that is referenced?
16         A.      I started school for massage therapy, which
17  is a two year program.
18         Q.      And you finished that massage program?
19         A.      Yes.
20         Q.      And you now have a license as a massage
21  therapist?
22         A.      Correct.
23         Q.      And when did you start, and when did you
24  finish?
25         A.      Well, I finished August '03. So two years
```

1  before that-ish.
2      Q.    All right.  And by the way, you continue to
3  work for the city, and this license that you have is not an
4  alternative to working for the city, it's just something
5  that you do in addition to working for the city; is that
6  correct?
7      A.    It's just a license I have.  I haven't done
8  anything with it yet.  I haven't started -- I don't do it
9  for money.
10     Q.    You haven't started to work or make money?
11     A.    Exactly.
12     Q.    And by the way, could you tell us roughly how
13 much the two year course cost?
14     A.    Ten thousand dollars-ish.
15     Q.    And this was obviously something you paid for
16 out of your pocket?
17     A.    Correct.
18           Actually I have loans I'm still paying for.
19 They're school loans.
20     Q.    It wasn't paid for by the city --
21     A.    No.
22     Q.    -- as some type of reimbursement programs --
23     A.    No.
24     Q.    -- or the way firefighters get reimbursed or
25 police officers get reimbursed?

1       A.      Or the way any employee from the city gets
2  reimbursed. I didn't ask for anything. I don't think we're
3  allowed that anyway.
4       Q.      All right. What do you remember about the
5  various medications that the doctor prescribed?
6               First of all, do you remember how many that
7  you took say between the first time you saw him in '98 until
8  today; half a dozen, a dozen different types of medication?
9       A.      Probably six different ones at different
10 times.
11      Q.      All right. Do you feel that -- well, let me
12 ask you today.
13              Are you taking any medications prescribed by
14 this doctor?
15      A.      Yes.
16      Q.      What medications are you taking?
17      A.      Neurontin and Effexor, and I have Klonopin
18 that I don't have to take regularly. I just take it when I
19 get over anxious or nervous. And a sleeping pill that's
20 called Ambien.
21      Q.      All right. So you mentioned Neurontin,
22 Effexor and Ambien.
23              Are these all anti-anxiety medications?
24      A.      No, Effexor is an antidepression. Ambien is
25 a sleeping pill. So I don't know what it is. Klonopin is

1  for anxiety, which I forgot to mention, and Neurontin I'm
2  not quite sure what that is.
3      Q.    All right. And these medications are paid
4  for by the city insurance program?
5      A.    And me.
6      Q.    Meaning your co-pay?
7      A.    Correct.
8      Q.    Could you tell us today, and I'm sure your
9  lawyer can provide greater detail, what your out-of-
10 pocket expenses, total for this entire proceeding,
11 attorneys' fees, doctor's bills --
12     A.    No.
13     Q.    -- co-pays, to date.
14              MS. MAURER:  Jim, if you'll hold that
15           open, I will give you that answer in writing.
16              MR. MINOR:  Okay. That's fine.
17              MS. MAURER:  Thank you.
18     Q.    All right. I'm just about done.
19           Do you remember getting the arbitration
20 decision of Mr. Vecchia's grievance and reading it, which is
21 marked Exhibit J for the deposition?
22              MS. MAURER:  Go ahead.
23     A.    Do I remember getting this?
24           I never got a copy of this.
25     Q.    All right. So you never got a copy, but you

1  did know that Mr. Vecchia's grievance was denied, and he was
2  unsuccessful in his attempt to become a city employee again?
3           A.    Yes.
4           Q.    You obviously were aware of that?
5           A.    Yes.
6           Q.    And you found out about the time that the
7  decision came out, which was February of 2003 either because
8  someone told you or because it was in the paper?
9           A.    Yes.
10          Q.    All right.  But you don't remember reading
11 the actual decision?
12          A.    I didn't get one, no.
13          Q.    Okay.  All right.
14                Well, since you didn't get it, I take it
15 you're not familiar with the decision?
16                You haven't read it recently?
17          A.    I just got it in my hand.
18          Q.    All right.  I don't want to ask you questions
19 then if you're not familiar with it.
20                Let me just ask about ten more questions.
21                And this relates to your Complaint which I
22 think we've discussed several times today, that you felt the
23 city didn't do anything as far as Mr. Vecchia and his
24 stalking of you is concerned.
25                Would you agree that in the meeting between

1  yourself, Bill Stover, Fred Manfredonia of the Human
2  Resources Department in September of 1998 you made a
3  complaint about Mr. Vecchia.  They met with Mr. Vecchia and
4  they warned Mr. Vecchia to leave you alone.
5       A.   That's what they said.
6       Q.   And at that time you were represented by your
7  attorney, Ben Fraser?
8       A.   Correct.
9       Q.   By the way, just to ask about money, you
10 don't have any bills that you paid Ben Fraser that you're
11 including in damages; are you?
12          Mr. Fraser represented you as a family friend
13 and didn't charge you?
14      A.   I wanted to pay him, but he wouldn't let me.
15      Q.   Okay.  All right.
16          And that after the meeting in September of
17 '98 with you and Human Resources, their meeting with
18 Mr. Vecchia and then their meeting when they reported back
19 to you and Mr. Fraser, that was your last contact with Human
20 Resources until after you went to the police in 2000?
21      A.   I had not heard -- that's correct, I did not
22 have any contact with Human Resources regarding this since
23 that meeting.
24      Q.   And that the next time you complained to
25 anyone in the city was after Mr. Vecchia stared at you and

```
 1   menaced you at Taranto's in October of 2000?
 2       A.   I complained about Vecchia to everyone
 3   that -- all the time.
 4       Q.   All right.
 5       A.   Peter Brown, Bob Lam (phonetic), Peter Lucia,
 6   Sandy Denise, Jim D'Vant (phonetic) -- anybody that would
 7   listen.  My friends that work at the city.
 8            Basically all my friends are city employees.
 9   I talked about David Vecchia stalking me and warned other
10   people to stay away from him and to be careful.  And the
11   whole **nannet at the city of Stamford knew.
12            And I complained to MEA people, MAA people,
13   department lead people.
14       Q.   And do you remember I think your earlier
15   testimony that you went to the police, you made a complaint
16   to Officer Carl Strate, S-T-R-A-T-E, and that you felt that
17   he did a job in preparing an arrest warrant affidavit and
18   resulted in Mr. Vecchia getting arrested?
19       A.   We didn't hear what job.  It blanked out.
20       Q.   Carl Strate did a thorough job in preparing a
21   twelve page arrest warrant against Mr. Vecchia, which
22   resulted in Mr. Vecchia getting arrested.
23       A.   I think Carl Strate did a great job
24   considering all the obstacles that he had to go through.
25       Q.   And Mr. Vecchia was, in fact, arrested in
```

|   |   |   |
|---|---|---|
| 1 | | November of 2000 and subsequently suspended from work from |
| 2 | | the city of Stamford? |
| 3 | A. | I'm not sure if it was -- whatever date he |
| 4 | | was arrested. Yes, he was arrested subsequently to Carl's |
| 5 | | and my report, and then he was suspended, yes. |
| 6 | Q. | And that eventually you wrote a letter to |
| 7 | | Judge Comerford opposing Mr. Vecchia's application for |
| 8 | | accelerated rehabilitation. |
| 9 | A. | Correct. |
| 10 | Q. | And in that letter, I think we discussed this |
| 11 | | in your previous deposition, you told Judge Comerford that |
| 12 | | Mr. Vecchia stopped stalking you and that he had focused his |
| 13 | | anti-social behavior towards his ex-wife, and after he |
| 14 | | stopped harassing his ex-wife and his family, he refocused |
| 15 | | his threatening behavior toward you in October of 2000. |
| 16 | | Do you remember saying that? |
| 17 | A. | I'm going to read it in like one second. |
| 18 | | MS. MAURER: I'll object to the |
| 19 | | point that the document speaks for itself. |
| 20 | | If you're asking her to read it and |
| 21 | | confirm that that's what she wrote, I think |
| 22 | | she can do that. |
| 23 | A. | I wrote everything in this letter. |
| 24 | Q. | All right. But would you agree that you told |
| 25 | | Judge Comerford that Mr. Vecchia stopped stalking you? |

```
1         A.    Where is that on the letter, and I'll agree
2   to it if I can find it on the letter.
3         Q.    Okay.  It's page two.
4         A.    Page two, paragraph --
5         Q.    Hold on just a sec.
6         A.    I'm trying to read quick.  I can't.
7               Oh, here it is.
8         Q.    From the beginning, it's third paragraph
9   which reads, "Mr. Vecchia's course of conduct towards me has
10  been continuous.  The only reason that he stopped stalking
11  me was because he had focused his anti-social behavior
12  towards his ex-wife.  After he stopped harassing her and her
13  family, he refocused his threatening behavior towards me in
14  October 2000."
15        A.    I believe that to be true.
16        Q.    All right.  So do I understand that to mean
17  that from September of 1998 until October of 2000,
18  Mr. Vecchia stopped stalking you?
19        A.    I don't know that.
20        Q.    All right. Do you remember any incident
21  where you could prove that Mr. Vecchia was stalking you from
22  September '98 until October 2000?
23        A.    I can't seem to prove anything about him
24  stalking me it seems.
25        Q.    Okay.  When I say prove, I mean you saw him
```

158

1   as opposed to not knowing whether he was stalking you or
2   not.
3       A.   I did not see Mr. Vecchia in that time frame
4   except for maybe -- no, I did not see him. I did not see
5   him -- I don't know. I don't know. I don't know.
6       Q.   And I think you said earlier that Peter Brown
7   and others from the fire department were supportive during
8   this entire process so that if you complained about, for
9   instance, not going over to the Government Center, they
10  would -- in fact, they did cooperate with you.
11          MS. MAURER:   I'm going to object
12          because the question is vague and overly
13          broad. If you want to ask about specific
14          incidents.
15          MR. MINOR:   All right. Let me
16          withdraw it.
17      Q.   Would you agree that Peter Brown cooperated
18  with you when you explained to him about Mr. Vecchia --
19      A.   It's not that he didn't cooperate.
20          What?
21      Q.   Did Peter Brown listen to your complaint
22  about Mr. Vecchia and take action such as barring
23  Mr. Vecchia from coming to the third floor --
24      A.   No.
25      Q.   -- of the fire department and allowing you

1  not's to go to the Government Center unless you chose to to
2  avoid any contact with Mr. Vecchia?
3              MS. MAURER:   Objection, compound.
4       Q.    You can still answer.
5       A.    The first part of the question where you said
6  Peter Brown did not allow Vecchia in the building, that's
7  not true.
8              When Vecchia came to the building once, I
9  asked Peter can I tell Vecchia that he's not allowed to
10 come. And when he came the second time, I said you're not
11 allowed to come here because I'd get fired if I have
12 visitors.
13             And as far as not having to go over to the
14 building, yes, Peter said later on, yes, I did not have to
15 go to the building to go to things that I was supposed to.
16      Q.    So did you say in there --
17             MS. MAURER:   Mr. Minor, could we
18             allow her to finish the prior question, the
19             answer.
20      Q.    I'm sorry. I didn't know you didn't finish.
21      A.    No, the time that no one was allowed up past
22 the third floor was after David's arrest or before the --
23 after the arrest or when the police called me and said he
24 was going to be arrested.
25             At that point, the fire department put a

1  notice downstairs at the watch desk that no one was allowed
2  in the building and especially Vecchia unless they signed
3  in, but Vecchia was not allowed. That's the time that
4  Vecchia was not allowed. The day after his -- going to have
5  him arrested.
6           Prior to that, he was allowed to do whatever
7  he wanted. He just didn't come over to the building because
8  maybe he didn't want me to get fired since the first time I
9  told him you can't come here or I'll get fired. I don't
10 really know.
11          Q.   Do you agree that the city has accommodated
12 you in allowing you time off, and if you needed to go to
13 counseling, for instance, or see this doctor that we've been
14 talking about, you've been accommodated?
15          A.   When I go to see my doctor, I take a sick day
16 or a sick time, and I've used my vacation time. So I have
17 time to use, which is mine to use however I want to, and
18 that's what I've been using.
19          I haven't had any free time, you know, like
20 not been charged for something if that's what you're trying
21 to imply.
22          Q.   All right. What specifically do you feel the
23 city should have done after September of 1998 and until
24 Mr. Vecchia was arrested in the end of 2000 that would have
25 prevented Mr. Vecchia from stalking you?

```
 1          A.      Well, they said they were going to give
 2   reports to Ben Fraser about his counseling or to keep him
 3   away or whatever, and they never responded to any of our
 4   requests. So that would have been nice.
 5               You know, anything would have been nice.
 6   Offer me EAP. Come and see, ask me how I'm doing. Barbara,
 7   is there any trouble?
 8               Usually if you have an employee who has such
 9   a serious issue, that's a very hard issue for someone to
10   talk about, one would think that someone would check up and
11   see if they were all right. And the city never did that.
12   So that was, you know, kind of not so great.
13               Basically the city just didn't do anything.
14   So I felt I had to do it all on my own throughout the whole
15   thing. So I basically changed my life and did things like
16   that.
17          Q.      All right. And just to clarify, you say the
18   city didn't offer you EAP.
19               EAP is Employee Assistance Program, and have
20   you ever used Employee Assistance Program?
21          A.      No.
22          Q.      The doctor whose notes we've been discussing,
23   that was outside of EAP?
24          A.      Correct.
25          Q.      And you mentioned that the city paid
```