```
 1   initially for this doctor and then stopped paying because he
 2   was out of network.
 3              If you had gone on EAP, would that have made
 4   a difference in the payment?
 5        A.    I have no idea.
 6        Q.    Did you go to EAP and say I want to use
 7   Dr. So-and-so, and they said yes or no?
 8        A.    I never went to EAP.
 9        Q.    All right.  So the only people that you
10   talked to -- you talked to the insurance people who said
11   this doctor was out of network?
12        A.    No.  You don't have to talk to them to say
13   that they were out of network.  They give you a thing saying
14   he's not in network.
15        Q.    All right.  In other words, you went to him
16   and you said here's my insurance coverage --
17        A.    And he said I don't take it.
18        Q.    -- and he says I'm not in the network; is
19   that how you learned?
20        A.    Right.
21              MR. MINOR:  Okay.  I think that's it
22              for me.  I thank you very much, and see if
23              Mr. Vecchia has any questions.
24              MR. VECCHIA:  Yes, I have questions.
25              MR. MINOR:  Okay.  Do you want to
```

1  take a break now and conclude -- you give me
2  an idea how long you're going to be.
3          MR. VECCHIA:  I don't know.  I've
4  never done this before.
5          MR. MINOR:  Because it is almost
6  noon.  Why don't we take a break and have
7  lunch and come back.
8          Okay.  I'll hang up and call you back
9  when we are done.
10         For lunch, how long do you want to
11 take?
12         MS. MAURER:  We'll take an hour.
13         MR. MINOR:  Okay.  One o'clock; is
14 that good?
15         MS. MAURER:  That's fine unless
16 Mr. Vecchia thinks he's got less than fifteen
17 or twenty minutes, that would be fine.
18 We'll go that far.
19         MR. VECCHIA:  I don't know.  I'll
20 come back at one o'clock.
21         MR. MINOR:  So why don't we come back
22 at one o'clock, and I'll call you then.
23         MS. MAURER:  Thank you very much.
24 (Lunch recess taken at 12:00 p.m.)
25

```
1      AFTERNOON SESSION    JUNE 11, 2004    1:05 P.M
2                    MS. MAURER:  Mr. Vecchia, are you
3           going to be wanting a transcript of this?
4                    MR. VECCHIA:  No.
5                    MS. MAURER:  All right.  You may
6           inquire.
7
8    CROSS-EXAMINATION BY MR. VECCHIA:
9         Q.    All right.  Barbara, did you get a phone call
10   from Sally Benkowski (phonetic) within the fifteen minutes
11   or half hour prior to the start of this discussion today?
12                   MS. MAURER:  Mr. Vecchia, I'm going
13          to object.  That has nothing to do with this
14          trial whatsoever, and I'm going to direct
15          Ms. Murphy not to answer.
16                   MR. VECCHIA:  That means yes?
17                   MS. MAURER:  That means that she's
18          not going to answer you.
19        Q.    All right.  Barbara Murphy, when was the last
20   time I spoke to you?
21        A.    March 20 something, 1998.  March 20 --
22        Q.    That's fine.
23        A.    Okay.
24        Q.    In your discussion with Attorney Minor
25   earlier, you mentioned that your plan right along was to sue
```

```
 1   the city.
 2              When did you decide to sue me as well as the
 3   city?
 4        A.    I have no idea and I -- I have no idea.
 5        Q.    I'm sorry.  Did you answer that?
 6        A.    Yes.
 7              MR. MINOR:  Barbara, did you say I
 8              have no idea?
 9              THE WITNESS:  Correct.
10              MR. MINOR:  Okay.  For some reason, I
11              don't why this afternoon both you and
12              Attorney Maurer seem to be cut off.  So
13              maybe speak a little bit slower.
14              THE WITNESS:  Okay.
15              MR. MINOR:  Thanks.
16        Q.    All right.  I want to look at the document
17   called Request for Admissions.  I have a copy that's dated
18   August 11th, 2003.
19              MS. MAURER:  Mr. Vecchia, if you
20              don't provide exhibits you want us to look at
21              in advance, we have no way to be prepared
22              for your questions.
23              MR. VECCHIA:  This is a document that
24              you provided to me the answers.  So I'm sure
25              you have it.
```

```
 1              MS. MAURER:    That may, in fact, be
 2     true, but we have a very substantial file
 3     here.  If you'd like to take a break and have
 4     me look for it, I can do that.
 5              MR. VECCHIA:   Certainly.
 6              MR. MINOR:    Can I suggest this,
 7     Mr. Vecchia.  Why don't you just ask her
 8     questions from the document.  I don't think
 9     she has to read it all; otherwise, we're
10     going to be here all afternoon.
11              If you have a specific question, just
12     go ahead and ask it.
13  BY MR. VECCHIA:
14       Q.    Okay.  I have a number of questions from the
15  document.
16              What were the circumstances of your transfer
17  from the position of payroll department to the fire
18  department?
19       A.    I was promoted.
20       Q.    What had happened prior to your promotion?
21              MS. MAURER:   Mr. Vecchia, you're
22     going to have to be more clear.
23              Objection; vague.
24       Q.    What is the peanut butter and jelly affair?
25       A.    I have no idea what you're talking about.
```

```
 1        Q.      All right.  Was there an investigation by
 2   Coopers and Lybrand?
 3                      MS. MAURER:   At what time,
 4                 Mr. Vecchia?
 5        Q.      Prior to Barbara's taking the new job in the
 6   fire department.
 7                      MS. MAURER:   Mr. Vecchia, I'm going
 8                 to object.  This has nothing to do with the
 9                 case at issue, and I'm going to direct her
10                 not to answer.
11                      MR. VECCHIA:   It has the issue of
12                 veracity and truthfulness.
13                      MS. MAURER:   You'll be able to ask
14                 those questions at trial if it comes up.  It
15                 doesn't apply in depositions.  This is a
16                 fact-finding deposition.
17        Q.      Were you disciplined by the city of Stamford?
18                      MS. MAURER:   That again has nothing
19                 to do with this matter, and I'm going to
20                 direct her not to answer.
21        Q.      Ms. Murphy, do you recall some time after
22   your movement to the position at the fire department that we
23   had a conversation, and it was about your transfer from one
24   position to the second, and you told me that you intended to
25   get even with the city one day?
```

1   A.   No.

2   Q.   Do you recall talking to me about people that
3   you hate, and you said that the only person that you hated
4   was Tom Hamilton?

5   A.   No. Never.

6   Q.   One of the items that Attorney Maurer asked
7   in her Request for Admissions was stated, "At the end of
8   1997 and the beginning of '98, Vecchia began making unwanted
9   sexual advances to Murphy."

10       What were those?

11  A.   Offering me -- trying to buy me drinks and
12  dinner and just standing behind me and sending me candies
13  interoffice and just a bunch of different various things.

14  Q.   Then she goes on to list them as "Vecchia
15  asked Murphy to lunch."

16       How many times did that occur, Ms. Murphy?

17  A.   Once. That's all it took.

18  Q.   And who asked who to lunch?

19  A.   You asked me to lunch.

20  Q.   Wasn't the circumstance of that, Ms. Murphy,
21  that the city had bought you a gift certificate to Macy's
22  and that you wanted to reciprocate in some manner and you
23  invited me to lunch?

24  A.   No, and the city never bought me a gift
25  certificate to Macy's in my life.

1  Q. Well, I recall one time I did see you at the
2  fire department, and that's the reason I went there, to
3  bring it to you.
4            MS. MAURER: I'm going to object at
5            this point in time. Ms. Murphy is being
6            questioned, not Mr. Vecchia.
7  Q. Okay. Do you recall my going to the fire
8  department and bringing you a gift certificate?
9  A. Yes, and you said it was a gift from you.
10 Q. No, I did not say that.
11            Well, and then the second -- then she says,
12 "Vecchia sent candy to Murphy's office."
13            How many times did that occur?
14 A. Probably -- I'm not sure how many times
15 exactly but over three.
16 Q. And then it says, "Vecchia sent cards to
17 Murphy through interoffice mail."
18            How many times did that occur, Ms. Murphy?
19 A. I don't recall.
20 Q. And then it says, "Vecchia went to Murphy's
21 office uninvited."
22            How many times did that occur?
23 A. Two.
24 Q. What were the circumstances of those?
25 A. You bringing me the Macy's thing and you

```
 1    bringing me candy.
 2         Q.    And after I brought you the things, did I
 3    have a meeting with the fire chief?
 4         A.    No.
 5         Q.    And in 1998 -- late 1997 and '98, your
 6    Request for Admission says "Murphy repeatedly told Vecchia
 7    to stop making 'advances' toward her as she was not
 8    interested."
 9               When did those occur, and what does
10    repeatedly mean in your mind?
11                   MS. MAURER:   Number one, you can only
12                ask one question at a time.  So which
13                question would you like an answer to?
14         Q.    When did these occur?
15                   MS. MAURER:   When did what occur?
16         Q.    "In late 1997 and 1998, Murphy repeatedly
17    told Vecchia to stop making 'advances' toward her as she was
18    not interested."
19         A.    At the office when I told you not to bring
20    the candy any more.  When I told you that I can't have
21    visitors at the office because I'd get fired and at
22    Brennan's numerous times.
23         Q.    How many times is numerous?
24         A.    I have no idea.  More than one.
25         Q.    Attorney Maurer's Request for Admission says
```

|   |   |
|---|---|
| 1 | in 1997 and '98 Vecchia said to have paid for Murphy's |
| 2 | drinks and meals. |
| 3 | What were the circumstances of those? |
| 4 | A. I was at Brennan's and you were at the other |
| 5 | end of the bar, and I was with Chris, my friend, and we were |
| 6 | having dinner and you offered to pay for our dinner, and I |
| 7 | told the bartender no thanks. |
| 8 | And you tried to buy me drinks a number of |
| 9 | times, and I said no thank you, and I told the bartender not |
| 10 | to let you buy me anything. |
| 11 | Q. Did I ever buy you anything prior to that, |
| 12 | Ms. Murphy? |
| 13 | A. I don't know if you bought a round for the |
| 14 | bar, but when you started getting specifically directed |
| 15 | towards me, I refused. |
| 16 | Q. One of the Requests for Admission states |
| 17 | that, "Vecchia would send Murphy articles and other |
| 18 | materials through interoffice mail related to topics that he |
| 19 | had overheard her discussing." |
| 20 | What were the circumstances of those? |
| 21 | A. I don't recall at this moment. One might |
| 22 | have been about my car being looted and you sent an article |
| 23 | from a newspaper and something else may have been about -- |
| 24 | I'm not really sure. I can't recall. |
| 25 | Q. Were they articles of a sexual or harassing |

1  nature?
2     A.    They were harassing in the fact that you were
3  being overly friendly by sending them when I told you to
4  really not be sending me anything any more.  It was an
5  uncomfortable situation for me.
6     Q.    And did you tell me that?
7     A.    I didn't respond to them at all because I had
8  already told you to stop.
9     Q.    One of the Request to Admit says that 1997
10 and '98 Vecchia began appearing on Murphy's running path at
11 the time that she regularly ran.
12          What were the circumstances of that?
13    A.    You were running down Shippan Avenue as I was
14 running in the opposite direction coming back.  Another time
15 you were running down Shippan Avenue.
16    Q.    So that's two times?
17    A.    It could have been more than two times.  You
18 want to know the circumstances, always it is on Shippan
19 Avenue.
20    Q.    The Request for Admission asks in 1997 and
21 1998, which makes it sound like this happened over a two
22 year period of time.
23          So is that your testimony or your answer is
24 that it occurred twice?
25    A.    Not necessarily, no.  No, that is not my

```
 1  answer, no.
 2       Q.    How many times do you think it occurred?
 3       A.    Well, maybe three times.  Maybe three or
 4  four.
 5       Q.    Let's see.
 6             Since one of the Requests for Admission says
 7  that, "The running path was over fifteen miles from
 8  Vecchia's home."
 9             How far was that running path from your home?
10       A.    Three miles, four miles.  And I ran there
11  regularly.
12       Q.    And then it says, "This running path was
13  several miles from Vecchia's place of employment."
14             How far is it from the Government Center to
15  Shippan Avenue?
16       A.    A mile.
17       Q.    One mile?
18       A.    Oh, from the Government Center, I don't know.
19  The Government Center.  I don't know how far from the
20  Government Center.
21       Q.    Well, how many would you think?
22             You lived in Stamford all your life.  I would
23  expect you to know that.
24             MS. MAURER:    Mr. Vecchia, I'm going
25             to object to that question as harassing, and
```

```
 1                 I'm going to ask you to ask a different
 2             question.
 3   BY MR. VECCHIA:
 4        Q.   All right.  One of the Request for Admission
 5   was, "At a United Way sponsored race, Vecchia attempted to
 6   run the entire race directly in front of Murphy."
 7             How does someone do that?
 8             MS. MAURER:  Mr. Vecchia, I'm not
 9             going to allow her to speculate, and I'm
10             going to object to that question.
11        Q.   One of the Request for Admission says that,
12   "Throughout 1998 Vecchia stared at Murphy."
13             When did this occur?
14        A.   At Brennan's, at the city of Stamford on the
15   tenth floor, while running, at the Life at Five.
16        Q.   How many times do you think this occurred?
17        A.   Hundreds.
18        Q.   Is that one hundred or two hundred?
19        A.   Hundreds.  So more than one.  I can't count
20   if it was two hundred, three hundred, I'm not quite sure
21   because I don't know are we talking every minute, the hours
22   that you were at Brennan's or what?
23        Q.   Days or occurrences.
24        A.   Every Friday I used to go to Brennan's and
25   you started coming there.  So that's quite a bit of time.
```

```
1    Live at Five, a couple times.
2              I don't know.  Countwise.  Numerous, a lot.
3        Q.    And then it says that, "Throughout 1998,
4    Vecchia sent Murphy gifts through interoffice mail."
5              How many times did that occur?
6              MS. MAURER:  That question has been
7    asked and answered.  Objection.
8              MR. VECCHIA:  What was the answer?
9              MS. MAURER:  Just prior you just
10   answered.  If you'd like, I'll ask the court
11   reporter to go back and read it to you.
12             Mr. Vecchia, would you like the court
13   reporter to read it to you?
14             MR. VECCHIA:  Please, yes.
15             MR. MINOR:  Can I suggest that it
16   was several times rather than going through
17   it.
18             You know, I object on the grounds
19   whether it's several or six or a dozen, it
20   don't really matter, and in the interest of
21   moving this along, I would ask, Mr. Vecchia,
22   you ask the next question.
23       Q.    One of the Requests to Admit says that,
24   "Throughout 1998, Vecchia sent Murphy drinks and food which
25   she rejected."
```

```
 1                How many times has that occur?
 2                     MS. MAURER:  Mr. Vecchia, that
 3           question was asked and answered.
 4                     MR. VECCHIA:  I don't recall the --
 5           what was the answer?
 6                     MS. MAURER:  You asked her whether
 7           she had rejected you buying her drinks and
 8           buying food, and she gave you the
 9           explanation that she had rejected food on
10           one occasion and she had rejected drinks on
11           many occasions.
12      BY MR. VECCHIA:
13           Q.   And how many was many?
14                     MS. MAURER:  More than one.
15           Q.   Is that more than two?
16                     MS. MAURER:  Mr. Vecchia, that
17           question was asked and answered, and I'm
18           going to direct her not to answer.
19                     MR. VECCHIA:  You said she didn't
20           answer each one of these questions, and I'm
21           asking -- you're saying I have to ask them
22           myself.
23                     MR. MINOR:  Can I suggest let's move
24           on.  This is to gather information and not to
25           get even.
```

1           MR. VECCHIA:    I'm gathering
2    information.
3           MR. MINOR:    Can we please just go to
4    the next question.
5           MR. VECCHIA:    No, I'd like an answer.
6           MR. MINOR:    But the answer has
7    already been made.  I remember the answer,
8    too.
9           MR. VECCHIA:    Tell me what it is.
10          MR. MINOR:    The answer was many times
11          to refusing drinks, meaning more than three
12          is my recollection.  But the transcript will
13          speak for itself when it comes out.
14   BY MR. VECCHIA:
15       Q.    The Request for Admission mentions that, "One
16   evening as Murphy left a restaurant, Vecchia followed her to
17   the car."
18          "As Murphy started the car, Vecchia stood in
19   front of her blocking her from leaving."
20          "As Murphy drove forward, Vecchia stayed in
21   the way and Murphy was unable to leave."
22          "As a result of Vecchia's actions, Murphy had
23   to put her car in reverse and drive the wrong way on a
24   one-way street to get away."
25          When did this occur?

```
1        A.      I don't know the specific date.
2        Q.      Month, year?
3        A.      1998, '97.
4        Q.      Okay.  And was this in the summer, spring,
5  fall, winter?
6        A.      I don't think there was snow out there.  So
7  it could have been summer, spring or winter.  I don't know
8  off the top of my head right now.
9        Q.      My recollection is this was in the winter of
10 January of 1998, and that it was a cold, icy day and that
11 the lock on my car was locked and that I couldn't open the
12 car door.
13               Do you recall that?
14       A.      No.
15       Q.      I'm sorry, did you answer?
16       A.      I said no.
17       Q.      Okay.  Regarding the meetings held with Fred
18 Mandredonia and William Stover from the Human Resources
19 Department in September of 1998, did you ever file a written
20 complaint with the city?
21       A.      At that meeting was the initial -- the
22 initial meeting was the formal complaint.
23       Q.      Did you ever file a written complaint with
24 the city?
25       A.      My attorney -- I don't know.  I don't think
```

1  so.
2       Q.    Did you ever write anything down or type
3  something out or fill out a form, or did you ever sign any
4  documents?
5       A.    I never wrote anything down.
6       Q.    Did Mr. Manfredonia or Stover ever have you
7  sign anything?
8       A.    No, they did not.  They wanted me to sign
9  something.
10      Q.    And you're telling me you did not sign it?
11      A.    It was a different subject.  I'm sorry.  It
12  was my mistake.
13      Q.    All right.  I'm confused here now.
14      A.    I never signed a document about a written
15  complaint against you.
16      Q.    One of Attorney Maurer's Request for
17  Admissions is that, "Vecchia agreed to cease contact with
18  Murphy during work and on City of Stamford premises."
19            Did Mr. Stover or Manfredonia tell you that?
20      A.    One of them.
21      Q.    Hello.
22                  MS. MAURER:  She said one of them.
23      Q.    Thank you.
24            And did one of them give you something in
25  writing to that effect?

```
 1        A.     No, they never produced anything.
 2        Q.     Did they tell you that I had signed
 3   something?
 4        A.     They didn't tell me that, no.
 5        Q.     What did they tell you?
 6        A.     When?
 7        Q.     In September, October or November of 1998.
 8        A.     Quite a few things.
 9        Q.     Okay.  What did they tell you?
10        A.     That you agreed to -- you admitted -- at one
11   of the meetings, you admitted everything, you were stupid,
12   that you were probably in love with me, that you agreed to
13   not -- either drafting up a report and an agreement and that
14   you're going to sign it saying you'll leave me alone and
15   you're seeking counseling and you'll get help, and they were
16   going to follow through on everything.  Something to that
17   effect.
18        Q.     Did you ever ask them for a copy of some
19   written agreements that I had supposedly signed?
20        A.     I did not.  Ben Fraser did, my attorney.
21        Q.     And did Attorney Fraser ever tell you that he
22   had a signed agreement?
23        A.     They never produced the agreement.
24        Q.     Did anyone ever go back to you or anyone who
25   represented you ever go back to the city and ask for a
```

1   written agreement?
2        A.   Yes.
3        Q.   And what was the reply from the Human
4   Resources people that --
5        A.   I don't know that there was any reply. I'm
6   under the impression there was none. But Ben is dead now.
7   So I don't have that.
8        Q.   You're known as a frank person and someone
9   who pushes for things.
10              You're telling me that you never went back to
11  them and asked them for anything?
12              MS. MAURER:  That question has been
13              asked and answered, and I'll object to it.
14       Q.   One of the Requests for Admissions is that,
15  "The City of Stamford never confirmed that Vecchia was
16  receiving counseling."
17              How would you know that?
18       A.   Because we never got any confirmation, as it
19  says in the thing.
20       Q.   You said that you never got any response, but
21  you didn't say anything that you had ever asked.
22              MS. MAURER:  Is there a question
23              there, Mr. Vecchia?
24       Q.   Yes.
25              Did you ever ask specifically if Vecchia was