```
 1   receiving counseling?
 2        A.    Me, personally, through my attorney was
 3   asked, and there was no response.
 4        Q.    When did that occur?
 5        A.    I have no idea off the top of my head.
 6        Q.    Did it occur in September of '98 and October
 7   of '98, November of '98, December of '98?
 8                   MS. MAURER:  Mr. Vecchia, that
 9              question has been asked and answered.
10              Please move on.
11        Q.    One of the Request for Admissions is that,
12   "The City of Stamford never followed up with Vecchia
13   regarding Vecchia's progress and therapy."
14              How would you know that?
15                   MS. MAURER:  Mr. Vecchia, those
16              questions were asked of you.
17                   MR. VECCHIA:  I understand that.  I'm
18              asking them of Ms. Murphy.
19                   MS. MAURER:  She's already answered
20              that question, Mr. Vecchia.
21                   MR. VECCHIA:  What was the answer,
22              please?
23                   MS. MAURER:  The answer was that her
24              attorney had asked for that, the city had
25              promised it, and the city had not provided
```

```
 1                    it.
 2                              MR. VECCHIA:   Thank you.
 3    BY MR. VECCHIA:
 4         Q.    One of the Requests for Admissions said that,
 5    "The City of Stamford never received any progress reports
 6    from Vecchia."
 7                    How would you know that?
 8                    Hello.
 9         A.    By the fact that they never gave us any.
10         Q.    That doesn't mean that it never happened.
11                    Why did you think that means it never
12    happened?
13                              MS. MAURER:   Mr. Vecchia, Requests
14                    for Admission are requests for you to answer
15                    certain questions.  They don't necessarily
16                    have a factual basis from us.  They are us
17                    trying to find that information.
18                              MR. VECCHIA:  I understand that.
19                              MS. MAURER:   So in this particular
20                    case, I was asking you whether or not that
21                    had happened.
22                              MR. VECCHIA:   In this particular
23                    case, I'm asking Ms. Murphy what's her backup
24                    for the allegation that they never followed
25                    up.
```

```
 1                      MS. MAURER:  It's not an allegation,
 2              it's a request for information which you said
 3              did not happen.  And that's what the answer
 4              was that I needed.
 5  BY MR. VECCHIA:
 6       Q.     One of the Requests for Admissions is that,
 7  "The City of Stamford never monitored Vecchia's conduct
 8  regarding Murphy in any manner."
 9              How would you know that?
10                      MS. MAURER:  Mr. Vecchia, I'm going
11              to tell you again.  She doesn't know that.
12              It was a request for an admission from you.
13       Q.     One of the Request for Admissions was that,
14  "Vecchia never obtained psychological treatment for his
15  behavior."
16              How would you know that?
17                      MS. MAURER:  Mr. Vecchia, I'm going
18              to tell you again, the answer to that, the
19              Request for Admission is a request for an
20              admission from you.  We don't have any basis
21              for that, and we're asking you whether it's
22              true.
23       Q.     One of the Request for Admissions is -- this
24  is talking about an October -- in October of 2000, that, "In
25  October 2000, Murphy reported Vecchia's harassment of her to
```

```
 1   the Stamford Police Department.  In late October or early
 2   November of 2000, the Police met with Vecchia."
 3                Who told you that?
 4                Hello.
 5        A.      I'm thinking.
 6                I believe the police.  I'm not sure.
 7        Q.      Well, who's the police?
 8                Was there a specific person or --
 9        A.      It would be the officer that I was speaking
10   with, Carl Strate.
11        Q.      Did he give you a copy of a written report?
12        A.      A written report of what?
13        Q.      Of a report that he spoke to me and that
14   didn't --
15        A.      I got no report from Carl Strate.
16        Q.      Okay.  It never occurred.  That's why I was
17   curious as to why you would ask that.
18                One of the Request for Admissions is that,
19   "Vecchia left the bullet on Murphy's deck at home."
20                What are the circumstances of that?
21        A.      There was a bullet on my deck, what I thought
22   was shot into my deck.
23        Q.      And I find in the document Attorney Maurer
24   had sent to me that there's a police report from the Norwalk
25   Police Department, November 3rd.
```

```
 1              MS. MAURER:    Is there a question,
 2        Mr. Vecchia?
 3     Q.   Yes.
 4          Did you ever discuss this with -- let's
 5  see -- Investigator Carl Strate of the Stamford Police
 6  Department?
 7              MS. MAURER:    Mr. Vecchia, as you can
 8        see from Mr. Strate's report, Officer Strate
 9        went to the Norwalk Police Department and did
10        that investigation on his own.
11              MR. VECCHIA:    Why would the Norwalk
12        Police Department be filing it then?
13              MS. MAURER:    Because they called.
14        Initially when Carl Strate did his
15        investigation, he confirmed that
16        investigation with the Norwalk Police
17        Department, as it says in his report.
18              MR. VECCHIA:    Well, I'm reading the
19        report from the Norwalk Police Department,
20        and it doesn't explain in that detail.
21              MS. MAURER:    They don't have to.
22     Q.   Now, did this occur after -- Ms. Murphy, did
23  that occur after that, you went to see Carl Strate
24  initially?
25     A.   Yes.
```

```
1      Q.    Why would you think the bullet was fired into
2  your deck, into your porch?
3      A.    Because it was imbedded in it.
4      Q.    Has Carl Strate ever been to your home?
5      A.    No.
6      Q.    I'm sorry?
7      A.    No.
8      Q.    Did Carl Strate give you a bullet and tell
9  you to stamp it into the floor of your porch?
10     A.    No.
11     Q.    Okay.  The next area I want to go into is
12 your psychological history.  That is something I'm not
13 particularly interested in, but since you dragged me into
14 your attempt to get money from the city, I have no choice,
15 and I apologize for asking you these questions.
16           When's the first time you saw a counselor or
17 therapist or psychiatrist or psychologist?
18              MS. MAURER:  Mr. Vecchia, are you
19           asking whether she's seen one in her life?
20              MR. VECCHIA:  I'm asking when was the
21           first time she saw one.
22              MS. MAURER:  That is completely
23           irrelevant to this matter.
24              MR. VECCHIA:  You're asking about
25           emotional damage.  And so you have to begin
```

```
1                      at the beginning.
2                           MS. MAURER:  Mr. Vecchia, you have to
3                      begin with things that are relevant or
4                      likely to be relevant.
5                           MS. MAURER:  Ms. Murphy's life is
6                      relevant for this.
7                           Mr. Vecchia, if you'd like to get an
8                      order from the court to discuss that, you
9                      may; otherwise, I'm going to direct her not
10                     to answer.
11   BY MR. VECCHIA:
12        Q.   Did you ever see a therapist, psychologist,
13   counselor when you were a child?
14                          MS. MAURER:  Mr. Vecchia, I'm going
15                     to direct Ms. Murphy not to answer on the
16                     same grounds that I have already given you.
17        Q.   Did you ever see one when you were a teenager
18   regarding your parents' divorce?
19                          MS. MAURER:  Mr. Vecchia, I'm going
20                     to direct Ms. Murphy not to answer on the
21                     same grounds as I gave you before.
22        Q.   Did you ever see one regarding your father's
23   death?
24                          MS. MAURER:  Mr. Vecchia, I'm going
25                     to direct Ms. Murphy not to answer on the
```

```
 1                    same grounds I've already given you.
 2         Q.         Did you ever see anyone regarding your
 3   leaving Stamford and moving to Florida and adjusting in
 4   Florida?
 5                    MS. MAURER:  Mr. Vecchia, if you
 6                    continue on these grounds, I'm going to close
 7                    this deposition, and we'll go no further.
 8                    Move on to another area or we will be
 9                    finished.
10                    MR. VECCHIA:  All right.  Then I'll
11                    have to go to Dr. Hamilton.
12         Q.         All right.  The first report we have from
13   Dr. Hamilton is on October 9th of 1998.
14                    MS. MAURER:  Mr. Vecchia, would you
15                    like her to review the documents?
16                    MR. VECCHIA:  Certainly.  The same
17                    documents that Attorney Minor had questions
18                    about.
19                    MS. MAURER:  All right.  Would you
20                    direct her to a page.
21         Q.         The page dated 10/9/98.
22                    MS. MAURER:  All right.
23         A.         Okay.  Go ahead.
24         Q.         And in this report -- again, this is -- I
25   have different questions about how Dr. Hamilton, his mode of
```

1  operating.
2           When you were visiting Dr. Hamilton, is he
3  there taking notes and one would think that the reports
4  were -- follow his notes, or do you feel that this is just a
5  summary of what he heard?
6       A.   There are no notes taken.
7       Q.   He does not take any notes when you're
8  speaking to him?
9       A.   No.
10      Q.   Okay. So this is a summary then that he must
11 write some time after he would speak -- meet with you?
12           MS. MAURER:  Mr. Vecchia, if you
13           would like to inquire with Dr. Hamilton as to
14           his methodology, I'm sure he would be
15           willing to do that for his normal fee;
16           however, Ms. Murphy is not a doctor and is
17           unfamiliar with his methodology.
18           MR. VECCHIA:  What I was interested
19           in is how he accumulated his information.
20           MS. MAURER:  And that's answered,
21           that he doesn't take notes during the
22           sessions.
23      Q.   Okay. This first time you went to see
24 Dr. Hamilton, I don't see any mention of myself in this
25 report or somebody stalking you or --

```
 1         A.    In the whole report?
 2         Q.    In this 10/9/98, this three pages he had that
 3   covers that.
 4               MS. MAURER:  Mr. Vecchia, these
 5               reports speak for themselves.  If the
 6               document doesn't include it, then it doesn't
 7               include it.  It doesn't necessarily make it
 8               an entire and complete report of the
 9               session.
10         Q.    On the 10/19/98 report, which is the fourth
11   page of the report, you do mention a man has been stalking
12   you.
13               MS. MAURER:  The document speaks for
14               itself, Mr. Vecchia.
15         Q.    Regarding the timing of this, were you still
16   in discussion with Mr. Stover and Mr. Manfredonia on
17   10/19/98?
18         A.    I don't know if that's the date that we met.
19   The dates that we met are recorded somewhere in all this
20   paperwork, but I don't know them right off the top of my
21   head.
22         Q.    Do you think that was before or after you
23   finished your discussions with them?
24               MS. MAURER:  With whom?
25         Q.    With Mr. Manfredonia and Mr. Stover.
```

1   A.   I have the list of dates when I went there.
2   So I don't recall at this moment.
3   Q.   At the time you initially went to see
4   Dr. Hamilton, in his first report -- and this again is his
5   summary, so I want to find out if you agreed with his
6   summary.
7        He states that your depression had become
8   unmanageable, that it had been a four year problem, that
9   your concerns were your mother's health, your employment
10  with the city and offer a new job, and that your son
11  leaving -- going to college, your being lonely, scared and
12  sad.
13       Do you think that's an accurate description?
14  A.   I'm reading.
15  Q.   Certainly.
16  A.   The thing that I originally went to Hamilton
17  was that if -- as you can see in the first paragraph, he
18  says she called last spring but never came in.
19       That was after you broke into the car, and I
20  was so distraught and depressed that I finally went to him,
21  but then I was embarrassed that I was going to seek help.
22       He was my mother's psychiatrist.  My mother
23  had an issue.  So I never went back again until October, and
24  I believe that's after the August issues with you, and I
25  think he might have omitted this in the conversation or not.

1  It doesn't really matter, but I was beyond depression at
2  that point and wanted some medication or some kind of help.
3                So however you want to interpret his writings,
4  I don't know. But that's why I went.
5       Q.    Well, you had contacted him earlier in the
6  spring.
7                Did these same problems exist, your mother's
8  health, your new job and your son going to college and you
9  were lonely, scared and sad?
10      A.    In spring I never saw him. I asked him if I
11 could come and see him, and I never went.
12      Q.    I understand that.
13      A.    What's your question?
14            I don't understand.
15      Q.    Were the same issues there in the spring?
16      A.    In the spring, all those issues -- I wasn't
17 necessarily sad -- I was upset about you and all those other
18 things were there also.
19      Q.    All right. And then as one reads through
20 Dr. Hamilton's reports, on October 26th he talks about you
21 being depressed a long time.
22               On November 5th he talks about your family
23 not being there for you. On November 19th, he talks about
24 your breaking up with and he talks about your sister's
25 chronic illnesses, and he talks about your health, a lymph

```
 1   node in the neck, and he talks about your concerns being
 2   bipolar, and he talks about you -- on December 2nd he talks
 3   about you being sad and tearful and somewhat volatile, and
 4   he talks about you being emotional and that you had an
 5   accident and totaled your car.
 6              MS. MAURER:  Mr. Vecchia, is there a
 7          question in here somewhere?
 8              MR. MINOR:  I have an objection
 9          after you finish your question.  So let me
10          make my objection.
11              Continue until you finish your
12          question.
13   BY MR. VECCHIA:
14       Q.    And on December 17th, he talks about your
15   abusing drugs and alcohol.  And on December 29th, he talks
16   about a variety of problems when you were growing up.
17              MS. MAURER:  Mr. Vecchia, let me
18          interrupt you.  Any question you have at this
19          point is compound and based on a
20          misrepresentation of the documents in front
21          of you.  So I would appreciate it if you
22          would rephrase at this point.
23              MR. MINOR:  And also I object on the
24          grounds that you inserted a name which is not
25          in the document that you have in front of
```

1  you.
2  　　　　Whether or not that name is true or
3  not true, I ask that it be deleted from the
4  transcript of the deposition because it's an
5  invasion of privacy of the other individual.
6  　　　　The document has been redacted to
7  protect third parties as well as to protect
8  the privacy of Ms. Murphy. So I think it's
9  an unfair question.
10 　　　　It's also probably an objectionable
11 statement, but I don't want to have that in
12 the transcript, and I would ask you if you
13 would not refer to any names, especially if
14 you're inventing them.
15 　　　　Can you respond to that?
16 　　　　MR. VECCHIA: I will.
17 　　　　MR. MINOR: I think Mr. Vecchia was
18 agreeing not to use any names, and he agrees
19 that that name be deleted.
20 　　　　Does everyone else agree?
21 　　　　MS. MAURER: We agree as well.
22 　　　　MR. MINOR: And if the court
23 reporter -- you may have gotten the name
24 except phonetically, you agree that that name
25 is deleted.

```
 1              MADAM COURT REPORTER:  Yes.
 2              MR. MINOR:  Anyway, why don't you
 3      re-ask your question so it's not a compound
 4      question because there is something that's
 5      pending.
 6              MR. VECCHIA:  I don't understand.
 7              MR. MINOR:  In other words, you asked
 8      a question that was a string of questions.
 9      You have to break it down.  Right now you
10      have to ask her --
11              MR. VECCHIA:  I'll ask her day by
12      day.
13  BY MR. VECCHIA:
14      Q.    Going back to the first page.  Again, on
15  October 9th -- and you have those papers in front of you?
16      A.    Yes.
17      Q.    Okay.  And there on October 9th the issues
18  discussed for Dr. Hamilton, your mother's health, city
19  employment, potential of a new job, your concerns with that
20  and your son going to college and you're lonely, scared and
21  sad.
22              And there's no mention of you're being upset
23  about someone stalking you; is that correct?
24              MS. MAURER:  Mr. Vecchia, the
25              documents speak for themselves.  If you'd
```

```
 1                  like to ask her a question about her
 2                  understanding of the documents or her
 3                  feelings at the time or whatever, you may,
 4                  but the documents are complete on their face,
 5                  and there's no reason to review them
 6                  individually.
 7   BY MR. VECCHIA:
 8          Q.      Okay.  On October 9th, if your emotional
 9   health is being affected by my conduct, why don't you
10   mention it?
11          A.      I don't know that I didn't mention it.  These
12   are his notes, not mine.
13          Q.      All right.  On October 26th, it doesn't
14   mention myself or my alleged conduct.
15                  Why don't you mention it then?
16          A.      I don't know that I didn't.
17          Q.      On November 5th, again, it speaks to some
18   issues of lack of support from your family and that troubled
19   you.  It didn't mention my conduct.
20                  Why don't you mention it?
21                  MS. MAURER:  Mr. Vecchia, she has
22                  told you at least on two prior occasions
23                  that these are the doctor's notes, and they
24                  are not a comprehensive recitation of
25                  everything that was said during the
```

```
 1              individual meetings, and she can't recall
 2              what was said during each of the individual
 3              meetings.
 4                      So if this is going to be your line of
 5              questioning, I think you're going to get the
 6              same answer repeatedly, and it is probably
 7              not a good use of your time.  So I'd ask you
 8              to move on to something else.
 9   BY MR. VECCHIA:
10       Q.     All right.  The same thing on November 19th,
11   December 2nd, December 17th, November 29th, January 21st,
12   February 3rd, February 18th, March 3rd, April 26th,
13   May 26th, June 19th, August 12th, and this whole period of
14   time 1998, 1999.
15              MS. MAURER:  Mr. Vecchia, I'm going
16              to tell you that these questions are all
17              compound and that they are objectionable.
18                      If you'd like to ask an individual
19              question, we can respond to it, but if you're
20              asking in a general sense why or why not
21              certain things were included in the doctor's
22              report, I think you're going to have to
23              depose the doctor to find that out.
24       Q.     Okay.  Let me ask it this way then.
25              Ms. Murphy, in your review of the reports
```

| | |
|---|---|
| 1 | from October of '98 through August of '99, do you see |
| 2 | anything there regarding your complaining about my conduct? |
| 3 | MS. MAURER: Mr. Vecchia, Ms. Murphy |
| 4 | has not had the reports until today. They |
| 5 | have not been shared with her under the |
| 6 | confidentiality agreement you entered into |
| 7 | along with at the order of Judge Kravitz, |
| 8 | and therefore she hasn't reviewed them in |
| 9 | total, and I would ask you to question her on |
| 10 | something specifically. |
| 11 | MR. VECCHIA: Could you explain that |
| 12 | to me again. |
| 13 | You're telling me that Attorney Minor |
| 14 | and myself and you had the reports, but |
| 15 | Ms. Murphy has never seen these? |
| 16 | MS. MAURER: That is exactly correct. |
| 17 | MR. VECCHIA: Why would that be? |
| 18 | MS. MAURER: Because Judge Kravitz |
| 19 | required of us that these were attorney eyes |
| 20 | only, and under those grounds, that's what I |
| 21 | did with them. |
| 22 | You got a redacted copy, Attorney |
| 23 | Minor got a redacted copy, the court got a |
| 24 | redacted copy and the original and that was |
| 25 | who it was provided to. That was the order |

```
1                of the court.
2                     If you have something specific
3                contained in these reports you'd like to
4                question her on, she is here now and can
5                answer those questions.
6                     MR. VECCHIA:  Thank you.
7    BY MR. VECCHIA:
8         Q.   Ms. Murphy, now that you know that and that's
9    what Dr. Hamilton is saying in his reports or does not say
10   in his reports, what's your opinion of that?
11        A.   I haven't read this, and I don't know that.
12   So unless I sit here and read the whole thing to read
13   whether your name is, and I don't have an opinion as to what
14   his notes are about in all honestly.
15        Q.   Did it surprise you that he didn't mention it
16   at all?
17                    MS. MAURER:  It is inappropriate and
18               I'm going to object that Ms. Murphy is asking
19               to speculate about the doctor's methodology
20               or what he includes or didn't include.
21                    If you'd like to speak with him, I'm
22               sure he'd be happy to be deposed at his usual
23               fee.
24        Q.   You think that the doctor was erroneous or
25   wrong in not stating that?
```

```
 1                    MS. MAURER:  I'm going to object
 2            again.  She has no way to testify about what
 3            the doctor's methodology is.
 4                    Again, you'll have to ask the doctor
 5            himself.
 6   BY MR. VECCHIA:
 7        Q.   Ms. Murphy, do you recall talking to the
 8   doctor about myself and stalking incidents in this time
 9   period?
10        A.   Yes.  From the beginning of 1998 to date, I
11   have talked to him, but I don't know what occasions and how
12   long a length of time, and I don't know how much it
13   required.  I don't know.
14        Q.   Okay.  Looking at the March 21st report.  You
15   had been seeing Dr. Hamilton, unless we're missing pages,
16   from August of '99 until March of '01.
17             Why was that?
18        A.   What?
19             I'm sorry can you --
20        Q.   Looking through Dr. Hamilton's report --
21        A.   Yeah.
22        Q.   -- you'll see a page for August of 1999 and
23   then the next --
24        A.   Okay.
25        Q.   -- report is dated March 21st of 2001.
```