# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------X
BARBARA E. MURPHY,               :      DN 3:03 CV 00519 (MRK)
    Plaintiff,                              :
                                                  :
    v.                                         :
THE CITY OF STAMFORD and     :
DAVID VECCHIA,                       :      May 3, 2005
    Defendants.                         :
---------------------------------------------------X

## AFFIDAVIT OF BARBARA MURPHY

Barbara Murphy, Being Duly sworn deposes and says:

1. I am the plaintiff herein. I submit this affidavit under oath in opposition to the City's Motion for summary judgment. Everything I testify to is on first hand knowledge except where I testify on information and belief, the basis of which is stated.

2. In 1996, I was promoted from a position in the Finance Dept at 888 Washington Boulevard (Government Center) to Administrative Assistant at the Fire Department Headquarters at 629 Main Street, six blocks away from Government Center.

3. After 1996, I reported to all of the Chief Officer's on the third floor.

4. Vecchia was in the Supervisors Union and I considered him to be a supervisor. He was the department head of the Purchasing Division. I was an account clerk in the Payroll division, both of which were divisions in the Finance department of the City. Both offices were located in the same area of the same floor of the Government Center which was know as the Finance department along with other divisions such as the accounts payable and accounts receivable. I considered Mr. Vecchia, Mr. Ruszkowski, Mr. Hamilton, Mr. Lucia, and Mr. Santorella, etc and all employees of the MAA Union in the Finance department to be supervisory positions of the Finance department of which I was a subordinate employee.

5. Vecchia was a division head in the department that I worked. Additionally, he was in charge of the New HTE financial system. He was also the head of the purchasing agreement committee that I was on and was supervisory in the HTE newsletter committee that I was on along with Alice Cools and Marianne Fitzgerald. What we did on the newsletter was approved by him as the newsletter was to show

employees tips on how to use the system he was in charge of and to supply user friendly information on the new system.

6. I considered Vecchia to be a supervisor and I wanted another position in the finance department that would work directly with the new financial system.

7. Vecchia asked me to lunch to go over the user manual we had worked on together, and then rather than discussing the manual with me, Vecchia told me that he thought I was attractive. I felt uncomfortable and hurried through the lunch. Afterward, Vecchia kept the manual and would not return it even after many requests unless I came to pick it up. Asst. Chief Brown ultimately went and got the manual after I explained the uncomfortable situation that occurred at lunch.

8. Chief Graner, A/C Brown, D/C Lehn and Harold Jackson, an account clerk who also worked in the Administrative Office of the Fire Department, all witnessed Vecchia's attempts to make advances.

9. I said to all of them that I did not want anything from Vecchia and would tell him to stop sending the candies, etc. The response was, by the Officers of the department, "don't tell him to stop, we will eat the candies". I told Vecchia to stop sending the candies and he

continued. Finally, after repeated requests to stop sending the candy, I told Vecchia that I was getting in trouble and to please stop at which time he did.

10. He then began to show up at the Administrative Office of the Fire Department. I asked Chief Brown if it would be okay to tell Vecchia that the Fire Department was not allowed visitors and Brown said ok. I related this to Vecchia and he stopped coming into the office.

11. Vecchia then began sending articles or items he thought I would be interested in. I would throw the items away in hope that he would stop.

12. I related Vecchia's behavior to everyone in the Administrative Office of the Fire Department, including Chiefs Brown, Graner, Lehn and Harold Jackson .

13. On the morning of March 21, 1998, I went to my car to find my briefcase as I had to do work for an attorney I was working for. It was not there and I thought that maybe I was robbed. I called Val Pankosky because she was with me the night before as we went to Boxing Cat together in separate cars. I asked if she remember me saying "that my car looked horrible because of a dented fender compared to all the nice cars

there and that at least I had a briefcase in the car so people would see that I work" (this was supposed to be funny). She remembered so at least I knew I had the briefcase when I left Boxing Cat.

14. After the Boxing Cat I went to Brennan's (Vecchia was there). When I could not find my briefcase, I called Brennan's to see if they would check the garbage bin and the parking areas to see if maybe someone might have tossed it after realizing there wasn't any money in it. The person said no. I then asked if they knew Ed's phone number because I gave him a ride the night before because I asked him if he would walk me out because Vecchia was there and he was scaring me.

15. They told me where Ed was working that day. I packed up my son and my mom and drove to where he was working to ask if he recalled something in my front seat. When I saw him I was very embarrassed because he was nice enough to walk me out and now I was troubling him at work with a crazy request. I asked if he recalled anything in my front seat and he said yes your lap top, (that is what he thought my briefcase was), he said yes and that I tossed it in the back seat so that he could sit in the front.

16. At this point I was at a loss and thought that I was robbed when it occurred to me that Vecchia was at Brennan's and I recalled my mother heard

someone in the driveway that evening but when I finally looked out the window there was no one there. At the time I explained to my mother, who was very upset and scared, that it must have been someone turning around in the driveway.

17. Now after recalling this, it finally dawned on me that it may have been Vecchia in the driveway and that he was in my car and stole my brief case. I could not believe it! Why would he want my brief case? In a panic, I drove home in disbelief and I called my friend Ben Fraser, who is an attorney as well, for advice because I was scared and was in disbelief.

18. After telling the story to Fraser, he suggested I call Vecchia and ask for the items back. I said, " I can't call him what if it is him?" What if it isn't? He said to call but I said I don't know where he lives. But I remembered that Kathy Barlow might know and called her and asked if she knew where Vecchia lived as she worked closely with Vecchia at times purchasing the system for the Tax/Assessors office. Barlow said maybe Ridgefield or Redding.

19. I called information and asked for a listing for Vecchia, and got it, I was very upset and scared but I called and the answering machine came on and I panicked and hung up. I called Fraser again crying and said "what if it

wasn't him. I could be fired for calling him and accusing him, he's a boss." Fraser told me to calm down and to call and calmly leave a message requesting my briefcase back.

20. I then called Vecchia's residence again and left a message stating would he please return my briefcase as it had important documents in it and I told him he would be able to leave it at the Fire Department before 4:30 pm. I then called Fraser and said that I had left a message. Then I waited all day in a panic and at 5:30 that evening I called the Fire Department to see if someone had brought back my briefcase. I spoke with Deputy Chief Wetmore, explained the situation and he said he would check at the watch desk and call me back. He did and said nothing and no-one came.

21. I was distraught at this time because I was concerned that I would be in trouble now that I left a message on the machine and nothing happened. I was afraid to go to work the next day (Monday). I was sitting on my couch in my house and at about 10:15pm Vecchia called and said he did what I requested and that he was sorry.

22. I said "Now leave me alone" and hung up. I could not believe this was happening, now it all began to come together, I called Ben Fraser scared out of my mind. He said call the Fire Department and see if Vecchia did in

fact leave it. I once again called the Fire Department and DC Wetmore checked and said it was at the watch desk. I asked him to hold it for me.

23. When I went to the Fire Department I got the brief case and went home. I was crying all the way home wondering what the heck was going on. Could this be happening to me? When I got home and checked the contents of the brief case it was in disarray and many items were missing. I was very frightened as was my mom and my son. I called Ben Fraser and he then called Vecchia at home and told him to bring back the rest of the stuff to the Fire Department, Ben Fraser told him to call him directly by a certain time the next day.

24. Vecchia brings a brown envelope to the Fire Department the next day and it has more of my things in it that are destroyed and some items are still missing. Ben Fraser calls him and Vecchia goes to Ben Fraser's office with more items and a letter of apology and $100 in cash and is begging Ben Fraser not to get him in trouble and he is sorry he is sick, etc.

25. Vecchia has his sister with him and another sister is on speaker phone (she is an Attorney in DC) asking if this could be resolved with out wrecking Vecchia's career and life as he is going through a hard time and how

remorseful he was. Ben Fraser sets an agreement in place with my approval. Vecchia and his attorney (sister) agree and that is supposed to be the end of it. Vecchia will get counseling and follow up with Ben Fraser and his sister the attorney will as well.

26. In September, after Vecchia had failed to comply with the agreement we had, I went to HR because Vecchia began bothering me again in work and other places. We had just signed a paper stating we read and understood the policy for Harassment and I thought, great this should be an open and shut case as did Ben Fraser.

27. However, in that meeting it appeared to be not that easy. I received a comment from Fred Manfredonia saying "well you are a good looking girl and that maybe he just wants to date?" I was insistent about the new sexual harassment policy and how my situation fell directly into this and so was Ben Fraser.

28. After Manfredonia and Stover met with Vecchia they reported to Fraser and me. Manfredonia said that Vecchia was in love with me. They said Vecchia admitted what I had told them. They were actually surprised by his admission. They said he wanted to date me and that he was stupid. They said he appeared angry with himself for being so

stupid. Mr. Manfredonia even went as far as to say, "You have that effect on men".

29. They asked me what did I want to have happen? I said I didn't care as long as he left me alone. I wished he would go away and I would never see him again. They asked would I be agreeable to the same type of arrangement that I attempted to get from Mr. Vecchia previously. I said if he doesn't stick to the agreement what happens? They said he would be terminated. I said I never wanted to hurt anyone or have anyone fired but he left me no choice and I said that if they got the agreement I would be okay with that. I thought the agreement would be enough to stop this behavior because of the embarrassment it should have caused and the fear of loss of employment.

29. They stated that they would get draft an agreement that Vecchia would sign. The agreement would include that Vecchia would get therapy, leave me alone, in and out of the workplace, provide reports of therapy and if he broke the agreement he would be fired.

30. This was to be reviewed by me and Ben Fraser and then signed by Vecchia. A copy was to go to Ben Fraser. Ben called the HR dept a few times but never got any response. I was exhausted and

depressed by the whole situation. After a while of no response by the City I stopped calling Ben Fraser and bothering him because the City was not going to get us the agreement.

31. I was told by Officer Strate that The Police went to the Human Resources department to get the file from them for the investigation. Mr. Stover and/or Manfredonia stated that they did not have any such file, that they did not consider the complaint official and that they weren't sure if they even took notes on the issue. The police came back to me and asked me if I was not telling the truth because the City said what they said to the police. I said that I officially went to the City Human Resources in 1998 after Ben Fraser spoke to the then Corporation Counsel Tom Cassone.

32. After so many times trying to get the City to give the agreement and not getting it, I was just exhausted with the lack of action and felt that it was a useless situation. I had changed everything in my way of doing things such as going out, running, taking different routes to wherever I go, sticking only with my immediate family and going out with the Fire Dept occasionally. I stopped going to the Govt Ctr completely, stopped going to meetings at the Gov't Ctr. When asked by the dept to go I told them I was to scared. Chief

Brown said it part of your job and I said I can't and he reluctantly allowed me to not go. I stopped going to lunches and only went back and forth to my house.

33. I was severely depressed at this point. I had the feeling that the City did not care if I was dead or alive and that Vecchia was more important to the City than me as he was the Purchasing Agent and very smart and I was just a Secretary, clerk, admin. Asst and easily replaced. I was also very busy taking care of my mother in addition to changing my lifestyle.

34. I do not know if the Stalking stopped for the two-year period because I had changed everything about me. I stopped going where I normally went if I went out at all. When I did go out I was in constant fear of seeing Vecchia. I stopped running outside. I avoided going to the Government Center for fear of seeing Vecchia. I did not go to any training courses held in those years following or attended any meetings that I normally would. Only when I had to did I.

35. It was discovered later on only after the Police investigation began did the City and I discover that in the 2 year SUPPOSED lapse of stalking me that Vecchia had also begun stalking his wife, children and the children's therapist.

36. I never was asked by Cassone, Stover and never especially by Manfredonia if I was ok. In fact, I stated several times to many people that I could not believe that HR never asked me if I was ok or if I needed anything. If I ran into Cassone or Stover anywhere, in passing they may have said "how are you" as in a generic greeting and this was usually if at all after work out at a restaurant. I never heard from the City again until I started the Police Investigation and even then, no one asked how I was even though they knew what was going on.

37. In October 2000, I went to the Police because I was at my wits end and I did not know what else to do. Vecchia had done things in the government center recently when I had to go there for work. These actions caused me distress and I even shared this distress with Val Pankosky and the SFRD 3rd floor when I got back to the fire dept. Then when I went out to a place that I never go to and Vecchia just happened to walk in and that there is the call on my phone later that evening and item on my lawn, I was really scared and needed someone to do something. I did not report this to the City HR because I felt they had done nothing previously and this needed to stop now.

38. As part of my interview with Officer Strate, I stated that I did not know if he was doing anything prior to the fall of 2000 but that I did think he was now.

39. After Vecchia was arrested, Manfredonia called me on March 15, 2001. As he spoke I took notes. .... "Fred then went on to say that the city is tired of paying DV (Vecchia) and having him out so the City wants to bring him back. They want me to look over an agreement that Barry Boodman is working on and to let them know if it was acceptable to me and that DV and I would sign it.

40. He also wanted me to let him (Fred) know where it is that I go now so that they could list the places in the agreement and when David signs he would be agreeing not to go there. He said Norwalk is listed as one and the Brennan's another and that in the agreement he is to go to and from work only.

41. I said you want to bring David back! I said that this is very upsetting to me and that I am having a nervous breakdown over this whole thing and that I don't want DV to come back and I will not agree and won't sign or talk to them and tell them where I go because then DV will know and he will go there. I said how stupid is that that I let my stalker know where I am going.

42. Fred said well he is innocent until proven guilty and we have to protect his rights and the City is tired of paying for a free vacation and he understands me being upset.

43. I said I understand the City's position about not wanting to pay someone for no work. I said why don't you send me home with pay, my nerves are shot. You want to bring David back send me home. I said that I am sick over this. I told him I don't know anything. This is crazy."

44. I am a member of a union with a collective bargaining agreement. I did try to file against the City with the Union however when I spoke with Gloria Kelly she said that because I retained a lawyer I could not have it. I reiterated this to Harold Jackson when I hung up the phone with her, in disbelief.

Further affiant sayeth not:

_____  5/9/05
BARBARA MURPHY

COUNTY OF FAIRFIELD   )
                      )   ss:   Stamford
STATE OF CONNECTICUT  )

On this 9th day of May, 2005, before me, the undersigned, personally appeared Barbara Murphy, personally known to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same of her own free will.

Subscribed and sworn to me this 9th day of May, 2005.

_____
Elisabeth Seieroe Maurer
Commissioner of the Superior Court
State of Connecticut