# EXHIBIT 10

```
 1                 UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF CONNECTICUT
 3
 4      * * * * * * * * * * * *
        BARBARA E. MURPHY,          *        COPY
 5
                 Plaintiff          *
 6
          VS.                       *    03-CV-519 (DJS)
 7
        THE CITY OF STAMFORD        *
 8      And DAVID VECCHIA,
                                    *
 9              Defendants
        * * * * * * * * * * * *
10
                                         Stamford, CT
11
                                         August 26, 2003
12
                                         10:00 A.M.
13
14                              - - -
                    DEPOSITION OF WILLIAM STOVER
15                              - - -
16
        APPEARANCES:
17
             FOR THE PLAINTIFF:
18
                  LAW OFFICES OF
19                ELISABETH SEIEROE MAURER, PC
                  BY:  ELISABETH SEIEROE MAURER, ESQ.
20                     871 Ethan Allen Highway
                       Ridgefield, CT  06877
21
             FOR THE DEFENDANT THE CITY OF STAMFORD:
22
                  JAMES V. MINOR, ESQ.
23                ASSISTANT CORPORATION COUNSEL
                  888 Washington Boulevard
24                Stamford, CT  06904-2152
25
```

```
 1              Deposition of WILLIAM STOVER, a Witness
    herein, taken on behalf of the Plaintiff herein,
 2  for the purpose of discovery and for use as
    evidence in this cause, pending in the United
 3  States District Court for the District of
    Connecticut, pursuant to Notice, before Terri
 4  Fidanza, LSR, a Notary Public within and for the
    State of Connecticut, at the offices of Stamford
 5  Government Center, 888 Washington Boulevard,
    Stamford, Connecticut, on August 26, 2003 at 10:00
 6  a.m., at which time counsel appeared as
    hereinbefore set forth. . .
 7

 8                 S T I P U L A T I O N S

 9         IT IS HEREBY STIPULATED AND AGREED TO
    by and among counsel for the respective parties
10  hereto that all technicalities as to the proof of
    the official character of the authority before
11  whom the deposition is to be taken are waived.

12         IT IS FURTHER STIPULATED AND AGREED TO
    by and among counsel for the respective
13  parties hereto that any objections to the
    sufficiency of the Notice are waived.
14
           IT IS FURTHER STIPULATED AND AGREED TO
15  by and among counsel for the respective parties
    hereto that all objections, except as to form, are
16  reserved to the time of trial.

17         IT IS FURTHER STIPULATED AND AGREED TO by
    and among counsel for the respective parties
18  hereto that the reading and signing of the
    deposition by the deponent are waived.
19

20

21

22

23

24

25
```

1   THEREUPON,

2       WILLIAM C. STOVER, 1043 Davisville Road,

3   South Hampton, Pennsylvania, 18966, having been

4   first duly sworn, as hereinafter certified, was

5   examined and testified as follows:

6   DIRECT EXAMINATION BY MS. MAURER:

7       Q.    Mr. Stover, as you know, my name is

8   Elisabeth Maurer. I'm the attorney for Barbara

9   Murphy in this matter. Have you ever been deposed

10  before?

11      A.    Yes.

12      Q.    What kind of matter?

13      A.    A couple lawsuits for the City and

14  some -- I believe a lawsuit in my prior

15  employment.

16      Q.    You know that the court reporter can

17  only take one of us at a time, so we have to speak

18  in turn?

19      A.    Yes.

20      Q.    You know that you have to speak audibly?

21      A.    Yes.

22      Q.    You also know if I ask a question that

23  you don't understand, you need to tell me before

24  you answer?

25      A.    Yes.

```
 1        Q.   Are you on any medication that might
 2   impact your ability to testify truthfully today?
 3        A.   No.
 4        Q.   Is there any other reason that you might
 5   not be able to testify today?
 6        A.   No.
 7        Q.   What is your current position with the
 8   City?
 9        A.   I'm the director of human resources.
10        Q.   How long have you been in that job?
11        A.   December 2000.
12        Q.   What were you before that?
13        A.   I was the assistant director of human
14   resources.  I believe I held that position -- I'm
15   assuming your next question is since when, so I
16   will answer it.  It is September of 1998.  And
17   then before that I was a labor relations
18   specialist with the City beginning in February of
19   1997.
20        Q.   Can you give me a sort of synopsis of
21   your education?
22        A.   Sure.  I graduated from the University
23   of Massachusetts at Amherst with a bachelor's in
24   business administration with a concentration in
25   human resource management.  Then I received my
```

1  master's of science in labor relations from the
2  University of Massachusetts and the bachelor's was
3  awarded in 1991 and the master's in 1993.
4      Q.   When did you first become aware of a
5  complaint regarding David Vecchia?
6      A.   When I received a telephone call in, I
7  believe it was September of 1998 from the
8  corporation counsel at the time was Tom Cassone,
9  director of legal affairs as well.
10     Q.   What did Mr. Cassone say to you and what
11 did you say to him?
12     A.   Mr. Cassone said to me he received a
13 phone call from Attorney Ben Fraser pertaining to
14 an employee working at the fire department,
15 Barbara Murphy, and that she was being harassed by
16 another employee, Mr. Vecchia, who was our
17 purchasing agent, and I came down to his office,
18 and we contacted, reached out to Barbara Murphy to
19 set up an interview to talk to her about it.
20     Q.   What other discussion did you have with
21 Mr. Cassone about the David Vecchia matter?
22     A.   At that time?
23     Q.   Yes.
24     A.   Not much other than we knew we wanted to
25 sit down with Barbara and find out exactly what

1  had transpired, so I think Tom told me to make
2  arrangements as soon as possible, which I did.
3      Q.   And when was it that you came to meet
4  with Barbara Murphy?
5      A.   I don't know the exact date, but it
6  probably would have been within a day or two, and
7  I know Barbara wanted to have Attorney Fraser
8  present, so we had to work with his schedule as
9  well. We also needed to find a time that was
10 convenient for her, and I think we met, my guess
11 is within a day or so, a couple of days.
12     Q.   So still in September of 1998?
13     A.   Yes.
14     Q.   And who was at that meeting?
15     A.   Myself, Fred Manfrendonia, who was a
16 human resource specialist in my office, Attorney
17 Fraser, and Barbara Murphy. I believe were at
18 that first meeting.
19     Q.   Was Tom Cassone there?
20     A.   I don't recall him being there at that
21 meeting, no. It's been a few years so --
22     Q.   Were minutes kept of that meeting?
23     A.   I took some notes of the meeting.
24     Q.   Do you have those notes?
25     A.   I don't have them with me right now.

1  Attorney Minor has them.
2      Q.   I'm going to ask that those notes be
3  produced.
4          MR. MINOR:  You already have the
5  notes, but I have a copy, I'm sure.
6          MS. MAURER:  A lot of times we get
7  documents.  Since we don't know what they are or
8  who did them --
9      A.   You piece them together as you go along.
10     Q.   Right.
11     A.   That looks like them.
12         MR. MINOR:  (Handing.)
13         (Whereupon, notes were marked as Stover
14 Exhibit 1 for Identification.)
15     Q.   Mr. Stover, have you seen this document
16 before?
17     A.   Yes.
18     Q.   What is that document?
19     A.   It represents my notes of the meeting
20 with Barbara Murphy on September 21, 1998 in the
21 Stamford Fire Department conference room.
22     Q.   Do you have the original of those notes?
23     A.   I don't have them.  I believe they are
24 with Attorney Minor.  I would have to look.  They
25 are somewhere.

1   Q.   They haven't been destroyed to your
2   knowledge?
3   A.   No.
4   Q.   Have you made any changes to them since
5   the meeting?
6   A.   No.
7   Q.   During that meeting, how did Barbara
8   Murphy describe the problem to you?
9   A.   She was upset. She indicated that for a
10  period of time dating back again a year or so, I
11  believe, that there had been circumstances where
12  Mr. Vecchia had made advances in bars and that
13  type of thing. I asked her to start from the very
14  beginning and walk us up through the present
15  point, which she did.
16  Q.   And she told you about an incident in
17  September of 1996 where Mr. Vecchia had approached
18  her at the fire department; is that correct? I'm
19  directing you to the bottom of the front page.
20  A.   Yes. It looks like she did, yes.
21  Q.   And she also told you that Mr. Vecchia
22  had sent candy through the interoffice mail?
23  A.   Yes.
24  Q.   And she told you that he had sent her a
25  $50 gift certificate?

```
 1      A.   Correct.
 2      Q.   In some way related to a newsletter that
 3 the two of them had been working on together?
 4      A.   Yes. I think when they first started
 5 working together, they were working on an NHT
 6 newsletter. He sent her a $50 certificate for her
 7 assistance.
 8      Q.   They also worked together on a manual
 9 that they were producing?
10      A.   I don't know if he was supervisor of
11 her, but I know they worked together on a manual.
12      Q.   He also sent her candy on more than one
13 occasion through the interoffice mail; is that
14 correct?
15      A.   Yes.
16      Q.   And he also sent her various articles
17 and literature through the interoffice mail?
18      A.   That's what she indicated to me, yes.
19      Q.   And she told you about the fact that he
20 had broken into her car in March of that year?
21      A.   Yes.
22      Q.   From your own memory, what did she tell
23 you about breaking into her car?
24      A.   She said that at the time someone broke
25 into her car. She wasn't sure who it was at
```

```
 1   first.  I think she then through piecing it
 2   together herself came to the conclusion that it
 3   was Mr. Vecchia.  I believe she contacted Attorney
 4   Ben Fraser, I think, to get advice from him.
 5   Subsequent to that I think she indicated she
 6   called Mr. Vecchia's house, his home, and I don't
 7   know if she spoke with his wife, but I think she
 8   spoke with him.  She asked that he return what he
 9   had taken from her car, which I think was a
10   briefcase and several objects, including, I think,
11   some computer disks.  At that point he agreed to
12   return those items, which he did at some point
13   soon thereafter, and when he brought it back, I
14   believe he brought the briefcase.  He had
15   destroyed some of the items that were in the
16   briefcase.  I believe he left a note and some
17   amount of cash, 50 or $100, to replace whatever he
18   destroyed.  I think he dropped that off at the
19   fire department one day.
20        Q.   Did she mention a meeting between
21   Mr. Vecchia and Attorney Fraser?
22        A.   Yes.  I think Mr. Vecchia or Attorney
23   Fraser asked that Mr. Vecchia come to his office
24   and meet with him, which he did.
25        Q.   Do you know the content of that meeting?
```

1    A.    I wasn't present, but from what I was
2 told, the content was, I believe, Mr. Vecchia's
3 sister was involved in that conversation. She's
4 an attorney, I believe, in the D.C. area, and the
5 conversation was basically Barbara wanted to be
6 left alone, and Mr. Fraser, I think, made that
7 clear to Mr. Vecchia, and that was the content of
8 the meeting to my knowledge.
9    Q.    Did she tell you that she wanted him to
10 seek counseling for this behavior?
11    A.    Yes. She had indicated -- I don't know
12 whether it was her or Attorney Fraser indicated
13 they want him to leave her alone, seek some
14 assistance in dealing with the problems he was
15 having and in return, they would not notify the
16 police or the City of Stamford as his employer of
17 what went on.
18    Q.    Did she tell you whether or not she
19 reached any sort of written agreement?
20    A.    I don't think they did reach a written
21 agreement. I could be wrong. I think there was
22 some understanding that was reached. Whether it
23 was put in writing or not, I never saw a written
24 agreement.
25    Q.    As of March of 1998, Mr. Vecchia had

1  promised to seek counseling and leave her alone?
2      A.  He promised Attorney Fraser, yes, to my
3  knowledge.
4      Q.  Did she tell you that she had stopped
5  working on the manual and the newsletter that she
6  had been working with David Vecchia on because of
7  some fear of being with him?
8      A.  Other than I'm writing my notes, I mean
9  stopped going to HT meetings, stopped doing the
10 newsletter.  If I wrote it down, I would assume
11 she told me that.
12     Q.  Did she tell you it was in relation to
13 seeing Mr. Vecchia?
14     A.  I can't recall.  I assume that's why she
15 didn't go.
16     Q.  And to your knowledge, did he resume
17 calling her?
18     A.  Calling her where?
19     Q.  At home.
20     A.  She indicated that, I think, subsequent
21 to all this leading up to when she came in when
22 Ben Fraser called that phone calls began happening
23 at her house again.  If I remember, the calls were
24 hang-ups.  She could never positively identify it
25 as Mr. Vecchia.

```
 1          Q.   She told you that her telephone I.D.
 2   said they were pay phone calls?
 3          A.   Yes.
 4          Q.   Did he also tell you that he was
 5   stalking her at Brennan's and in August, he
 6   started following her again?
 7          A.   It looks like in August, the week of the
 8   16th or the 22nd, she couldn't recall which week,
 9   she went to Brennan's with Christine.  When she
10   got there, Vecchia was not there.  They ordered a
11   cocktail, and she went to the bathroom, and came
12   back and she sat down in her seat.  She had a
13   conversation.  He sat down next to her.  He said
14   I'm sitting with you.  No, you are not.  Do you
15   want me to leave?  And she said yes and he got up
16   and left.
17          Q.   Did she tell you about Vecchia taking
18   her out to lunch and telling her she was a pretty
19   girl?
20          A.   Yes.
21          Q.   That was in relationship to a
22   work-related project on this HTE manual in the
23   newsletter they were working on together?
24          A.   Right.  He asked her out to lunch to
25   discuss the HT manual and when they were out, he
```

```
 1   said I was pretty.
 2       Q.   Meaning Barbara?
 3       A.   Barbara, I am sorry.  I'm not bad
 4   looking either.  And --
 5       Q.   And he kept the manual after the meeting
 6   was over as a guarantee so he can continue to see
 7   her?
 8       A.   That's what Barbara said Mr. Vecchia
 9   said.
10       Q.   And in September then again, on
11   September 10 that year, they ran a foot race
12   called the High Ridge Race and he ran right behind
13   her, within two feet of her until she had to leave
14   the race?
15       A.   That's what Barbara said.
16       Q.   What was your conversation with -- other
17   than her reporting her experiences, what was your
18   conversation with Attorney Fraser and Barbara
19   Murphy?
20       A.   At that meeting?
21       Q.   Yes.
22       A.   At that meeting after Barbara concluded
23   going through the incidents, what we -- obviously
24   it was concerning to us, so we wanted to find out
25   from her exactly what it was that we could do to
```

```
1    try to resolve the issue. Barbara at that time
2    told us she wanted Mr. Vecchia to leave her
3    alone. She didn't want him to have any contact
4    with her. And Attorney Fraser said that, you
5    know, to my recollection was they had tried to
6    deal with it themselves back in, I believe, a
7    couple or a year or two earlier, and obviously it
8    wasn't successful in doing that. That's why they
9    came to meet with us, and they wanted our
10   assistance in getting this to stop, so -- I'm
11   paraphrasing, but that's the best of my
12   recollection, and that Barbara's desire was that
13   he would leave her alone, and we said that we
14   obviously needed to talk with Mr. Vecchia at that
15   point and we would get back in touch with him.
16        Q.   At that time based on your notes, you
17   were aware of conduct that had taken place during
18   work hours as well as conduct that was outside of
19   work; is that correct?
20        A.   When you say conduct, I was aware he
21   worked with her on a couple projects. I believe
22   it was the HT project and something with the
23   purchasing orders and I believe --
24        Q.   You knew she was complaining about --
25        A.   Right. The meeting on the 21st was the
```

```
 1    first notification that we got from Barbara of a
 2    complaint about conduct of Mr. Vecchia that she
 3    didn't like on the job and issues that took place
 4    off the job, yes.
 5         Q.   Did you meet with Mr. Manfrendonia or
 6    anyone else after this meeting regarding the
 7    content of this meeting?
 8         A.   Fred and I probably drove over to the
 9    fire department together, so I mean did we have a
10    specific meeting about it, no.  We would have
11    talked about what transpired among ourselves, but
12    I can't remember having a conversation with
13    anybody else.  I probably reported back to Tom
14    Cassone.  He was my boss at the time.  Is my boss
15    now.
16         Q.   Sort of the bad penny of the Stamford
17    city government, comes and goes?
18         A.   No.  He's the lucky quarter.  I would
19    say that I probably had a conversation with also
20    at some point, not necessarily all the details,
21    would have been Tom Hamilton, who is
22    Mr. Vecchia's supervisor.
23         Q.   What did you say to Mr. Cassone and what
24    did he say to you in sum or substance?
25         A.   I probably summarized the meeting to Tom
```

```
 1   about what the complaint was and told Tom that our
 2   next step was that we were going to meet with
 3   Mr. Vecchia. I'm sure I went up and told
 4   Mr. Hamilton the same thing. That we had a
 5   complaint and that we were going to be meeting
 6   with one of his employees. I think within a
 7   couple days of meeting with Barbara, we scheduled
 8   a meeting with Mr. Vecchia.
 9        Q.   Did you in fact take notes during that
10   meeting?
11        A.   I believe I did, yes. I don't have them
12   with me, but I'm sure Attorney Minor has them.
13        Q.   This is my way to find out who wrote all
14   this stuff.
15             MR. MINOR: Here are notes. It is
16   more than one meeting.
17        A.   This right here is the meeting. This
18   was just a summary of when we met and things like
19   that. It is not part of meeting. I think it was
20   in the file.
21             MR. MINOR: I think that's several
22   meetings and I wasn't sure about the first page.
23             MS. MAURER: Would you mark that as
24   Stover 2, please.
25             (Whereupon, notes were marked as
```

```
 1    Stover Exhibit 2 for Identification.)
 2         Q.    I'm going to turn to page 2 of what's
 3    been marked as Stover Exhibit 2 and ask if you can
 4    identify that page.
 5         A.    Yes.  It looks like my notes from an
 6    interview with Mr. David Vecchia on 9-25-98 in the
 7    finance conference room.  Present at the meeting
 8    was Fred Manfrendonia and myself and Mr. Vecchia.
 9         Q.    Can you tell me what was the content of
10    that meeting?
11         A.    Yes.  I think Fred started off
12    explaining what had taken place as far as the
13    conversation we had with Barbara concerning her
14    claim that he was harassing her and we asked him a
15    series of questions.  The notes are not very long
16    because, as you know, Mr. Vecchia is not a man of
17    many words.  He did not offer a lot of
18    explanation, but basically we ran through the
19    incidents that Barbara went through with us.
20    Asked him questions about it.  He indicated that
21    he had, you know, had lunch with her, had sent her
22    some candy, I think.  I think he said he sent her
23    a gift certificate for her work on that HT
24    manual.  We asked him if he ever went on a date
25    with her.  He said no.  But he did have lunch with
```

19

| | |
|---|---|
| 1 | her, and he did indicate he frequented bars that |
| 2 | she went to. He said they were places he hangs |
| 3 | out at, and we asked if he was pursuing a |
| 4 | relationship. He said no. And I believe at that |
| 5 | interview he also -- we confronted him as to |
| 6 | breaking into her car and he admitted that he |
| 7 | broke into her car. I think we also had a copy of |
| 8 | a note that he had written. We showed him the |
| 9 | note and asked him if that was his handwriting, if |
| 10 | he had written that note, and he indicated he |
| 11 | had. He was obviously concerned about losing his |
| 12 | job, concerned about, I think, the embarrassment |
| 13 | of everything, but again, he didn't -- a lot of |
| 14 | yes, no answers. Not a lot of adding things on |
| 15 | his part, and at the end of the meeting, we told |
| 16 | him that obviously from our perspective that, you |
| 17 | know, we had an issue here that we needed to |
| 18 | address and that was his interaction with |
| 19 | Barbara. We wanted to obviously get his side of |
| 20 | the story, which after that meeting I think we had |
| 21 | done that. By the conclusion of it then at that |
| 22 | point, we said we were going to be meeting with |
| 23 | Barbara Murphy and her attorney again, Ben Fraser, |
| 24 | that we would get back in touch with him as to how |
| 25 | we were going to resolve the matter. |