```
 1         Q.   As the director of human resources, do
 2   you have access to Mr. Vecchia's personnel file?
 3         A.   Yes.
 4         Q.   Did you review it before you had this
 5   meeting with Mr. Vecchia?
 6         A.   Probably not.
 7         Q.   Did you know at that time Mr. Vecchia
 8   was a Vietnam War veteran?
 9         A.   I believe Fred in my office knew that.
10   I did not know that.  Before the meeting, I didn't
11   know that.
12         Q.   Did you know in what capacity he had
13   served in Vietnam?
14         A.   From what Fred told me, who was also in
15   Vietnam, I believe it was an intelligence role
16   with the Army.
17         Q.   Did you know he had received various
18   awards for his ability to work under cover?
19         A.   No.  I didn't know that.
20         Q.   Did you talk to him about his agreement
21   with Ben Fraser and Barbara Murphy?
22         A.   I can't recall, but I have to assume
23   that when we ran through the incidents, the
24   conversation with Barbara, that that would have
25   come up with him, yes, I am sure it did.  I don't
```

1    have a specific recollection of it, but my
2    process, just so you know, when I sit down with
3    him, we would have gone through the incidents and
4    part of the incidents would have included his
5    meeting with Mr. Fraser. I'm sure we covered it.
6         Q.   You are sure because that would be your
7    habit, not because you have any specific memory?
8         A.   Not because I have a specific memory
9    because I would have made sure I covered every
10   incident that Barbara had referenced.
11        Q.   You didn't write it down?
12        A.   No.
13        Q.   Do you have any other notes other than
14   this?
15        A.   Other than that meeting?
16        Q.   Of this meeting.
17        A.   No, I don't believe I do.
18        Q.   Did you discuss with Mr. Vecchia whether
19   he had complied with his agreement with Barbara
20   Murphy?
21        A.   I don't think we would have asked him
22   that because it was clear to us that we wouldn't
23   have been there had he been in compliance with
24   what they had requested.
25        Q.   Do you know whether or not he had been

1 seeking any form of counseling or psychiatric
2 treatment?
3     A.   I believe he said he was speaking,
4 whether it was EAP or someone. He had indicated
5 to us that he was talking to someone, but he would
6 not get into the specifics of what that was about.
7     Q.   In your understanding of the agreement
8 that he had made with Barbara Murphy, was he
9 supposed to report to her in some way that he had
10 been seeking treatment?
11     A.   That was what -- or I think
12 Attorney Fraser had indicated when they reached
13 the agreement, that they wanted some assurances
14 from, I think it was his sister and him that he
15 was getting treatment, but I wasn't part of the
16 agreement. I'm going on what Attorney Fraser told
17 me.
18     Q.   Did Attorney Fraser tell you whether
19 Mr. Vecchia had ever provided those assurances?
20     A.   I can't recall him saying that he did or
21 didn't.
22     Q.   Did Attorney Fraser ever tell you that
23 David Vecchia had shown him any bills or receipts
24 or anything else from any health care provider?
25     A.   I don't remember him saying that.

| | |
|---|---|
| 1 | Q. After this interview with David Vecchia, did you investigate this situation in any manner? |
| 3 | A. What do you mean investigate? |
| 4 | Q. Did you speak to anyone other than Barbara Murphy and David Vecchia regarding Barbara Murphy's complaint about David Vecchia? |
| 7 | A. I think I might have spoken with Peter Brown, who is the assistant chief of the fire department. |
| 10 | Q. What did he say to you and what did you say to him? |
| 12 | A. It was more or less talking about -- Peter is friendly with Barbara, and he had some concerns, and I think Barbara had confided in him on things, so I spoke with Pete, and Pete listed some of the things that happened that Barbara had told us earlier. |
| 18 | Q. When did that meeting take place? |
| 19 | A. I don't think it was a specifically scheduled meeting. I interact with Pete pretty regularly. I think it was one of those things we were meeting on something else and I caught him afterwards. I believe it was in my office that we had the conversation, but it wasn't a long conversation, and again, I wouldn't have done -- |


1  Q.  After this interview with David Vecchia,
2  did you investigate this situation in any manner?
3  A.  What do you mean investigate?
4  Q.  Did you speak to anyone other than
5  Barbara Murphy and David Vecchia regarding Barbara
6  Murphy's complaint about David Vecchia?
7  A.  I think I might have spoken with Peter
8  Brown, who is the assistant chief of the fire
9  department.
10 Q.  What did he say to you and what did you
11 say to him?
12 A.  It was more or less talking about --
13 Peter is friendly with Barbara, and he had some
14 concerns, and I think Barbara had confided in him
15 on things, so I spoke with Pete, and Pete listed
16 some of the things that happened that Barbara had
17 told us earlier.
18 Q.  When did that meeting take place?
19 A.  I don't think it was a specifically
20 scheduled meeting.  I interact with Pete pretty
21 regularly.  I think it was one of those things we
22 were meeting on something else and I caught him
23 afterwards.  I believe it was in my office that we
24 had the conversation, but it wasn't a long
25 conversation, and again, I wouldn't have done --

```
 1   the investigation wouldn't have been too drawn out
 2   only because Mr. Vecchia admitted to most of the
 3   things that she had complained about, so when I
 4   have someone who admits to it, there's not much
 5   need to investigate.
 6        Q.   Did Mr. Brown tell you that he and
 7   Chief Malone had put out a candy jar and told
 8   Barbara Murphy that she should not try to stop
 9   David Vecchia because they liked the candy?
10        A.   Never told me that. That's news to me.
11        Q.   Peter Brown had told you he had seen the
12   candy, didn't he?
13        A.   I can't recall him saying that, no. The
14   jar or actual candy?
15        Q.   The candy that had come through the
16   interoffice mail.
17        A.   That might have been one of the things
18   he said that Barbara said to him, that she
19   received candy, but I never heard anything about
20   the jar.
21        Q.   Did you talk to anybody else about the
22   matter at that time?
23        A.   Yes. I have to go back because I keep
24   forgetting I wasn't the director. I was the
25   assistant director. I spoke with Jim Hazelcamp.
```

```
 1    I had the same conversation with Tom Cassone
 2    summarizing where we were with the information and
 3    the complaint and trying to resolve it.  I had
 4    conversations with Ben Fraser again, but I can't
 5    recall having any specific conversations with
 6    anybody other than that.
 7         Q.    In this meeting on the 25th, did there
 8    come a time where you reached some agreement with
 9    Mr. Vecchia as to what you wanted him to do?
10         A.    I don't think it was at that meeting on
11    the 25th.  That was our initial meeting.  I think
12    after that we went back and met with Barbara
13    Murphy and Ben Fraser again.  And then I think we
14    had another follow-up meeting with Mr. Vecchia.
15         Q.    I'm going to turn your attention to the
16    third page of Stover 2 and ask you if you
17    recognize that document.
18         A.    Yes.  It looks like notes from a meeting
19    on September 30, 1998 in the fire department
20    conference room with Ben Fraser, Barbara Murphy,
21    and Fred Manfrendonia, and myself.  This would
22    have been after we met with Mr. Vecchia.
23         Q.    What did you tell Barbara Murphy you
24    were going to do?
25         A.    I think what we did, we wanted to know,
```

1  obviously keeping in mind here what she wanted out
2  of this, which is important, we spoke with
3  Attorney Fraser and her about how we would resolve
4  the matter.  Barbara throughout the process was
5  adamant that she just wanted to be left alone, but
6  she always was adamant she didn't want Mr. Vecchia
7  irreparably harmed by this.  She wanted him to
8  stay away from her.  She didn't want him to lose
9  his job.  She said this repeatedly.
10 Attorney Fraser said how can we go about getting
11 him to leave her alone.  We said we had a
12 conversation with him.  We explained he admitted
13 he broke into her car, so we at that point said
14 that our goal was to sit down with him again and
15 make it clear to him that he was to leave her
16 alone.  We felt that the best way to resolve it to
17 her satisfaction was to have that conversation
18 with him so that he wouldn't have any additional
19 contact with her.  There was issues from our
20 perspective of because we were dealing with some
21 issues that took place off duty and the difficulty
22 of regulating someone's, you know, if they are in
23 the movie theater, and this is a hypothetical, if
24 they are in a movie theater, let's say David
25 Vecchia was in a movie theater watching a movie

1  and Barbara walked in, what do we do. We wanted
2  him to avoid contact with her as much as
3  possible. That meant in the workplace, if he saw
4  her walking down the hall, we wanted him to turn
5  around and go the other way. Mr. Vecchia
6  indicated that's what he would do. We talked with
7  Ben Fraser and Barbara and how they wanted it
8  resolved. Our understanding after that meeting
9  was I think Ben wanted -- and I think Ben did most
10 of the talking, if I recall. He wanted us to make
11 sure that he left her alone. He wanted
12 Mr. Vecchia to get treatment or, you know, speak
13 with someone about the issues he was dealing with,
14 whether it be EAP or another source, and he wanted
15 that file -- I say file, the complaint to stay
16 open in the sense that if this reoccurred in the
17 future, that obviously we would pick up right
18 where we left off, and, you know, we said that we
19 wanted to resolve the matter as well. We asked
20 Barbara if she was comfortable with that
21 resolution that her lawyer put out there. She
22 said that would be okay with her. Again, always
23 stressing that she wanted to be left alone to do
24 her job. At that point we left the meeting and I
25 think we scheduled something pretty quickly

```
 1    thereafter with Mr. Vecchia to try to resolve the
 2    matter.
 3        Q.   Did you tell Barbara Murphy and Ben
 4    Fraser that you were going to draw up a written
 5    agreement with Mr. Vecchia?
 6        A.   I don't know if we said we would get a
 7    written agreement.  Obviously we would like to
 8    have gotten a written agreement.  I believe one of
 9    the things Barbara said was, you know, again
10    keeping in mind that she didn't want him
11    permanently, this is Mr. Vecchia, to be
12    permanently irreparably harmed over this issue.
13    Getting a written agreement, putting that in
14    someone's file, would be in there for at least the
15    policies of not destroying any documents.  It is a
16    document out there in the public sector that can't
17    be destroyed.  It would have been there forever.
18    Did we specifically say we were going to get a
19    written agreement.  I think we said we would try
20    to get a written agreement.  I don't have any
21    recall of specifically saying we would get one,
22    but we were going to try.
23        Q.   I notice in your notes that you have a
24    comment that says you are looking to get
25    authorization for the doctor's notes.
```

A. I think that's actually Ben Fraser said that. He wanted authorization for access to the doctor's reports and evaluations. Access to therapist evaluation. These were the three points that Ben Fraser looks like wanted.

Q. Did you agree to try and get that?

A. Yes. We basically took the three things they were looking for, which was I'm going to err on the side of caution when it comes to contact with Barbara Murphy. This is explained to David Vecchia. Access to therapist evaluation from EAP. Get authorization for access to doctor report or psychological profile. Leave file open. Fear of history repeating itself. I think that referred to the fact they had tried to resolve it on their own and it came back.

Q. What arguments did you make to assure yourself that Mr. Vecchia was getting treatment?

A. What we did was we went back and met with Mr. Vecchia and we told him basically that, number one, he's not to have any contact with her. Our position was we didn't want him to have any contact with her either inside or outside of the workplace. The difficult part is obviously controlling what happens outside the workplace

```
 1   from our perspective.  He was given a clear
 2   directive to stay away from her.  The second thing
 3   was we wanted him to seek some treatment and that
 4   we wanted to be able to verify that he was seeking
 5   the treatment.  Again, we deal with EAP a lot, so
 6   we didn't care whether it was EAP or someone, but
 7   we wanted that.  We also told him at that point
 8   that we would keep -- the matter would be kept
 9   open just to assure that he followed these
10   directives or the directive to stay away from
11   her.  We really stressed the fact if he didn't
12   stay away from her and he wanted to have contact
13   with her, that we would seek to terminate
14   employment.
15        Q.   Mr. Vecchia told you at the time that he
16   did not believe you had the authority to control
17   his out-of-work behavior, didn't he?
18        A.   I think he mentioned that type of
19   hypothetical I gave you, which is what if he's in
20   a place and she comes in.
21        Q.   So he never agreed to stay away from her
22   outside of work, correct?
23        A.   That's not true.  I mean we told him to
24   the extent that we directed him that he was to
25   stay away from her.  I don't remember him saying
```

1   he was not going to stay away from her.
2       Q.   You don't have anything in writing on
3   that point?
4       A.   Only if it is in my notes there. I
5   don't recall that.
6       Q.   You didn't have anything in writing
7   signed by David Vecchia?
8       A.   No. Other than the letter he sent
9   Barbara Murphy that I told you about earlier but
10  nothing on the resolution.
11      Q.   Are we talking about the letter he sent
12  her apologizing for breaking into her car?
13      A.   Yes. That's the only thing I have in
14  writing.
15      Q.   You have nothing in writing that gives
16  you any mechanism to verify his treatment, correct?
17      A.   No. I don't think that's true. I think
18  that you would have to ask Fred, but I believe we
19  got something from Mr. Vecchia's doctor at some
20  point during the process.
21      Q.   You also got a letter from Mr. Vecchia's
22  attorney telling you that he saw no reason to
23  provide you that information, correct?
24      A.   Which attorney was that?
25      Q.   Mr. Katz?

```
 1          A.   Yes, I believe we got a letter from
 2   Attorney Katz.
 3          Q.   When you had this opportunity on the
 4   15th of October, you didn't get anything, any
 5   waiver from Mr. Vecchia allowing you to get his
 6   doctor's notes, did you?
 7          A.   The 15th of October.  Attorney Katz
 8   wasn't involved then.
 9          Q.   I understand.  On October 15, 1998 when
10   you met with Mr. Vecchia, you did not get a
11   written waiver so that you could get a copy of his
12   doctor's notes, did you?
13          A.   No.  Not that I recall.
14          Q.   I have received a copy of Mr. Vecchia's
15   personnel file.  I see no report of this or
16   agreement indicated in his personnel file.  Can
17   you tell me what you did to keep open this
18   complaint?
19          A.   We have a file that included all the
20   notes from the incident.  That's where we kept
21   them.
22          Q.   Other than in his personnel file?
23          A.   That's what these notes were in, in an
24   investigation file.
25          Q.   To your personal knowledge, what actions
```

```
 1   were taken to verify that Mr. Vecchia was seeking
 2   psychological treatment?
 3        A.   At what point are we talking about?
 4        Q.   Between 10-15, 1998 and October of
 5   2000?
 6        A.   I don't have any knowledge. Again,
 7   Fred Manfrendonia was also involved with this
 8   so --
 9        Q.   As the director --
10        A.   I was the assistant director at the
11   time. We have two people in our office involved
12   in it. One of us could have followed up. I did
13   not follow up.
14        Q.   You don't remember seeing any piece of
15   paper showing that?
16        A.   No, I don't.
17        Q.   Would you be surprised if Fred
18   Manfrendonia told me he didn't feel he could
19   follow up because there were privacy issues?
20        A.   Would I be surprised? You would have to
21   ask Fred.
22        Q.   In 1998, did you speak to Mr. Vecchia's
23   sister?
24        A.   You know, I don't think I ever spoke
25   directly with her, no. I think Fred had contact
```

```
 1   with her.
 2        Q.   Did he tell you what the content of that
 3   contact was?
 4        A.   Yeah.  Basically said that he spoke with
 5   that Dave -- I think the sister explained things
 6   that were going on in David's personal life with
 7   his marriage and such.  I think she pleaded with
 8   Fred that we not fire him and that she would
 9   assist in whatever she could do to try to resolve
10   the matter.  I'm just paraphrasing, but that's my
11   recollection of what he said the conversation
12   included.
13        Q.   Did Fred tell you that Mary Vecchia had
14   a restraining order against her husband?
15        A.   I became aware of that at some point,
16   yes.  When it was, I don't know.
17        Q.   Did there come a time in October of 2000
18   where you became aware that Mr. Vecchia had
19   been -- that there was an officer doing an
20   investigation about Mr. Vecchia stalking Barbara
21   Murphy?
22        A.   I don't know whether it was October, but
23   I know it was in the fall of 2000.  David became
24   aware that was going on.
25        Q.   Did there come a time when you met with
```

```
 1   Officer Carl Strate?
 2        A.   Yes.
 3        Q.   Officer Strate recounts a meeting with
 4   you on 10-12-00. Would you have kept notes on
 5   that meeting?
 6        A.   Honestly I'm a horrible note taker, so a
 7   lot of times I get in meetings and I start taking
 8   notes and it ends up being the top page. It would
 9   have been in the file if I had taken notes on it.
10        Q.   Did you tell Officer Strate that --
11   about the previous conversations that we've just
12   talked about?
13        A.   Yes.  I believe I would have summarized
14   them, yes.
15        Q.   Did you tell Officer Strate that it was
16   the agreement between the City and David Vecchia
17   that he was to have no contact with Barbara
18   Murphy?
19        A.   I believe I would have told him that,
20   yes.
21        Q.   Did you report to Carl Strate that you
22   had spoken to Janet Vecchia and that she had
23   pleaded with you not to fire her brother?
24        A.   Again, I don't recall specifically
25   speaking with her. I don't know if I said that or
```

1  whether my office said it. And, again, I can't
2  recall if Fred was in that meeting with Officer
3  Strate or not. So --
4      Q. Did you provide Officer Strate any
5  documentation regarding the complaint against
6  David Vecchia?
7      A. I can't recall. He may have asked for
8  copies of our notes, which I think we would have
9  provided if he had asked for them.
10     Q. Did you tell Officer Strate that it was
11 your intention to get a written agreement with
12 David Vecchia?
13     A. I can't recall.
14     Q. Did there ever come a time where there
15 was a written agreement with David Vecchia?
16     A. No.
17     Q. Why not?
18     A. We never got a written agreement from
19 Mr. Vecchia, A, taking into account Barbara's
20 wishes on it, and B, I don't think Mr. Vecchia was
21 going to be in a position to sign an agreement.
22 He never indicated he would sign anything.
23     Q. You didn't have an agreement with him?
24     A. We had an agreement with him.
25     Q. Nothing he was willing to sign?

1  A. We didn't have a signed agreement. We
2  had an agreement he was going to stay away from
3  her.
4  Q. Did you have someone draft an agreement?
5  A. No. It would have been myself or Fred
6  that would draft it. We didn't draft an
7  agreement.
8  Q. Was there an attorney in the legal
9  department by the name of Boodman?
10  A. Barry Boodman, yes.
11  Q. Did Mr. Boodman draft an agreement with
12  Mr. Vecchia?
13  A. I believe that was an issue later.
14  There was some draft done on this after
15  Mr. Vecchia was placed on administrative leave. I
16  was not involved. That was Fred. I was aware of
17  it.
18  Q. So if we're in the fall of 1998, no
19  agreement was ever drafted, there's no draft or
20  outline or anything indicating the parameters of
21  that agreement?
22  A. Other than in my notes and the clear
23  directive that was given to Mr. Vecchia.
24  Q. Did Officer Strate inform you that
25  Barbara Murphy was alleging that David Vecchia had

1   resumed stalking her?
2       A.   I believe, yeah, that's why he was
3   meeting with us.
4       Q.   Did he tell you that Barbara Murphy was
5   asserting that Vecchia was stalking her in the
6   Government Center?
7       A.   Again, I believe he went through
8   incidents that she claimed took place, and I think
9   there was at least one that took place in the
10  Government Center.
11      Q.   Did he tell you that Barbara Murphy had
12  seen David Vecchia in the finance department in
13  early October of 2000 and that he had stared at
14  her while she was there?
15      A.   You have to forgive me. Barbara told me
16  that when we ended up meeting with her. I'm sure
17  if Officer Strate has it in his report, he told
18  me. I have no doubt.
19      Q.   Did she also tell you that a few days
20  later in the first week of November that Vecchia
21  followed her out of a conference room and paced
22  back and forth behind her at the elevators on the
23  fourth floor?
24      A.   When Officer Strate met with us
25  timeline-wise, I'm not sure whether we had met

1  with Barbara yet or soon thereafter we had met
2  with Barbara. I do know that Barbara went to the
3  police before she came to us. And when we became
4  aware, we reached out to Barbara to sit down with
5  her and I think we had a meeting with her. I
6  don't have the exact date, but we met with her and
7  Attorney Fraser. I believe at that meeting Tom
8  Cassone was there and I think Fred. That was
9  where these incidents that you are talking about,
10 she walked us through a series of incidents that
11 took place.
12        Q.   Did you take notes on that meeting as
13 well?
14        A.   I believe there are, yes.
15             MR. MINOR:   (Handing.)
16             (Whereupon, notes were marked as
17 Stover Exhibit 3 for Identification.)
18        Q.   Mr. Stover, can you identify what's been
19 previously marked as Stover 3?
20        A.   Sure. It is my notes from an interview
21 with Barbara Murphy on December 18, 2000. Present
22 were -- I have Cassone, Manfrendonia, and Stover.
23 I thought Ben Fraser was at this meeting too, but
24 I could be wrong, and obviously Barbara Murphy.
25        Q.   Just so we're clear on this, you don't