```
1   take notes verbatim from what's going on?
2       A.   No, I don't.  I do the best I can.
3       Q.   But you are putting down what's
4   important to you, correct?
5       A.   I'm putting down what the individual
6   stresses and what they say, so when you are asking
7   questions, as you know, as I watch you take notes
8   over there, it is difficult to write down every
9   single word that's said, so you do your best to
10  summarize it.
11      Q.   So during this meeting, Barbara Murphy
12  identified three additional incidents that had
13  happened with David Vecchia?
14      A.   I believe it was four.
15      Q.   Four additional incidents, at least two
16  of them were on government property?
17      A.   There was the issue at Torontos, an
18  incident on the tenth floor of the Government
19  Center and one at the fourth floor.  And the
20  fourth issue is something at her house.  Two of
21  them were at the Government Center.
22      Q.   At that time did you or anyone in the HR
23  department investigate any of these behaviors
24  other than to talk to Barbara Murphy about them?
25      A.   The incident where she said that she saw
```

1   Mr. Vecchia on the tenth floor of the Government
2   Center, I think we had asked whether or not there
3   were any witnesses and she indicated there
4   weren't. The issue as far as the meeting with
5   Lisa Reynolds on the financial system, I think we
6   checked into whether or not the meeting took place
7   and whether Mr. Vecchia was in that class. So
8   yeah. We looked into it, but again, there were no
9   witnesses to where she claims he passed by her
10  going to the cafeteria, came back and stared at
11  her. I said please don't get in the elevator.
12  The elevator arrived, I got in, he did not.
13  Passed again slowly staring at me the whole time.
14  To the extent we could talk to an individual or
15  individuals that would have witnessed it, there
16  were none.
17       Q.   Did you talk to Val Pankowsky?
18       A.   I did not, no.
19       Q.   That's who Barbara identified she was
20  going to see, right?
21       A.   I think she walked down to see her and
22  when she walked by the board of finance room,
23  which is a big conference room, that's where she
24  saw him, and she went to talk to Val, but Valerie
25  wasn't a witness to her. We took Barbara's word

```
 1   that's what she was doing.  There's no reason not
 2   to believe her.
 3       Q.   Did you talk to Mr. Vecchia?
 4       A.   As result of the complaint that Barbara
 5   made when we met with her, yes, I believe we had a
 6   meeting with Mr. Vecchia.  He was placed -- at
 7   that point I think he had been placed on
 8   administrative leave.  So we scheduled a meeting
 9   with him to discuss these incidents.
10       Q.   When was that?
11       A.   I don't know.  You probably have the
12   notes from the meeting.
13       Q.   The next set of notes I have here in
14   February, approximately two months later.
15       A.   That could be.
16            (Whereupon, a recess was taken.)
17       Q.   So let's return to the days of November
18   2000 and Mr. Vecchia is on leave.  Who decided to
19   put him on leave?
20       A.   It was myself, the director of human
21   resources and Tom Hamilton.  I will probably say
22   it was probably -- Tom Hamilton, so you understand
23   the roles here.  Tom is Mr. Vecchia's supervisor.
24   Obviously with HR, we met with Tom Hamilton, it
25   would have been our recommendation to put him on
```

```
 1   leave and Tom would have followed that.  It would
 2   have been the three of us that would have made the
 3   decision.
 4        Q.   What did you base that recommendation on?
 5        A.   At the time Mr. Vecchia had been -- he
 6   was arrested, and I think that, number one, you
 7   have to understand that we -- I think we met with
 8   Barbara after the arrest, but when we became aware
 9   that she had gone to the police department, we
10   began reaching out to her to try to get to meet
11   with her, and there was a period of time where she
12   did not want to meet with us or it was
13   inconvenient for her to meet with us.  That's why
14   it wasn't until the 18th of December, I think is
15   when we met with her, of 2000.  So at the time all
16   I had was my conversations with Carl Strate, which
17   were not directly from Barbara, and more
18   importantly, Carl Strate being a detective, he was
19   not as sharing with the information as necessarily
20   he would be because he's conducting a criminal
21   investigation, and I wouldn't expect -- usually
22   police are not as open with their information when
23   they are doing a criminal.  We put him on
24   administrative leave after he was arrested.  I
25   think he was arrested the last day of November,
```

```
 1   around there.  I think the following day he didn't
 2   arrive at work either.  He didn't make bail or he
 3   just didn't come in.  I think Friday was December
 4   1.  I was not in that day.  The director, Jim
 5   Hazelcamp, met with Tom Hamilton, Mr. Vecchia and
 6   placed him on administrative leave.  At the time
 7   we had not had an opportunity to meet with Barbara
 8   Murphy.  From a labor relations standpoint, we
 9   felt if we put him on unpaid leave, it would have
10   been disciplinary in nature, which would have
11   started the grievance process and would have been
12   disciplining him without giving him an opportunity
13   to respond to charges, and more importantly,
14   again, all I had gotten was from Carl Strate was a
15   summary of what happened and we needed to meet
16   with Barbara.
17        Q.   On 12-18, you meet with Barbara?
18        A.   I think it is the 12-18.
19        Q.   You meet with Barbara, you get a
20   rundown of what she says has happened, and you
21   have the prior agreement, which basically says
22   anything else and you get fired.  Why didn't you
23   fire him on 12-18?
24        A.   Because Barbara Murphy alleged four
25   incidents that took place.  One incident involved
```

1  her finding a bullet on her deck, which she didn't
2  say Dave Vecchia put it there. It was her belief
3  he put it there. Another incident involved him,
4  two incidents that we spoke about earlier at the
5  Government Center, and the third incident was
6  something that took place in Torontos. When she
7  got there, I guess she claims Vecchia showed up
8  after she got there and stayed. At that point I
9  hadn't had an opportunity to speak with
10 Mr. Vecchia because we found out from her on
11 12-18. I'm not in the habit of firing employees
12 without bringing them in and giving them an
13 opportunity to respond to charges, otherwise I
14 would probably not be employed by the City.
15      Q.    So as of 12-18, you have got him out on
16 leave. You have got her information about what's
17 happening, and you haven't had a chance to talk to
18 him yet?
19      A.    Correct.
20      Q.    But you are working under an agreement
21 that you believe is sort of a drop dead
22 agreement. The next occasion we get any
23 information you are out of here. Is that a fair
24 summary of the agreement you had with Mr. Vecchia?
25      A.    The agreement is if he engaged -- if he

1  did not -- if he continued to engage in the
2  conduct that had taken place in the past, which is
3  pursuing her, going to places she was at,
4  confronting her in the workplace or having contact
5  in the workplace, that we would be -- again,
6  contact in the workplace. If he walked by her in
7  the hallway, because there's only one hallway to
8  get out of here, and he turned to look at her,
9  that's not contact. There are certain things you
10 have to be reasonable about. We were trying to
11 imply a reasonable standard. Yes, he was told if
12 he engaged in that contact, he was told he would
13 be terminated. That's what we were operating
14 under.
15      Q. On 12-18, you had her testimony there
16 was two contacts in the Government Center, a
17 contact at Torontos, a hang-up call later that
18 night from a pay phone in Redding. That she
19 thought was from him?
20      A. Correct.
21      Q. So you had three contacts that by her
22 testimony violated the agreement, correct?
23      A. On her side of the story.
24      Q. That's all I'm asking. At that point
25 she had given you three contacts that as far as by

1   what you describe as the agreement and by her
2   testimony violated the agreement?
3       A.   Right.  If everything transpired exactly
4   as she had said in those three incidents, yes, I
5   would say that that would have violated our
6   agreement with Mr. Vecchia.  I'm not saying all
7   three all of them.  One of the three may have been
8   enough to terminate him.
9       Q.   You met with Mr. Vecchia in February?
10      A.   Um-hum.
11      Q.   Why did it take from the 18th of
12  December until February 7th to meet with him?
13      A.   Two weeks between Christmas and New
14  Year's.  I always take that off to be with my
15  kids.  I know I wasn't around.  We had to schedule
16  a meeting with his attorney, Mark Katz, who was
17  his criminal attorney at the time.  Mr. Vecchia
18  wanted him to be present, so I think it was just a
19  matter of getting everyone's schedule together,
20  including my own and the union.  I think the
21  union, that was the first point that the union was
22  involved.  That would be Mr. Beeble and
23  Mr. Iadarola is the other person.
24      Q.   And what did Mr. Vecchia say?
25      A.   Mr. Vecchia did not offer a lot because

```
 1    of the criminal charges pending.  I believe
 2    Mr. -- Attorney Katz did most of the speaking.
 3    What we did, we walked through the incidents that
 4    Ms. Murphy complained about when we met on the
 5    18th, and we wanted to get a response from him,
 6    but again, because there was pending criminal
 7    charges, he really -- his lawyer was advising him
 8    with the pending criminal not to answer these
 9    questions -- respond to incidents.  He may have
10    given a blanket denial or say he wasn't going to
11    answer.  I have to look at my notes to recall what
12    he said.
13         Q.   Does Stamford have a policy similar to
14    the Garrity case if you testify at a disciplinary
15    matter, it can't be used against you for a
16    contractual matter?
17         A.   I'm aware of the Garrity case.  Do we
18    have a policy on it?  It wouldn't be a policy on
19    it.
20         Q.   Garrity involves police and it's been
21    applied to fire.  I'm wondering if you do the same
22    thing for other type of unionized employees.
23         A.   Let me put it this way:  In certain
24    cases, if the union -- sometimes people come in
25    and they will answer questions even with criminal
```

```
 1   proceedings hanging over their head and not think
 2   of it. In other cases have we invoked Garrity
 3   with nonuniform service. I can't think of one
 4   offhand, but there may have been a situation where
 5   we may have invoked Garrity with an employee.
 6        Q.   So in this hearing, you could have
 7   assured Mark Katz that the information that was
 8   coming out in this hearing was not going to be
 9   utilized in his criminal matter; is that correct?
10        A.   That's what -- the question is whether
11   or not Garrity applies to other municipal
12   employees is a question I haven't seen anything
13   out that really says definitively yes or no, so
14   Mark Katz is a criminal attorney. I don't know
15   how much involvement he would have had with this
16   type of situation. We didn't in this case, so it
17   is kind of a moot point.
18        Q.   So now we're moving forward to February
19   of 2001 -- I just realized something. Is this a
20   February '02 meeting?
21        A.   This is an '02 meeting. I know we met
22   with him in '01. I know we met with him soon
23   after this. The only reason I say the terms of
24   plea. We didn't have a plea in '01.
25            (Discussion Off the Record.)
```

| | |
|---|---|
| 1 | Q. First I'm going to ask if there were any |
| 2 | notes from the meeting in January or February of |
| 3 | '01, that they be produced. |
| 4 | MR. MINOR: Okay. Let me say I'm |
| 5 | positive that whatever notes there are were sent |
| 6 | to you a long time ago. I'm not positive that I |
| 7 | have received and put in my file all of the notes |
| 8 | I sent to you, so I will double check to make sure |
| 9 | I'm not confusing the deposition by not turning up |
| 10 | those notes. I can either do that now or we can |
| 11 | go on and I will check at the break. All the |
| 12 | notes we have have been produced. I think that I |
| 13 | got a copy of all the notes I sent you, but I will |
| 14 | again double check. |
| 15 | MS. MAURER: In the event |
| 16 | additional notes appear, then we will have to |
| 17 | reopen the deposition. |
| 18 | MR. MINOR: Or I will check at the |
| 19 | break and make sure I didn't miss anything. I |
| 20 | agree if there are additional notes and we have |
| 21 | concluded the depositions, you have an absolute |
| 22 | right to reopen it and that's what I will try to |
| 23 | avoid. |
| 24 | Q. So we'll try the first meeting first. |
| 25 | You remember that there was a meeting in January |

```
 1    or February of '01.  And at that meeting was David
 2    Vecchia, his attorney, Mark Katz, yourself, Fred
 3    Manfrendonia.
 4         A.    There was union representation.  Let me
 5    say this now that I'm thinking back, it could have
 6    been Dominick Garzone who was the union president
 7    at the time.  There was a union representative
 8    there.  The only reference I referenced was
 9    Antonio and Tim.  I know they were involved in the
10    second meeting.  There was definitely union
11    representative at that meeting.
12         Q.    Is it your testimony that the sum and
13    substance of that meeting was that Mr. Vecchia
14    denied or refused to provide any testimony
15    whatsoever?
16         A.    That's my recollection, yes.
17         Q.    And at that time in January or February
18    of '01 did the City of Stamford's decisions
19    regarding Mr. Vecchia change in any way?
20         A.    Say that again.
21         Q.    Did you decide to do anything different
22    about Mr. Vecchia?
23         A.    Following that interview?
24         Q.    Yes.
25         A.    I mean after he reached a plea bargain,
```

1    we brought him in.
2        Q.    Let's hit some of the middle ground
3    first.  Did there come a time in March of 2001
4    where the City contacted Barbara Murphy about
5    having David Vecchia return to work?
6        A.    I believe so, yes.
7        Q.    And was that a result of a meeting
8    between yourself and the board of finance
9    regarding David Vecchia?
10       A.    No.
11       Q.    Did you remember attending a meeting at
12   the board of finance regarding David Vecchia in
13   February '01?
14       A.    I go every month, so yes.
15       Q.    And were they concerned about the outlay
16   of money in the salary to David Vecchia?
17       A.    Certain members were concerned, yes.
18       Q.    Did they ask you to do anything about it?
19       A.    The purpose of them asking me to come to
20   those meetings was to update where the criminal
21   process was and where we were with resolving the
22   matter so -- when we're in executive session in a
23   board of finance meeting, I'm not allowed to
24   discuss the content of executive session, am I?
25            MR. MINOR:   Off the record.

```
 1                (Discussion Off the Record.)
 2        A.    Several times over following our
 3   decision to place Mr. Vecchia on administrative
 4   leave I was before the board of finance updating
 5   him on what his court dates were and that type of
 6   thing.  Again, there were at least one member, two
 7   members that were obviously not satisfied that,
 8   you know, they wanted to know why we were
 9   continuing to pay him, and I told them that at
10   that point, we had not been able to conclude our
11   investigation because he was not answering
12   questions, and rather than err on the side of --
13   we wanted to err on the side of caution.  If that
14   meant keeping him on administrative leave pending
15   the outcome of the criminal, that's what we were
16   going to do.  The decision to continue him on
17   administrative leave or not was not guided by the
18   board of finance.
19        Q.    Did you tell them that in sum or
20   substance, that the result of the contractual
21   matter would control the outcome of whether David
22   Vecchia remained with the City?
23        A.    I don't remember specifically saying
24   that, but I think clearly from our position a
25   guilty verdict or some sort of plea bargain that
```

Case 3:03-cv-00519-SRU    Document 81-5    Filed 05/11/2005    Page 15 of 20

54

| | |
|---|---|
| 1 | indicated he violated his agreement with us would |
| 2 | have resulted in his termination, but I don't |
| 3 | remember specifically saying that, no. |
| 4 | Q.   If he had been acquitted, would the City |
| 5 | have retained him? |
| 6 | A.   Understanding that there's a difference, |
| 7 | different threshold of proof between a criminal |
| 8 | proceeding and a labor arbitration proceeding, we |
| 9 | didn't have to cross that bridge, but again, we |
| 10 | would have probably had to make a decision |
| 11 | obviously had there been an acquittal or dismissal |
| 12 | of the charges whether we were going to terminate |
| 13 | him. Since it didn't come to that, we didn't have |
| 14 | to make that decision. |
| 15 | Q.   I would assume that before the plea |
| 16 | bargain was entered, there had been a fair amount |
| 17 | of discussion on how the City was going to deal |
| 18 | with him depending on the outcome, correct? |
| 19 | A.   Yes. |
| 20 | Q.   Did you have any discussion about what |
| 21 | would happen if he was acquitted? |
| 22 | A.   Yes. |
| 23 | Q.   Who did you have that discussion with? |
| 24 | A.   I would have had that discussion with |
| 25 | Andrew McDonald, who was at that point director of |

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

1   legal affairs.
2       Q.   What did you say to him and what did he
3   say to you?
4       A.   Clearly we said once the criminal
5   process is resolved, we would be in a position we
6   would bring Mr. Vecchia in and question him as to
7   the incidents that he was not answering to and
8   based on his answers to those incidents, which
9   could have resulted in us making a decision to do
10  anything from terminate him to put him back to his
11  job.
12      Q.   If he continued to deny those incidents,
13  what would have been the response?
14      A.   Then we would have had to make a
15  credibility decision, whether or not we felt he
16  was credible in his statements to us.  Whether
17  Barbara's statements were credible.  Obviously all
18  this is subject to -- ultimately would have been
19  subject to review on the disciplinary level at the
20  State Labor Board.  Keeping in contact my
21  experiences at the labor board, speaking with
22  Andrew and his experience as an attorney, we would
23  have had to weigh all these issues on whether or
24  not we would -- if termination or what discipline
25  was appropriate.  I wouldn't have been able to do

```
 1    that unless I got an opportunity to hear what he
 2    said. He could have come in and say there were
 3    five witnesses that were there that day and all of
 4    them saw me run the other direction. If he listed
 5    the five and we talked to the five and they said
 6    yes, who knows what we would have done.
 7         Q.   When Barbara reported to you the
 8    incident at Torontos, did she tell you who was
 9    with her?
10         A.   I can't recall. I know there was --
11    again, there were -- no. I can't recall. She may
12    have told me.
13         Q.   I'm going to direct your attention to
14    what's been marked Stover's 3, the bottom of the
15    first paragraph.
16         A.   Boomer.
17         Q.   Mr. Tuccinardi is a city employee, isn't
18    he?
19         A.   I believe he is.
20         Q.   Did you talk to him?
21         A.   I did not talk to him, no. I don't know
22    if Fred talked to him. I may have had Fred. I
23    can't recall, but I did not.
24         Q.   Did you know -- so you don't know
25    whether anyone talked to him?
```

```
 1        A.    No.  I don't know.  If I had someone
 2   talk to him, I would know.
 3        Q.    So here you have a city employee who
 4   witnessed this event and nobody talked to him?
 5        A.    Again, I did not talk to him.
 6        Q.    And you have no recollection of anyone
 7   else talking to him?
 8        A.    No.
 9        Q.    In March of 2001, what occurred to bring
10   about the City's consideration of having
11   Mr. Vecchia come back to work?
12        A.    This is one aspect that I was not as
13   involved with.  I knew about it.  Again, Andrew
14   McDonald and I think Fred had a conversation, I
15   believe, but you would have to ask Fred about the
16   prospect of him returning.  And what transpired --
17   transpired between Fred and Barbara, and I don't
18   know if Ben Fraser was involved, but I was not
19   involved in that conversation directly.
20        Q.    Mr. Manfrendonia reported to you that he
21   had been tasked with trying to figure out an
22   agreement that Mr. Vecchia could return to work
23   in, did he not?
24        A.    I think him and Andrew had a
25   conversation and I think Fred was involved with
```

```
 1      Attorney Boodman on trying to come up with
 2      something, yes. I never really was party to the
 3      conversations between Attorney Boodman and Fred.
 4           Q.   I notice on some of the letters that
 5      involve Mr. McDonald he seemed very angry about
 6      how a lot of the Vecchia situation was being
 7      handled; is that right?
 8           A.   Angry?
 9           Q.   Dissatisfied.
10           A.   With who though?
11           Q.   The way the City was handling the
12      Vecchia situation.
13           A.   That's news to me. I thought Andrew was
14      not dissatisfied the way it was being handled.
15           Q.   So --
16                (Whereupon, Notes were marked as Stover
17      Exhibit 4 for Identification.)
18           Q.   I'm going to show you what's previously
19      been marked Stover 4. What do you recognize that
20      document to be?
21           A.   It appears to be notes from a meeting on
22      February 7, 2002 involving Mr. Vecchia's
23      predisciplinary hearing. Present is Mark Katz,
24      Dave Vecchia, Antonio Iadarola, who is the vice
25      president of the supervisors union. Tim Beeble is
```

1  a steward with the supervisors union, myself, and
2  Fred Manfrendonia.
3       Q.   Mr. Vecchia essentially denied any
4  violation of the agreement; is that correct?
5       A.   He responded to each incident.  I will
6  go through them.  Incident one, he claimed he
7  never had a conversation with Barbara Murphy since
8  February 1998.  He said he was at Torontos, he
9  looked at her, not staring.  He left after he
10 arrived 10 minutes or so.  He had never seen her
11 there before.  Not aware how long she was there.
12 Incident two.  Never stared at her on the tenth
13 floor.  Don't recall seeing her on the tenth floor
14 anywhere near my office.  Something about a
15 Christmas party in 1999.  Twelve days of
16 Christmas.  Incident three.  Never put a plastic
17 frog in her yard.  He admitted he gave her candy
18 in 1998.  Gift certificate in the fall of 1997.
19 He got one for Barbara and another employee that
20 works on Alice Helm's incident.  Four.  Down on
21 the fourth floor he was there present in a
22 workshop on purchasing.  Left the meeting, he saw
23 Barbara at the elevator, walked past her, did a
24 stutter step, walked past her to go get coffee.
25 She never spoke to him, he says.  He said he had