1  visions of our conversation to avoid her, so I
2  decided to get coffee, came back after she was
3  gone. The union rep said it was coincidental.
4  Only been to Barbara Murphy's one time, he said.
5  Never put a bullet on her deck. Never called her
6  house, never called and hung up. I asked him --
7  Pitney Bowes, I don't know what that means. Then
8  I think we started conversing about the plea
9  arrangement with his attorney.
10      Q.   At this time did you have available to
11 you the arrest warrant that -- the arrest warrant
12 application that Officer Strate had prepared?
13      A.   At that point? I got it at some point,
14 yes.
15      Q.   So you knew at this point that Mary
16 Vecchia had a copy of the phone records that
17 showed that David Vecchia had called Barbara's
18 house numerous times?
19      A.   I don't recall that, but it could be the
20 case.
21      Q.   And did you also get the exhibits to the
22 arrest warrant application?
23      A.   Exhibits.
24      Q.   Officer Strate attached a number of
25 documents to --

```
 1         A.   I assume so.
 2         Q.   At that point in time, you knew that
    David Vecchia had been carrying the high school
    photograph of Barbara Murphy?
 5         A.   That was -- right. My understanding,
    that was up to -- that was pre the 1998 issue that
    took place in 1998. I think his wife found the
    yearbook photo in his briefcase. My understanding
    that was pre 1998. That was leading up to the
10  1998 issue. But I do remember seeing a photo of
    her.
12         Q.   You read in the arrest warrant
    application she had provided it to Officer Strate
    in November of 2000, correct?
15         A.   Right, but I don't know when she had
    gotten that.
17         Q.   During this hearing, were there any
    decisions made about Mr. Vecchia?
19         A.   Not at that hearing, no.
20         Q.   After this hearing, did you or anyone in
    the HR department have any form of investigation
    about the information he had provided?
23         A.   To the extent he had pled guilty to the
    disorderly conduct in the sense he was staring at
    her in Torontos, we felt that was enough
```

```
 1   information to separate his employment.  As I
 2   said earlier, the plea agreement was discussed.
 3   He accepted a guilty plea for criminal mischief,
 4   which was the breaking into the car in 1998, and
 5   disorderly conduct for the incident at Torontos,
 6   so based on him staring at her at Torontos, and we
 7   took the position that we would terminate his
 8   employment because it violated the clear directive
 9   that we had given him, so when we reached that
10   conclusion, I think within a day or so I met with
11   Tom Hamilton, Andrew and we made the decision at
12   that point to separate his employment.  I
13   shouldn't say separate.  Terminate his
14   employment.
15        Q.   Did you speak to anyone else than the
16   three people you have just mentioned before making
17   that decision?
18        A.   I would assume -- I'm trying to think.
19   You are asking me if I had a conversation with
20   anyone about the decision or --
21        Q.   Prior to making the decision.
22        A.   No.  I think those are the two
23   individuals I had a conversation with prior to.
24   Obviously afterwards once the decision had been
25   made by Andrew, myself and Tom, I would have
```

```
 1   notified the mayor, I'm sure I have told him that
 2   we made a decision to terminate. I think I would
 3   have notified the chairman of the board of finance
 4   because I had just been in a meeting not too long
 5   earlier at their request, so I would have told
 6   some people subsequent to that that were involved
 7   to the degree that we had conversations about the
 8   progress of where things were going.
 9        Q.   Did you seek legal counsel in this other
10   than Mr. McDonald?
11        A.   Yes. I think I would have had a
12   conversation -- I did have a conversation with Pat
13   McHale. I don't think I spoke with anybody else
14   in this law department.
15        Q.   Did you provide Mr. McHale with any
16   documents from Mr. Vecchia's file or the files of
17   the City to make this decision?
18        A.   I don't think I provided him anything.
19   I think we had a conversation over the phone.
20   Eventually he got him after we retained him to
21   represent the City in the arbitration case before
22   the State Labor Board. Prior to that, I don't
23   think I sent him anything, no.
24        Q.   Was there any documentation provided to
25   the mayor or the board of finance regarding this
```

| | |
|---|---|
| 1 | decision? |
| 2 | A.    I can't think of anything I gave them as |
| 3 | a document.  I know we sent Mr. Vecchia a letter |
| 4 | terminating his employment.  Whether that went to |
| 5 | the board of finance or not, I don't think.  I |
| 6 | don't think we sent the letter to anybody other |
| 7 | than Mr. Vecchia. |
| 8 | Q.    Other than the payroll change of status |
| 9 | form and the termination letter, there wasn't a |
| 10 | letter to the board of finance saying this is how |
| 11 | we resolved this issue and here's why? |
| 12 | A.    No.  No disrespect to the boards, but I |
| 13 | just wouldn't send something like that to them. |
| 14 | Q.    Would you send something like that to |
| 15 | the mayor? |
| 16 | A.    The mayor does not really get involved |
| 17 | in personnel matters.  He leaves that to us to |
| 18 | resolve the issues.  We would advise him at the |
| 19 | end what transpired. |
| 20 | Q.    Even in a situation like this that's |
| 21 | been a front page situation for days and days and |
| 22 | days? |
| 23 | A.    In Stamford, everything seems to be a |
| 24 | front page story.  I wouldn't send him a copy of a |
| 25 | termination letter unless it was someone who was a |

1  direct report to him.
2      Q.   You wouldn't have authority to fire?
3      A.   Technically I don't have the authority
4  to fire anybody unless they work for me. I advise
5  and I counsel and make recommendations. My
6  recommendations are usually followed. I can't
7  think of a time when they haven't been followed.
8      Q.   Since I don't work in your office, I can
9  only piece together the paper I have. Have there
10 been any other meetings or -- regarding the David
11 Vecchia/Barbara Murphy issue that I haven't asked
12 you about?
13     A.   At all ever? Clearly once we involved
14 Pat McHale on the handling of the Board of
15 Mediation/Arbitration case, I had conversations
16 with Pat McHale.
17     Q.   I'm not particularly interested in the
18 arbitration. I mean in the actual management of
19 David Vecchia and Barbara Murphy.
20     A.   There was a CHRO complaint that was
21 filed by Barbara Murphy. There was a lawyer that
22 I dealt with in that. I can't remember his name.
23 He was outside counsel. So there would have been
24 conversations with respect to the CHRO. Again,
25 no, when it comes to personnel issues, I don't

```
 1   really have conversations with any people outside
 2   of who I indicated.
 3        Q.   Can you tell me the last time that David
 4   Vecchia received sexual harassment training?
 5        A.   I would have to look in his file. I
 6   don't know offhand.
 7        Q.   If I told you that the only thing I have
 8   seen is a 1993 certificate of training, would that
 9   be the last time he was trained?
10        A.   I don't know. I know that when we
11   redrafted our sexual harassment policy, I think
12   sometime in 1998, I think, I'm not sure whether or
13   not at that point all supervisors went back
14   through some training or not. I don't know. You
15   have a certificate, that doesn't mean that was the
16   last time.
17        Q.   So possibly in 1998?
18        A.   Possibly.
19        Q.   How do you document --
20        A.   There would be something, usually a
21   certificate, or if we did send a bunch of people,
22   there would be a notice they attended or something
23   like that. Usually there would be some
24   correspondence indicating that they had gone to
25   the training.
```

```
 1        Q.   Does the City of Stamford have a group
 2   or a unit or people who are tasked with doing
 3   sexual harassment investigations?
 4        A.   Human resources is where when a
 5   complaint comes in, we are responsible for
 6   investigating the complaints.  Specifically who in
 7   my office would do investigations.  Myself.  I did
 8   more investigations when I was the assistant
 9   director and in labor relations than I do as
10   director.  Fred Manfrendonia has done
11   investigations.  I think when Jim Hazelcamp was
12   here, he was involved in investigations.  I think
13   those people would be mostly -- would be the ones
14   since I have been here in the six years.
15        Q.   In those six years, what kind of
16   training had Fred Manfrendonia had in doing a
17   sexual harassment investigation?
18        A.   I know Fred also does a lot of our
19   coordinating or training, so I know Fred has been
20   involved with actual sexual harassment training.
21   As far as investigations go, I try to send my
22   staff to training workshops and that type of
23   thing.  Offhand I don't know.  I can't say
24   specifically he went to training workshops, but
25   Fred has many years of being an HR professional
```

```
 1   and conducting investigations so --
 2       Q.   So you don't remember anything specific?
 3       A.   On sexual harassment, no.  Or doing
 4   investigations, not specifically, no.
 5       Q.   Have you ever been trained to do a
 6   sexual harassment investigation?
 7       A.   Yes.
 8       Q.   By whom?
 9       A.   I have been to several seminars put on
10   by either law firms or been in labor employment
11   symposiums where they were put on.
12       Q.   Do you remember the names of any of them?
13       A.   I have been to Shipman and Goodwin.
14   There's the national -- the CONPELRA, which is the
15   Connecticut Public Employer Labor Relation.  They
16   put on stuff on how to conduct an investigation.
17       Q.   C-O-N-P-E-L-R-A.
18       A.   Shipman and Goodwin.  I have been to the
19   National Employment Law Institute.  NELI.  They
20   are annual.  They cover stuff on that.  So I have
21   been to, you know --
22       Q.   Different seminars at different times?
23       A.   Yes.
24       Q.   Do you have a handbook for doing a
25   sexual harassment investigation?
```

    A.    That we drafted or that we would consult. We have various resources in the department. If you went into my office right now, I would have a book on how to conduct an investigation. We have resources that we can certainly consult.

    Q.    Did you consult any of those books when you looked into Barbara's claims?

    A.    Not that I can recall. I may have. I may not have.

    Q.    Mr. Stover, we talked about a lot of different things. Is there any of the questions I asked you that you would like to modify your answers to or is there something I asked poorly now that you have had a chance to think about that you would like to answer differently?

    A.    Nothing that I can think of. I think I'm all right.

    Q.    I'm going to thank you for coming here today, and I appreciate your time, and your counsel has an opportunity to ask you whatever he cares to.

<u>CROSS-EXAMINATION BY MR. MINOR:</u>

    Q.    I do have a few questions. Mr. Stover, you have testified about the entire subject of

```
 1   this deposition before the Board of Mediation and
 2   Arbitration or the State Labor Board when it had a
 3   hearing on the grievance of Mr. Vecchia, did you
 4   not?
 5       A.   Yes.
 6       Q.   There was a transcript produced.
 7       A.   Yes, I believe there was.
 8       Q.   You also provided a sworn affidavit in
 9   response to Mr. Vecchia's complaint before the
10   administrative agency Human Rights and
11   Opportunities, and you also testified about all
12   the areas of the subject of this deposition; isn't
13   that correct?
14       A.   Was that the CHRO he filed?  I forgot
15   about that, on claiming a disability.
16       Q.   Correct.
17       A.   Yes.
18            MR. MINOR:  And I would like to
19   mark this document which is his affidavit.
20            (Whereupon, the affidavit was marked as
21   Defendants' Exhibit A for Identification.)
22       Q.   Now, do you recognize the document which
23   has been marked Defendants' Exhibit A, and it
24   consists of four pages?
25       A.   Yes.  It looks to be my affidavit for
```

```
 1   CHO Complaint 0320054.
 2        Q.   That's your signature on the back?
 3        A.   Yes, it is.
 4        Q.   And it's dated October 8, 2002?
 5        A.   Yes.
 6        Q.   And it was acknowledged by Michael Toma,
 7   T-O-M-A, Commissioner of the Superior Court?
 8        A.   Correct.
 9        Q.   And I don't want to go through it at any
10   great length, but -- by the way, is Ben Fraser
11   misspelled in paragraph 3?  I believe it is.
12        A.   In 3, 4, 5, every one.  It is S,
13   correct.  Not a Z.
14        Q.   I direct your attention to paragraph 7.
15   Could you read that for the record out loud?
16        A.   Mr. Manfrendonia and I met with
17   Ms. Murphy and her attorney on or about September
18   30, 1998.  Mr. Frazier stated that
19   Ms. Murphy wanted Mr. Vecchia to have no contact
20   with her, that he and the client wanted access to
21   the reports of Mr. Vecchia's therapists to ensure
22   that he was attending therapy, and he wanted the
23   City's file regarding this situation to remain
24   open to that appropriate action could be taken in
25   the event that Mr. Vecchia resumed his harassing
```

```
 1   behavior.  Ms. Murphy indicated she would be
 2   satisfied with this resolution.
 3        Q.    Is that consistent with what you
 4   testified to?
 5        A.    Yes.
 6        Q.    And what your recollection is?
 7        A.    Yes.
 8        Q.    Reading paragraph 8, On or about October
 9   15, 1998, Mr. Manfrendonia and I met with Mr.
10   Vecchia.  We told Mr. Vecchia to stay away from
11   Ms. Murphy and avoid all interactions and contact
12   with her.  He was told to stop pursuing her both
13   in and out of the workplace.  We suggested that he
14   contact the City's EAP.  Mr. Vecchia agreed that
15   he would avoid all interactions and contact, in
16   and out of the workplace with Ms. Murphy and cease
17   his pursuit of her.  He also agreed he would seek
18   counseling.  I told Mr. Vecchia that any future
19   inappropriate interactions and/or contact with Ms.
20   Murphy would result in the termination of his
21   employment.
22              At this time did Mr. Vecchia state he
23   had a disability or the City was discriminating
24   against him?  Is that consistent of what you
25   testified to and what your recollection is?
```

```
 1        A.    Yes, it is.
 2        Q.    Just read the next paragraph.
 3        A.    Over the next two years, I periodically
 4   asked Ms. Murphy how things were going. She did
 5   not complain about Mr. Vecchia during this time.
 6        Q.    Is that consistent with what your
 7   recollection is?
 8        A.    Yes.
 9        Q.    And during the next two years, what time
10   period would that be?
11        A.    That would have been from approximately
12   October of 1998 through when we met with her in
13   the fall, winter of 2000.
14        Q.    So other than you asking her how things
15   were and she did not complain, were any other
16   complaints through any other source from, for
17   instance, Mr. Fraser or any representative of
18   Ms. Murphy come to your attention prior to the
19   event you testified today, which was Carl Strate,
20   the detective in charge of the criminal
21   investigation?
22        A.    No.  There was no other contact from Ms.
23   Murphy or Attorney Fraser complaining about any
24   continuance of Mr. Vecchia bothering
25   Ms. Murphy after we met with him in the fall of
```

```
 1    1998 until you indicated.
 2         Q.  In paragraph 12, I think you summarize
 3    your meeting with Mr. Katz, Mr. Vecchia.  In that
 4    paragraph, could you read the sentence saying
 5    Mr. Vecchia indicated he had attended counseling
 6    sessions.
 7         A.  Mr. Vecchia indicated that he had
 8    attended counseling sessions and, therefore, we
 9    asked him to provide written confirmation from his
10    counselors of the dates that he had seen them.  Mr.
11    Vecchia and his attorney agreed to provide this
12    information.  At no time did Mr. Vecchia state or
13    his attorney state that Mr. Vecchia had an
14    disability or that the City was discriminating
15    against him.
16         Q.  It was your understanding that sometime
17    during the period of 1998 through the fall of 2000
18    Mr. Vecchia had attended counseling sessions?
19         A.  Yeah.  I believe Fred was involved in
20    looking into that.
21         Q.  And just read paragraph 13.
22         A.  Mr. Vecchia provided written
23    confirmation of his appointments with his
24    counselors.  He was then asked to provide
25    permission for City to speak with his counsellors
```

```
 1    to confirm that he had sought counseling related
 2    to his inappropriate conduct with Ms. Murphy.  Mr.
 3    Vecchia did not give the City such permission.
 4    Therefore, we did not contact Mr. Vecchia's
 5    counselors.
 6         Q.   And is that consistent with your
 7    recollection today?
 8         A.   Yes.
 9         Q.   Although I think you testified earlier
10    you didn't ask Mr. Vecchia, you believe that it
11    was Mr. Manfrendonia?
12         A.   I believe it was Mr. Manfrendonia
13    because I believe there was a letter that was sent
14    to his doctor listing dates and I believe it went
15    to Fred.  It didn't come to my attention.  I know
16    there's a letter showing he went on certain dates,
17    that being Mr. Vecchia.
18         Q.   And the rest of this deals with the
19    termination, which I think you have already
20    discussed, and his allegations that he suffered
21    from a mental disorder.  You mentioned EAP.  What
22    is EAP?
23         A.   Employee assistance program.
24         Q.   And could you just tell us if someone
25    goes to EAP, do you have the authority to find
```

1  out, A, who they saw; B, what they discussed; C,
2  what the counselor's recommendation is?
3      A.   No.  I would have to have specific
4  permission from, some sort of release from the
5  employee to allow them to discuss with me what,
6  even whether or not the employee was going to
7  counseling because of confidentiality issues.
8      Q.   What is the role of confidentiality with
9  EAP?
10     A.   EAP is a separate entity that we
11 contract with to provide counseling and other
12 services to employees.  They are separate from the
13 city.  If an employee is having problems at home
14 or alcohol problems or drug problems, they can
15 reach, contact EAP directly 24 hours a day.  The
16 counselor who takes the call will direct that
17 individual to someone who can help them in their
18 area, and then the employee would meet with that
19 counselor, that doctor, that social worker or
20 whatever and get treatment and it is all done
21 confidential.  The only reports we get back from
22 our EAP provider is the number of people that
23 utilize EAP but not necessarily who or how many
24 times or that type of thing.
25     Q.   There came a point when the State Labor

1   Board, Board of Mediation and Arbitration denied
2   the grievance of Mr. Vecchia and his union, that
3   he was not terminated for just cause?
4        A.   Correct.
5        Q.   You have reviewed that decision?
6        A.   Yes.
7        Q.   And this decision was preceded by how
8   many days of hearings?
9        A.   I think there was two hearing days,
10  although the first day we didn't do much
11  testifying. It was really one full day hearing,
12  but we were up there two times.
13               MR. MINOR:  I would like to mark
14  that.
15               (Whereupon, the Decision was marked as
16  Defendants' Exhibit B for Identification.)
17       Q.   Before I ask you questions about
18  Defendants' Exhibit B for identification, let me
19  just ask you whether you agree or disagree with
20  the following statements: Does a employee have
21  certain rights before he is terminated?
22       A.   Yes.
23       Q.   This is a public employee who has
24  tenure. Did Mr. Vecchia have tenure, so to speak?
25       A.   He was not a probationary employee.

```
 1         Q.    He had passed his probation?
 2         A.    Correct.
 3         Q.    Prior to terminating Mr. Vecchia, wasn't
 4   he entitled to have a hearing where he was allowed
 5   to present his side of the case when there's an
 6   accusation again him?
 7         A.    Yes.  Laudermill.
 8         Q.    And Laudermill refers to a Supreme Court
 9   decision saying that if you fail to give someone a
10   hearing with a right to explain themselves, then
11   you violated their rights?
12         A.    Correct.
13         Q.    During the course of the deposition you
14   discussed the fact that when Mr. Vecchia was
15   represented by Mr. Katz and he had been arrested,
16   you were not able to give him his Laudermill
17   hearing?
18         A.    Well, we met to question him and present
19   him with the charges and the accusations, but he
20   did not answer the questions so --
21         Q.    I think you testified that his attorney
22   was present?
23         A.    Correct.
24         Q.    Mr. Katz said in effect that he denied
25   all of the allegations, at least the sexual
```

1  harassment or stalking?
2     A.   Yeah.  At the ultimate predisciplinary
3  hearing, they denied that he did anything
4  inappropriate.
5     Q.   And in general, is it difficult to
6  terminate a city employee and before the Board of
7  Mediation and Arbitration when they hear a
8  grievance?
9     A.   Yeah.  Any time you go up in front of a
10 neutral party at the State Labor Board, there's a
11 chance that you walk away not prevailing on the
12 termination, but, you know, certainly you want to
13 make sure that you follow all the right steps and
14 make sure that you protect the rights of everybody
15 involved in the process so there's not a due
16 process violation, so yes, it's difficult going
17 before the State Labor Board and having
18 terminations upheld.
19    Q.   Isn't it true that there's been language
20 in decisions of the Labor Board and Board of
21 Mediation and Arbitration that termination of an
22 employee is equivalent to capital punishment?
23    A.   Yes.  That's what we're reminded of up
24 there.
25    Q.   Therefore the burden is not upon the