# EXHIBIT 11

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF CONNECTICUT

 3
      * * * * * * * * * * *
 4                                              COPY
      BARBARA E. MURPHY,         *
 5
              Plaintiff          *
 6
         VS.                     *       03-CV-519 (DJS)
 7
      THE CITY OF STAMFORD       *
 8    And DAVID VECCHIA,
                                 *
 9             Defendants
      * * * * * * * * * * *
10
                                         Stamford, CT
11
                                         November 6, 2003
12
                                         9:10 A.M.
13
                                  - - -
14
                  DEPOSITION OF PETER BROWN
15                                - - -

16    APPEARANCES:

17       FOR THE PLAINTIFF:

18          LAW OFFICES OF
            ELISABETH SEIEROE MAURER, PC
19          BY:  ELISABETH SEIEROE MAURER, ESQ.
                 871 Ethan Allen Highway
20               Ridgefield, CT  06877

21       FOR THE DEFENDANT THE CITY OF STAMFORD:

22          JAMES V. MINOR, ESQ.
            ASSISTANT CORPORATION COUNSEL
23          888 Washington Boulevard
            Stamford, CT  06904-2152
24

25
```

| | |
|---|---|
| 1 | Deposition of PETER BROWN, a Witness herein, taken on behalf of the Plaintiff herein, |
| 2 | for the purpose of discovery and for use as evidence in this cause, pending in the United |
| 3 | States District Court for the District of Connecticut, pursuant to Notice, before Terri |
| 4 | Fidanza, LSR, a Notary Public within and for the State of Connecticut, at the offices of Elisabeth |
| 5 | Seieroe Maurer, PC, 871 Ethan Allen Highway, Ridgefield, Connecticut, on November 6, 2003 at |
| 6 | 9:10 a.m., at which time counsel appeared as hereinbefore set forth. . . |
| 7 | |
| 8 | S T I P U L A T I O N S |
| 9 | IT IS HEREBY STIPULATED AND AGREED TO by and among counsel for the respective parties |
| 10 | hereto that all technicalities as to the proof of the official character of the authority before |
| 11 | whom the deposition is to be taken are waived. |
| 12 | IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective |
| 13 | parties hereto that any objections to the sufficiency of the Notice are waived. |
| 14 | |
| 15 | IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties |
| 16 | hereto that all objections, except as to form, are reserved to the time of trial. |
| 17 | IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties |
| 18 | hereto that the reading and signing of the deposition by the deponent are waived. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1   THEREUPON,
2       PETER M. BROWN, 53 Crane Road, Stamford,
3   Connecticut, 06902, having been first duly sworn,
4   as hereinafter certified, was examined and
5   testified as follows:
6   DIRECT EXAMINATION BY MS. MAURER:
7       Q.   Mr. Brown, my name is Elisabeth Maurer
8   and I'm the attorney for Barbara Murphy. Have you
9   ever been deposed before?
10      A.   Yes. I believe so, yes.
11      Q.   You may remember what the rules are but
12  let me repeat them for you.
13      A.   It's been quite awhile.
14      Q.   She can only record one of us at a time,
15  so it is really important that you let me speak,
16  then you answer. You have to answer verbally.
17  She can't take head nods.
18      A.   Yes.
19      Q.   The other point is that attorneys tend
20  to be convoluted. If there's something that I say
21  that's not clear to you, it is important that you
22  say Attorney Maurer, that's not clear and define
23  what it is that I have said poorly so I can give
24  you a better question, all right?
25      A.   Okay.

```
 1        Q.   Are you under the influence of any
 2   medication or drugs that might limit your ability
 3   to testify clearly today?
 4        A.   No.
 5        Q.   Are feeling well today?
 6        A.   I feel just fine, thank you.
 7        Q.   Could you give me a summary of what your
 8   current position is?
 9        A.   Assistant fire chief in the Stamford
10   Fire Rescue Department.  The administrative chief
11   in charge of finance, personnel and all business
12   matters.
13        Q.   The chain of command, where do you fit
14   versus Barbara Murphy?
15        A.   I would be her direct supervisor above
16   her.  She's the administrative assistant for
17   myself and the chief.  I sign her time card and
18   things like that.  I would be considered immediate
19   supervisor.  She acts as the chief's secretary, so
20   she really works for both of us.
21        Q.   Does she support any other workers in
22   the fire department?
23        A.   Sure.  She supports the whole
24   department.  We only have one support staff person
25   in our whole department.  At one time we had
```

```
 1   three.
 2       Q.   So she's extremely busy?
 3       A.   Yes.
 4       Q.   When did you first become aware of David
 5   Vecchia's interest in Barbara Murphy?
 6       A.   Time, I'm going to have a big problem
 7   with time.  I do recall him coming over to the
 8   firehouse after she had been working there for a
 9   short time and bringing some things, candy and
10   some other things to her.  And I have to be
11   honest, I couldn't tell you the time frames.
12   Probably more than three, four years ago.  Around
13   there.
14       Q.   If I told you that Barbara came to work
15   in the fire department in 1997, would that help?
16       A.   Yes, so it was obviously after that.
17   Exactly how soon thereafter, I'm not positive, but
18   it would probably be within -- I can't give you an
19   accurate answer.  I know it was within a year
20   after she came to work there.
21       Q.   So you were aware that he was bringing
22   candy to the fire department for her?
23       A.   Yes.
24       Q.   And you were aware that he did that on
25   more than one occasion?
```

```
 1       A.   Yes.
 2       Q.   And you were aware that he was doing
 3   that also through the interoffice mail?
 4       A.   I'm not positive about the interoffice
 5   mail.  I knew about him bringing the things
 6   there.  We actually had a discussion about it one
 7   time.  Not realizing the potential of the
 8   seriousness thing.  She said I want this guy to
 9   stop.  I said what, we're getting free candy here,
10   not realizing the seriousness of the situation.
11       Q.   For those of you who like candy, it was
12   a difficult opportunity to give up?
13       A.   I dealt with him quite a bit.  In
14   actuality, he had no need to come to the
15   firehouse.  Many people come there on one or two
16   occasions to see what we have to do there.  I
17   dealt with him quite regularly purchasing, but
18   mostly that was done over the phone or in the
19   Government Center.
20       Q.   You said that she came to you because
21   she was unhappy about it.  Did she come to you
22   asking for permission to say that he couldn't come
23   to the fire department anymore?
24       A.   Yes.
25       Q.   And was that early in 1998 or late 1997?
```

1  A.  I believe it was -- would be around that
2  time frame, yes.  It -- it wasn't a lot of visits
3  before she was somewhat uncomfortable about his
4  visits.
5  Q.  Do you remember him breaking into her
6  car?
7  A.  I was only told about it after the fact,
8  yes.
9  Q.  That happened in March of 1998 and he
10  admitted that, correct?
11  A.  Yes.
12  Q.  So she had come to you about the candy
13  prior to that time; is that correct?
14  A.  Correct.  Oh, yes, definitely, correct,
15  because at that point I wouldn't have made a joke
16  about the candy or anything like that had I
17  realized this was a more serious thing than she
18  had led me to believe initially.
19  Q.  Did she raise the candy issue again to
20  say that she didn't want him in the firehouse?
21  A.  Yes.  She had said to me that she wanted
22  to make it clear that she didn't want him in the
23  firehouse, and then at some point around that time
24  frame, that's when I found out about the car, and
25  she was getting very upset about it, and I called

```
 1   human resources to tell them that we have a
 2   potential problem here, that I can't have this guy
 3   in the firehouse. I can't have him relating with
 4   Barbara.
 5       Q.  You said you called him. Do you
 6   remember who you spoke to?
 7       A.  I spoke with on two different occasions,
 8   I spoke once with Bill Stover and once with Fred
 9   Manfrendonia.
10       Q.  Can you remember whether that was before
11   or after Vecchia broke into the car?
12       A.  It would have definitely been after. It
13   was when the situation was starting to turn
14   somewhat serious, and it was only -- it was really
15   because Barbara had come in very upset, getting
16   scared, and she was breaking down, and I kind of
17   had really no experience in dealing with that
18   directly, so I was looking for direction, guidance
19   and also letting them know we had a problem that
20   was basically outside the department, but it was
21   affecting my operation within the department.
22       Q.  When you said she was upset, was she
23   crying?
24       A.  Yes.
25       Q.  Was she verbal, telling she was upset
```

1   what was going on?
2   A. Yes.
3   Q. Would you describe that as being
4   hysterical?
5   A. That's hard to describe hysterical
6   because you deal with a lot of different things.
7   I would say she was very upset and scared is
8   probably the way I would describe it.
9   Q. Did she tell you that David was
10  following her to Brennan's?
11  A. Yes.
12  Q. Were you part of the group that went to
13  Brennan's?
14  A. Not really, no. I won't say hadn't been
15  there. I didn't go on Friday nights. My wife
16  didn't allow me to do that. I have to go for
17  lunch.
18  Q. You knew from her and Bob Lehn perhaps
19  that David Vecchia was showing up at Brennan's and
20  showing inappropriate attention to Barbara?
21  A. Yes, that was part of what she was
22  telling me, she was upset, and that's what I said
23  to Stover. It seems to be something outside it is
24  affecting inside Barbara in her job as
25  administrative assistant to administrative chief.

1  I deal with all the financial issues, payroll and
2  everything else and that would be what Barbara
3  would assist me in or do. Many times it would
4  require her to go to the Government Center with me
5  or for me or for herself because she was in charge
6  of the payroll too. At that point she had decided
7  she wouldn't go there as long as he was there. I
8  said that's fine. I will pick up whatever you
9  need to do. I would go for her. That was another
10 thing I was making human resources aware of.
11     Q.   At one point in time as I understood it,
12 there was a program to bring process mapping into
13 how the City of Stamford was handling its
14 purchasing and other administrative duties; is
15 that correct?
16     A.   You have to repeat that.
17     Q.   As I understand it from Barbara, late in
18 1997 and 1998 you went to a new system of how to
19 handle purchasing --
20     A.   Correct. A new system. Yeah. HTE, I
21 think is the name of the system.
22     Q.   And you didn't have time to participate
23 in that, so you gave Barbara that task to
24 participate in getting that information for the
25 fire department; is that correct?

1  A. Correct. That would be her
2  responsibility.
3  Q. And part of her responsibility in that
4  job was to prepare -- to assist in the preparation
5  of a manual for that process for the fire
6  department?
7  A. Yes. There was a committee and she
8  became part of that committee.
9  Q. That was a committee that David Vecchia
10 was active in?
11 A. Yes.
12 Q. And can you tell me about how often that
13 committee met?
14 A. I just know that they met several
15 times. My recollection, that was kind of
16 earlier. That was before that March of 1998
17 incident, but I can't remember exactly how long.
18 I don't really know. They met several times.
19 Q. As I understood it, as she was leaving
20 the Government Center and coming to you, that
21 process was just taking place at the end of 1997
22 and so she was working on it. It was almost one
23 of the first things she was doing when she started
24 to work for you; is that correct?
25 A. Right.

1  Q. And they also tried to put together a
2  newsletter for that process to give people little
3  bits of updates on how the process was going. Do
4  you remember that?
5  A. Yes. The City had a newsletter and that
6  would be part of it. That whole process was
7  probably reported in that newsletter and Barbara
8  was our representative to that newsletter group.
9  Q. And David Vecchia was part of the
10 process of getting that newsletter out, correct?
11 A. He was involved somehow. His
12 responsibility I wasn't positive about. I didn't
13 participate in the newsletter committee.
14 Q. Were you aware that she had had lunch
15 with David Vecchia about -- as part of that
16 newsletter? She testified that they went to lunch
17 as sort of a reward for her work on that
18 committee.
19 A. She had made me aware of that after the
20 fact. It was not at the time, but later on when
21 she was telling me about the problem with the
22 candy, the car, she related to me that she didn't
23 realize when it started. She did say it probably
24 started one time she went to lunch with him. She
25 told me about the lunch.

Q. What did she tell you about the lunch?

A. It was kind of like as a reward she worked hard. She made the process go better, and he invited her to lunch and she went as a worker-to-worker social type of thing. Certainly not as a personal thing. He made a comment to her about her looks or something after that. In other words, that's when she realized later, that's when this whole thing probably started and his attraction for her.

Q. Did she tell you that that lunch made her uncomfortable?

A. She did tell me that it had made her uncomfortable. She didn't realize the magnitude of her discomfort at the time. It was afterwards she realized, I guess, that was certainly the beginning of a long process.

Q. When you talked to Bill Stover, can you tell me -- Bill Stover or Fred Manfrendonia, whichever one you spoke to.

A. I believe I spoke to Bill first and he had Fred get back in touch with me later on this.

Q. Did you exchange notes or phone calls or anything between them about the concern that you had?

     A.    It was a phone call. I spoke to him on the phone.

     Q.    Did they get back to you by e-mail?

     A.    Fred called me back on the phone.

     Q.    And what did Fred tell you he was going to do, if anything?

     A.    Basically he just said that he was going to look into it and handle it. It was my concern that, first of all, I had an employee who was very upset, and second of all, I had an employee who couldn't do her job fully because she wouldn't go to the Government Center. Also I said to him that this person needs to be made sure he doesn't come near the firehouse or call there. She answered the phone for all of us. At that point there was another person in the office. There might have been two other people in the office. Many times she answered the phone, so she didn't want him calling the phone asking for me. Those were some of the things they said they would take care of.

     Q.    Do you keep any documentation of phone calls like this that you make?

     A.    No. I spend 90 percent of my time on the phone.

     Q.    Was it close to when her car was broken

1   into?
2       A.  Yes.  I believe that it was after that.
3   It was not long after that.  That that's when she
4   started to -- that's when she came back, that's
5   when she was upset all these things are coming
6   together.  She's really starting to feel very
7   scared.  Before that she had mentioned to me she
8   was uncomfortable, but it was at that point now --
9   and Barbara had this facade of being a very tough
10  person.  To see this side that was breaking down
11  and crying, that was a side I wasn't used to
12  dealing with.  That's another reason I was
13  calling, looking for help.
14      Q.  That's a big change in her?
15      A.  Yes.
16      Q.  Did you talk to Fred Manfrendonia
17  afterward about what his investigation, what he
18  had found out?
19      A.  No.  I believe I only spoke with him
20  once and that was to relate some of the few things
21  I knew and to tell him to -- reiterate to him what
22  I had talked to Bill about, that we have to make
23  sure there's some kind of barrier between these
24  people here and something needs to be done so
25  there's no interface between David and Barbara.

```
 1      Q.   So as far as you knew, they handled it
 2  and you never heard about it again?
 3      A.   They were handling it and the next time
 4  I heard about it was -- I couldn't again tell you
 5  the time frame, but then the next time I heard
 6  about I think Tom Cassone was involved.
 7      Q.   Let's go back a little bit.  I
 8  understand from Bob Lehn that it had been the
 9  practice in the firehouse that people could come
10  to the third floor unannounced and that at some
11  time somewhere in that year that practice was
12  changed and you said to the desk, that they needed
13  to announce themselves?
14      A.   Correct.  That was part of our way of
15  just dealing with it, that he wouldn't come
16  upstairs.  We wanted to know who was coming
17  upstairs.
18      Q.   As a city employee, you didn't -- as a
19  city employee, David Vecchia would not be stopped
20  from coming upstairs, correct?
21      A.   To that point, he wouldn't have been.
22  But at that point we instituted a new policy.  I
23  think we put a book down at the desk, a visitors
24  log, which we never had before.  There was a
25  sign-in book.  They would call the office and so
```

and so is downstairs and we would say send them up.

Q. If he was coming upstairs to see you on a purchasing matter, there would be no reason to turn him away, right?

A. Right. Prior to that, he wouldn't have been turned away, no. To my recollection, I don't know that he was ever turned away. I'm assuming that Fred Manfrendonia must have talked to him and told him don't go near the firehouse again because we did institute a policy to have people called in. I don't recall anybody ever calling, saying he was downstairs and that he couldn't come upstairs.

Q. You didn't get anything back in writing or a phone call from Fred Manfrendonia that he had done that?

A. No.

Q. Did Barbara talk to you about how she was trying to resolve the car break-in?

A. Yes. She had mentioned to me that I guess she had called a friend of hers who is an attorney, Ben Fraser, and he was dealing with it to some degree.

Q. Did she tell you what arrangements they

```
 1   worked out?
 2        A.   You know, most of the stuff she told me
 3   was more after the fact.  When she kind of just
 4   needed somebody to talk to since me and her work
 5   together quite a bit.  She would tell me certain
 6   things.  She did tell me, my recollection was
 7   that -- I recollect that he talked to -- I'm
 8   not -- Fraser talked directly to David or he
 9   talked to -- I think David had a sister or
10   something that was an attorney.  I know that Ben
11   talked to him and I guess he was going to agree.
12   He agreed to stop doing anything and be good and
13   go and seek help and all of this other stuff and
14   everything was supposed to get better.
15        Q.   Did you know that David Vecchia was
16   calling her at the office?
17             MR. MINOR:  Objection.  What time
18   are we talking about?
19             MS. MAURER:  We have been in mid
20   1998 for awhile.
21        A.   At that point, you know, when he would
22   visit, he was calling.  That was part when she
23   came to me, she was upset and scared.  She didn't
24   want him calling.  That was part of us saying he
25   couldn't come to the firehouse.  I also wanted him
```

```
 1   to be told not to call her. I thought I said that
 2   earlier. I made that clear to Stover and
 3   Manfrendonia that we needed to limit contact to
 4   zero between David and Barbara. That also meaning
 5   telephone calls. I know that on several
 6   occasions, Barbara had numerous hang-up phone
 7   calls and she would say I think that's him. I
 8   think that's him.
 9       Q.   Hang-up calls at the firehouse?
10       A.   Yes.
11       Q.   Did you see articles that he had sent
12   her through the interoffice mail?
13       A.   I remember the candy. I remember her
14   talking about some things, but I have no
15   recollection of -- I have recollection of her
16   telling me he sent her things. I don't have a
17   recollection of what they are. I only remember
18   one thing which she said at her house, there was a
19   frog on her yard because I thought that was kind
20   of weird. I didn't know what the frog was. I
21   remember her saying a frog was put by her house.
22   That's the only thing I remember him doing.
23       Q.   Do you remember him putting balloons on
24   her car when she had a birthday?
25       A.   Now that you mention, I have a
```