1    recollection that she mentioned something about
2    balloons on her car.
3        Q.   That was before he broke into the car?
4        A.   Yeah. We are talking a little while
5    ago.
6        Q.   I understand it is very difficult.
7    After the car break-in, were you aware that
8    David's contact with her fell off or became less
9    frequent?
10       A.   Yes. She told me and she assumed that
11   had to do with Ben. Hoped that it also had to do
12   with my call to Stover and Manfrendonia and I'm
13   not sure. I don't believe I told her right away
14   that I spoke to Stover and Manfrendonia, but
15   sometime later on I did tell her.
16       Q.   Were you aware he had started to come
17   back into Brennan's and follow her in June and
18   July and August of 1998?
19       A.   Again, I became aware of that kind of
20   way after the fact.
21       Q.   Did she tell you at the time when she
22   was coming into the office that he was following
23   her again?
24       A.   I remember at some point her mentioning
25   that, but in other words, the timing of when she

1  told me that, I don't remember.
2      Q.   Do you remember her talking about
3  walking out of Brennan's, going home and getting a
4  hang-up phone call, calling back to Brennan's and
5  having Vecchia being at the phone at Brennan's?
6      A.   I do have a recollection of her telling
7  me that. But I can't tell you the timing of when
8  she told me. My recollection of a lot of things
9  are that at some point thereafter she put these
10 things together and did tell me all at once. I
11 don't have a recollection at every day she came in
12 last night this happened. Many times it was an
13 accumulation of things. Sometime there later she
14 would tell me this, this and this happened.
15     Q.   Was it you that suggested that Ben and
16 she talk to Tom Cassone in August or September of
17 1998?
18     A.   I know that we had conversations about
19 it, and at the time Cassone was being involved,
20 whether I suggested or not, I don't want to say I
21 did or I didn't. It is possible.
22     Q.   And then as I understand the time line,
23 Mr. Cassone recommended that they go back to Ben
24 and Barbara go to the HR department and talk to
25 them; is that right?

1    A.   Yes.
2    Q.   Were you aware that they had gone to the
3 HR department at that time in September of 1998?
4    A.   I knew that some things were being
5 handled. Barbara would tell me some little
6 things. I do have a recollection of Tom Cassone
7 coming to the firehouse and speaking to her at the
8 firehouse.
9    Q.   Do you remember Bill Stover and Fred
10 Manfrendonia coming to the firehouse to talk to
11 her this September of 1998?
12    A.   I don't know the date. I know they had
13 come to speak to her too.
14    Q.   Is that the same meeting?
15    A.   I know Tom came by himself one time. I
16 say I know. I recall that Tom came by himself.
17 And I know that she had talked to Stover and to
18 Manfrendonia also. Which one was first, I
19 couldn't tell you.
20    Q.   Did Fred Manfrendonia or Bill Stover
21 come and talk to you about what was going on?
22    A.   I didn't have any real official things
23 with them except for the call telling them that
24 and basically, you know, I believe in passing they
25 just made it clear that things were being handled

1    the best they could.  I didn't have any details.
2        Q.  Let me ask you a question.  If -- how
3    long have you been with the fire department?
4        A.  A little over 30 years.
5        Q.  If you have an accusation against one of
6    your employees, something you don't see, how do
7    you go about investigating to find out whether the
8    accusation is accurate?
9            MR. MINOR:  Objection to the
10   form.  Accusation meaning what, somebody killed
11   somebody, somebody is nasty to another person?
12       Q.  Let's make it simple.  Let's say you
13   have an accusation that one of your fire fighters
14   behaved inappropriately in the way they are
15   treating the people that they command.
16       A.  Any time we have a complaint, normally
17   the first thing we would do is have the
18   complainant put the complaint in writing so we
19   know exactly what the complaint is.  We would
20   assign immediate supervisor or someplace in there
21   the job to investigate it and write a report and
22   have the person who -- the complainant make the
23   complaint in writing, and part of the
24   investigation would be to get a written statement
25   from the people involved, the person who did the

1  harm and maybe whoever else was involved, and
2  assign a captain or a deputy chief to handle the
3  investigation, then to write a report back on
4  whether it could be handled. We try to handle
5  things at the closest possible level of
6  supervision so every little thing that happens
7  isn't handled by administration. It is in the
8  group structure. Fire fighter, captain,
9  lieutenant, each one as a deputy chief or a shift
10 commander and those shift commanders report to the
11 assistant chief and the chief.
12     Q.   But it is normal practice to document
13 the investigation?
14     A.   Right. We would get the complaint in
15 writing and get the -- then have the immediate
16 supervisor handle it. If it is beyond being
17 handled in this immediate group, then the
18 documentation would be forwarded to the chief or
19 myself for administrative action.
20     Q.   So when this matter went to HR with Ben
21 Fraser and Barbara Murphy, were you expecting to
22 be contacted to give a statement?
23     A.   When I first talked to Stover, the thing
24 was different. It was that most of the things I
25 was aware of were taking place outside the

1  department. Outside of the City, outside of
2  employment. And they made that clear to me when
3  we were talking. And we are talking about things
4  that are happening after work hours. I said in
5  most cases. They were made aware of the candy,
6  but that was the start of it. Said the reason
7  that I think that something needs to be done,
8  because it is affecting the work. Our ability to
9  be able to function. It was kind of a different
10 thing. If a fire fighter gets in trouble in
11 Ridgefield and knocks your fountain over, we don't
12 have an internal investigation about that. We
13 leave that basically to --
14     Q.    Our blues in Ridgefield?
15     A.    Yes.
16     Q.    As your secretary, she was responsible
17 or had opportunity to have regular contact with
18 David Vecchia because he was doing the purchasing
19 and procurement for the fire department?
20     A.    Correct.
21     Q.    And he was coming to the fire department
22 and sending candy and so on on work time at the
23 firehouse?
24     A.    Correct.
25     Q.    And he was -- you were also aware that

```
 1    he was following her at city activities like the
 2    Alive at Five?
 3        A.   Correct. I became aware of that after
 4    the fact also. I guess he would show up at the --
 5    again, but these were all things that were after
 6    work.
 7        Q.   But the Alive at Five is a
 8    city-sponsored activity?
 9        A.   To some degree. I think it is more run
10    by the Downtown Special Services Group, which is a
11    private group.
12        Q.   And he did call at the fire department,
13    correct?
14        A.   Yes.
15        Q.   He came into the fire department to
16    return her briefcase, correct?
17        A.   I know he returned it. Exactly when and
18    how he did return it, I'm not sure.
19        Q.   Came back to the main firehouse?
20        A.   He may have just left it downstairs or
21    something. I don't believe he came upstairs. I'm
22    not positive. I may not have been there. My job
23    does get me out of the office once in awhile.
24        Q.   Since this was out of -- some of this
25    was occurring off work time, did you suggest to
```

1  Barbara she go to the police?
2  A.  I believe she had mentioned to me, in
3  other words, after she talked to Ben and it was
4  being handled, and again, I felt I had done my
5  obligation to making sure that human resource is
6  aware that -- make sure the contact between
7  Barbara and David didn't take place during work
8  hours.  Part of her job is to help me administer
9  procurement and final things that's done in
10 David's area.  I don't recall.  I know it was when
11 things started up again.  She said this guy here
12 has made the promises.  Here he's following me
13 around at Brennan's and Tarantos.  That's when I
14 recall her going to the police.
15 Q.  She went to the police in 2000?
16 A.  Yes.  I guess the thing had been handled
17 to some degree by Fraser and some city people, and
18 then he didn't listen for forever and it started
19 up again.  My recollection there was a hiatus in
20 him following her.
21 Q.  Let me go back one point.  We kind of
22 got off on the fountain.  In late 1998, no one
23 from HR came to you and took a statement from you
24 about David Vecchia or Barbara Murphy; is that
25 correct?

Case 3:03-cv-00519-SRU     Document 81-9     Filed 05/11/2005     Page 9 of 15

28

1    A.   I don't recall ever giving an official
2  statement. Again, I do recall having phone call
3  conversations with Bill and Fred. I may have had
4  more than one phone call conversation with Fred.
5    Q.   Do you remember either Bill or Fred
6  coming into the fire department and interviewing
7  other fire fighters or other fire employees?
8    A.   I remember him coming there. I remember
9  him talking to Barbara. They may have talked to
10  the chief at the time.
11    Q.   But other than that, you don't remember
12  them speaking to anyone?
13    A.   I don't have a recollection of that,
14  no.
15    Q.   In approximately October of 2000, did
16  Barbara tell you that she had gone to the police
17  about Vecchia?
18    A.   The timing was sometime around there. I
19  know it was quite a bit of time after the original
20  thing. If you tell me it is October 2000, it was
21  after she went to the police, she did tell me that
22  he's harassing her again. Now she had enough and
23  she was going to the police.
24    Q.   Did she tell you that she had seen him a
25  couple of times at Government Center and he was

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

```
 1   following her again?
 2        A.   She did tell me, yeah.  I remember her
 3   saying she did see him someplace and he would give
 4   her the stares.
 5        Q.   Did she tell you about him following her
 6   outside to the elevator of the Government Center?
 7        A.   She may have told me.  I don't recall
 8   specifically things.  All I know, she told me she
 9   decided to get the police involved because it
10   was obvious just having people talk to him wasn't
11   working.  He was making promises that he wasn't
12   keeping.
13        Q.   Around that time you told me you
14   remember her talking about the frog.  Did she also
15   tell you about the bullet on her back porch?
16        A.   Yes.
17        Q.   Did somebody come to HR and take your
18   statement then?
19        A.   No.
20        Q.   Can you tell what Barbara's demeanor was
21   late in 2000 after she had gone to the police?
22   Was she upset?
23        A.   Again, she was upset back in 1998 when
24   this was happening.  Then she went to the police.
25   Then she was very upset again.  And then I believe
```

```
 1   it was affecting her work to some degree.
 2        Q.   Did you know she was seeing a doctor?
 3        A.   She had mentioned to me that she was
 4   going to see somebody.
 5        Q.   Did she tell you that she was seeking
 6   counseling?
 7        A.   Yes.
 8        Q.   Did you see a change in her ability to
 9   do her job from -- in the 1998 period?  Let's
10   start with that one.
11        A.   Yes.  I do believe that I did see it.
12   When I first met her, who knows what issues people
13   have.  I would say she had no issues that I was
14   aware of.  Her work -- she has a very energetic
15   work ethic, and it would be -- she would come to
16   work, she would turn or burn and work pretty hard
17   all day.  After these incidents, there were many
18   times she was upset and it would affect her
19   ability to be able to function.  Sometimes she
20   would come into my office and cry.  She would have
21   to get away from her desk.  It certainly did
22   affect her.
23        Q.   Her being unwilling to go to the
24   Government Center?
25        A.   That bothered her a lot.  To do her job
```

1  properly. She would like to go there. We went
2  for preliminary budget matters. She would help me
3  prepare the budget. She would normally want to be
4  a part of those meetings so she was there to
5  oversee exactly what was going on and she would
6  not go to any of those. So, yes, I think that
7  bothered her quite a bit.
8      Q.  When it started up again in 2000, did it
9  affect her ability to do her job then too?
10     A.  I think it did to some degree, yes.
11     Q.  Do you know whether or not she changed
12 the way she dealt with her personal life because
13 of what was happening with Vecchia?
14     A.  No. I wouldn't know that.
15     Q.  Did you talk to Officer Strate about
16 David Vecchia?
17     A.  I don't recall talking to him.
18     Q.  Other than Fred Manfrendonia and to a
19 lesser extent Bill Stover, who else have you
20 talked to about the Barbara Murphy situation? I'm
21 not talking about casual conversation, but in the
22 sense of trying to get some relief that you have
23 appeared to do in 1998 for her.
24     A.  I believe that would be the extent of
25 it. I know myself and the chief at that time had

```
 1   some conversation about it, and there were two
 2   different chiefs.  March of 1998 was Ron Graner
 3   and after that was Tony Malone.  I normally meet
 4   with the chief.  I'm his assistant.  We would have
 5   three or four meetings a week on any little thing
 6   that happened in the department, so anything I
 7   would normally brief him to some degree, whatever
 8   little I know.
 9       Q.   Chief Graner was aware of what was going
10   on with David Vecchia and Barbara Murphy?
11       A.   Yes.
12       Q.   And Chief Malone was also?
13       A.   Yes.
14       Q.   And Chief McGrath?
15       A.   Yes.  But he was much later on.  Three
16   years I think he's been chief, so it would have
17   been sometime in 2000 he came in.
18            MS. MAURER:  Chief, I think I have
19   asked you everything I want to.
20            MR. MINOR:  No questions.
21            (Whereupon, the deposition was concluded
22   at 10:00 a.m.)
23            (Whereupon, all exhibits were retained
24   by counsel.)
25
```

```
 1                    C E R T I F I C A T E

 2      STATE OF CONNECTICUT

 3      JUDICIAL DISTRICT OF WATERBURY

 4
              I, TERRI FIDANZA, Notary Public within and
 5      for the State of Connecticut, duly Commissioned
        and qualified, do hereby certify that pursuant to
 6      Notice, PETER BROWN, the deponent herein, was by
        me first duly sworn to tell the truth, the whole
 7      truth and nothing but the truth of his knowledge
        touching and concerning the matters in controversy
 8      in this case; that he was thereupon carefully
        examined upon his oath and his testimony reduced
 9      to writing by me; and that the deposition is a
        true record of the testimony given by the witness.
10
              I further certify that I am neither attorney
11      or counsel for, nor related to or employed by, any
        of the parties to the action in which this
12      deposition is taken, and further that I am not a
        relative or employee of any attorney or counsel
13      employed by the parties thereto or financially
        interested in the action.
14
              IN WITNESS WHEREOF, I have hereunto set my
15      hand and affixed my notarial seal this 18th day of
        ___NOV___, 2003 at Prospect, Connecticut.
16
                           _____
17                         Terri Fidanza, LSR
                           Notary Public
18                         State of Connecticut

19
        My Commission Expires:
20      October 31, 2008

21

22

23

24

25
```

INDEX

PETER BROWN                              Page

Direct Examination by Ms. Maurer           3