```
 1    which is fine.  The whole articles were just upsetting,

 2    Jim.  It wasn't because of any content necessarily.  They

 3    were just all upsetting.

 4         Q.    All right.  I gotcha.

 5               Let's go -- skip two pages to the one headed

 6    2/25/2002.  And tell me when you're there.

 7                    MS. MAURER:  Yes, we're there.

 8         Q.    In about the third or fourth sentence, it

 9    says, "Things have gotten further mixed up since the trial

10    was completed.  The deadline to file with the Human Rights

11    Commission is up and also there are questions about her

12    pursuing the suit with the City."

13               And here's my question.  You were confused or

14    you were upset that your lawyer informed you that he

15    missed filing with the Human Rights Commission.

16               Do you remember anything about a lawyer

17    telling you that he missed the date to file with the Human

18    Rights Commission?

19                    MS. MAURER:  I'm going to object.

20                    That's attorney-client privilege, and I'm

21                    going to direct her not to answer.

22         Q.    All right.  Let me ask it this way.

23               Did there come a time when you stopped using

24    Lew Chimes as your attorney?

25         A.    Yes.
```

```
 1              Q.      And do you know what deadline was missed?

 2              A.      Not specifically, no.

 3                      Did you hear my answer?

 4              Q.      Yes, I heard.

 5                      All right.  And then go down to the next

 6      paragraph beginning the whole idea about filing a civil

 7      suit is uncomfortable, you feel that Mr. Vecchia has already

 8      lost his family, his job, he's living with his mother

 9      apparently in Bethel, you're afraid that he may continue to

10      stalk you and perhaps even hurt you, and the idea of suing

11      him seems like that might aggravate a somewhat unstable

12      situation.

13                      Do you remember feeling that?

14              A.      Yes, I wasn't sure if I should file a suit

15      against David Vecchia.

16              Q.      All right.  Now, you would agree that you did

17      file a Commission on Human Rights and Opportunities

18      complaint against the city, which I believe is marked as

19      Exhibit C in this deposition.  And if I could ask you to

20      just take a quick look at Exhibit C.

21                              MS. MAURER:    It's this one.

22              Q.      Okay.

23                              MS. MAURER:    Do you want us to review

24                      the exhibit?

25              Q.      Well, just take a quick look at the Human
```

```
 1   Rights complaint because my next question is:  Did you

 2   prepare this on your own; did you prepare it with the

 3   assistance of an attorney, and if so, which attorney?

 4        A.     This -- I prepared part of it and then Lew

 5   Chimes.

 6        Q.     All right.  So Lew Chimes prepared it.

 7               And do you remember --

 8                    MS. MAURER:   I'm sorry, that's

 9               misstating what she just said.

10        Q.     I'm sorry.  Then maybe I didn't hear you

11   correctly.

12               What did you respond?

13        A.     I prepared it along with and then Lew Chimes

14   also helped.

15        Q.     All right.  Well, that's my question.

16               So you did some and Lew Chimes was your

17   attorney who also helped you?

18        A.     Yes.

19        Q.     And do you remember receiving a decision from

20   the CHRO, which is marked Exhibit H, and if you can take a

21   look at that, tell me when you're ready.

22               And also take a look at Exhibit I, please,

23   and tell me when you're ready.

24                    MS. MAURER:   She has those in front

25               of her.
```

```
 1                        Do you want her to read them?

 2          Q.    No, I just want to -- Exhibit I, which is the

 3     letter from CHRO dated March 3, 2002, it says underlined,

 4     "The Complainant must bring an action in Superior Court

 5     within ninety days of receipt of this release."

 6                    Do you remember reading that when you

 7     received the letter?

 8          A.    No.

 9          Q.    All right.  Do you remember getting this

10     letter at all?

11          A.    I think so.

12          Q.    All right.  In that letter the sentence I

13     just read you is the deadline that you have ninety days and

14     it also mentions two years.

15                    Is that the deadline that you were referring

16     to?

17          A.    It might have been.

18                    MS. MAURER:   I'm going to direct

19                    Ms. Murphy, again, please not to speculate.

20                    THE WITNESS:   Oh.

21                    MS. MAURER:   To give only information

22                    that she's sure of.

23          A.    I don't know.

24          Q.    All right.  In any event, you don't remember

25     worrying about the fact that this letter said you had three
```

```
 1    months from March 3, 2002 to sue on your complaint?

 2          A.    I was reading, and I didn't hear what you

 3    were asking.

 4          Q.    Okay.  I think I asked you earlier do you

 5    remember receiving a letter.  You said yes, but an earlier

 6    question I asked was do you remember that sentence about

 7    having three months to sue after March 2002, and I wasn't

 8    sure of your response.

 9          A.    I do not recall.

10          Q.    Okay.  Would you agree with me that you

11    didn't sue within three months of March 2002?

12          A.    I don't know.

13          Q.    Did you ever make a conscious decision based

14    upon advice of your attorney or advice of friends or anyone

15    else to not sue the city for the allegations that were

16    contained in your CHRO complaint?

17          A.    I never made a decision not to sue the city.

18          Q.    All right.  So your intention was always to

19    sue the city?

20          A.    Yes.

21          Q.    But you didn't use Attorney Chimes, you used

22    Attorney Maurer.

23                Sorry about that.  It's the loudspeaker

24    announcement.

25                Is there any reason why you -- well, why
```

```
 1    didn't you sue within three months of March 2002; do you
 2    know that?
 3            A.    I do not know.
 4            Q.    Okay.  Do you remember looking for an
 5    attorney until you found Attorney Maurer to represent you?
 6                        MS. MAURER:   Would you repeat the
 7                    question?
 8                        MR. MINOR:   Yes.
 9            Q.    Did you try to find -- eventually after you
10    no longer used Attorney Chimes, you eventually retained
11    Attorney Maurer; that's correct, isn't it?
12            A.    After I no longer had Attorney Chimes, I then
13    got Attorney Maurer?
14                        MS. MAURER:   We're asking you was
15                    that the question.
16                        MR. MINOR:   Okay.  I didn't hear you.
17                    I'm sorry.   There's a loudspeaker going
18                    on.
19                        All right.  Let me withdraw the
20                    question.
21            Q.    Would you agree with me that Exhibit A, which
22    is the federal lawsuit, is dated March 20, 2003, a year
23    after the Release of Jurisdiction letter, Exhibit I, which
24    is March 30, 2002?
25            A.    Yes.
```

```
 1              Q.    All right.  Why was there a delay between the
 2        March 2002 letter from CHRO and your federal lawsuit; if you
 3        know?
 4              A.    Attorney Chimes decided he didn't want to
 5        represent me any more, and then I had to find another
 6        attorney.
 7              Q.    Okay.  And it just took you a period of time
 8        to find Attorney Maurer; is that it?
 9              A.    Yes.
10              Q.    All right.  By the way, did you pay anything
11        out of your pocket for Attorney Chimes, and if so, do you
12        remember how much?
13              A.    I don't remember how much, but yes, I did.
14              Q.    Was it over five hundred, under five hundred
15        dollars?
16              A.    Over.
17              Q.    And do you know if you paid anything out of
18        your pocket to Vickie DeToledo?
19              A.    I did not.
20              Q.    All right.  If you could go to page
21        thirty-seven, the note headed 10/17/2002, and tell me when
22        you're there.
23              A.    Okay.
24                         MR. VECCHIA:    This is on the
25                         original suit?
```

GOLDFARB & AJELLO 203-972-8320

```
 1                           MR. MINOR:    No, this is the doctor's
 2              notes.
 3                           MR. VECCHIA:    All right.
 4    BY MR. MINOR:
 5         Q.     In this note it mentions that you were
 6    feeling better, you were joking and laughing, that you were
 7    planning to sue the city and you feel more in control if
 8    you're suing then if you were being sued against.
 9                     Do you read that note?
10         A.     I read what it says here, yes.
11         Q.     All right.  Well, first of all, do you
12    remember being relieved after you participated in the
13    arbitration of Mr. Vecchia's grievance and that was over and
14    done with?
15         A.     Do I remember -- what was the question?
16         Q.     All right.  Let me rephrase it.
17         A.     Just ask the question.
18         Q.     Do you remember that prior to October of 2002
19    you had to go to the town of Wethersfield for a hearing
20    before the Board of Mediation and Arbitration on
21    Mr. Vecchia's grievance?
22         A.     Yes.
23         Q.     And that was upsetting to you?
24         A.     Yes, it was.
25         Q.     And I believe you had to go twice or once?
```

```
1              A.     I went twice.

2              Q.     And after you gave testimony, was that the

3    last time you saw Mr. Vecchia in person until your

4    deposition a couple months ago?

5              A.     2002, until my deposition?

6                     Probably.  I don't know.

7              Q.     All right.  And it also mentions that you

8    continue with your massage class.

9              A.     What page was that again?

10             Q.     That's the same page, 10/17/2002.

11             A.     I'm sorry.  I flipped pages.

12             Q.     All right.  It's not important because I'm

13   not going to ask you about the page.

14                    Just tell us this, what is the massage class

15   that is referenced?

16             A.     I started school for massage therapy, which

17   is a two year program.

18             Q.     And you finished that massage program?

19             A.     Yes.

20             Q.     And you now have a license as a massage

21   therapist?

22             A.     Correct.

23             Q.     And when did you start, and when did you

24   finish?

25             A.     Well, I finished August '03.  So two years
```

1    before that-ish.

2         Q.    All right.  And by the way, you continue to

3    work for the city, and this license that you have is not an

4    alternative to working for the city, it's just something

5    that you do in addition to working for the city; is that

6    correct?

7         A.    It's just a license I have.  I haven't done

8    anything with it yet.  I haven't started -- I don't do it

9    for money.

10        Q.    You haven't started to work or make money?

11        A.    Exactly.

12        Q.    And by the way, could you tell us roughly how

13   much the two year course cost?

14        A.    Ten thousand dollars-ish.

15        Q.    And this was obviously something you paid for

16   out of your pocket?

17        A.    Correct.

18              Actually I have loans I'm still paying for.

19   They're school loans.

20        Q.    It wasn't paid for by the city --

21        A.    No.

22        Q.    -- as some type of reimbursement programs --

23        A.    No.

24        Q.    -- or the way firefighters get reimbursed or

25   police officers get reimbursed?

```
 1            A.    Or the way any employee from the city gets
 2     reimbursed.  I didn't ask for anything.  I don't think we're
 3     allowed that anyway.
 4            Q.    All right.  What do you remember about the
 5     various medications that the doctor prescribed?
 6                  First of all, do you remember how many that
 7     you took say between the first time you saw him in '98 until
 8     today; half a dozen, a dozen different types of medication?
 9            A.    Probably six different ones at different
10     times.
11            Q.    All right.  Do you feel that -- well, let me
12     ask you today.
13                  Are you taking any medications prescribed by
14     this doctor?
15            A.    Yes.
16            Q.    What medications are you taking?
17            A.    Neurontin and Effexor, and I have Klonopin
18     that I don't have to take regularly.  I just take it when I
19     get over anxious or nervous.  And a sleeping pill that's
20     called Ambien.
21            Q.    All right.  So you mentioned Neurontin,
22     Effexor and Ambien.
23                  Are these all anti-anxiety medications?
24            A.    No, Effexor is an antidepression.  Ambien is
25     a sleeping pill.  So I don't know what it is.  Klonopin is
```

GOLDFARB & AJELLO 203-972-8320

```
1    for anxiety, which I forgot to mention, and Neurontin I'm

2    not quite sure what that is.

3              Q.    All right.  And these medications are paid

4    for by the city insurance program?

5              A.    And me.

6              Q.    Meaning your co-pay?

7              A.    Correct.

8              Q.    Could you tell us today, and I'm sure your

9    lawyer can provide greater detail, what your out-of-

10   pocket expenses, total for this entire proceeding,

11   attorneys' fees, doctor's bills --

12             A.    No.

13             Q.    -- co-pays, to date.

14                        MS. MAURER:  Jim, if you'll hold that

15                   open, I will give you that answer in writing.

16                        MR. MINOR:  Okay.  That's fine.

17                        MS. MAURER:  Thank you.

18             Q.    All right.  I'm just about done.

19                   Do you remember getting the arbitration

20   decision of Mr. Vecchia's grievance and reading it, which is

21   marked Exhibit J for the deposition?

22                        MS. MAURER:  Go ahead.

23             A.    Do I remember getting this?

24                   I never got a copy of this.

25             Q.    All right.  So you never got a copy, but you
```

```
 1    did know that Mr. Vecchia's grievance was denied, and he was

 2    unsuccessful in his attempt to become a city employee again?

 3            A.    Yes.

 4            Q.    You obviously were aware of that?

 5            A.    Yes.

 6            Q.    And you found out about the time that the

 7    decision came out, which was February of 2003 either because

 8    someone told you or because it was in the paper?

 9            A.    Yes.

10            Q.    All right.  But you don't remember reading

11    the actual decision?

12            A.    I didn't get one, no.

13            Q.    Okay.  All right.

14                  Well, since you didn't get it, I take it

15    you're not familiar with the decision?

16                  You haven't read it recently?

17            A.    I just got it in my hand.

18            Q.    All right.  I don't want to ask you questions

19    then if you're not familiar with it.

20                  Let me just ask about ten more questions.

21                  And this relates to your Complaint which I

22    think we've discussed several times today, that you felt the

23    city didn't do anything as far as Mr. Vecchia and his

24    stalking of you is concerned.

25                  Would you agree that in the meeting between
```

```
 1    yourself, Bill Stover, Fred Manfredonia of the Human

 2    Resources Department in September of 1998 you made a

 3    complaint about Mr. Vecchia.  They met with Mr. Vecchia and

 4    they warned Mr. Vecchia to leave you alone.

 5            A.      That's what they said.

 6            Q.      And at that time you were represented by your

 7    attorney, Ben Fraser?

 8            A.      Correct.

 9            Q.      By the way, just to ask about money, you

10    don't have any bills that you paid Ben Fraser that you're

11    including in damages; are you?

12                    Mr. Fraser represented you as a family friend

13    and didn't charge you?

14            A.      I wanted to pay him, but he wouldn't let me.

15            Q.      Okay.  All right.

16                    And that after the meeting in September of

17    '98 with you and Human Resources, their meeting with

18    Mr. Vecchia and then their meeting when they reported back

19    to you and Mr. Fraser, that was your last contact with Human

20    Resources until after you went to the police in 2000?

21            A.      I had not heard -- that's correct, I did not

22    have any contact with Human Resources regarding this since

23    that meeting.

24            Q.      And that the next time you complained to

25    anyone in the city was after Mr. Vecchia stared at you and
```

```
 1    menaced you at Taranto's in October of 2000?
 2          A.    I complained about Vecchia to everyone
 3    that -- all the time.
 4          Q.    All right.
 5          A.    Peter Brown, Bob Lam (phonetic), Peter Lucia,
 6    Sandy Denise, Jim D'Vant (phonetic) -- anybody that would
 7    listen.  My friends that work at the city.
 8                Basically all my friends are city employees.
 9    I talked about David Vecchia stalking me and warned other
10    people to stay away from him and to be careful.  And the
11    whole **nannet at the city of Stamford knew.
12                And I complained to MEA people, MAA people,
13    department lead people.
14          Q.    And do you remember I think your earlier
15    testimony that you went to the police, you made a complaint
16    to Officer Carl Strate, S-T-R-A-T-E, and that you felt that
17    he did a job in preparing an arrest warrant affidavit and
18    resulted in Mr. Vecchia getting arrested?
19          A.    We didn't hear what job.  It blanked out.
20          Q.    Carl Strate did a thorough job in preparing a
21    twelve page arrest warrant against Mr. Vecchia, which
22    resulted in Mr. Vecchia getting arrested.
23          A.    I think Carl Strate did a great job
24    considering all the obstacles that he had to go through.
25          Q.    And Mr. Vecchia was, in fact, arrested in
```

1    November of 2000 and subsequently suspended from work from

2    the city of Stamford?

3         A.     I'm not sure if it was -- whatever date he

4    was arrested.  Yes, he was arrested subsequently to Carl's

5    and my report, and then he was suspended, yes.

6         Q.     And that eventually you wrote a letter to

7    Judge Comerford opposing Mr. Vecchia's application for

8    accelerated rehabilitation.

9         A.     Correct.

10        Q.     And in that letter, I think we discussed this

11   in your previous deposition, you told Judge Comerford that

12   Mr. Vecchia stopped stalking you and that he had focused his

13   anti-social behavior towards his ex-wife, and after he

14   stopped harassing his ex-wife and his family, he refocused

15   his threatening behavior toward you in October of 2000.

16                    Do you remember saying that?

17        A.     I'm going to read it in like one second.

18                    MS. MAURER:    I'll object to the

19                    point that the document speaks for itself.

20                    If you're asking her to read it and

21                    confirm that that's what she wrote, I think

22                    she can do that.

23        A.     I wrote everything in this letter.

24        Q.     All right.  But would you agree that you told

25   Judge Comerford that Mr. Vecchia stopped stalking you?

1        A.      Where is that on the letter, and I'll agree

2   to it if I can find it on the letter.

3        Q.      Okay.  It's page two.

4        A.      Page two, paragraph --

5        Q.      Hold on just a sec.

6        A.      I'm trying to read quick.  I can't.

7                Oh, here it is.

8        Q.      From the beginning, it's third paragraph

9   which reads, "Mr. Vecchia's course of conduct towards me has

10  been continuous.  The only reason that he stopped stalking

11  me was because he had focused his anti-social behavior

12  towards his ex-wife.  After he stopped harassing her and her

13  family, he refocused his threatening behavior towards me in

14  October 2000."

15       A.      I believe that to be true.

16       Q.      All right.  So do I understand that to mean

17  that from September of 1998 until October of 2000,

18  Mr. Vecchia stopped stalking you?

19       A.      I don't know that.

20       Q.      All right.  Do you remember any incident

21  where you could prove that Mr. Vecchia was stalking you from

22  September '98 until October 2000?

23       A.      I can't seem to prove anything about him

24  stalking me it seems.

25       Q.      Okay.  When I say prove, I mean you saw him

```
 1    as opposed to not knowing whether he was stalking you or
 2    not.
 3            A.      I did not see Mr. Vecchia in that time frame
 4    except for maybe -- no, I did not see him.  I did not see
 5    him -- I don't know.  I don't know.  I don't know.
 6            Q.      And I think you said earlier that Peter Brown
 7    and others from the fire department were supportive during
 8    this entire process so that if you complained about, for
 9    instance, not going over to the Government Center, they
10    would -- in fact, they did cooperate with you.
11                       MS. MAURER:   I'm going to object
12                       because the question is vague and overly
13                       broad.  If you want to ask about specific
14                       incidents.
15                       MR. MINOR:   All right.  Let me
16                       withdraw it.
17            Q.      Would you agree that Peter Brown cooperated
18    with you when you explained to him about Mr. Vecchia --
19            A.      It's not that he didn't cooperate.
20                    What?
21            Q.      Did Peter Brown listen to your complaint
22    about Mr. Vecchia and take action such as barring
23    Mr. Vecchia from coming to the third floor --
24            A.      No.
25            Q.      -- of the fire department and allowing you
```

```
 1    not's to go to the Government Center unless you chose to to
 2    avoid any contact with Mr. Vecchia?
 3                        MS. MAURER:   Objection, compound.
 4          Q.    You can still answer.
 5          A.    The first part of the question where you said
 6    Peter Brown did not allow Vecchia in the building, that's
 7    not true.
 8                When Vecchia came to the building once, I
 9    asked Peter can I tell Vecchia that he's not allowed to
10    come.   And when he came the second time, I said you're not
11    allowed to come here because I'd get fired if I have
12    visitors.
13                And as far as not having to go over to the
14    building, yes, Peter said later on, yes, I did not have to
15    go to the building to go to things that I was supposed to.
16          Q.    So did you say in there --
17                        MS. MAURER:   Mr. Minor, could we
18                        allow her to finish the prior question, the
19                        answer.
20          Q.    I'm sorry.   I didn't know you didn't finish.
21          A.    No, the time that no one was allowed up past
22    the third floor was after David's arrest or before the --
23    after the arrest or when the police called me and said he
24    was going to be arrested.
25                At that point, the fire department put a
```

GOLDFARB & AJELLO 203-972-8320

1    notice downstairs at the watch desk that no one was allowed

2    in the building and especially Vecchia unless they signed

3    in, but Vecchia was not allowed.  That's the time that

4    Vecchia was not allowed.  The day after his -- going to have

5    him arrested.

6             Prior to that, he was allowed to do whatever

7    he wanted.  He just didn't come over to the building because

8    maybe he didn't want me to get fired since the first time I

9    told him you can't come here or I'll get fired.  I don't

10   really know.

11        Q.   Do you agree that the city has accommodated

12   you in allowing you time off, and if you needed to go to

13   counseling, for instance, or see this doctor that we've been

14   talking about, you've been accommodated?

15        A.   When I go to see my doctor, I take a sick day

16   or a sick time, and I've used my vacation time.  So I have

17   time to use, which is mine to use however I want to, and

18   that's what I've been using.

19             I haven't had any free time, you know, like

20   not been charged for something if that's what you're trying

21   to imply.

22        Q.   All right.  What specifically do you feel the

23   city should have done after September of 1998 and until

24   Mr. Vecchia was arrested in the end of 2000 that would have

25   prevented Mr. Vecchia from stalking you?