1          A.      Well, they said they were going to give

2     reports to Ben Fraser about his counseling or to keep him

3     away or whatever, and they never responded to any of our

4     requests.  So that would have been nice.

5                  You know, anything would have been nice.

6     Offer me EAP.  Come and see, ask me how I'm doing.  Barbara,

7     is there any trouble?

8                  Usually if you have an employee who has such

9     a serious issue, that's a very hard issue for someone to

10    talk about, one would think that someone would check up and

11    see if they were all right.  And the city never did that.

12    So that was, you know, kind of not so great.

13                 Basically the city just didn't do anything.

14    So I felt I had to do it all on my own throughout the whole

15    thing.  So I basically changed my life and did things like

16    that.

17         Q.      All right.  And just to clarify, you say the

18    city didn't offer you EAP.

19                 EAP is Employee Assistance Program, and have

20    you ever used Employee Assistance Program?

21         A.      No.

22         Q.      The doctor whose notes we've been discussing,

23    that was outside of EAP?

24         A.      Correct.

25         Q.      And you mentioned that the city paid

1    initially for this doctor and then stopped paying because he
2    was out of network.
3              If you had gone on EAP, would that have made
4    a difference in the payment?
5         A.    I have no idea.
6         Q.    Did you go to EAP and say I want to use
7    Dr. So-and-so, and they said yes or no?
8         A.    I never went to EAP.
9         Q.    All right.  So the only people that you
10   talked to -- you talked to the insurance people who said
11   this doctor was out of network?
12        A.    No.  You don't have to talk to them to say
13   that they were out of network.  They give you a thing saying
14   he's not in network.
15        Q.    All right.  In other words, you went to him
16   and you said here's my insurance coverage --
17        A.    And he said I don't take it.
18        Q.    -- and he says I'm not in the network; is
19   that how you learned?
20        A.    Right.
21                  MR. MINOR:  Okay.  I think that's it
22              for me.  I thank you very much, and see if
23              Mr. Vecchia has any questions.
24                  MR. VECCHIA:  Yes, I have questions.
25                  MR. MINOR:  Okay.  Do you want to

GOLDFARB & AJELLO 203-972-8320

1          take a break now and conclude -- you give me

2          an idea how long you're going to be.

3                    MR. VECCHIA:    I don't know.    I've

4          never done this before.

5                    MR. MINOR:    Because it is almost

6          noon.    Why don't we take a break and have

7          lunch and come back.

8                    Okay.    I'll hang up and call you back

9          when we are done.

10                    For lunch, how long do you want to

11          take?

12                    MS. MAURER:    We'll take an hour.

13                    MR. MINOR:    Okay.    One o'clock; is

14          that good?

15                    MS. MAURER:    That's fine unless

16          Mr. Vecchia thinks he's got less than fifteen

17          or twenty minutes, that would be fine.

18          We'll go that far.

19                    MR. VECCHIA:    I don't know.    I'll

20          come back at one o'clock.

21                    MR. MINOR:    So why don't we come back

22          at one o'clock, and I'll call you then.

23                    MS. MAURER:    Thank you very much.

24          (Lunch recess taken at 12:00 p.m.)

25

1    AFTERNOON SESSION    JUNE 11, 2004    1:05 P.M

2                    MS. MAURER:    Mr. Vecchia, are you

3              going to be wanting a transcript of this?

4                    MR. VECCHIA:    No.

5                    MS. MAURER:    All right.  You may

6              inquire.

7

8    CROSS-EXAMINATION BY MR. VECCHIA:

9         Q.    All right.  Barbara, did you get a phone call

10   from Sally Benkowski (phonetic) within the fifteen minutes

11   or half hour prior to the start of this discussion today?

12                   MS. MAURER:    Mr. Vecchia, I'm going

13             to object.  That has nothing to do with this

14             trial whatsoever, and I'm going to direct

15             Ms. Murphy not to answer.

16                   MR. VECCHIA:    That means yes?

17                   MS. MAURER:    That means that she's

18             not going to answer you.

19        Q.    All right.  Barbara Murphy, when was the last

20   time I spoke to you?

21        A.    March 20 something, 1998.  March 20 --

22        Q.    That's fine.

23        A.    Okay.

24        Q.    In your discussion with Attorney Minor

25   earlier, you mentioned that your plan right along was to sue

GOLDFARB & AJELLO  203-972-8320

1    the city.

2                When did you decide to sue me as well as the

3    city?

4         A.    I have no idea and I -- I have no idea.

5         Q.    I'm sorry.  Did you answer that?

6         A.    Yes.

7                    MR. MINOR:   Barbara, did you say I

8                have no idea?

9                    THE WITNESS:   Correct.

10                   MR. MINOR:   Okay.  For some reason, I

11               don't why this afternoon both you and

12               Attorney Maurer seem to be cut off.  So

13               maybe speak a little bit slower.

14                   THE WITNESS:   Okay.

15                   MR. MINOR:   Thanks.

16        Q.    All right.  I want to look at the document

17   called Request for Admissions.  I have a copy that's dated

18   August 11th, 2003.

19                   MS. MAURER:   Mr. Vecchia, if you

20               don't provide exhibits you want us to look at

21               in advance, we have no way to be prepared

22               for your questions.

23                   MR. VECCHIA:   This is a document that

24               you provided to me the answers.  So I'm sure

25               you have it.

GOLDFARB & AJELLO 203-972-8320

```
 1                    MS. MAURER:   That may, in fact, be

 2            true, but we have a very substantial file

 3            here.  If you'd like to take a break and have

 4            me look for it, I can do that.

 5                    MR. VECCHIA:   Certainly.

 6                    MR. MINOR:   Can I suggest this,

 7            Mr. Vecchia.  Why don't you just ask her

 8            questions from the document.  I don't think

 9            she has to read it all; otherwise, we're

10            going to be here all afternoon.

11                    If you have a specific question, just

12            go ahead and ask it.

13    BY MR. VECCHIA:

14         Q.    Okay.  I have a number of questions from the

15    document.

16            What were the circumstances of your transfer

17    from the position of payroll department to the fire

18    department?

19         A.    I was promoted.

20         Q.    What had happened prior to your promotion?

21                    MS. MAURER:   Mr. Vecchia, you're

22            going to have to be more clear.

23                    Objection; vague.

24         Q.    What is the peanut butter and jelly affair?

25         A.    I have no idea what you're talking about.
```

GOLDFARB & AJELLO 203-972-8320

1          Q.     All right.   Was there an investigation by

2     Coopers and Lybrand?

3                         MS. MAURER:    At what time,

4                    Mr. Vecchia?

5          Q.     Prior to Barbara's taking the new job in the

6     fire department.

7                         MS. MAURER:   Mr. Vecchia, I'm going

8                    to object.   This has nothing to do with the

9                    case at issue, and I'm going to direct her

10                   not to answer.

11                        MR. VECCHIA:   It has the issue of

12                   veracity and truthfulness.

13                        MS. MAURER:   You'll be able to ask

14                   those questions at trial if it comes up.   It

15                   doesn't apply in depositions.   This is a

16                   fact-finding deposition.

17         Q.     Were you disciplined by the city of Stamford?

18                        MS. MAURER:   That again has nothing

19                   to do with this matter, and I'm going to

20                   direct her not to answer.

21         Q.     Ms. Murphy, do you recall some time after

22    your movement to the position at the fire department that we

23    had a conversation, and it was about your transfer from one

24    position to the second, and you told me that you intended to

25    get even with the city one day?

1      A.    No.

2      Q.    Do you recall talking to me about people that
3  you hate, and you said that the only person that you hated
4  was Tom Hamilton?

5      A.    No.  Never.

6      Q.    One of the items that Attorney Maurer asked
7  in her Request for Admissions was stated, "At the end of
8  1997 and the beginning of '98, Vecchia began making unwanted
9  sexual advances to Murphy."

10          What were those?

11     A.    Offering me -- trying to buy me drinks and
12  dinner and just standing behind me and sending me candies
13  interoffice and just a bunch of different various things.

14     Q.    Then she goes on to list them as "Vecchia
15  asked Murphy to lunch."

16          How many times did that occur, Ms. Murphy?

17     A.    Once.  That's all it took.

18     Q.    And who asked who to lunch?

19     A.    You asked me to lunch.

20     Q.    Wasn't the circumstance of that, Ms. Murphy,
21  that the city had bought you a gift certificate to Macy's
22  and that you wanted to reciprocate in some manner and you
23  invited me to lunch?

24     A.    No, and the city never bought me a gift
25  certificate to Macy's in my life.

```
 1              Q.    Well, I recall one time I did see you at the

 2        fire department, and that's the reason I went there, to

 3        bring it to you.

 4                           MS. MAURER:    I'm going to object at

 5                    this point in time.    Ms. Murphy is being

 6                    questioned, not Mr. Vecchia.

 7              Q.    Okay.    Do you recall my going to the fire

 8        department and bringing you a gift certificate?

 9              A.    Yes, and you said it was a gift from you.

10              Q.    No, I did not say that.

11                    Well, and then the second -- then she says,

12        "Vecchia sent candy to Murphy's office."

13                    How many times did that occur?

14              A.    Probably -- I'm not sure how many times

15        exactly but over three.

16              Q.    And then it says, "Vecchia sent cards to

17        Murphy through interoffice mail."

18                    How many times did that occur, Ms. Murphy?

19              A.    I don't recall.

20              Q.    And then it says, "Vecchia went to Murphy's

21        office uninvited."

22                    How many times did that occur

23              A.    Two.

24              Q.    What were the circumstances of those?

25              A.    You bringing me the Macy's thing and you
```

1    bringing me candy.

2        Q.    And after I brought you the things, did I

3    have a meeting with the fire chief?

4        A.    No.

5        Q.    And in 1998 -- late 1997 and '98, your

6    Request for Admission says "Murphy repeatedly told Vecchia

7    to stop making 'advances' toward her as she was not

8    interested."

9            When did those occur, and what does

10   repeatedly mean in your mind?

11               MS. MAURER:    Number one, you can only

12           ask one question at a time.  So which

13           question would you like an answer to?

14       Q.    When did these occur?

15               MS. MAURER:    When did what occur?

16       Q.    "In late 1997 and 1998, Murphy repeatedly

17   told Vecchia to stop making 'advances' toward her as she was

18   not interested."

19       A.    At the office when I told you not to bring

20   the candy any more.  When I told you that I can't have

21   visitors at the office because I'd get fired and at

22   Brennan's numerous times.

23       Q.    How many times is numerous?

24       A.    I have no idea.  More than one.

25       Q.    Attorney Maurer's Request for Admission says

1   in 1997 and '98 Vecchia said to have paid for Murphy's

2   drinks and meals.

3           What were the circumstances of those?

4       A.    I was at Brennan's and you were at the other

5   end of the bar, and I was with Chris, my friend, and we were

6   having dinner and you offered to pay for our dinner, and I

7   told the bartender no thanks.

8           And you tried to buy me drinks a number of

9   times, and I said no thank you, and I told the bartender not

10  to let you buy me anything.

11      Q.    Did I ever buy you anything prior to that,

12  Ms. Murphy?

13      A.    I don't know if you bought a round for the

14  bar, but when you started getting specifically directed

15  towards me, I refused.

16      Q.    One of the Requests for Admission states

17  that, "Vecchia would send Murphy articles and other

18  materials through interoffice mail related to topics that he

19  had overheard her discussing."

20          What were the circumstances of those?

21      A.    I don't recall at this moment.  One might

22  have been about my car being looted and you sent an article

23  from a newspaper and something else may have been about --

24  I'm not really sure.  I can't recall.

25      Q.    Were they articles of a sexual or harassing

1   nature?

2           A.      They were harassing in the fact that you were

3   being overly friendly by sending them when I told you to

4   really not be sending me anything any more.  It was an

5   uncomfortable situation for me.

6           Q.      And did you tell me that?

7           A.      I didn't respond to them at all because I had

8   already told you to stop.

9           Q.      One of the Request to Admit says that 1997

10  and '98 Vecchia began appearing on Murphy's running path at

11  the time that she regularly ran.

12                  What were the circumstances of that?

13          A.      You were running down Shippan Avenue as I was

14  running in the opposite direction coming back.  Another time

15  you were running down Shippan Avenue.

16          Q.      So that's two times?

17          A.      It could have been more than two times.  You

18  want to know the circumstances, always it is on Shippan

19  Avenue.

20          Q.      The Request for Admission asks in 1997 and

21  1998, which makes it sound like this happened over a two

22  year period of time.

23                  So is that your testimony or your answer is

24  that it occurred twice?

25          A.      Not necessarily, no.  No, that is not my

1    answer, no.

2         Q.    How many times do you think it occurred?

3         A.    Well, maybe three times.  Maybe three or

4    four.

5         Q.    Let's see.

6              Since one of the Requests for Admission says

7    that, "The running path was over fifteen miles from

8    Vecchia's home."

9              How far was that running path from your home?

10        A.    Three miles, four miles.  And I ran there

11   regularly.

12        Q.    And then it says, "This running path was

13   several miles from Vecchia's place of employment."

14             How far is it from the Government Center to

15   Shippan Avenue?

16        A.    A mile.

17        Q.    One mile?

18        A.    Oh, from the Government Center, I don't know.

19   The Government Center.  I don't know how far from the

20   Government Center.

21        Q.    Well, how many would you think?

22             You lived in Stamford all your life.  I would

23   expect you to know that.

24                  MS. MAURER:   Mr. Vecchia, I'm going

25                  to object to that question as harassing, and

```
 1                    I'm going to ask you to ask a different
 2               question.
 3   BY MR. VECCHIA:
 4        Q.     All right.  One of the Request for Admission
 5   was, "At a United Way sponsored race, Vecchia attempted to
 6   run the entire race directly in front of Murphy."
 7                    How does someone do that?
 8                    MS. MAURER:    Mr. Vecchia, I'm not
 9               going to allow her to speculate, and I'm
10               going to object to that question.
11        Q.     One of the Request for Admission says that,
12   "Throughout 1998 Vecchia stared at Murphy."
13                    When did this occur?
14        A.     At Brennan's, at the city of Stamford on the
15   tenth floor, while running, at the Life at Five.
16        Q.     How many times do you think this occurred?
17        A.     Hundreds.
18        Q.     Is that one hundred or two hundred?
19        A.     Hundreds.  So more than one.  I can't count
20   if it was two hundred, three hundred, I'm not quite sure
21   because I don't know are we talking every minute, the hours
22   that you were at Brennan's or what?
23        Q.     Days or occurrences.
24        A.     Every Friday I used to go to Brennan's and
25   you started coming there.  So that's quite a bit of time.
```

1  Live at Five, a couple times.

2              I don't know.  Countwise.  Numerous, a lot.

3        Q.    And then it says that, "Throughout 1998,

4  Vecchia sent Murphy gifts through interoffice mail."

5              How many times did that occur?

6                   MS. MAURER:    That question has been

7              asked and answered.  Objection.

8                   MR. VECCHIA:   What was the answer?

9                   MS. MAURER:   Just prior you just

10             answered.  If you'd like, I'll ask the court

11             reporter to go back and read it to you.

12                  Mr. Vecchia, would you like the court

13             reporter to read it to you?

14                  MR. VECCHIA:   Please, yes.

15                  MR. MINOR:   Can I suggest that it

16             was several times rather than going through

17             it.

18                  You know, I object on the grounds

19             whether it's several or six or a dozen, it

20             don't really matter, and in the interest of

21             moving this along, I would ask, Mr. Vecchia,

22             you ask the next question.

23        Q.    One of the Requests to Admit says that,

24  "Throughout 1998, Vecchia sent Murphy drinks and food which

25  she rejected."

```
1                        How many times has that occur?

2                             MS. MAURER:   Mr. Vecchia, that

3                        question was asked and answered.

4                             MR. VECCHIA:   I don't recall the --

5                        what was the answer?

6                             MS. MAURER:   You asked her whether

7                        she had rejected you buying her drinks and

8                        buying food, and she gave you the

9                        explanation that she had rejected food on

10                       one occasion and she had rejected drinks on

11                       many occasions.

12  BY MR. VECCHIA:

13        Q.   And how many was many?

14                            MS. MAURER:   More than one.

15        Q.   Is that more than two?

16                            MS. MAURER:   Mr. Vecchia, that

17                       question was asked and answered, and I'm

18                       going to direct her not to answer.

19                            MR. VECCHIA:   You said she didn't

20                       answer each one of these questions, and I'm

21                       asking -- you're saying I have to ask them

22                       myself.

23                            MR. MINOR:   Can I suggest let's move

24                       on.   This is to gather information and not to

25                       get even.
```

1              MR. VECCHIA:   I'm gathering

2         information.

3              MR. MINOR:   Can we please just go to

4         the next question.

5              MR. VECCHIA:   No, I'd like an answer.

6              MR. MINOR:   But the answer has

7         already been made.   I remember the answer,

8         too.

9              MR. VECCHIA:   Tell me what it is.

10             MR. MINOR:   The answer was many times

11        to refusing drinks, meaning more than three

12        is my recollection.   But the transcript will

13        speak for itself when it comes out.

14   BY MR. VECCHIA:

15        Q.   The Request for Admission mentions that, "One

16   evening as Murphy left a restaurant, Vecchia followed her to

17   the car."

18             "As Murphy started the car, Vecchia stood in

19   front of her blocking her from leaving."

20             "As Murphy drove forward, Vecchia stayed in

21   the way and Murphy was unable to leave."

22             "As a result of Vecchia's actions, Murphy had

23   to put her car in reverse and drive the wrong way on a

24   one-way street to get away."

25             When did this occur?

1          A.    I don't know the specific date.

2          Q.    Month, year?

3          A.    1998, '97.

4          Q.    Okay.  And was this in the summer, spring,

5     fall, winter?

6          A.    I don't think there was snow out there.  So

7     it could have been summer, spring or winter.  I don't know

8     off the top of my head right now.

9          Q.    My recollection is this was in the winter of

10    January of 1998, and that it was a cold, icy day and that

11    the lock on my car was locked and that I couldn't open the

12    car door.

13                Do you recall that?

14         A.    No.

15         Q.    I'm sorry, did you answer?

16         A.    I said no.

17         Q.    Okay.  Regarding the meetings held with Fred

18    Mandredonia and William Stover from the Human Resources

19    Department in September of 1998, did you ever file a written

20    complaint with the city?

21         A.    At that meeting was the initial -- the

22    initial meeting was the formal complaint.

23         Q.    Did you ever file a written complaint with

24    the city?

25         A.    My attorney -- I don't know.  I don't think

GOLDFARB & AJELLO 203-972-8320

1    so.

2         Q.    Did you ever write anything down or type

3    something out or fill out a form, or did you ever sign any

4    documents?

5         A.    I never wrote anything down.

6         Q.    Did Mr. Manfredonia or Stover ever have you

7    sign anything?

8         A.    No, they did not.  They wanted me to sign

9    something.

10        Q.    And you're telling me you did not sign it?

11        A.    It was a different subject.  I'm sorry.  It

12   was my mistake.

13        Q.    All right.  I'm confused here now.

14        A.    I never signed a document about a written

15   complaint against you.

16        Q.    One of Attorney Maurer's Request for

17   Admissions is that, "Vecchia agreed to cease contact with

18   Murphy during work and on City of Stamford premises."

19             Did Mr. Stover or Manfredonia tell you that?

20        A.    One of them.

21        Q.    Hello.

22             MS. MAURER:    She said one of them.

23        Q.    Thank you.

24             And did one of them give you something in

25   writing to that effect?

GOLDFARB & AJELLO 203-972-8320

1          A.    No, they never produced anything.

2          Q.    Did they tell you that I had signed

3    something?

4          A.    They didn't tell me that, no.

5          Q.    What did they tell you?

6          A.    When?

7          Q.    In September, October or November of 1998.

8          A.    Quite a few things.

9          Q.    Okay.  What did they tell you?

10         A.    That you agreed to -- you admitted -- at one

11   of the meetings, you admitted everything, you were stupid,

12   that you were probably in love with me, that you agreed to

13   not -- either drafting up a report and an agreement and that

14   you're going to sign it saying you'll leave me alone and

15   you're seeking counseling and you'll get help, and they were

16   going to follow through on everything.  Something to that

17   effect.

18         Q.    Did you ever ask them for a copy of some

19   written agreements that I had supposedly signed?

20         A.    I did not.  Ben Fraser did, my attorney.

21         Q.    And did Attorney Fraser ever tell you that he

22   had a signed agreement?

23         A.    They never produced the agreement.

24         Q.    Did anyone ever go back to you or anyone who

25   represented you ever go back to the city and ask for a