```
 1  written agreement?
 2       A.   Yes.
 3       Q.   And what was the reply from the Human
 4  Resources people that --
 5       A.   I don't know that there was any reply.  I'm
 6  under the impression there was none.  But Ben is dead now.
 7  So I don't have that.
 8       Q.   You're known as a frank person and someone
 9  who pushes for things.
10            You're telling me that you never went back to
11  them and asked them for anything?
12                 MS. MAURER:  That question has been
13                 asked and answered, and I'll object to it.
14       Q.   One of the Requests for Admissions is that,
15  "The City of Stamford never confirmed that Vecchia was
16  receiving counseling."
17            How would you know that?
18       A.   Because we never got any confirmation, as it
19  says in the thing.
20       Q.   You said that you never got any response, but
21  you didn't say anything that you had ever asked.
22                 MS. MAURER:  Is there a question
23                 there, Mr. Vecchia?
24       Q.   Yes.
25            Did you ever ask specifically if Vecchia was
```

| | |
|---|---|
| 1 | receiving counseling? |
| 2 | A. Me, personally, through my attorney was |
| 3 | asked, and there was no response. |
| 4 | Q. When did that occur? |
| 5 | A. I have no idea off the top of my head. |
| 6 | Q. Did it occur in September of '98 and October |
| 7 | of '98, November of '98, December of '98? |
| 8 | MS. MAURER: Mr. Vecchia, that |
| 9 | question has been asked and answered. |
| 10 | Please move on. |
| 11 | Q. One of the Request for Admissions is that, |
| 12 | "The City of Stamford never followed up with Vecchia |
| 13 | regarding Vecchia's progress and therapy." |
| 14 | How would you know that? |
| 15 | MS. MAURER: Mr. Vecchia, those |
| 16 | questions were asked of you. |
| 17 | MR. VECCHIA: I understand that. I'm |
| 18 | asking them of Ms. Murphy. |
| 19 | MS. MAURER: She's already answered |
| 20 | that question, Mr. Vecchia. |
| 21 | MR. VECCHIA: What was the answer, |
| 22 | please? |
| 23 | MS. MAURER: The answer was that her |
| 24 | attorney had asked for that, the city had |
| 25 | promised it, and the city had not provided |

1           it.
2                    MR. VECCHIA:  Thank you.
3    BY MR. VECCHIA:
4         Q.    One of the Requests for Admissions said that,
5    "The City of Stamford never received any progress reports
6    from Vecchia."
7                    How would you know that?
8                    Hello.
9         A.    By the fact that they never gave us any.
10        Q.    That doesn't mean that it never happened.
11                   Why did you think that means it never
12   happened?
13                   MS. MAURER:  Mr. Vecchia, Requests
14                   for Admission are requests for you to answer
15                   certain questions.  They don't necessarily
16                   have a factual basis from us.  They are us
17                   trying to find that information.
18                   MR. VECCHIA:  I understand that.
19                   MS. MAURER:  So in this particular
20                   case, I was asking you whether or not that
21                   had happened.
22                   MR. VECCHIA:  In this particular
23                   case, I'm asking Ms. Murphy what's her backup
24                   for the allegation that they never followed
25                   up.

```
1                MS. MAURER:  It's not an allegation,
2         it's a request for information which you said
3         did not happen.  And that's what the answer
4         was that I needed.
5  BY MR. VECCHIA:
6       Q.   One of the Requests for Admissions is that,
7  "The City of Stamford never monitored Vecchia's conduct
8  regarding Murphy in any manner."
9                How would you know that?
10               MS. MAURER:  Mr. Vecchia, I'm going
11        to tell you again.  She doesn't know that.
12        It was a request for an admission from you.
13      Q.   One of the Request for Admissions was that,
14 "Vecchia never obtained psychological treatment for his
15 behavior."
16               How would you know that?
17               MS. MAURER:  Mr. Vecchia, I'm going
18        to tell you again, the answer to that, the
19        Request for Admission is a request for an
20        admission from you.  We don't have any basis
21        for that, and we're asking you whether it's
22        true.
23      Q.   One of the Request for Admissions is -- this
24 is talking about an October -- in October of 2000, that, "In
25 October 2000, Murphy reported Vecchia's harassment of her to
```

```
 1  the Stamford Police Department.  In late October or early
 2  November of 2000, the Police met with Vecchia."
 3                  Who told you that?
 4                  Hello.
 5       A.         I'm thinking.
 6                  I believe the police.  I'm not sure.
 7       Q.         Well, who's the police?
 8                  Was there a specific person or --
 9       A.         It would be the officer that I was speaking
10  with, Carl Strate.
11       Q.         Did he give you a copy of a written report?
12       A.         A written report of what?
13       Q.         Of a report that he spoke to me and that
14  didn't --
15       A.         I got no report from Carl Strate.
16       Q.         Okay.  It never occurred.  That's why I was
17  curious as to why you would ask that.
18                  One of the Request for Admissions is that,
19  "Vecchia left the bullet on Murphy's deck at home."
20                  What are the circumstances of that?
21       A.         There was a bullet on my deck, what I thought
22  was shot into my deck.
23       Q.         And I find in the document Attorney Maurer
24  had sent to me that there's a police report from the Norwalk
25  Police Department, November 3rd.
```

```
 1                    MS. MAURER:  Is there a question,
 2         Mr. Vecchia?
 3    Q.     Yes.
 4            Did you ever discuss this with -- let's
 5  see -- Investigator Carl Strate of the Stamford Police
 6  Department?
 7                    MS. MAURER:  Mr. Vecchia, as you can
 8             see from Mr. Strate's report, Officer Strate
 9             went to the Norwalk Police Department and did
10             that investigation on his own.
11                    MR. VECCHIA:  Why would the Norwalk
12             Police Department be filing it then?
13                    MS. MAURER:  Because they called.
14             Initially when Carl Strate did his
15             investigation, he confirmed that
16             investigation with the Norwalk Police
17             Department, as it says in his report.
18                    MR. VECCHIA:  Well, I'm reading the
19             report from the Norwalk Police Department,
20             and it doesn't explain in that detail.
21                    MS. MAURER:  They don't have to.
22    Q.     Now, did this occur after -- Ms. Murphy, did
23  that occur after that, you went to see Carl Strate
24  initially?
25    A.     Yes.
```

1    Q.    Why would you think the bullet was fired into
2  your deck, into your porch?
3    A.    Because it was imbedded in it.
4    Q.    Has Carl Strate ever been to your home?
5    A.    No.
6    Q.    I'm sorry?
7    A.    No.
8    Q.    Did Carl Strate give you a bullet and tell
9  you to stamp it into the floor of your porch?
10   A.    No.
11   Q.    Okay. The next area I want to go into is
12 your psychological history. That is something I'm not
13 particularly interested in, but since you dragged me into
14 your attempt to get money from the city, I have no choice,
15 and I apologize for asking you these questions.
16        When's the first time you saw a counselor or
17 therapist or psychiatrist or psychologist?
18              MS. MAURER:   Mr. Vecchia, are you
19         asking whether she's seen one in her life?
20              MR. VECCHIA:   I'm asking when was the
21         first time she saw one.
22              MS. MAURER:   That is completely
23         irrelevant to this matter.
24              MR. VECCHIA:   You're asking about
25         emotional damage. And so you have to begin

```
 1                  at the beginning.
 2                          MS. MAURER:  Mr. Vecchia, you have to
 3                  begin with things that are relevant or
 4                  likely to be relevant.
 5                          MS. MAURER:  Ms. Murphy's life is
 6                  relevant for this.
 7                          Mr. Vecchia, if you'd like to get an
 8                  order from the court to discuss that, you
 9                  may; otherwise, I'm going to direct her not
10                  to answer.
11   BY MR. VECCHIA:
12        Q.    Did you ever see a therapist, psychologist,
13   counselor when you were a child?
14                          MS. MAURER:  Mr. Vecchia, I'm going
15                  to direct Ms. Murphy not to answer on the
16                  same grounds that I have already given you.
17        Q.    Did you ever see one when you were a teenager
18   regarding your parents' divorce?
19                          MS. MAURER:  Mr. Vecchia, I'm going
20                  to direct Ms. Murphy not to answer on the
21                  same grounds as I gave you before.
22        Q.    Did you ever see one regarding your father's
23   death?
24                          MS. MAURER:  Mr. Vecchia, I'm going
25                  to direct Ms. Murphy not to answer on the
```

```
 1              same grounds I've already given you.
 2      Q.      Did you ever see anyone regarding your
 3   leaving Stamford and moving to Florida and adjusting in
 4   Florida?
 5              MS. MAURER:  Mr. Vecchia, if you
 6              continue on these grounds, I'm going to close
 7              this deposition, and we'll go no further.
 8              Move on to another area or we will be
 9              finished.
10              MR. VECCHIA:  All right.  Then I'll
11              have to go to Dr. Hamilton.
12      Q.      All right.  The first report we have from
13   Dr. Hamilton is on October 9th of 1998.
14              MS. MAURER:  Mr. Vecchia, would you
15              like her to review the documents?
16              MR. VECCHIA:  Certainly.  The same
17              documents that Attorney Minor had questions
18              about.
19              MS. MAURER:  All right.  Would you
20              direct her to a page.
21      Q.      The page dated 10/9/98.
22              MS. MAURER:  All right.
23      A.      Okay.  Go ahead.
24      Q.      And in this report -- again, this is -- I
25   have different questions about how Dr. Hamilton, his mode of
```

1   operating.
2           When you were visiting Dr. Hamilton, is he
3   there taking notes and one would think that the reports
4   were -- follow his notes, or do you feel that this is just a
5   summary of what he heard?
6       A.   There are no notes taken.
7       Q.   He does not take any notes when you're
8   speaking to him?
9       A.   No.
10      Q.   Okay. So this is a summary then that he must
11  write some time after he would speak -- meet with you?
12              MS. MAURER:  Mr. Vecchia, if you
13              would like to inquire with Dr. Hamilton as to
14              his methodology, I'm sure he would be
15              willing to do that for his normal fee;
16              however, Ms. Murphy is not a doctor and is
17              unfamiliar with his methodology.
18              MR. VECCHIA:  What I was interested
19              in is how he accumulated his information.
20              MS. MAURER:  And that's answered,
21              that he doesn't take notes during the
22              sessions.
23      Q.   Okay. This first time you went to see
24  Dr. Hamilton, I don't see any mention of myself in this
25  report or somebody stalking you or --

1       A.      In the whole report?

2       Q.      In this 10/9/98, this three pages he had that

3  covers that.

4               MS. MAURER:  Mr. Vecchia, these

5               reports speak for themselves.  If the

6               document doesn't include it, then it doesn't

7               include it.  It doesn't necessarily make it

8               an entire and complete report of the

9               session.

10      Q.      On the 10/19/98 report, which is the fourth

11 page of the report, you do mention a man has been stalking

12 you.

13              MS. MAURER:  The document speaks for

14              itself, Mr. Vecchia.

15      Q.      Regarding the timing of this, were you still

16 in discussion with Mr. Stover and Mr. Manfredonia on

17 10/19/98?

18      A.      I don't know if that's the date that we met.

19 The dates that we met are recorded somewhere in all this

20 paperwork, but I don't know them right off the top of my

21 head.

22      Q.      Do you think that was before or after you

23 finished your discussions with them?

24              MS. MAURER:  With whom?

25      Q.      With Mr. Manfredonia and Mr. Stover.

```
 1        A.    I have the list of dates when I went there.
 2   So I don't recall at this moment.
 3        Q.    At the time you initially went to see
 4   Dr. Hamilton, in his first report -- and this again is his
 5   summary, so I want to find out if you agreed with his
 6   summary.
 7              He states that your depression had become
 8   unmanageable, that it had been a four year problem, that
 9   your concerns were your mother's health, your employment
10   with the city and offer a new job, and that your son
11   leaving -- going to college, your being lonely, scared and
12   sad.
13              Do you think that's an accurate description?
14        A.    I'm reading.
15        Q.    Certainly.
16        A.    The thing that I originally went to Hamilton
17   was that if -- as you can see in the first paragraph, he
18   says she called last spring but never came in.
19              That was after you broke into the car, and I
20   was so distraught and depressed that I finally went to him,
21   but then I was embarrassed that I was going to seek help.
22              He was my mother's psychiatrist.  My mother
23   had an issue.  So I never went back again until October, and
24   I believe that's after the August issues with you, and I
25   think he might have omitted this in the conversation or not.
```

1  It doesn't really matter, but I was beyond depression at
2  that point and wanted some medication or some kind of help.
3          So however you want to interpret his writings,
4  I don't know. But that's why I went.
5      Q.   Well, you had contacted him earlier in the
6  spring.
7          Did these same problems exist, your mother's
8  health, your new job and your son going to college and you
9  were lonely, scared and sad?
10     A.   In spring I never saw him. I asked him if I
11 could come and see him, and I never went.
12     Q.   I understand that.
13     A.   What's your question?
14          I don't understand.
15     Q.   Were the same issues there in the spring?
16     A.   In the spring, all those issues -- I wasn't
17 necessarily sad -- I was upset about you and all those other
18 things were there also.
19     Q.   All right. And then as one reads through
20 Dr. Hamilton's reports, on October 26th he talks about you
21 being depressed a long time.
22          On November 5th he talks about your family
23 not being there for you. On November 19th, he talks about
24 your breaking up with and he talks about your sister's
25 chronic illnesses, and he talks about your health, a lymph

```
 1   node in the neck, and he talks about your concerns being
 2   bipolar, and he talks about you -- on December 2nd he talks
 3   about you being sad and tearful and somewhat volatile, and
 4   he talks about you being emotional and that you had an
 5   accident and totaled your car.
 6                   MS. MAURER:  Mr. Vecchia, is there a
 7              question in here somewhere?
 8                   MR. MINOR:  I have an objection
 9              after you finish your question.  So let me
10              make my objection.
11                   Continue until you finish your
12              question.
13   BY MR. VECCHIA:
14        Q.   And on December 17th, he talks about your
15   abusing drugs and alcohol.  And on December 29th, he talks
16   about a variety of problems when you were growing up.
17                   MS. MAURER:  Mr. Vecchia, let me
18              interrupt you.  Any question you have at this
19              point is compound and based on a
20              misrepresentation of the documents in front
21              of you.  So I would appreciate it if you
22              would rephrase at this point.
23                   MR. MINOR:  And also I object on the
24              grounds that you inserted a name which is not
25              in the document that you have in front of
```

1    you.
2         Whether or not that name is true or
3    not true, I ask that it be deleted from the
4    transcript of the deposition because it's an
5    invasion of privacy of the other individual.
6         The document has been redacted to
7    protect third parties as well as to protect
8    the privacy of Ms. Murphy. So I think it's
9    an unfair question.
10        It's also probably an objectionable
11   statement, but I don't want to have that in
12   the transcript, and I would ask you if you
13   would not refer to any names, especially if
14   you're inventing them.
15        Can you respond to that?
16        MR. VECCHIA:   I will.
17        MR. MINOR:   I think Mr. Vecchia was
18   agreeing not to use any names, and he agrees
19   that that name be deleted.
20        Does everyone else agree?
21        MS. MAURER:   We agree as well.
22        MR. MINOR:   And if the court
23   reporter -- you may have gotten the name
24   except phonetically, you agree that that name
25   is deleted.

```
 1                MADAM COURT REPORTER:   Yes.
 2                MR. MINOR:   Anyway, why don't you
 3       re-ask your question so it's not a compound
 4       question because there is something that's
 5       pending.
 6                MR. VECCHIA:   I don't understand.
 7                MR. MINOR:   In other words, you asked
 8       a question that was a string of questions.
 9       You have to break it down.  Right now you
10       have to ask her --
11                MR. VECCHIA:   I'll ask her day by
12       day.
13   BY MR. VECCHIA:
14       Q.    Going back to the first page.  Again, on
15   October 9th -- and you have those papers in front of you?
16       A.    Yes.
17       Q.    Okay.  And there on October 9th the issues
18   discussed for Dr. Hamilton, your mother's health, city
19   employment, potential of a new job, your concerns with that
20   and your son going to college and you're lonely, scared and
21   sad.
22             And there's no mention of you're being upset
23   about someone stalking you; is that correct?
24                MS. MAURER:   Mr. Vecchia, the
25       documents speak for themselves.  If you'd
```

```
 1                    like to ask her a question about her
 2                    understanding of the documents or her
 3                    feelings at the time or whatever, you may,
 4                    but the documents are complete on their face,
 5                    and there's no reason to review them
 6                    individually.
 7   BY MR. VECCHIA:
 8         Q.    Okay.  On October 9th, if your emotional
 9   health is being affected by my conduct, why don't you
10   mention it?
11         A.    I don't know that I didn't mention it.  These
12   are his notes, not mine.
13         Q.    All right.  On October 26th, it doesn't
14   mention myself or my alleged conduct.
15               Why don't you mention it then?
16         A.    I don't know that I didn't.
17         Q.    On November 5th, again, it speaks to some
18   issues of lack of support from your family and that troubled
19   you.  It didn't mention my conduct.
20               Why don't you mention it?
21                    MS. MAURER:  Mr. Vecchia, she has
22                    told you at least on two prior occasions
23                    that these are the doctor's notes, and they
24                    are not a comprehensive recitation of
25                    everything that was said during the
```

1    individual meetings, and she can't recall
2    what was said during each of the individual
3    meetings.
4         So if this is going to be your line of
5    questioning, I think you're going to get the
6    same answer repeatedly, and it is probably
7    not a good use of your time. So I'd ask you
8    to move on to something else.
9  BY MR. VECCHIA:
10       Q.   All right. The same thing on November 19th,
11 December 2nd, December 17th, November 29th, January 21st,
12 February 3rd, February 18th, March 3rd, April 26th,
13 May 26th, June 19th, August 12th, and this whole period of
14 time 1998, 1999.
15             MS. MAURER:  Mr. Vecchia, I'm going
16       to tell you that these questions are all
17       compound and that they are objectionable.
18             If you'd like to ask an individual
19       question, we can respond to it, but if you're
20       asking in a general sense why or why not
21       certain things were included in the doctor's
22       report, I think you're going to have to
23       depose the doctor to find that out.
24       Q.   Okay. Let me ask it this way then.
25  Ms. Murphy, in your review of the reports

1  from October of '98 through August of '99, do you see
2  anything there regarding your complaining about my conduct?
3         MS. MAURER:  Mr. Vecchia, Ms. Murphy
4     has not had the reports until today.  They
5     have not been shared with her under the
6     confidentiality agreement you entered into
7     along with at the order of Judge Kravitz,
8     and therefore she hasn't reviewed them in
9     total, and I would ask you to question her on
10    something specifically.
11        MR. VECCHIA:  Could you explain that
12    to me again.
13        You're telling me that Attorney Minor
14    and myself and you had the reports, but
15    Ms. Murphy has never seen these?
16        MS. MAURER:  That is exactly correct.
17        MR. VECCHIA:  Why would that be?
18        MS. MAURER:  Because Judge Kravitz
19    required of us that these were attorney eyes
20    only, and under those grounds, that's what I
21    did with them.
22        You got a redacted copy, Attorney
23    Minor got a redacted copy, the court got a
24    redacted copy and the original and that was
25    who it was provided to.  That was the order

1        of the court.
2              If you have something specific
3        contained in these reports you'd like to
4        question her on, she is here now and can
5        answer those questions.
6              MR. VECCHIA:   Thank you.
7  BY MR. VECCHIA:
8        Q.   Ms. Murphy, now that you know that and that's
9  what Dr. Hamilton is saying in his reports or does not say
10 in his reports, what's your opinion of that?
11       A.   I haven't read this, and I don't know that.
12 So unless I sit here and read the whole thing to read
13 whether your name is, and I don't have an opinion as to what
14 his notes are about in all honestly.
15       Q.   Did it surprise you that he didn't mention it
16 at all?
17             MS. MAURER:   It is inappropriate and
18        I'm going to object that Ms. Murphy is asking
19        to speculate about the doctor's methodology
20        or what he includes or didn't include.
21             If you'd like to speak with him, I'm
22        sure he'd be happy to be deposed at his usual
23        fee.
24       Q.   You think that the doctor was erroneous or
25 wrong in not stating that?