```
 1                    MS. MAURER:    I'm going to object
 2            again.   She has no way to testify about what
 3            the doctor's methodology is.
 4                    Again, you'll have to ask the doctor
 5            himself.
 6  BY MR. VECCHIA:
 7        Q.    Ms. Murphy, do you recall talking to the
 8  doctor about myself and stalking incidents in this time
 9  period?
10        A.    Yes.   From the beginning of 1998 to date, I
11  have talked to him, but I don't know what occasions and how
12  long a length of time, and I don't know how much it
13  required. I don't know.
14        Q.    Okay.   Looking at the March 21st report.   You
15  had been seeing Dr. Hamilton, unless we're missing pages,
16  from August of '99 until March of '01.
17                    Why was that?
18        A.    What?
19                    I'm sorry can you --
20        Q.    Looking through Dr. Hamilton's report --
21        A.    Yeah.
22        Q.    -- you'll see a page for August of 1999 and
23  then the next --
24        A.    Okay.
25        Q.    -- report is dated March 21st of 2001.
```

```
 1                    Do you follow me?

 2         A.    Yes, I do see that.

 3         Q.    Okay.  Did you see Dr. Hamilton at all during

 4    that period of time?

 5         A.    I don't recall the dates of my visits, if

 6    there were any in that time.

 7         Q.    Did you see anybody else?

 8         A.    No.

 9         Q.    Okay.  If you look at Dr. Hamilton's report

10    of March 21st, you'll notice that he puts there -- if you

11    read that paragraph, the last -- "Interestingly it didn't

12    get mentioned again."

13         A.    Okay.

14         Q.    So again, Dr. Hamilton reaffirms that there

15    was no discussion of these stalking or about my conduct and

16    its affect on you.

17                    Do you think that's a reasonable assumption?

18         A.    I don't recall.

19         Q.    I didn't understand the answer.

20         A.    I don't recall when I spoke -- at what

21    appointments I spoke about you or how upset I was at the

22    time about you.  I was basically -- I don't know.  I don't

23    know why he writes what he writes, and if he wrote it, then

24    maybe that's how he felt I would think.

25         Q.    Again, on March 30th, the third line there,
```

```
 1     it starts -- the second sentence reads, "I will check my
 2     notes from before as she did mention the stalking once in
 3     the very beginning -- but never mentioned it again."
 4              A.     Okay.
 5                          MS. MAURER:    Is there a question,
 6                     Mr. Vecchia?
 7                          MR. VECCHIA:    No.
 8                          MS. MAURER:    Then I would ask that
 9                     the last line of that --
10                          MR. VECCHIA:    You can strike it.
11              Q.     Why do you think the doctor would write that?
12                          MS. MAURER:    Mr. Vecchia, I'm going
13                     to direct Ms. Murphy not to speculate.  She
14                     has no way to know what the doctor's
15                     methodology or thought pattern was at this
16                     moment.
17              Q.     Ms. Murphy, it's your testimony that you
18     specifically remember mentioning these incidents to
19     Dr. Hamilton?
20                          MS. MAURER:    That question's been
21                     answered many times.  She has testified that
22                     she spoke to Dr. Hamilton repeatedly about
23                     you stalking her and the impact of your
24                     stalking of her had on her; however, she
25                     doesn't remember the dates and times she
```

```
 1                          spoke with him.

 2          Q.    Ms. Murphy, are you at all surprised that if

 3    you emphasized this so much that Dr. Hamilton, he didn't

 4    write it in his report, in fact, he even said when it's

 5    brought up again he's surprised to hear of it?

 6                          MS. MAURER:    Mr. Vecchia, you're

 7                     asking her to speculate again, and I'm going

 8                     to direct her not to do so.

 9                          MR. VECCHIA:    No, I think I'm asking

10                     someone to use common sense.

11                          MS. MAURER:    Mr. Vecchia, if you'd

12                     like to testify, you're going to get your

13                     chance at court.

14                          MR. VECCHIA:    Okay.

15          Q.    March 21st, '01 is when you first went back

16    to see Dr. Hamilton.

17                     Did Attorney Victoria DeToledo tell you to go

18    see a counselor?

19          A.    No.

20          Q.    Am I correct that you retained Attorney

21    DeToledo in approximately March of 2001?

22          A.    I don't know.

23          Q.    I'm sorry.  I didn't hear your answer.

24          A.    I don't know the exact date.

25          Q.    Okay.  How about month; do you know the exact
```

1    month or approximate month, within two months?

2            A.     I honestly don't, but it's around the time

3    that she wrote the letter to the city.  So it was shortly

4    before that.  So whatever date that was.

5            Q.     Well, that is on March 20th and you saw --

6            A.     Okay.

7            Q.     And you saw Dr. Hamilton on March 21st after

8    not seeing him for a year and a half.

9            A.     Okay.

10           Q.     That's what prompted my question.

11                  During the questioning by Attorney Minor, he

12   asked you about the newspaper articles and how they affected

13   you or what you thought of them.

14                  Did you ever speak to a newspaper reporter?

15           A.     No.

16           Q.     Did you ever give any documents to a

17   newspaper reporter?

18           A.     No.

19           Q.     Some time during that period you filed a case

20   with the Human Rights Commission.

21                  Did you notify the newspaper that you had

22   filed a case with the Human Rights Commission?

23           A.     No.

24           Q.     Did the city notify the newspaper?

25           A.     I have no idea.

```
 1              Q.    Did you ever talk to a reporter from the

 2     Stamford Advocate?

 3                        MS. MAURER:   That question's been

 4                    asked and answered, Mr. Vecchia.

 5              Q.    Had you ever spoken to a reporter from the

 6     Stamford Hour, the Norwalk Hour edition of the Stamford

 7     paper?

 8                        MS. MAURER:   That question has also

 9                    been asked and answered.

10              Q.    Since you're reading this meeting with

11     Attorney Stover and -- pardon me, with Fred (sic) Stover and

12     Fred Manfredonia in April of 1998, could you tell me the

13     number of times that you've seen me?

14                        MS. MAURER:   Mr. Vecchia, did you say

15                    April of 1998?

16                        MR. VECCHIA:   No, September.   This

17                    is when -- after Ms. Murphy met the Human

18                    Resources officials.

19                        MS. MAURER:   And what was your

20                    question again, please?

21                        MR. VECCHIA:   I asked her to tell me

22                    about the number of times that she had seen

23                    me between then and when I was arrested in

24                    November of 2000.

25                        MS. MAURER:   If she knows, I'll let
```

```
 1                        her answer.

 2          A.    ,  I don't know.

 3                        MR. VECCHIA:   I'm sorry?

 4                      · MS. MAURER:   I said if she knows the

 5                    answer, I will allow her to answer.

 6                        MR. VECCHIA:   All right.

 7          A.    Since 1998 until 2001?

 8          Q.    Until 2000.

 9          A.    I have no idea how many times I saw you.

10          Q.    Where would you have seen me?

11          A.    I could have seen you at the Government

12    Center.

13          Q.    Apart from the Government Center.

14          A.    I could have seen you anywhere where you

15    might have to be.

16          Q.    What places specifically?

17          A.    I don't have a specific place where I could

18    have probably seen you.  You pop up at the craziest places,

19    David.

20                        MS. MAURER:   All right.  Why don't we

21                    move along, Mr. Vecchia.        .

22                        MR. VECCHIA:   I'm looking for an

23                    answer to my question.

24                        MS. MAURER:   You've got an answer.

25                    She's given you what she knows.
```

GOLDFARB & AJELLO 203-972-8320

```
1          Q.     Okay.  Did you ever see me at a birthday
2     party for Victor Palicchi (phonetic) who worked in the
3     accounts payable department?
4          A.     I don't recall.
5          Q.     I'll try to refresh your memory.  You sat
6     across the table from me for four hours.
7                 Do you recall that?
8          A.     Was it -- no, I don't.
9                      MS. MAURER:    Would you say that
10                     name?
11                     MR. VECCHIA:   Palicchi.
12         A.     I could have.  Victor is a very good friend
13    of mine.  So I would have been at his party, whether I
14    noticed how many people were there, whether I noticed
15    whether you were there.
16         Q.     As I said, Ms. Murphy, I was sitting right
17    across the table.
18         A.     You may not have been that significant to me
19    at the time.  I'm sorry.
20         Q.     And yet you're filing a lawsuit that I'm
21    harassing you.
22                Did I ever see you at Brennan's during that
23    time?
24                     MS. MAURER:    What period of time,
25                     Mr. Vecchia?
```

GOLDFARB & AJELLO 203-972-8320

```
 1                        MR. VECCHIA:    I'm asking about the

 2               time period from September of 1998 until I

 3               was arrested in November of 2000.

 4         A.    Yes.

 5         Q.    How many times, Ms. Murphy?

 6         A.    I have no idea, David.

 7         Q.    Would you think once?

 8         A.    More than once.

 9         Q.    More than two?

10         A.    More than two.

11         Q.    More than five?

12         A.    David, I honestly don't recall the number of

13    times.

14         Q.    Approximately five?

15         A.    Several times.

16         Q.    More than ten?

17         A.    More than ten, maybe not.

18         Q.    I'm sorry.  I didn't hear you.

19         A.    I don't recall how many times.

20         Q.    Okay.  I'm talking about a period of two

21    years and two months.

22         A.    That's correct.

23         Q.    So you don't know if it's five or it was a

24    hundred; is that what you're saying?

25                        MS. MAURER:    Mr. Vecchia, you have
```

```
 1                      asked this question, and she has answered it
 2                      a number of times.  I'm going to ask you to
 3                      move on.
 4                          MR. VECCHIA:   No, I'd like to get an
 5                      answer.
 6                          MS. MAURER:   You have had the answer
 7                      you're going to get.  She doesn't remember
 8                      how many times more than five.
 9                          MR. VECCHIA:   More than five is the
10                      answer.
11   BY MR. VECCHIA:
12        Q.   Okay.  If you only saw me five times, how
13   could that be the basis of charges that someone was stalking
14   you?
15                          MS. MAURER:   Mr. Vecchia, I'm going
16                      to object.  You are mischaracterizing her
17                      testimony.  Her testimony was more than five
18                      times, and I'm also going to suggest that she
19                      is an inappropriate person to ask for a
20                      legal explanation to her claims.
21                          MR. VECCHIA:   Could you say that
22                      again because I didn't understand that.
23                          MS. MAURER:   I'll ask the court
24                      reporter to read it back.
25             (The requested colloquy was read back.)
```

```
 1                        MR. VECCHIA:    Let me think about
 2              what that means.
 3                        It's inappropriate to ask for a
 4              legal --
 5                        MS. MAURER:    She's not an attorney,
 6              Mr. Vecchia.    Whether or not she had a claim
 7              was not a decision that she made.    It was
 8              made by her attorney.
 9                        MR. VECCHIA:    I understand now.
10              Thank you.
11    BY MR. VECCHIA:
12         Q.    And I saw you at Taranto's, Ms. Murphy; do
13    you recall that?
14                        MS. MAURER:    When, Mr. Vecchia?
15         Q.    During the period of September of 1998 to
16    November of 2000.
17                        I'm sorry?
18         A.    Nobody said anything.
19         Q.    Oh.
20         A.    Yes, I recall seeing you at Taranto's in --
21    yeah, I do.
22         Q.    Okay.    And how many times did you see me at
23    Taranto's, Ms. Murphy?
24         A.    Well, I was only there once.    So once.
25         Q.    You were only there one time?
```

1    A.    Uh-huh.

2         Q.    My lucky day.

3              Okay.  So far we've gone through the

4    Government Center, Palicchi, Brennan's and one time at

5    Taranto's.

6              Is there any other place that I saw you that

7    you saw me?

8         A.    During that time period of September of 1998

9    to November of 2000, I don't recall any place, no.

10        Q.    And since November of 2000 until today, where

11   and approximately how many times have I seen you since then?

12        A.    I don't know how many times you've seen me.

13        Q.    Okay.  Where have you seen me?

14        A.    In court.

15        Q.    I didn't hear.  I'm sorry.

16        A.    In court, at a deposition here in Attorney

17   Maurer's office.

18        Q.    In court you mean where?

19        A.    The Department of Labor, the courthouse in

20   Stamford.  I think that's it.

21              Somewhere in Wethersfield or something.  I

22   don't know.  Those are court type things to me.

23        Q.    . Okay.  And you mentioned the deposition at

24   Attorney Maurer's office.

25        A.    Correct.

```
1              Q.    During the time from November of 2000 until
2    today, have you been contacted by anybody from the state of
3    Connecticut, either the Judicial Bureau, Probation Bureau or
4    any other bureau regarding if you have seen me?
5              A.    No.
6              Q.    No one had ever called you?
7              A.    No.
8              Q.    Did they tell you they were going to contact
9    you?
10                   Did anybody tell you that from either
11   Victims' Rights, Department of Probation?
12             A.    No one told me they were going to -- no one
13   from those two places said that they would ever talk to me
14   about you.
15             Q.    So no one from Victims' Rights then has
16   spoken to you since the case was closed at Superior Court;
17   is that correct?
18             A.    When was the case closed?
19             Q.    When I pled guilty in January of 2002.
20             A.    After your trial?
21             Q.    Yes.
22             A.    The Victims' Rights woman called me once to
23   ask me how I was, like a week later.
24             Q.    And since then, no one's inquired about your
25   welfare?
```

```
1           A.    No.

2           Q.    Is that correct?

3           A.    That's correct.

4           Q.    Thank you.

5                 Ms. Murphy, did I ever apologize to you for

6      my conduct?

7           A.    Yes, you did.  Your initial conduct.  I'm

8      sorry.  Let me clear that one up.

9           Q.    I didn't hear you.  I'm sorry.

10          A.    Your initial -- after you broke into my car,

11     the next day or actually Sunday, you called at like ten

12     o'clock at night and said you were sorry.  Ten-thirty at

13     night.  And you said you returned my briefcase to the fire

14     department.  And you said you were sorry for hurting my

15     family and ruining my life.

16          Q.    And I am.

17                I recall trying once after that to apologize

18     to you also in July or August of 1998 when you went -- as I

19     recall, you were sitting in the back area, and I went over

20     to talk to you, and you just kind of waved me off, that you

21     didn't want to talk.

22                MR. VECCHIA:   Again, I apologize for

23                asking these very personal questions today,

24                but that's the spot I am.  That's it.

25                MR. MINOR:   I have nothing further.
```

GOLDFARB & AJELLO  203-972-8320

1          MS. MAURER:   And I have nothing

2      further.

3          MR. MINOR:   Why don't we conclude the

4      deposition and, you know, I'll ask the court

5      reporter to send me the usual transcript, and

6      I guess that's it.

7          MS. MAURER:   Mr. Minor, I'm going to

8      ask the court reporter to also send you the

9      original of Defendant's L.  I have a copy for

10     myself and that way you'll have a complete

11     set of exhibits.

12         MR. MINOR:   Fine.  Thank you.

13         MS. MAURER:   Thank you very much.

14     Good-bye.

15         MR. MINOR:   Good-bye.

16  (Deposition concluded at 2:25 p.m.)

17

18

19

20

21

22

23

24

25

1
2
3
4              I, BARBARA MURPHY, have read the
5         foregoing pages, and find the answers to the
6         questions therein contained to be true and correct
7         with the exception of changes, if any, as may be
8         noted on the Correction Page.
9
10        _____              _____
          Dated                         Barbara Murphy
11
12             Subscribed and sworn to before me this
13        day of            , 2004.
14
15
16                                       _____
                                         Notary Public
17
    My Commission expires:
18
19
20
21
22
23
24
25

1                          I N D E X

2

3                                    —

4     WITNESS:                                        PAGE

5           BARBARA MURPHY

6

7     CONTINUED DIRECT EXAMINATION BY MR. MINOR        105

8     CROSS-EXAMINATION BY MR. VECCHIA                 164

9

10                       E X H I B I T S

11

12    DEFENDANT'S EXHIBITS FOR IDENTIFICATION:

13

14    L       Medical papers                          107

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF CONNECTICUT   )

2                           )   ss:   Ansonia

3    COUNTY OF NEW HAVEN   )

4

5         I, Donna M. Miani, a Certified Court Reporter and

6    Notary Public within and for the State of Connecticut, do

7    hereby certify that within deposition of BARBARA MURPHY

8    was held before me on the 11th day of June, 2004.

9         I further certify that after said deposition was

10   recorded stenographically by me, it was reduced to type-

11   writing by me and I hereby submit that the within contents

12   of said deposition are true and accurate to the best of my

13   ability.

14         I further certify that I am not a relative of nor

15   an attorney for any of the parties connected with the

16   testimony of the witness.

17         Dated at Ansonia, Connecticut, on the 28th day of

18   June, 2004.

19

20                              _____
                                Donna M. Miani, CSR
21                              Certified Court Reporter

22

23
     My commission expires July 31, 2008.
24

25
```