UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------X

BARBARA E. MURPHY,                    :          3:03 CV 00519 (SRU)
    Plaintiff,                        :
                                   :

          v.                          :

THE CITY OF STAMFORD and              :
DAVID VECCHIA,                        :          March 20, 2006
    Defendants.                       :

---------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION

The Plaintiff, Barbara Murphy. (hereinafter "Murphy"), by and through her

attorneys, Maurer & Associates, PC, moves the Court for Reconsideration of its

decision granting the City of Stamford summary judgment entered on March 10,

2006 pursuant to Federal Rule of Civil Procedure 59(e).

    The Court granted summary judgment on Counts Two and Three of the

Complaint holding that, pursuant to the Second Circuit's ruling in *Amnesty*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------X

BARBARA E. MURPHY,                    :        3:03 CV 00519 (SRU)
    Plaintiff,                        :
                                      :
                                      :
        v.                            :
                                      :
                                      :
                                      :
THE CITY OF STAMFORD and              :
DAVID VECCHIA,                        :        March 19, 2006
    Defendants.                       :
                                      :
---------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION

The Plaintiff, Barbara Murphy. (hereinafter "Murphy"), by and through her

attorneys, Maurer & Associates, PC, moves the Court for Reconsideration of its

decision granting the City of Stamford summary judgment entered on March 10,

2006 pursuant to Federal Rule of Civil Procedure 59(e).

The Court granted summary judgment on Counts Two and Three of the

Complaint holding that, pursuant to the Second Circuit's ruling in *Amnesty*

*America v Town of West Hartford*, 361 F 3d 113 (2d Cir. 2004), to avoid summary judgment on her claim under 42 USC § 1983 , the plaintiff had to show that a policymaker was aware of the violation of Barbara Murphy's right of equal protection by the City of Stamford and consciously chose to permit or ratify that conduct. Further, the Court held that Barbara Murphy's workplace was not objectively hostile because the incidents of workplace harassment were relatively minor and she was actually effected by the out of workplace conduct of David Vecchia. Finally, the Court ruled that without proof of a City policy or custom created by the policymaker there could not be a continuing violation and therefore, the statute of limitations precluded any claim based on conduct prior to March 2000.

The Court also dismissed Counts Four, Five, Six, and Eight based on the plaintiff's inability to show a continuing violation sufficient to toll the Statute of Limitations. Count Thirteen was dismissed by agreement.

This motion is made on the basis that 1) the Court overlooked certain material facts, and 2) the Court overlooked controlling law.

## I.    FACTUAL STATEMENT

The factual basis of this matter is recounted in detail in the Plaintiff's FRCP 56(a)2 Statement of Material Facts in Dispute with Exhibits and Plaintiff's Memorandum of Law in Opposition to the City of Stamford's Motion for Summary Judgment.

## II.    ARGUMENT

### A.    Standard to Grant a Motion for Reconsideration

Shrader v. CSX Transp., 70 F.3d 255(2d Cir 1995) holds:

> The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked -matters, in other words, that might reasonably be expected to alter the conclusion reached by the court. See Schonberger v. Serchuk, 742 F. Supp. 108, 119 (S.D.N.Y. 1990); Adams v. United States, 686 F. Supp. 417, 418 (S.D.N.Y. 1988). CSXT argues that it did present the district court with data that the court had not previously considered. First, CSXT pointed to numerous statements in the FELA's legislative history, which the district court had not discussed in its original ruling, and which CSXT claimed gave support to CSXT's interpretation of the statute. Second, CSXT argued that the district court had originally examined only two of the circuit court decisions on the issue before it. Instead, four circuits -- every one that had considered the applicability of section 10 to circumstances similar to those presented by Shrader's complaint -- had concluded that section 10 [**6] did not

apply. See Bielicke v. Terminal R.R. Ass'n, 30 F.3d 877, 878 (7th Cir. 1994); Lewy v. Southern Pac. Transp. Co., 799 F.2d 1281, 1293 (9th Cir. 1986); Gonzalez v. Southern Pac. Transp. Co., 773 F.2d 637, 644 (5th Cir. 1985) ("Gonzalez II"); Landfried v. Terminal R.R. Ass'n, 721 F.2d 254, 256 (8th Cir. 1983), cert. denied, 466 U.S. 928, 80 L. Ed. 2d 185, 104 S. Ct. 1712 (1984).

Admittedly, a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided. But in light of CSXT's introduction of additional relevant case law and substantial legislative history, we cannot say that the district court's decision to reconsider its earlier ruling was an abuse of discretion. Id. at 257.

**B.    Amnesty America is Factually and Legally Distinguishable from this Matter and therefore Should Not Form the Basis of Summary Judgment in this Case**

*Amnesty America v Town of West Hartford*, 361 F 3d 113 (2d Cir. 2004) revolves around the City of West Hartford's Police Department's response to two peaceful anti-abortion protests at an abortion clinic in April and June of 1989. The plaintiffs, demonstrators  at the protestors sought to hold the Police Chief, Robert McCue, and the City liable based on Chief McCue's presence and personal participation in the alleged use of excess force by the police officers that removed the protestors from the clinic. Id. at 117.  The plaintiffs asserted two theories of liability: 1) that the City had failed to supervise its police force, because the Chief

4

was present, aware of the brutality and failed to intervene, and 2) that the City acted with deliberate indifference in failing to train their officers to arrest passive resisters without the use of excess force after the City had received excess force complaints about the first protest. Id.

The Second Circuit held that 1) there were issues of material fact to be tried as to whether excess force had in fact been used, 2) the plaintiffs had offered sufficient facts to preclude summary judgment on whether the City could be held liable for failing to supervise its police officers; 3) the plaintiffs had failed to proffer sufficient evidence about the deficiencies of the City's training program and how those deficiencies connected to the asserted use of excess force at the second demonstration to get to the jury on that claim. Id. at 118.

The Court reiterated that :

> In *Monell v. Department of Social Services*, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978), the Supreme Court established that "local governing bodies . . . can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690.

Id. at 124.

The Court described several of the methods to establish municipal liability when the single tortuous decision is taken by or attributable to an authorized municipal policy maker, saying:

> Thus, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. **One means of doing so, of course, is to establish that a policymaker ordered or ratified the subordinates' actions.** See _Weber v. Dell_, 804 F.2d 796, 803 (2d Cir. 1986) (holding that liability could be premised on sheriff's ordering of unconstitutional strip searches). Another method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.
>
> ******
>
> Moreover, because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability.

Id. at 126. Emphasis added.

The facts of this case are dramatically different from those in _Amnesty America_ and thus, preclude this decision being applied herein. In that case, the incidents in question occurred on two days over a relatively short period of time. Here, Murphy was harassed over several years at her work place, at City events, at outside activities and at home. In _Amnesty America_, the City was on notice of

the alleged constitutional violations because the Chief of Police was on site when they occurred and was directing the police officers' actions. In this matter, the City was constructively on notice because of the long period of time involved, the high supervisor who was the harasser, the Sexual Harassment Policy that required Murphy's supervisor to report to the HR Department, and the repeated nature of Vecchia's acts. The City also had actual notice of the harassment at least three times by the Assistant Chief of the Fire Department to the HR Department, by Murphy herself to Tom Cassone, General Counsel to the City and to the HR Department, and by Police Detective Carl Strate to the Assistant Director of the HR Department.

Further, *Amnesty America* is legally distinguishable on a number of fronts as described in more detail below. Further, although it is an accurate statement of the law that when a policymaker, in *Amnesty America* the Police Chief, is on site as the commander of a contingent of subordinate police officers and is an active participant in the alleged constitutional violation, the municipality can be held liable, it is not the only way that Murphy can show a municipal policy or custom sufficient to hold the City of Stamford responsible for the harassment she

experienced by David Vecchia, a supervisory employee of the City.

C.    The Court Overlooked Controlling Law that Holds Municipal Custom or Policy May be Shown in Other Ways than Actual Notice to a Policymaker and Actions by that Policymaker demonstrating Deliberate Indifference

In *Patterson v. County of Oneida*, 375 F.3d 206 ,226 (2d Cir 2004), a case

decided after *Amnesty America v Town of West Hartford*, 361 F 3d 113 (2d Cir.

2004), the Second Circuit described how a victim of racial or sexual harassment

could seek to hold a municipality liable under 42 USC §1983 saying;

> the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom, see, e.g., Jett v. Dallas Independent School District, 491 U.S. at 733-36 (§ 1981); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692-94, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978) (§ 1983). To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation. See, e.g., Sorlucco v. New York City Police Department, 971 F.2d 864, 870 (2d Cir. 1992). It is sufficient to show, for example, that a discriminatory practice of municipal officials was so "persistent or widespread" as to constitute "a custom or usage with the force of law," id. at 870-71 (internal quotation marks omitted), or that a discriminatory practice of subordinate employees was "so manifest as to imply the constructive acquiescence of senior policy-making officials," id. at 871; see, e.g., Gierlinger v. New York State Police, 15 F.3d at 34 ("Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations

of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer.").

The Second Circuit in *Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2d Cir. 1994):

> It was the plaintiff's theory that the constitutional right she claimed the defendants violated under 42 U.S.C. § 1983 was her right under the Equal Protection Clause of the Fourteenth Amendment to be free from sexual harassment. See *** ("Sexual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment."); see also Davis v. Passman, 442 U.S. 228, 234-35, 60 L. Ed. 2d 846, 99 S. Ct. 2264 (1979). **Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer.** See Bohen, 799 F.2d at 1189. Id. Accord: Zahra v. Town of Southold, 48 F.3d 674,685 (2d Cir 1995) (that "municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct,")

Murphy has asserted a claim based on failure to investigate or remediate sexual harassment in the form of on-duty and off-duty "stalking" pursuant to the City's own Zero Tolerance Sexual Harassment Policy. As Judge Hall in

9

Richardson v. Metro. Dist. Comm'n, 2003 U.S. Dist. LEXIS 12757  (D Ct 2003)

found:

> The Second Circuit has previously ruled that "a municipal policy
> may be inferred from the informal acts or omissions of supervisory
> municipal officials . . . and that 'municipal inaction such as the
> persistent failure to discipline subordinates who violate [persons']
> civil rights could give rise to an inference of an unlawful municipal
> policy of ratification of unconstitutional conduct,'" Zahra v. Town of
> Southold, 48 F.3d 674, 685 (2d Cir. 1995)  (citing Batista v.
> Rodriguez, 702 F.2d 393, 397). ******

> The facts presented by Richardson show that she complained
> about Johnson's conduct, that his supervisors knew of the
> problem, but that no disciplinary or corrective action was taken.

Similarly, the failure to take prophylactic measures can rise to the level of

deliberate indifference even in the absence of actual knowledge of the

harassment. Mejia v. City of New York, 228 F. Supp. 2d 234 (EDNY 2002)

describes various forms of proof including:

> Second, the need for a policy has been found when the danger of
> a constitutional deprivation is high but the victim has strong
> disincentives against reporting it, for example, when there are
> allegations of sexual harassment or sexual abuse of children. See
> Estes, 926 F. Supp. at 988 (need for policy on sexual abuse of
> children by school officials because children are more vulnerable
> than adults and less likely to report abuse); Reynolds, 799 F.
> Supp. at 447 (need for sexual harassment policy because "these
> incidents by their very nature are far less likely to be reported than
> other types of constitutional violations"). In these situations, the

presence or extent of serious problems within a particular organization are often hidden by the strong disincentives to report, but the existence of such problems is generally known to the public. Accordingly, these courts held that the failure of an organization to take prophylactic measures can rise to the level of deliberate indifference, even in the absence of actual knowledge of abuse or harassment. See Estes, 926 F. Supp. at 988; Reynolds, 799 F. Supp. at 447. Id. at 245

In this case, Murphy alleges that "[t]he City's ongoing failure to remedy the harassment of Murphy by [Defendant David] Vecchia for an extended and continuous period of time, constitutes an ongoing policy and practice". Complaint, ¶80. The Complaint alleges that such 'ongoing failure' by the City manifested itself because the City, among other things:

(i) "failed to take reasonable steps to remedy the ongoing sexual harassment of Murphy by Vecchia [which the complaint alleges began in 1997] until long after Vecchia was arrested [in 2000], spent a year on paid leave, and eventually pled guilty [in 2002]", Complaint ¶74;

(ii) "failed to properly follow through and enforce the agreement that it reached with Vecchia [in 1998] that required Vecchia to stay away from Murphy", Complaint ¶75;

(iii)"failed to obtain a written agreement from Vecchia that he would cease harassing Murphy, as they promised they would", Complaint ¶76;

(iv) "failed to complete its investigation of Vecchia's harassment of Murphy in a timely manner, but instead neglected their responsibility and 'deferred' their investigation until there was an outcome in Vecchia's criminal case", Complaint ¶79;

(v) "was aware of and acquiesced in, the deprivation of equal protection of Murphy through: repeated acts of sexual harassment, failing to enforce and abide by the City's policies and procedures, failing to investigate and/or remedy sexual harassment", Complaint ¶96;

(vi) "failed to properly train, supervise, control, and discipline Vecchia, Murphy's supervisors, and the Human Resources Department", Complaint, ¶97;

(vii) "failed to make an adequate or effective investigation of Murphy's complaints of sexual harassment", Complaint ¶98;

(viii) "failed to adequately remediate Murphy's complaints of sexual harassment", Complaint ¶99;

(ix) "was aware that Vecchia had sexually harassed Murphy in 1998", Complaint, ¶ 104;

(x) "acted in an inadequate manner in its efforts to prohibit sexual harassment that it is well aware of within its workforce", Complaint ¶¶105, 112, 121;

(xi) "was informed of and notified of prior sexual harassment against Murphy, but neglected to adequately investigate or deter such conduct", Complaint ¶¶106, 113;

(xii) "breached its duty to the employees of the City, including Murphy, "to enact and enforce appropriate policies and

guidelines to prohibit sexual harassment in the workplace",
Complaint, ¶¶107, 108, 114, 115, 123, 124;

(xiii)  "was well aware that Vecchia had committed prior acts
similar for those which he was criminally charged" and that
"Vecchia had harassed Murphy for an extended period of
time", Complaint ¶118, 119;

(xiv)  "was informed of prior sexual harassment against Murphy,
but neglected to adequately investigate, remedy, and deter
such conduct", Complaint ¶122.

Plaintiff has offered the following testimony and evidence regarding how

persistent and widespread the practice or custom of the City's subordinate

employees was in failing to investigate or remediate Vecchia's conduct so that it is

appropriate to find the constructive acquiescence of senior policy making officials.

- Vecchia sent candy to Murphy through the interoffice mail so that
  co-workers who would see candy delivered to her would tease her.
  Id. at 24, lines 6-10. See Vecchia Deposition, p. 9, lines 14-20.

- Murphy said to her supervisors and co-workers that she did not want
  anything from Vecchia and would tell him to stop sending the candy.
  The response was, "don't tell him to stop, we will eat the candies".
  Assistant Chief Peter Brown Deposition ("Brown Dep") P. 6, lines 5-
  10. Prior to March 1998, Murphy had told Chief Brown that Vecchia
  was bringing her candy at work. Brown Dep., p. 7, lines 12-14.

- Vecchia then began to show up to the office to see Murphy. There
  was no need for Vecchia to come to the firehouse. Brown Dep. p 6,
  lines 13-15. However, if Vecchia were coming to see Brown on a
  purchasing matter, there would be no reason to turn him away.

Murphy asked Chief Brown if it would be okay to tell Vecchia that the Fire Department was not allowed visitors. Brown Dep. P. 6, lines 21 through p. 7, line 4.

- Vecchia then began sending articles and items through the interoffice mail he thought Murphy would be interested in. Murphy would throw the items away hoping that he would stop. Murphy Aff. Para. 11.

- Murphy told Chiefs Brown, Granier, Lehn and Harold Jackson about Vecchia's behavior . Murphy Aff. Para. 12. Murphy told Chief Brown about Vecchia following her at Brennan's. Brown Dep. p. 9, lines 9-12.

- Murphy told Brown she would get hang up calls at the firehouse that she thought were Vecchia. Brown Dep P. 19, lines 6-9.

- Before the break in to Murphy's car, Murphy told Brown:
  - about balloons being left on her car at work and at home. Brown Dep P. 19, line 23 through p. 20, line 2.
  - about walking out of Brennan's, going home, getting a hang up call, calling back to Brennan's and being told Vecchia was at the phone at Brennan's. Brown Dep p. 2, lines 2-8.

- Murphy told Chief Brown about Vecchia seeing her at the Government Center and following/staring at her again Brown Dep P. 28, lines 15 through p. 26, line 4.
  - about the bullet on her porch. Brown Dep P. 29, lines 13-16.
  - she wouldn't go to the Government Center as long as Vecchia was there; Brown Dep P. 10, lines 8-9.

- Murphy would come into Brown's office and cry; she would have to get away from her desk. Brown Dep P. 30; lines 11-22.

- Fire Chief Granier and Chief Malone were aware of this situation. Brown Dep p. 32, lines 9-17.

- In March 1998 Vecchia went to Murphy's home, broke into her car, and took a briefcase and other items. Id. at 66 (Testimony of David Vecchia), lines 14-16.    Within days Chief Brown knew about Vecchia's break in of Murphy's car. Brown Dep. P. 7, lines 21-25.

- Chief Brown called Human Resources to tell them there was a potential problem. Brown Dep. P. 7, lines 24-p. 8, lines 1-5. The situation with Vecchia was becoming serious. Murphy had come in very upset, looking scared, she was breaking down, crying. Brown had no experience dealing with this; he called Human Resources for some direction in dealing with this situation that was affecting the operations within the department. Brown Dep.P. 8, lines 12-24. Chief Brown wasn't used to dealing with people experiencing an emotional breakdown in the office. Id., P. 15, lines 10-13.

- Soon after the car break in, Brown spoke once to the Assistant Director of the Human Resources Department William Stover ("Stover") and once to an investigator in Human Resources Fred Manfredonia ("Manfredonia"). Id., P. 8, lines 7-9. Stover had Manfredonia get in touch with Brown. Id., P. 13, lines 18-22. Chief Brown told Stover that Vecchia's conduct was affecting the department, i.e., Barbara in her job. Id. P. 9, lines 18-25. Brown told Stover that they needed to limit Vecchia's contact with Barbara to zero, including phone calls. Id., P. 19, lines 2-5.

- Manfredonia said to Brown that he was going to look into it and handle it. Brown told Manfredonia that Vecchia needed to be told that he can't come near the firehouse or call there. Manfredonia said they'd take care of it. Id. P. 14, lines 7-20. Brown reiterated

to Manfredonia that we have to make sure there's some kind of barrier between Murphy and Vecchia. <u>Id.</u>, P. 15, lines 19-25.

- The next time Brown heard anything from Human Resources about Vecchia was in September 1998. <u>Id.</u>, P. 16, lines 3-6. Chief Brown never received anything back in writing or a phone call from Manfredonia, that Manfredonia had spoken to Vecchia and told him don't go near the firehouse. <u>Id.</u> p. 17, lines 1-12

- In September of 1998, Murphy filed a complaint with Stover's office regarding Vecchia. <u>Id.</u> at 140 (Testimony of William Stover), lines 22-25. Murphy explained to Stover and Manfredonia what happened, dating all the way back to the beginning, <u>id.</u> at 40 (Opening Statement of the City), lines 14-16, and described how Vecchia had stalked, harassed and followed her, went to bars and city events where she frequented and broke into her car at her home. <u>Id.</u> at 142 (Testimony of William Stover), lines 20-25 and at 143, lines 1-7. Murphy told Stover and Manfredonia she needed help, that she's a nervous wreck and that Vecchia was making her sick. <u>Id.</u> at 40 (Opening Statement of the City), lines 18-20. She asked them to please make this behavior by Vecchia stop. <u>Id.</u> at 41, line 1.

- Manfredonia and Stover reported to Murphy that Vecchia was in love with her and had admitted to the car break in, the late night phone calls, sending her things at the office, going to the fire house to see her, leaving things on her car, following her, shouting at her in the bar, trying to buy her drinks and food, trying to stop her from leaving places, running at places she had been, taking her personal things as well as other incidents she had reported to them. Murphy Aff. Para. 28.

- Stover and Manfredonia stated that they would get an agreement that Vecchia would sign. William Stover Deposition P 28, lines 19-20. Stover agreed to get authorization for access to Vecchia's

16

doctor's reports and evaluations. Stover Dep. P. 29, lines 1-8.
The City never got a written waiver from Vecchia. Stover Dep. P.
32, lines 9-13.

- The City never followed up with Vecchia's progress in therapy.
  See Vecchia Response to Request for Admissions, ¶55, ¶57.
  Stover made no effort to verify Vecchia's counseling. Stover
  Dep.P. 32, line 25 through p. 33, lines 1-2. Manfredonia and
  Stover did not tell Vecchia that counseling was mandatory to
  keep his job with the City. Vecchia Termination Proceeding at
  101, lines 1-2.

- Manfredonia and Stover told Vecchia that they would get back to
  Vecchia with a written agreement for him. Id. at 101 lines 7-8.
  The City never drafted any agreement. Vecchia Response to
  Request for Admissions, ¶53. The City placed no restrictions on
  Vecchia's dealings with Murphy outside of work. The City only
  told Vecchia that he should limit his dealings with Murphy in the
  workplace. Id.102 lines 3-9.

- Stover told Vecchia that as far as he was concerned, the City
  was not involved in Murphy's complaint and that her complaint
  ended in March of 1998. Id. at 105 lines 2-8. The City did not tell
  Vecchia that any future inappropriate contact with Murphy would
  result in Vecchia's dismissal. Id. at 106 lines 5-8.

- After September of 1998, Vecchia continued to go to Brennan's
  and   saw Murphy there "plenty of times". Vecchia Dep p. 83,
  lines 1-15, and p. 96, lines 14-17.

- Murphy does not know if the stalking stopped  because she
  changed her entire lifestyle to protect herself from Vecchia.  She
  lived each day  in constant fear of seeing Vecchia. Id. Para 36.
  Murphy  never heard from the City again until she went to the Police.
  Id. Para. 37.

- In October 2000, Vecchia, upon seeing Murphy on the 10th floor of the Government Center, stood and stared at her. Murphy left quickly. Id. at 44, line 25, and at 45, lines 1-5. A week later, Murphy, while on the 4th floor of the Government Center, saw Vecchia in a conference room. She walked to the elevator. Vecchia immediately walked out of the conference room and followed her. He walked past her several times while staring at her. She was afraid that Vecchia was going to get into the elevator with her, but he did not. She left. Id. at 45, lines 6-16.

- On October 12, 2000, Officer Strate requested copies of all investigative files regarding the City's investigation of Murphy's complaints against Vecchia, which William Stover and Manfredonia agreed to provide. No such file was ever produced. Arrest Warrant Application page 1, paragraph 4. Manfredonia stated that they did not have any such file, that they did not consider the complaint official and that they weren't sure if they even took notes on the issue. Murphy Aff. Para. 32.

- Vecchia was arrested November 29, 2000 and placed on paid administrative leave. The City did not make any decision regarding disciplining Vecchia until he actually pled guilty to criminal trespass and disorderly conduct in 2002. Id. at 148 lines 18-20.

- In March 2001, the City discussed with Murphy permitting Vecchia to return to work with the City. Id. at 162 (Testimony of Fred Manfredonia), lines 4-6.

- In February 2002, the City terminated Vecchia because Vecchia while at Toronto's restaurant, stared at Murphy, making her feel very uncomfortable to the point where she had to leave. Id at 175 lines 14-18. Vecchia's discharge was related to the City's sexual harassment policy as Vecchia had engaged in inappropriate

conduct toward an employee. Id. at 150 (Testimony of William
Stover), lines 9-15.

In determining whether the City has been deliberately indifferent to the

plight of Barbara Murphy it is important to consider the City's own Sexual

Harassment Policy dated August 18,1998 and attached as Exhibit 13 to Plaintiff's

FRCP 56(a) 2 Statement of Material Facts in Dispute. It says the following:

- Prohibited conduct Includes making sexual or romantic
  advances toward an employee and persisting, despite the
  employee's rejection of the advances. Id. at pg1.

- Employees are prohibited from harassing other employees
  whether or not the incidents of harassment occur on City
  premises and whether or not the incidents occur during working
  hours. Id. at pg.2.

- Employees are to report to their supervisors or Management within
  the City's HR department. Id.

- Supervisors must deal expeditiously with or without written
  complaint. Id.

- Supervisors must report to HR. Id.

- Supervisors must act promptly to  investigate

- Supervisors must take corrective action to prevent reoccurrence.

- The HR Department  must investigate, report to police and produce
  written report Id. at pg3.

- HR must conduct a thorough Investigation and issue a report. Id. at pg 4.

- HR must Monitor Compliance- Supervisor MUST ensure that the harassment does not reoccur

As described above, the City's policy was violated in numerous ways including; Vecchia not refraining from harassing Murphy; Chiefs Granier and Brown not reporting Vecchia's actions; William Stover and Fred Manfredonia failing to investigate in March 1998, failing to investigate in September 1998, failing to create a written report in September 1998, failing to monitor Vecchia, failing to investigate from October 2000 through February 2002, and failing to discipline Vecchia in any way from March 1998 through February 2002.

Therefore, the Court erred in determining that Murphy was limited to showing a municipal policy or custom by showing actual notice to a municipal policymaker and conscious participation in or ratification of the behavior of the subordinate employees. Murphy has shown sufficient evidence of constructive and actual notice to the City combined with a long standing failure to investigate or remediate the harassment by Vecchia to establish a municipal policy or custom.

20

D.    The Court Overlooked Controlling Law that Holds Sexual
Harassment must be Evaluated by Considering  the Totality of the
Circumstances

The Court determined that Barbara Murphy's workplace was not hostile

because most of Vecchia's actions were taken outside of the work environment.

This decision ignores the clear requirement that the Court consider the totality of

the circumstances.

1.    Summary Judgment Is Appropriate Only Where Application Of
The Law To the Undisputed Facts Will Reasonably Support Only
One Ultimate Conclusion.

In describing the standard to be applied in determining whether a work

environment is hostile for purposes of summary judgment,  the Second Circuit in

Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426 ,437 (2d.

Cir 1999)  holds that such determinations should generally be reserved for the

jury, saying:

> "The existence of racial harassment in a hostile work environment
> involves an application of facts (the specific discriminatory conditions
> alleged by the plaintiff) to law (the standards governing the existence of

21

racial harassment and hostile work environment discrimination)." The question may thus be characterized as a "mixed question of law and fact" because it involves "the application of a legal standard to a particular set of facts". Such mixed questions are "especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." Although such questions may be ripe for summary adjudication where the underlying facts are undisputed, that the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion.

Id.(internal citations omitted.)

Further, the Court goes on to warn against setting the bar too high in

determining what is "severe or pervasive" behavior, saying:

"the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." Rather, we noted that the "'appalling conduct' alleged in prior cases should not be taken to 'mark the boundary of what is actionable.'" We summarized that "whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment."

Id. at 439. Internal Citations omitted.

The Second Circuit regularly considers conduct that occurs outside of the work environment and regular working hours in evaluating hostile environment claims. For example in *Petrosino v. Bell Atl.*, 385 F.3d 210, 215 (2d cir 2004) the Court overturned the grant of summary judgment to the employer where the plaintiff had been grabbed, kissed and groped at a Christmas Party by a co-worker. Similarly, the Second Circuit held Delta responsible for creating a hostile work environment when a male flight attendant drugged and raped a female attendant on a layover in a Rome hotel. *Ferris v Delta*, 277 F3d 128 (2 D Cir.2001).

Conduct outside of the work environment has regularly been considered when the employment relationship has given access to the victim or a position of power over the victim. *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 748, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)* (the supervisor had invited her to the hotel lounge, made remarks about her breasts, and, when she gave no encouragement to him, told her to "loosen up" and warned her, "I could make your life very hard or very easy at Burlington."); *Meritor Sav. Bank v. Vinson, 477 U.S. 57, 60, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)* (supervisor had invited her out to dinner and, at the dinner, suggested that they go to a motel and have sexual relations and that

23

her supervisor had made repeated demands upon her for sexual favors, both during and after business hours); Tomka v. Seiler Corp., 66 F.3d 1295, 1301-02 (2d Cir. 1995) (at "business dinner" with two supervisors and a co-worker the three men raped her in the back seat of a rental car).

In considering the complete interaction between Barbara Murphy and David Vecchia it can be seen that Murphy stalked at work, at home and whenever she left either environment. Her work environment was altered for the worse simply by the fear that the next time she picked up the telephone Vecchia would be there; the next time she opened the mail something from him would be there; the next time she left the firehouse her car would be damaged, broken into or used as delivery spot for balloons or flowers or puppets; the next time she went to a City event he would be there; and the next time he would harm her.

## CONCLUSION

For all of the reasons stated above and in Plaintiff's Memorandum of Law, and FRCP 56 (a)2 Statement, Barbara Murphy respectfully requests that this Court reconsider it decision of March 8, 2006 and deny the City's motion for

24

summary judgment in every regard.

PLAINTIFF,
BARBARA E. MURPHY

BY: _____

Elisabeth Seieroe Maurer (ct11445)
Maurer & Associates, PC
871 Ethan Allen Hwy., Suite 202
Ridgefield, CT 06877
Phone (203) 438-1388
Fax (203) 431-0357
E-mail emaurer@maurerandassociates.com